AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036
Telephone:  (212) 872-1000
David H. Botter

AKIN GUMP STRAUSS HAUER & FELD LLP
1700 Pacific Avenue, Suite 4100
Dallas, Texas 75201
Telephone:  (214) 969-2800
Sarah Link Schultz (*pro hac vice* admission pending)
Travis A. McRoberts (*pro hac vice* admission pending)

*Proposed Counsel to Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>INTERNATIONAL SHIPHOLDING CORPORATION, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 16-_____ (  )<br><br>Joint Administration Requested |

**DECLARATION OF ERIK L. JOHNSEN, PRESIDENT**
**AND CHIEF EXECUTIVE OFFICER, PURSUANT TO LOCAL**
**BANKRUPTCY RULE 1007-2 AND IN SUPPORT OF FIRST DAY FILINGS**

I, Erik L. Johnsen, declare as follows under penalty of perjury:

1.      I am President and Chief Executive Officer of International Shipholding

Corporation ("ISH" and, together with its debtor[1] and non-debtor subsidiaries and affiliates,[2]

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: International Shipholding Corporation (9662); Enterprise Ship Co. (9059); Sulphur Carriers, Inc. (8965); Central Gulf Lines, Inc. (8979); Coastal Carriers, Inc. (6278); Waterman Steamship Corporation (0640); N.W. Johnsen & Co., Inc. (8006); LMS Shipmanagement, Inc. (0660); U.S. United Ocean Services, LLC (1160); Mary Ann Hudson, LLC (8478); Sheila McDevitt, LLC (8380); Tower LLC (6755); Frascati Shops, Inc. (7875); Gulf South Shipping PTE LTD (8628); LCI Shipholdings, Inc. (8094); Dry Bulk Australia LTD (5383); Dry Bulk Americas LTD (6494); and Marco Shipping Company PTE LTD (4570).  The service address for each of the above Debtors is 601 Poydras Street, Pan American Building, Suite 1850, New Orleans, Louisiana 70130.

"International Shipholding"), a corporation organized under the laws of Delaware and one of the above-captioned debtors and debtors in possession (collectively, the "Debtors").[3]  I am a 1979 graduate of Trinity University.  I joined International Shipholding in 1979 and have served in various operations and management positions since that time.  In 1994, I was appointed to the ISH board of directors and President of Sulphur Carriers, Inc.  Thereafter, in 1996, I assumed the position of President of Debtor LMS Shipmanagement, Inc., and the following year I was appointed President of Debtors Central Gulf Lines, Inc. and LCI Shipholdings, Inc.  In addition, in 1997 I was named Executive Vice President of Waterman Steamship Corporation.  I was elevated to president of ISH in 2007, a position I have served in since that time. I became Chief Executive Officer of ISH in 2016.  Accordingly, I am familiar with International Shipholding's day-to-day operations, business, and financial affairs.

2.      I submit this Declaration to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of these chapter 11 cases and in support of the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and the pleadings filed by the Debtors on the date hereof (the "Petition Date").  I have reviewed the factual support set forth in each of the Debtors' "First Day" pleadings[4] and attest to the accuracy thereof.  Except as otherwise indicated, all facts set forth herein are based on my personal knowledge, my discussions with other members of the

---

[2] The non-Debtor subsidiaries of ISH, along with the last four digits of each non-Debtor subsidiary's federal tax identification number, are:  C.G. Railway Inc. (1108); Cape Holding LTD (6062); Dry Bulk Cape Holding, Inc. (0798); East Gulf Shipholding, Inc. (9387); MPV Netherlands C.V. (3066); MPV Netherlands Cooperatief U.A. (7325); MPV Netherlands B.V. (5493); Bulk Shipholding Inc. (1419); and Terminales Transgolfo S.A. de C.V. (none).

[3] A chart detailing the corporate structure of the Debtors and their non-Debtor affiliates is annexed hereto as Exhibit A.

[4] "First Day" pleadings means the pleadings filed by the Debtors on the Petition Date or referred to in Sections V and VI herein.

Debtors' senior management, my review of relevant documents, or my opinion based upon experience, knowledge, and information concerning the Debtors' operations and financial affairs. If called upon to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtors.

3.       Sections I through IV of this Declaration provide an overview of the Debtors' business, organizational structure, capital structure, events giving rise to these chapter 11 cases, and information regarding these chapter 11 cases. Section V summarizes the relief requested with respect to, and the support for, the Debtors' motion for entry of an order approving their continued use of their existing cash management system and the interim and final orders authorizing the Debtors to incur debtor in possession financing and use cash collateral. Section VI summarizes the relief requested in certain of the other First Day pleadings.

## I.   OVERVIEW OF DEBTORS' BUSINESS

**A.       General Overview**

4.       ISH was founded in 1947 when the Johnsen family purchased a Liberty Ship after the establishment of the War Ship Act of 1946 and became a public company in 1979. ISH and its Debtor and non-Debtor affiliates are engaged in waterborne cargo transportation and maintain a diversified customer base with emphasis on medium and long term contracts. As of the Petition Date, International Shipholding maintains offices in Mobile, Alabama, New Orleans, Louisiana, New York, New York, and Tampa, Florida, as well as a network of agencies in major cities worldwide.[5] Through its Debtor and non-Debtor subsidiaries, International Shipholding

---

[5] The Debtors are in the process of evaluating their office space requirements with the objective to consolidate operations.

operates a diversified fleet of twenty-one (21)[6] U.S. and foreign flag vessels that provide domestic and international maritime transportation services to commercial and governmental customers primarily under medium to long-term contracts.

5.      International Shipholding's business strategy consists of identifying niche market opportunities, utilizing its extensive experience to meet those needs, and continuing to maintain a diverse portfolio of medium to long-term contracts, as well as seeking to maintain long-standing customer base by providing quality transportation services. As of March 31, 2016, nineteen (19) of the Debtors' vessels were committed under various contracts extending beyond 2016 and expiring at various dates through 2021. Certain of these agreements also contain options to extend the contracts beyond their minimum terms.

6.      Importantly, ISH is one of the few U.S. publicly listed shipping companies. The company, through two (2) of its Debtor subsidiaries, is qualified for, and participates, in the U. S. Government's Maritime Security Program (the "MSP"). MSP is a fleet of sixty (60) active, commercially viable, militarily useful, and privately owned vessels contracted to meet national defense and other security requirements. The company has eight (8) vessels in total in the MSP, and all of them are required to participate in the Department of Defense's (DOD) Voluntary Intermodal Sealift Agreement (VISA).[7] VISA provides the DOD with assured access to sealift capacity in support of the ongoing deployment and sustainment of U. S. Military forces around the world.

---

[6] This number is inclusive of owned, leased, and chartered in vessels. ISH also owns another vessel that is currently laid up.

[7] Of these eight (8) vessels, two (2) are owned, two (2) are leased, and four (4) are chartered in.

7.      Prior to the adoption of the Strategic Plan (as defined below), International Shipholding operated six (6) separate business segments:  Jones Act, Pure Car Truck Carriers or "PCTC", Dry Bulk Carriers, Rail-Ferry, Specialty Contracts,[8] and Other.[9]   The business segments are distinguished primarily by the market in which the relevant assets are deployed, the physical characteristics of those assets, and the type of services provided to customers.  Each segment is managed separately, as each requires different resources depending on the nature of the contract or terms under which the vessels within the segment operate.

**B.      The Strategic Plan**

8.      Since 2014, International Shipholding has encountered certain challenges related to complying with its debt covenants and overall liquidity restraints.  In an attempt to strengthen International Shipholding's financial position, on October 21, 2015, the Board of Directors of ISH approved a plan (the "Strategic Plan") to restructure International Shipholding by focusing on its three (3) core segments—the Jones Act,[10] PCTC,[11] and Rail-Ferry[12] segments—with the

---

[8] The Specialty Contracts segment is comprised of vessels owned or chartered and operating under unique contracts. This segment includes three (3) mini-bulkers, one (1) multi-purpose vessels, two (2) tankers, and four (4) vessels chartered in under MSP contracts.

[9] The Other segment consists of several International Shipholding subsidiaries that provide ship and cargo charter brokerage, ship management services, and agency services to the operating subsidiaries as well as third party customers.  Also included in the Other segment are corporate related items, results of insignificant operations, and income and expense items not allocated to the other segments.

[10] The Merchant Marine Act of 1920 (better known as the Jones Act) requires that all goods transported by water between U.S. ports must, subject to certain limited exceptions, be carried aboard U.S. flag vessels that are constructed in the U.S., owned predominantly by U.S. citizens, and crewed by U.S. citizens.  Under its Jones Act segment, International Shipholding currently deploys two (2) bulk carriers, one (1) integrated tug-barge unit, one (1) articulated tug-barge unit, and one (1) vessel that transports molten sulphur.  Vessels deployed under the Jones Act segment serve primarily in the Gulf of Mexico and operate as the primary marine transporter of coal, sulphur, and phosphate rock.  Petroleum coke and fertilizer are the other principal cargoes carried by the Jones Act vessels.

[11] The PCTC business segment currently includes five (5) vessels, four (4) of which are U.S. flag vessels and one (1) of which is an international flag vessel.  The PCTC vessels transport all types of vehicles from fully assembled passenger cars to construction machinery and equipment in large number on multiple internal decks.

objective to reduce debt to more manageable levels and to increase liquidity. Since that date, International Shipholding has modified the Strategic Plan in response to new developments, including efforts to sell assets and ongoing discussions with its lenders, lessors, directors, and others.

9.      Pursuant to the Strategic Plan, as amended, International Shipholding classified the following assets as held for sale on December 31, 2015: (i) the assets in the Dry Bulk Carriers segment; (ii) an inactive tug included in the Jones Act segment; (iii) minority interests in mini-bulkers in the Dry Bulk Carriers segment; (iv) minority interests in chemical and asphalt tankers in the Specialty Contracts segment; (v) International Shipholding's New Orleans office building; and (vi) a small, non-strategic portion of operations that owns and operates a certified rail-car repair facility near the port of Mobile, Alabama.

10.     By the end of the first quarter of 2016, International Shipholding had sold or exchanged all of the assets formerly included in the Dry Bulk Carriers segment. Although the implementation of the Strategic Plan reduced the number of vessels and operating segments, International Shipholding's business strategy and historical practices have not significantly changed. International Shipholding's immediate goal is to increase liquidity and decrease debt, but the long-term strategy is to continue to focus on the acquisition and divestiture of vessels in an effort to maintain a diverse fleet of attractive vessels that operate in niche markets.

---

[12] The Rail-Ferry segment currently uses two (2) double-deck roll-on/roll-off rail ferries, which carry rail cars between the U.S. Gulf Coast and Mexico in regularly scheduled waterborne service. The service provides departures every four (4) days from Mexico and the U.S. Gulf Coast, respectively, for a three (3) day transit between ports. Since 2007, International Shipholding has conducted these operations out of its terminal in Mobile, Alabama and a terminal in Coatzacoalcos, Mexico. Trade for this segment is primarily driven by commodities such as forest products, sugar, metals, minerals, plastics and chemicals. In August 2012, ISH acquired two (2) related businesses that own and operate a certified rail-car repair facility near the port of Mobile, Alabama.

11.     More specifically, during the first quarter of 2016, International Shipholding completed the following sales:

(i)     The sale of two (2) handysize vessels for cash proceeds of approximately $20.7 million, which were used to partially pay down the related debt of $25.1 million.  Prior to sale, these vessels were included in the Dry Bulk Carriers segment and had previously been written down to fair value less costs to sell.

(ii)    The sale of one (1) capesize bulk carrier for cash proceeds of approximately $10.1 million, which was used to pay off the related debt of $8.6 million.  The remaining sales proceeds of $1.5 million were used to pay down the outstanding principal balance on the handysize vessels discussed above.  Prior to sale, this vessel was also included in the Dry Bulk Carriers segment and had previously been written down to fair value less costs to sell.

(iii)   An exchange for International Shipholding's 25% and 23.68% shareholding interests in Oslo Bulk AS and Oslo Bulk Holding Pte Ltd, respectively, which together deployed fifteen (15) mini-bulkers in the spot market or on short- to medium-term time charters, for a 2008 mini-bulker. Prior to the exchange, these interests were included in the Dry Bulk Carriers segment.  Immediately following the exchange, International Shipholding sold the 2008 mini-bulker, and on April 1, 2016, commenced providing technical services for this vessel on behalf of its owner.

(iv)    The sale of International Shipholding's 30% interests in Saltholmen Shipping Ltd and Brattholmen Shipping Ltd, which were organized to purchase and operate two newbuilding chemical tankers and two asphalt tankers, for $5.7 million and $1.5 million, respectively.

12.     As of March 31, 2016, International Shipholding continued to classify as held for sale the following assets: (i) an inactive tug included in the Jones Act segment; and (ii) the New Orleans Office Building; and (iii) a small, non-strategic portion of International Shipholding's operations that owns and operates a certified rail-car repair facility near the port of Mobile, Alabama.  While International Shipholding continues to actively market these assets, it has ceased depreciating them.  In April 2016, International Shipholding sold its New Orleans office building in exchange for relief from amounts owed to the construction company.

13.    As of March 31, 2016, International Shipholding reported total assets of approximately $305,087,000 on its unaudited consolidated balance sheets, of which approximately $59,399,000 were current assets.  The remaining $245,688,000 in reported assets related to (i) vessels, property, and other equipment, net of accumulated depreciation, (ii) deferred charges, net of accumulated amortization, (iii) amounts due from related parties,[13] (iv) notes receivable, (v) investment in unconsolidated entities, and (vi) other long-term assets. International Shipholding reported consolidated net loss of approximately $8,454,000 for the three months ending March 31, 2016 and a consolidated net loss of approximately $179,693,000 for the year ended December 31, 2015.[14]

## II.    THE DEBTORS' ORGANIZATION

14.    As indicated on the corporate structure chart attached hereto as Exhibit A, ISH, which was formed as a Delaware corporation in 1978 and became a public company in 1979, is the ultimate corporate parent of the International Shipholding family of companies.  International Shipholding's fleet is operated by ISH's principal Debtor and non-Debtor subsidiaries, including Central Gulf Lines, Inc., Waterman Steamship Corporation, Enterprise Ship Company, Inc., U.S. United Ocean Services, LLC, CG Railway, Inc., LCI Shipholdings, Inc., Sulphur Carriers, Inc., and East Gulf Shipholding, Inc.  Certain other of ISH's Debtor-subsidiaries, including LMS Shipmanagement, Inc. and N. W. Johnsen & Co., Inc., provide ship management, ship charter brokerage, agency and other specialized services.  As set forth above, C.G. Railway Inc., Cape Holding LTD, Dry Bulk Cape Holding, Inc., East Gulf Shipholding, Inc., MPV Netherlands

---

[13] International Shipholding books these intercompany amounts as assets regardless of their positive or negative value.

[14]    A substantial portion of the consolidated net losses reported are a direct result of the disposition of assets sold under the Strategic Plan and reflect, among other things, impairment losses and losses on the dispositions.

C.V., MPV Netherlands Cooperatief U.A., MPV Netherlands B.V., Bulk Shipholding Inc., and

Terminales Transgolfo S.A. de C.V. are not debtors in these chapter 11 cases.

15.    To minimize confusion, the chart below sets forth the International Shipholding

entities that are (i) Debtors in these chapter 11 cases, or (ii) non-Debtor subsidiaries:

| Debtors in these Chapter 11 Cases | Non-Debtor Subsidiaries |
|---|---|
| Central Gulf Lines, Inc. | C.G. Railway Inc. |
| Coastal Carriers, Inc. | Cape Holding LTD |
| Dry Bulk Americas LTD | Dry Bulk Cape Holding, Inc. |
| Dry Bulk Australia LTD | East Gulf Shipholding, Inc. |
| Enterprise Ship Co. | MPV Netherlands C.V. |
| Frascati Shops, Inc. | MPV Netherlands Cooperatief U.A. |
| Gulf South Shipping PTE LTD | MPV Netherlands B.V. |
| International Shipholding Corporation | Bulk Shipholding Inc. |
| LCI Shipholdings, Inc. | Terminales Transgolfo S.A. de C.V. (none) |
| LMS Shipmanagement, Inc. | |
| Marco Shipping Company (PTE) LTD | |
| Mary Ann Hudson, LLC | |
| N.W. Johnsen & Co., Inc. | |
| Sheila McDevitt, LLC | |
| Sulphur Carriers, Inc. | |
| Tower LLC | |
| U.S. United Ocean Services, LLC | |
| Waterman Steamship Corporation | |

### III.    THE DEBTORS' CAPITAL STRUCTURE

**A.    Secured Debt**

16.    ISH and certain of its Debtor subsidiaries are indebted under five (5) secured financing arrangements.  International Shipholding has pledged, among other things, all of the vessels that it owns to secure the obligations under these agreements.  All five (5) of the principal credit agreements require International Shipholding entities to comply with various loan covenants, including financial covenants that require minimum levels of net worth, working capital, liquidity, and interest expense or fixed charges coverage and a maximum amount of debt leverage.  On the Petition Date, the Debtors were current on all payment obligations under each of their secured financing arrangements, but they were in covenant and other non-monetary default under each secured financing arrangement.

*(i)    Senior Credit Facility*

17.    ISH and thirteen (13) of its subsidiaries, as borrowers, currently maintain a senior secured credit facility with a syndicate of lenders led by Regions Bank pursuant to that certain Credit Agreement, dated as of September 24, 2013 (which was comprehensively amended on November 13, 2015),[15] with Regions Bank, as administrative agent and collateral agent, and Regions Bank, Capital One, N.A., Branch Banking and Trust Company, and Whitney Bank, as lenders, (as so amended, the "Senior Facility").  As of March 31, 2016, the borrowers and guarantors party thereto had an aggregate of approximately $65.8 million of credit outstanding under the Senior Facility, consisting of (i) $31.0 million of borrowings under the revolving credit facility component (the "LOC"), (ii) $28.0 million under the term loan facility component, and

---

[15] Each of the borrowers under the Senior Facility are Debtors with the exception of CG Railway, Inc.

