**Objection Deadline: September 22, 2016**
**Hearing Date: September 29, 2016 at 10:00 a.m. (prevailing Eastern Time)**

PHELPS DUNBAR, LLP
Brian D. Wallace, (Louisiana Bar #17191)
(*pro hac vice* application to be filed)
365 Canal Place, Suite 2000
New Orleans, Louisiana 70130-6534
T: 504-566-1311
Email: wallaceb@phelps.com

Richard Montague (Mississippi Bar #3411)
(*pro hac vice* application pending)
4270 I-55 North
Jackson, Mississippi 39211-6391
Post Office Box 16114
Jackson, Mississippi  39236-6114
Telephone: 601-352-2300
Facsimile: 601-360-9777
Email:  richard.montague@phelps.com
**Counsel to Patriot Shipping, LLC and**
**US Ocean, LLC**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **IN RE:** | ) | **CHAPTER 11** |
| | ) | |
| **INTERNATIONAL SHIPHOLDING** | ) | **CASE NO. 16-12220 (SMB)** |
| **CORPORATION, et al.,**[1] | ) | |
| | ) | **JOINTLY ADMINISTERED** |
| **Debtors** | ) | |

**MOTION TO COMPEL DEBTOR WATERMAN STEAMSHIP CORPORATION**
**TO ASSUME OR REJECT CHARTER AGREEMENTS WITH**
**PATRIOT SHIPPING, LLC AND US OCEAN, LLC**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: International Shipholding Corporation (9662); Enterprise Ship Co. (9059); Sulphur Carriers, Inc. (8965); Central Gulf Lines, Inc. (8979); Coastal Carriers, Inc. (6278); Waterman Steamship Corporation (0640); N.W. Johnsen & Co., Inc. (8006); LMS Shipmanagement, Inc. (0660); U.S. United Ocean Services, LLC (1160); Mary Ann Hudson, LLC (8478); Sheila McDevitt, LLC (8380); Tower LLC (6755); Frascati Shops, Inc. (7875); Gulf South Shipping PTE LTD (8628); LCI Shipholdings, Inc. (8094); Dry Bulk Australia LTD (5383); Dry Bulk Americas LTD (6494); and Marco Shipping Company PTE LTD (4570). The service address for each of the above Debtors is 601 Poydras Street, Pan American Building, Suite 1850, New Orleans, Louisiana 70130.

PD.20033916.1

Patriot Shipping, LLC ("Patriot") and US Ocean, LLC (US Ocean") (together, the "Movants"), respectfully represent as follows:

## RELIEF REQUESTED

1. By this motion (the "Motion"), Movants seek entry of an order, substantially in the form attached hereto as Exhibit A, pursuant to sections 105 and 365(d)(2) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), directing the Debtor Waterman Steamship Corporation ("Waterman") to assume or reject the Charter Agreements (as identified below) on or before a date certain to be set by the Court, within seven (7) days of the date set for the hearing.

## JURISDICTION AND VENUE

2. This Court has subject-matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## FACTUAL BACKGROUND

3. On August 1, 2016, (the "Petition Date"), the Debtors, including Waterman,[2] filed petitions for voluntary relief under Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code"). On August 4, 2016, the Court entered an Order consolidating the Debtors' Chapter 11 cases for procedural purposes only to be jointly administered under Case No. 16-12220 (SMB). The Debtors continue to operate their businesses and manage their property as a debtors-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108. No trustee or examiner has been appointed in these Bankruptcy Cases. An Official Committee of Unsecured Creditors was appointed on September 1, 2016.

---

[2] Case No. 16-12219.

