AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036
Telephone: (212) 872-1000
David H. Botter
Sean E. O'Donnell
Stephanie L. Gal

AKIN GUMP STRAUSS HAUER & FELD LLP
1700 Pacific Avenue, Suite 4100
Dallas, Texas 75201
Telephone: (214) 969-2800
Sarah Link Schultz (*pro hac vice* admission pending)

*Proposed Counsel to Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| INTERNATIONAL SHIPHOLDING CORPORATION, *et al.*,[1] | Case No. 16-12220 (SMB) |
| Debtors. | Joint Administration Requested |

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: International Shipholding Corporation (9662); Enterprise Ship Co. (9059); Sulphur Carriers, Inc. (8965); Central Gulf Lines, Inc. (8979); Coastal Carriers, Inc. (6278); Waterman Steamship Corporation (0640); N.W. Johnsen & Co., Inc. (8006); LMS Shipmanagement, Inc. (0660); U.S. United Ocean Services, LLC (1160); Mary Ann Hudson, LLC (8478); Sheila McDevitt, LLC (8380); Tower LLC (6755); Frascati Shops, Inc. (7875); Gulf South Shipping PTE LTD (8628); LCI Shipholdings, Inc. (8094); Dry Bulk Australia LTD (5383); and Dry Bulk Americas LTD (6494). The service address for each of the above Debtors is 601 Poydras Street, Pan American Building, Suite 1850, New Orleans, Louisiana 70130.

**DECLARATION OF WILLIAM B. MOLLARD IN SUPPORT OF ENTRY OF INTERIM
AND FINAL ORDERS:  (I) AUTHORIZING DEBTORS TO (A) OBTAIN
PRIMING AND SUPER-PRIORITY POSTPETITION FINANCING
PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3),
364(d)(1) AND 364(e) AND (B) USE CASH COLLATERAL PURSUANT TO
11 U.S.C. § 363, (II) GRANTING ADEQUATE PROTECTION PURSUANT TO 11
U.S.C. §§ 361, 362, 363 AND 364, (III) SCHEDULING A FINAL HEARING PURSUANT
TO BANKRUPTCY RULES 4001(b) AND (c) AND (IV) GRANTING RELATED RELIEF**

I, William B. Mollard, declare as follows under penalty of perjury:

### BACKGROUND AND QUALIFICATIONS

1.       I am the principal of William B. Mollard, Inc., an independent ship sales &
purchase brokerage that specializes in negotiating the sale & purchase of containerships, bulk
carriers, tankers, RoPax, cruise ships and other types of vessels–including vessels for
demolition–for the account of buyers and sellers worldwide.  As such, my firm maintains a
continuous dialogue with an extensive network of ship sales & purchase brokers in the United
States, UK, Europe and the Far East.  And, as detailed below, I am very familiar with the
Debtors' feet.

2.       I am a graduate of the United States Merchant Marine Academy, and I have over
50 years of experience as a ship sales & purchase broker.  I have negotiated the purchase of U.S.
flag ships and foreign-built ships, including container ships, bulk carriers, MPP vessels, and
RoPax vessels.  As a result, I am frequently retained to prepare ship appraisals.

3.       I am a member of the American Bureau of Shipping and the American Society of
Appraisers, and have received a Lifetime Professional Achievement Award from the U.S.
Merchant Marine Academy.  A true and correct copy of my resume is attached as Exhibit A.

4.      I have appeared as an expert witness in actions pending before bankruptcy courts, federal district courts and tax courts throughout the United States.  Attached as Exhibit B is a list of actions in which I was retained as an expert witness since 1984.

### SPECIFIC EXPERIENCE WITH INTERNATIONAL SHIPHOLDING CORPORATION

5.      I am very familiar with the Debtors, their management, and their fleet of vessels. Since the 1960s, I have negotiated the sale and purchase of all types of vessels in the Debtors' fleet and, most recently, concluded the sale of the Debtors' handy-size bulk carrier, "EGS Tide" in March 2015.

6.      I have also previously appraised many of the vessels in the Debtors' current fleet. I appraised the Green Dale in February 2012, July 2012, and March 2013, I appraised the Green Ridge in March 2012 and March 2013, and I appraised the Green Cove and Green Lake in March 2012.  Attached as Exhibit C is a schedule summarizing my prior appraisals during the last five years.

### COMPENSATION

7.      A statement of my compensation for the study and testimony in this case is attached as Exhibit D.  My compensation does not depend in any way on the nature of my opinions or on the outcome of this action.

