Expedited Hearing Requested: **November 10, 2016 at 10:00 a.m.**
(prevailing Eastern Time)

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036
Telephone: (212) 872-1000
David H. Botter

1700 Pacific Avenue, Suite 4100
Dallas, TX 75201
Telephone: (214) 969-2800
Sarah Link Schultz (admitted *pro hac vice*)
Sarah J. Crow (admitted *pro hac vice*)

*Counsel to Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| INTERNATIONAL SHIPHOLDING CORPORATION, *et al.*,[1] | Case No. 16-12220 (SMB) |
| Debtors. | Jointly Administered |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER**
**AUTHORIZING THE DEBTORS TO ENTER INTO THE RESTRUCTURING**
**SUPPORT AGREEMENT WITH SEACOR CAPITAL CORP.**

The debtors and debtors in possession in the above-captioned cases (collectively, the

"Debtors")[2] hereby move for entry of orders, substantially in the form attached hereto as Exhibit

A (the "Proposed Order") pursuant to sections 105(a) and 363(b) of title 11 of the United States

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: International Shipholding, Inc. (9662); Enterprise Ship Co. (9059); Sulphur Carriers, Inc. (8965); Central Gulf Lines, Inc. (8979); Coastal Carriers, Inc. (6278); Waterman Steamship Corporation (0640); N.W. Johnsen & Co., Inc. (8006); LMS Shipmanagement, Inc. (0660); U.S. United Ocean Services, LLC (1160); Mary Ann Hudson, LLC (8478); Sheila McDevitt, LLC (8380); Tower LLC (6755); Frascati Shops, Inc. (7875); Gulf South Shipping PTE LTD (8628); LCI Shipholdings, Inc. (8094); Dry Bulk Australia LTD (5383); Dry Bulk Americas LTD (6494); and Marco Shipping Company PTE LTD (4570). The service address for each of the above Debtors is 601 Poydras Street, Pan American Building, Suite 1850, New Orleans, Louisiana 70130.

[2] Unless otherwise noted herein, capitalized terms not otherwise defined herein shall have the meaning(s) ascribed to such terms in the RSA or Term Sheet (each as defined herein), as applicable.

Code (the "Bankruptcy Code"), authorizing the Debtors to enter into a restructuring support agreement (as amended, the "RSA") between the Debtors and SEACOR Capital Corp. ("SEACOR" and together with the Debtors, the "Parties"), substantially in the form attached to the Proposed Order as Exhibit 1. In support of the Motion, the Debtors rely upon and incorporate by reference the *Declaration of Manuel G. Estrada, Vice President and Chief Financial Officer, in Support of Debtors' Motion for Entry of an Order Authorizing the Debtors to Enter into the Restructuring Support Agreement* (the "Declaration"), filed contemporaneously herewith. In further support of the Motion, the Debtors, by and through their undersigned proposed counsel, respectfully represent:

## PRELIMINARY STATEMENT

1.     In the three months since the Petition Date, the Debtors have worked diligently with their key constituencies toward a goal of maximizing the value of the Debtors' estates. After concluding a comprehensive analysis of the alternatives available to the estates, the Debtors have determined that the way to best reach this goal is a two-pronged approach: the Debtors will (1) execute a sale process for one of their four business segments, the Specialty Business Segment,[3] and (2) propose a plan of reorganization (the "Plan"), with SEACOR as plan sponsor, to reorganize the remaining business segments. As a first step in this process, the Debtors are seeking authority to enter into the RSA, which serves as a blueprint for a Plan and contemporaneously herewith have filed a motion to establish procedures to sell the Specialty Business Segment.

---

[3] The "Specialty Business Segment" is comprised of various contracts and agreements between Company affiliates and third parties, as well as certain notes receivable financing certain vessels owned by third parties, in each case relating to the Company's provision of logistical and seaborne transportation services in Southeast Asia and third party brokerage services related to these Southeast Asian operations.

2.      The RSA and its associated Term Sheet (as defined below), both of which were heavily negotiated by the Debtors and their advisors contemplate that pursuant to the Plan and the transactions contemplated thereby, SEACOR will:

- contribute $10 million in cash to the reorganization process and contribute the DIP Claim (including that portion owned by DVB Bank SE ("DVB"), which shall be purchased by SEACOR or repaid by SEACOR) in exchange for 100% of the equity in the reorganized Debtors
- offer employment opportunities to the Debtors' union members on terms contained in CBAs modified to contain terms not less favorable than the terms proposed by the unions currently utilized by SEACOR for substantially similar jobs (with such terms not including any obligation to contribute to any defined benefit pension plans that would be new to SEACOR)
- arrange for a $25 million exit facility
- assume certain of the Debtors' pre-petition contracts

The RSA and Term Sheet further provide that the Debtors will:

- liquidate certain vessels not being purchased by SEACOR
- satisfy all administrative, priority and, depending on the results of certain asset sales, all or substantially all secured claims

3.      The Debtors seek authority to enter into the RSA to ensure that the agreement will be valid and enforceable against all signatories thereto as these cases move towards plan solicitation and confirmation.  The RSA itself is the product of arm's-length negotiations among the Parties and reflects the signatories' mutual agreement that the restructuring contemplated by the RSA and Term Sheet represents the best available means for completing a comprehensive balance sheet restructuring and maximizing creditor recoveries.  Importantly, the RSA contains a "fiduciary out" ensuring that the Debtors can continue to exercise their fiduciary duties in all respects during the chapter 11 cases.

4.      In view of the foregoing, authorization for the Debtors to enter into the RSA and to perform their obligations under the RSA is integral to the Debtors' pursuit of the Plan, which the Debtors intend to file (along with a related Disclosure Statement) in the near term in

3

accordance with the milestones contained in the RSA. Accordingly, approval of this Motion does not dictate the terms of—or require the Court to preapprove—any particular plan of reorganization in these chapter 11 cases. Therefore, the Debtors believe that their entry into the RSA is an exercise of sound business judgment and is in the best interests of the Debtors and their estates.

## JURISDICTION

5.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

6.      Venue of these cases and this Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

7.      The bases for the relief requested herein are Bankruptcy Code sections 105(a) and 363(b).

## BACKGROUND

8.      On July 31, 2016 (the "Petition Date"), the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

9.      The Debtors are continuing in the possession of their respective properties and the management of their respective businesses as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108. These chapter 11 cases have been consolidated for procedural purposes only. No trustee or examiner has been appointed in the chapter 11 cases. On September 1, 2016, the Office of the United States Trustee for Region 2 (the "U.S. Trustee") appointed the statutory

committee of unsecured creditors (the "Committee") [ECF No. 125]. On September 22, 2016, the U.S. Trustee amended the Committee's appointment [ECF No. 185].[4]

10.     The events leading up to the Petition Date and the facts and circumstances supporting the relief requested herein are set forth in the *Declaration of Erik L. Johnsen, President and Chief Executive Officer, Pursuant to Local Bankruptcy Rule 1007-2 and in Support of First Day Filings* [Docket No. 7] (the "First Day Declaration"), and are incorporated herein by reference.

## SPECIFIC BACKGROUND

11.     As described in the First Day Declaration, since 2014, International Shipholding Corporation ("ISH" and, together with its debtor and non-debtor subsidiaries and affiliates, "International Shipholding") has encountered certain challenges related to complying with debt covenants and overall liquidity restraints. In an attempt to strengthen International Shipholding's financial position, on October 21, 2015, the Board of Directors of ISH approved a plan (the "Strategic Plan") to restructure International Shipholding by focusing on its three (3) core segments—the Jones Act, PCTC, and Rail-Ferry segments—with the objective to reduce debt to more manageable levels and to increase liquidity. Following that date, International Shipholding modified the Strategic Plan in response to new developments, including efforts to sell assets and ongoing discussions with its lenders, lessors, directors, and others.

12.     Pursuant to the Strategic Plan, as amended, International Shipholding classified the following assets as held for sale on December 31, 2015: (i) the assets in the Dry Bulk Carriers segment; (ii) an inactive tug included in the Jones Act segment; (iii) minority interests in

---

[4] The Committee members are (i) Willard E. Bartel and David C. Peebles, Administrators for the Estate of Robert N. Cain; (ii) Marine Engineers Beneficial Association; (iii) Masters, Mates, and Pilots Benefit Plans; (iv) Seafarers Benefits Plan; and (v) U.S. Ocean LLC.

mini-bulkers in the Dry Bulk Carriers segment; (iv) minority interests in chemical and asphalt tankers in the Specialty Business Segment; (v) International Shipholding's New Orleans office building; and (vi) a small, non-strategic portion of operations that owns and operates a certified rail-car repair facility near the port of Mobile, Alabama.

13.     By the end of the first quarter of 2016, International Shipholding had sold or exchanged all of the assets formerly included in the Dry Bulk Carriers segment.  Following this pre-petition sale process, the Debtors' businesses consist of four primary segments—the Jones Act Vessels segment, the Rail Ferry Business segment, the PCTC segment, and the Specialty Business segment.

14.     Since the filing of their chapter 11 cases, the Debtors have been actively engaged with their pre-petition lenders, the lenders under their post-petition debtor-in-possession credit facility, their unions, and the Committee to determine the appropriate exit strategy for these cases.  The Debtors have held weekly calls with these creditor constituencies, in addition to multiple in-person meetings and regular informal discussions.

15.     Prior to the filing of these chapter 11 cases, in early July 2016, the Debtors began a marketing process targeting various strategic and financial counterparties as plan of reorganization sponsors or outright buyers of all or some of the business segments.  During this process, the Debtors, through their financial advisors, Blackhill Partners, LLC ("Blackhill"), managed a comprehensive marketing process, pursuant to which they contacted sixty-eight (68) prospective sponsors or buyers, receiving a total of ten (10) indications of interest.  During this process, the Debtors established a data room, met with bidders to respond to questions, and facilitated on-site visits.  After carefully reviewing the bids received both individually and in the aggregate, the Debtors have determined, in consultation with their advisors and creditor

constituencies, that the value of their estates will be maximized by a sale of the Specialty Business Segment and a reorganization of the other segments in accordance with the terms of the Restructuring contemplated by the RSA.  In addition to this option providing the most value, the Debtors believe that SEACOR has the financial capacity to consummate a transaction of this size, making the degree of risk for such a transaction low.  Based on these considerations, the Debtors believe this course of action is in the best interests of their estates and creditors.