(iii) $6.8 million of letters of credit. International Shipholding currently has no additional borrowing capacity under this facility.

18.    The Senior Facility was originally scheduled to mature on September 24, 2018 and included a term loan in the principal amount of $45.0 million and a LOC in the principal amount of up to $40.0 million. The LOC component originally included a $20.0 million sublimit for the issuance of standby letters of credit and a $5.0 million sublimit for swingline loans. As stated above, on November 13, 2015, the Senior Facility was amended. The maturity date was accelerated to July 20, 2017. Additionally, the interest rate increased from LIBOR plus 3.5% to LIBOR plus 9.25%, which is effective from November 13, 2015 through June 30, 2016, and LIBOR plus 10.0% from July 1, 2016 through July 20, 2017.

19.    Under the Senior Facility, each of International Shipholding's domestic subsidiaries is a joint and several co-borrower. The obligations of all the borrowers under the Senior Facility are secured by all personal property of the borrowers, but excluding certain real property, but including the U.S. flagged vessels owned by International Shipholding's domestic subsidiaries and certain collateral related to such vessels, including cash.

*(ii)    ING Financing Agreement*

20.    Dry Bulk Australia Ltd. and Dry Bulk Americas Ltd., as joint and several borrowers, and ISH, as guarantor, entered into a variable rate financing agreement with ING Bank N.V, London branch in August 2010 pursuant to that certain Senior Secured Term Loan Facility Agreement by and among East Gulf Shipholding, Inc., a wholly-owned subsidiary and non-Debtor, as borrower, ISH, as guarantor, the banks and financial institutions lenders thereto, and ING Bank N.V., London branch, as facility agent and security trustee (the "2010 ING Facility"), for a seven (7) year facility to finance the construction and acquisition of three (3)

handysize vessels. Pursuant to the terms of the agreement, the lenders thereto agreed to provide a secured term loan facility divided into two (2) tranches which corresponded to the vessel delivery schedule. Tranche I covered the first two (2) vessels delivered with Tranche II covering the third vessel. Tranche I was fully drawn in the amount of $36.8 million, and Tranche II fully drawn at $18.4 million.

21.     Dry Bulk Australia Ltd. and Dry Bulk Americas Ltd., as joint and several borrowers, and ISH, as guarantor, also entered into a variable rate financing agreement with ING Bank N.V., London branch in June 2011 pursuant to that certain Credit Agreement, dated as of June 20, 2011, with ING Bank N.V. London branch, as lender, facility agent, and security trustee (the "2011 ING Facility"), for a seven (7) year facility to finance the acquisition of a capesize vessel and a supramax bulk carrier newbuilding. Pursuant to the terms of the ING Facility, the lender thereto agreed to provide a secured term loan facility divided into two (2) tranches: Tranche A, fully drawn in June 2011 in the amount of $24.1 million, and Tranche B, providing up to $23.3 million of additional credit. Under Tranche B, International Shipholding drew $6.1 million in November 2011 and $12.7 million in January 2012. In order to aid in the collateral value coverage covenant, the 2010 ING Facility and the 2011 ING Facility were merged into one (1) facility (the "ING Facility") without altering the debt maturities or terms of its indebtedness. Effective November 4, 2015, the interest rate was increased from LIBOR plus 2.5% to LIBOR plus 4.5%.

22.     As of March 31, 2016, $1.9 million was due and owing under the ING Facility. International Shipholding expects to satisfy the remaining balance under the ING Facility using either (i) the proceeds of the DIP Facility (as defined below), or (ii) certain insurance proceeds pledged and payable to Gulf South Shipping PTE LTD on account of a machinery casualty event

on one of the vessels securing the ING Facility. The current collateral under the ING Facility includes the two (2) rail-ferry vessels—the Bali Sea and the Banda Sea.

### (iii)   *Capital One Facility*

23.    In December 2011, LCI Shiphldings, Inc. (assigned from Waterman Steamship Corporation), as borrower, and ISH, as guarantor, entered into a variable rate financing agreement with Capital One N.A. as lender for a five (5) year facility totaling $15.7 million pursuant to that certain Credit Agreement, dated as of December 28, 2011 (the "Capital One Facility"), to finance a portion of the acquisition price of a multi-purpose ice strengthened vessel. This loan requires the borrowers to make fifty-nine (59) monthly payments with a final balloon payment of $4.7 million in January 2017. As of March 31, 2016, $6.3 million was due and owing under the Capital One Facility. The Oslo Wave serves as the primary collateral for the Capital One Facility.

### (iv)   *DVB Facility*

24.    LCI Shipholdings, Inc. (assigned from Central Gulf Lines, Inc.), as borrower, and ISH, as guarantor, entered into a fixed rate financing agreement on August 26, 2014 in the amount of $38.5 million pursuant to that certain Credit Agreement, dated as of August 26, 2014, with the banks and financial institutions listed therein, as lenders, and DVB Bank SE, as mandated lead arranger, facility agent, and security trustee (the "DVB Facility"). The borrowed amounts due under the DVB Facility are collateralized by International Shipholding's 2007 PCTC (*i.e.*, the Green Bay) at a rate of 4.35% with twenty-four (24) quarterly payments and a final balloon payment of $20.7 million in August 2020. Effective November 4, 2015, the interest rate increased from 4.35% to 6.35%. As of March 31, 2016, $32.3 million was due and owing under the DVB Facility.

*(v)    Citizens Facility*

25.    LCI Shipholdings, Inc., as borrower, and ISH, as guarantor, also have a $23.0 million facility with Citizens Asset Finance (f/k/a RBS Asset Finance) pursuant to that certain Credit Agreement, dated as of August 25, 2014, with and Citizens Asset Finance, Inc. (f/k/a RBS Asset Finance, Inc.) as lender (the "Citizens Facility"), that is collateralized by one (1) of International Shipholding's 1999 PCTCs (*i.e.*, the Green Dale) at a variable rate equal to the 30-day Libor rate plus 2.75% payable in eighty-four (84) monthly installments with the final payment due August 2021.    Late in 2015, the Citizens Facility was amended to include an increase to the annual interest rate of 1.0%, and in April 2016 the Citizens Facility was further amended to include an additional increase to the annual interest rate of 0.5%.    As of March 31, 2016, the balance due under the Citizens Facility was $17.6 million.

**B.    Vessel Leases**

26.    International Shipholding also leases three (3) vessels under operating lease contracts (collectively, the "Vessel Leases"), which include the molten-sulphur carrier in the Jones Act segment (*i.e.*, the Sulphur Enterprise) and two (2) U. S. flagged PCTCs (*i.e.*, the Green Cove and the Green Lake).    The Vessel Leases were entered as part sale of separate sale leaseback transactions with BMO Harris Equipment Finance Company ("BMO Harris"), BB&T Equipment Finance Corporation ("BB&T"), and CapitalSource Bank ("CapitalSource"), respectively.    The Vessel Leases impose certain financial covenants, including defined minimum working capital and net worth requirements.    The Vessel Leases prohibit International Shipholding from incurring, without the lessor's prior written consent, additional debt or lease obligations, subject to certain specified exceptions.    These financial covenants are generally similar, but not identical to, the financial covenants set forth in the Senior Facility.

27.     In addition, the Vessel Leases contain early buy-out options and fair value purchase options that enable International Shipholding to purchase the vessels under certain specified circumstances (collectively, the "Lease EBOs").  As of March 31, 2016, the amount of each of the Lease EBOs was as follows: $19,695,469 for the Sulphur Enterprise, $15,584,000 for the Green Cove, and $16,123,390 for the Green Lake.

**C.      Preferred Stock**

*(i)      Series A Preferred Stock*

28.     ISH has 250,000 issued and outstanding shares of that certain 9.50% Series A Cumulative Perpetual Preferred Stock (the "Series A Preferred Stock").  Each share of the Series A Preferred Stock has a par value of $1.00 and a liquidation preference of $100.00.  The Series A Preferred Stock accrues dividends of 9.50% per annum that are payable on January 30, April 30, July 30, and October 30 of each year, when, as, and if declared by ISH's Board of Directors.  Because no dividend was paid to the Series A Preferred Stock for two (2) periods, the per annum dividend rate increased to 11.50% commencing on January 31, 2016.  The per annum dividend rate further increased to 13.50% as of April 30, 2016 because the Company did not pay the scheduled dividend to the Series A Preferred Stock on that date.  If ISH continues to not pay dividends to the Series A Preferred Stock, the per annum dividend rate will continue to increase up to a maximum annual dividend rate of twice the original rate.

*(ii)     Series B Preferred Stock*

29.     In addition to the Series A Preferred Stock, ISH has 316,250 issued and outstanding shares of that certain 9.00% Series B Cumulative Perpetual Preferred Stock (the "Series B Preferred Stock" and, together with the Series A Preferred Stock, the "Preferred Stock").  Each share of the Series B Preferred Stock has a par value of $1.00 and a liquidation

preference of $100.00. Each share of Series B Preferred Stock accrues dividends of 9.00% per annum that are payable on January 30, April 30, July 30, and October 30 of each year, when, as, and if declared by ISH's Board of Directors. The per annum dividend rate increased to 11.00% commencing on January 31, 2016 because ISH failed to pay dividends for two (2) periods, and 13.00% as of April 30, 2016, because ISH did not pay a dividend to the Series B Preferred Stock for a third period. If ISH continues to not pay dividends to the Series B Preferred Stock, the per annum dividend rate will continue to increase up to a maximum annual dividend rate of twice the original rate.

30. The Series A Preferred Stock and Series B Preferred Stock was previously listed for trading on the New York Stock Exchange (the "NYSE") under ticker symbol ISHPRA and ISHPRB, respectively. On December 18, 2015, ISH was notified by the NYSE that it was not in compliance with the continued listing standards set forth in Section 802.01B of the NYSE Listed Company Manual (the "Continued Listing Standards") because it had not maintained an average global market capitalization over a consecutive thirty (30) trading day period of at least $15 million. The NYSE further informed ISH that trading in the Preferred Stock would cease immediately. The Series A Preferred Stock and Series B Preferred Stock is now quoted on the OTCQX Best Market under the ticker symbols ISHCP and ISHCO, respectively.

**D.    Common Stock**

31. ISH is authorized to issue 20,000,000 shares of common stock, with a $1.00 par value per share. As of April 30, 2016, ISH had 7,393,406 shares of common stock issued and outstanding. Members of the Johnsen family and entities controlled by them beneficially owned approximately 20.3% of ISH's outstanding common stock.

32.    ISH's common stock was previously listed on the NYSE under the trading symbol "ISH."  As with the Preferred Stock, on December 18, 2015, the NYSE informed ISH that it was not in compliance with the Continued Listing Standards and advised that trading in ISH's common stock would cease immediately and that the common stock would be delisted.  The common stock of ISH is now traded under the ticker symbol "ISHC" on the OTCQX Best Market.

### IV.    EVENTS GIVING RISE TO THESE CHAPTER 11 CASES

33.    International Shipholding has faced significant challenges over the last two (2) years and has had to make difficult decisions to continue to operate as a going concern.  As set forth above, since 2014, International Shipholding has suffered substantial losses and encountered significant challenges related to complying with its debt covenants and meeting minimum liquidity requirements to operate.

34.    In response to these challenges, since 2014, International Shipholding has undertaken a series of efforts to improve its financial position and liquidity, including, among other things, by:

(i)    soliciting and receiving from its lenders amendments to, or waivers from, various of its covenants to assure compliance therewith as of the end of the first, third, and fourth quarters of 2014, and the end of the first, second, third and fourth quarters of 2015;

(ii)    attempting to refinance all of its debt and operating leases by September 30, 2015, and thereafter seeking to raise funds by either selling debt securities or borrowing funds from financial institutions;

(iii)    requesting limited debt covenant waivers of as September 30, 2015 from all of its lenders and lessors in case its attempts to refinance were unsuccessful;

(iv)    beginning negotiations by early October 2015, with all of its lenders and lessors to receive additional limited waivers and begin to formulate a new strategy designed to improve its liquidity and financial position;

      (v)     implementing the Strategic Plan starting in October 2015 and continuing to divest assets through the first quarter of 2016; and

      (vi)    taking various other steps to improve its liquidity, including eliminating dividends, laying up vessels, and reducing costs.

35.     Since late September 2015, International Shipholding's lenders have provided a series of additional default waivers, including waivers granted in connection with credit facility amendments entered into on or prior to November 16, 2015. These amendments also effected a series of additional substantive amendments to each of International Shipholding's credit facilities, including but not limited to accelerated repayment terms, increased interest rates, and required asset divestitures by specified milestone deadlines and at specified amounts.

36.     As set forth above, in connection with International Shipholding's efforts to improve its financial position and liquidity, the Board of Directors approved the Strategic Plan on October 21, 2015 to restructure International Shipholding by focusing on its three (3) core business segments—the Jones Act, PCTC, and Rail-Ferry business segments. Throughout the first quarter of 2016, International Shipholding continued to execute its Strategic Plan with the sale of, among other things, two (2) handysize vessels, one (1) capesize vessel, and International Shipholding's equity interests in fifteen (15) mini-bulkers, two (2) asphalt tankers, and two (2) chemical tankers. All of the proceeds of these sales were furnished directly to International Shipholding's lenders, resulting in approximately $38.0 million in non-cash activity that reduced International Shipholding's consolidated indebtedness. In April of 2016, International Shipholding also executed the sale of its New Orleans, Louisiana office building in exchange for relief of $6.2 million of amounts owed on the property. While International Shipholding has made significant strides in accomplishing its Strategic Plan, International Shipholding continues to divest its assets at values that are much lower than previously anticipated, and, as a result,

International Shipholding continues to lack the necessary liquidity to operate at the required levels.

37. The divestitures International Shipholding has made thus far have been limited to those identified under the Strategic Plan, as well as one Jones Act inactive barge and self-unloading coal carrier. The proceeds from these transactions have allowed International Shipholding to reduce its gross debt obligations, in addition to regularly-scheduled principal payments, by approximately $82.3 million (from $242.9 million at the end of 2014 to $117.1 million at the end of the first quarter of 2016). Based on International Shipholding's financial position and weak conditions in the shipping industry, however, it has been impossible for International Shipholding to refinance all of its existing indebtedness in the near term, come into compliance with its existing facilities, or generate necessary liquidity. As a result, on the Petition Date, each of the Debtors filed a voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Court") to restructure their debt obligations and capital structure.

## V.     CASH MANAGEMENT AND DIP FINANCING[16]

**A.     Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Continue in Ordinary Course (A) Using Existing Cash Management System, Bank Accounts, and Business Forms and (B) Performing Intercompany Transactions; (II) Authorizing Debtors' Banks to Honor All Related Payment Requests; and (III) Waiving, or Extending the Time to Comply with, Investment Guidelines of Bankruptcy Code Section 345(b) (the "Cash Management Motion")**

*(i)     Overview of the Debtors' Existing Cash Management System*

38. The Debtors utilize an integrated, centralized cash management system in the ordinary course of their business to collect, manage, disburse, and invest funds used in their

---

[16] Capitalized terms used in sections V and VI not otherwise defined herein have the meaning ascribed to such terms in the applicable pleading.

operations (the "Cash Management System"), including with respect to the operation and maintenance of the Debtors' fleet of domestic and international-flagged vessels and rail repair yard.

39.      The Debtors maintain a primary operating account (the "ISH Operating Account") with Regions Bank ("Regions Bank") in the name of ISH.  The ISH Operating Account is owned and maintained directly by ISH and is funded generally from (i) a daily sweep of charter and other operating revenues received by the Debtors via transfers from individual bank accounts maintained by the other Debtors and certain non-Debtor subsidiaries, at Regions Bank, Whitney Bank, Capital One Bank, JP Morgan Chase Bank, Bank of America, DNB Bank, and DVB Bank; (ii) certain other operating charter operating revenues; and (iii) miscellaneous receipts (*e.g.*, vendor rebates, insurance proceeds, and customer refunds).  Except with respect to certain payroll, union, and tax obligations, all wires and payables are funded out of the ISH Operating Account.

*(ii)      The Debtors' Bank Accounts*

40.      In connection with the Cash Management System, the Debtors maintain numerous bank accounts (the "Bank Accounts") with multiple banks, including, without limitation, Regions Bank, Whitney Bank, Capital One Bank, JP Morgan Chase Bank, Bank of America, DNB Bank and DVB Bank (the "Cash Management Banks").   In the ordinary course of business, the Debtors transfer money between the Bank Accounts via wire transfers and other electronic funds transfers.  There are in excess of approximately 100 intercompany transfers between and among the Bank Accounts in any given month.  While the amount of funds that flow through the Cash Management System is highly variable, for the three (3) month period ending on June 30, 2016, an average of approximately $31 million in funds was transferred

between the various Bank Accounts in the Cash Management System each month.  The Debtors track and record the intercompany balances that result from these transfers across the Debtors' corporate structure through journal entries.

41.    As of the Petition Date, the Debtors maintained the Bank Accounts at the Cash Management Banks as set forth in Exhibit C to the Cash Management Motion.

*(iii)    Intercompany Transactions*

42.    In the ordinary course of business, the Debtors utilize a series of intercompany transfers between the various Bank Accounts in order to fund the payment of operating and G&A expenses (the "Intercompany Transactions").  As a result, at any given time, Intercompany Transactions may exist that reflect intercompany receivables and payables (the "Intercompany Claims") made in the ordinary course of business between and among the Debtors.

43.    Certain cash flows and revenue from the Debtors' charter and other revenue-generating contracts are deposited into various accounts at the direction of the Debtors, their customers or the Debtors' pre-petition secured lenders.  Such deposited amounts are subsequently swept into the ISH Operating Account (subject to certain limitations related to the Debtors' pre-petition credit facilities) and recorded on the Debtors' books and records as Intercompany Claims.