4.  An Overview of the Debtors' Business was provided in the Declaration of Erik L. Johnsen (Doc. 7) filed with Debtors' First Day Motions. The Following excerpt from the Johnsen Declaration describes the Debtors' business operations relating to the Charter Agreements with the Movants:

> … Through its Debtor and non-Debtor subsidiaries, International Shipholding operates a diversified fleet of twenty-one (21)[6] U.S. and foreign flag vessels that provide domestic and international maritime transportation services to commercial and governmental customers primarily under medium to long-term contracts.
>
> 5.  International Shipholding's business strategy consists of identifying niche market opportunities, utilizing its extensive experience to meet those needs, and continuing to maintain a diverse portfolio of medium to long-term contracts, as well as seeking to maintain long-standing customer base by providing quality transportation services. As of March 31, 2016, nineteen (19) of the Debtors' vessels were committed under various contracts extending beyond 2016 and expiring at various dates through 2021. Certain of these agreements also contain options to extend the contracts beyond their minimum terms.
>
> 6.  Importantly, ISH is one of the few U.S. publicly listed shipping companies. The company, through two (2) of its Debtor subsidiaries, is qualified for, and participates, in the U. S. Government's Maritime Security Program (the "MSP"). MSP is a fleet of sixty (60) active, commercially viable, militarily useful, and privately owned vessels contracted to meet national defense and other security requirements. The company has eight (8) vessels in total in the MSP, and all of them are required to participate in the Department of Defense's (DOD) Voluntary Intermodal Sealift Agreement (VISA).[7] VISA provides the DOD with assured access to sealift capacity in support of the ongoing deployment and sustainment of U. S. Military forces around the world.
>
> [6] This number is inclusive of owned, leased, and chartered in vessels. ISH also owns another vessel that is currently laid up.
>
> [7] Of these eight (8) vessels, two (2) are owned, two (2) are leased, and four (4) are chartered in.

Johnsen Declaration, pages 3 and 4. Two of the eight MSP Fleet vessels discussed in the Johnsen Declaration are the OCEAN GIANT and OCEAN GLOBE.[3] Both of these vessels are "chartered

---

[3] The Ocean Giant and Ocean Globe are currently operating as part of the MSP Fleet. Another Patriot vessel, the Ocean Jazz, had been approved for operation as part of the MSP Fleet as of the Petition Date, but was not yet in

in" under bareboat charter agreements between Patriot Shipping, the Owner pro hac vice, and Waterman. Waterman, in turn, time charters the vessels to US Ocean, who commercially operates the vessel in the international trade. US Ocean is a subsidiary of Patriot Shipping

5. Following is a list of the Charter Agreements, as amended, between the Movants and Waterman:

A. Ocean Giant Bareboat Charter from Patriot to Waterman, dated September 23, 2013.

B. Amendment 1 to Ocean Giant Bareboat Charter, dated April 9, 2015.

C. Ocean Giant Time Charter from Waterman to US Ocean, dated September 23, 2013.

D. Amendment 1 to Ocean Giant Time Charter, dated April 9, 2015.

E. Ocean Globe Bareboat Charter from Patriot to Waterman, dated January 9, 2015.

F. Ocean Globe Time Charter from Waterman to US Ocean, dated January 9, 2015.

G. Advance of Management Fee Agreement ("Advance Agreement") by and between Patriot, US Ocean and Waterman, amending the Ocean Globe and Ocean Giant Time Charters, dated October 28, 2015, and the First Amendment to Advance of Management Fee Agreement dated December 30, 2015.

All of the agreements and amendments shall be referred to collectively as the "Charter Agreements." The agreements relating to the Ocean Giant, shall be referred to collectively as the "Giant Charter Agreements." The agreements and amendments relating to the Ocean Globe shall be referred to collectively as the "Globe Charter Agreements."

---

service as part of the MSP Fleet. On information and belief, after the Petition Date, Waterman voluntarily terminated the MSP slot for which the Ocean Jazz had previously been approved and which was subject to chartering agreements similar to those for the Ocean Giant and Ocean Globe. By terminating the Ocean Jazz slot, Waterman is in breach of the Jazz Charter Agreements. Movants reserve the right to assert a claim for damages for breach of the Jazz Charter Agreements.