### SCOPE OF WORK

8.      At the request of Akin Gump Strauss Hauer & Feld LLP, as counsel for the Debtors, I have performed a desktop valuation of each of the vessels securing the Debtors' prepetition loan obligations.  Desktop valuations are the most common valuations used by brokers engaged in the purchase and sale of maritime vessels.  Such valuations assess value, using a variety of methodologies, based on recorded details of the vessels, and do not require a

physical inspection of the vessels.  They are frequently used and relied upon by vessel owners and vessel lenders with respect to the financing of such vessels.

### VALUATION STANDARDS

9.      I have assessed the Fair Market Value of each of the vessels securing the Debtors' prepetition loan obligations.  Fair Market Value approximates the "full price" value of an asset, and assumes that a reasonable time is allowed for the sale process in an open and competitive market.

10.      Based on my 50 years of experience as a ship sales & purchase broker, the numerous conversations I have had with other ship sales & purchase brokers regarding the Debtors' fleet, I believe it is reasonable to expect that the Debtors will be able to achieve fair market value for the vessels in their fleet if they have at least 90 days to market and sell the vessels.

11.      In fact, it is also possible that the Debtors will be able to achieve fair market value with less time, as they have done in the past.  For example, in November 2015, the Debtors began marketing their vessel m/s *Glovis Countess*.  She was sold by the end of December. Moreover, where a vessel has an attached time charter – as is the case with much of the Debtors' fleet – it increases the likelihood that the Debtors will be able to sell the vessel at fair market value in a shorter period of time.

12.      I have also reviewed the Appraisal Report for m/s "***Green Dale***" vessel, dated August 17, 2016, prepared by North American Marine Consultants, LLC for Vedder Price, counsel to Citizens Lender (the "Citizens Lender Appraisal").  In addition to fair market value, the Citizens Lender Appraisal employs two other valuation standards: (a) Orderly Liquidation Value and (b) Forced Liquidation Value.  Orderly Liquidation Value and Forced Liquidation

Value approximate the values expected to be produced when an asset has to be sold more quickly than through normal market exposure. A forced liquidation value assumes that the sale must occur in less than 30 days, that there may be no opportunity for the buyer conduct an inspection of the vessel or other due diligence, and that there may not be sufficient time for a buyer to obtain financing. A discount of up to 50% of FMV may be justified in a forced liquidation scenario. An Orderly Liquidation Value may be appropriate if a seller has more than 30 days but less than 90 days to consummate the sale of a vessel. To assess Orderly Liquidation Value, it may be appropriate to apply a discount of up to 15%-25% to Fair Market Value. The appropriate discount varies depending on the circumstances and the amount of time afforded for a sale. As the amount of time for a sale approaches three months, it is reasonable to assume that the seller will be able to achieve close to fair market value for a vessel, and to therefore apply little or no discount.

13. There are several key assumptions respecting value standards in the Citizens Lender Appraisal of m/s "*Green Dale*," with which I disagree. First, the Citizen Lender Appraisal defines the sales periods for (a) a Forced Liquidation Value to be 90 days or less, and (b) an Orderly Liquidation Value to be five to eight months. These defined time periods are too long. Ordinarily, five to eight months is more than an ample period of time to obtain the Fair Market Value for a vessel, not merely an Orderly Liquidation Value. And, as stated above, a 30 to 90 day period is generally sufficient to obtain an Orderly Liquidation Value for a vessel. Force Liquidation Value is more appropriate for vessel sales in less than 30 days. Second, the Citizen Lender Appraisal utilizes a 25% discount to Fair Market Value when calculating the Orderly Liquidation Value for m/s "*Green Dale*." Based on my understanding that the Debtors'

have already begun marketing their vessels, have already received indications of interest, and will have several more months to consummate the sale of the vessels, this discount is too high.

## VALUATION METHODOLOGIES

14.     My firm's appraisals of the Debtors' fleet utilize multiple valuation methodologies to estimate Fair Market Value, including the sales comparison approach, which estimates value through an analysis of recent sales or offering prices of comparable assets.  In the case of the "Jones Act" vessels where few sales, if any, have been concluded in recent years, I have also consulted with other United States-based shipowners and shipbrokers in connection with my valuation of such vessels.

15.     I have also considered the cost approach and income approach in connection with my appraisals of the Debtors' fleet.  The cost approach is based on the principle that the value of a vessel is related to the replacement cost of the asset, adjusted for depreciation.  The income approach estimates value by calculating the present value of the future economic benefits of owning the asset.