## RELIEF REQUESTED

16.     By this Motion, the Debtors seek entry of the Proposed Order authorizing the Debtors to enter into the RSA.

17.     The RSA, entered into by and among the Parties on October 28, 2016, commits the parties to pursue a pre-negotiated Plan consistent with the term sheet attached to the RSA (the "Term Sheet"), subject to definitive documentation.  The Plan is designed to implement a comprehensive balance sheet restructuring that will solve the Debtors' liquidity issues by significantly reducing the Debtors' funded indebtedness while providing the Debtors with sufficient working capital to operate on a go-forward basis.  In addition, pursuant to the RSA, the Parties have committed to support the Plan, at the appropriate time and consistent with applicable law.

18.     The Plan provides the Debtors with a clear exit strategy from bankruptcy for their Jones Act business segment, their PCTC business segment, and their Rail Ferry business segment.  The Plan will sufficiently de-lever the Debtors' capital structure to allow the reorganized Debtors to operate effectively and strengthen their competitive position in the shipping industry.  The Debtors believe that the transactions contemplated by the Plan will position the company to be a profitable, successful enterprise going forward.

19.     The RSA contemplates, among other things, that the Plan will provide for the

following:[5]

a)      SEACOR will cause $25 million of committed financing to be made available to the Debtors by one or more money center banks

b)      SEACOR shall provide a cash infusion of $10 million dollars.  As consideration for this cash infusion, SEACOR shall receive 35.6% of the ownership interests in Reorganized ISH

c)      SEACOR shall buy out the any portion of the DIP Facility funded by any other party, so that it is the sole beneficial owner of any DIP Facility Claims.   SEACOR shall receive 64.4% of the ownership interests in Reorganized ISH as a result of these claims

d)      Holders of secured claims on account of the DVB Facility shall receive, at the option of the  Debtors, with the consent of SEACOR, in full and final satisfaction of their allowed secured claims, either (w) cash in an amount necessary to satisfy their allowed secured claims, (x) the proceeds generated from the disposition of the collateral securing their claims, (y) delivery of the collateral securing their claims or (z) such other treatment as complies with Bankruptcy Code section 1129

e)      Holders of secured claims on account of the Citizens Facility shall receive, at the option of the Debtors, with the consent of SEACOR, in full and final satisfaction of their allowed secured claims, either (x) the proceeds generated from the disposition of the collateral securing their claims, (y) delivery of the collateral securing their claims, or (z) such other treatment as complies with Bankruptcy Code section 1129

f)      Holders of secured claims on account of the Capital One Facility shall receive, at the option of the Debtors, with the consent of SEACOR, in full and final satisfaction of their allowed secured claims, either (x) the proceeds generated from the disposition of the collateral securing their claims, (y) delivery of the collateral securing their claims or (z) such other treatment as complies with Bankruptcy Code section 1129

g)      Holders of secured claims on account of the Regions Senior Facility and the Line of Credit shall receive, at the option of the Debtors, with the consent of SEACOR, in full and final satisfaction of their allowed secured claims, (x) (a) either (i)  the proceeds generated from the disposition of the

---

[5] The summary of the terms of the RSA contained herein is qualified in its entirety by reference to the RSA and the Term Sheet.  If there are any inconsistencies between this summary and the terms of the RSA or the Term Sheet, the RSA or Term Sheet, as applicable, shall govern in all respects.  Capitalized terms used in this section but not otherwise defined shall have the meanings ascribed to such terms in the RSA or the Term Sheet, as applicable.

> *Louisiana Enterprise* and/or the *Texas Enterprise*, and/or (ii) delivery of the vessels securing their claims, the *Louisiana Enterprise* and/or the *Texas Enterprise* plus (b) cash in an amount equal to $[28.1] million or (y) such other treatment as complies with Bankruptcy Code section 1129

   h)    Holders of allowed prepetition secured/priority employee claims shall be entitled to receive cash, in full and final satisfaction of their claim

   i)    General unsecured creditors, which shall consist of, among other things, unsecured employee, union, and plan claims, deficiency claims, general trade claims, and rejection damage claims shall receive their pro rata share all amounts remaining from cash on hand after satisfaction of administrative and priority claims including, without limitation, the Cash Consideration, amounts generated as a result of the sale of the Specialty Business Segment and the sale of any vessels in accordance with the Term Sheet

   j)    All current equity interests in the Debtors, except for intercompany equity interests, shall be cancelled

20.    The RSA outlines a number of events, the occurrence of which would enable the Parties to terminate the RSA.  Specifically, with respect to the chapter 11 milestones, the Debtors have agreed to pursue a restructuring in accordance with certain deadlines, which are consistent with the revised milestones in the DIP Credit Agreement.  In the event the Debtors fail to meet such deadlines, SEACOR has the authority to terminate the RSA.  These deadlines include, among others, filing the Plan, the Disclosure Statement, and the motion to approve the Disclosure Statement with the Bankruptcy Court no later than November 14, 2016 and using commercially reasonable efforts to obtain entry of an order approving the Disclosure Statement on December 23, 2016 and entry of an order confirming the Plan on February 2, 2017.  The Debtors believe that the milestones set forth in the RSA will allow these cases to proceed expeditiously, while also providing sufficient time for parties in interest to review and consider the relevant transactions.

21.    Pursuant to the RSA, the Debtors shall pay in full in cash when due (and in no event later than ten (10) days following receipt of a summary statement of fees) (i) all reasonable

and documented fees and expenses relating to the Restructuring, whether incurred on or before the RSA Effective Date (as defined in Section 2 of the RSA), of (x) Milbank, Tweed, Hadley & McCloy LLP ("Milbank"), as primary counsel to SEACOR (y) one maritime counsel to SEACOR, and (z) one counsel to advise of issues of Mexican law, and (ii) any other reasonable and documented out-of-pocket fees and expenses (including travel expenses) incurred by SEACOR in connection with the Restructuring, whether incurred on or before the RSA Effective Date. The RSA represents a complex transaction involving multiple business segments and the interaction of bankruptcy and maritime law.    SEACOR requires the assistance of its professionals to pursue the Restructuring and is not prepared to incur these expenses without the Debtors' agreement to reimburse the actual costs incurred.    The expense reimbursement provision of the RSA is therefore reasonable and appropriate under the circumstances.

22.    Notably, the RSA does not purport to impair the Debtors' fiduciary duties in administering the chapter 11 cases.  Specifically, the RSA provides:

> Notwithstanding anything to the contrary herein, nothing in this Agreement shall require ISH, any of the other ISH Entities, or any of their respective officers or directors (in such person's capacity as such) to take any action, or to refrain from taking any action, to the extent that taking such action or refraining from taking such action would be inconsistent with such person's or entity's fiduciary obligations under applicable law.    ISH shall give SEACOR not less than three (3) business days' prior written notice before the exercise of rights under this Section 11 or the termination of this Agreement in accordance with Section 10(b)(i) of this Agreement (it being understood that the specific performance provisions of Section 12 of this Agreement shall not be applicable to the Parties with respect to the exercise of rights under this Section 11 or termination of this Agreement in accordance with Section 10(b)(i) of this Agreement).    For the avoidance of doubt, the foregoing shall not preclude SEACOR from challenging the appropriateness of the exercise of fiduciary duties as the basis for the exercise of rights under this Section 11 or the termination of this Agreement in accordance with Section 10(b)(i) of this Agreement.

10

## BASIS FOR RELIEF

**A. The Debtors' Entry into the RSA Is an Exercise of Their Sound Business Judgment.**

23.      Section 363(b) of the Bankruptcy Code provides, in relevant part, that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).

24.      Courts in this District have held that a debtor's entry into and performance under a plan support agreement, in and of itself, does not need to be approved pursuant to section 363(b)(1) of the Bankruptcy Code because a debtor's right to negotiate and file a plan does not implicate property of the debtor's estate. See, *e.g.*, *Trans World Airlines, Inc. v. Texaco, Inc. (In re Texaco, Inc.)*, 81 B.R. 813, 818 (Banrk. S.D.N.Y. 1988) ("In sum, 11 U.S.C § 363(b)(1) simply has no application to the Stipulation which Texaco and Pennzoil negotiated in furtherance of the goal of effecting a confirmed plan of reorganization. Hence prior court approval of the Stipulation was not required…."). However, the Debtors seek the Court's approval to enter into and perform under the RSA out of an abundance of caution under section 363(b)(1) and to provide all of the Debtors' stakeholders notice of the RSA and an opportunity to object to the Debtors' decision to enter into and perform under it.  Moreover, authority to enter into and perform under the RSA ensures that the agreement that forms the foundation of the Debtors' consensual restructuring continues to be valid and enforceable against all signatories, an important benefit to the Debtors, and continues to provide the Debtors with the benefits they heavily bargained for thereunder.

25.      Use of estate property outside the ordinary course of business is allowed if the debtor demonstrates a sound business justification for it.  *See, e.g.*, *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983) (business judgment rule requires finding that good business reason exists to grant debtor's application under section 363(b)); *In re Del. Hudson Ry. Co.*, 124 B.R.

169, 179 (Bankr. D. Del. 1991). The Second Circuit has held that, although the bankruptcy court sits as an "overseer of the wisdom with which the bankruptcy estate's property is being managed by the…debtor-in-possession, it must resist becoming "arbiter of disputes between creditors and the estate. *In re Orion Pictures Corp.*, 4 F.3d 1095, 1099 (2d Cir. 1993). A court's consideration of a motion under section 363(b) of the Bankruptcy Code is a summary proceeding, intended as a means to "efficiently review the…debtor's decision[s]…in the course of the swift administration of the bankruptcy estate. It is not the time or place for prolonged discovery or a lengthy trial." *Id*.

26.    The business judgment rule shields a debtor's management from judicial second-guessing. *See In re Residential Capital, LLC*, 2013 WL 3286198 *18 (Bankr. S.D.N.Y. 2013) ("Once a debtor has articulated a valid business justification under section 363, a presumption arises that the debtor' decision was made on an informed basis, in good faith, and in the honest belief that the action was in the best interest of the Debtors."); *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions."); *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (noting that once a debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'") (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)); *see also Orion*, 4 F.3d at 1098 (noting that that Bankruptcy Code section 365 "permits the trustee or debtor-in-possession, subject to the approval of the bankruptcy court, to go through the inventory of executory contracts of the debtor and decide which ones it would be beneficial to adhere to and

12

which ones it would be beneficial to reject"). Thereafter, "[p]arties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity." *Integrated Res.*, 147 B.R. at 656. To satisfy its burden, an objector must "produce some evidence respecting its objections." *Lionel*, 722 F.2d at 1071.