44.    The Intercompany Transactions have historically involved non-Debtor affiliates of the Debtors, including short-term transfers to non-Debtor CG Railway, Inc. ("CGR").  CGR is a cash-flow positive entity which on occasion has immediate liquidity needs beyond its capacity, and funds are temporarily transferred from the ISH Operating Account into CGR's operating account.  The amount of the transferred funds is subsequently funded back to the ISH Operating Account by cash generated in the ordinary court of CGR's business.

45.     The Debtors maintain current and accurate accounting records of the Intercompany Transactions and resulting Intercompany Claims, principally through journal entries that are used to track and record the intercompany balances that exist across the Debtors' corporate structure, including those Intercompany Transactions and Intercompany Claims arising with respect to non-Debtors.  The Debtors will continue to maintain accurate records of the Intercompany Transactions and resulting Intercompany Claims during these chapter 11 cases. The Debtors also seek to continue their historical practice of limited and short-term Intercompany Transactions with CGR, as this arrangement is critical to the ongoing success of a cash flow positive affiliate that provides significant value to the Debtors' estates.  If the Intercompany Transactions were to be discontinued, the Cash Management System and related administrative controls would be disrupted, to the Debtors' detriment.  Accordingly, the Debtors submit that the continuation of the Intercompany Transactions is in the best interests of the Debtors' estates and their creditors.

(iv)     *The Debtors' Existing Business Forms and Checks*

46.     In the ordinary course of business, the Debtors use numerous business forms, including, without limitation, checks, business cards, letterhead, service purchase orders, purchase orders, wire transfer forms, requisitions, and invoices (the "Business Forms").  Certain of the Debtors' business forms are customized and/or pre-printed.

(v)     *Bank Fees and Charges*

47.     In the ordinary course of business, the Cash Management Banks charge, and the Debtors pay, honor, or allow the deduction of, certain service and other fees, costs, charges, and expenses (collectively, the "Bank Fees") from the appropriate bank account.  In the months

leading up the Petition date, the Bank Fees averaged approximately $10,000 to $15,000 per month.

*(vi)    The Debtors' Investment Practices*

48.    In the ordinary course of business, the Debtors maintain five (5) bank accounts with an investment component at Capital One Bank and Whitney Bank (the "Investment Accounts"). The Investment Accounts, which are swept on a daily basis, receive funds pursuant to the terms of certain of the Debtors' contracts, which funds are in turn used to pay, among other things, certain tax payments and other required payments. In addition, the Debtors also maintain two (2) money market accounts at Regions Bank (the "Money Market Accounts"). The Investment Accounts and the Money Market Accounts are maintained by the Debtors in an effort to maintain sufficient liquidity to meet operational objectives, contractual obligations, and debt requirements, while seeking to maximize investment yield, subject to secured creditor approved investment alternatives, policy guidelines, and approved investment vehicles (collectively, the "Investment Practices").

49.    The Debtors utilize the Cash Management System in its current form as part of their ordinary and usual business practices. In certain instances, pursuant to the terms of the Debtors' loan documentation, the Debtors are required to deposit cash in particular banks and/or in banks with a control agreement. The current Cash Management System complies with this requirement. These practices occur in the ordinary course of business.

50.    The relief requested in the Cash Management Motion will help minimize any disruption in the Debtors' business operations during the pendency of the chapter 11 cases and preserve the value of the Debtors' estates. Indeed, as set forth in the various "first day" motions, given the foreign (non-U.S.) nature of a portion of the Debtors' business and the constantly

moving location of their material assets—the vessels—at any time throughout the world, any disruptions in the Cash Management System could lead to delays in satisfying the Debtors' obligations to their vendors and suppliers and meeting the demands of their various customers. In order to avoid the potential erosion of value that could ensue from any such interruptions in the Debtors' ordinary course business operations, the Debtors believe it is imperative that they be authorized to continue the Cash Management System consistent with historical practices.

51.    Moreover, requiring the Debtors to maintain separate accounts would decentralize their Cash Management System because, given the Debtors' complex corporate and financial structure, it would be difficult to establish an entirely new cash management system for the Debtors.  Indeed, strict adherence to the U.S. Trustee Guidelines would prove to be exceedingly burdensome to the Debtors and their management, reduce efficiencies, and cause unnecessary expense.  Absent the relief requested in the Cash Management Motion, the Debtors would be required to, among other things, (i) close all existing bank accounts and open new debtor in possession accounts, (ii) maintain separate debtor in possession accounts for cash collateral, (iii) obtain checks that bear the designation "debtor in possession," and (iv) create new systems for manually issuing checks and paying post-petition obligations.  The delays that would result from opening the new accounts, revising cash management procedures, and instructing customers to redirect payments would disrupt the Debtors' business operations at this critical time, have little or no benefit to the Debtors' estates, and potentially erode the value of the Debtors' business to the detriment of all stakeholders.  Accordingly, the Debtors should be allowed to continue using the Cash Management System consistent with historical practice.

52.    In the ordinary course of business, the Debtors use a variety of Business Forms. By virtue of the nature and scope of the Debtors' business operations, and in order to minimize

expenses to the Debtors' estates, it is important that the Debtors be permitted to continue using the existing Business Forms without alteration or change, except as requested in the Cash Management Motion. Parties doing business directly with the Debtors undoubtedly will be aware of the Debtors' status as a debtors in possession as a result of the publicized nature of the chapter 11 cases and the communications and notice of the commencement thereof the Debtors intend to distribute to such parties. Accordingly, the requirement to change the Business Forms is unnecessary, would be unduly burdensome, and should be waived.

53.    Given the Debtors' current operations, it is necessary for the Debtors to conduct transactions by debit, wire, automated clearing house ("ACH") transfers, ACH credit, ACH debit, and other similar methods of electronic transfers. Denying the Debtors the opportunity to conduct transactions by these methods would likely interfere with the Debtors' performance under their contracts and obligations, and unnecessarily distract the Debtors and their management from the Debtors' business operations, as well as create additional costs to be borne by the Debtors and their creditors. Accordingly, the Debtors believe it is imperative that the Cash Management Banks be authorized to continue to pay, honor, and execute any and all debit instructions, wires, ACH payments, and other forms of electronic transfers issued and drawn on the Bank Accounts after the Petition Date.

54.    The continued performance of the ordinary course Intercompany Transactions is integral to ensure the Debtors' ability to operate their world-wide business and preserve and maintain the Debtors' going-concern value for the benefit of all parties in interest.[17] Because the Debtors' business is operationally and functionally interconnected, they maintain the centralized

---

[17] The Debtors engage in Intercompany Transactions on a regular basis and such transactions are common among similar enterprises.

Cash Management System described above which necessarily requires numerous Intercompany Transactions. Indeed, even if it were possible for the Debtors to obtain from third parties the services they currently receive from other Debtors pursuant to the Intercompany Transactions on an entity by entity basis,[18] aside from incurring excessive financial burdens in identifying appropriate providers of these services and entering into individual agreements for providing these services, the Debtors would be required to divert their attention from their restructuring efforts and the desired smooth transition into operating as debtors in possession. In contrast, the continuation of the Intercompany Transactions helps permit the Debtors to operate in the normal course, and avoids the unnecessary distractions that inevitably would be associated with any substantial disruption in the Cash Management System. Accordingly, the Debtors should be expressly authorized to continue performing the Intercompany Transactions consistent with the Debtors' customary practice.

55.     In addition, the Debtors may need to transfer funds on a short-term basis to non-Debtor CGR to fund certain immediate liquidity needs.[19] The Debtors believe that Intercompany Transactions with CGR are low-risk given that CGR is a cash-flow positive entity that will generate sufficient funds in the ordinary course of its business to satisfy the Intercompany Claim in short order. The Debtors further believe that continuing this aspect of their Cash Management System is crucial to the success of its non-Debtor affiliate and should be approved as well.

---

[18] Examples of these services include payment of corporate payroll and crew pay obligations, management of the vessels, contracting with customers, and purchasing and procurement of goods, supplies, and services from the Debtors' trade creditors.

[19] The Debtors also regularly engage in intercompany transactions with other non-Debtors. However, all other non-Debtors are at present sufficiently capitalized and do not require funding from the Debtors.

**B.    Debtors' Motion for Entry of Interim and Final Orders (1) Authorizing Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Certain Protections to Prepetition Lenders, (2) Scheduling a Final Hearing, and (3) Granting Certain Related Relief**

56.    The Debtors are seeking entry of the Proposed Orders authorizing them to enter into a credit agreement pursuant to the DIP Facility and approving the terms and conditions set forth in the DIP Credit Agreement, which will allow them to obtain the funds available through the DIP Facility pursuant to the terms set forth in this Motion, the DIP Credit Agreement, the Interim Order, and the Final Order.

57.    Despite their best efforts, the Debtors are unable to obtain financing on an unsecured basis.  The Debtors attempted to secure financing on terms other than a secured super-priority basis, but given the Debtors' asset base and balance sheet, they were unable to do so. The Debtors have been unable to obtain (a) adequate unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense; (b) credit for money borrowed secured solely by a lien on property of the estate that is not otherwise subject to a lien; or (c) credit for money borrowed secured by a junior lien on property of the estate which is subject to a lien, in each case, on more favorable terms and conditions than those provided in the DIP Facility.  In addition, the Debtors are unable to obtain credit for borrowed money without granting priming liens on the Debtor Collateral.

58.    The DIP Facility is necessary to preserve the assets of the estates, as it will allow the Debtors to continue, among other things, the orderly operation of the Debtors' business and the chapter 11 cases, and to otherwise satisfy their working capital requirements.  Without immediate access to new borrowing relief, the Debtors' business operations, their assets, and the chapter 11 cases in general would be in serious jeopardy.  The new liquidity offered by the

proposed DIP Facility will enable the Debtors to maintain and ultimately increase the value of their assets and successfully administer the chapter 11 cases through the bankruptcy process.

## VI.    RELIEF REQUESTED IN REMAINING FIRST DAY PLEADINGS

**A.    Debtors' Motion for Entry of Interim and Final Orders: (I) Authorizing Debtors to (A) Pay Pre-Petition Wages, Other Compensation, and Reimbursable Expenses, (B) Continue Employee Benefit Programs, and (C) Pay Director Fees and Expenses; and (II) Authorizing Financial Institutions to Honor and Process All Checks and Electronic Payment Requests Related to Such Obligations (the "Wages Motion")**

*(i)    Overview of Debtors' Workforce*

59.    As of the Petition Date, the Debtors employ approximately 123 people in their shore-side operations, of which sixty-nine (69) are salaried and fifty-four (54) are hourly (collectively, the "Employees"). The entities that employ the Employees are (i) ISH (forty-eight (48) Employees), (ii) LMS Shipmanagement, Inc. ("LMS") (twenty-nine (29) Employees), (iii) Frascati Shops, Inc. ("FSI") (thirty-two (32) Employees), (iv) N.W. Johnsen & Co., Inc. ("NWJ") (nine (9) Employees), and (v) U.S. United Ocean Services, LLC ("UOS") (five (5) Employees). As of the Petition Date, the Debtors also employ 188 Crew Members (as defined below) for their U.S. flag vessels.[20] In addition, the Debtors currently supplement their business needs and workforce with seven (7) independent contractors (each an "Independent Contractor" and collectively, the "Independent Contractors") that provide services in a number of different business areas, including accounting, IT, and treasury.[21] Payments to the Employees and Independent Contractors are made through ISH.

---

[20]    The Debtors employ Crew Members only with respect to their U.S. flagged vessels. The Crew Members for the Debtors' foreign flagged vessels are paid by third-party agent Wallem Ship Management Inc. ("Wallem"). The Debtors are seeking to pay Wallem as a "Critical Trade Creditor" pursuant to the Critical Vendors Motion.

[21]    As of January 2016, David Drake, the Debtors' former Treasurer, is one of the Debtors' Independent Contractors. In July 2016, Niels M. Johnsen, the Debtors' former chairman and chief executive officer, was also retained as an Independent Contractor.

60.    The Employees and Independent Contractors perform a variety of critical functions, including sales, vessel operations, risk management, banking approvals, consulting, and a variety of administrative, accounting, legal, finance, management, supervisory, personnel management, and other related tasks.  Their skills, knowledge, and understanding with respect to the Debtors' operations, customer relations, and infrastructure are essential to maintaining the Debtors' business as a going concern during these cases.  Just as the Debtors depend on the Employees and Independent Contractors to operate their business on a daily basis, those individuals also depend on the Debtors.  Indeed, the vast majority of these individuals rely exclusively on payments from the Debtors for their basic living necessities

(ii)    Overview of the Employee Obligations

61.    The Debtors provide a variety of compensation and benefits to their Employees, all of which are more fully described below (collectively, the "Employee Obligations").  The following table contains descriptions of the Employee Obligations and the Debtors' estimates of the amount of Employee Obligations accrued but unpaid as of the Petition Date and, of the unpaid Employee Obligations, the amounts due in the ordinary course of business within twenty-one (21) days of the Petition Date.

| Category | Description | Approximate Amount Accrued as of Petition Date | Approximate Amount Due Within 21 Days of Petition Date |
|---|---|---|---|
| Employee Compensation | Employee compensation consists of amounts owed to the Employees pursuant to their individual terms of employment and under applicable law (as more fully described in the Cash Management Motion, the "Employee Compensation").   Employee Compensation includes, as applicable, wages and salaries earned in the ordinary course of business, but does not include Severance Obligations (as defined below), Reimbursable Expenses, Vacation Time, Sick Time (each as defined | $30,000 | $30,000 |

| Category | Description | Approximate Amount Accrued as of Petition Date | Approximate Amount Due Within 21 Days of Petition Date |
|---|---|---|---|
| | below), or the value of the non-cash benefits described in the Cash Management Motion.<br><br>The Debtors have both salaried and hourly Employees. The Debtors estimate that the average aggregate cost of Employee Compensation is $745,585 per month. Employees who are employed by ISH, LMS, NWJ, or UOS are paid semi-monthly.  With respect to these Employees, the most recent payroll occurred on July 31, 2016, with all amounts accrued through and including that date being paid in full.<br><br>Employees who are employed by FSI are paid weekly, one (1) week in arrears.  The most recent payroll for these Employees was also on July 31, 2016.  However, because FSI Employees are paid one (1) week in arrears, seven (7) days of pre-petition Employee Compensation—approximately $30,000—accrued but was unpaid as of the Petition Date on account of the FSI Employees. | | |
| Independent Contractor Compensation | The Independent Contractors are compensated as the need arises for their services in the ordinary course of business (the "Independent Contractor Compensation"). Independent Contractor Compensation is paid through the Debtors' accounts payable system upon receipt of their invoices, with an average aggregate cost of approximately $14,000 per month.  As of the Petition Date, the Debtors estimate that approximately $12,000 in Independent Contractor Compensation had accrued but remained unpaid. | $12,000 | $12,000 |
| Crew Members | With respect to their U.S. operations, the Debtors and their affiliates rely upon a highly skilled crew that works on the vessels to maintain daily operations (the "Crew Members").  The Debtors pay these crew members a salary (the "Crew Member Compensation") in exchange for their services.  As of the Petition Date, the Debtors | $1,500,000 | $1,500,000 |

| Category | Description | Approximate Amount Accrued as of Petition Date | Approximate Amount Due Within 21 Days of Petition Date |
|---|---|---|---|
| | estimate that approximately $1,500,000 in Crew Member Compensation had accrued but remained unpaid.[22] There are three (3) Crew Members who are owed more than $12,475 for pre-petition Crew Member Compensation. These individual Crew Members are owed these amounts within twenty-one (21) days of the Petition Date and the Debtors are requesting authority to make such payments. The aggregate amount payable to these individuals (less than $30,000) in excess of the $12,475 cap is a result of the manner in which Crew Members are paid, their position, and the small allotments these Crew Members elected to receive while on vessel.<br><br>With respect to the Debtors' foreign operations, the individuals that crew the Debtors' foreign flagged vessels are compensated via third party agent Wallem. | | |
| Director Compensation | The Debtors have eight (8) directors (collectively, the "Directors"). Directors who also serve as the Debtors' executive officers do not receive any additional compensation for their service as Directors.[23] The non-Employee Directors receive (i) an annual cash payment in the amount of $47,500 (payable in quarterly installments) and (ii) an annual equity award valued at $20,000, based on the prior day's closing price, of unrestricted shares of common stock payable in January 2016 (collectively, the "Director Compensation"). With respect to the equity awards for 2016, the Debtors determined to convert 40%, or $8,000, of the overall value of each such award to cash payable to the individual Directors. As of the Petition Date, the Debtors estimate that the following aggregate amounts had accrued but remained unpaid for six (6) Directors (and that no amounts had accrued but remained unpaid | $119,250 | $0 |

---

[22]   Generally, Crew Members are due to receive their salary when their voyage concludes. However, Crew Members are entitled to elect to receive periodic allotments, which are advances against a Crew Member's compensation and are received while the Crew Member is on the vessel. When Crew Member's time on vessel ends, their Crew Member Compensation is trued up against the allotments received by that Crew Member while on the vessel, with the balance owed to the Crew Member paid at that time.

[23]   As of the Petition Date, the Debtors have seven (7) outside Directors and one (1) Employee Director.

| Category | Description | Approximate Amount Accrued as of Petition Date | Approximate Amount Due Within 21 Days of Petition Date |
|---|---|---|---|
|  | for the remaining two (2) Directors): (i) approximately $71,250 for the applicable quarterly retainer, or $11,875 per Director, and (ii) approximately $48,000 for the equity awards, or $8,000 per Director, on account of the conversion of such equity awards into cash. |  |  |
| Bonus Program | Prior to the Petition Date, the Debtors maintained a discretionary bonus program (the "Bonus Program") pursuant to which: (i) Employees received 8% of base salary per year for every year the company achieved EBITDA of $35,705,000 or greater; and (ii) certain eligible Employees received up to $1,500 for the referral of a new hire who successfully completed six (6) months of employment. With respect to non-insider employees, the Debtors intend to continue, in their sole discretion, the Bonus Program in the ordinary course of business during these chapter 11 cases. At this time, the Debtors have not paid any bonuses under the Bonus Program in 2016, and do not expect to owe any bonuses on account of the pre-petition period.[24] | None | None |

---

[24] For the avoidance of doubt, the Debtors do not intend, and will not, make payments under the Bonus Programs to insiders, as such term is defined in Bankruptcy Code section 101(31), absent further order of the Court.