4

PD.20033916.1

### *MARITIME SECURITY FLEET AND PARTICIPATION OF THE*
### *OCEAN GIANT AND OCEAN GLOBE AS MSP FLEET VESSELS*

6. Through the Charter Agreements, both the Ocean Giant and Ocean Globe participate in the Maritime Security Program. As MSP Fleet vessels, Ocean Giant and Ocean Globe contribute to the national security objective of the MSP Program. The MSP Fleet, which is authorized under 46 U.S.C. § 53102, et seq, consists of no more than 60 active, commercially viable, militarily useful, privately-owned U.S.-flag vessels needed to meet national defense and other security requirements and to maintain a United States presence in international commercial shipping. As stated by the United States Maritime Administrator: "MSP is a vital element of our military's strategic sealift and global response capacity" and "[w]ithout the MSP Fleet, the United States would have assured access to very few U.S.-flag commercial vessels to support Department of Defense operations."[4] Importantly, the MSP Fleet also provides the U.S. government with access to U.S. citizen crews that sail onboard U.S. Flag vessels like to Ocean Giant and Ocean Globe.

7. MSP is administered by the United States Maritime Administration in conjunction with the Department of Defense. 46 U.S.C. § 53102. MSP Fleet participating vessels receive an operating payment from the Maritime Administration for operating in compliance with the program. To be eligible for the MSP Program, a vessel must be "suitable" for United States national defense or military purposes as determined by the Secretary of Defense and determined to be "commercially viable" by the Secretary of Transportation. 46 U.S.C. § 53102(b)(4). Both the Ocean Giant and Ocean Globe were found to meet this requirement and have been performing under MSP operating agreements nos. MA/MSP-104 and 105 pursuant to the Giant and Globe Charter Agreements, which were approved by the United States Maritime

---

[4] U.S. Department of Transportation, Maritime Administration, "The Maritime Security Program – Meeting the National Sealift Needs" (May 2016).

Administration prior to the participation of the Ocean Giant and Ocean Globe as MSP Fleet vessels.

### *OCEAN GIANT AND OCEAN GLOBE CHARTER AGREEMENTS*

8.      Under the Charter Agreements, the funds for capital and operational requirements of the vessels are funded through: (i) the time charter hire that is paid from US Ocean to Waterman, and (ii) the application of the MSP stipend that is paid to Waterman under operating agreement nos. 104 and 105. A summary of the elements of each the Charter Agreements is as follows:

*Bareboat Charter – Amounts payable from Waterman to Patriot*

- A Basic Charter Hire amount

*Time Charter – Amounts payable from US Ocean to Waterman*

- Basic Charter Hire. Specifically, this is the amount of Basic Charter Hire specified in the Bareboat Charter.

*Plus*

- Operating Expenses. This includes the operational costs associated with operation of the vessel, such as crew costs, deck & engine stores, lube oil, repairs, spares, steward and other costs, as well as insurance and vessel technical manager fees and costs. Also included within Operating Expenses is a fixed management fee that is payable to Waterman.

*Plus*

- Supplemental Expenses (if any). This includes certain additional expenses in connection with the operation of the vessel, such as modifications to the Vessel, insurance deductibles, etc.

*Less*

- Amount of the MSP payments made by the US Government to Waterman.

Under the structure of the Charter Agreements, the operating expenses are borne by US Ocean, with a credit for the amount of the MSP stipend. Waterman enjoys the benefits of the continuous employment of mariners with whom the Company maintains collective bargaining agreements, as well as the stipulated management fee.

9.   Some of the specific operating considerations and Operating Expenses include:

**Crewing.** Waterman is obligated to provide a fully crewed vessel. The crewing for both the Ocean Giant and Ocean Globe is performed by LMS Shipmanagment, Inc. ("LMS"), another ISH Debtor.[5]   The crews that serve onboard the Ocean Giant and Ocean Globe are members of the MMP, MEBA and SIU unions. Either LMS or Waterman maintain collective bargaining agreements with the MMP, MEBA and SIU unions. The chartering structure has and continues to allow Waterman to employ seafarers without a direct cost, as the crew wages, benefits and other costs are all included by the monies that make up the time charter hire for the vessel. Additionally, the crewing of the Ocean Giant and Ocean Globe under the Waterman collective bargaining agreements has allowed Waterman to continue employing seafarers and either avoid or minimize withdrawal or other liabilities that could accrue to Waterman under the CBAs or Pension Plans.

**Management Fee.**  One component of the Operational Expense for the Time Charters is a management fee for Waterman. In October 2015, Patriot, Waterman and US Ocean executed the Advance Agreement, amending the Charter Agreements and, as a part of such amendments, provided Waterman with an advance payment of the per diem Waterman management fees.