## SPECIALIZED ROLL-ON ROLL-OFF VESSELS

16.     The Debtors own two specialized Singapore flag rail ferries: (a) m/s "*Bali Sea*," and (b) m/s "*Banda Sea*".  Attached as Exhibit E is my Valuation Certificate setting forth my opinion of the current market values of these vessels at $12,000,000.00 to $13,500,000.00 each.

17.     These two vessels have been extensively modified for their dedicated rail ferry service.  They have been modernized and the terminals at each end of the trade route have been specially designed at considerable cost (Mobile terminal modification cost: ~$25,000,000) to accommodate a second deck that was added to the vessels in 2007, thereby doubling the vessels'

carrying capacity.  The vessels' original configuration was 7 rails/53 rail cars on the first deck. With the second deck, they now have an additional 8 rails/60 rail cars.

18.     In conducting my appraisals of these two vessels, I also considered the cost of the vessels' up-grades and modifications.  Between 1995 and 2007 the following "works" were completed at a cost of approximately $40,000,000 in the aggregate:  (a) Installation of 33 meter mid-bodies; (b) Laid track on main deck; (c) Installation of deck walls; (d) Installation of second decks; and (e) Laid track on second deck.

19.     The vessels benefit from low competition, high barriers to entry in the market, and have an earning capacity of ~$5,000,000 to $6,000,000 per year, and they can be expected to continue in their current trade for another 9 to 10 years, generating between $45,000,000 and $60,000,000 over that period.

20.     The present value of $60,000,000 over 10 years at 8% is $27,791,609.29. Residual value (demolition delivered sub-continent) is ~$8,000,000 based on current prices.  The sum of these two figures, $35,791,609.29, divided by 2 or $17,985,804.65, supports my opinion of the vessels' value.

**PURE CAR TRUCK CARRIERS**

21.     Attached as Exhibit F are my Valuation Certificates setting forth my opinions of the current market values of the Debtors' Pure Car Truck Carriers, (i) the m/s "*Green Dale"*, (ii) m/s "*Green Ridge"*, and (iii) m/s "*Green Bay"*.  As summarized below, the total value of these vessels is $95 million.

| VESSEL NAME | VALUE |
|---|---|
| m/s "Green Dale" | $21,000,000 |
| m/s "Green Bay" | $47,000,000 |
| m/s "Green Ridge" | $27,000,000 |
| **TOTAL** | **$95 MILLION** |

22.    In reaching my conclusion regarding the fair market value of the m/s "*Green Dale*", I have considered that the charterer, Nippon Yusen Kaisha ("NYK"), has the option to extend the charter for an additional two years, *i.e.*, until the end of September 2019.  Assuming this option were to be exercised, my opinion of value increases to $24,500,000 - 25,500,000.  As the vessel has been on charter to NYK since 1999, it can be reasonably expected that this option will be declared.  It is important to note that the original charter party provided for 2 x 6-year options whereby the vessel would be on charter to NYK until 2029.  I have also considered that the owners of the m/s "*Green Ridge*" and m/s "*Green Bay*" have a time charter agreements with NYK to transport automobiles and trucks from ports in Japan to ports on the United States East Coast which will continue in effect until 2019 and 2020 respectively, assuming all options to extend the charter are exercised.

23.    In reaching my conclusion regarding the fair market value of the m/s "*Green Bay*" and m/s "*Green Ridge*", I considered the fact that, unlike a foreign flag PCTC, these United States flag vessels are subsidized under the United States government's Maritime Security Program (MSP) which contributes $3,500,000 annually toward each vessels' operating costs. MSP is an arrangement which supports a fixed number of United States flag ships to enable their readiness for military deployment in times of conflict or national emergency.  Of the 60 ships

enrolled in MSP, only 14 of them are RoRos, including PCTCs, which are among the program's most valuable units.  The government's annual contribution is expected to increase by $1,000,000 to $1,500,000 on October 1, 2016, and to continue through 2025.  At that time, the program is expected to be extended so that m/s "**Green Bay**" and m/s "**Green Ridge**" will continue to qualify for MSP until they reach an age limit of 25 years in 2032 and 2023 respectively.  Accordingly, I consider my valuation of these vessels to be conservative.  Further information on MSP, run by the Maritime Administration, U.S. Department of Transportation, is attached as Exhibit G.

24.    I have also considered that the Debtors are a signatory to the Voluntary lntermodal Sealift Agreement (VISA) which is a partnership with the U.S. government to provide the Department of Defense (DOD) with "assured access" to commercial sealift in the event of a national emergency or conflict. Further information on VISA is attached as Exhibit H.  Although this provides an additional potential source of income, I have not assumed that the Debtors will earn such income for the purposes of my analysis.