27.     In addition, the Debtors seek approval of the assumption of the RSA pursuant to Bankruptcy Code section 105(a), which provides, in relevant part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

28.     The Debtors' decision to enter into the RSA is an exercise of their sound business judgment. First, the terms of the RSA are the result of extensive, arm's-length negotiations between the Parties, with all Parties represented by counsel. The final terms of the RSA are the culmination of give-and-take negotiations and represent a positive outcome for the Debtors in their efforts to restructure and emerge from bankruptcy as expeditiously as possible. Without the support of SEACOR, the Debtors would be forced to consider less attractive bids for the sale of their assets, which would reduce creditor recoveries. Thus, given the significant benefits to be garnered by the proposed restructuring, the Debtors determined, in the exercise of their reasonable business judgment, that the terms of reorganization set forth in the RSA and Term Sheet combined with the sale of their Specialty Business represent the best opportunity to maximize the value of their estates and, thereby, maximize creditor recoveries. Indeed, the terms of the Plan will not only reduce the Debtors' indebtedness significantly, but also will provide the necessary capital to fund the Debtors' future operations, meet competitive conditions, and preserve asset value for the Debtors' estates and creditors.

29.    In addition, the Debtors believe that an expeditious prosecution of, and emergence from, these chapter 11 cases is essential to preserve value for their estates and all parties in interest by ensuring that the Debtors' businesses do not languish in chapter 11 for an extended period of time.  By ensuring that the Debtors' efforts to restructure will have the necessary support, the RSA directly serves the Debtors' ultimate goal—the expedient and efficient emergence from chapter 11 that will minimize the impact of these chapter 11 cases on the Debtors' businesses.

30.    Importantly, the Debtors' boards of directors may terminate the Debtors' obligations under the RSA to the extent required to comply with their fiduciary duties.  Thus, assumption of the RSA will enable, not prohibit, the Debtors' fulfillment of their fiduciary obligations to maximize the value of their estates.

**B. The RSA Complies with Bankruptcy Code Section 1125**

31.    Section 1125(b) provides that "[a]n acceptance or rejection of a plan may not be solicited after the commencement of the case under this title… unless, at the time of or before such solicitation, there is transmitted…a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information." 11 U.S.C. § 1125(b).

32.    The Debtors are mindful of the solicitation and voting provisions in Bankruptcy Code Sections 1125 and 1126 and have included provisions in the RSA to ensure compliance with these sections.  In particular, the RSA expressly states that it "is not, and shall not be deemed to be…a solicitation of a vote for the acceptance of any chapter 11 plan (including the Plan) pursuant to section 1125 of the Bankruptcy Code.  The acceptance of votes from holders of claims against, and interests in, the Debtors, as applicable, will not be solicited until such holders have received the Disclosure Statement and related solicitation materials that meet the

14

requirements of the Bankruptcy Code, including sections 1125 and 1126 of the Bankruptcy Code." RSA § 14.

33.    Courts in this district have approved restructuring and plan support agreements containing similar language, finding that such agreements did not violate Bankruptcy Code section 1125.  *See In re AOG Entertainment, Inc. et. al.*, Case No. 16-11090 (SMB) (Bankr. S.D.N.Y. June 29, 2016) [Docket No. 184] (approving entry into restructuring support agreement where agreement clearly stated that the agreement was not a solicitation of votes for the purposes of Bankruptcy Code sections 1125 and 1126); *In re Nautilus Holdings Ltd.*, Case No. 14-22885 (RDD) (Bankr. S.D.N.Y. Oct. 3, 2014) [Docket No. 165] (same); *In re The Great Atlantic & Pacific Tea Company, Inc.*, Case No. 10-24549 (RDD) (Bankr. S.D.N.Y. Dec. 19, 2011) [Docket No. 3060] (approving post-petition plan support agreement where agreement provided that obligation to vote for the plan was subject to the receipt of a disclosure statement approved by the Court); *In re Quigley Co., Inc.*, Case No. 04-15739 (SMB) (Bankr. S.D.N.Y. Apr. 7, 2011) [Docket No. 2269] (approving post-petition plan support agreement that contained a provision making clear that the casting of votes would only occur once they were solicited following receipt of a court-approved disclosure statement in accordance with Bankruptcy Code sections 1125 and 1126).

34.    In sum, the RSA is designed to ensure that the Debtors can emerge with a healthier balance sheet in short order and are the products of arm's-length negotiations among the Parties.  By this Motion, the Debtors seek to keep these cases on track and achieve their next important milestone.  For the foregoing reasons, the RSA is a critical component of the Debtors' proposed restructuring efforts and the Debtors' decision to enter into such an agreement represents a sound exercise of the Debtors' business judgment.

## **RESERVATION OF RIGHTS**

35.     Nothing contained herein is intended or should be construed as an admission of the validity of any claim against the Debtors or a waiver of the Debtors' rights to dispute any claim.  The Debtors expressly reserve their right to contest any invoice or claim related to the relief requested herein in accordance with applicable non-bankruptcy law.

## **NOTICE**

36.     No trustee or examiner has been appointed in the Debtors' chapter 11 cases.  The Debtors have caused notice of this application to be provided by electronic mail, facsimile, regular or overnight mail, and/or hand delivery to: (i) the U.S. Trustee; (ii) the agent under the Debtors' post-petition debtor-in-possession financing and its counsel; (iii) the Committee and its counsel; (iv) counsel to the agents and lenders under the Debtors' pre-petition credit facilities; (v) the U.S. Attorney's Office for the Southern District of New York; (vi) the Internal Revenue Service; (vii) the United States Securities and Exchange Commission; (ix) all parties that have filed a request to receive service of pursuant to Bankruptcy Rule 2002; and (x) all other parties on the master service list prepared and maintained pursuant to the Order Establishing Certain Notice, Case Management, and Administrative Procedures [ECF No. 178].  In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court (a) enter an order,

substantially in the form of the Proposed Order, granting the relief requested herein, and

(b) grant such other and further relief as may be just and proper.


Dated:  New York, New York        **AKIN GUMP STRAUSS HAUER & FELD LLP**
        October 28, 2016          By: _/s/ David H. Botter_

                                  David H. Botter
                                  One Bryant Park
                                  New York, NY 10036
                                  Telephone: (212) 872-1000
                                  Facsimile: (212) 872-1002

                                  Sarah Link Schultz (admitted *pro hac vice*)
                                  Sarah J. Crow (admitted  *pro hac vice*)
                                  1700 Pacific Avenue, Suite 4100
                                  Dallas, Texas 75201
                                  Telephone: (214) 969-2800
                                  Facsimile: (214) 969-4343


                                  *Counsel to Debtors and Debtors in Possession*

## EXHIBIT A

**RSA Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) |
| | ) Chapter 11 |
| INTERNATIONAL SHIPHOLDING | ) |
| CORPORATION, *et al.*,[1] | ) Case No. 16-12220(SMB) |
| | ) |
| Debtors. | ) Jointly Administered |

**ORDER AUTHORIZING THE DEBTORS TO ENTER INTO THE RESTRUCTURING**
**SUPPORT AGREEMENT WITH SEACOR CAPITAL CORP.**

Upon the motion (the "Motion")[2] of the debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors") for entry of an order, pursuant to sections 105(a), and 363(b) of title 11 of the United States Code (the "Bankruptcy Code"), authorizing the Debtors to enter into the RSA, all as more fully set forth in the Motion; and upon the *Declaration of Manuel G. Estrada, Vice President and Chief Financial Officer, in Support of Debtors' Motion for Entry of an Order Authorizing the Debtors to Enter into the Restructuring Support Agreement*; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors and other parties in interest; and the Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue being proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409; and it

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: International Shipholding Corporation (9662); Enterprise Ship Co. (9059); Sulphur Carriers, Inc. (8965); Central Gulf Lines, Inc. (8979); Coastal Carriers, Inc. (6278); Waterman Steamship Corporation (0640); N.W. Johnsen & Co., Inc. (8006); LMS Shipmanagement, Inc. (0660); U.S. United Ocean Services, LLC (1160); Mary Ann Hudson, LLC (8478); Sheila McDevitt, LLC (8380); Tower LLC (6755); Frascati Shops, Inc. (7875); Gulf South Shipping PTE LTD (8628); LCI Shipholdings, Inc. (8094); Dry Bulk Australia LTD (5383); Dry Bulk Americas LTD (6494); and Marco Shipping Company PTE LTD (4570).  The service address for each of the above Debtors is 601 Poydras Street, Pan American Building, Suite 1850, New Orleans, Louisiana 70130.

[2] Capitalized terms not otherwise defined herein shall have the meaning(s) ascribed to such terms in the Motion.

appearing that notice of the Motion is appropriate under the circumstances; and any objections to the requested relief having been withdrawn or overruled on the merits; and after due deliberation and sufficient cause appearing therefor

IT IS FOUND AND DETERMINED THAT:[3]

A.      The Court has jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334.  Consideration of the Motion and the requested relief is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      The notice given by the Debtors of the Motion and the hearing with respect to the Motion constitutes proper, timely, adequate, and sufficient notice thereof and complies with the Bankruptcy Code, the Bankruptcy Rules, and applicable local rules, and no other or further notice is necessary.

C.      The terms and conditions of the RSA are incorporated as if fully set forth herein; [4] provided, that nothing in this Order shall be, or shall be deemed or construed to be, findings or determinations with respect to (i) the Plan as contemplated in the Term Sheet, or (ii) any other chapter 11 plan of reorganization proposed in the Debtors' chapter 11 cases.  The terms and conditions thereunder are fair, reasonable, and the best available to the Debtors under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, are based on good, sufficient, and sound business purposes and justifications, and are supported by reasonably equivalent value and consideration.  The RSA

---

[3] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, pursuant to Rule 7052 of the Bankruptcy Rules.

[4] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

- 2 -

was negotiated in good faith and at arms' length among the Parties and their respective professional advisors.

        D.      The obligation to pay fees and expenses set forth in Section 9 of the RSA is a bargained for and integral part of the transactions contemplated by the RSA and, without such inducement, SEACOR would not have agreed to the terms and conditions of the RSA.

        E.      The entry into the RSA by the Parties, and the performance and fulfillment of their respective obligations thereunder, do not constitute the solicitation of a vote on a chapter 11 plan and comply with the Bankruptcy Code and any and all other applicable statutes, laws, regulations, or orders.