32

| Category | Description | Approximate Amount Accrued as of Petition Date | Approximate Amount Due Within 21 Days of Petition Date |
|---|---|---|---|
| Withholdings and Payroll Taxes | During each pay period, the Debtors routinely withhold certain amounts from the gross pay of Employees, including Employee contributions to retirement savings plans, health benefits plans, employment insurance, garnishments, child support, personal insurance premiums, and similar withholdings (collectively, the "Withholdings"), which either the Debtors or a third-party service provider then forwards to the appropriate recipients. The Debtors estimate that the Withholdings total approximately $95,065 per month. The Debtors believe that, as of the Petition Date, the only Withholdings that have not been remitted are those that accrued during the week period preceding the last payroll on July 31, 2016 (the "Unremitted Withholdings") on account of the FSI Employees who, as noted above, are paid weekly, one (1) week in arrears. The Debtors are seeking authority to remit those amounts, or approximately $11,060, when appropriate. To the extent that any other Withholdings have been collected and not remitted, the Debtors similarly seek authority to remit those amounts.<br><br>In addition to the Withholdings, the Debtors are required by law to withhold amounts from wages of certain Employees that are related to federal, state and local income taxes, including social security and Medicare taxes, and employment insurance for remittance to the appropriate taxing and other governmental authorities (collectively, the "Payroll Taxes"). The Debtors estimate that the Payroll Taxes total approximately $322,474 per month, including employer amounts due. The Debtors believe that, as of the Petition Date, the only Payroll Taxes that have not been remitted are amounts that accrued prior to the last payroll on July 31, 2016 that have not yet been remitted to the appropriate authorities (the "Unremitted Payroll Taxes") on account of Employees of ISH, LMS, NWJ, UOS, and FSI. The Debtors are seeking authority to remit those amounts, or approximately $318,000, when appropriate. To the extent that any other Payroll Taxes have been collected and not remitted, the Debtors similarly seek authority to remit those amounts. | $329,060 | $329,060 |

| Category | Description | Approximate Amount Accrued as of Petition Date | Approximate Amount Due Within 21 Days of Petition Date |
|---|---|---|---|
| Reimbursable Expenses and Credit Card Program | The Debtors routinely reimburse certain Employees and Directors from accounts payable for business-related expenses, such as travel, meals, telephone, relocation, and certain other expenses (the "Reimbursable Expenses").  With the exception of travel-related expenses, Employees pay for the Reimbursable Expenses in the first instance using their personal funds or credit cards and then submit the expenses to the Debtors for reimbursement.  Reimbursable Expenses are not fringe benefits to be considered as part of an Employee's compensation; rather, they are reimbursements for out-of-pocket expenses incurred by Employees in the performance of their duties on behalf of the Debtors for the Debtors' benefit.  The Debtors estimate that as of the Petition Date, approximately $35,000 of Reimbursable Expenses are outstanding.[25]  In addition, currently, only one (1) Employee—the Debtors' travel coordinator—has two (2) company-issued American Express credit cards.  These credit cards are used primarily to pay for expenses related to transporting Crew Members to the vessels (*e.g.* transportation, hotel, rental car, etc. and other employee travel-related expenses).  As of July 26, 2016, approximately $380,449.79 is owed to American Express on account of these credit cards. | $415,774.79 | $35,000 |
| Severance Obligations | With certain exceptions, all regular, full or part-time Employees working a minimum of thirty (30) hours per week that are not (i) terminated for cause, (ii) entitled to separate severance benefits under an individual agreement, or (iii) employed pursuant to a written employment contract are eligible to receive severance under the Debtors' severance benefit plan (the "Severance Plan" and such obligations of the Debtors, the "Severance Obligations").  Severance is calculated as follows: | None | None |

---

[25]  Such amounts are estimates of the total outstanding Reimbursable Expenses and accordingly the actual amounts may vary due to delays in the submission of receipts by Employees for Reimbursable Expenses.

| Category | Description | Approximate Amount Accrued as of Petition Date | Approximate Amount Due Within 21 Days of Petition Date |
|---|---|---|---|
| | <table><tr><td>YEARS OF EMPLOYMENT</td><td>WEEKS/MONTHS OF BASE PAY</td></tr><tr><td>0 – 2 Years</td><td>1 Week</td></tr><tr><td>2 – 5 Years</td><td>½ Month</td></tr><tr><td>5 - 10 Years</td><td>1 ½ Months</td></tr><tr><td>10 – 15 Years</td><td>3 Months</td></tr><tr><td>15 or More Years</td><td>6 Months</td></tr></table><br>As of the Petition Date, the Debtors believe that there are no unpaid amounts due under the Severance Plan. With respect to non-insider employees, the Debtors intend to continue the Severance Plan.[26]<br><br>The Debtors also have in place change in control retention incentive plans for executives, key employees, and staff (collectively, the "Change in Control Plans"). The Debtors are not seeking to make any payments under the Change in Control Plans at this time and no amounts are due and owing thereunder as of the Petition Date. | | |
| Vacation and Sick Time | The Debtors provide their full-time Employees with paid vacation time (the "Vacation Time"). The Debtors' policies provide that the amount of Vacation Time available to Employees and the rate at which such Vacation Time accrues is generally determined by the Employee's length of employment with the Debtors, with most Employees receiving between two (2) and three (3) weeks of Vacation Time per year. Ordinarily, when an Employee elects to take Vacation Time, that Employee is paid his or her regular hourly or salaried rate for such time. Generally, Employees may not carry forward unused Vacation Time into the next year, absent extenuating circumstances. If an Employee ceases to be employed by the Debtors, the Employee's final paycheck will include any accrued but unused Vacation Time (including any permitted rollover from the prior year) for the current year. The total accrued value of Vacation | None | None |

---

[26] For the avoidance of doubt, the Debtors will not pay any bonus, retention or severance payments to "insiders" (as that term is defined in Bankruptcy Code section 101(31)) without first seeking appropriate relief from this Court.

| Category | Description | Approximate Amount Accrued as of Petition Date | Approximate Amount Due Within 21 Days of Petition Date |
|---|---|---|---|
| | Time owing to Employees as of July 25, 2016 is approximately $653,480.26, of which no amounts are presently due and payable.<br><br>Employees also receive five (5) days of sick time (the "Sick Time") every year.  Each Employee's yearly allotment of Sick Time is granted on the first business day of each year.  The total accrued value of Sick Time owing to Employees as of July 25, 2016 is approximately $112,512.80, of which no amounts are presently due and payable.<br><br>The Debtors seek authority to continue their Vacation Time and Sick Time policies in the ordinary course of business on a post-petition basis, *provided that* (i) each Employee will be required to use any post-petition Vacation Time first, with any accrued pre-petition Vacation Time to be applied thereafter, and (ii) all requests for Vacation Time and Sick Time must be coordinated and approved by the applicable Employee's supervisor, consistent with past practices, to ensure no disruption to the Debtors' ongoing business operations.[27] | | |
| Medical Benefits | The Debtors offer a number of insurance and benefits programs, including, among other things, fully-funded health plans administered by United Healthcare, Blue Cross Blue Shield of Alabama, CIGNA, dental plans administered by Metlife Dental and Always Care, a vision plan administered by United HealthCare Vision and Always Care, flexible spending accounts administered by Discovery Benefits; and other employee benefit plans (collectively, the "Medical Benefit Plans").<br><br>The Debtors estimate that the monthly cost of the Medical Benefit Plans, including administrative fees, claims paid under the medical, dental and prescription drug plans and the premium for the vision plan, is $147,459, which is paid in advance.<br><br>In addition to the foregoing, the Debtors have in place | None | None |

---

[27] For the avoidance of doubt, the Debtors are not seeking blanket authority to cash out accrued pre-petition Vacation Time or to otherwise deviate from their pre-petition policies.

| Category | Description | Approximate Amount Accrued as of Petition Date | Approximate Amount Due Within 21 Days of Petition Date |
|---|---|---|---|
| | miscellaneous practices, programs, and policies that provide benefits and protections to Employees, including Family Medical Leave Act benefits, COBRA, and an employee assistance program (collectively, the "Other Medical Programs"). The Debtors believe that the Other Medical Programs are important to maintaining Employee morale and assisting in the retention of the Debtors' workforce. The monthly cost of such programs for the Debtors is negligible in the context of the Debtors' aggregate compensation and benefit obligations, and is also paid in advance. The Debtors believe that failing to honor expected benefits under such Other Medical Programs would have an adverse effect on the Employees. | | |
| Workers' Compensation | The Debtors provide workers' compensation insurance for Employees at the statutorily required level for each applicable state. Additionally, in accordance with state law, the Debtors provide workers' compensation coverage to the Employees under state-administered workers' compensation programs. The Debtors are insured through May 1, 2017 and pay annual premiums totaling $116,569 in two monthly installments on May 31, 2016 and August 1, 2016. As of the Petition Date, the Debtors estimate that $55,787 is outstanding. | $55,787 | $55,787 |

| Category | Description | Approximate Amount Accrued as of Petition Date | Approximate Amount Due Within 21 Days of Petition Date |
|---|---|---|---|
| Life, Disability, and Accident Insurance | The Debtors provide a number of different types of additional insurance benefits to their Employees, including basic life and accidental death and dismemberment, voluntary life and accidental death and dismemberment, long-term care, short-term disability, and long-term disability (collectively, the "Supplemental Insurance"), which policies are administered by Reliance Standard Insurance Company.  The Debtors and the Employees that elect to receive such coverage pay the premiums therefor, and such premiums are paid in advance.   In 2015, the Debtors paid approximately $7,975 per month on account of Supplemental Insurance premiums, while the Employees' monthly deductions totaled approximately $6,636. | None | None |
| Retirement Savings Plan | The Debtors maintain, for all eligible full-time Employees, (i) a retirement defined benefit plan (the "Retirement Defined Benefit Plan"), and (ii) a qualified defined contribution plan that meets the requirements of sections 401(a) and 401(k) of the Internal Revenue Code (the "401(k) Plan") administered by T. Rowe Price, as follows:<br><br>Retirement Defined Benefit Plan<br><br>• Generally, all full time Employees are eligible for enrollment in the Retirement Defined Benefit Plan, which is funded solely by the Debtors, after the Employee completes one (1) year of employment with the Debtors and which has two (2) components depending on an Employee's respective date of hire:  a final average pay defined benefit plan (for those hired before September 1, 2006) and a cash balance defined benefit plan (for those hired after September 1, 2006).  For the Retirement Defined Benefit Plan, the Debtors contribute cash to the Debtors' account based on a formula that considers the Employee's age, years of service with the | $34,547.20 | $19,000 |

| Category | Description | Approximate Amount Accrued as of Petition Date | Approximate Amount Due Within 21 Days of Petition Date |
|---|---|---|---|
| | Debtors, and the 30-year U.S. Treasury bond rate for November of the preceding year. The balances in the Retirement Defined Benefit Plan are fully vested after that Employee's third year of enrollment in such plan.<br><br>• In 2015, the Debtors (i) contributed $646,872.00 to the Retirement Defined Benefit Plan, and (ii) paid (a) $24,933.00 to Whitney Bank for administering payments made by the Retirement Defined Benefit Plan and handling mailings and other administrative matters, (b) $31,912.00 to Leavell Investment Management as a management fee (the "Leavell Management Fees") for managing the investments in the Retirement Defined Benefit Plan and the 401(k) Plan, which fee is calculated as a specified percentage of the balance of the Retirement Defined Benefit Plan,[28] (c) $164,405.00 to Milliman Benefits ("Milliman") as a management fee (the "Milliman Fees") for actuarial services, (d) $24,339.00 to the Pension Benefit Guaranty Corporation, and (e) $18,000 to Postlethwaite & Netterville as independent auditor for the Retirement Defined Benefit Plan. As of the Petition Date, the Debtors estimate that approximately $21,705.98 in Leavall Management Fees for managing the investments in the Retirement Defined Benefit Plan and the 401(k) Plan and approximately $54,782.00 in Milliman Fees for services in connection with the investments in the Retirement Defined Benefit Plan have accrued but remained unpaid.<br><br>• On June 7, 2016, the Debtors received a notice from Milliman advising the Debtors that the Retirement Defined Benefit Plan is well-funded | | |

---

[28] The Leavell Management Fees paid by the Debtors for managing the investments in the Retirement Defined Benefit Plan totaled $7,780 in January of 2016 and $8,188 in April of 2016. For managing the investments in the 401(k) Plan, the Debtors paid Leavell Management Fees in the amount of $7,780 in January of 2016 and $7,468 in April of 2016.

| Category | Description | Approximate Amount Accrued as of Petition Date | Approximate Amount Due Within 21 Days of Petition Date |
|---|---|---|---|
| | and, accordingly, the Debtors do not need to make any contributions to the Retirement Defined Benefit Plan during 2016. <br><br>401(k) Plan <br><br>• The Debtors' 401(k) Plan is administered by International Shipholding Corporation. <br><br>• Generally, eligible Employees can contribute eligible compensation through payroll deductions on a pre-tax basis up to the limits imposed on those contributions under the 401(k) Plan and Internal Revenue Code.  In 2015, Employees contributed approximately $753,371 to the 401(k) Plan.  As of the Petition Date, the Debtors estimate that approximately $9,500 in contributions to the 401(k) Plan accrued but remained unpaid. <br><br>• Employees are eligible to receive a matching employer contribution of up to 50% of an Employee's yearly contribution to the 401(k) Plan, up to $1,000 (the "Company Match"). <br><br>• In 2015, the total Company Match was $107,239.00.  As of the Petition Date, the Debtors estimate that their outstanding obligations on account of matching contributions total approximately $43. <br><br>• In 2015, the Debtors did not pay any fees associated with the administration of the 401(k) Plan because the balance of the 401(k) Plan exceeded a certain threshold.  The Debtors do not anticipate paying any fees associated with administration of the 401(k) Plan in 2016. | | |

62.     The Debtors have agreed that, during the period between the Petition Date and the

date of the Final Hearing (the "Interim Period"), any payment of pre-petition Employee

Obligations that are the obligations of the Debtors shall not exceed $1,980,847 (the "Interim Cap"), absent further order of the Court. The Debtors are, however, seeking authority to exceed the $12,745 individual priority cap for three (3) Crew Members owed more than the individual priority cap on an interim basis.

63.     To maintain their operations and preserve the value of their estates, it is essential that the Debtors continue to operate, to the extent possible, in the ordinary course of their business. To achieve that result, the Debtors must retain the uninterrupted service and loyalty of their Employees. The maintenance and continuation of employee programs, as well as the payment of amounts owing in respect thereof, is essential to this goal.

64.     Failure to pay these Crew Members as and when due would produce any number of harmful consequences for the Debtors' estates, including the loss of valued Crew Members, reputational damage among the seamen community, and/or various issues with their labor unions. In addition, payment of these amounts is necessary to avoid the potential imposition of a maritime lien for unpaid Crew Member wages on the Debtors' respective vessels, which would be detrimental to the Debtors, the Debtors' estates, and all stakeholders in these chapter 11 cases.

65.     The relief requested in the Cash Management Motion will benefit the Debtors' estates and creditors by allowing the Debtors' business operations to continue without interruption while the Debtors seek to restructure their business. In the absence of such payments, the Debtors believe that their Employees, Crew Members, and Independent Contractors may immediately seek alternative employment opportunities. Such a development would deplete the Debtors' workforce, hinder the Debtors' ability to meet their customer obligations, and diminish customers' confidence in the Debtors. Moreover, the loss of valuable

individuals and the recruiting efforts that would be required to replace them would be a massive

and costly distraction at a time when the Debtors should be focusing on the chapter 11 cases.

**B.      Debtors' Motion for Entry of Interim and Final Orders (I) Determining That Utility
         Providers Have Been Provided with Adequate Assurance of Payment;
         (II) Approving the Proposed Adequate Assurance Procedures; (III) Prohibiting
         Utility Providers from Altering, Refusing, or Discontinuing Utility Services; and
         (IV) Determining That Debtors Are Not Required to Provide Any Additional
         Assurance (the "Utilities Motion")**

        66.     To operate their business, the Debtors incur utility expenses for electricity,

telephone, trash, communications, internet and other essential services provided by certain utility

providers (collectively, the "Utility Providers"), each of which are listed on Exhibit C attached to

the Utilities Motion (the "Utility Service List"), in the ordinary course of their business.  These

utility services generally are the direct obligations of and paid by the Debtor contracting for the

service.  In 2015, the Debtors spent, on average, approximately $80,453.11 each month on utility

costs.

        67.     Uninterrupted utility services are important to the Debtors' business and,

therefore, to the success of their restructuring.  Any discontinuance in the provision of utility

services to the Debtors could disrupt operations, negatively affect customers, and ultimately

impact creditor recoveries.  It is critical that utility services continue uninterrupted.  Therefore,

the Debtors seek approval of proposed adequate assurance procedures in the event that any

Utility Provider makes a demand for adequate assurance or otherwise threatens to alter, refuse, or

discontinue utility service to the Debtors.

        68.     The Debtors intend to pay post-petition obligations owed to the Utility Providers

in a timely manner.  The Debtors expect that cash reserves and cash flows from the Debtors'

operations, as well as the borrowing availability under their contemplated debtor in possession

credit facility (the "DIP Facility"), will be sufficient to pay post-petition obligations related to

42

their utility services.  Furthermore, with respect to any Utility Provider that transacts directly

with or provides utility service directly to the Debtors, the Debtors propose to deposit into a

segregated bank account (the "Adequate Assurance Account") an amount equal to two (2) weeks'

worth of the estimated aggregate annual amount of utility services provided by any such Utility

Provider, based on the higher of (i) the Debtors' average usage for the prior year, and (ii) the

most recent invoice received from such Utility Provider (the "Adequate Assurance Deposit").