**ISM Company and Technical Management Expenses**.  Under the terms of the Time Charters, Waterman is obligated to provide the technical management for the vessels. Through LMS, these services are subcontracted to Crowley Technical Management. Crowley provides procurement, port engineering, compliance, and other services for the vessel. Crowley's technical management fee is included within the time charter hire components.

10.   On information and belief, Patriot, US Ocean and Waterman are currently in substantial compliance with the terms and conditions of the Giant and Globe Charter Agreements. The budget presented to the court with the interim DIP financing appears to include funding for and payment of all obligations of Waterman to the Movants and third parties, which payments are  necessary for Waterman to remain in compliance with the terms and conditions of

---

[5] Case No. 16-12229 (SMB)

7

the Giant and Globe Charter Agreements. However, there are no specific assurances in any of the papers filed by the Debtors regarding the Giant and Globe Charter Agreements and Movants are not aware of the other aspects of the Company's "specialized" operations that may impact the funding and payments under the Globe and Giant Charter Agreements.

11. From Patriot's perspective, as the owner of the Ocean Giant and Ocean Globe, it is critical that all obligations of Waterman to third parties associated in any way with the Ocean Giant and Ocean Globe be paid when due to avoid the imposition of maritime liens on the Ocean Giant and Ocean Globe. Any failure by Waterman to pay or cause to be paid any such obligation would constitute a breach of the respective Charter Agreement.

12. Despite requests by representatives of the Movants, Waterman has refused to commit to assumption or rejection of the Charter Agreements. It is critical for the Movants to know whether the Ocean Giant and Ocean Globe will be committed to the Charter Agreements as amended by the Advance Agreement, as soon as possible. If the Charter Agreements are rejected, there are implications not only to Movants, but also to many other parties, including but not limited to (i) the United States Maritime Administration and Department of Defense insofar as the Vessels are MSP Fleet participants operating under approved charter agreements and enrolled in the Voluntary Intermodal Sealift Agreement under the terms of the Charter Agreements; (ii) U.S. government and commercial customers whose cargos may be transported onboard the vessels; (iii) the Waterman employed U.S. citizen mariners that sail onboard the vessels and contribute to the sealift capacities of the country; (iv) Crowley Technical Management, who is the ISM Company for both the Ocean Giant and the Ocean Globe and provides the technical management services for the Vessel; and (v) many others. Movants will

need to plan for the Ocean Giant and Ocean Globe and coordinate with the large number of impacted parties in the event of rejection.

13. While the Debtors' Chapter 11 cases were filed on August 1, 2016, the Debtors have been working on their reorganization and evaluating their restructuring and strategic alternatives since at least May 6, 2016. According to the Declaration of Laurence H. Gourley, Managing Director of Blackhill Partners, LLC ("Blackhill") (Doc. 23):

> 4. Since May 6, 2016, Blackhill has been rendering investment banking and advisory services to the Debtors in connection with its restructuring efforts. Blackhill, among other advisory services, has: (a) analyzed the Debtors' current liquidity and projected cash flow; (b) assisted the Debtors in evaluating its restructuring and strategic alternatives; (c) helped the Debtors prepare for the commencement of this chapter 11 case; and (d) conducted an expedited process to identify and secure debtor-in-possession financing for the Debtors in connection with its chapter 11 filing.

Gourley Declaration, page 3. Indeed, the Debtors have been exploring financing alternatives and attempting to sell their business prior to the engagement of Blackhill on May 6, 2016:

> … [P]rior to the Petition Date, the Debtors explored all practicable avenues to obtain the financing necessary to address their ongoing liquidity issues. I understand that the Debtors independently reached out to a number of financial sponsors and strategic buyers of the business prior to engaging Blackhill. These discussions did not result in any proposal to allow the Debtors to continue to operate via an out of court restructuring.

Gourley Declaration, page 7.