### JONES ACT FLEET

25.    Attached as Exhibit I are my Valuation Certificates setting forth my opinions of the current market values of the following United States flag "Jones Act" vessels, totaling $47 million:

| VESSEL NAME | VALUE |
|---|---|
| m/s Mississippi Enterprise | $12,000,000 |
| m/s Texas Enterprise | $13,000,000 |
| ITS Barge Florida Enterprise | $8,000,000 |
| ITS Tug Coastal 202 | $2,500,000 |
| ATB Barge Louisiana Enterprise | $10,000,000 |
| ATB Tug Coastal 101 | $1,500,000 |
| TOTAL | $47 MILLION |

26.     The Merchant Marine Act of 1920, also known as the "Jones Act," is a United States federal statute that provides for the promotion and maintenance of the American merchant marine. The law regulates maritime commerce in U.S. waters and between U.S. ports. The Jones Act requires that all goods transported by water between U.S. ports be carried on U.S. flag ships, constructed in the United States, owned by U.S. citizens, and crewed by U.S. citizens or permanent residents.

27.     I have considered the U.S. vessel newbuilding replacement costs for these vessels, which far exceed those in foreign shipyards. For example, the cost for Matson, Inc. to build 2 x 45,000 mtdw/3,600 teu containerships at Aker Philadelphia Shipyard, Inc. was $418,000,000 (see Exhibit J) and the cost for Crowley ConRo, LLC to build 2 x 26,500 mtdw/ 2,400 teu ConRo ships at VT Halter Marine, Inc. was $414,600,000 (see Exhibit K). On August 25, 2016, Matson also announced they had contracted to build two (2) ConRos, at NASSCO for a contract price of $511,000,000 for both vessels, delivery in 2019 and mid 2020 (see Exhibit L).

28.     I have also consulted VT Halter for an estimate to build a 36,000 mtdw bulkcarrier like m/s "Mississippi Enterprise", and their price was $130,000,000.  Their estimate to build a 33,000 mtdw ATB like "Louisiana Enterprise" was $90,000,000-100,000,000.

29.     With the exception of "*Louisiana Enterprise*" and "*Coastal 101"*, the above vessels have Contracts of Affreightment (COAs) with the following companies:

    a.   Tampa Electric Company through 2017, firm, with 3 x one-year options;

    b.   Mosaic, Plymouth, MN through 2017, firm, with 2 x two-year options;

    c.   Jacksonville Electric Authority, COA bid quarterly

The contract with Tampa Electric Company commenced in 1952, and the contracts with Mosaic commenced in the 1980s.   These contracts are expected to continue for many more years. Collectively, the Jones Act fleet produces approximately $12,000,000 per year in income.

30.     While "*Louisiana Enterprise"* and "*Coastal 101"* are presently idle (laid-up in Tampa, FL), these vessesls will be available in the event of a casualty to one of the trading vessels, if the market requires the Company to carry more cargo under the COAs, or if other charter/COA opportunities arise.

31.     The cost for drydocking the tug and barge is estimated to be between $6,000,000 and $8,000,000. I have appraised these vessels as an active vessel in good and seaworthy condition and have assumed that such drydocking will be performed.

### ICE-STRENGTHENED MULTI-PURPOSE VESSEL

32.     Attached as Exhibit M is my Valuation Certificates setting forth my opinions of the current market value of the m/s "*Oslo Waive*" at between $4,400,000 and $4,600,000. When making this assessment, I took into consideration the fact that this multi-purpose vessel is ice-strengthened (ABS Al), fitted with two 57 ton MacGregor Hagglund cranes, combinable to

110 tons, can traverse the St. Lawrence Seaway, is strengthened for heavy cargo, and is equipped for the carriage of containers (1,084 teu, 60 reefer sockets) and dangerous goods, including ammunition. Since purchasing the vessel, the owners added a sprinkler system to the vessel's cargo holds making her suitable for Class 4 cargoes. I have also considered that this vessel is subject to a bareboat charter for 4 years trading between the Baltic and the Mediterranean Sea.

### ASSUMPTIONS

33.    In making my assessment, I used the best information available and took into consideration my understanding that the units were built/modified to the highest standards available at the time of construction/modification.

34.    I have assumed the vessels are to be delivered promptly and in good and seaworthy condition.

35.    The valuation conclusions set forth in this declaration are based on good faith as to the probable market as of the date of this declaration. No assurance whatsoever can be given that such figures will be sustained or can be realized in an actual transaction.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and

correct to the best of my knowledge and belief.


Dated: September 2, 2016
       Windemere, Florida

_____
William B. Mollard