        F.      All parties in interest have been afforded a reasonable opportunity to object and be heard with respect to the Motion and the RSA and all of the relief granted herein.

**BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

1.      The Motion is granted to the extent set forth herein.

2.      The Debtors are authorized and directed to assume the RSA, a copy of which is attached hereto as <u>Exhibit 1</u>, effective upon entry of this Order.

3.      The RSA shall be binding and enforceable against the Parties in accordance with its terms.

4.      The failure to describe specifically or include any particular provision of the RSA in the Motion or this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the RSA be entered into by the Debtors in its entirety.

5.      The Debtors are authorized to execute, deliver, and perform one or more amendments, waivers, consents, or other modifications to and under the RSA, in each case in accordance with the terms of the RSA, and no further approval of the Court shall be required for

any amendment, waiver, consent, or other modification to and under the RSA that does not have a material adverse effect on the Debtors' estates.

6.      The RSA shall be solely for the benefit of the Parties, and no other person or entity shall be a third-party beneficiary hereof.  No entity shall have any right to seek or enforce specific performance of the RSA, other than the parties thereto.

7.      The Debtors are hereby authorized and empowered to take all actions, execute all documents that may be necessary to perform under the RSA and implement the relief granted in this Order, and such actions shall not constitute a solicitation of acceptances or rejections of a plan pursuant to Bankruptcy Code section 1125.

8.      The Debtors shall be obligated to pay all fees and expenses incurred prior to the termination of the RSA should an event described in Section 12 of the RSA occur (collectively, "SEACOR's Professional Fees"), provided, that notwithstanding anything to the contrary herein, the RSA and/or the Term Sheet, any and all payments in respect to SEACOR's Professional Fees shall be subject to the same ten (10) day notice and payment procedures set forth in the *Final Order (1) Authorizing Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Certain Protections to Prepetition Lenders and (2) Granting Certain Related Relief* [Docket No. 180] for the Committee and/or the U.S. Trustee to review monthly invoices and, if necessary, object for reasonableness.

9.      Notwithstanding anything to the contrary herein, nothing in this Order makes, or shall be deemed or construed to make, any findings or determinations with respect to the Plan contemplated by the RSA or any other chapter 11 plan that is proposed in the Debtors' chapter 11 cases.

10.    Notwithstanding the Debtors' entry into the RSA and anything to the contrary in this Order, the RSA and/or Term Sheet, the rights of all parties are reserved and preserved to object (on any grounds) to any or all aspects of the Plan as contemplated by the RSA, any amended Plan, or any other chapter 11 plan that may be proposed in the Debtors' chapter 11 cases (or recommend to creditors to vote to reject any such plans), as well as to the adequacy of any disclosure statement related to the Plan or any other chapter 11 plan proposed in these cases.

11.    Notwithstanding anything to the contrary herein, nothing in this Order shall require the Debtors or any directors or officers of the Debtors, in such person's capacity as a director or officer of a Debtor, to take any action inconsistent with or to refrain from taking any action consistent with, its or their fiduciary obligations under applicable law.

12.    Notice of the Motion as provided therein shall be deemed good and sufficient notice, and the requirements of the Bankruptcy Rules and the Local Rules are satisfied by such notice.

13.    The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

14.    Any stay of this Order, otherwise required pursuant to Bankruptcy Rule 6004(h), is hereby waived and the terms and conditions of this Order shall be immediately effective and enforceable upon its entry by the Court.

15.    This Court shall retain jurisdiction with respect to any and all matters arising from or relating to the implementation or interpretation of this Order.

Dated: _____, 2016
New York, New York

_____
THE HONORABLE  STUART M. BERNSTEIN
UNITED STATES BANKRUPTCY JUDGE

- 5 -

## **Exhibit 1**

**Restructuring Support Agreement**

**THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF VOTES WITH RESPECT TO A CHAPTER 11 PLAN OF REORGANIZATION.   ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR, AS APPLICABLE, PROVISIONS OF THE BANKRUPTCY CODE.**

---

**RESTRUCTURING SUPPORT AGREEMENT**

**by and among**

**INTERNATIONAL SHIPHOLDING CORPORATION AND ITS SUBSIDIARIES PARTY HERETO**

**and**

**THE UNDERSIGNED CREDITOR PARTIES**

**dated as of [__], 2016**

---

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (as the same may be amended, modified or supplemented from time to time in accordance with the terms hereof and including all exhibits annexed hereto which are incorporated by reference herein, this "Agreement"), dated as of [__], 2016, is entered into by and among (x) International Shipholding Corporation, a Delaware corporation ("ISH"), and each of the undersigned direct and indirect subsidiaries of ISH (the "Subsidiaries," and together with ISH, the "ISH Entities" or the "Debtors") and (y) SEACOR Capital Corp. ("SEACOR").  Each of the ISH Entities and SEACOR is referred to herein individually as a "Party" and, collectively, as the "Parties".

WHEREAS, the ISH Entities provide waterborne cargo transportation services to a diversified customer base with an emphasis on medium and long-term contracts;

WHEREAS, on July 31, 2016, the ISH Entities filed cases under chapter 11 (the "Chapter 11 Cases") of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

WHEREAS, the Bankruptcy Court approved that certain senior secured super-priority debtor-in-possession financing (as amended, modified or supplemented from time to time, the "DIP Facility") by and among the ISH Entities, SEACOR, as administrative agent and collateral agent, DVB Bank SE and SEACOR and/or one or more of their designated affiliates or other lender parties thereto from time to time, as lenders (the "DIP Lenders") on August 4, 2016 and on September 20, 2016, on an interim and final basis, respectively (the "DIP Orders"). Claims and obligations owed by the Debtors under the DIP Facility are collectively referred to herein as the "DIP Facility Claims";

WHEREAS, the ISH Entities and SEACOR have negotiated, in good faith and at arms' length, a transaction that will effectuate a financial restructuring of the ISH Entities' capital structure and financial obligations (the "Restructuring"), on the terms and conditions set forth in this Agreement and the Term Sheet attached hereto as **Exhibit A** (including any annexes and schedules attached thereto, the "Term Sheet") that is to be implemented through a chapter 11 plan to be consummated in the Chapter 11 Cases, on the terms and conditions described in this Agreement and the Term Sheet, and that is otherwise in form and substance acceptable to the Debtors and SEACOR (the "Plan"); and

WHEREAS, the Parties desire to express to each other their mutual support and commitment in respect of the Restructuring pursuant to the Plan on the terms and conditions contained in this Agreement and the attached Term Sheet.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

1.    **Incorporation of Term Sheet and Definitions; Interpretation**.

The Term Sheet is expressly incorporated herein by reference and is made part of this Agreement.  All references herein to this "Agreement" or "herein" shall include the Term Sheet whether or not expressly stated.  Capitalized terms used and not defined in this Agreement shall have the meaning ascribed to them in the Term Sheet.

In this Agreement, unless the context otherwise requires:

a.    words importing the singular also include the plural, and references to one gender include all genders;

b.    the headings are inserted for convenience only and do not affect the construction of this Agreement and shall not be taken into consideration in its interpretation;

c.    the words "hereof," "herein" and "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular provision of this Agreement;

d.    the words "include," "includes," and "including" shall be deemed to be followed by the phrase "without limitation." The word "or" is not exclusive; and

e.    references to any governmental entity or any governmental department, commission, board, bureau, agency, regulatory authority, instrumentality, or judicial or administrative body, in any jurisdiction shall include any successor to such entity.

2.    **Effectiveness; Entire Agreement**.

a.    This Agreement shall become effective and binding on the Parties upon (i) delivery of counterpart signature pages to this Agreement by the ISH Entities and SEACOR and (ii) entry of an order by the Bankruptcy Court approving the Debtors' entry into the Agreement (such date, the "RSA Effective Date").

b.    Without limiting the rights and remedies of any Party arising from a breach of this Agreement prior to its valid termination, if this Agreement is validly terminated in its entirety in accordance with its terms, then this Agreement shall be null and void and have no further legal effect and none of the Parties shall have any liability or obligation arising under or in connection with this Agreement; provided that if this Agreement is validly terminated in its entirety in accordance with its terms as to any Party but not as to all Parties, then this Agreement shall be null and void and have no further legal effect only with respect to such Party.

2

c. Each of the exhibits attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include and incorporate all exhibits attached hereto.  In the event of any inconsistency between this Agreement and any of the exhibits, this Agreement shall govern, except in the case of any inconsistency between this Agreement and the Term Sheet, in which case the Term Sheet shall govern.

d. With the exception of non-disclosure and confidentiality agreements among the Parties and, until the Restructuring is consummated, this Agreement and the DIP Facility constitute the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements (oral and written) and all other prior negotiations.

3.  **Mutual Covenants of All Parties**.

For so long as this Agreement has not been validly terminated in its entirety in accordance with its terms, and subject to the terms and conditions of this Agreement, the Parties agree, severally and not jointly, to use commercially reasonable efforts to complete the Restructuring within the timeframe contemplated by this Agreement and on terms and conditions consistent with those set forth herein and in the Term Sheet.  For so long as this Agreement has not been validly terminated in its entirety in accordance with its terms, each Party hereby agrees and covenants severally (but not jointly) to:

a. comply with all of its obligations under this Agreement (unless compliance is expressly waived in writing by the other Party);

b. cooperate with each other in good faith and coordinate their activities in connection with (i) the pursuit and implementation of the Restructuring, and (ii) confirmation and consummation of the Plan;

c. use commercially reasonable efforts and work in good faith to negotiate definitive documents implementing, achieving and relating to the Restructuring, including, but not limited to, (i) the Plan, a disclosure statement containing "adequate information" (as that term is used in the Bankruptcy Code) with respect to the Plan (the "Disclosure Statement"), the motion seeking approval of the Disclosure Statement, the order of the Bankruptcy Court confirming the Plan (the "Confirmation Order"), the motion seeking entry of the Confirmation Order, all documents constituting the plan supplement, the Solicitation Procedures (as defined below), and each of the organizational, governance and exit credit documents contemplated by the Term Sheet, each of the foregoing in form and substance acceptable to the Debtors and SEACOR; and (ii) such other related plan documents and ancillary agreements required to implement the Restructuring, each of which are more specifically described in the Term Sheet and shall contain terms and

3

conditions substantially consistent in all respects with the Term Sheet (collectively, the "Definitive Documents");[1]

d.  execute the Definitive Documents and otherwise support and seek to perform the actions and transactions contemplated thereby, in each case as soon as reasonably practicable, provided that each of the Definitive Documents shall (A) contain terms and conditions consistent in all material respects with this Agreement and the Term Sheet and (B) otherwise be in all respects acceptable or reasonably acceptable, as set herein, to the Debtors and SEACOR, including with respect to any modifications, amendments, or supplements to such Definitive Documents;

e.  take such action as may be reasonably necessary to carry out the purposes and intent of this Agreement;

f.  not take any action that is inconsistent in any material way with, or is intended to frustrate, delay or impede the timely approval and confirmation of the Plan and consummation of the Restructuring;

g.  to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the transactions contemplated herein, negotiate in good faith appropriate additional or alternative provisions to address any such impediment; provided, that the economic outcome for the Parties and other materials terms of this Agreement are preserved in any such provisions; and

h.  support and use commercially reasonable efforts to (i) complete the Restructuring and all transactions contemplated under this Agreement as soon as reasonably practicable, and in any event, not later than in accordance with the deadlines specified in the milestones set forth in the section entitled "*Additional Covenants of the Debtors*" herein (collectively, as the same may be modified in accordance with the terms of this Agreement, the "Milestones"), (ii) take any and all reasonably necessary actions in furtherance of the Restructuring and the transactions contemplated under this Agreement and, once drafted, the Plan, and (iii) obtain (solely as it relates to such Party) any and all required regulatory and/or third-party approvals necessary to consummate the Restructuring.