The Debtors expect that the Authorized Assurance Deposits will total approximately $84,599.00.

**C.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing, But Not Directing, Debtors to Pay Taxes and Fees; and (II) Authorizing Financial Institutions to Honor All Related Checks and Electronic Payment Requests (the "Tax Motion")**

69.    In the ordinary course of business, the Debtors (i) pay fees and other similar

charges and assessments (collectively, the "Fees") and certain taxes (collectively, the "Taxes"

and, together with the Fees, the "Fees and Taxes") to various taxing, licensing, regulatory, and

other governmental authorities (the "Authorities") in order to conduct their business, and (ii)

charge Fees on behalf of various Authorities.

*(i)    Income Taxes*

70.    In the ordinary course of operating their businesses, the Debtors incur state and

federal income taxes, including domestic and foreign tonnage taxes based on the net tonnage of

each qualifying vessel.  In addition to the United States government, the Debtors generally pay

income taxes to the following jurisdictions; Alabama; California; Florida; Louisiana;

Massachusetts; the state of New York; the city of New York; Virginia; and Singapore.  The

Debtors generally pay income taxes on an annual basis.  The Debtors estimate that they will

incur $734,543.00 in income tax for the 2016 calendar year, including $663,143.00 attributable

to the pre-petition period.

*(ii)    Business Taxes*

71.     The Debtors incur a variety of fees related to business and occupational licensing in a number of jurisdictions, including, among others, the following: the state of New York; the city of New Orleans, Louisiana; the city of Mobile, Alabama; Singapore; the Republic of the Marshall Islands; the Cayman Islands; Panama; and the British Virgin Islands.   These fees consist of the amounts paid for a permit or license to operate a business within a respective jurisdiction, with the exception of a commercial rent tax payable in New York for the Debtors' New York office.   The Debtors remit almost all of these fees to the relevant Authorities on an annual or quarterly basis.   In general, the Debtors pay to the appropriate Authorities such fees as the Debtors deem reasonably appropriate for the operation of their businesses.   The Debtors estimate that they will incur $63,645.00 in business fees for the 2016 calendar year.   Of this amount $55,645.00 is estimated to arise out of the period prior to the Petition Date.

*(iii)    Franchise Taxes*

72.     The Debtors are required to pay various state franchise taxes to continue conducting their businesses pursuant to state laws.   The states that require the Debtors to remit franchise taxes include: Alabama; Delaware; California; Louisiana; Massachusetts; the state of New York; the city of New York; and Texas.   The Debtors typically pay the franchise taxes on an annual or quarterly basis.   The Debtors estimate that they will owe $375,935.00 in franchise taxes for the 2016 calendar year, with approximately $73,920.00 applicable to the pre-petition period.

*(iv)    Property Taxes*

73.     The Debtors are required to pay various personal property and ad valorem taxes to localities in which they conduct their business.   The Debtors pay these taxes on an annual basis.

The Debtors estimate that they will pay $331,700.00 in property taxes for the 2016 calendar year in the following jurisdictions: the city of New Orleans, Louisiana; the parish of Plaquemines, Louisiana; the county of Hillsborough, Florida; the county of Dallas, Texas; and the county of Mobile, Alabama. Of these amounts, the Debtors believe that $331,700.00 of this amount will be attributable to the pre-petition period.

(v)    *Sales and Use Taxes*

74.    The Debtors also occasionally incur, collect, and remit sales taxes to the Authorities in connection with their businesses. These taxes are not paid on a regular basis. The Debtors estimate that they will owe $8,451.66 in connection with sales and use taxes for the 2016 calendar year, of which approximately $3,399.36 will be attributable to the period prior to the Petition Date.

(vi)    *Foreign Taxes*

75.    Because part of the Debtors' business is conducted overseas, they also owe certain jurisdiction specific taxes to foreign Authorities. The Debtors generally pay income taxes on an annual basis to the appropriate authorities in Singapore. Foreign taxes due also include tonnage taxes. A tonnage tax is levied on a ship-owning entity based on the net tonnage of the ships that the entity operates to the following jurisdictions: the Marshall Islands and Singapore. Tonnage Taxes are generally paid in advance and due annually. The Debtors also owe value added taxes to the appropriate authorities in Singapore. The Debtors estimate that they will owe $26,184.00 to foreign Authorities for the 2016 calendar year and that $20,184.00 of that amount will be applicable to the pre-petition period.

76.    The Debtors' failure to pay the Fees and Taxes could materially and adversely impact their business operations and threaten their reorganization in several ways. Any

regulatory dispute or delinquency that impacts the Debtors' ability to conduct business in a particular jurisdiction could have a wide-ranging and adverse effect on the Debtors' operations as a whole. Specifically, the Debtors' failure to pay the Taxes and Fees could adversely affect the Debtors' business Operations because, among other things, (a) the Authorities could initiate audits of the Debtors or prevent the Debtors from continuing their business, which, even if unsuccessful, would unnecessarily divert the Debtors' attention away from the reorganization process; (b) the Authorities could attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and pursue other remedies that will harm the estates; and (c) certain directors and officers might be subject to personal liability—even if such a failure to pay such Taxes and Fees was not a result of malfeasance on their part—which would undoubtedly distract these key employees from their duties related to the Debtors' restructuring..

**D.     Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Maintain Existing Insurance Programs and (B) Pay All Obligations in Respect Thereof; and (II) Authorizing Financial Institutions to Honor and Process All Related Checks and Electronic Payment Requests (the "Insurance Motion")**

*(i)     Insurance Programs*

77.     In connection with the operation of their business, the Debtors maintain comprehensive insurance programs (collectively, the "Insurance Programs") that include a variety of policies through several different insurance carriers and an insurance club (collectively, the "Insurance Carriers"). A detailed list of the Insurance Programs is annexed to the Insurance Motion as Exhibit C.

78.     The Debtors maintain the Insurance Programs to protect their personnel and the vessels against accident-related risks that may arise in the course of their shipping business. The nature of the Debtors' shipping business and the operation of the vessels carry inherent risks, including mechanical failure, collision, property loss, cargo loss or damage, personal injury, and

46

potential business interruption due to political instability in foreign countries, labor strikes, piracy, or potential hostilities. Additionally, there are inherent liabilities that arise from owning and operating the vessels in international trade.[29]

79.    In order to protect the Debtors against such risks, as well as other risks associated with operating any business, the Insurance Programs include, but are not limited to, the following types of coverage:

(a)    <u>Protection and Indemnity</u>.    The protection and indemnity policies generally provide insurance against loss, damage, liability, or expense, including liabilities relating to wreck removal, injury, or death of employees, passengers or other third parties, and loss or damage to cargo that is incurred by the Debtors in connection with the operation of their vessels. The protection and indemnity policies cover war risks, protecting the Debtors against losses to the vessels due to acts of war, revolution, rebellion, insurrection, and piracy. The protection and indemnity policies further protect the Debtors against losses to the vessels from losses from any chemical, biological, bio-chemical, or electromagnetic weapon.

(b)    <u>Hull and Machinery</u>.    The hull and machinery policies provide coverage against damages or total loss of a vessel caused by risks of the sea, fire, explosion, and liabilities resulting from a collision or the break-down of a vessel as a result of normal wear and tear.    The hull and machinery policies also include coverage for loss of hire.

(c)    <u>Hull and Machinery Increased Value</u>.    The increased value insurance is ancillary to the hull and machinery policies and is designed to cover an additional percentage of the vessel's insured value in the event of a total loss. Such policies also protect against loss of freight.

(d)    <u>War Risk</u>.    The war risk policy is an as-needed policy taken out in the event that work is performed in an area of ongoing or constant conflict, and is intended to cover hull and machinery.

(e)    <u>Bumbershoot Liabilities</u>.    The bumbershoot insurance offers excess coverage for underlying policies including but not limited to general liability, marine general liability, protection and indemnity, and foreign liability.

---

[29]    In addition, Debtors Tower LLC and Frascati Shops, Inc. maintain the appropriate insurance coverage necessary to operate a rail repair yard.

(f)    Marine General Liability.  The marine general liability insurance covers a range of areas including bodily injury and property damage, personal and advertising injury, and medical payments.

(g)    Equipment Floater/Rolling Stock.  The equipment floater insurance covers direct physical damage to contractors' equipment.

(h)    Commercial Property.  The commercial property policies provide coverage of buildings, personal property, electronic data processing, machinery and equipment, and business income with extra expense other than rental value in the event of all risk excluding flood and earth movement and terrorism.

(i)    Commercial Auto.  The commercial auto policies provide coverage for personal injury and damage to property resulting from collisions involving automobiles used in the Debtors' business.

(j)    Cargo.  The cargo policies cover fleet materials and merchandise shipped in the course of business against physical loss or damage.

(k)    Workers' Compensation.  The workers' compensation policies provide coverage from claims by employees who have suffered bodily harm by accident or disease as a result of their employment. These policies include coverage for acts of terrorism.

(l)    Directors and Officers Policies.  The Debtors also maintain director and officer insurance policies ("D&O Insurance") to indemnify the Debtors' directors and officers from claims brought against such individuals in their capacities as executives and directors.

   (ii)    *Insurance Obligations*

80.    The Debtors have incurred and continue to incur certain obligations relating to the Insurance Programs (such obligations, including those which accrued prior to the Petition Date, the "Insurance Obligations"). The different categories of Insurance Obligations include the following: (i) fixed-rate premiums based on a rate established by each Insurance Carrier, which are generally payable on a quarterly or annual basis; (ii) deductibles and other fees related to the

Insurance Programs; (iii) certain fully reimbursable obligations and advances;[30] (iv) premium payments to the Standard Club, an insurance club based in London, England, of which the Debtors are a member and who provides the Debtors' protection and indemnity coverage; and (v) payments to insurance broker Marsh LLC ("Marsh") who assists the Debtors with the procurement and negotiation of the balance of the Insurance Programs.[31]

81.    During the 12 months preceding the Petition Date, the Insurance Obligations paid by the Debtors include (i) approximately $7.578 million in premiums, (ii) approximately $2.092 million in deductibles, (iii) approximately $1.8 million in certain fully reimbursable obligations and advances, and (iv) approximately $214,000 in broker's fees.  As of the Petition Date, the Debtors owe approximately $3.7 million on account of pre-petition Insurance Obligations.  The Debtors expect to pay premiums, deductibles, reimbursable obligations and advances, and brokers' fees during the anticipated timeframe of these chapter 11 cases as and when they come due, as described in Exhibit C annexed to the Insurance Motion. As noted in footnote 4, certain of these obligations may relate to pre-petition obligations and certain of such payments may ultimately be fully reimbursable by the applicable Insurance Carrier.

82.    The Debtors submit that the continuation of the Insurance Programs and the payment of any Insurance Obligations are necessary and essential to the preservation of the

---

[30]    In certain instances, claims against the Debtors, although fully insured, must first be paid by the Debtors in full prior to being reimbursed by the applicable insurance company.  For example, the Debtors recently settled an asbestos-related claim that requires, pursuant to the terms of the Debtors' applicable insurance policy, that the Debtors pay the settlement amount in three (3) monthly installments.  The Debtors will then be reimbursed by the insurance company thirty (30) days following each monthly installment.  In addition, one of the Debtors' vessels is currently undergoing repair work, which repairs are fully covered by insurance.  However, similar to the asbestos-related claim, the Debtors must also pay this claim for repair work in full before receiving reimbursement from the applicable insurance company.

[31]    The Debtors also have certain pre-petition obligations related to custom duties in India.  Although the amounts due in connection with these custom duties are insured, the amounts are often less than the deductible, and are effectively self-insured by the Debtors.

Debtors' estates. The potential exposure to the Debtors and their estates in the event that the Insurance Programs are not maintained is an unreasonable risk for any debtor or debtor-in-possession to take. The Insurance Programs that the Debtors seek to maintain by this motion fall within the definition of payments made in the ordinary course of business as contemplated by Bankruptcy Code section 363(c).

83.      Continuation of the Insurance Programs is imperative to the Debtors' continued operation and their ability to restructure, and payment of the Insurance Obligations is essential to ensure that the value of the Debtors' estates is maintained. The Debtors need to minimize the risks associated with operating the business, particularly those unique to the maintenance and operation of their vessels. Even a brief delay or suspension in the Debtors' ability to pay the Insurance Obligations could create significant risk that they would void or otherwise eviscerate the benefits of the Insurance Programs, including those programs intended to protect the vessels.

84.      Any disruption of the Debtors' insurance coverage could cause, among other things: (i) the incurrence of direct liability for payment of claims, including potential administrative liabilities, that would otherwise have been payable (outside of applicable deductibles) by the Insurance Carriers under the Insurance Programs; (ii) the incurrence of material costs or losses that would otherwise have been reimbursed by the Insurance Carriers under the Insurance Programs; (iii) consequences to the Debtors' ability to conduct business in jurisdictions that require the Debtors to maintain certain insurance coverage; (iv) the inability to obtain equivalent coverage from alternative sources; and (v) the incurrence of higher costs in order to re-establish lapsed insurance policies or obtain new insurance coverage. Accordingly, the Debtors submit that the Court should grant the relief requested in the Tax Motion because

maintenance of the Insurance Programs and payment of all Insurance Obligations is warranted

and is in the best interests of the Debtors' estates, creditors, and all parties in interest.

**E.     Debtors' Motion for the Entry of Interim and Final Orders Establishing Notification and Hearing Procedures for Transfers of, or Claims of Worthlessness With Respect to, Certain Equity Securities (the "<u>Trade Restrictions Motion</u>")**

85.     As of the Petition Date, the Debtors had NOLs of approximately $30,223,384.00.

These NOLs could translate into a potential future tax savings of approximately $12,089,353.60,

based on a combined federal and state income tax rate of approximately forty-percent (40%).

Failure to preserve the Debtors' NOLs would cause the Debtors' estates to suffer a significant

tax liability to the detriment of stakeholder interests.

86.     Similar to NOLs, the Tax Credits and other Tax Attributes are valuable assets of

the Debtors' estates.  The Tax Credits, like NOLs, may be used by the Debtors to offset future

income and reduce future federal income taxes.  By establishing procedures for continuously

monitoring the trading of all classes of Equity Securities, the Debtors can preserve their ability to

seek substantive relief at the appropriate time, particularly if it appears that additional trading

may jeopardize the use of their Tax Attributes.  Accordingly, the Debtors are seeking to establish

the following procedures (collectively, the "<u>Equity Trading Procedures</u>"):

> *i.*     Any entity (as defined in section 101(15) of the Bankruptcy Code, an "<u>Entity</u>") who currently is or becomes a Substantial Shareholder (as such term is defined in paragraph (vi) below) must file with the Court, and serve upon counsel to the Debtors, a declaration of such status, substantially in the form of <u>Exhibit 1</u> to the Proposed Interim Order, on or before the later of (i) thirty (30) days after the date of the Notice of Interim Order (as defined herein) and (ii) ten (10) days after becoming a Substantial Shareholder.

> *ii.*     Prior to effectuating any transfer of Beneficial Ownership (as such term is defined in paragraph (vi) below) of any class of Equity Securities (including Options to acquire any such class of securities) that would result in an increase in the amount of Equity Securities of which a Substantial Shareholder has Beneficial Ownership or that would result in

an Entity becoming a Substantial Shareholder, such Entity shall file with the Court, and serve upon the Debtors and Debtors' counsel, an advance written declaration of the intended transfer of Equity Securities in the form of Exhibit 2 to the Proposed Interim Order (each, a "Declaration of Intent to Purchase, Acquire or Otherwise Accumulate Equity Securities"), specifically and in detail describing the proposed transaction in which shares of any class of Equity Securities would be acquired. At the holder's election, the Declaration of Intent to Purchase, Acquire or Otherwise Accumulate Equity Securities to be filed with the Court may be redacted to exclude such holder's federal tax identification number and the number of shares of any class of Equity Securities that such holder beneficially owns and proposes to purchase or otherwise acquire.

iii.    Prior to effectuating any transfer of Beneficial Ownership of any class of Equity Securities that would result in a decrease in the amount of shares of any class of Equity Securities of which a Substantial Shareholder has Beneficial Ownership or would result in an Entity ceasing to be a Substantial Shareholder, such Substantial Shareholder must file with the Court, and serve upon counsel to the Debtors, an advance written declaration of the intended transfer of Equity Securities in the form of Exhibit 3 to the Proposed Interim Order (each, a "Declaration of Intent to Sell, Trade, or Otherwise Transfer Equity Securities" and with a Declaration of Intent to Purchase, Acquire or Accumulate Equity Securities, each, a "Declaration of Proposed Transfer"). At the holder's election, the Declaration of Intent to Sell, Trade, or Otherwise Transfer Equity Securities to be filed with the Court may be redacted to exclude such holder's federal tax identification number and the number of shares of any class of Equity Securities that such holder beneficially owns and proposes to sell or otherwise transfer.

iv.    The Debtors shall have thirty (30) calendar days after receipt of a Declaration of Proposed Transfer to file with the Court and serve on such Substantial Shareholder an objection to any proposed transfer of shares of any class of Equity Securities described in the Declaration of Proposed Transfer on the grounds that such transfer might adversely affect the Debtors' ability to utilize their Tax Attributes. If the Debtors file an objection, such transaction would not be effective unless such objection is withdrawn by the Debtors or such transaction is approved by a final order of the Court that becomes non-appealable. If the Debtors do not object within such thirty (30) day period, such transaction could proceed solely as set forth in the Declaration of Proposed Transfer. Further transactions within the scope of this paragraph must be the subject of additional notices in accordance with the procedures set forth herein, with an additional thirty (30) day waiting period for each Declaration of Proposed Transfer.

*v.*    Effective as of the Petition Date and until further order of the Court to the contrary, any acquisition, disposition or other transfer of Beneficial Ownership of shares of any class of Equity Securities, including Options to acquire shares of any class of Equity Securities, in violation of the procedures set forth herein shall be null and void *ab initio* as an act in violation of the automatic stay under Bankruptcy Code sections 362 and 105(a).