14. This bankruptcy filing by the Debtors without a plan in place, the repeated adjournment of the DIP financing motion, the voluntary termination by Waterman of the MSP slot previously designated for the Ocean Jazz, and the Debtors' unwillingness to commit to assumption or rejection of the remaining Charter Agreements has shrouded the ability of Waterman to perform its obligations Giant Charter Agreements and the Globe Charter Agreements in doubt.

9

**BASIS FOR RELIEF REQUESTED**

  A. **The Charter Agreements Are Executory Contracts That the Debtors May Assume or Reject**

15. Section 365 of the Bankruptcy Code allows a debtor to assume or reject executory contracts, subject to court approval. See 11 U.S.C. § 365(a). While the Bankruptcy Code does not define "executory," the legislative history of section 365 indicates that the term "generally includes contracts on which performance remains due to some extent on both sides." H.R. Rep. No. 95-595, at 347 (1977), reprinted in 1978 U.S.C.A.A.N. 5963, 6303.

16. To determine whether a contract is executory, most courts in this jurisdiction follow the "Countryman" definition, which defines an executory contract as "one that is not so fully performed that a breach by either side would constitute a material breach of the contract." *See, e.g., In re Helm*, 335 B.R. 528, 534 (Bankr. S.D.N.Y. 2006); *In re Teligent, Inc.*, 268 B.R. 723, 730 (Bankr. S.D.N.Y. 2001); *In re Delta Air Lines, Inc.*, 2010 Bankr. LEXIS 233, at *12 (Bankr. S.D.N.Y. Feb. 3, 2010).[6]

17. The Charter Agreements are unquestionably executory contracts within the meaning of section 365 of the Bankruptcy Code. Significant performance remains due from both parties to the Charter Agreements such that either party's failure to perform would constitute a material breach. One commentator has observed that vessel charters generally have been treated as executory contracts under the Bankruptcy Code.[7] In the case styled *In re Lykes Bros. S.S. Co., Inc.*, 221 B.R. 881 (Bankr. M.D. Fla. 1997), the Bankruptcy Court treated a vessel charter as an

---

[6] "In addition to the Countryman definition, [some] courts have articulated the 'some performance due' test, as well as the 'functional approach' to executoriness. *See generally In re Riodizio*, 204 B.R. 417 (Bankr. S.D.N.Y. 1997). The Countryman definition is generally accepted as the most stringent test, *see Teligent*, [268 B.R.] at 732, and thus, if a contract is executory under that standard, the contract is necessarily executory under the other two approaches. *Id.*" *Helm*, 335 B.R. at 535 (footnotes omitted). Since the Charter Agreements satisfy the Countryman definition, it is unnecessary to address any other test.

[7] Collateral Protection and Competing Priorities: Secured Credit in the International Arena, 120315 ABI-CLE 583.

10

executory contract and authorized its assumption pursuant to 11 U.S.C. § 365(b). While considering related bankruptcy appeals from this Court, the U.S. District Court for the Southern District of New York discussed the assignment of "charter parties" or charter agreements along with the sale of the underlying vessels. *In re Millenium Seacarriers, Inc.*, No. 04 CIV. 6482 (DLC), 2005 WL 2398014, at *1 (S.D.N.Y. Sept. 28, 2005), aff'd and remanded, 458 F.3d 92 (2d Cir. 2006). In a footnote, the court cited the Black's law dictionary definition of charter parties:

> A charter party is defined as "[a] contract by which a ship, or a principal part of it, is leased by the owner, esp. to a merchant for the conveyance of goods on a predetermined voyage to one or more places or for a specified period of time; a special contract between the shipowner and charterer, esp. for the carriage of goods at sea." Black's Law Dictionary (8th ed.2004).

In *Millenium*, the parties and the court took for granted that the charters, like leases, are executory contracts, subject to 11 U.S.C. § 365..

18.     It is well established that as a general proposition an executory contract must be assumed or rejected in its entirety.[8]

### B.     This Court Has Authority to Compel the Debtors to Assume or Reject the Agreements

19.     Section 365(d)(2) of the Bankruptcy Code authorizes courts to compel debtors to assume or reject executory contracts within a specified time period. It provides:

> In a case under chapter 9, 11, 12, or 13 of this title, the [debtor in possession] may assume or reject an executory contract ... of the debtor at any time before the confirmation of a plan but the court, on the request of any party to such contract ..., may order the [debtor in possession] to determine within a specified period of time whether to assume or reject such contract....