---

[1] The form substance and provisions of (a) the Plan and  the order confirming the Plan shall be consistent with the Term Sheet and otherwise satisfactory to the Debtors and SEACOR;  (b) any exit facility financing agreement, and the constitutional and organizational documents of the Reorganized Debtors including any charters, bylaws, operating agreements, indentures, warrants, stockholders' agreements, registration rights agreements, management incentive plan, or other similar agreements shall be consistent with the Term Sheet and otherwise satisfactory to SEACOR; and (c) all other Definitive Documents shall be in form and substance reasonably acceptable to the Debtors and SEACOR.

4.    **Additional Covenants of SEACOR**.

For so long as this Agreement has not been validly terminated in its entirety in accordance with its terms with respect to it, SEACOR hereto agrees and covenants to:

a.  not, directly or indirectly, (i) object to, delay, impede, or take any other action to interfere with the acceptance, implementation, confirmation or consummation of the Restructuring and the Plan; (ii) seek, solicit, support, encourage, or vote any claims or equity interests for, consent to, or participate in any discussions regarding the negotiation or formulation of any restructuring or reorganization for any of the Debtors that is inconsistent with this Agreement, the Term Sheet or, when filed, the Plan in any respect; (iii) take any other action that would delay or obstruct the timely approval and consummation of the transactions contemplated by this Agreement, the Term Sheet or, when filed, the Plan in any respect; (iv) commence or support any action or proceeding to shorten or terminate the period during which only the Debtors may propose and/or seek confirmation of a plan of reorganization; or (v) otherwise support any plan or sale process that is inconsistent with this Agreement, the Term Sheet or the Plan;

b.  use commercially reasonable efforts to execute any document and give any notice, order, instruction, or direction necessary or reasonably requested by the Debtors to support, facilitate, implement, or consummate or otherwise give effect to the Restructuring;

c.  (i) reasonably support the approval of the Disclosure Statement, and the solicitation procedures with respect to the Plan (such procedures, in form and substance reasonably acceptable to SEACOR, the "Solicitation Procedures"), and the applicable Definitive Documents by the Bankruptcy Court or any regulatory authority, (ii) reasonably support confirmation and consummation of the Plan, (iii) not oppose, object to or join in or support any objection to the Disclosure Statement, the solicitation in accordance with the Solicitation Procedures, or any of the Definitive Documents, or (iv) otherwise commence any proceeding to oppose or alter any of the terms of the Plan or any other document filed by Debtors (to the extent such document is in form and substance acceptable or reasonably acceptable, as set forth herein, to SEACOR) in connection with the confirmation and consummation of the Plan; and

d.  subject to receipt of the Disclosure Statement approved by the Bankruptcy Court, cause SEACOR's portion of the DIP Facility Claims to support the Plan and to consent to the treatment set forth in the Term Sheet and either (i) cause the remainder of the DIP Facility to be paid in full in cash on the effective date of the Plan or (ii) purchase the remainder of the DIP Facility Claims and cause such claims to support the Plan and to consent to the treatment set forth in the Term Sheet.

5.    **Additional Covenants of the Debtors**.

For so long as this Agreement has not been validly terminated in its entirety in accordance with its terms, the Debtors agree and covenant to:

a.  continue the sale process for the Specialty Business Segment (as defined in the Term Sheet);

b.  use commercially reasonable efforts to satisfy all reasonable diligence requests made by SEACOR or its advisors in a timely manner;

c.  use good-faith efforts to provide draft copies of all material pleadings the Debtors intend to file with the Bankruptcy Court to counsel to SEACOR within a reasonable time prior to filing such pleadings and shall consult in good faith with SEACOR regarding the form and substance of any such proposed pleading;

d.  file the Plan, the Disclosure Statement, and the motion to approve the Disclosure Statement and the Solicitation Procedures with the Bankruptcy Court no later than November 14, 2016;

e.  obtain (i) approval by the Bankruptcy Court of the Disclosure Statement and the Solicitation Procedures on or before December 22, 2016, and (ii) entry of the Confirmation Order on or before February 2, 2017, which Confirmation Order shall become a final order no later than fourteen (14) days from the date of entry;

f.  use commercially reasonable efforts to consummate the Plan on or before [TBD], 2017;

g.  take no action that is materially inconsistent with this Agreement, the Term Sheet, or, when filed, the Plan, or that would unreasonably delay or impede the approval or ratification, as applicable, of the Disclosure Statement, the solicitation and Solicitation Procedures, or confirmation and consummation of the Plan;

h.  not directly or indirectly join in or support any alternative plan or transaction other than the Plan;

i.  object to any motion to approve or confirm, as applicable, any other plan of reorganization, sale transaction, or any motions related thereto, to the extent that the terms of any such motions, documents, or other agreements are inconsistent with this Agreement or the Term Sheet and such inconsistencies were not approved in writing by SEACOR;

j.  continue to operate its businesses, market for sale those assets of the Debtors which are specifically contemplated to be sold under the Term Sheet, and conduct sale processes in accordance with its business judgment;

6

k.  confer with SEACOR and its representatives, as reasonably requested, to report on operational matters, the asset sale process, and the general status of ongoing operations and dispositions;

l.  use commercially reasonable efforts to provide prompt written notice to SEACOR between the date hereof and the effective date of the Plan of (i) receipt of any written notice from any third party alleging that the consent of such party is or may be required as a condition precedent to consummation of the transactions contemplated by the Restructuring, (ii) receipt of any written notice from any governmental body that is material to the consummation of the transactions contemplated by the Restructuring, (iii) receipt of any written notice of any proceeding commenced, or, to the actual knowledge of the Debtors' management, threatened against the Debtors, that, if determined in a manner adverse to the Debtors, would be material to the consummation of the transactions contemplated by the Restructuring, and (iv) any failure of the Debtors to comply, in any material respect, with or satisfy any covenant, condition or agreement to be complied with or satisfied by them hereunder as a condition precedent to the consummation of the transactions contemplated by the Restructuring;

m.  use commercially reasonable efforts to obtain the earliest possible date for a hearing on confirmation of the Plan as the Bankruptcy Court may provide; and

n.  provide to SEACOR, upon reasonable advance notice to the Debtors, (i) reasonable access (without any material disruption to the conduct of the Debtors' business) during normal business hours to the Debtors' books, records and facilities, and (ii) reasonable access to the respective management and advisors of the Debtors during normal business hours for the purposes of evaluating the Debtors' finances and operations and participating in the planning process with respect to the Restructuring.

**6.      Preservation of Participation Rights**.  For the avoidance of doubt, except as expressly stated herein, nothing in this Agreement shall limit any rights of any Party to (a) appear and participate as a party-in-interest in any contested matter to be adjudicated in the Chapter 11 Cases; (b) initiate, prosecute, appear, or participate as a party in interest in any adversary proceeding in the Chapter 11 Cases, so long as, in the case of each of (a) or (b), such appearance, initiation, prosecution or participation and the positions advocated in connection therewith are not materially inconsistent with this Agreement, the Plan (when filed) or the Term Sheet; (c) object to any motion to approve or confirm, as applicable, any other plan of reorganization or liquidation, sale transaction, or any motions related thereto, to the extent that the terms of any such motions, documents, or other agreements are materially inconsistent with this Agreement, the Plan (when filed) or the Term Sheet and such inconsistencies were not approved in writing by each other Party; (d) file a copy of this Agreement or a description of its terms with the Bankruptcy Court or as required under applicable non-bankruptcy law; (e) appear as a party-in-interest in the Chapter 11 Cases for the purpose of contesting whether any matter or fact is or results in a breach of, or is materially inconsistent with, this Agreement; and (f) as applicable, file any proof of claim.

7

7.     **Mutual Representations and Warranties of All Parties**.  Each Party represents and warrants to each of the other Parties that, as of the date hereof and, with respect to the Debtors, subject to the entry of an order from the Bankruptcy Court approving their entry into this Agreement:

      a.  it has all requisite power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its obligations under, this Agreement;

      b.  the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary action on its part; and

      c.  this Agreement constitutes the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

8.     **Additional Representations and Warranties by SEACOR**.    SEACOR represents and warrants to the best of its knowledge, as of the date hereof that:

      a.  Holdings by SEACOR.  SEACOR (A) is the sole beneficial owner of the principal amount of the DIP Facility Claims set forth on **Schedule 1** hereto, and (B) has full power and authority to act on behalf of, vote, and consent to matters concerning such DIP Facility Claims and to dispose of, exchange, assign, and transfer such DIP Facility Claims, including, but not limited to, the conversion of such DIP Facility Claims contemplated by the Term Sheet.

      b.  No Transfers.  SEACOR has made no assignment, sale, participation, grant, conveyance, pledge, or other transfer of, and has not entered into any other agreement to assign, sell, use, participate, grant, convey, pledge, or otherwise transfer, in whole in or part, any portion of its right, title, or interests in any of the DIP Facility Claims set forth on **Schedule 1** hereto that conflict with the representations and warranties of SEACOR herein or would render SEACOR otherwise unable to comply with this Agreement and perform its obligations hereunder.

      c.  Sufficiency of Information Received.  SEACOR has reviewed, or has had the opportunity to review, with the assistance of professional and legal advisors of its choosing, the information it deems necessary and appropriate to propose the terms set forth in the Term Sheet.