*vi.*    Definitions:

a)    a "Substantial Shareholder" is any Entity that has Beneficial Ownership of at least:

(A)    353,250 shares of Common Stock, representing approximately 4.75% of the outstanding shares of Common Stock; or

(B)    11,875 shares of Series A Preferred Stock, representing approximately 4.75% of the outstanding shares of Series A Preferred Stock; or

(C)    15,022 shares of Series B Preferred Stock, representing approximately 4.75% of the outstanding shares of Series B Preferred Stock.

b)    "Beneficial Ownership" (or any variation thereof of any class of Equity Securities and Options to acquire any class of Equity Securities) shall be determined in accordance with applicable rules under IRC section 382, the U.S. Department of Treasury regulations (the "Treasury Regulations") promulgated thereunder and rulings issued by the Internal Revenue Service (the "IRS"), and, thus, to the extent provided in those rules, shall include, without limitation, (A) direct and indirect ownership (*e.g.*, a holding company would be considered to beneficially own all stock owned or acquired by its wholly-owned subsidiaries), (B) ownership by a holder's family members and any group of persons acting pursuant to a formal or informal understanding to make a coordinated acquisition of stock, and (C) ownership of Equity Securities that such holder has an Option to acquire.

c)    an "Option" to acquire stock includes any contingent purchase right, warrant, convertible debt, put, call, stock subject to risk of forfeiture, contract to acquire stock or

similar interest, regardless of whether it is contingent or otherwise not currently exercisable.

vii.   Except to the extent information contained in a Declaration of Proposed Transfer or a Declaration of Intent to Claim a Worthless Securities Deduction (as defined below) is public or in connection with an audit or other investigation by the IRS or other taxing authority, the Debtors shall keep such notices and any additional information provided pursuant to the Interim Order strictly confidential; *provided*, *however*, that the Debtors may disclose the information in a Declaration of Proposed Transfer or a Declaration of Intent to Claim a Worthless Securities Deduction to their counsel and professional advisors and those of any other Entities that are subject to a nondisclosure agreement with the Debtors (as applicable), each of whom shall keep all such notices strictly confidential; *provided*, *further*, *however*, the Debtors will redact the name and address of the submitting party prior to sharing any Declaration of Proposed Transfer or a Declaration of Intent to Claim a Worthless Securities Deduction with any other Entities that are subject to a nondisclosure agreement with the Debtors (as applicable).

vii.   The Debtors may waive, in writing, any and all restrictions, stays and notification procedures contained in the Proposed Orders.

87.   The Debtors are also seeking an order restricting the ability of shareholders that own or have owned at any time since December 1, 2012, fifty-percent (50%) or more, by value, of any class of Equity Securities to claim a deduction for the worthlessness of those securities on their federal or state tax returns for a tax year ending before the Debtors emerge from chapter 11 protection.  By restricting a holder of fifty-percent (50%) or more of the shares in a class of Equity Securities from claiming a worthlessness deduction prior to the Debtors' emergence from chapter 11 protection, the Debtors can preserve their ability to seek substantive relief to use the NOLs at a later date.   Accordingly, the Debtors have requested an order establishing the following procedures (the "Worthless Stock Deduction Procedures"):

i.   Any Entity that currently is or becomes a 50% Shareholder (as such term is defined in paragraph (iv) below) must file with the Court, and serve upon counsel to the Debtors, a notice of such status, in the form of Exhibit 4 to the Proposed Interim Order, on or before the later of (a) thirty (30) days after the date of entry of the Proposed Interim Order, and (b) if they

54

are not currently and have not been a 50% Shareholder as of the time of the Proposed Interim Order, ten (10) days after becoming a 50% Shareholder.

ii.    Prior to filing any federal or state tax return, or any amendment to such a return, claiming any deduction for worthlessness of any class of the Equity Securities of International Shipholding Corporation, for a tax year ending before the Debtors' emergence from chapter 11 protection, such 50% Shareholder must file with the Court, and serve upon counsel to the Debtors, an advance written notice, in the form of Exhibit 5 to the Proposed Interim Order (a "Declaration of Intent to Claim a Worthless Stock Deduction"), of the intended claim of worthlessness.

iii.    The Debtors will have thirty (30) calendar days after receipt of a Declaration of Intent to Claim a Worthless Stock Deduction to file with the Court and serve on such 50% Shareholder an objection to any proposed claim of worthlessness described in the Declaration of Intent to Claim a Worthless Stock Deduction on the grounds that such claim might adversely affect the Debtors' ability to utilize their Tax Attributes.  If the Debtors file an objection, the filing of the return with such claim would not be permitted unless approved by a final and non-appealable order of the Court.  If the Debtors do not object within such thirty (30) day period, the filing of the return with such claim would be permitted only as set forth in the Declaration of Intent to Claim a Worthless Stock Deduction. Additional returns within the scope of this paragraph must be the subject of additional notices as set forth herein, with an additional thirty (30) day waiting period.

iv.    For purposes of these procedures a "50% Shareholder" is any Entity that at any time since December 1, 2012 has or had Beneficial Ownership of at least 3,718,417 shares of Common Stock, representing approximately 50% of the outstanding shares of Common Stock; or 125,000 shares of Series A Preferred Stock, representing approximately 50% of the outstanding shares of Series A Preferred Stock; or 158,125 shares of Series B Preferred Stock, representing approximately 50% of the outstanding shares of Series B Preferred Stock (determined in accordance with IRC section 382(g)(4)(D) and the applicable regulations thereunder).

v.    The Debtors may waive, in writing and in their sole and absolute discretion, any restrictions, sanctions, remedies, stays, or notification procedures contained in this motion or in any order granting the relief requested herein.

**F.** **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Payment of Certain Critical Trade Claims in the Ordinary Course of Business; and (II) Authorizing Financial Institutions to Honor All Related Checks and Electronic Payment Requests (the "Critical Vendors Motion")**

88.     The Debtors rely on numerous domestic and international suppliers, professionals, and vendors who supply various goods and services to the Debtors used in the operation of their business.   The Debtors have carefully reviewed and analyzed their books and records, and consulted operations management, and relevant personnel to identify those domestic and international vendors of goods and services (collectively, the "Critical Trade Creditors," whose pre-petition claims shall be identified herein collectively as the "Critical Trade Claims"), the absence of which would immediately threaten the Debtors' operations or cause the Debtors to operate with significantly higher costs.   The Critical Trade Creditors include vendors outside the United States, and those who may be able to assert maritime liens on the Debtors' vessels for work and other services they have provided for the Debtors' vessels benefit.   Given the fact that a significant portion of the Debtors' operations are conducted outside the United States, and given the fact that maritime vendors are almost always entitled to arrest or to assert maritime liens if they are not paid, the payments sought to be authorized by the Critical Vendors Motion encompass the vast majority of the Debtors' vendor payables that are paid in the ordinary course of business.

89.     In the maritime industry, the timing of a vendor's supply can render such vendor a Critical Trade Creditor.   The Debtors are involved in a highly transactional and capital intensive business.   As a result, the Debtors are highly dependent on their ability to order and receive materials from vendors in a particular timeframe.   The Debtors' current vendors are familiar with the Debtors' numerous vessels and if, for example, a replacement part or specialized lube is

needed at any port which the vessels frequent, the current vendors can deliver the right product in a timely fashion.

90.     The Critical Trade Creditors supply the Debtors' vessels with goods and services that could arguably be considered "necessaries" as that term is understood under United States maritime law and the laws of other jurisdictions.[32]  *See e.g.* 46 U.S.C. § 31301(4) ("'necessaries' includes repairs, supplies, towage, and the use of dry dock or marine railway").  Creditors alleging claims for necessaries under maritime law may claim a maritime lien against the Debtors' vessels, similar to shippers', warehousemens', and artisans' liens in the United States.

91.     In determining which domestic and international vendors of goods and services should be considered Critical Trade Creditors, the Debtors considered other numerous factors, including whether:

- a vendor is a sole- or limited-source or high-volume supplier;

- alternate vendors exist to provide the same or similar goods or services on equal or better terms;

- the Debtors could continue to operate while transitioning their business to a replacement vendor, taking into account the costs of replacing a vendor (including pricing, transition expenses, professional fees, and lost sales or future revenue) and the degree to which replacement costs exceed the amount of the vendor's pre-petition claim;

- a contract exists by which the Debtors could compel the vendor's continued performance on pre-petition terms and, if so, whether the Debtors could enforce it in a timely, cost-efficient manner without the undue burden on, or disruption of, the Debtors' business and operations;

- certain specifications and/or requirements unique to the Debtors' operations would prevent obtaining goods or services from alternate sources;

---

[32]  The Debtors make no admission as to the nature of any claim or lien against any vessels based on necessaries, and reserve all rights with respect to the same.

- failure to pay all or part of a particular vendor's claim could cause the vendor to refuse to supply critical goods or provide critical services on a post-petition basis; and/or

- failure to pay a particular vendor could result in a contraction of trade terms as a matter of applicable non-bankruptcy law or regulation.

92.    Following this analysis, the Debtors identified the categories of Critical Trade Creditors described below.   These Critical Trade Creditors supply goods and services to the Debtors that are necessary to operate their businesses, which, in certain instances, may include, but are not limited to, services critical to the Debtors' operations, shipping supplies and materials, and information technology, and other computer-related services.  With respect to the Debtors' Critical Trade Creditors, replacement vendors, even where available, would likely result in higher costs for the Debtors and, in certain instances, would substantially interfere with the Debtors' ability to operate going forward.

93.    If the Debtors can benefit from maintaining lower costs of goods and services purchased during the post-petition period and avoid the severe disruption that might be caused by a cessation of service, prudence dictates that the Debtors should have the authority to pay selected Critical Trade Creditors some or all of their pre-petition claims.  The Debtors intend that such payments would be contingent on an agreement by the relevant Critical Trade Creditor that it will continue to sell goods or provide services to the Debtors on a go-forward basis on terms favorable to the Debtors.  Nonetheless, the Debtors seek the right, in their sole discretion, to pay a Critical Trade Creditor without such agreement if such payment is necessary to avoid immediate and irreparable harm to, and is in the best interest of, their estates.

94.    As of the Petition Date, the Debtors believe they owe the Critical Trade Creditors approximately $10,424,279.85.   To preserve and protect their relationships with the Critical

Trade Creditors and to ensure the supply of goods and services critical to the Debtors' operations, the Debtors request authority to pay, in the ordinary course of business, up to $7,171,995.76 of Critical Trade Claims upon entry of the Proposed Interim Order (the "Interim Critical Trade Cap") and up to $10,424,279.85 million of Critical Trade Claims upon entry of the Proposed Final Order (the "Critical Trade Cap"). The Critical Trade Creditors provide a variety of goods and services to the Debtors, including those set forth below.

95.    *Technical Manager Fees*.    Like most international shipping companies, the Debtors outsource the technical and operational management of their international-flagged vessels to technical managers, including Wallem Ship Management Inc. (the "Technical Managers").    As part of the Technical Managers' services, these managers oversee the maintenance and efficiency of the vessels, employ and compensate the crew that work on the vessels, arrange for necessary ship provisions and repairs, and organize the supply, transport, and the handling of goods.    Moreover, pursuant to standard shipping industry management agreements, the Technical Managers act on behalf of the Debtors to disburse funding to certain other Critical Trade Creditors.    Given the vast network of vendors that provide goods and services on account of each vessel, the services provided by the Technical Managers with respect to management of vendor relationships provides the Debtors with a competitive advantage. Absent these services, the Debtors would be required to negotiate with and administer separate accounts with hundreds of different vendors.

96.    *Agents' Expenses and Costs*.    In the ordinary course of their business operations, the Debtors regularly use several third-party agents to arrange for, in connection with both the Debtors' domestic and international ships:  (i) any and all necessary ship provisions and repairs; (ii) the organization of the supply, transport, and handling of goods; and (iii) the payment of

certain port expenses accrued by the Debtors' vessels (rather than the charter party), which expenses include pilotage, docking masters, towage, mooring, tugs, harbor dues, and tonnage dues. These third-party agents could terminate their ongoing relationships with the Debtors if there is any lapse in payment, and the Debtors would be required to hire additional office staff to perform the services done by these third-party agents at the expense of the Debtors' estates. Payment of the agents' fees in exchange for these critical services is vital to the Debtors' ability to continue to operate.

97. *Providers of Bunkers & Lubes*. In the ordinary course of their business, the vessels must routinely be provided with fuel ("Bunkers") and lubricants ("Lubes"). Bunkers and Lubes are crucial to the operation of the engine and most other mechanical functions on board the vessels. Under the Debtors' existing agreements, the Debtors are generally responsible for paying for Bunkers and Lubes utilized by their vessels. However, occasionally, the Bunkers and Lubes utilized by the Debtors' vessels are paid for, or reimbursed by a customer, or third party. The Debtors primarily rely on approximately five (5) to ten (10) vendors around the globe to supply and ship the Bunkers and Lubes. Without Bunkers and Lubes, the vessels cannot serve customers. Bunkers and Lubes must also be procured in close proximity to the vessels, which in many cases, limits the availability of alternative suppliers.[33]

98. *Cabin, Deck and Engine Stores, and Spares*. Stores consist of materials necessary to keep the vessels operating. These necessary materials may include communication systems, engineer's tools, chemicals, gases, spare parts, paints, safety equipment, cloth and linen products, rigging, and equipment. To ensure that vessels are able to maintain their schedules, stores are

---

[33]   Bunker and Lube vendors may also assert that they are entitled to a lien on the Bunkers if they are not paid in full, notwithstanding the application of the automatic stay under Bankruptcy Code section 362.

often supplied by foreign vendors in close physical proximity to the vessels.  Stores are of a specialized nature, which makes it imperative that relationships with these vendors are maintained.

99.    *General Maintenance and Repair*.  It is essential that the vessels (*e.g.* engines, decks, hulls, communications equipment, and radar) be maintained and repaired for safe and efficient operation.

100.    *Dry Docking and Special Surveys*.  The vessels are subject to dry docking when special surveys are conducted every two and a half (2.5) to five (5) years, as required under applicable maritime law.  Prior to the Petition Date, certain of the Debtors' vessels had been subject to dry docking and special surveys.  As a consequence, these vessels incurred significant one-time expenses associated with dry docking and surveys, including shipyard expenses, paints, spares, and engineer services.  Services of this nature are critical to ensuring the Debtors' vessels maintain the desired class designation, without which they would not be able to sail or procure insurance.

101.    *Safety and Quality*.  The vessels and their machinery are on a continuous survey inspection to ensure safe operating conditions.  As a result, the vessels continuously maintain and add safety equipment to meet governmental and certification bureau standards.  In order to assure the quality of the vessels, and the safety of the crew, and others, it is necessary to satisfy those vendors who provide services and goods related to safety and quality of the vessels.

102.    *Other Vendors, Suppliers, and Service Providers*.  In addition, in connection with vessels that the Debtors manage "in-house," the Debtors regularly transact directly with other Critical Trade Creditors, including maintenance service providers, spare parts suppliers, dry dock

service providers, communications service providers, and security service providers. The services provided by these parties are equally critical to the Debtors' business operations.

103.    While the Debtors hope and expect to be able to ensure a continuing post-petition supply of goods and services through consensual negotiation with the Critical Trade Creditors, the Debtors recognize that their fiduciary duties bind them to consider and plan for vendors that refuse to provide future goods or services unless their pre-petition claims are paid. The Critical Trade Creditors are so essential to the Debtors' business that the lack of each of their particular goods and services, even for a short duration, would severely disrupt the Debtors' operations and cause irreparable harm to the Debtors' business, goodwill, and market share. This irreparable harm to the Debtors and to the recovery of all creditors would far outweigh the cost of payment of the pre-petition claims of the Critical Trade Creditors.

**G.    Debtors' Motion for Entry of an Order Enforcing and Restating the Automatic Stay, *Ipso Facto* and Non-Discrimination Provisions (the "<u>Automatic Stay Motion</u>")**

104.    Given the global nature of the Debtors' shipping business, they regularly transact with vendors and suppliers of goods and services, as well as governmental units, located outside the United States. These foreign creditors and counterparties are not likely to be familiar with the Bankruptcy Code, particularly with respect to the various protections it affords to chapter 11 debtors, including the automatic stay. As such, the Debtors believe there is a risk that certain foreign creditors and counterparties will not adhere to, or respect, the automatic stay or the orders of a court in the United States. Any such act by a foreign creditor or counterparty in contravention of the Bankruptcy Code could cause a severe disruption to the Debtors' ability to operate their business, which depends on the ability to travel without hindrance or delay through international waters and transact in numerous foreign ports of call. Accordingly, the Debtors

believe that the relief requested in the Automatic Stay Motion is necessary to mitigate this type of disruption and/or self-help.

105.    Entry of the Proposed Order is necessary to inform any affected parties of the existence of Bankruptcy Code sections 362, 365, and 525, and the protections they afford the Debtors and their assets, regardless of where such assets are located.  The Debtors believe that entry of the Proposed Order will also help protect them and their assets from any improper actions that may be taken, including actions that may be taken by foreign parties that may be unaware of the protections of the Bankruptcy Code and may therefore unwittingly violate it.

**H.    Debtors' Motion for Entry of Interim and Final Orders: (I) Authorizing the Debtors to Pay Certain Pre-Petition Claims (A) of Shippers and Warehousemen, (B) of Miscellaneous Lien Claimants, (C) Arising Under Bankruptcy Code Sections 503(b)(9) and (b)(1) and (D) Incurred in Connection with Post-Petition Delivery of Goods and Services; and (II) Authorizing Financial Institutions to Honor and Process Checks and Electronic Payment Requests Related to the Foregoing Obligations; and (III) Scheduling a Final Hearing (the "<u>Lien Claimants Motion</u>")**

106.    Various third parties who provide goods and services to the Debtors, such as shippers and transporters (collectively, the "<u>Shippers</u>,") and certain third-party warehousemen (collectively, the "<u>Warehousemen</u>," and, together with the Shippers, the "<u>Shippers and Warehousemen</u> and, the claims thereof, the "<u>Shipping and Warehousing Claims</u>"), may be able to assert liens against the Debtors' assets.  In addition, due to the nature of the Debtors' business, certain vendors may have claims entitled to administrative expense priority under Bankruptcy Code section 503(b)(9) (collectively, the "<u>503(b)(9) Claims</u>" and, holders of such claims, the "<u>503(b)(9) Claimants</u>").