11 U.S.C. § 365(d)(2) (emphasis added). *See also* 11 U.S.C. § 105(d)(2)(A) (authorizing courts to issue orders setting dates by which debtors in possession must assume or reject executory contracts).

---

[8] See *Stewart Title Guar. Co. v. Old Republic Nat'l Title Ins. Co*., 83 F.3d 735, 741 (5th Cir. 1996) (internal quotation and citation omitted).

11

PD.20033916.1

20. Congress's purpose in crafting this section was to "prevent parties in contractual ... relationships from being left in doubt concerning their status vis-à-vis the estate." H.R. Rep. No. 95-595, at 348 (quoted in *In re Univ. Med. Ctr.*, 973 F.2d 1065, 1078–79 (3d Cir. 1992); In re *Beker Indus. Corp.*, 64 B.R. 890, 898 (Bankr. S.D.N.Y. 1986)).

21. While the general policy of section 365 of the Bankruptcy Code is to provide debtors with "breathing space" to determine which executory contracts to assume or reject, that "breathing space ... is not without limits." *In re Enron Corp.*, 279 B.R. 695, 702 (Bankr. S.D.N.Y. 2002) (quoted in *In re Adelphia Commc'ns Corp.*, 291 B.R. 283, 292 (Bankr. S.D.N.Y. 2003)). Indeed, "in certain circumstances, the rights of the nondebtor party ... outweigh the need of the debtor in possession for unlimited flexibility and breathing space." *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 551–52 (1984).

22. Instead, the settled rule is that debtors have only a reasonable time in which to assume or reject executory contracts. *See Theatre Holding Corp. v. Mauro*, 681 F.2d 102, 105 (2d Cir. 1982); *Enron,* 279 B.R. at 702; 3 *Collier on Bankruptcy* ¶ 365.05[2] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).

C. **The Standard for Determining the Reasonableness of the Time to Assume or Reject Executory Contracts**

23. For a court deciding whether to compel a debtor to assume or reject an executory contract, the dispositive issue is whether a debtor has been allowed a reasonable time to assume or reject a particular executory contract. "What constitutes a reasonable time is left to the bankruptcy court's discretion in the light of the circumstances of each case." *Theatre Holding*, 681 F.2d at 105. *See also In re Hawker Beechcraft, Inc.,* 483 B.R. 424, 429 (Bankr. S.D.N.Y. 2012).

24. In exercising this discretion, courts in this jurisdiction have considered a variety of factors that have been expressed differently in different contexts. *See Adelphia*, 291 B.R. at 292–93 (gathering authority and synthesizing a comprehensive list of factors).[9] These factors include:

(1) the nature of the interests at stake;

(2) the balance of hurt to the litigants;

(3) the good to be achieved;

(4) the safeguards afforded to the litigants;

(5) whether the action to be taken is so in derogation of Congress's scheme as to be arbitrary;

(6) the debtor's ability to satisfy postpetition obligations;

(7) the damage the non-debtor will suffer beyond the compensation available under the Bankruptcy Code;

(8) the contract's importance to the debtor's business and reorganization;

(9) whether the debtor has had sufficient time to appraise its financial situation and the potential value of its assets;

(10) whether the court needs to determine if the contract is executory;

(11) whether exclusivity has ended; and

(12) above all, the purpose of Chapter 11 and the determination's effect on the debtor's ability to reorganize.

---

[9] *See also South St. Seaport Ltd. P'ship v. Burger Boys* (*In re Burger Boys*), 94 F.3d 755, 761 (2d Cir. 1996); *Theatre Holding*, 681 F.2d at 105–06; *Hawker Beechcraft*, 483 B.R. at 429; In re *Dana Corp.*, 360 B.R. 144, 147 (Bankr. S.D.N.Y. 2006); *In re Teligent, Inc.*, 268 B.R. 723, 738–39 (Bankr. S.D.N.Y. 2001); *Beker*, 64 B.R. at 896–97.