9.     **Payment of Fees and Expenses**.  The Debtors shall pay in full in cash when due (and in no event later than ten (10) days following receipt of a summary statement of fees) (i) all reasonable and documented fees and expenses relating to the Restructuring and/or this Agreement, whether incurred on or before the RSA Effective Date, of (x) Milbank, Tweed, Hadley & McCloy LLP ("Milbank"), as primary counsel to SEACOR (y) one maritime counsel

to SEACOR, and (z) on counsel to advise of issues of Mexican law, and (ii) any other reasonable and documented out-of-pocket fees and expenses (including travel expenses) incurred by SEACOR in connection with the Restructuring and/or this Agreement, whether incurred on or before the RSA Effective Date.

10. **Transfer Restrictions**. SEACOR shall not (i) sell, use, pledge, assign, transfer, permit the participation in, or otherwise dispose of any ownership interest (including any beneficial ownership) in the DIP Facility Claims set forth on **Schedule 1** hereto in whole or in part; or (ii) grant any proxies, deposit any of its interests in DIP Facility Claims set forth on **Schedule 1** hereto into a voting trust, or enter into a voting agreement with respect to any such interest (each action described in clauses (i) and (ii), a "Transfer"), without the prior written consent of the ISH Entities, which consent shall not be unreasonably withheld or delayed.

Notwithstanding anything to the contrary herein, the foregoing provisions shall not preclude SEACOR from transferring its DIP Facility Claims to one or more of its affiliates, provided each such affiliate automatically shall be bound by this Agreement upon the transfer of such DIP Facility Claims.

This Agreement shall in no way be construed to preclude SEACOR or any of its affiliates from acquiring additional DIP Facility Claims or any other claims against the ISH Entities or equity interest in ISH; provided, however, that (i) if SEACOR acquires additional DIP Facility Claims or any other claims against any of the ISH Entities after the RSA Effective Date, SEACOR shall notify the ISH Entities promptly of such acquisition including the amount of such additional claims and (ii) such acquired DIP Facility Claims or other claims shall automatically and immediately upon acquisition by SEACOR be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given in accordance herewith).

Any Transfer made in violation of this provision shall be void *ab initio*.

12. **Termination of Obligations.**

(a)     This Agreement shall terminate and all of the obligations of the Parties shall be of no further force or effect in the event that and upon the occurrence of any of the following events:  (i) occurrence of the effective date of the Plan; (ii) an order denying confirmation of the Plan is entered; (iii) an order confirming the Plan is reversed or vacated; (iv) any court of competent jurisdiction has entered an order declaring this Agreement to be unenforceable; (v) the Parties mutually agree to terminate this Agreement in writing; or (vi) this Agreement is terminated pursuant to paragraph (b), (c) or (d) of this Section 10.

(b)     The ISH Entities may, in their discretion, terminate this Agreement, by written notice to counsel for SEACOR, upon the occurrence of any of the following events:

(i)     a determination by ISH's board of directors (the "Board"), in good faith, after seeking the advice of outside counsel, that proceeding with the Restructuring and pursuit of confirmation and consummation of the Plan would be inconsistent with the continued exercise of the Debtors' fiduciary duties under applicable law;

9

(ii)    a breach by SEACOR of its material covenants or other material obligations hereunder, which breach is not cured within three (3) business days after the giving of written notice by ISH of such breach to SEACOR;

(iii)    SEACOR shall assert after the RSA Effective Date any claim or cause of action against any Debtor or any of its current directors, officers or advisors relating to the DIP Facility, or the Restructuring, except the DIP Facility Claims themselves or to enforce the terms of this Agreement;

(iv)    any representation or warranty in this Agreement made by SEACOR shall have been untrue in any material respect when made, and such breach remains uncured for a period of three (3) business days following SEACOR's receipt of written notice thereof from ISH; or

(v)    the Bankruptcy Court (or other court of competent jurisdiction) enters an order (A) invalidating, disallowing, subordinating or limiting the enforceability, priority or validity of any of the DIP Facility Claims, or (B) the effect of which would render the Plan incapable of consummation on the terms set forth in this Agreement and the Term Sheet;

provided, that upon a termination of this Agreement by the ISH Entities pursuant to this Section 10(b) with respect to SEACOR, (x) all obligations of SEACOR hereunder shall immediately terminate without further action or notice by SEACOR, and (y) the ISH Entities (and each of its directors, officers, employees, advisors, subsidiaries, and representatives) shall not have or incur any liability under this Agreement or otherwise on account of such termination

(c)    This Agreement may be terminated by SEACOR upon the occurrence of any of the following events (it being understood that the following termination events are intended solely for the benefit of SEACOR) (the "Lender Termination Events"):

(i)    filing by the Debtors of a plan (or disclosure statement related thereto) in the Chapter 11 Cases that is materially inconsistent with the terms of the Term Sheet and this Agreement and not otherwise in form and substance acceptable to SEACOR;

(ii)    any representation or warranty in this Agreement made by the ISH Entities shall have been untrue in any material respect when made, and such breach remains uncured for a period of three (3) business days following ISH's receipt of written notice thereof from SEACOR;

(iii)    any of the Debtors or their non-Debtor affiliates shall assert after the RSA Effective Date any claim or cause of action against SEACOR or any of its affiliates, except to enforce the terms of this Agreement;

(iv)    after filing of the Plan, any amendment or modification to the Plan inconsistent with the terms of the Term Sheet or this Agreement and not otherwise in form and substance acceptable to SEACOR, or the filing of any pleading by any of the ISH Entities that seeks such amendment or modification;

10

(v)    a breach by any of the ISH Entities of its material covenants or other material obligations under this Agreement or the Term Sheet, which breach is not cured within three (3) business days after the giving of written notice by counsel for SEACOR of such breach;

(vi)    the Debtors (A) withdraw the Plan, (B) publicly announce their intention not to support the Plan or the Restructuring, (C) file a motion with the Bankruptcy Court seeking approval of any transaction that is inconsistent with the Restructuring, or (D) agree to pursue (including as may be evidenced by any term sheet, letter of intent or similar document) or publicly announce their intent to pursue any transaction that is inconsistent with the Restructuring;

(vii)    the failure of the Debtors to comply with the Milestones within the periods specified therein, unless otherwise agreed in writing by SEACOR and the Debtors; it being understood that if a Milestone ends on a weekend or holiday on which the Bankruptcy Court is not open and holding hearings, such Milestone shall be automatically extended to the next business day on which the Bankruptcy Court is open and holding hearings;

(viii)    the Bankruptcy Court enters an order modifying or terminating the Debtors' exclusive right to file and/or solicit acceptances of a plan of reorganization (including the Plan); or

(ix)    the Bankruptcy Court (or other court of competent jurisdiction) enters an order (A) directing the appointment of an examiner with expanded powers or a trustee in any of the Chapter 11 Cases, (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (C) dismissing any of the Chapter 11 Cases, (D) invalidating, disallowing, subordinating or limiting the enforceability, priority or validity of any of the DIP Facility Claims, or (E) the effect of which would render the Plan incapable of consummation on the terms set forth in this Agreement and the Term Sheet.

(d)    The ISH Entities or SEACOR may terminate this Agreement by written notice to the other Party in the event that the Bankruptcy Court or other governmental authority shall have issued any order, injunction or other decree or take any other action, which restrains, enjoins or otherwise prohibits the implementation of the Restructuring and/or the Plan substantially on the terms and conditions set forth in this Agreement.

(e)    If this Agreement is terminated pursuant to this Section 10, all further obligations of the Parties hereunder shall be terminated and without further liability; provided that each Party shall have all rights and remedies available to it under applicable law.  Upon a termination of this Agreement in accordance with this Section, no Party shall have any continuing liability or obligation to any other Party and the provisions of this Agreement shall have no further force or effect; provided that no such termination shall relieve any Party from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination.

**13.    Fiduciary Duties.**    Notwithstanding anything to the contrary herein, nothing in this Agreement shall require ISH, any of the other ISH Entities, or any of their respective officers

or directors (in such person's capacity as such) to take any action, or to refrain from taking any action, to the extent that taking such action or refraining from taking such action would be inconsistent with such person's or entity's fiduciary obligations under applicable law. ISH shall give SEACOR not less than two (2) business days' prior written notice before the exercise of rights under this Section 11 or the termination of this Agreement in accordance with Section 10(b)(i) of this Agreement (it being understood that the specific performance provisions of Section 12 of this Agreement shall not be applicable to the parties' exercising rights under this Section 11 or termination of this Agreement in accordance with Section 10(b)(i) of this Agreement).

14.     **Specific Performance**.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party and the non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.  The Parties expressly consent to entry of orders by the Bankruptcy Court to enforce this Agreement.

15.     **Counterparts**.  This Agreement and any amendments, waivers, consents, or supplements hereto or in connection herewith may be executed in multiple counterparts (including by means of telecopied or electronically transmitted signature pages), all of which taken together shall constitute one and the same Agreement.

16.     **No Solicitation and Acknowledgements**.  Each Party acknowledges that (a) no securities of any of the ISH Entities are being offered or sold hereby and this Agreement neither constitutes an offer to sell nor a solicitation of an offer to buy any securities of any of the ISH Entities and (b) this Agreement is not, and shall not be deemed to be, a solicitation of a vote for the acceptance of any chapter 11 plan (including the Plan) pursuant to section 1125 of the Bankruptcy Code.  The votes from holders of claims against, and interests in, the Debtors, as applicable, will not be solicited until such holders have received the Disclosure Statement approved by the Bankruptcy Court and related solicitation materials that meet the requirements of the Bankruptcy Code, including sections 1125 and 1126 of the Bankruptcy Code.

17.     **Confidentiality**.  Other than as may be required by applicable law and regulation or by any governmental or regulatory authority or as may be required to comply with the terms of this Agreement, no Party shall make any public announcement regarding this Agreement without the consent of the other Parties, and each Party shall coordinate with the other Parties regarding communications with the press with respect to this Agreement; for the avoidance of doubt, each Party shall have the right, without any obligation to any other Party, to decline to comment to the press with respect to this Agreement.

18.     **Time Is of the Essence**.  The Parties acknowledge and agree that time is of the essence, and that they must each use best efforts to effectuate and consummate the Restructuring as soon as reasonably practicable.