107.    It is critical to the Debtors' business operations that the Debtors continue to receive, without disruption, goods and services, as applicable, from the Shippers and Warehousemen, Miscellaneous Lien Claimants (as defined below), and 503(b)(9) Claimants

(collectively, the "Trade Claimants," whose claims shall be identified herein collectively as the "Trade Claims").   The Debtors believe that without the relief requested in the Lien Claimants Motion, many of these vendors will cease delivering goods and providing services to the Debtors.  Any such disruption would have a devastating effect on the Debtors' operations and their reorganization efforts.

(i)        *Shipping and Warehousing Claims*

108.    The Debtors depend upon reputable Shippers and Warehousemen to transport and store goods and property that are essential to the Debtors' current and future operations.  The Debtors utilize three warehouses:  one (1) located in Tampa, Florida and two (2) located in New Orleans, Louisiana.  The items stored at the Tampa warehouse include, among other things, shafts and propellers.  The items stored at the New Orleans warehouses include, among other things, anchor chain, chain link, gantry, a crane, buckets, and a rock flat.  The Shippers provide a variety of goods required by the Debtors' vessels, including consumables, such as food and water, and non-consumables, such as ship parts and other supplies.  The Shippers also provide waste removal services.  The Debtors expect that, as of the Petition Date, certain Shippers and Warehousemen may have outstanding invoices for goods or supplies (i) delivered to the Debtors before the Petition Date or for those currently in transit, and (ii) currently in storage by the Warehousemen.  The estimated value of goods and supplies in transit and storage on the Petition Date is approximately $2,250,420.17.  The Debtors estimate that, as of the Petition Date, approximately $228,571.56 has accrued and remains unpaid on account of such claims.

109.    To prevent immediate and irreparable harm to the Debtors' business, the Debtors seek authority to pay, in the ordinary course of business, up to $228,571.56 of Shipping and Warehousing Claims upon entry of the Proposed Final Order (the "Shipping and Warehousing

Claims Cap"). If the Shipping and Warehousing Claims are not paid, the Shippers and

Warehousemen may assert possessory liens for transportation or storage costs, and refuse to

deliver or store the Debtors' goods and supplies until their invoices are paid and their liens

released, which will severely disrupt the Debtors' operations. As a result, the Debtors may

potentially suffer a significant loss of revenue and future business, which will harm their

reorganization efforts.[34]

    *(ii)*        *Miscellaneous Lien Claims*

110.    The Debtors also rely on supplies and services from a number of third-party

contractors and vendors who can assert liens against the Debtors and their property (such as

equipment and other assets) if the Debtors fail to pay for the goods delivered or services rendered

by such parties. These claimants (the "Miscellaneous Lien Claimants") perform various services

for the Debtors, including the provision of bunkers and lube, towage-related services, railcar

switching services, stevedore-related services, the manufacturing and repair of equipment and

component parts necessary for the Debtors' shipping equipment, and in certain instances, the

supply of certain other goods to the Debtors.

111.    Although the Debtors generally make timely payments to their vendors, as of the

Petition Date, certain vendors, such as Miscellaneous Lien Claimants, may not have been paid

for their goods or services. As a result, the Miscellaneous Lien Claimants may have the right to

assert and perfect, among others, mechanics' or maritime liens (collectively, the "Miscellaneous

Liens") against the Debtors' assets, notwithstanding the application of the automatic stay under

---

[34] For the avoidance of doubt, the Debtors seek authority to only pay those Shipping and Warehousing Claims that they believe, in their business judgment, are necessary or appropriate. The Debtors submit that the total amount to be paid to the Shippers and Warehousemen on account of their pre-petition claims is minimal compared to the direct and indirect losses the Debtors would suffer if a Shipper or Warehouseman refused to deliver or store the Debtors' property.

Bankruptcy Code section 362.  In fact, pursuant to Bankruptcy Code section 362(b)(3), the act of perfecting such Miscellaneous Liens, to the extent consistent with Bankruptcy Code section 546(b), or to the extent the act is accomplished within the thirty (30) day period set forth in Bankruptcy Code section 547(e)(2)(A), is expressly excluded from the automatic stay.  Unless the Miscellaneous Lien Claimants are paid for outstanding pre-petition amounts, the Debtors believe Miscellaneous Lien Claimants may refuse to perform their ongoing obligations with the Debtors and may assert Miscellaneous Liens on equipment in the Debtors' possession, or may refuse to release finished goods in their possession.  The Debtors estimate that approximately $7,799,081.73 on account of pre-petition claims held by the Miscellaneous Lien Claimants (the "Miscellaneous Lien Claims") have accrued as of the Petition Date.

112.    In light of the foregoing, the Debtors seek authority, in their reasonable business judgment and in the ordinary course of business and regardless of whether such Miscellaneous Lien Claimants have already perfected their interests, to pay and discharge the Miscellaneous Lien Claims in an amount  up to $4,028,586.55  of Miscellaneous Lien Claims upon entry of the Proposed Interim Order (the "Interim Miscellaneous Lien Claims Cap") and up to $7,799,081.73 of Miscellaneous Lien Claims upon entry of the Proposed Final Order (the "Miscellaneous Lien Claims Cap").[35]

---

[35]    Notwithstanding the authority requested in the Lien Claimants Motion, the Debtors will not pay a Miscellaneous Lien Claimant on account of any pre-petition claims unless the Miscellaneous Lien Claimant has perfected or, in the Debtors' judgment, is or may be capable of perfecting one or more liens in respect of such claim irrespective of the automatic stay, nor shall payment of a Miscellaneous Lien Claimant's pre-petition claim be deemed to be a waiver of rights regarding the extent, validity, perfection, or possible avoidance of such liens.  The Debtors expect that they will pay only pre-petition claims to the Miscellaneous Lien Claimants when they believe, in their business judgment, the benefits to making such payments would exceed the costs, delays, and disruption associated with bringing an action to compel the turnover of goods held by the Miscellaneous Lien Claimants or otherwise discharging the lien in question.

*(iii)*        *503(b)(9) Claims*

113.    Certain of the Debtors' vendors may be entitled to administrative expense priority under Bankruptcy Code section 503(b)(9) to the extent the Debtors received goods, supplies, or materials from a vendor, in the ordinary course of business, within the twenty (20) day period immediately preceding the Petition Date.   The Debtors' ongoing ability to obtain goods as provided in the Lien Claimants Motion is key to their survival and necessary to preserve the value of their estates.   Because the Bankruptcy Code requires the Debtors to pay such claims in full to confirm a plan of reorganization, the payment of these 503(b)(9) Claims merely affects the timing of such payments, and not the amount.   Currently, any vendors which may have 503(b)(9) Claims that have accrued but remain unpaid as of the Petition Date also provide the Debtors with goods that are vital to the Debtors' operations such that they are also considered Critical Trade Creditors,[36] and therefore the Debtors are not requesting authority to pay any 503(b)(9) Claims on an interim basis.   Nevertheless, the Debtors are continuing to review their records and will seek authority, but not direction, to pay 503(b)(9) Claims upon entry of the Proposed Final Order (the "503(b)(9) Claims Cap").

I.    **Debtors' Motion for Entry of an Order (I) Authorizing Debtors to Prepare and Maintain a Consolidated List of Creditors in Lieu of a Formatted Mailing Matrix; (II) Authorizing Debtors to File a Consolidated List of Top Thirty Unsecured Creditors; and (III) Waiving the Requirement to File a List of Equity Security Holders (the "Creditor Matrix Motion")**

114.    The Debtors submit that maintaining the electronic Creditor List in lieu of preparing and filing a separate creditor matrix for each Debtor is warranted in the chapter 11 cases.   Strict compliance with the List Filing Requirements would distract the Debtors from the efficient management of their estates and the chapter 11 cases and would not provide any

---

[36]    As defined in the Critical Vendors Motion.

corresponding benefit to the Debtors' estates.  In contrast, authorizing the Debtors to maintain a consolidated Creditor List, rather than preparing and filing a separate creditor matrix for each Debtor, will maximize efficiency and accuracy and will reduce costs.  Indeed, preparing a consolidated Creditor List will be sufficient to permit a court-appointed claims and noticing agent to promptly provide notice of all relevant pleadings, notices, dates and deadlines to the appropriate parties.  Accordingly, the Court should waive the List Filing Requirements and authorize the Debtors to maintain a consolidated Creditor List.

115.    Given the affiliated nature of the Debtors and the fact that they share a number of creditors in common, the Debtors believe that filing one (1) Consolidated Top Thirty List would facilitate the U.S. Trustee's review of creditors' claims and its potential appointment of a creditors' committee in the chapter 11 cases.  Under these circumstances, the exercise of satisfying the literal requirements of Bankruptcy Rule 1007(d) would only serve to frustrate its intended purpose.  Considering the inconvenience to the U.S. Trustee of the Debtors filing eighteen (18) separate but very similar Top Twenty Lists and the absence of any corresponding benefit, the Debtors request authority to file the Consolidated Top Thirty List in lieu of filing separate Top Twenty Lists for each Debtor.  The Debtors believe that such relief is appropriate under the circumstances for the efficient and orderly administration of the chapter 11 cases.

**J.    Debtors' Application for Appointment of Prime Clerk LLC as Claims and Noticing Agent (the "Prime Clerk Application")**

116.    Although the Debtors have not yet filed their schedules of assets and liabilities, they anticipate that there will be in excess of 500 entities to be noticed.  The Debtors have therefore obtained and reviewed engagement proposals from Prime Clerk and three (3) other court-approved claims and noticing agents to ensure selection through a competitive process.  The Debtors submit, based on all engagement proposals obtained and reviewed, that Prime

Clerk's rates are competitive and reasonable given Prime Clerk's quality of services and expertise.

**K.    Debtors' Motion for Entry of an Order Granting an Extension of Time to File (I) Schedules and Statements; and (II) Rule 2015.3 Financial Reports (the "SOFA and Schedules Extension Motion")**

117.    The Debtors have started compiling information that will be required to complete the Schedules and Statements.  Nevertheless, as a consequence of the size and complexity of the Debtors' business operations, the large number of Debtors and the critical matters that the Debtors' management and professionals were required to address prior to the commencement of these chapter 11 cases, the Debtors have not yet finished gathering such information.  The Debtors, together with their non-Debtor subsidiaries, held on a consolidated basis approximately $305,087,000 in assets and approximately $226,833,000 in liabilities as indicated in their balance sheet from the end of the first (1st) quarter of 2016.  The Debtors estimate that they have between 500 and 1,000 creditors on a consolidated basis.

118.    Given the numerous critical operational matters that the Debtors' accounting and legal personnel must address in the early days of these chapter 11 cases and the volume of information that must be prepared and included in the Schedules and Statements, the Debtors anticipate that they will be unable to complete their Schedules and Statements within fourteen (14) days after the Petition Date.  Accordingly, the Debtors seek a forty-five (45) day extension—through and including September 28, 2016—of the time to file their Schedules and Statements with the Court.

119.    Preparing and finalizing the Schedules and Statements within the next two (2) weeks would unnecessarily distract key management and professionals from their efforts to

stabilize the Debtors' business operations in the wake of the chapter 11 filings and their nascent

reorganization efforts, including the preservation of creditor and employee relationships.

**L.    Debtors' Motion for Entry of an Order Establishing Certain Notice, Case Management, and Administrative Procedures (the "Case Management Procedures Motion")**

120.    Given the size and complexity of these chapter 11 cases, the Debtors believe that

implementing the proposed procedures in the Case Management Procedures Motion will

facilitate the fair and efficient administration of these cases and promote judicial economy.

Specifically, the proposed procedures will benefit the Debtors, the Court, and all parties in

interest by, among other things:

> a.    reducing the need for emergency hearings and requests for expedited relief;
>
> b.    providing for omnibus hearings for the Court to consider motions, pleadings, applications, objections and responses thereto;
>
> c.    fostering consensual resolution of important matters;
>
> d.    assuring prompt and appropriate notice of matters affecting parties' interests;
>
> e.    allowing for electronic notice pursuant to the Court's electronic filing system;
>
> f.    providing ample opportunity to parties in interest to prepare for and respond to matters before the Court;
>
> g.    reducing the substantial administrative and financial burden that would otherwise be placed on the Debtors and other parties in interest who file documents in these chapter 11 cases; and
>
> h.    reducing the administrative burdens on the Court and the clerk of the Court.

**ADDITIONAL INFORMATION REQUIRED BY LOCAL RULE 1007-2**

121.    Attached hereto as Exhibits B through Exhibit M is additional information

required by Local Rule 1007-2, as set forth below:

a.       <u>Exhibit B</u>: Committees;

b.       <u>Exhibit C</u>: Consolidated List of the Holders of the 30 Largest Unsecured Claims of the Debtors;

c.       <u>Exhibit D</u>: Consolidated List of the Holders of the Five Largest Secured Claims;

d.       <u>Exhibit E</u>: Summary of the Debtors' Assets and Liabilities;

e.       <u>Exhibit F</u>: Publicly Held Securities;

f.       <u>Exhibit G</u>: Debtors' Property Not in Debtors' Possession;

g.       <u>Exhibit H</u>: Debtors' Property;

h.       <u>Exhibit I</u>: Location of Debtors' Assets, Books and Records;

i.       <u>Exhibit J</u>: Litigation;

j.       <u>Exhibit K</u>: Senior Management;

k.       <u>Exhibit L</u>: Payroll; and

l.       <u>Exhibit M</u>: Cash Receipts and Disbursements, Net Cash Gain or Loss, Unpaid Obligations and Receivables.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.


By: */s/ Erik L. Johnsen*
Erik L. Johnsen
President and Chief Executive Officer
International Shipholding Corporation

**Exhibit A**

**Corporate Organizational Chart**



International Shipholding Corporation*
Delaware
100%
Central Gulf Lines, Inc. Delaware
100%
Enterprise Ship Company, Inc. Delaware
100%
CG Railway, Inc. Delaware
49%
Terminales Transgolfo, S.A. de C.V. Mexico
100%
N.W. Johnsen & Co., Inc. New York
100%
LMS Shipmanagement, Inc. Louisiana
100%
Waterman Steamship Corporation New York
100%
Sulphur Carriers, Inc. Delaware
99+%
MPV Netherlands C.V. Netherland
100%
MPV Netherlands Cooperatief U.A. Netherlands
100%
MPV Netherlands B.V. Netherlands
100%
Marco Shipping Company (PTE) Ltd Singapore
100%
Gulf South Shipping PTE Ltd Singapore
100%
LCI Shipholdings, Inc. Marshall Islands
100%
Cape Holding, Ltd. Cayman Islands
100%
Dry Bulk Cape Holding Inc. Panama
100%
Dry Bulk Australia Ltd. BVI
100%
Dry Bulk Americas Ltd. BVI
100%
Frascati Shops, Inc. Alabama
100%
Tower, LLC Alabama
100%
Bulk Shipholding, Inc. Marshall Islands
100%
East Gulf Shipholding, Inc. Marshall Islands
100%
Coastal Carriers, Inc. Delaware
100%
U.S. United Ocean Services, LLC Florida
100%
Sheila McDevitt, LLC Delaware
100%
Mary Ann Hudson, LLC Delaware
Filing entity
Non-filing entity

## <u>Exhibit B</u>

### Committees

Pursuant to Local Rule 1007-2(a)(3), to the best of my knowledge, information and belief, no committees were organized prior to the Petition Date.

Exhibit C

**Consolidated List of the Holders of the 30 Largest Unsecured Claims of the Debtors**

Pursuant to Local Rule 1007-2(a)(4), the following provides information with respect to the holders of the 30 largest unsecured claims against the Debtors on a consolidated basis.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors.  The Debtors reserve all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount or status of any such claim or debt.  In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.  The schedule estimates outstanding claim amounts (including principal and interest) as of the Petition Date.