13

*See id.* These factors are not exhaustive; courts may consider other factors or focus on only a few factors. *See Hawker Beechcraft*, 483 B.R. at 429.

25. Movants respectfully submit that the *Adelphia* factors favor a prompt decision compelling assumption or rejection of the Charter Agreements. All of these factors from Waterman's perspective can be boiled down to whether the Giant and Globe Charter Agreements are part of the Debtors' financial problem or part of the Debtors' financial solution. Waterman has been analyzing and considering its reorganization strategy since before May, 2016.[10] This is more than sufficient time to the value of the Charter Agreements to the Debtors.

26. The Giant and Globe Charter Agreements enable the Debtors to supply vessels for two (2) of the eight (8) valuable slots held by the Debtors in the MSP Fleet. The fact that the Debtors will not commit to assume or reject the Giant and Globe Charter Agreements creates uncertainty surrounding the Debtors' intentions regarding the Giant and Globe Charter Agreements.

27. Assuming or rejecting the Charter Agreements as soon as possible will be in the best interest of the Debtors and their estates. Assumption or rejection will signal to potential financing sources a commitment by the Debtors to a business strategy going forward. Delay in assuming or rejecting the Charter Agreements harms the Debtors' ability to reorganize by signaling indecision or inability to perform on a long term basis.

28. The Debtors' DIP financing requires the Debtors to file a plan and disclosure statement or a 363 sale motion in a form acceptable to the DIP lenders or before seventy-five

---

[10] See Gourley Declaration, pages 3 and 7. Blackhill was hired by the Debtors on May 6, 2016 (Page 3). "Specifically, prior to the Petition Date, the Debtors explored all practicable avenues to obtain the financing necessary to address their ongoing liquidity issues. I understand that the Debtors independently reached out to a number of financial sponsors and strategic buyers of the business prior to engaging BlackhilL." (Page 7)

(75) days from the Petition Date or October 14, 2016. Waterman should be required to assume or reject the Charter Agreements as soon as possible and prior to a Plan or Sale Notice deadline..

29. Accordingly, the Court should set a prompt deadline for Debtor to decide whether to assume or reject the Charter Agreements, within seven (7) days of the date of this hearing, which is only eight (8) days before the DIP financing deadline for filing a Plan or Sale Notice.

## CONCLUSION AND REQUEST FOR RELIEF

WHEREFORE, Movants request that this Court order the Debtor Waterman to assume or reject the Charter Agreements pursuant to Section 365(d)(2) of the Bankruptcy Code on or before a date certain as soon as possible to be set by the court, no later than seven (7) days from the date of the hearing on this Motion, and, in the event that the Charter Agreements are assumed, Movants request the Court to order Waterman to cure or provide adequate assurance of prompt cure of the any defaults existing at that time and provide adequate assurance of future performance of the Debtor Waterman's obligations under the Charter Agreements, concurrently with its election to assume, in accordance with the proposed order attached hereto as Exhibit A.. Movants further pray that no stay apply to the execution of the order on this Motion.

Dated: September 5, 2016

Respectfully submitted,

**PHELPS DUNBAR LLP**

BY:  s/ Richard Montague
Richard Montague (Mississippi Bar #3411)
(*pro hac vice* application pending)
4270 I-55 North
Jackson, Mississippi 39211-6391
Telephone: 601-352-2300
Telecopier: 601-360-9777
Email: richard.montague@phelps.com

PD.20033916.1

        Brian D. Wallace, (Louisiana Bar #17191)
        (*pro hac vice* application to be filed)
        365 Canal Place, Suite 2000
        New Orleans, Louisiana 70130-6534
        T: 504-566-1311
        Email: wallaceb@phelps.com

**COUNSEL TO PATRIOT SHIPPING, LLC AND US OCEAN, LLC.**

### CERTIFICATE OF SERVICE

I, Richard Montague, do hereby certify that on this day the foregoing paper was filed electronically with the Clerk of the Court using the Court's ECF system, which served a true and correct copy of such paper electronically on all parties enlisted to receive service electronically as of the date hereof, including the Debtor

This, the 5th day of September, 2016.

        /s/ Richard Montague
        RICHARD MONTAGUE

PD.20033916.1