19.     **Governing Law; Consent to Jurisdiction; Waiver of Jury Trial**.

THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISION WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.

(a)    By its execution and delivery of this Agreement, each of the Parties hereto irrevocably and unconditionally agrees for itself that any legal action, suit, or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit, or proceeding, shall be brought, to the extent possible, in either the United States District Court for the Southern District of New York or any New York State Court sitting in New York City or the Bankruptcy Court (the "Chosen Courts"). By execution and delivery of this Agreement, each of the Parties irrevocably accepts and submits itself to the exclusive jurisdiction of the Chosen Courts, generally and unconditionally, with respect to any such action, suit, or proceeding, and waives any objection it may have to venue or the convenience of the forum.

(b)    Each Party hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal proceeding arising out of, or relating to, this Agreement or the transactions contemplated hereby (whether based on contract, tort, or any other theory). Each Party (i) certifies that no representative, agent, or attorney of any other Party has represented, expressly or otherwise, that such other Party would not, in the event of litigation, seek to enforce the foregoing waiver and (ii) acknowledges that it and the other Parties have been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section 17.

20.    **Independent Analysis**.  Each Party hereby confirms that it has made its own decision to execute this Agreement based upon its own independent assessment of documents and information available to it, as it has deemed appropriate.

21.    **Third-Party Beneficiaries.**  Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary hereof.

22.    **Notices**.  Any notice, request, instruction or other document to be given hereunder by any party to the others shall be in writing and delivered personally or sent by registered or certified mail, postage prepaid, by email or overnight courier.

(a)    If to **SEACOR**, to:

SEACOR Holdings, Inc.
2200 Eller Drive
Port Everglades Station
FT. Lauderdale, FL 33316

13

with copy to:

> Milbank, Tweed, Hadley & McCloy LLP
> 28 Liberty Street
> New York, NY 10005-1412
> Attn: Evan R. Fleck and Nelly Almeida
> Email: Efleck@milbank.com and Nalmeida@milbank.com

(b)     If to any of the **ISH Entities**, to:

> International Shipholding Corporation
> 601 Poydras Street, Suite 1850
> New Orleans, Louisiana 70130
> Attn: Manny Estrada
> Fax: +1-251-706-6919

with copy to:

> Akin Gump Strauss Hauer & Feld LLP
> One Bryant Park
> Bank of America Tower
> New York, New York 10036-6745
> Attn: David Botter, Stephen B. Kuhn and Patrick Rice
> Fax: +1-212-872-1002
> Email: dbotter@akingump.com, skuhn@akingump.com and
> price@akingump.com

> and

> Akin Gump Strauss Hauer & Feld LLP
> 1700 Pacific Avenue
> Suite 4100
> Dallas, Texas 75201
> Fax: +1-214-969-4343
> Attn: Sarah Link Schultz
> E-mail: sschultz@akingump.com

23.     **Severability**.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.  In the event that any part of this Agreement is declared by any court of competent jurisdiction or any administrative body to be null, void or unenforceable, said provision survives to the extent it is not so declared, and all of the other provisions of this Agreement remain in full force and effect only if, after

14

excluding the portion deemed to be unenforceable, the remaining terms provide for the consummation of the transactions contemplated hereby in substantially the same manner as originally set forth at the later of the date this Agreement was executed or last amended.

24. **Mutual Drafting**. This Agreement is the result of the Parties' joint efforts, and each of them and their respective counsel have reviewed this Agreement and each provision hereof has been subject to the mutual consultation, negotiation, and agreement of the Parties, and the language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent, and therefore there shall be no construction against either Party based on any presumption of that Party's involvement in the drafting thereof.

25. **Headings**. The headings used in this Agreement are for convenience of reference only and do not constitute a part of this Agreement and shall not be deemed to limit, characterize, or in any way affect any provision of this Agreement, and all provisions of this Agreement shall be enforced and construed as if no headings had been used in this Agreement.

26. **Amendments.** Notwithstanding anything to the contrary contained herein, this Agreement may not be modified, amended, or supplemented, nor shall any provision or requirement hereof be waived, without the prior written agreement signed by both the ISH Entities and SEACOR.

27. **Several, Not Joint, Claims.** The agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

*[Signature Pages Follow]*

15

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first above written.

**[PARTY NAME]**

By:

_____

Name:

Title:

## EXHIBIT A

**Term Sheet**

INTERNATIONAL SHIPHOLDING CORPORATION (16-12220)
TERM SHEET

This term sheet (the "Term Sheet") sets forth the principal terms of a financial restructuring (as proposed, the "Restructuring") of the existing debt and other obligations of the Company (as defined herein), which shall be effected through the necessary definitive documents (the "Restructuring Documents") reflecting the transactions described herein. The Restructuring will be consummated through the cases pending under chapter 11 (the "Chapter 11 Cases") of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

**This Term Sheet is for discussion purposes only. This Term Sheet does not contain all of the terms of any proposed Plan and shall not be construed as (i) an offer capable of acceptance, (ii) a binding agreement of any kind, (iii) a commitment to enter into, or offer to enter into, any agreement or (iv) an agreement to file any chapter 11 plan or disclosure statement or to consummate any transaction. This Term Sheet is confidential and may not be released to any other party without the prior written consent of SEACOR or counsel to SEACOR.**

**This Term Sheet remains subject to ongoing review by SEACOR in all respects.**

| Proposed Term Sheet | |
|---|---|
| *Company* | International Shipholding Corporation ("ISH" or, the "Company" and, as reorganized, "Reorganized ISH"). |
| *Bankruptcy* | ISH and its affiliated debtors and debtors in possession, whose Chapter 11 Cases are jointly administered under Case No. 16-12220, shall be collectively referred to as the "Debtors." |
| ***Debt to be Restructured*** | |
| *DVB Facility* | That certain Senior Secured Term Loan Credit Agreement, dated as of August 26, 2014, as amended, supplemented or modified from time to time (the "DVB Facility"), by and among Central Gulf Lines, Inc., as borrower, ISH, as guarantor, the lenders party thereto and DVB Bank SE, as mandated lead arranger, facility agent, and security trustee. |
| *Capital One Facility* | That certain Loan Agreement, dated as of December 28, 2011, as amended, supplemented or modified from time to time (the "Capital One Facility"), by and among LCI Shipholdings, Inc. ("LCI"), a corporation existing under the laws of the Marshall Islands, as borrower, ISH, as guarantor, and Capital One, National Association, as lender. |
| *Citizens Facility* | That certain Loan Agreement, dated as of August 25, 2014, as amended, supplemented or modified from time to time (the "Citizens Facility"), by and among LCI, as borrower, ISH, as guarantor, and Citizens Asset Finance, Inc. (f/k/a RBS Asset Finance, Inc.), as lender. |
| *Regions Facility* | That certain Credit Agreement, dated as of September 24, 2013, as amended, supplemented or modified from time to time (the "Regions Facility"), by and among ISH, Enterprise Ship Company, Inc., Sulphur Carriers, Inc., CG Rail, Central Gulf Lines, Inc., Waterman Steamship Corporation, Coastal Carriers, Inc., N.W. Johnsen & Co., Inc., LMS Shipmanagement, Inc., U.S. United Ocean Services, LLC, Mary Ann Hudson, LLC, Sheila McDevitt, LLC, Tower, LLC) and Frascati Shops, |

| | |
|---|---|
| | Inc., as borrowers (the "Regions Facility Borrowers"), the lenders party thereto (the "Regions Facility Lenders") and Regions Bank, as administrative agent and collateral agent. |
| *DIP Facility* | That certain senior secured super-priority debtor-in-possession financing (the "DIP Facility") pursuant to that certain Debtor-in-Possession Credit Agreement (as such agreement may be amended, restated, supplemented or otherwise modified from time to time) by and among the Debtors, SEACOR Capital Corp. ("SEACOR"), as administrative agent and collateral agent, and DVB Bank SE and SEACOR and/or one or more of their designated affiliates or other lender parties thereto from time to time, as lenders. |
| **Transaction Summary** | |
| *Summary* | The Restructuring shall be implemented pursuant to a chapter 11 plan of reorganization that is acceptable to SEACOR (the "Plan"), which Plan will provide for the following new capital structure of Reorganized ISH: <br><br> 1. $25 million:  SEACOR will cause $25 million of committed financing to be made available to the Debtors by one or more money center banks (the "New Senior Debt"). <br><br> 2. New Equity Interests:  All current equity interests in the Debtors, except for intercompany equity interests, shall be cancelled. <br><br>     a. The New Equity Interests (x) shall be subject to dilution by a management incentive plan, which shall be acceptable to SEACOR in all respects and (y) shall consist of the New Money Equity Interests and the DIP Equity Interests (each as defined herein). |
| *Capital Infusion* | 1. SEACOR shall provide cash infusion of $10 million dollars (the "Cash Consideration"). <br><br>     • As consideration for this cash infusion, SEACOR shall receive 35.6% of the ownership interests in Reorganized ISH (the "New Money Equity Interests"). <br><br> 2. SEACOR shall acquire the DVB portion of the DIP Facility and convert 100% of the DIP Facility to equity, as set forth herein. <br><br> 3. All proceeds from the sale of ISH's Specialty Business Segment[1] shall be used to pay Prepetition Lender Secured Claims and, to the extent excess funds exist, to fund allowed administrative, priority, and priority tax claims, and, to the extent excess funds continue to exist, to fund the Unsecured Creditor Recovery Pool (as defined below). |

---

[1] The "Specialty Business Segment" is comprised of various contracts and agreements between Company affiliates and third parties, as well as certain notes receivable financing certain vessels owned by third parties, in each case relating to the Company's provision of logistical and seaborne transportation services in Southeast Asia.

| Classes and Treatment of Claims and Equity Interests | |
|---|---|
| The Plan will provide that each holder of an allowed claim will receive the following on or as soon as practicable after the effective date of the plan of reorganization (the "Effective Date"), unless different treatment is agreed to by the holder of such allowed claim, the Company, and SEACOR: | |
| *Administrative, Priority and Secured Claims* | 1. **Administrative, Priority, and Priority Tax**. Allowed administrative, priority, and priority tax claims will be satisfied in full, in cash, or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.[2]<br><br>2. **DIP Facility Claims**:  Estimated allowed claims: approximately $18.1 million[3]<br><br>    a. SEACOR shall buy out the portion of the DIP Facility funded by DVB.<br><br>    b. SEACOR shall receive 64.4% of the ownership interests in Reorganized ISH (the "DIP Equity Interests").<br><br>3. **Prepetition Lender Secured Claims**<br><br>    a. DVB Facility Claims: Estimated allowed secured claims: approximately $[28] million<br><br>        i. Holders of secured claims on account of the DVB Facility shall receive, at the option of the Debtors, with the consent of SEACOR, in full and final satisfaction of their allowed secured claims, either (w) cash in an amount necessary to satisfy their allowed secured claims, (x) the proceeds generated from the disposition of the collateral securing their claims or (y) delivery of the collateral securing their claims, or (z) such other treatment as complies with Bankruptcy Code section 1129.<br><br>    b. Citizens Facility Claims: Estimated allowed secured claims: approximately $[16.8] million<br><br>        i. Holders of secured claims on account of the Citizens Facility shall receive, at the option of the Debtors, with the consent of SEACOR, in full and final satisfaction of their allowed secured claims, either (x) the proceeds generated from the disposition of the collateral securing their claims, (y) delivery of the collateral securing their claims or (z) such other treatment as complies with |

---

[2] This Term Sheet assumes, among other things, that (i) there will be no allowed 507(b) Superpriority Claims, and (ii) the cash on the balance sheet as of the Effective Date will be sufficient to satisfy all administrative, priority and secured claims not addressed herein, including any cure obligations; *provided*, *however*, that to the extent allowed 507(b) Superpriority Claims do exist, such claims will reduce the amount available for distribution to junior creditors.