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim(for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured Claim |
| 1 U.S. Customs & Border Attention: Dept of Homeland Security Bureau of Customs & Border 6650 Telecom Dr Suite 100 Indianapolis, IN 46278 | U.S. Customs & Border Attention: Dept of Homeland Security PHONE: 877-227-5511 FAX: 317-248-4174 EMAIL: cfomedia@cbp.dhs.gov | Government Creditor | Contingent, Unliquidated, Disputed | $0.00 | | $298,878.00 |
| 2 Nippon Yusen Kaisha Attention: General Counsel YSEN Building 3-2, Marunouchi 2 Chome Chiyoda-Ku 100-005 Japan | Nippon Yusen Kaisha Attention: General Counsel PHONE: 81-3-3284-5151 FAX: 81-3-5217-778 EMAIL: Jed.Artz@na.nykline.com; ncl_expso_sales@jp.nykline.com | Trade Creditor | Unliquidated | $0.00 | | $2,913,871.00 |
| 3 Masters Mates & Pilots Attention: Patrick McCullough 700 Maritime Blvd Suite A Linthicom Heights, MD 21090-1996 | Masters Mates & Pilots Attention: Patrick McCullough PHONE: 410-850-8603 FAX: 410-850-8655 EMAIL: Pmccullough@mmpplans.com | Union Obligation | Unliquidated | $0.00 | | $2,875,422.00 |
| 4 Seafarers International Union Attention: Maggie Bowen 5201 Auth Way Camp Springs, MD 20746 | Seafarers International Union Attention: Maggie Bowen PHONE: 301-899-0675 FAX: 301-899-7355 EMAIL: Mbowen@seafarers.org | Union Obligation | Unliquidated | $0.00 | | $2,453,722.00 |
| 5 Meba Medical Benefits Plan Attention: Ann Gilchrist 1007 Eastern Avenue Baltimore, MD 21202 | Meba Medical Benefits Plan Attention: Ann Gilchrist PHONE: 410-547-9111 FAX: 410-385-2024 EMAIL: agilchrist@mebaplans.org | Union Obligation | Unliquidated | $0.00 | | $2,364,005.00 |

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured Claim |
| 6 | Sembcorp Marine Attention: General Counsel 29 Tanjong Kling Road Singapore 628054 Singapore | Sembcorp Marine Attention: General Counsel PHONE: 65-6265-1766 FAX: 65-6261-0738 EMAIL: ir@sembmarine.com; sanlye.chua@sembmarine.com | Trade Creditor | | $0.00 | $1,323,801 |
| 7 | Kristensons Petroleum Co Inc. Attention: Jordan Felber 21 East Front St Red Bank, NJ 07701 | Kristensons Petroleum Co Inc. Attention: Jordan Felber PHONE: 732-788-7002 FAX: 732-219-7919 EMAIL: newyork@kpibridgeoil.com | Trade Creditor | | $0.00 | $1,064,179 |
| 8 | Matson Integrated Logistics Attention: General Counsel 1815 S Meyers Road Ste 700 Oakbrook Terrace, IL 60181 | Matson Integrated Logistics Attention: General Counsel PHONE: 800-462-8766 FAX: 925-887-6230 EMAIL: customerservice@matson.com | Trade Creditor | | $0.00 | $926,680 |
| 9 | Niels W. Johnsen Estate Attention: Christopher C. Schwabacher, Executor Windels Marx Lane & Mittendorf, LLP 156 West 56th Street 22nd Floor New York, NY 10019 | Niels W. Johnsen Estate Attention: Christopher C. Schwabacher, Executor PHONE: 212-237-1078 FAX: 212-262-1215 EMAIL:  cschwabacher@windelsmarx.com | Contract Obligation | | $0.00 | $900,000 |
| 10 | Windels Marx Lane & Mittendorf, LLP Attention: General Counsel 156 West 56th Street New York, NY 10019 | Windels Marx Lane & Mittendorf, LLP Attention: General Counsel PHONE: 212-237-1000 FAX: 212-262-1215 EMAIL:  WMLM@windelsmarx.com | Professional Creditor | | $0.00 | $821,529 |
| 11 | Bomin Bunker Oil PTE Ltd Attention: General Counsel 15 Hoe Chiang Road #06-06 Euro-Asia-Centra Singapore 089316 Singapore | Bomin Bunker Oil PTE Ltd Attention: General Counsel PHONE: 65-6221-9222 FAX: 65-6305-7882 EMAIL: nari@bomin.com.sg; bunkers@bomin.com.sg; ldoering@bomin.com.sg | Trade Creditor | | $0.00 | $753,138 |

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim. If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured Claim |
| 12 | Yusen Navtec Co Ltd<br>Attention: General Counsel<br>Yusen Building 3F<br>3-9 Kaigandori<br>Naka-Ku<br>Yokahama<br>Japan | Yusen Navtec Co Ltd<br>Attention: General Counsel<br>PHONE: 045-663-1401<br>FAX: 045-663-1420<br>EMAIL: navtec@ynt.co.jp;shojibu@ynt.co.jp | Trade Creditor | | $0.00 | | $692,751 |
| 13 | American Bureau Of Shipping<br>Attention: General Counsel<br>16855 Northchase Drive<br>Houston, TX 77060 | American Bureau Of Shipping<br>Attention: General Counsel<br>PHONE: 281-877-5800<br>FAX: 281-877-5803<br>EMAIL: ABS-Amer@eagle.org | Trade Creditor | | $0.00 | | $652,000 |
| 14 | Erik F. Johnsen Estate<br>Attention: R. Christian Johnsen<br>Jones Walker LLP<br>499 S. Capitol Street, SW<br>Washington, DC 20003 | Erik F. Johnsen Estate<br>Attention: R. Christian Johnsen<br>PHONE: 202-203-1012<br>FAX: 202-203-1013<br>EMAIL:   cjohnsen@joneswalker.com | Contract Obligation | Contingent | $0.00 | | $630,000.00 |
| 15 | ISS Machinery Services Limited<br>Attention: General Counsel<br>Osaka Kasen Building<br>Yodoyabashi Square, 2-6-18<br>Kitahama, Chuo-Ku<br>Osaka 541-0048<br>Japan | ISS Machinery Services Limited<br>Attention: General Counsel<br>PHONE: 81-6-6203-5156<br>FAX: 81-6-6203-5195<br>EMAIL: psc@iss-shipping.com | Trade Creditor | | $0.00 | | $404,473 |
| 16 | Port Manatee Ship Repair & Fabrication LLC<br>Attention: General Counsel<br>210 National Street<br>Warehouse #3<br>Manatee Port Authority<br>Palmetto, FL 34221 | Port Manatee Ship Repair & Fabrication LLC<br>Attention: General Counsel<br>PHONE: 908-285-0912<br>FAX:<br>EMAIL: frank@manateeshiprepair.com;<br>jim@manateeshiprepair.com | Trade Creditor | | $0.00 | | $361,424 |
| 17 | Total Lubrifiants SA<br>Attention: Vanessa Garay<br>562 Avenue Du Parc Del'Ile<br>Nanterre Cedex 92000<br>France | Total Lubrifiants SA<br>Attention: Vanessa Garay<br>PHONE: 908-374-5104<br>FAX:<br>EMAIL: | Trade Creditor | | $0.00 | | $326,156 |

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim(for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured Claim |
| 18 | Tampa Electric Company Attention: General Counsel 702 N. Franklin Street Tampa, FL 33602 | Tampa Electric Company Attention: General Counsel PHONE: 813-228-1326 FAX: 813-228-1820 EMAIL: investorrelations@tecoenergy.com | Trade Creditor | | $0.00 | $316,838 |
| 19 | W.H. Brennan & Co (Pte) Ltd Attention: General Counsel 47 Loyang Way Singapore 508739 Singapore | W.H. Brennan & Co (Pte) Ltd Attention: General Counsel PHONE: 65-6549-5111 FAX: 65-6542-5246 EMAIL: singapore@survitecgroup.com | Trade Creditor | | $0.00 | $305,668 |
| 20 | Wartsila North America Inc. Attention: General Counsel 16330 Air Center Blvd Houston, TX 77032 | Wartsila North America Inc. Attention: General Counsel PHONE: 281-233-6200 FAX: 281-233-6233 EMAIL: wna@wartsila.com | Trade Creditor | | $0.00 | $286,076 |
| 21 | United Bulk Terminals Attention: Brian Miles 15602 Jacintoport Boulevard Houston, TX 77015 | United Bulk Terminals Attention: Brian Miles PHONE: 281-457-7900 FAX: 281-457-7991 EMAIL: info@oiltanking.com | Trade Creditor | | $0.00 | $284,937 |
| 22 | Portserv International Ltd Attention: General Counsel 201 Amber Street Markham, ON L3R 3J7 Canada | Portserv International Ltd Attention: General Counsel PHONE: 905-470-7066 FAX: 905-470-9958 EMAIL: portserv@portservinternational.com | Trade Creditor | | $0.00 | $280,968 |
| 23 | Marine Towing of Tampa LLC Attention: General Counsel 908 South 20th Street Tampa, FL 33605-6304 | Marine Towing of Tampa LLC Attention: General Counsel PHONE: 813-242-6500 FAX: 813-242-4525 EMAIL: operations@marinetowingtampa.com | Trade Creditor | | $0.00 | $267,612 |

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured Claim |
| 24 Tampa Ship LLC Attention: General Counsel 1130 McCloskey Blvd. Tampa, FL 33605 | Tampa Ship LLC Attention: General Counsel PHONE: 813-248-9310 FAX: 813-248-9806 EMAIL: info@tampaship.com; joem@bollingershipyards.com | Trade Creditor | | $0.00 | | $262,827 |
| 25 MMIF, LLC Attention: General Counsel 6065A Rangeline Road Theodore, AL 36582 | MMIF, LLC Attention: General Counsel PHONE: 251-443-1100 FAX: 251-443-1110 EMAIL: webmaster@mmif-llc.com | Trade Creditor | | $0.00 | | $256,704 |
| 26 Buck Kreihs Marine Repair LLC Attention: Bill Eckert 2225 Tchoupitoulas Street New Orleans, LA 70130 | Buck Kreihs Marine Repair LLC Attention: Bill Eckert PHONE: 504-524-7681 FAX: 504-522-5879 EMAIL: info@bkco.us | Trade Creditor | | $0.00 | | $253,988 |
| 27 Marine Industrial Gears Attention: General Counsel 2201 St Joseph Lane Harvey, LA 70058 | Marine Industrial Gears Attention: General Counsel PHONE: 504-362-2999 FAX: EMAIL: info@marineindustrialgears.com | Trade Creditor | | $0.00 | | $241,387 |
| 28 Delta Marine Environmental LLC Attention: General Counsel 61134 St. Tammany Street Slidell, LA 70460 | Delta Marine Environmental LLC Attention: General Counsel PHONE: 985-288-5597 FAX: 985-641-0755 EMAIL: ops@deltames.com | Trade Creditor | | $0.00 | | $226,647 |
| 29 ARA Plan Attention: John Linder 3445 N. Causeway Blvd. Suite 902 Metairie, LA 70002-3770 | ARA Plan Attention: John Linder PHONE: 480-560-5464 FAX: EMAIL: jlindner@araplans.com | Union Obligation | Unliquidated | $0.00 | | $205,363.00 |

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim(for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim  If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured Claim |
| 30 | MacGregor USA Inc.  Attention: Noah Schwehm  10723 Rockley Road  Houston, TX 77099 | MacGregor USA Inc.  Attention: Noah Schwehm  PHONE: 713-434-8975  FAX: 973-285-7861  EMAIL: noah.schwehm@cargotec.com | Trade Creditor | | $0.00 | | $204,755 |

## Exhibit D

### Consolidated List of the Holders of the Five Largest Secured Claims

Pursuant to Local Rule 1007-2(a)(5), the following lists the Debtors' five (5) largest secured claims on a consolidated basis.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors.  The Debtors reserve all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount or status of any such claim or debt.  The descriptions of the collateral securing the underlying obligations are intended only as brief summaries.  In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.  The schedule estimates outstanding claim amounts (including principal and interest) as of the March 31, 2016.

| No | Creditor | Contact Mailing Address & telephone Number, and Email Address | Amount of Claim (as of March 31, 2016) | Type of Collateral |
|---|---|---|---|---|
| 1 | Regions Bank as Administrative Agent | Douglas Smith 6805 Morrison Blvd. Suite 100 Charlotte, NC  28211 (P) (704) 362 3596 (E) douglase.smith@regions.com | Approximately $65.8 million | See DIP order ¶ 5(b) |
| 2 | DVB Bank SE | Christoph Clauss 609 Fifth Avenue, New York NY 10017-1021 (P) (212) 858 2619 (E) Christoph.Clauss@dvbbank.com | Approximately $32.3 million | See DIP order ¶ 5(b) |
| 3 | Citizens Asset Finance (formerly RBS Asset Finance) | Ed Jennings 45 Dan Road, Suite 210 Canton, MA 02021 (P) (781) 364 3036 (E) Edward.Jennings@citizensbank.com | Approximately $17.6 million | See DIP order ¶ 5(b) |
| 4 | Capital One N.A. | Al Kropog 201 St. Charles Avenue, 29th Floor New Orleans, LA 70170 (P) (504) 654 1878 (E) al.kropog@capitalone.com | Approximately $6.3 million | See DIP order ¶ 5(b) |
| 5 | ING Bank N.V, London branch | Andrew Hedges 60 London Wall London (P) +44 20 7767 1000 (E) andrew.hedges@uk.ing.com | Approximately $1.9 million | See DIP order ¶ 5(b) |

**Exhibit E**

**Summary of the Debtors' Assets and Liabilities**

The following financial data is the latest available information and reflects the Debtors' financial condition, as consolidated with its domestic affiliated debtors and non-debtors as of March 31, 2016.  The following financial data shall not constitute an admission of liability by the Debtors.  The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt or challenge the priority, nature, amount or status of any claim or debt.

Total Assets (consolidated):          $305,087,000
Total Liabilities (consolidated):      $226,833,000

## Exhibit F

## Publicly Held Securities

Pursuant to Local Rule 1007-2(a)(7), the officers and directors of the Debtors hold the following amount of common equity as of the Petition Date.

| Holder | Common Stock Equivalent Held | % Of Common Shares Outstanding |
|---|---|---|
| Johnsen, Niels M. (Director) | 1,145,014 | 15.487 |
| Johnsen, Erik L. (Chairman of the Board, Chief Executive Officer and President) | 167,577 | 2.267 |
| Estrada, Manuel G. (Chief Financial Officer and Vice President) | 27,428 | 0.371 |
| Morrissette, Harris V. (Independent Director, Chairman of Nominating & Governance Committee and Member of Audit Committee) | 18,904 | 0.256 |
| Robinson Jr., T. Lee (Director, Member of Nominating & Governance Committee and Member of Compensation Committee) | 15,372 | 0.208 |
| McNamara, James J. (Director, Chairman of Compensation Committee and Member of Nominating & Governance Committee) | 15,204 | 0.206 |
| Johnston, Peter M. (Executive Vice President) | 15,046 | 0.204 |
| Lupberger, Edwin A. (Director, Member of Audit Committee and Member of Compensation Committee) | 14,904 | 0.202 |
| Lane III, H. Merritt (Director, Chairman of Audit Committee and Member of Compensation Committee) | 14,904 | 0.202 |
| Beer, Kenneth H. (Independent Director, Member of Audit Committee and Member of Nominating & Governance Committee) | 14,904 | 0.202 |
| Wilson, Kevin M. (Principal Accounting Officer and Corporate Controller) | 586 | 0.008 |

## <u>Exhibit G</u>

### Debtors' Property Not in Debtors' Possession

Pursuant to Local Rule 1007-2(a)(8), the following lists the Debtors' property, as of the Petition Date, that is in the possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, secured creditor, or agent for any such entity.

Certain property of the Debtors is likely to be in the possession of various other persons, including maintenance providers, shippers, common carriers, materialmen, custodians, public officers, mortgagees, pledges, assignees of rents, secured creditors, or agents. Through these arrangements, the Debtors' ownership interest is not affected. In light of the movement of this property, providing a comprehensive list of the persons or entities in possession of the property, their addresses and telephone numbers, and the location of any court proceeding affecting such property would be impractical.

## Exhibit H

### Debtors' Property

Pursuant to Local Rule 107-2(a)(9), the Debtors lease or hold under other arrangements the following premises from which they operate their business.

**New Orleans Office**
601 Poydras St.
Pan American Building
Suite 1850
New Orleans, LA  70130

**Mobile Office**
11 North Water Street
Suite 18290
Mobile, Alabama 36602

**New York Office**
1 Whitehall Street
19th Floor
New York, New York 10004

**Tampa Office**
601 S Harbour Island Blvd.
Suite 200
Tampa, FL 33602

**Railcar Service Center**
1120 Paper Mill Rd
Mobile, AL 36610

## Exhibit I

### Location of Debtors' Assets, Books and Records

Pursuant to Local Rule 1007-2(a)(10), the following lists the locations of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

### Location of Debtors' Substantial Assets

As stated in above, the Debtors' substantial assets consist of vessels.  Due to the nature of the Debtors' business, at any time, these assets are located in domestic and international waters around the world.

### Books and Records

The Debtors' books and records are located at International Shipholding Corporation's New Orleans offices at 601 Poydras Street, Pan American Building, Suite 1850, New Orleands, LA 70130.

### Debtors' Assets Outside the United States

Please see the Location of Debtors' Substantial Assets above.

## **Exhibit J**

### **Litigation**

Pursuant to Local Rule 1007-2(a)(11), the following is a list of the nature and present status of each action or proceeding, pending or threatened against the Debtors or their properties where a judgment against the Debtors or a seizure of their property may be imminent.

To the best of the Debtors' knowledge, information and belief, there is no action or proceeding, pending or threatened against the Debtors or their properties where a judgment against the Debtors or a seizure of their property may be imminent.

## Exhibit K

### Senior Management

Pursuant to Local Rule 1007-2(a)(12), the following provides the names of the individuals who comprise the Debtors' existing senior management and a brief summary of their relevant responsibilities and experience.

| Name | Title | Tenure and Experience |
|---|---|---|
| Erik L. Johnsen | President and Chief Executive Officer | Has served International Shipholding Corp in management and operating roles since 1980 |
| Manuel G. Estrada | Vice President, Chief Financial Officer | Has served International Shipholding Corp in various financial roles since 1979 |
| Peter M. Johnston | Executive Vice President | Has served International Shipholding Corp since 1991 in various management and operating roles |

# **Exhibit L**

## **Payroll**

Pursuant to Local Rules 1007-2(b)(1)-(2)(A) and (C), the following provides the estimated amount of weekly payroll to the Debtors' employees (not including officers, directors and stockholders) and the estimated amount to be paid to officers, stockholders, directors and financial and business consultants retained by Debtors for the 30-day period following the Petition Date.

| | |
|---|---|
| Payment to Employees (Not Including Officers, Directors, and Stockholders) | Approximately $1,109,000 for the next 30 days |
| Payment to Officers, Directors, and Stockholders | Approximately $101,000 for the next 30 days |
| Payment to Financial and Business Consultants Retained by the Debtors | Approximately $125,000 will be accrued (do not expect any amounts to be paid in the next 30 days) |

**Exhibit M**

**Cash Receipts and Disbursements,
Net Cash Gain or Loss, Unpaid Obligations and Receivables**

Pursuant to Local Rule 1007-2(b)(3), the following provides for the 30-day period following the commencement of the chapter 11 cases, the Debtors' estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| | |
|---|---|
| Cash Receipts[1] | $19.3 million |
| Cash Disbursements | $20.8 million |
| Net Cash Gain / (Loss) | ($1.5) million |
| Unpaid Obligations | $0 |
| Unpaid Receivables | $0 |

---

[1] Includes funds projected to be available pursuant to the proposed DIP Facility.