[3] For the avoidance of doubt, to the extent that any portion of the DIP Facility Claims are repaid before the Effective Date, SEACOR shall increase the Cash Consideration by an amount equal to $18.1 million less the amount of the DIP Facility Claims as of the Effective Date.

<table>
<tr><td></td><td>Bankruptcy Code section 1129.</td></tr>
</table>

|  |  |
|---|---|
|  | c. <u>Capital One Facility Claims</u>: Estimated allowed secured claims: approximately $[4.5] million |
|  |     i. Holders of secured claims on account of the Capital One Facility shall receive, at the option of the Debtors, with the consent of SEACOR, in full and final satisfaction of their allowed secured claims, either (x) the proceeds generated from the disposition of the collateral securing their claims, (y) delivery of the collateral securing their claims or (z) such other treatment as complies with Bankruptcy Code section 1129. |
|  | d. <u>Regions Facility Claims</u>: Estimated allowed secured claims: (Senior Facility: approximately $[21.7] million; Line of Credit approximately $[34.4] million) |
|  |     i. Holders of secured claims on account of the Regions Senior Facility and the Line of Credit shall receive, at the option of the Debtors, with the consent of SEACOR, in full and final satisfaction of their allowed secured claims, (x)(a) either (i) the proceeds generated from the disposition of the *Louisiana Enterprise* and/or the *Texas Enterprise*, and/or (ii) delivery of the vessels securing their claims, the *Louisiana Enterprise* and/or the *Texas Enterprise* plus (b) assignment of the proceeds of the BP claim, plus (c) cash in an amount equal to $[28.1] million or (y) such other treatment as complies with Bankruptcy Code section 1129. |
| *Prepetition Employee Claims (Secured/Priority)*[4] | 1. **Prepetition Secured/Priority Employee Claims:** Estimated allowed claims: approximately $[1.3] million |
|  |     a. The holders of allowed prepetition secured/priority employee claims shall be entitled to receive cash, in full and final satisfaction of their claim. |
| *General Unsecured Claims* | 1. **General Unsecured Creditor Recovery**: General unsecured creditors, which shall consist of, among other things, unsecured employee, union, and plan claims, deficiency claims, general trade claims, and rejection damage claims shall receive their pro rata share all amounts remaining from cash on hand after satisfaction |

---

[4] This Term Sheet assumes there are no other employee obligations due and owing. To the extent that an employee's employment is continued with Reorganized ISH, SEACOR shall honor the accrued and unused vacation days, subject to an agreed upon limitation on the number of vacation days that may be used; *provided, that,* at no time shall SEACOR be liable to such employees for any cash obligations on account of such accrued an unused vacation days (except in accordance with SEACOR's vacation policy and applicable law). To the extent that an employee's employment is not continued, such employee shall be entitled to a priority claim for such accrued but unused vacation to the extent (a) such employees have not exceeded the 507(a)(4) cap and (b) such payments otherwise qualify for priority treatment under 507(a)(4).

| | |
|---|---|
| | of administrative and priority claims including, without limitation, the Cash Consideration, amounts generated as a result of the sale of the Specialty Business Segment and the sale of any vessels in accordance with this term sheet (the "Unsecured Creditor Recovery Pool"). |
| *Equity Interests* | 1. **Equity Interests**: Equity interests in the Debtors, except for intercompany equity interests, shall be cancelled and holders of equity interests in the Debtors shall not be entitled to a distribution. |
| **Other Terms** | |
| *NYK Asset Purchase and Charter Modifications* | Prior to the Effective Date, the Debtors and NYK shall have entered into an agreement for the disposition of the U.S. flagged PCTC vessels and/or modified charters associated with such vessels, which agreement(s) shall be acceptable to SEACOR. |
| *Other Leases, including but not limited to office leases* | The Debtors shall use commercially reasonable efforts to assist SEACOR in renegotiating certain unexpired leases and executory contracts, as SEACOR deems necessary.  To the extent that an agreement cannot be reached with respect to such unexpired leases and executory contracts, the Debtors shall reject such leases and contracts. |
| *MARAD Approval* | The Debtors shall use commercially reasonable efforts to assist SEACOR with obtaining the necessary approvals from MARAD prior to the Effective Date. |
| *Intermarine Management* | The Debtors shall reject the Ship Management Agreement between LMS Shipmanagement Inc., and Crowley Technical Management, Inc. and nominate SEABULK Tankers Inc., or an affiliate, as replacement ship manager.<br><br>The Debtors shall assume the agreement between Waterman Steamship Corporation and Patriot Shipping LLC. |
| *Diligence* | The Debtors shall comply with all reasonable confirmatory due diligence requests from SEACOR in parallel to finalizing all necessary documentation and consents. |
| *Asbestos Claims* | The Debtors shall comply with all reasonable due diligence requests by SEACOR regarding the Debtors' asbestos liabilities. Further, the Debtors shall use commercially reasonable efforts to confirm there is sufficient insurance coverage to address any ongoing asbestos liabilities. |
| *Union Settlement* | The Debtors shall use commercially reasonable efforts to assist in all union negotiations and to mitigate any withdrawal liability and cause any such withdrawal liability to be treated as an unsecured liability.<br><br>• Note that to the extent there is any withdrawal liability and such withdrawal liability is found to be an administrative expense claim, there will be no additional funds provided by SEACOR under this proposal to satisfy such claim. |

| | |
|---|---|
| | SEACOR will offer employment to the Debtors' union members on terms contained in CBAs modified to contain terms not less favorable than the terms proposed by the unions currently utilized by SEACOR for substantially similar jobs (with such terms not including any obligation to contribute to any defined benefit pension plans that would be new to SEACOR).<br><br>The Plan will set forth the terms of any settlement that may be reached with the unions, which terms shall be acceptable to SEACOR and may include terminations for certain of the CBAs. |
| *Other Plan Terms* | The Plan shall provide for other matters customary under chapter 11 plans of reorganization, including, but not limited to, corporate governance, classification and treatment of claims, restated charter and bylaws and other terms, in each case upon terms and conditions agreed to by the Company and SEACOR.  To the fullest extent permitted by applicable law, the Plan shall include usual and customary exculpation and release provisions in favor of the Debtors and each of the Debtors' respective current and former officers and directors, professionals, advisors, accountants, attorneys, investment bankers, consultants, employees, agents, and other representatives, with respect to any liability relating to the Company or the Chapter 11 Cases arising prior to the Effective Date. |
| *Reorganized Board* | As a private company, Reorganized ISH shall be subject to the by-laws and governance typical for other divisions of SEACOR.  The current chief executive officer is expected to continue with the business in a capacity to be mutually agreed by SEACOR and the current chief executive officer. |

| | |
|---|---|
| *Conditions to Confirmation and the Effective Date* | Conditions precedent to confirmation of the Plan and/or the occurrence of the Effective Date, each of which may be waived in writing by the Company and SEACOR, shall include, without limitation, the following: <br><br> *Conditions to Confirmation* <br><br> • The proposed confirmation order shall be acceptable to SEACOR. <br><br> • Each of the Restructuring Documents (as applicable) shall be approved in accordance with this Term Sheet and on terms acceptable to SEACOR and the Company. <br><br> • There shall be executed definitive documents with respect to the sale of the Specialty Business Segment/The sale of the Specialty Business Segment shall be consummated. <br><br> • The TECO contract shall be extended through December 2019. <br><br> *Conditions to the Effective Date* <br><br> • The confirmation order shall have been entered and not stayed, and shall be approved consistent with the terms of this Term Sheet and such other terms acceptable to SEACOR and the Company. <br><br> • All conditions precedent specified in the Plan shall have been satisfied or waived in accordance with the terms thereof. <br><br> • All actions, documents, certificates, and agreements necessary to implement the Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable government units in accordance with applicable law. <br><br> • Any governmental or others approvals required to effectuate the terms of the Plan shall have been obtained. |
| *Executory Contracts and Unexpired Leases* | The Plan will provide that the executory contracts and unexpired leases that are not assumed or rejected as of the Effective Date pursuant to the Plan or a separate motion will be deemed rejected pursuant to section 365 of the Bankruptcy Code. |

## **EXHIBIT B**

**Form of Transfer Agreement**

<u>Transfer Agreement & Joinder</u>

The undersigned ("<u>Transferee</u>") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of [_____] (the "<u>Agreement</u>"), by and among (x) International Shipholding Corporation, a Delaware corporation, and each of its direct and indirect subsidiaries party thereto, and (y) SEACOR Capital Corp., party thereto ("<u>Transferor</u>") and (i) agrees to be bound by the terms and conditions of the Agreement to the extent Transferor was thereby bound and (ii) hereby makes all representations and warranties made in the Agreement by Transferor.  The Transferee is acquiring DIP Facility Claims from Transferor in the amounts set forth on **Schedule 1** hereof.  All notices and other communications given or made pursuant to the Agreement shall be sent to the Transferee at the address set forth in the Transferee's signature below.

Date Executed: _____

[TRANSFEREE]


By: _____
Name:
Title:

Address: _____
           _____
           _____
Attn: _____
Fax: _____
Email:_____