**Expedited Hearing Requested: November 10, 2016 at 10:00 a.m.**

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036
Telephone: (212) 872-1000
David H. Botter

1700 Pacific Avenue, Suite 4100
Dallas, TX 75201
Telephone: (214) 969-2800
Sarah Link Schultz (admitted *pro hac vice*)
Sarah J. Crow (admitted *pro hac vice*)

*Counsel to Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| INTERNATIONAL SHIPHOLDING CORPORATION, *et al.*,[1] | Case No. 16-12220 (SMB) |
| Debtors. | Jointly Administered |

**DEBTORS' MOTION FOR (I) AN ORDER ESTABLISHING BIDDING PROCEDURES AND GRANTING RELATED RELIEF AND (II) AN ORDER OR ORDERS APPROVING THE SALE OF THE DEBTORS' ASSETS IN THE SPECIALTY BUSINESS SEGMENT**

The debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors") seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Bidding Procedures Order"), (i) approving the proposed auction and bidding procedures attached hereto as **Exhibit B** (the "Bidding Procedures") for the sale of certain assets contained in the Debtors' Specialty Business Segment (collectively, the "Assets"); (ii) approving

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: International Shipholding, Inc. (9662); Enterprise Ship Co. (9059); Sulphur Carriers, Inc. (8965); Central Gulf Lines, Inc. (8979); Coastal Carriers, Inc. (6278); Waterman Steamship Corporation (0640); N.W. Johnsen & Co., Inc. (8006); LMS Shipmanagement, Inc. (0660); U.S. United Ocean Services, LLC (1160); Mary Ann Hudson, LLC (8478); Sheila McDevitt, LLC (8380); Tower LLC (6755); Frascati Shops, Inc. (7875); Gulf South Shipping PTE LTD (8628); LCI Shipholdings, Inc. (8094); Dry Bulk Australia LTD (5383); Dry Bulk Americas LTD (6494); and Marco Shipping Company PTE LTD (4570). The service address for each of the above Debtors is 601 Poydras Street, Pan American Building, Suite 1850, New Orleans, Louisiana 70130.

expense reimbursement for the proposed buyer (the "Stalking Horse Purchaser"); (iii) establishing procedures for the assumption and assignment of executory contracts and unexpired leases, including notice of proposed cure amounts (the "Assumption and Assignment Procedures"); (iv) approving the form and manner of notice of the procedures, protections, schedules, and agreements described herein and attached hereto; and (v) scheduling a hearing (the "Sale Hearing") to approve such sale (the "Sale Transaction"). Additionally, the Debtors seek entry of an order (the "Sale Order") pursuant to sections 105, 363, and 365 of title 11 of the United States Code (the "Bankruptcy Code") and rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (i) authorizing the sale of the Assets free and clear of liens, claims, interests, and encumbrances; (ii) authorizing the assumption and assignment of certain executory contracts and unexpired leases; and (iii) granting related relief.[2] In support of the motion, the Debtors represent and set forth as follows:

## **PRELIMINARY STATEMENT**[3]

1.      By this motion, the Debtors seek to continue the process that has been in progress for the past three months to maximize the value of their estates through a sale of the Assets. As the Court is aware, pre-petition, in July of 2016, the Debtors launched a formal marketing process, led by Blackhill, for the potential sale of substantially all of the Debtors' assets. That marketing effort has continued in earnest since the Petition Date and has culminated in a fully negotiated Stalking Horse Agreement with the Stalking Horse Purchaser for the Debtors' Specialty Business Segment, which represents the highest and best offers that the Debtors have received for these Assets to date. The Debtors wish to continue this effort through a competitive

---

[2] This motion contains the Debtors' request for entry of the Bidding Procedures Order and the Sale Order. The Debtors are seeking approval of the Bidding Procedures Order at the initial hearing to be conducted on this motion. The Debtors subsequently will seek approval of the Sale Order at the Sale Hearing.

[3] Capitalized terms used in this Preliminary Statement shall have the meaning ascribed to them in the body of the motion.

208368594

marketing process in the form of an auction for all or substantially all of the Assets, in which the proposed Sale Transaction will be subject to higher and better offers and approval by this Court as described in the Bidding Procedures.

2.      The Debtors have, where appropriate, engaged with their pre-petition secured lenders, the lenders under their post-petition debtor-in-possession credit facility, and the Committee regarding the best path forward to exit chapter 11, including consulting with these parties regarding the terms of the proposed Sale Transaction.  As a result of this collaborative process, a consensus has emerged among the parties that a sale of the Assets of the Specialty Business Segment, combined with a stand-alone restructuring for the Debtors' remaining business segments, is the best option to maximize the value of the Debtors' estates at this time.[4] A sale of the Assets conducted in accordance with the Bidding Procedures will maximize the value of the Assets by setting a minimum purchase price for the Assets and providing for a streamlined diligence period that minimizes disruption to the Debtors' business operations, thus ensuring that the Debtors' estates will receive the current market value for the Assets.  The Debtors believe that implementing the Bidding Procedures and consummating the Sale Transaction with the Stalking Horse Purchaser or Successful Bidder is the best course of action for the Debtors and is in the best interest of the Debtors' estates.

3.      The Debtors also seek approval of the Assumption and Assignment Procedures to enhance the Debtors' ability to sell the Assets while preserving the Debtors' contract counterparties' cure rights.  Many of the Debtors' executory contracts are necessary to realize the full value of the Assets.  Accordingly, it is essential that the Debtors establish procedures that

---

[4] At this time, the Debtors have not precluded bids in other forms, including company bids and plan proposals to the extent they represent a higher value to the estates.  The Debtors have contemporaneously filed the *Debtors' Motion for Entry of an Order Authorizing the Debtors to Enter into the Restructuring Support Agreement with SEACOR Capital Corp.*, through which the Debtors seek the proposed restructuring of the remaining business segments.

208368594

permit the assumption and assignment of their executory contracts. The Assumption and Assignment Procedures set forth herein provide the Debtors with the authority to assume and assign their executory contracts as necessary, while also preserving the contract counterparties' right to appropriate cure amounts.

4.      Accordingly, the Debtors submit that the relief requested herein is essential to their reorganization in their chapter 11 cases, and, therefore, is in the best interests of the Debtors, their estates, and their creditors.

## JURISDICTION

5.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

6.      Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

7.      The bases for the relief requested herein are Bankruptcy Code sections 105(a), 363, and 365 and Bankruptcy Rules 2002, 6004, and 6006.

## BACKGROUND

**A.      General Background**

8.      On July 31, 2016 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

9.      The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108. No trustee or examiner has been appointed in the chapter 11 cases. On September 1, 2016, the Office of the United States Trustee for Region 2 (the "U.S. Trustee") appointed the statutory committee of

4

unsecured creditors (the "Committee") [ECF No. 125]. On September 22, 2016, the U.S. Trustee amended the Committee's appointment [ECF No. 185].[5]

10.    A description of the Debtors' business and the reasons for filing these chapter 11 cases is set forth in the *Declaration of Erik L. Johnsen, President and Chief Executive Officer, Pursuant to Local Bankruptcy Rule 1007-2 and in Support of First Day Filings* (the "First Day Declaration") filed previously with this Court [ECF No. 7] and incorporated by reference as if fully set forth herein.

**B.    Specific Background**

       *i.  Pre-Petition Marketing Efforts*

11.    As described in the First Day Declaration, since 2014, International Shipholding Corporation ("ISH" and, together with its debtor and non-debtor subsidiaries and affiliates, "International Shipholding") has encountered certain challenges related to complying with debt covenants and overall liquidity restraints. In an attempt to strengthen International Shipholding's financial position, on October 21, 2015, the Board of Directors of ISH approved a plan (the "Strategic Plan") to restructure International Shipholding by focusing on its three (3) core segments—the Jones Act,[6] PCTC,[7] and Rail-Ferry[8] segments—with the objective to reduce debt

---

[5] The Committee members are Willard E. Bartel and David C. Peebles, Administrators for the Estate of Robert N. Cain; Marine Engineers Beneficial Association; Masters, Mates, and Pilots Benefit Plans; Seafarers Benefits Plan; and U.S. Ocean LLC.

[6] The Merchant Marine Act of 1920 (better known as the Jones Act) requires that all goods transported by water between U.S. ports must, subject to certain limited exceptions, be carried aboard U.S. flag vessels that are constructed in the U.S., owned predominantly by U.S. citizens, and crewed by U.S. citizens. Under its Jones Act segment, International Shipholding currently deploys two (2) bulk carriers, one (1) integrated tug-barge unit, one (1) articulated tug-barge unit, and one (1) vessel that transports molten sulphur. Vessels deployed under the Jones Act segment serve primarily in the Gulf of Mexico and operate as the primary marine transporter of coal, sulphur, and phosphate rock. Petroleum coke and fertilizer are the other principal cargoes carried by the Jones Act vessels.

[7] The PCTC business segment currently includes five (5) vessels, four (4) of which are U.S. flag vessels and one (1) of which is an international flag vessel. The PCTC vessels transport all types of vehicles from fully assembled passenger cars to construction machinery and equipment in large number on multiple internal decks.

[8] The Rail-Ferry segment currently uses two (2) double-deck roll-on/roll-off rail ferries, which carry rail cars between the U.S. Gulf Coast and Mexico in regularly scheduled waterborne service. The service provides departures every four (4) days from Mexico and the U.S. Gulf Coast, respectively, for a three (3) day transit between

208368594

to more manageable levels and to increase liquidity. Since that date, International Shipholding has modified the Strategic Plan in response to new developments, including efforts to sell assets and ongoing discussions with its lenders, lessors, directors, and others.

12.    Pursuant to the Strategic Plan, as amended, International Shipholding classified the following assets as held for sale on December 31, 2015: (i) the assets in the Dry Bulk Carriers segment; (ii) an inactive tug included in the Jones Act segment; (iii) minority interests in mini-bulkers in the Dry Bulk Carriers segment; (iv) minority interests in chemical and asphalt tankers in the Specialty Business Segment; (v) International Shipholding's New Orleans office building; and (vi) a small, non-strategic portion of operations that owns and operates a certified rail-car repair facility near the port of Mobile, Alabama.

13.    By the end of the first quarter of 2016, International Shipholding had sold or exchanged all of the assets formerly included in the Dry Bulk Carriers segment. Following this pre-petition sale process, the Debtors' businesses consist of four primary segments—the Jones Act Vessels segment, the Rail Ferry Business segment, the PCTC segment, and the Specialty Business Segment.[9]

### ii. Post-Petition Marketing Efforts

14.    Since the filing of their chapter 11 cases, the Debtors have been actively engaged with their pre-petition lenders, the lenders under their post-petition debtor-in-possession credit facility, their unions, and the Committee. The Debtors have held weekly calls with these creditor constituencies, in addition to multiple in-person meetings and regular informal discussions as

---

ports. Since 2007, International Shipholding has conducted these operations out of its terminal in Mobile, Alabama and a terminal in Coatzacoalcos, Mexico. Trade for this segment is primarily driven by commodities such as forest products, sugar, metals, minerals, plastics and chemicals. In August 2012, ISH acquired two (2) related businesses that own and operate a certified rail-car repair facility near the port of Mobile, Alabama.

[9] The "Specialty Business Segment" is comprised of various contracts and agreements between Company affiliates and third parties, as well as certain notes receivable financing certain vessels owned by third parties, in each case relating to the Company's provision of logistical and seaborne transportation services in Southeast Asia and third party brokerage services related to these Southeast Asian operations.

208368594

needed.  As a result of this collaboration, and in consultation with their advisors, the Debtors

have determined that a sale of the Assets will preserve and maximize the value of their estates

and, accordingly, is in the best interests of their estates and creditors.

15.    The Debtors, through their financial advisors, Blackhill Partners, LLC

("Blackhill"), began a marketing process in early July 2016, targeting various strategic and

financial third parties either as sponsors of a reorganization or outright buyers.  Through this

process, Blackhill contacted approximately sixty-eight (68) prospective buyers and received ten

(10) indications of interest for either purchasing substantially all of the Debtors' assets or for one

of the Debtors' individual business segments.  The Debtors received two specific proposals for

the purchase of the Assets.  After providing diligence and negotiating terms with each interested

counterparty, the Debtors determined that the Stalking Horse Purchaser's proposal represented

the highest and best proposal.  The Debtors then went back to the other prospective purchaser to

solicit a topping bid, but such competing bidder declined to increase its bid. Thus, the Debtors

believe executing the purchase and sale agreement for the Specialty Business Segment attached

hereto (the "Stalking Horse Agreement") was the best option for maximizing value for the

estates.

16.    The Stalking Horse Purchaser is substantially owned by Erik L. Johnsen, the

C.E.O. of the Debtors and an insider of the Debtors.  Nevertheless, negotiations of the Stalking

Horse Agreement were conducted at arms' length, with the Debtors interests being represented

by Blackhill and Manuel Estrada, the Debtors' C.F.O.  Mr. Johnsen and his family members

were not privy to the Debtors' consideration of the competing bids for the Assets.  As a result of

the arms' length negotiations, the Stalking Horse Agreement represents a substantially higher

purchase price for the assets than any other proposed purchase. The Debtors also believe that the

7

Stalking Horse Agreement represents a lower execution risk, and indeed, the Stalking Horse Purchaser has already provided its $1.8 million deposit. Further, the process for soliciting overbids ensures that other parties have the opportunity to submit higher and better bids in order to maximize the recovery from the Assets.

**C.    Proposed Timeline for the Sale Transaction**

17.    The Debtors propose the following timeline for the Sale Transaction:[10]

| <div align="center">Deadline</div> | <div align="center">Action</div> |
|---|---|
| December 8, 2016 at 5:00 p.m. (prevailing Eastern Time) | Bid Deadline |
| December 15, 2016 at 10:00 a.m. (prevailing Eastern Time) | Auction |
| December ___, 2016 at _____ _.m. (prevailing Eastern Time) | Sale Objection Deadline |
| December ___, 2016 at _____ _.m. (prevailing Eastern Time) | Reply Deadline |
| December 20, 2016 at 10:00 a.m. (prevailing Eastern Time) | Sale Hearing |

18.    The Debtors submit that this proposed timeline is eminently reasonable, will foster robust participation in the sale process, is consistent with local practice and custom, and will not prejudice any party in interest.

**D.    Highlights of Bidding Procedures**

19.    A summary of the principal terms of the Bidding Procedures, a complete copy of which is attached hereto as **Exhibit B** is as follows:[11]

| | **Description of Provision** |
|---|---|
| **Access to Diligence Materials** | To receive access to due diligence materials and to participate in the bidding process, an interested party must submit to the Debtors and their advisors: |

---

[10] The Debtors, in the exercise of their business judgment, reserve the right to change these dates to achieve the maximum value for the Assets.

[11] The following summary is qualified in its entirety by reference to the provisions of the Bidding Procedures. In the event of any inconsistencies between the provisions of the Bidding Procedures and the terms herein, the terms of the Bidding Procedures shall govern.

208368594

| | |
|---|---|
| | (i) if one does not already exist between the parties, an executed confidentiality agreement in form and substance satisfactory to the Debtors; |
| | (ii) sufficient information, as determined by the Debtors, that the interested party has, or can obtain, the financial wherewithal to consummate a sale transaction for the Assets; and |
| | (iii) a non-binding written indication of interest identifying the Assets in which the party is interested in purchasing. |
| **Auction Qualification Process** | (a) <u>Good Faith Deposit</u>:  Except as set forth in the Bidding Procedures, each Bid for all or substantially all of the Assets must be accompanied by a deposit (a "<u>Good Faith Deposit</u>") submitted by wire transfer of immediately available funds to an account identified by the Debtors. Each Good Faith Deposit must equal in the case of a Bid for all or substantially all of the Assets, the amount of ten percent (10%) of the purchase price contained in the Modified Stalking Horse Agreement. |
| | (b) <u>Bids for Portions of the Assets</u>:  A Bid must offer to purchase all or substantially all of the Assets. |
| | (c) <u>Same or Better Terms</u>:  Each subsequent Bid for all or substantially all of the Assets must be on terms that, in the Debtors' business judgment, in consultation with the Bid Consultation Parties (as defined below), are the same or better than the terms of the Stalking Horse Agreement. |
| | (d) <u>Executed Agreement</u>:   Each Bid must be based on the Stalking Horse Agreement and must include executed transaction documents, including the revised Stalking Horse Agreement, signed by an authorized representative of such Bidder, pursuant to which the Bidder proposes to effectuate an Alternate Transaction (the "<u>Modified Stalking Horse Agreement</u>"), and a blackline copy of the applicable Modified Stalking Horse Agreement marked against the Stalking Horse Agreement to show all changes requested by the Bidder (including those related to purchase price). |
| | (e) <u>Designation of Assigned Contracts and Leases, Payment of Cure Amounts</u>:  A Bid must identify any and all executory contracts and unexpired leases of the Debtors that the Bidder wishes to have assumed and assigned to it at closing and provide for the payment of all cure amounts payable with respect to such contracts and leases under the Bankruptcy Code. |
| | (f) <u>Corporate Authority</u>:   A Bid must include written evidence reasonably acceptable to the Debtors, in their business judgment, demonstrating appropriate corporate authorization to consummate the proposed Alternate Transaction, *provided* that, if the Bidder is an entity specially formed for the purpose of effectuating the |

208368594

Alternate Transaction, then the Bidder must furnish written evidence reasonably acceptable to the Debtors of the approval of the Alternate Transaction by the equity holder(s) of such Bidder.

(g) <u>Disclosure of Identity of Bidder</u>: A Bid must fully disclose the identity of each entity that will be bidding for or purchasing the Assets or otherwise participating in connection with such Bid (including any equity holder or other financial backer if the Bidder is an entity specially formed for the purpose of effectuating the Alternate Transaction), and the complete terms of any such participation, including any binding agreements, arrangements, or understandings concerning a collaborative or joint bid or any other combination concerning the proposed Bid.

(h) <u>Proof of Financial Ability to Perform</u>: A Bid must include written evidence that the Debtors reasonably conclude in their business judgment, in consultation with their advisors and the Bid Consultation Parties, demonstrates that the Bidder has the necessary financial ability to (i) close the Alternate Transaction and (ii) provide adequate assurance of future performance under all contracts to be assumed and assigned in such Alternate Transaction. Such information must include, *inter alia*, the following:

  (1)   contact names and numbers for verification of financing sources;

  (2)   evidence of the Bidder's internal resources and proof of unconditional debt funding commitments from a recognized financial institution and, if applicable, equity commitments in an aggregate amount equal to the cash portion of such Bid (including, if applicable, the Bidder's payment of cure amounts) or the posting of an irrevocable letter of credit from a recognized banking institution issued in favor of the Debtors in such amount, in each case, as are needed to close the Alternate Transaction;

  (3)   the Bidder's current financial statements (audited if they exist) or other similar financial information reasonably acceptable to the Debtors;

  (4)   a description of the Bidder's pro forma capital structure; and

  (5)   any such other form of financial disclosure or credit-quality support information or enhancement reasonably requested by the Debtors, in consultation with the Bid Consultation Parties, demonstrating that such Bidder has the ability and financial wherewithal to close the Alternate Transaction.

(i) <u>Regulatory and Third Party Approvals</u>: A Bid must set forth each regulatory and third-party approval required for the Bidder to consummate the Alternate Transaction, if any, and the time period

| | |
|---|---|
| | within which the Bidder expects to receive such regulatory and third-party approvals (and if receipt of any such regulatory or third-party approval is expected to take more than thirty (30) days following execution and delivery of the Modified Stalking Horse Agreement, those actions the Bidder will take to ensure receipt of such approval(s) as promptly as possible). |
| | (j) <u>Contingencies</u>:  Bids may not be conditioned on obtaining financing or any internal approval, or on the outcome or review of due diligence. |
| | (k) <u>Irrevocable</u>:   Bids must expressly provide that (1) the Bidder is prepared to consummate the transaction set forth in the Modified Stalking Horse Agreement promptly following entry of the Sale Order and satisfaction of the closing conditions (if any) set forth in the Modified Stalking Horse Agreement, and (2) the offer reflected in such Bid shall remain open and irrevocable until the conclusion of the Auction, provided that if such Bid is accepted as the Successful Bid or the Backup Bid (each as defined in the Bidding Procedures), such Bid shall continue to remain open and irrevocable as provided in the Bidding Procedures. |
| | (l) <u>Bid Deadline</u>:  Each Bid must be received by each of Bid Notice Parties, in writing, on or before December 8, 2016 at 5:00 p.m. (prevailing Eastern Time). |
| **Auction Procedures** | ***The Debtors Shall Conduct the Auction***. The Debtors and their advisors shall direct and preside over the Auction, which shall be transcribed.<br><br>***Credit Bidding***. The applicable Pre-petition Lenders and the DIP Lenders shall have the right, subject in all respects to the Bankruptcy Code and other applicable law, to credit bid all or any portion of their allowed claims secured by the Assets at the Auction pursuant to Bankruptcy Code section 363(k) or other applicable law, in accordance with the applicable provisions of the applicable debt documents.<br><br>***Terms of Overbids***. An "<u>Overbid</u>" is any bid made at the Auction, in accordance with the requirements set forth in the Bidding Procedures, subsequent to the Debtors' announcement of the respective Auction Baseline Bid.  To submit an Overbid for purposes of this Auction, a Bidder must comply with the following conditions:<br><br>(a) <u>Minimum Overbid Increments</u>:   The initial Overbid for the Assets shall provide for total consideration for the Assets with a value that exceeds the value of the consideration under the Auction Baseline Bid an incremental amount that is not less than the sum of (x) $500,000 (the "<u>Minimum Overbid Increment</u>") plus (y) $500,000 which is equal to the value of the Bid Protections under the Stalking Horse Agreement, and each |

11

successive Overbid shall exceed the then-existing Overbid by an incremental amount that is not less than the Minimum Overbid Increment.

(b) Remaining Terms Are the Same as for Qualified Bids: Except as modified in the Bidding Procedures, an Overbid at the Auction must comply with the conditions for a Qualified Bid set forth above, provided, however, that the Bid Deadline shall not apply. Any Overbid must include, in addition to the amount and the form of consideration of the Overbid, a description of all changes requested by the Bidder to the Stalking Horse Agreement, Modified Stalking Horse Agreement, as the case may be, in connection therewith. For the avoidance of doubt, any Overbid shall be irrevocable and shall remain open and binding on the Bidder in accordance with these Bidding Procedures and the conditions for a Qualified Bid.

At the Debtors' discretion, to the extent not previously provided a Bidder submitting an Overbid at the Auction must submit, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors), as the Debtors, in their business judgment in consultation with the Bid Consultation Parties, may request, demonstrating such Bidder's ability to consummate the Alternate Transaction proposed by such Overbid.

***Announcement and Consideration of Overbids.***

(a) Announcement of Overbids. A Bidder submitting an Overbid at the Auction shall announce at the Auction the material terms of such Overbid, including the total amount and type of consideration offered in such Overbid.

(b) The Debtors reserve the right, in their business judgment and in consultation with the Bid Consultation Parties, to make one or more continuances of the Auction to, among other things: facilitate discussions between the Debtors and individual Qualified Bidders; allow individual Qualified Bidders to consider how they wish to proceed; and give Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their business judgment and in consultation with the Bid Consultation Parties, may require, that the Qualified Bidder has sufficient internal resources, or has received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed Alternate Transaction at the prevailing Overbid amount.

***Closing the Auction; Successful Bidder***. The Auction shall continue until there is only one Qualified Bid for the Assets, which Qualified Bid

12

| | |
|---|---|
| | the Debtors determine in their business judgment, in consultation with the Bid Consultation Parties, is the highest or otherwise best Qualified Bid at the Auction for the Assets.  Thereafter, the Debtors shall select such Qualified Bid(s), in consultation with the Bid Consultation Parties, as the overall highest or otherwise best Qualified Bid for the Assets (such Bid, the "<u>Successful Bid</u>," and the Bidder submitting such Successful Bid, the "<u>Successful Bidder</u>").<br><br>The Auction shall close when the Successful Bidder submits fully executed sale and transaction documents, memorializing the terms of the Successful Bid. |
| **Modification of Bidding and Auction Procedures** | The Debtors, in consultation with the Bid Consultation Parties, in the exercise of their fiduciary duties for the purpose of maximizing value for their estates from the sale process, may make non-material modifications to the Bidding Procedures and implement additional procedural rules for conducting the Auction. |
| **Closing with Alternative Backup Bidder** | Notwithstanding anything in the Bidding Procedures to the contrary, the Qualified Bid for the Assets that the Debtors determine in their business judgment, in consultation with the Bid Consultation Parties, is the next highest or otherwise best Qualified Bid at the Auction for the Assets after the Successful Bid, will be designated as the "<u>Backup Bid</u>" and the Bidder submitting such Backup Bid, the "<u>Backup Bidder</u>." The Backup Bidder shall be required to keep the Backup Bid open and irrevocable until the earlier of 5:00 p.m. (prevailing Eastern Time) on the date that is ___ days after the date of entry of the Sale Order (the "<u>Outside Backup Date</u>") or the closing of the transaction with the Successful Bidder (defined herein).<br><br>Following entry of a Sale Order, if a Successful Bidder for any business segment of the Assets fails to consummate its Successful Bid, the Debtors may, in consultation with the Bid Consultation Parties, designate the Backup Bid to be the new Successful Bid and the Backup Bidder to be the new Successful Bidder for the applicable business segment of the Assets, and the Debtors will be authorized, but not required, to consummate the transaction with the Backup Bidder without further order of the Bankruptcy Court. |

208368594

E.      **Highlights of Stalking Horse Agreement**

20.     A summary of the principal terms of the Stalking Horse Agreement, a complete

copy of which are attached hereto as **Exhibit D**, is as follows:[12]

|  | **Description of Provision** |
|---|---|
| **Stalking Horse Purchaser** | J Line Corporation |
| **Debtor Sellers:** | International Shipholding Corporation; LCI Shipholdings, Inc.; Gulf South Shipping PTE Ltd.; Marco Shipping Company (PTE) Ltd.; N.W. Johnsen & Co., Inc. |
| **Non-Debtor Sellers:** | MPV Netherlands C.V., MPV Netherlands Cooperaties U.A., and MPV Netherlands V.B. |
| **Stalking Horse Purchase Price** | $18 million |
| **Deposit** | 10% of the Stalking Horse Purchase Price |
| **Extraordinary Provisions of Stalking Horse Agreement** | The Stalking Horse Purchaser is an insider of the Debtors |
| **Bid Protections** | Expense Reimbursement up to $500,000 |
| **Minimum Overbid Increment** | $500,000 |

21.     In all cases, the Debtors will retain and/or have reasonable access to their books

and records to enable them to administer these chapter 11 cases through to a conclusion.

## **RELIEF REQUESTED**

22.     By this motion, the Debtors first request entry of the Bidding Procedures Order,

which will authorize and approve, among other things: (i) the Bidding Procedures for conducting

---

[12] The following summary is qualified in its entirety by reference to the provisions of the Stalking Horse Agreement. In the event of any inconsistencies between the provisions of the Stalking Horse Agreement and the terms herein, the terms of the Stalking Horse Agreement shall govern.

208368594

the auction for the Assets; (ii) the Expense Reimbursement (as defined below); (iii) the Assumption and Assignment Procedures; (iv) the scheduling of the Sale Hearing to approve the Sale Transaction with respect to any bid accepted by the Debtors; and (v) the form and manner of notice with respect to all procedures, protections, schedules, and agreements described herein and attached hereto.

23.     Subsequently, at the Sale Hearing, the Debtors will also request entry of the Sale Order that will approve (i) the sale of the Assets in accordance with the terms of the Stalking Horse Agreement executed by the Stalking Horse Purchaser or other Successful Bidder, which shall be free and clear of all liens, claims, encumbrances, and other interests, including rights or claims based on any taxes or successor or transferee liability (other than certain expressly specified permitted encumbrances and assumed liabilities, all as more specifically set forth in the Stalking Horse Agreement; and (ii) the assumption and assignment of certain executory contracts and unexpired leases related to the Assets and the Sale Transaction.

**BASIS FOR RELIEF**

24.     As set forth in detail above, the Debtors have pursued various financial and strategic alternatives both pre- and post-petition, and have determined that the best course of action is a sale of the Assets in the manner and on the timetable set forth in the Bidding Procedures.

25.     The Debtors' highest priority in these chapter 11 cases is preserving value for their stakeholders, while minimizing disruptions to their business.  The Bidding Procedures ensure a prompt sale, while allowing the Debtors to maximize the value of the Assets and thus, the value of their estates for the benefit of their creditors.  The Debtors believe that the proposed process will protect their estates from lengthy delays and avoid interruption to the Debtors'

208368594

business as a going concern, thereby providing the greatest available protection to the Debtors' stakeholders.

## A.    Approval of Bidding Procedures

26.    The Bidding Procedures are designed to maximize value for the Debtors' estates, while ensuring an orderly sale process consistent with the timeline available to the Debtors under the Stalking Horse Agreement.  The Bidding Procedures describe, among other things, the procedures for interested parties to access due diligence, the manner in which bidders and bids become qualified, the receipt and negotiation of bids received, the conduct of any auction, the selection and approval of any ultimately successful bidder, and the deadlines with respect to the foregoing.  The Debtors further believe, with the concurrence and support of their key constituents, that the Bidding Procedures afford the Debtors a sufficient opportunity to pursue a sale process that will maximize the value of their estates.

## B.    Expense Reimbursement

27.    After extensive arm's-length negotiations, the Debtors and the Stalking Horse Purchaser executed the Stalking Horse Agreement.  The Stalking Horse Agreement allows the Debtors to maximize the value received for the Assets by establishing minimum acceptable bids that will promote more competitive bidding.  As part of the negotiations, the Debtors have agreed to provide, subject to the approval of this Court, the reimbursement of certain reasonable expenses incurred by the Stalking Horse Purchaser in connection with the negotiation of the Stalking Horse Agreement, including conducting due diligence related to the Sellers, the Company and the Assets, of up to $500,000 for the Specialty Business Segment (the "Expense Reimbursement").  As summarized in the table above, the Stalking Horse Agreement sets forth the terms under which the Stalking Horse Purchaser is entitled to receive the applicable Expense Reimbursement.  The Debtors have further agreed that their obligation to pay the Expense

16

Reimbursement pursuant to the Stalking Horse Agreement shall, upon entry of the Bidding Procedures Order, constitute a super-priority administrative expense of the Debtors under Bankruptcy Code section 364(c)(1) with priority over any and all administrative expenses of any kind, including those specified in Bankruptcy Code sections 503(b) or 507(b) and shall only be paid form the proceeds of a sale pursuant to a successful overbid.

28.    The Debtors believe that the Expense Reimbursement is fair and reasonable in light of the circumstances and because, if any Expense Reimbursement is triggered, the applicable Stalking Horse Purchaser's efforts will have increased the chances that the Debtors will receive the highest or otherwise best offer for the Assets to the benefit of the Debtors' estates.

**C.    Assumption and Assignment Procedures**

29.    The Debtors propose the procedures set forth below for notifying counterparties to executory contracts and unexpired leases of potential cure amounts in the event the Debtors decide to assume and assign such contracts or leases.

**(i)       Notice of Assumption and Assignment**

30.    On or before December 1, 2016, (any such date, the "Assumption and Assignment Service Date") the Debtors shall file with the Court, and post on the website maintained for these chapter 11 cases at https://cases.primeclerk.com/ish/ (the "Case Website"), a notice of assumption and assignment, substantially in the form attached hereto as **Exhibit E** (the "Cure Notice") and, included therewith, a list that specifies (i) each of the Debtors' executory contracts and unexpired leases proposed to be assumed and assigned pursuant to the Sale Transaction (the "Assigned Contracts") and (ii) the proposed amount necessary, if any, to cure all monetary defaults, if any, under each Designated Contract (the "Cure Costs").  If no Cure Cost is listed, then the Debtors believe that there is no Cure Cost due to the counterparty.

31.    The Debtors shall serve on all non-Debtor counterparties to the Assigned Contracts, via first-class mail or courier service, a customized version of the Cure Notice, which will not include the full list of Assigned Contracts, but which will include (a) instructions regarding how to view the full list on the Case Website, (b) information necessary and appropriate to provide notice of the proposed assumption and assignment of the relevant Assigned Contract(s), (c) Cure Costs, if any, and (d) procedures for objecting thereto. The Debtors shall serve, via first-class mail or courier service, a generic version of the Cure Notice on the master service list prepared and maintained pursuant to the *Order Establishing Certain Notice, Case Management, and Administrative Procedures* [ECF No. 178].

32.    The Debtors request that the Court set the deadline to object to any Cure Cost or to assumption and assignment fourteen (14) days after the applicable Assumption and Assignment Service Date. Any such objection shall (i) be in writing; (ii) state the basis for such objection; and (iii) state with specificity what cure amount the counterparty to the Assigned Contract believes is required (in all cases with appropriate documentation in support thereof). If a counterparty to an Assigned Contract files an objection in a manner that is consistent with the requirements set forth above, and the parties are unable to consensually resolve the dispute prior to the Sale Hearing, then the amount to be paid or reserved with respect to such objection will be determined either at the Sale Hearing, such later hearing date that the Debtors determine in their discretion, or such other date determined by this Court.

33.    At the Sale Hearing, the Debtors shall (i) present evidence necessary to demonstrate adequate assurance of future performance by the Successful Bidder and (ii) request entry of an order granting approval of the assumption and assignment of any Assigned Contracts to the Successful Bidder.

208368594

**(ii)        Supplemental Notice of Assumption and Assignment**

34.    Although the Debtors intend to make a good-faith effort to identify all Assigned Contracts in connection with a Sale Transaction, the Debtors may discover certain contracts inadvertently omitted from the Assigned Contracts list, or Successful Bidder may identify other executory contracts or unexpired leases that they desire to assume and assign in connection with the Sale.  Accordingly, the Debtors reserve the right, at any time after the Assumption and Assignment Service Date and before the closing of a Sale Transaction, to (i) supplement the list of Assigned Contracts with previously omitted Assigned Contracts (the "Previously Omitted Contracts") in accordance with the definitive agreement for a Sale Transaction, (ii) remove an Assigned Contract from the list of contracts that a Successful Bidder proposes be assumed and assigned to it in connection with a Sale Transaction, and/or (iii) modify the previously stated Cure Cost associated with any Assigned Contract.

35.    In the event that the Debtors exercise any of the rights reserved above, the Debtors will promptly serve a supplemental notice of assumption and assignment (a "Supplemental Cure Notice").  The Supplemental Cure Notice will be served by electronic transmission, hand delivery, or overnight mail on the counterparty (and its attorney, if known) to each impacted Assigned Contract at the last known address available to the Debtors.  Each Supplemental Cure Notice will include the same information with respect to listed Assigned Contracts as was included in the Cure Notice.

36.    Any counterparty to an Assigned Contract listed on a Supplemental Cure Notice may file an objection (a "Supplemental Assigned Contract Objection") if such objection is to the proposed assumption and assignment of the applicable Assigned Contract or the proposed Cure Costs, if any.  All Supplemental Assigned Contract Objections must (i) state, with specificity, the legal and factual basis thereof, as well as what Cure Costs the objecting party believes are

19

required, if any, (ii) include appropriate documentation in support of the objection, and (iii) be filed and served no later than fourteen days from the date of service of such Supplemental Cure Notice, which date will be set forth in the Supplemental Cure Notice.

37.    If a counterparty to an Assigned Contract files a Supplemental Assigned Contract Objection and the parties are unable to consensually resolve the dispute, the Debtors will seek an expedited hearing before the Court (a "Supplemental Assigned Contract Hearing") to determine the Cure Costs, if any, and approve the assumption of the relevant Assigned Contracts.  If there is no such objection, then the Debtors will seek to obtain an order of this Court, including by filing a certification of no objection, fixing the Cure Costs and approving the assumption of any Assigned Contract listed on a Supplemental Cure Notice.

**D.    Notice Procedures**

38.    Notice of Sale Hearing. Within seven (7) days after the entry of the Bidding Procedures Order or as soon as reasonably practicable thereafter (the "Mailing Date"), the Debtors shall serve this motion, the Stalking Horse Agreement, the Bidding Procedures Order, and the Bidding Procedures by first-class mail, postage prepaid, or courier service upon (a) all entities known by the Debtors to have expressed an interest in a transaction with respect to all or part of the Assets within the past two years; (b) all entities known to have asserted any lien, claim, interest, or encumbrance in or upon any of the Assets; (c) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by this motion; (d) the Office of the United States Trustee for Region 2, Attn: Serene K. Nakano; (e) the agent under the Debtors' post-petition debtor-in-possession financing and its counsel; (f) the Committee and its counsel; (g) counsel to the agents and lenders under the Debtors' pre-petition credit facilities; (h) the U.S. Attorney's Office for the Southern District of New York; (i) the Internal Revenue Service; and (j) the Securities and Exchange Commission.

20

39.     <u>Sale Notice</u>.  On the Mailing Date, or as soon as reasonably practicable thereafter, the Debtors shall serve by first-class mail, postage prepaid, or courier service a sale notice, substantially in the form attached hereto as **Exhibit F** (the "<u>Sale Notice</u>"), upon all other known creditors and equity interest holders of the Debtors.

40.     <u>Publication Notice</u>.  Because direct notice to all potentially interested parties is impracticable, the Debtors have determined that it is in the best interest of their estates to provide notice by publication.  Pursuant to Bankruptcy Rules 2002, 6004, and 6006, the Debtors propose to publish the Sale Notice in a form substantially similar to the notice attached hereto as **Exhibit G**, in *The Wall Street Journal* and *TradeWinds* on one occasion on the Mailing Date or as soon as reasonably practicable thereafter.  In addition, the Debtors respectfully request the authority, but not the direction, to publish the Sale Notice in local publications of general circulation as the Debtors deem appropriate.

41.     <u>Post-Auction Notice</u>.  As soon as reasonably practicable after the conclusion of the Auction, the Debtors shall file on the docket, but not serve, a notice identifying any Successful Bidder (the "<u>Post-Auction Notice</u>"), substantially in the form attached hereto as **Exhibit H**.

42.     The Debtors request that the Court approve the proposed notice procedures and find that such notice procedures constitute good, adequate, and sufficient notice, including to those creditors or other interested parties with a foreign address, and satisfy the requirements of the Bankruptcy Code, Bankruptcy Rules, and Local Rules.

## **APPLICABLE AUTHORITY**

43.     Ample authority exists for granting the requested relief.  The Debtors submit that application of the section 363(b) standard for sales outside of the ordinary course of a debtor's business is met here.  Bankruptcy Code section 363(b) provides, in relevant part, that, "the

21

trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). This Court's power under Bankruptcy Code section 363 is supplemented by Bankruptcy Code section 105(a), which provides in relevant part, that "the Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). As set forth below, the Debtors submit they have satisfied the requirements of Bankruptcy Code sections 105 and 363 as those sections have been construed by courts in the Second Circuit.

44.    The use, sale, or lease of property of the estate, other than in the ordinary course of business, should be authorized when there is an "articulated business justification" for the action to be taken. *See In re Boston Generating, LLC*, 440 B.R. 302, 321 (Bankr. S.D.N.Y. 2010); *In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983). When a valid business justification exists, the law vests the debtor's decision to use property out of the ordinary course of business with a strong presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *See Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.* (*In re Integrated Res., Inc.),* 147 B.R. 650, 656 (S.D.N.Y. 1992) (citation omitted).

45.    The Debtors have sound business justifications for selling the Assets as set forth in the Bidding Procedures. After consideration of the full spectrum of possibilities and in consultation with their key creditor constituencies, the Debtors have determined that the best option to maximize value for their estates is through a sale of the Assets as set forth in this motion. The Debtors solicited offers from approximately 65 potentially interested third parties for either the sponsorship of a reorganization or the sale of any combination of their four

22

business segments. Following a thorough analysis of all available options, together with their professionals and in consultation with their key constituencies, the Debtors determined that the bid as reflected in the Stalking Horse Agreement would yield the maximum value for the Assets. The Debtors submit that the sale of the Assets to the Stalking Horse Purchaser pursuant to the Stalking Horse Agreement, or to another Successful Bidder pursuant to Modified Stalking Horse Agreement (as defined in the Bidding Procedures), will allow the Debtors to receive the current market value for these Assets and thus, is in the best interests of the Debtors' estates and should be approved.

**A.    The Bidding Procedures Are Fair and Are Designed to Maximize the Value Received for the Assets.**

46.    The Debtors believe that the Bidding Procedures are appropriate under Bankruptcy Code sections 105 and 363 to ensure that the bidding process is fair and reasonable and will yield the maximum value for their estates and creditors. The Bidding Procedures proposed herein are designed to maximize the value received for the Assets by facilitating a competitive bidding process in which all potential bidders are encouraged to participate and submit competing bids. The Bidding Procedures provide potential bidders with sufficient notice and an opportunity to conduct necessary diligence and submit a timely and informed bid. Thus, the Debtors and all parties in interest can be assured that the consideration for the Assets will be fair and reasonable. At the same time, the Bidding Procedures provide the Debtors with the opportunity to consider all competing offers and to select, in their reasonable business judgment and in consultation with their advisors, the highest and best offer for the Assets.

47.    For the foregoing reasons, the Debtors request that the Court approve the Bidding Procedures. In addition, similar procedures have been previously approved by this Court. *See, e.g.*, *In re SunEdison, Inc,. et al.*, No. 16-10992 (SMB) (Bankr. S.D.N.Y. Aug. 19, 2016); *In re*

*The Great Atlantic & Pacific Tea Co., Inc.*, No. 15-23007 (RDD) (Bankr. S.D.N.Y. Nov. 16, 2015); *In re Relativity Fashion, LLC*, No. 15-11989 (MEW) (Bankr. S.D.N.Y. Sept. 1, 2015); *In re Excel Mar. Carriers Ltd.*, No. 13-23060 (RDD) (Bankr. S.D.N.Y. July, 3, 2013); *In re Eastman Kodak Co.*, No. 12-10202 (ALG) (Bankr. S.D.N.Y. Mar. 22, 2012); *In re Alexander Gallo Holdings, LLC*, No. 11-14220 (ALG) (Bankr. S.D.N.Y. Oct. 6, 2011).

**B.    The Expense Reimbursement Should Be Authorized.**

48.    As set forth above, the Stalking Horse Agreement provides for an Expense Reimbursement in the event that the Stalking Horse Agreement is terminated under the terms set forth therein.  The Debtors believe that the Expense Reimbursement is fair and reasonable in light of the circumstances.  Specifically, the Stalking Horse Purchaser has expended significant time and effort in furtherance of diligence and negotiation of the Stalking Horse Agreement, including the incurrence of professional fees.  Moreover, any Successful Bid must necessarily yield a higher and better value for the Assets than that proposed by the Stalking Horse Purchaser, including accounting for the applicable Expense Reimbursement that would be triggered by an alternate transaction.  Thus, the Debtors believe that, if the Expense Reimbursement is triggered, the Stalking Horse Purchaser's efforts will have increased the chances that the Debtors will receive the highest or otherwise best offer for the Assets to the benefit of the Debtors' creditors. The Debtors seek authorization to pay the Expense Reimbursement in accordance with the terms of the Stalking Horse Agreement.

49.    Approval of expense reimbursements and other forms of bidding protections in connection with the sale of significant assets pursuant to Bankruptcy Code section 363 has become established practice in chapter 11 cases.  Such bidding protections enable a debtor to ensure a sale to a contractually committed bidder at a price the debtor believes is fair, while providing the debtor with an opportunity to enhance the value to its estate through an auction

process.    Historically, bankruptcy courts have approved bidding incentives similar to the Expense Reimbursement pursuant to the business judgment rule. *See, e.g., Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650 (S.D.N.Y. 1992); *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989).

50.    In the Southern District of New York, bidding protections, including expense reimbursements are evaluated under the a three-factor test: "(1) is the relationship of the parties who negotiated the break-up fee tainted by self-dealing or manipulation; (2) does the fee hamper, rather than encourage, bidding; (3) is the amount of the fee unreasonable relative to the proposed purchase price?" *In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 465 (Bankr. S.D.N.Y. 2014) (quoting *Integrated Resources*, 147 B.R. at 657); *In re Metaldyne Corp.*, 409 B.R. 661, 670 (Bankr. S.D.N.Y. 2009); *see also Gey Associates General P'ship v. 310 Associates (In re 310 Associates)*, 346 F.3d 31, 34 (2d Cir. 2003) ("Breakup fees are sometimes authorized in the bankruptcy auction sale context because they provide an incentive for an initial bidder to serve as a so-called 'stalking horse,' whose initial research, due diligence, and subsequent bid may encourage later bidders.").

51.    The Stalking Horse Purchaser is an insider of the Debtors; however, the Debtors and the Stalking Horse Purchaser agreed to the Stalking Horse Agreement and Expense Reimbursement after an arms' length negotiation. As a result of the complex structure by which the Debtors hold the Assets in multiple jurisdictions, the Stalking Horse Purchaser must rely on its own professionals in structuring the transaction.    The Expense Reimbursement only reimburses actual expenses incurred by the Stalking Horse Purchaser and no breakup fee is being paid.    Moreover, the Expense Reimbursement is actually necessary to preserve the value of the estate.    Without the Expense Reimbursement, the Stalking Horse Purchaser would not be willing

to enter into the Stalking Horse Agreement. Further, the Debtors believe that the amounts of the Expense Reimbursement is reasonable and appropriate in light of the size and nature of the transaction and the efforts that have been and will be expended by the Stalking Horse Purchaser. In sum, the Debtors' ability to offer the Expense Reimbursement enables them to ensure the sale of the Assets to the Stalking Horse Purchaser at a price they believe to be fair, while at the same time providing the Debtors with the potential of even greater benefit to the estates through a higher offer under the Bidding Procedures. Additionally, payment of the Expense Reimbursement will not diminish the value of Debtors' estates. Specifically, the Debtors do not intend to terminate the Stalking Horse Agreement if to do so would incur an obligation to pay the Expense Reimbursement, unless it is to accept an alternative bid, which bid must exceed the consideration offered by the Stalking Horse Purchaser by an amount sufficient to pay the Expense Reimbursement.

52.     This Court has approved protections similar to the proposed Expense Reimbursement as reasonable and consistent with the type and range of bidding protection typically approved. *See*, *e.g.*, *In re Advance Watch Company, LTD.*, No. 15-12690 (MG) (Bankr. S.D.N.Y. Oct. 23, 2015), ECF No. 105 (approving break-up fee and expense reimbursement for 4.67% of purchase price); *In re SunEdison, Inc.*, No. 16-10992 (SMB) (Bankr. S.D.N.Y. Apr. 21, 2016), ECF No. 1033 (approving break-up fee and expense reimbursement for 4.0% of purchase price); *In re Choice Bldg. Supplies of Westchester Co. Inc.*, No. 13-23859 (RDD) (Bankr. S.D.N.Y. Apr. 1, 2014), ECF No. 26 (approving a break-up fee of approximately 3.64% of the purchase price); *In re Hostess Brands, Inc.*, Case No. 12-22052 (RDD) (Bankr. S.D.N.Y. Feb. 11, 2013) ECF No. 2275 (approving break-up fee and expense reimbursement 5.4% of purchase price); *In re MSR Resort Golf Course LLC*, Case No. 11-10372 (SHL) (Bankr. S.D.N.Y. Dec. 20,

2011), ECF No. 920 (approving topping fee and expense reimbursement 4.0% of purchase price); *In re Cabrini Med. Ctr.*, No. 09-14398 (AJG) (Bankr. S.D.N.Y. Dec. 30, 2009), ECF No. 224 (approving a break-up fee of approximately 3.75% of the purchase price); *In re Tronox Inc.*, No. 09-10156 (ALG) (Bankr. S.D.N.Y. Sept. 23, 2009), ECF No. 715 (approving a break-up fee and expense reimbursement totaling approximately 3.72% of the total purchase price); *In re Silicon Graphics, Inc.*, Case No. 09-11701 (MG) (Bankr. S.D.N.Y. Apr. 3, 2009), ECF No. 55 (approving a break-up fee and expense reimbursement totaling approximately 6% of the total purchase price).

**C.     Approval of the Sale Transaction Is Warranted under Bankruptcy Code Section 363(b).**

53.     As noted above, Bankruptcy Code section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Bankruptcy Code section 105(a) provides, in relevant part, that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  The use, sale, or lease of property of the estate, other than in the ordinary course of business, is authorized when there is an "articulated business justification" for the action to be taken.  *See Fulton State Bank v. Schipper* (*In re Schipper*), 933 F.2d 513, 515 (7th Cir. 1991) (citation omitted).  When a valid business justification exists, the law vests the debtor's decision to use property out of the ordinary course of business with a strong presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."  *See Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.* (*In re Integrated Res., Inc.*), 147 B.R. 650, 656 (S.D.N.Y. 1992) (citation omitted).

27

54.    Once a court has determined there is a sound business justification for a sale outside of a plan, the court must also determine that (i) the trustee has provided the interested parties with adequate and reasonable notice, (ii) the sale price is fair and reasonable and (iii) the purchaser is proceeding in good faith.  *See In re MF Global Inc.*, 467 B.R. 726, 730 (Bankr. S.D.N.Y. 2012); *In re Gen. Motors Corp.*, 407 B.R. 463, 493-94 (Bankr. S.D.N.Y. 2009); *In re Betty Owens Sch.*, No. 96 Civ. 3576 (PKL), 1997 U.S. Dist. LEXIS 5877, at *14 (S.D.N.Y. Apr. 16, 1997).

55.    The Debtors submit that the sale of the Assets is based upon their sound business judgment.  As explained above, the Debtors have determined that a sale, conducted in accordance with the Bidding Procedures, is in the best interest of their estates.  An orderly sale process will minimize disruptions to operations and instill confidence in customers, which will help ensure that the Debtors can continue their remaining operations.  The Debtors have determined that their best opportunity to maximize creditor recoveries is to sell substantially all of the Assets.  In addition, contemporaneously with filing of the instant motion, the Debtors have filed the *Debtors' Motion for Entry of an Order Authorizing the Debtors to Enter into the Restructuring Support Agreement with Seacor Capital Corp.*  regarding their remaining business segments.  The sale of the Specialty Business Segment is required under the Restructuring Support Agreement.

56.    The Debtors also meet the additional requirements necessary to approve a sale under Bankruptcy Code section 363.  As stated herein, the Debtors will provide adequate notice of the Sale Transaction to interested parties, and the Debtors believe that the aforementioned notice procedures are reasonable and adequate under the circumstances.  Additionally, the Debtors entered into the Stalking Horse Agreement after a deliberate, calculated effort to market

28

the Assets and, while hopeful that other bidders materialize, are confident that the proposed

purchase price for the Assets is fair and reasonable. Moreover, the Stalking Horse Purchaser has

proceeded in good faith. The Debtors and the Stalking Horse Purchaser were represented by

practical and experienced advisors in the arm's-length negotiations of the Stalking Horse

Agreement. Accordingly, the Debtors submit that it is a valid exercise of their business

judgment to seek the relief requested by this motion.

**D.    The Proposed Sale Transaction Satisfies the Requirements of Bankruptcy Code
Section 363(f) for a Sale Free and Clear of Interests.**

57.    Bankruptcy Code section 363(f) provides as follows:

The trustee may sell property under subsection (b) or (c) of this section free and clear of
any interest in such property of an entity other than the estate, only if—

(1)    applicable non-bankruptcy law permits sale of such property free and clear
of such interest;

(2)    such entity consents;

(3)    such interest is a lien and the price at which such property is to be sold is
greater than the aggregate value of all liens on such property;

(4)    such interest is in bona fide dispute; or

(5)    such entity could be compelled, in a legal or equitable proceeding, to
accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

58.    Because Bankruptcy Code section 363(f) is drafted in the disjunctive, it is

necessary to meet only one of the five conditions. The entities with liens on the Assets have

consented to the proposed Sale Transaction or their liens will attach to the proceeds of the Sale

Transaction in order of priority. Further, such entity could be compelled is a legal or equitable

proceeding to accept a money satisfaction of such interest. Therefore, the Debtors believe that

they have satisfied the requirements of Bankruptcy Code section 363(f). Accordingly, pursuant

208368594

to Bankruptcy Code section 363, the Debtors may sell the Assets free and clear of all liens, claims, and encumbrances.

59.     The Debtors also submit that it is appropriate to sell the Assets free and clear of successor liability relating to the Debtors' business.  Such a provision ensures that the Successful Bidder is protected from any claims or lawsuits premised on the theory that the Successful Bidder is a successor in interest to one or more of the Debtors.  Courts have consistently held that a buyer of a debtor's assets pursuant to a Bankruptcy Code section 363 sale takes free and clear from successor liability relating to the debtor's business.  *See, e.g.*, *Elliot v. General Motors LLC (In re Motors Liquidation Co.)*, 829 F.3d 135, 156 (2d Cir. 2016) ("[A] bankruptcy court may approve a § 363 sale 'free and clear' of successor liability claims if those claims flow from the debtor's ownership of the sold assets. Such a claim must arise from a (1) right to payment (2) that arose before the filing of the petition or resulted from pre-petition conduct fairly giving rise to the claim. Further, there must be some contact or relationship between the debtor and the claimant such that the claimant is identifiable"); *In re General Motors Corp.*, 407 B.R. 463, 505-06 (Bankr. S.D.N.Y. 2009) ("[T]he law in this Circuit and District is clear; the Court will permit GM's assets to pass to the purchaser free and clear of successor liability claims, and in that connection, will issue the requested findings and associated injunction."); *In re Chrysler LLC*, 405 B.R. 84, 111 (Bankr. S.D.N.Y. 2009) ("[*I*]*n personam* claims, including any potential state successor or transferee liability claims against New Chrysler, as well as in rem interests, are encompassed by section 363(f) and are therefore extinguished by the Sale Transaction."); *see also In re Trans World Airlines, Inc.*, 322 F.3d 283, 288-90 (3d Cir. 2003) (sale of assets pursuant to section 363(f) barred successor liability claims for employment discrimination and rights under travel voucher program); *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 585 (4th

30

Cir. 1996) (affirming the sale of debtors' assets free and clear of certain taxes); *In re Insilco Techs., Inc.*, 351 B.R. 313, 322 (Bankr. D. Del. 2006) (stating that a 363 sale permits a buyer to take ownership of property without concern that a creditor will file suit based on a successor liability theory).

60.    The purpose of an order purporting to authorize the transfer of assets free and clear of all liens, claims, encumbrances, and all other interests would be frustrated if claimants could thereafter use the transfer as a basis to assert claims against a purchaser arising from a seller's pre-sale conduct. Moreover, without such assurances, the Debtors would run the risk that potential bidders may not enter the auction or, if they did, would do so with reduced bid amounts. To that end, the Successful Bidder should not be liable under any theory of successor liability relating to the Debtors' businesses, but should hold the Assets free and clear.

**E.    The Successful Bidder Should Be Entitled to the Protections of Bankruptcy Code Section 363(m).**

61.    Pursuant to Bankruptcy Code section 363(m), a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims. *In re Lehman Bros. Holdings, Inc.*, 415 B.R. 77, 83 (S.D.N.Y. 2009); *In re Congoleum Corp.*, No. 03-51524, 2007 WL 1428477, *2 (Bankr. D.N.J. May 11, 2007). *In re Mark Bell Furniture Warehouse, Inc.*, 992 F.2d 7, 9 (1st Cir. 1993); *In re Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985).

62.    The Stalking Horse Agreement was negotiated at arm's length by sophisticated parties, each represented by their own counsel and financial advisors. Accordingly, the Debtors request that the Sale Order include a provision that the Successful Bidder for the Assets, are "good faith" purchasers within the meaning of Bankruptcy Code section 363(m). The Debtors

believe that providing the Successful Bidder with such protection will ensure that the maximum

price will be received by the Debtors for the Assets and closing of the same will occur promptly.

**F.    Assumption and Assignment of Executory Contracts and Unexpired Leases Should Be Authorized.**

63.    Bankruptcy Code section 365(a) provides, in pertinent part, that a debtor in

possession "subject to the court's approval, may assume or reject any executory contract or

unexpired lease of the debtor."  11 U.S.C. § 365(a).  The standard governing a debtor's decision

to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable

business judgment supports assumption or rejection.  *See, e.g., Orion Pictures Corp. v. Showtime*

*Networks, Inc.* (*In re Orion Pictures Corp.*), 4 F.3d 1095, 1098 (2d Cir. 1993) (noting that

Bankruptcy Code section 365 "permits the trustee or debtor-in-possession, subject to the

approval of the bankruptcy court, to go through the inventory of executory contracts of the

debtor and decide which ones it would be beneficial to adhere to and which ones it would be

beneficial to reject").  The business judgment test "requires only that the trustee [or debtor in

possession] demonstrate that [assumption or] rejection of the contract will benefit the estate."

*Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel*

*Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting *In re Stable Mews Assoc.*, 41 B.R.

594, 596 (Bankr. S.D.N.Y 1984)).  Any more exacting scrutiny would slow the administration of

a debtor's estate, increase costs, interfere with the Bankruptcy Code's provision for private

control of administration of the estate, and threaten the court's ability to control a case

impartially.  *See Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir.

1985).  In addition, for a debtor to assume an executory contract, it must "cure, or provide

adequate assurance that the debtor will promptly cure," any default, including compensation for

any "actual pecuniary loss" relating to such default.  11 U.S.C. § 365(b)(1).

64.    Once an executory contract is assumed, the trustee or debtor in possession may elect to assign such contract. Bankruptcy Code section 365(f) provides that the "trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of future performance is provided." 11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case. Adequate assurance may be provided, among other means, by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned." *See*, *e.g.*, *In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding that adequate assurance is present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business to give it strong likelihood of success).

65.    To facilitate and effect the proposed Sale Transaction, the Debtors request approval of the assumption and assignment of the Assigned Contracts to the Stalking Horse Purchaser or other Successful Bidder under Bankruptcy Code section 365. The Debtors further request that the Sale Order provide that the Assigned Contracts will be transferred to, and remain in full force and effect for the benefit of, the Stalking Horse Purchaser or other Successful Bidder notwithstanding any provisions in the Assigned Contracts, including those described in Bankruptcy Code sections 365(b)(2), (f)(1), and (f)(3), that prohibit such assignment.

66.    The Stalking Horse Purchaser will have the financial resources required to complete the Sale Transaction, including performing under the Assigned Contracts upon the closing of the Stalking Horse Agreement. Moreover, the Debtors contemplate that the Successful Bidder will be able to provide adequate assurance of future performance in connection with any assigned executory contracts and unexpired leases because such Successful

33

Bidder must submit evidence sufficient to demonstrate its financial wherewithal and ability to consummate the Sale Transaction. Furthermore, to the extent that any defaults exist under any executory contract or unexpired lease that is to be assumed and assigned in connection with the sale of the Assets, any such default will be cured prior to such assumption and assignment.

67.    The Debtors will present facts at the Sale Hearing to show the financial credibility, willingness, and ability of the Stalking Horse Purchaser or other Successful Bidder to perform under the Assigned Contracts. The Sale Hearing thus will afford the Court and other interested parties the opportunity to evaluate the ability of the Stalking Horse Purchaser or other Successful Bidder to provide adequate assurance of future performance under the Assigned Contracts, as required under Bankruptcy Code section 365(b)(1)(C). Further, as set forth above, the Debtors will give notice to all parties to the Assigned Contracts or the Previously Omitted Contracts of their intention to assume the Assigned Contracts or the Previously Omitted Contracts, as the case may be, and what the Debtors believe are the cure amounts for such Assigned Contracts.

68.    Accordingly, the Debtors submit that implementation of the proposed Assumption and Assignment Procedures is appropriate in these cases. The Court therefore should have a sufficient basis to authorize the Debtors to reject or assume and assign contracts as will be set forth in the applicable purchase agreements.

## NOTICE

69.    No trustee or examiner has been appointed in the Debtors' chapter 11 cases. The Debtors have caused notice of this motion to be provided by electronic mail, facsimile, regular or overnight mail, and/or hand delivery to: (i) the Office of the United States Trustee for Region 2, Attn: Serene K. Nakano; (ii) the agent under the Debtors' post-petition debtor-in-possession financing and its counsel; (iii) the Committee and its counsel; (iv) counsel to the agents or

34

lenders under the Debtors' pre-petition credit facilities; (v) the U.S. Attorney's Office for the

Southern District of New York; (vi) the Internal Revenue Service; (vii) the United States

Securities and Exchange Commission; and (viii) all parties that have filed a request to receive

service of pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, the

Debtors respectfully submit that no further notice is necessary.

## CONCLUSION

WHEREFORE the Debtors respectfully request the Court (i) enter the Bidding

Procedures Order, (iii) after the Sale Hearing, enter the Sale Order and (iii) grant such other and

further relief as is just and proper.

Dated:  New York, New York      **AKIN GUMP STRAUSS HAUER & FELD LLP**
       October 28, 2016      By: _/s/ David H. Botter_

David H. Botter
One Bryant Park
New York, NY 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

Sarah Link Schultz (admitted *pro hac vice*)
Sarah J. Crow (admitted *pro hac vice*)
1700 Pacific Avenue, Suite 4100
Dallas, TX 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343

*Counsel to Debtors and Debtors in Possession*

208368594

**<u>Exhibit A to Sale Motion</u>**

**Bidding Procedures Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>INTERNATIONAL SHIPHOLDING<br>CORPORATION, *et al.*,[1]<br><br>　　　　　　　　　　Debtors. | Chapter 11<br><br>Case No. 16-12220 (SMB)<br><br>Jointly Administered |

## ORDER ESTABLISHING BIDDING PROCEDURES RELATING TO THE SALE THE DEBTORS' ASSETS IN THE SPECIALTY BUSINESS SEGMENT

Upon consideration of the motion of the debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors")[2] seeking entry of this order (the "Bidding Procedures Order") (i) approving the proposed auction and bidding procedures attached hereto as **Exhibit 1** (the "Bidding Procedures") by which the Debtors will solicit and select the highest or otherwise best offer for the sale of certain assets contained in the Debtors' Specialty Business Segment[3] (the "Assets") through one or more sales of the Assets (the "Sale Transaction"); (ii) establishing procedures for the assumption and assignment of executory contracts and unexpired leases, including notice of proposed cure amounts (the "Assumption and Assignment Procedures"); (iii) approving the form and manner of notice of all procedures, protections,

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: International Shipholding, Inc. (9662); Enterprise Ship Co. (9059); Sulphur Carriers, Inc. (8965); Central Gulf Lines, Inc. (8979); Coastal Carriers, Inc. (6278); Waterman Steamship Corporation (0640); N.W. Johnsen & Co., Inc. (8006); LMS Shipmanagement, Inc. (0660); U.S. United Ocean Services, LLC (1160); Mary Ann Hudson, LLC (8478); Sheila McDevitt, LLC (8380); Tower LLC (6755); Frascati Shops, Inc. (7875); Gulf South Shipping PTE LTD (8628); LCI Shipholdings, Inc. (8094); Dry Bulk Australia LTD (5383); Dry Bulk Americas LTD (6494); and Marco Shipping Company PTE LTD (4570). The service address for each of the above Debtors is 601 Poydras Street, Pan American Building, Suite 1850, New Orleans, Louisiana 70130.

[2] Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the motion or the Bidding Procedures, as applicable.

[3] The "Specialty Business Segment" is comprised of various contracts and agreements between Company affiliates and third parties, as well as certain notes receivable financing certain vessels owned by third parties, in each case relating to the Company's provision of logistical and seaborne transportation services in Southeast Asia and third party brokerage services related to these Southeast Asian operations.

schedules, and agreements described in the motion and attached thereto; (iv) scheduling (a) a date for an auction if the Debtors receive two or more timely and acceptable Qualified Bids for the Assets (the "<u>Auction</u>") and (b) a final hearing (the "<u>Sale Hearing</u>") to approve the Sale Transaction; and (v) granting related relief, all as more fully described in the motion; and it appearing that the relief requested is in the best interests of the Debtors' estates, their creditors, and other parties-in-interest; and it appearing that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that the motion is a core proceeding pursuant to 28 U.S.C. § 157; and adequate notice of the motion and opportunity for objection having been given, with no objections having been filed, or all objections having been resolved or overruled, as the case may be; and it appearing that no other notice need be given; and after a hearing on the motion  (the "<u>Bidding Procedures Hearing</u>")  being held; and after and due deliberation and sufficient cause therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The predicates for the relief granted herein are Bankruptcy Code sections 105, 363, and 365 and Bankruptcy Rules 2002, 6004, and 6006.  Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

B.     The legal and factual bases set forth in the motion establish just cause for the relief granted herein.  Entry of this Bidding Procedures Order is in the best interests of the Debtors and their respective estates, creditors, and all other parties-in-interest.

C.     The notice of the motion, the Bidding Procedures Hearing, and the proposed entry of this Bidding Procedures Order was adequate and sufficient under the circumstances of these chapter 11 cases, and such notice complied with all applicable requirements of the Bankruptcy

2

Code, the Bankruptcy Rules, and the Local Rules.  Accordingly, no further notice of the motion, the Bidding Procedures Hearing, or this Bidding Procedures Order is necessary or required.

D.      The Debtors have demonstrated a compelling and sound  business justification for the Court to grant the relief requested in the motion, including, without limitation, to (i) approve the Bidding Procedures; (ii) establish the Assumption and Assignment Procedures, (iii) approve the form and manner of notice of all procedures, protections, schedules, and agreements described in the motion and attached thereto, and (iv) schedule a date for the (a) Auction and (b) Sale Hearing; and (v) grant related relief as set forth herein.  Such compelling and sound business justification, which was set forth in the motion and on the record at the Bidding Procedures Hearing, is incorporated herein by reference and, among other things, forms the basis for the findings of fact and conclusions of law set forth herein.

E.      All objections to the relief requested in the motion that relate to the entry of the Bidding Procedures Order that have not been withdrawn, waived, or settled as announced to the Court at the Bidding Procedures Hearing or by stipulation filed with the Court are overruled except as otherwise set forth herein.

F.      The Bidding Procedures, substantially in the form attached hereto as **Exhibit 1** and incorporated herein by reference as if fully set forth in this Bidding Procedures Order, are fair, reasonable, and appropriate and represent the best method for maximizing the value of the Debtors' estates.

G.      The Cure Notice, substantially in the form attached to the motion as **Exhibit E** and incorporated herein by reference as if fully set forth in this Bidding Procedures Order, is appropriate and reasonably calculated to provide all interested parties with timely and proper

notice of the potential assumption and assignment of the Assigned Contracts in connection with the sale of the Assets and the related Cure Costs, and no other or further notice is required.

H.      The Sale Notice and the Publication Notice, substantially in the forms attached to the motion as **Exhibit F** and **Exhibit G**, respectively, and incorporated herein by reference as if fully set forth in this Bidding Procedures Order, are appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the sale of Assets, including the sale of Assets free and clear of all liens, claims, and encumbrances, the Sale Transaction, the Bidding Procedures, the Auction, and the Sale Hearing, and no other or further notice is required.

I.      The Post-Auction Notice, substantially in the form attached to the motion as **Exhibit H** and incorporated herein by reference as if fully set forth in this Bidding Procedures Order, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Successful Bidder, and no other or further notice is required.

J.      The findings of fact and conclusions of law herein constitute the Court's findings of fact and conclusions of law for the purposes of Bankruptcy Rule 7052, made applicable pursuant to Bankruptcy Rule 9014. To the extent any findings of facts are conclusions of law, they are adopted as such. To the extent any conclusions of law are findings of fact, they are adopted as such.

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.      The motion is granted as set forth herein.[4]

---

[4] Notwithstanding anything to the contrary herein, the consummation of any Sale Transaction is subject to entry of the Sale Order.

**A.    The Timeline for the Sale**

2.    The Debtors are authorized to proceed with the Sale Transaction in accordance with the Bidding Procedures and are authorized to take any and all actions reasonably necessary or appropriate to implement the Bidding Procedures in accordance with the following timeline:

| Deadline | Action |
|---|---|
| December 8, 2016 at 5:00 p.m. (prevailing Eastern Time) | Bid Deadline |
| December 15, 2016 at 10:00 a.m. (prevailing Eastern Time) | Auction |
| December ___, 2016 at _____ _.m (prevailing Eastern Time) | Sale Objection Deadline |
| December ___, 2016 at _____ _.m (prevailing Eastern Time) | Reply Deadline |
| December 20, 2016 at 10:00 a.m. (prevailing Eastern Time) | Sale Hearing |

3.    For the avoidance of doubt, the Debtors reserve the right, and are authorized to, modify the above timeline and the Bidding Procedures (the "Modifications") in accordance with the provisions of the Bidding Procedures; *provided, however*, that the Debtors shall consult with the Consultation Parties or, to the extent provided therein, the Bid Consultation Parties, with respect to any Modifications.

**B.    The Bidding Procedures**

4.    The Bidding Procedures are approved in their entirety.  The Debtors are authorized to take any and all actions reasonably necessary or appropriate to implement the Bidding Procedures in accordance therewith.  The failure to specifically include or reference a particular provision of the Bidding Procedures in this Order shall not diminish or impair the effectiveness of such provision.

5.    The Expense Reimbursement set forth in the Stalking Horse Agreement is approved.

5

6.      The process and requirements associated with submitting a Qualified Bid are approved as fair, reasonable, and appropriate and are designed to maximize recoveries for the benefit of the Debtors' estates, creditors, and other parties in interest.  As further described in the Bidding Procedures, the Bid Deadline shall be December 8, 2016 at 5:00 p.m. (prevailing Eastern Time).  Any disputes or objections to the selection of a Qualified Bid, Successful Bid, or Backup Bid (all as defined in the Bidding Procedures) shall be resolved by this Court at the Sale Hearing as set forth herein.

7.      The Debtors are authorized to conduct the Auction in accordance with the Bidding Procedures.  The Auction shall take place on December 15, 2016 at 10:00 a.m. (prevailing Eastern Time) at the offices of counsel for the Debtors, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036, or at such other place and time as the Debtors shall notify all Qualified Bidders and the Consultation Parties.

8.      The lenders under the Debtors' post-petition debtor-in-possession financing (the "<u>DIP Lenders</u>") and the lenders under the Debtors' pre-petition credit facilities (the "<u>Pre-Petition Lenders</u>") shall have the right, subject in all respects to the Bankruptcy Code and other applicable law, to credit bid all or any portion of their allowed secured claims pursuant to Bankruptcy Code section 363(k) or other applicable law, in accordance with the applicable provisions of the applicable debt documents.

**C.      Notice Procedures**

9.      The form of Sale Notice substantially in the form attached to the motion as **Exhibit F** is approved.

10.      On the Mailing Date or as soon as reasonably practicable thereafter, the Debtors shall serve the motion, the Stalking Horse Agreement, the Bidding Procedures Order, and the Bidding Procedures by first-class mail, postage prepaid, or courier service upon (a) all entities

known by the Debtors to have expressed an interest in a transaction with respect to all or part of the Assets within the past two years; (b) all entities known to have asserted any lien, claim, interest, or encumbrance in or upon any of the Assets; (c) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by this motion; (d) the Office of the United States Trustee for Region 2, Attn: Serene K. Nakano; (e) the agent under the Debtors' post-petition debtor-in-possession financing and its counsel; (f) the Committee and its counsel; (g) counsel to the agents and lenders under the Debtors' pre-petition credit facilities; (h) the U.S. Attorney's Office for the Southern District of New York; (i) the Internal Revenue Service; and (j) the Securities and Exchange Commission.

11.    In addition, on the Mailing Date or as soon as reasonably practicable thereafter, the Debtors shall serve by first-class mail, postage prepaid, or courier service the Sale Notice upon all other known creditors and equity interest holders of the Debtors.  Service of the Sale Notice as described above shall be sufficient and proper notice of the Sale Transaction with respect to known interested parties, including those creditors or other interested parties with a foreign address.

12.    The Publication Notice, substantially in the form attached to the motion as **Exhibit G**, is approved.  The Debtors are directed to publish the Sale Notice, as modified for publication, in *The Wall Street Journal* and *TradeWinds* on one occasion on the Mailing Date or as soon as reasonably practicable thereafter.  In addition, the Debtors are authorized, but not directed, to (i) publish the Sale Notice in additional publications as the Debtors deem appropriate and (ii) cause the Sale Notice to be posted on their Case Website.

13.    Service of the Publication Notice as described above shall be sufficient and proper notice of the Sale Transaction with respect to all unknown parties.

7

14.     The form of the Post-Auction Notice, substantially in the form attached to the motion as **Exhibit H** is approved.  As soon as reasonably practicable after the conclusion of the Auction, the Debtors shall file on the docket, but not serve, the Post-Auction Notice identifying any Successful Bidder.

**D.      Assumption and Assignment Procedures**

15.     The Assumption and Assignment Procedures, as detailed in the motion and incorporated herein by reference as if fully set forth in this Bidding Procedures Order, are approved.

16.     The Cure Notice, substantially in the form attached to the motion as **Exhibit E** is approved.

17.     On or before the Assumption and Assignment Service Date, the Debtors shall file with the Court, and post on the Case Website, the Cure Notice, substantially in the form attached to the motion as Exhibit E and, included therewith, a list that specifies (i) each of the Debtors' executory contracts and unexpired leases proposed to be assumed and assigned pursuant to the Sale Transaction (the "Assigned Contracts") and (ii) the proposed amount necessary, if any, to cure all monetary defaults, if any, under each Designated Contract (the "Cure Costs").  If no Cure Cost is listed, then the Debtors believe that there is no Cure Cost due to the counterparty.

18.     The Debtors shall serve on all non-Debtor counterparties to the Assigned Contracts, via first class mail, a customized version of the Cure Notice, which will not include the full list of Assigned Contracts, but which will include (a) instructions regarding how to view the full list on the Case Website, (b) information necessary and appropriate to provide notice of the proposed assumption and assignment of the relevant Assigned Contract, (c) Cure Costs, if any, and (d) the procedures for objecting thereto.  The Debtors shall serve, via first class mail, a generic version of the Cure Notice on the master service list prepared and maintained pursuant to

the *Order Establishing Certain Notice, Case Management, and Administrative Procedures* [ECF No. 178].

19.     Service of such Cure Notice as set forth herein shall be deemed proper, due, timely, good and sufficient notice of, among other things, the proposed assumption and assignment of the Assigned Contracts and rights thereunder, the Cure Costs, and the procedures for objecting thereto, and no other or further notice is necessary.

20.     Any objection by a counterparty to an Assigned Contract must (i) be in writing; (ii) state the basis for such objection; and (iii) state with specificity what cure amount the counterparty to the Assigned Contract believes is required (in all cases with appropriate documentation in support thereof).  All such objections must be filed and served on (i) Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Attn: David Botter, Esq., Email: dbotter@akingump.com, and Sarah Link Schultz, Esq., 1700 Pacific Avenue, Suite 4100, Dallas, Texas 75201, Email: sschultz@akingump.com, counsel for the Debtors; (ii) Pachulski Stang Ziehl & Jones LLP, 780 Third Avenue, 34th Floor, New York, NY 10017, Attn: Robert J. Feinstein, Esq., Email: rfeinstein@pszjlaw.com, and Bradford J. Sandler, Esq., Email: bsandler@pszjlaw.com, proposed counsel to the statutory committee of unsecured creditors; (iii) the Office of the United States Trustee for the Southern District of New York, U.S. Federal Office Building, 201 Varick St., Room 1006, New York, New York 10014, Attn: Serene Nakano, Esq., Email: serene.nakano@usdoj.gov; (iv) counsel to the agents and lenders under the Debtors' pre-petition credit facilities; (v) counsel to the agent under the Debtors' post-petition debtor-in-possession financing; (vi) the Internal Revenue Service; (vii) the United States Attorney for the Southern District of New York; (viii) the Securities and Exchange Commission; (ix) all parties that have filed a request to receive service of court filings pursuant to Bankruptcy

9

Rule 2002; (x) all other parties on the master service list prepared and maintained pursuant to the Order Establishing Certain Notice, Case Management, and Administrative Procedures [ECF No. 178]; and (xi) if known, any Successful Bidder, (collectively, the "Objection Recipients") no later than 4:00 p.m. (prevailing Eastern Time) fourteen (14) days following the service of the Cure Notice.

21.    If a counterparty to an Assigned Contract files an objection and the parties are unable to consensually resolve the dispute prior to the Sale Hearing, then the amount to be paid or reserved with respect to such objection will be determined either at the Sale Hearing, such later hearing date that the Debtors determine in their discretion, or such other date determined by this Court.

22.    Any time after the Assumption and Assignment Service Date and before the closing of a Sale Transaction, the Debtors reserve the right to supplement the list of Assigned Contracts in accordance with the definitive agreement for a Sale Transaction.

23.    In the event the Debtors supplement the list of Assigned Contracts, the Debtors shall promptly serve a Supplemental Cure Notice. The Supplemental Cure Notice will be served by electronic transmission, hand delivery, or overnight mail on the counterparty (and its attorney, if known) to each impacted Assigned Contract at the last known address available to the Debtors. Each Supplemental Cure Notice will include the same information with respect to listed Assigned Contracts as was included in the Cure Notice.

24.    Any counterparty to a Designated Contract listed on a Supplemental Cure Notice may file a Supplemental Designated Contract Objection if such objection is to the proposed assumption and assignment of the applicable Assigned Contract or the proposed Cure Costs, if any. All Supplemental Designated Contract Objections must (i) state, with specificity, the legal

and factual basis thereof as well as what Cure Costs the objecting party believes are required, if any, (ii) include appropriate documentation in support of the objection, and (iii) be filed and served on the Objection Recipients no later than fourteen days from the date of service of such Supplemental Cure Notice, which date will be set forth in the Supplemental Cure Notice.

25.    If a counterparty to an Assigned Contract files a Supplemental Designated Contract Objection and the parties are unable to consensually resolve the dispute, the Debtors will seek an expedited hearing before the Court (a "Supplemental Designated Contract Hearing") to determine the Cure Costs, if any, and approve the assumption of the relevant Designated Contracts.  If there is no such objection, then the Debtors will obtain an order of this Court, including by filing a certification of no objection, (a "Supplemental Designated Contract Order") fixing the Cure Costs and approving the assumption of any Designated Contract listed on a Supplemental Cure Notice.

26.    Absent the filing of a Designated Contract Objection or Supplemental Designated Contract Objection and a subsequent order of the Court establishing an alternative Cure Cost, the Cure Costs, if any, set forth in the Cure Notice shall be controlling, notwithstanding anything to the contrary in any Assigned Contract or any other document, and the counterparty to the Assigned Contract will be deemed to have consented to the assumption, assignment, and sale of the Assigned Contract and the Cure Costs, if any, and will be forever barred from asserting any other claims related to such Assigned Contract against the Debtors or the applicable Successful Bidder, or the property of any of them, except with respect to adequate assurance of future performance by such Successful Bidder.  For the avoidance of doubt, any objections to a Successful Bidder's proposed form of adequate assurance of future performance must be raised at the Sale Hearing or Supplemental Designated Contract Hearing, as applicable, and will be

resolved at the hearing at which it is raised or, in the Debtors' discretion, adjourned to a later hearing.

27.    The inclusion of an Assigned Contract on the Cure Notice will not (a) obligate either the Debtors to assume any Assigned Contract listed thereon or the Successful Bidder to take assignment of such Assigned Contract or (b) constitute any admission or agreement of the Debtors that such Assigned Contract is an "executory" contract.  Only those Assigned Contracts that are included on a schedule of assumed and assigned contracts attached to the final purchase agreement with the Successful Bidder upon closing (each, an "Acquired Contract") will be assumed and assigned to the Successful Bidder.

**E.    The Sale Hearing**

28.    A Sale Hearing to (i) approve a sale of the Assets to the Successful Bidder and (ii) authorize the assumption and assignment of certain executory contracts and unexpired leases shall be held on December 20, 2016 at 10:00 a.m. (prevailing Eastern Time) and may be adjourned or rescheduled without notice, subject to paragraph A.3 of this Order.  At the Sale Hearing, the Debtors will seek approval of the Successful Bid and the Back-Up Bid.  Unless this Court orders otherwise, the Sale Hearing shall be an evidentiary hearing on matters relating to the Sale Transaction.  In the event that the Successful Bidder cannot or refuses to consummate the Sale Transaction, the Debtors may, in accordance with the Bidding Procedures, designate the Back-Up Bid to be the new Successful Bid and the Back-Up Bidder to be the new Successful Bidder, and the Debtors shall be authorized, but not required, to consummate the applicable transaction with the Back-Up Bidder without further order of the Bankruptcy Court.

29.    Any and all objections, if any, to any Sale Transaction must be filed no later than December ___, 2016 at _____ _.m. (prevailing Eastern Time) (the "Sale Objection Deadline").  Any and all such objections must be served on the Objection Recipients and counsel to any

Successful Bidder, if known on the Sale Objection Deadline. All replies to such objections must be filed by December ___, 2016 at _____ _.m. (prevailing Eastern Time) (the "Reply Deadline").

**F.    Other Provisions**

30.    The Debtors are authorized and empowered to take such action as may be necessary to implement and effect the terms and requirements established under this Bidding Procedures Order.

31.    This Bidding Procedures Order shall be binding on and inure to the benefit of the Debtors, including any chapter 7 or chapter 11 trustee or other fiduciary appointed for the estates of the Debtors.

32.    This Bidding Procedures Order shall constitute the findings of fact and conclusions of law and shall take immediate effect upon execution hereof.

33.    To the extent this Bidding Procedures Order is inconsistent with any prior order or pleading with respect to the motion, the terms of this Bidding Procedures Order shall govern.

34.    To the extent any of the deadlines set forth in this Bidding Procedures Order do not comply with the Local Rules, such Local Rules are waived and the terms of this Bidding Procedures Order shall govern.

35.    Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 6006(d), 7062, 9014, or otherwise, this Court, for good cause shown, orders that the terms and conditions of this Bidding Procedures Order shall be immediately effective and enforceable upon its entry.

36.    This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Bidding Procedures Order, including, but not limited to, any matter, claim, or dispute arising from or relating to the Bidding Procedures, any Stalking Horse Agreement, and the implementation of this Bidding Procedures Order.

13

New York, New York
Dated: _____, 2016

_____
United States Bankruptcy Judge

**Exhibit B to Sale Motion and Exhibit 1 to Bidding Procedures Order**

**Bid Procedures**

# BIDDING PROCEDURES[1]

## Introduction

International Shipholding Corporation and its debtor subsidiaries (collectively, the "Debtors")[2] are debtors in possession in chapter 11 cases (jointly administered under Case No. 16-12220 (SMB)) pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

These procedures (the "Bidding Procedures") were approved by order of the Bankruptcy Court dated November [___], 2016 (the "Bidding Procedures Order"), pursuant to the motion of the Debtors for (a) an order (i) approving the Bidding Procedures, (ii) approving the form and manner of notice, (iii) scheduling an auction and sale hearing, and (iv) granting related relief; and (b) an order (i) approving the purchase and sale agreement (the "Stalking Horse Agreement") by and between certain of the Debtor entities and J Line Corporation (the "Stalking Horse Purchaser") for the acquisition of the assets that comprise the Debtors' specialty business segment and described in the Stalking Horse Agreement, (ii) approving bid protections in favor of the Stalking Horse Purchaser, (iii) authorizing the sale of Debtor owned assets free and clear of liens, claims, and encumbrances (other than those permitted by the purchase agreement submitted by the prevailing purchaser) and (iv) granting related relief.

## Bidding Procedures

The Bidding Procedures set forth herein describe, among other things, the Assets (as defined below) available for sale, the manner in which prospective bidders may gain access to or continue to have access to due diligence materials concerning the Assets, the manner in which bidders and bids become Qualified Bidders (as defined below) and Qualified Bids (as defined below), respectively, the receipt and negotiation of bids received, the conduct of any Auction (as defined below), and the Bankruptcy Court's approval thereof (the "Bidding Process").

## Assets to be Sold

The Debtors are offering for sale, in one or more value maximizing transactions, those assets that comprise the Debtors' specialty business segment that are described in the Stalking Horse Agreement (including the stock of certain non-Debtor subsidiaries that is owned by the Debtors (collectively, the "Assets").

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Debtors' Motion for (I) an Order Establishing Bidding Procedures and Granting Related Relief and (II) an Order or Orders Approving the Sale of the Specialty Business Assets* (the "Sale Motion") or in the Stalking Horse Agreement, as applicable.

[2] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: International Shipholding, Inc. (9662); Enterprise Ship Co. (9059); Sulphur Carriers, Inc. (8965); Central Gulf Lines, Inc. (8979); Coastal Carriers, Inc. (6278); Waterman Steamship Corporation (0640); N.W. Johnsen & Co., Inc. (8006); LMS Shipmanagement, Inc. (0660);  U.S. United Ocean Services, LLC (1160); Mary Ann Hudson, LLC (8478); Sheila McDevitt, LLC (8380);  Tower LLC (6755); Frascati Shops, Inc. (7875); Gulf South Shipping PTE LTD (8628); LCI Shipholdings, Inc. (8094);  Dry Bulk Australia LTD (5383); Dry Bulk Americas LTD (6494); and Marco Shipping Company PTE LTD (4570).  The service address for each of the above Debtors is 601 Poydras Street, Pan American Building, Suite 1850, New Orleans, Louisiana 70130.

## Key Dates

These Bidding Procedures provide interested parties with the opportunity to complete diligence, to submit competing bids for all or a portion of the Assets, and to participate in an auction to be conducted by the Debtors (the "<u>Auction</u>").

The key dates for the sale process are as follows:

| | |
|---|---|
| December 8, 2016 at 5:00 p.m. (prevailing Eastern Time) | Bid Deadline |
| December 15, 2016 at 10:00 a.m. (prevailing Eastern Time) | Auction |
| December 20, 2016 at 10:00 a.m. (prevailing Eastern Time) | Sale Hearing |

## Access to Debtors' Diligence Materials

To receive access to due diligence materials and to participate in the bidding process, an interested party must submit to the Debtors and their advisors (i) if one does not already exist between the parties, an executed confidentiality agreement in form and substance satisfactory to the Debtors (which, for the avoidance of doubt, may be substantially in the form attached hereto as **Exhibit 2**), (ii) sufficient information, as determined by the Debtors, that the interested party has, or can obtain, the financial wherewithal to consummate a sale transaction for the Assets, and (iv) a non-binding written indication of interest identifying the Assets the party is interested in purchasing.

A party that the Debtors determine, in their reasonable discretion, satisfies the requirements set forth in the immediately preceding sentence for receiving access to diligence materials shall be a "<u>Diligence Party</u>." As promptly as practicable after the Debtors determine that a party is a Diligence Party, the Debtors will deliver to the Diligence Party access to the Debtors' confidential electronic data room and/or such other access to diligence materials as the Debtors reasonably determine to be appropriate under the circumstances. The Debtors will afford any Diligence Party the time and opportunity to conduct due diligence before the Bid Deadline (as defined below). Notwithstanding the foregoing, the Debtors reserve the right, in an excise of their fiduciary duties and to maximize value, to withhold any diligence materials that the Debtors determine are sensitive or otherwise not appropriate for disclosure to a Diligence Party who the Debtors determine is a competitor of the Debtors or is affiliated with any competitor of the Debtors. The Debtors and/or their representatives shall not be obligated to furnish information of any kind whatsoever to any person that is not determined to be a Diligence Party. The Debtors shall update the Consultation Parties periodically regarding the identity of parties that have been designated as Diligence Parties and of any determination that an interested party is not a Diligence Party.

All due diligence requests must be directed to the Debtors' investment banker, Blackhill Partners, LLC, attention: Matt Denny (dennym@bhpllc.com).

Each Diligence Party and Qualified Bidder (as defined below) shall comply with all reasonable requests for additional information and due diligence access by the Debtors or their

2

advisors regarding such Bidder and its contemplated transaction. Failure by a Diligence Party to comply with requests for additional information and due diligence access may be a basis for the Debtors to determine, in consultation with the Consultation Parties, that such bidder is not a Qualified Bidder. Failure by a Qualified Bidder to comply with requests for additional information and due diligence access may be a basis for the Debtors to determine, in consultation with the Consultation Parties, that a bid made by such Qualified Bidder is not a Qualified Bid. The Debtors reserve the right, in an exercise of their fiduciary duties and to maximize value, in consultation with the Consultation Parties, to permit a Diligence Party or Qualified Bidder to remedy any such failure to comply.

## Auction Qualification Process

To be eligible to participate in the Auction, each offer or proposal (each, a "Bid"), and each party submitting such a Bid (each, a "Bidder") must satisfy each of the conditions set forth below, as determined by the Debtors. A Bid will not be considered qualified for the Auction if such Bid does not satisfy each of the following conditions:

(a)    Good Faith Deposit: Except as set forth herein, each Bid for all or substantially all of the Assets must be accompanied by a deposit (a "Good Faith Deposit") submitted by wire transfer of immediately available funds to an account identified by the Debtors. Each Good Faith Deposit must equal in the case of a Bid for all or substantially all of the Assets, the amount of ten percent (10%) of the purchase price contained in the Modified Stalking Horse Agreement (as defined below).

(b)    Bids for Portions of the Assets: A Bid must offer to purchase all or substantially all of the Assets.

(c)    Same or Better Terms: Each subsequent Bid for all or substantially all of the Assets must be on terms that, in the Debtors' business judgment, in consultation with the Bid Consultation Parties (as defined below), are the same or better than the terms of the Stalking Horse Agreement.

(d)    Executed Agreement: Each Bid must be based on the Stalking Horse Agreement and must include executed transaction documents, including the revised Stalking Horse Agreement, signed by an authorized representative of such Bidder, pursuant to which the Bidder proposes to effectuate an Alternate Transaction (the "Modified Stalking Horse Agreement"), and a blackline copy of the applicable Modified Stalking Horse Agreement marked against the Stalking Horse Agreement to show all changes requested by the Bidder (including those related to purchase price).

(e)    Designation of Assigned Contracts and Leases, Payment of Cure Amounts: A Bid must identify any and all executory contracts and unexpired leases of the Debtors that the Bidder wishes to have assumed and assigned and, if applicable, non-Debtors to be assigned to it at closing and provide for the payment of all cure amounts payable with respect to such contracts and leases under the Bankruptcy Code.

(f)     Corporate Authority:  A Bid must include written evidence reasonably acceptable to the Debtors, in their business judgment, demonstrating appropriate corporate authorization to consummate the proposed Alternate Transaction, *provided* that, if the Bidder is an entity specially formed for the purpose of effectuating the Alternate Transaction, then the Bidder must furnish written evidence reasonably acceptable to the Debtors of the approval of the Alternate Transaction by the equity holder(s) of such Bidder.

(g)     Disclosure of Identity of Bidder:  A Bid must fully disclose the identity of each entity that will be bidding for or purchasing the Assets or otherwise participating in connection with such Bid (including any equity holder or other financial backer if the Bidder is an entity specially formed for the purpose of effectuating the Alternate Transaction), and the complete terms of any such participation, including any binding agreements, arrangements, or understandings concerning a collaborative or joint bid or any other combination concerning the proposed Bid.

(h)     Proof of Financial Ability to Perform:  A Bid must include written evidence that the Debtors reasonably conclude in their business judgment, in consultation with their advisors and the Bid Consultation Parties, demonstrates that the Bidder has the necessary financial ability to (i) close the Alternate Transaction and (ii) provide adequate assurance of future performance under all contracts to be assumed and assigned in such Alternate Transaction.  Such information must include, *inter alia*, the following:

    (1)     contact names and numbers for verification of financing sources;

    (2)     evidence of the Bidder's internal resources and proof of unconditional debt funding commitments from a recognized financial institution and, if applicable, equity commitments in an aggregate amount equal to the cash portion of such Bid (including, if applicable, the Bidder's payment of cure amounts) or the posting of an irrevocable letter of credit from a recognized banking institution issued in favor of the Debtors in such amount, in each case, as are needed to close the Alternate Transaction;

    (3)     the Bidder's current financial statements (audited if they exist) or other similar financial information reasonably acceptable to the Debtors;

    (4)     a description of the Bidder's pro forma capital structure; and

    (5)     any such other form of financial disclosure or credit-quality support information or enhancement reasonably requested by the Debtors, in consultation with the Bid Consultation Parties, demonstrating that such Bidder has the ability and financial wherewithal to close the Alternate Transaction.

(i)     Regulatory and Third Party Approvals:  A Bid must set forth each regulatory and third-party approval required for the Bidder to consummate the Alternate Transaction, if any, and the time period within which the Bidder expects to receive such regulatory and third-party approvals (and if receipt of any such regulatory or third-party approval is expected to take more than thirty (30) days

4

following execution and delivery of the Modified Stalking Horse Agreement, those actions the Bidder will take to ensure receipt of such approval(s) as promptly as possible).

(j)    <u>Contingencies</u>:  Bids may not be conditioned on obtaining financing or any internal approval, or on the outcome or review of due diligence.

(k)    <u>Irrevocable</u>:  Bids must expressly provide that (1) the Bidder is prepared to consummate the transaction set forth in the Modified Stalking Horse Agreement promptly following entry of the Sale Order and satisfaction of the closing conditions (if any) set forth in the Modified Stalking Horse Agreement, and (2) the offer reflected in such Bid shall remain open and irrevocable until the conclusion of the Auction, *provided* that if such Bid is accepted as the Successful Bid or the Backup Bid (each as defined herein), such Bid shall continue to remain open and irrevocable as provided under "Closing the Auction; Successful Bidder" and "Backup Bidder" below.

(l)    <u>Bid Deadline</u>:  Each Bid must be received by each of the following parties, in writing, on or before December 8, 2016 at 5:00 p.m. (prevailing Eastern Time) or such earlier date as may be designated by the Debtors in consultation with the Consultation Parties (the "<u>Bid Deadline</u>"): (1) the Debtors, International Shipholding Corporation, 601 Poydras Street, Pan American Building, Suite 1850, New Orleans, Louisiana 70130, Attn: Manny Estrada, CFO (estradm@intship.com); (2) counsel for the Debtors, Akin Gump Strauss Hauer & Feld LLP, 1333 New Hampshire Avenue N.W., Washington, D.C. 20036, Attn: J. Robertson Clarke, Esq. (rclarke@akingump.com); (3) investment banker for the Debtors, Blackhill Partners, LLC, 2651 North Harwood Street, Suite 120, Dallas, Texas 75201, Attn: Matt Denny (dennym@bhpllc.com); (4) counsel for the official committee of unsecured creditors of the Debtors (the "<u>Creditors' Committee</u>"), Pachulski Stang Ziehl & Jones LLP, 780 Third Avenue, 34th Floor, New York, New York 10017, Attn: Robert J. Feinstein, Esq. (rfeinstein@pszjlaw.com) and Bradford J. Sandler, Esq. (bsandler@pszjlaw.com); (5) counsel for the DIP Agent, Milbank, Tweed, Hadley & McCloy LLP, 28 Liberty Street, New York, New York 10005, Attn: Evan R. Fleck, Esq. (EFleck@milbank.com) and Nelly Almeida, Esq. (NAlmeida@milbank.com); (6) counsel for DVB Bank SE, Seward & Kissel LLP, One Battery Park Plaza, New York, New York 10004, Attn: John R. Ashmead, Esq. (ashmead@sewkis.com) and Robert J. Gayda, Esq. (gayda@sewkis.com); (7) counsel for Regions Bank, Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, NY 10017, Attn: Steven M. Fuhrman, Esq. (sfuhrman@stblaw.com) and Moore & Van Allen PLLC, 100 North Tryon Street, Suite 4700, Charlotte, North Carolina 28202, Attn: David S. Walls, Esq. (davidwalls@mvalaw.com); (8) counsel for Capital One, National Association, McGlinchey Stafford, 112 West 34th Street, Suite 1515, New York, New York 10120, Attn: Deborah A. Reperowitz, Esq. (dreperowitz@mcglinchey.com) and McGlinchey Stafford, 301 Main Street, Suite 1400, Baton Rouge, Louisiana 70801, Attn: E. Stewart Spielman, Esq. (sspielman@mcglinchey.com); and (9) counsel for Citizens Asset Finance, Inc.,

5

Vedder Price, 1633 Broadway, 47th Floor, New York, New York 10019, Attn: Michael J. Edelman, Esq. (mjedelman@vedderprice.com) and Vedder Price, 222 North LaSalle Street, Chicago, Illinois 60601, Attn: Douglas J. Lipke, Esq. (dlipke@vedderprice.com) ((1)-(9), collectively, the "Bid Notice Parties").

A Bid received from a Bidder on or before the Bid Deadline that the Debtors determine, in consultation with the Bid Consultation Parties, meets the requirements set forth above for the applicable Assets shall constitute a "Qualified Bid" for such Assets, and such Bidder shall constitute a "Qualified Bidder" for such Assets.

### Highest or Otherwise Best Bid

Whenever these Bidding Procedures refer to the highest or otherwise best Qualified Bid, such determination shall take into account any factors the Debtors, in their business judgment and in consultation with the Bid Consultation Parties, reasonably deem relevant to the value of the Qualified Bid to the estates and may include, but are not limited to, the following: (i) the amount and nature of the consideration, including any Assumed Liabilities and Permitted Liens (each as defined in the Stalking Horse Agreement); (ii) the number, type, and nature of any changes to the Stalking Horse Agreement requested by each Qualified Bidder; (iii) the extent to which such modifications are likely to delay closing of the sale of the Assets and the cost to the Debtors of such modifications or delay; (iv) the likelihood of the Qualified Bidder being able to close the proposed transaction (including obtaining any required regulatory approvals) and the timing thereof; (v) the net benefit to the Debtors' estates including, after taking into consideration any bidding protections; and (vi) any other facts that the Debtors may reasonably deem relevant (collectively, the "Bid Assessment Criteria").

### Auction

If one or more Qualified Bids for Assets are received by the Bid Deadline, the Debtors will conduct the Auction to determine the highest or otherwise best Qualified Bid for the Assets. If only one (1) Qualified Bid is received by the Bid Deadline, the Debtors shall not conduct the Auction with respect to such Assets.

### Procedures for Auction

The Auction shall take place on December 15, 2016 at 10:00 a.m. (prevailing Eastern Time) at the offices of counsel for the Debtors, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, or such other place and time as the Debtors shall notify all Qualified Bidders and the Consultation Parties. The Auction shall be conducted according to the procedures set forth herein.

Only the Debtors, the Consultation Parties, the Stalking Horse Bidder, any other Qualified Bidders, and/or other party that the Debtors may determine to include in their discretion, in each case along with their representatives and advisors, shall be entitled to attend the Auction (such attendance to be in person) (collectively, the "Auction Participants") and only Qualified Bidders will be entitled to make any Overbids (as defined below) at the Auction. If a party other than those listed above would like to attend the Auction, such party shall make a request to attend the Auction in writing (which writing may be in the form of an electronic mail)

6

and serve such request on the Debtors no later than 12:00 p.m. (prevailing Eastern Time) two business days prior to the date of the Auction.

### The Debtors Shall Conduct the Auction.

The Debtors and their advisors shall direct and preside over the Auction, which shall be transcribed. Other than as expressly set forth herein, the Debtors (in consultation with the Consultation Parties or, to the extent provided herein, the Bid Consultation Parties) may conduct the Auction in the manner they determine will result in the highest or otherwise best offer for any of the Assets. The Debtors shall use their best efforts to, at least twenty-four (24) hours prior to commencement of the Auction, provide the Consultation Parties and each Qualified Bidder participating in the Auction with a copy of the Modified Stalking Horse Agreement, as determined by the Debtors in consultation with the Bid Consultation Parties (such highest or otherwise best Qualified Bid, the "Auction Baseline Bid"). At the start of the Auction, each Qualified Bidder participating in the Auction must confirm that (a) it has not engaged in any collusion with respect to the bidding or sale of the Assets, (b) it has reviewed, understands, and accepts the Bidding Procedures, (c) it has consented to the core jurisdiction of the Bankruptcy Court (as described more fully below), and (d) its Qualified Bid is a good faith *bona fide* offer that it intends to consummate if selected as the Successful Bidder.

### Credit Bidding.

The applicable Pre-petition Lenders and the DIP Lenders shall have the right, subject in all respects to the Bankruptcy Code and other applicable law, to credit bid all or any portion of their allowed claims secured by the Assets at the Auction pursuant to Bankruptcy Code section 363(k) or other applicable law, in accordance with the applicable provisions of the applicable debt documents. Such secured creditors shall each be a Qualified Bidder to the extent that such creditors otherwise comply with the requirements set forth herein and the Bankruptcy Code, *provided*, *however*, that the secured creditors shall not be required to submit a Good Faith Deposit as part of a credit bid.

### Terms of Overbids.

An "Overbid" is any bid made at the Auction, in accordance with the requirements set forth herein, subsequent to the Debtors' announcement of the respective Auction Baseline Bid. To submit an Overbid for purposes of this Auction, a Bidder must comply with the following conditions:

(a)    Minimum Overbid Increments:  The initial Overbid for the Assets shall provide for total consideration for the Assets with a value that exceeds the value of the consideration under the Auction Baseline Bid an incremental amount that is not less than the sum of (x) $500,000 (the "Minimum Overbid Increment") plus (y) $500,000 which is equal to the value of the Bid Protections under the Stalking Horse Agreement, and each successive Overbid shall exceed the then-existing Overbid by an incremental amount that is not less than the Minimum Overbid Increment.  The Debtors reserve the right, in consultation with the Bid Consultation Parties, to announce reductions or increases in any Minimum Overbid Increment at any time during the Auction.  Additional consideration in

excess of the amount set forth in the respective Auction Baseline Bid may include cash and/or non-cash consideration, *provided, however,* that the value for such non-cash consideration shall be determined by the Debtors in their business judgment and in consultation with the Bid Consultation Parties

(b)    <u>Remaining Terms Are the Same as for Qualified Bids</u>:  Except as modified herein, an Overbid at the Auction must comply with the conditions for a Qualified Bid set forth above, *provided*, *however*, that the Bid Deadline shall not apply.   Any Overbid must include, in addition to the amount and the form of consideration of the Overbid, a description of all changes requested by the Bidder to the Stalking Horse Agreement, Modified Stalking Horse Agreement, as the case may be, in connection therewith.   For the avoidance of doubt, any Overbid shall be irrevocable and shall remain open and binding on the Bidder in accordance with these Bidding Procedures and the conditions for a Qualified Bid.

At the Debtors' discretion, to the extent not previously provided a Bidder submitting an Overbid at the Auction must submit, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors), as the Debtors, in their reasonable business judgment in consultation with the Bid Consultation Parties, may request, demonstrating such Bidder's ability to consummate the Alternate Transaction proposed by such Overbid.

***Announcement and Consideration of Overbids.***

(a)    <u>Announcement of Overbids</u>:  A Bidder submitting an Overbid at the Auction shall announce at the Auction the material terms of such Overbid, including the total amount and type of consideration offered in such Overbid.

(b)    <u>Consideration of Overbids</u>:  The Debtors reserve the right, in their reasonable business judgment and in consultation with the Bid Consultation Parties, to make one or more continuances of the Auction to, among other things:   facilitate discussions between the Debtors and individual Qualified Bidders;  allow individual Qualified Bidders to consider how they wish to proceed; and give Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment and in consultation with the Bid Consultation Parties, may require, that the Qualified Bidder has sufficient internal resources, or has received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed Alternate Transaction at the prevailing Overbid amount.

***Additional Procedures.***

The Debtors, in consultation with the Bid Consultation Parties, in the exercise of their fiduciary duties for the purpose of maximizing value for their estates from the sale process, may make non-material modifications to the Bidding Procedures and implement additional procedural rules for conducting the Auction.  Specifically, among other things, the Debtors, in consultation with the Bid Consultation Parties, may determine to select more than one Successful Bid and

more than one Successful Bidder (and/or more than one Backup Bid and more than one Backup Bidder, in which event such Backup Bids may provide for groupings of Assets that are different from the groupings of Assets reflected in the Successful Bid(s)) for separate portions of the Assets.

### Consent to Jurisdiction as Condition to Bidding.

All Qualified Bidders shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court to enter an order or orders, which shall be binding in all respects, in any way related to the Debtors, their chapter 11 cases, the Bidding Procedures, the Stalking Horse Agreement, the Auction, or the construction and enforcement of documents relating to any Alternate Transaction and waived any right to a jury trial in connection with any disputes relating to the Debtors, their chapter 11 cases, the Bidding Procedures, the Stalking Horse Agreement, the Auction, or the construction and enforcement of documents relating to any Alternate Transaction.

### Sale Is As Is/Where Is.

Any of the Assets sold pursuant to the Bidding Procedures shall be sold free and clear of all liens, claims, and encumbrances as permitted by Bankruptcy Code section 363(f) other than any Assumed Liabilities and Permitted Liens and conveyed at Closing in their then-present condition, "**AS IS, WHERE IS, WITH ALL FAULTS, AND WITHOUT ANY WARRANTY WHATSOEVER, EXPRESS OR IMPLIED**", and without surviving representations or warranties of any kind, nature, or description by the Debtors, their agents or estates, except to the extent set forth in the definitive agreement(s) for the Successful Bid(s), if applicable.

### Closing the Auction; Successful Bidder.

The Auction shall continue until there is only one Qualified Bid for the Assets, which Qualified Bid the Debtors determine in their reasonable business judgment, in consultation with the Bid Consultation Parties, is the highest or otherwise best Qualified Bid at the Auction for the Assets. Thereafter, the Debtors shall select such Qualified Bid(s), in consultation with the Bid Consultation Parties, as the overall highest or otherwise best Qualified Bid for the Assets (such Bid, the "Successful Bid," and the Bidder submitting such Successful Bid, the "Successful Bidder").

The Auction shall close when the Successful Bidder(s) submits fully executed sale and transaction documents, memorializing the terms of the Successful Bid(s).

Promptly following the Debtors' selection of the Successful Bid(s) and the conclusion of the Auction, the Debtors shall announce the Successful Bid(s) and Successful Bidder(s) and shall file with the Bankruptcy Court notice of the Successful Bid(s) and Successful Bidder(s).

The Debtors shall not consider any Bids submitted after the conclusion of the Auction. The Successful Bidder(s) shall be required to keep the Successful Bid(s) open and irrevocable until the closing of the transactions contemplated thereby.

***Backup Bidder.***

Notwithstanding anything in the Bidding Procedures to the contrary, the Qualified Bid for the Assets that the Debtors determine in their reasonable business judgment, in consultation with the Bid Consultation Parties, is the next highest or otherwise best Qualified Bid at the Auction for the Assets after the Successful Bid, will be designated as the "Backup Bid" and the Bidder submitting such Backup Bid, the "Backup Bidder." The Backup Bidder shall be required to keep the Backup Bid open and irrevocable until the earlier of 5:00 p.m. (prevailing Eastern Time) on the date that is [_____] days after the date of entry of the Sale Order (the "Outside Backup Date") or the closing of the transaction with the Successful Bidder (defined herein).

Following entry of a Sale Order, if a Successful Bidder for any business segment of the Assets fails to consummate its Successful Bid, the Debtors may, in consultation with the Bid Consultation Parties, designate the Backup Bid to be the new Successful Bid and the Backup Bidder to be the new Successful Bidder for the applicable business segment of the Assets, and the Debtors will be authorized, but not required, to consummate the transaction with the Backup Bidder without further order of the Bankruptcy Court. In such case of a breach or failure to perform on the part of the Successful Bidder, the defaulting Successful Bidder's deposit shall be forfeited to the Debtors. The Debtors specifically reserve the right to seek all available damages, including specific performance, from any defaulting Successful Bidder (including any Backup Bidder designated as a Successful Bidder) in accordance with the terms of the Bidding Procedures.

## Return of Good Faith Deposits

The Good Faith Deposits of all Qualified Bidders shall be held in escrow in one or more accounts, and shall not become property of the Debtors' estates; *provided*, *however*, that the Good Faith Deposit of any Successful Bidder (including any Backup Bidder that becomes a Successful Bidder) may be forfeited to the Debtors or credited towards the purchase price set forth in the Successful Bid, in either case as provided in these Bidding Procedures. The Good Faith Deposit of any Qualified Bidder that is neither the Successful Bidder nor the Backup Bidder shall be returned to such Qualified Bidder not later than seven (7) days after the Sale Hearing. The Good Faith Deposit of the Backup Bidder, if any, shall be returned to the Backup Bidder not later than three (3) business days after (i) the closing of the transaction with the Successful Bidder (defined herein) for the Assets and (ii) the Outside Backup Date; *provided, however*, that if the Back-up Bid becomes the Successful Bid as provided herein, any subsequent breach or failure to perform by the Back-up Bidder may result in the forfeit of the Good Faith Deposit of the Back-up Bidder to the Debtors. Upon the return of the Good Faith Deposits, their respective owners shall receive any and all interest that may have accrued thereon. If the Successful Bidder consummates the Successful Bid, its Good Faith Deposit shall be credited towards the purchase price set forth in the Successful Bid.

## The Consultation Parties

The Debtors will consult with the DIP Agent and the DIP Lenders, each as provided for under the Debtor-in-Possession Credit Agreement (as amended from time to time), the applicable pre-petition lenders secured by the Assets, and the Creditors' Committee (collectively, the "Consultation Parties" and each, a "Consultation Party") as explicitly provided for in these

Bidding Procedures; *provided, however*, that, in certain circumstances as set forth in these Bidding Procedures, the Debtors shall consult only with the Bid Consultation Parties (as defined below).  The "Bid Consultation Parties" shall be all Consultation Parties (and their advisors) other than any Consultation Party (and its advisors) that submits a Bid or has a Bid submitted on its behalf for so long as such Bid remains open.  For the avoidance of doubt, the Debtors' obligation to consult with the Consultation Parties may, in the Debtors' discretion and in an exercise of their reasonable business judgment, be met by (i) consultation solely with the respective advisors to each of the Consultation Parties, as set forth in "Auction Qualification Process – Bid Deadline" above (collectively, the "Consultation Party Advisors"); or (ii) consultation with each of the Consultation Parties and their Consultation Party Advisors at the same time or in separate communications; for the further avoidance of doubt, nothing contained herein shall be construed to alter or diminish the Asset Sale consent rights provided for under section 8.9 of the Debtor-in-Possession Credit Agreement (as amended from time to time); *provided*, *however*, that to the extent the lenders under the Debtor-in-Possession Credit Agreement becomes a Bidder, such lender shall not have the right to exercise such consent rights.

## Reservation of Rights of the Debtors

Except as otherwise provided in the Stalking Horse Agreement, these Bidding Procedures or the Bidding Procedures Order, the Debtors further reserve the right, in their reasonable business judgment in consultation with the Consultation Parties or, to the extent provided herein, the Bid Consultation Parties to:  (i) determine which bidders are Qualified Bidders; (ii) determine which Bids are Qualified Bids; (iii) determine which Qualified Bid is the highest or otherwise best proposal and which is the next highest or otherwise best proposal in accordance with the Bid Assessment Criteria; (iv) reject, at any time prior to the closing of the Auction or, if no Auction is held, at any time prior to entry of the Sale Order, any Bid that is (a) inadequate or insufficient, (b) not in conformity with the requirements of these Bidding Procedures or the requirements of the Bankruptcy Code, or (c) contrary to the best interests of the Debtors and their estates; (v) waive terms and conditions set forth herein with respect to all potential bidders; (vi) impose additional terms and conditions; (vii) extend the deadlines set forth herein; (viii) continue or cancel the Auction and/or Sale Hearing in open court, or by filing a notice on the docket of the Debtors' chapter 11 cases, without further notice; (ix) include any other party as a Consultation Party and attendee at the Auction; and (x) modify the Bidding Procedures and implement additional procedural rules for conducting the Auction so long as such rules are not inconsistent in any material respect with the Bankruptcy Code, if applicable, the Bidding Procedures Order, or any other order of the Court.

11

## **Exhibit 1**

**Stalking Horse Agreement**

**<u>Exhibit 2</u>**

**Confidentiality Agreement**

**To be filed prior to hearing on Bidding Procedures**

**Exhibit C to Sale Motion**

**Sale Order**

**Subject to Revision in All Respects**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) ) ) |
| | Chapter 11 |
| INTERNATIONAL SHIPHOLDING CORPORATION, *et al.*,[1] | Case No. 16-12220 (SMB) |
| Debtors. | Jointly Administered |

## ORDER APPROVING THE SALE OF THE
## SPECIALTY BUSINESS ASSETS TO J LINE CORPORATION

Upon consideration of the motion of the debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors") seeking entry of this order (the "Sale Order"),[2] (i) authorizing the sale of the Specialty Business Assets to J Line Corporation free and clear of liens, claims, interests, and encumbrances; (ii) authorizing the assumption and assignment of certain executory contracts and unexpired leases; and (iii) granting related relief, all as more fully described in the motion; and it appearing that the relief requested is in the best interests of the Debtors' estates, their creditors, and other parties-in-interest; and it appearing that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that the motion is a core proceeding pursuant to 28 U.S.C. § 157; and adequate notice of the motion and opportunity for objection having been given, and all objections having been

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: International Shipholding, Inc. (9662); Enterprise Ship Co. (9059); Sulphur Carriers, Inc. (8965); Central Gulf Lines, Inc. (8979); Coastal Carriers, Inc. (6278); Waterman Steamship Corporation (0640); N.W. Johnsen & Co., Inc. (8006); LMS Shipmanagement, Inc. (0660); U.S. United Ocean Services, LLC (1160); Mary Ann Hudson, LLC (8478); Sheila McDevitt, LLC (8380); Tower LLC (6755); Frascati Shops, Inc. (7875); Gulf South Shipping PTE LTD (8628); LCI Shipholdings, Inc. (8094); Dry Bulk Australia LTD (5383); Dry Bulk Americas LTD (6494); and Marco Shipping Company PTE LTD (4570). The service address for each of the above Debtors is 601 Poydras Street, Pan American Building, Suite 1850, New Orleans, Louisiana 70130.

[2] Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the motion, the the Bidding Procedures Order, or the Asset Purchase Agreement (as defined herein), as applicable.

resolved or overruled, as the case may be; and it appearing that no other notice need be given; and after due deliberation and sufficient cause therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.      **Jurisdiction, Core Proceeding, Statutory Predicates, and Venue.**  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States Southern District of New York*, dated as of January 31, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The predicates for the relief granted herein are Bankruptcy Code sections 105, 363, and 365, Bankruptcy Rules 2002, 6004, and 6006, and Local Rule 6004-1 (including the Guidelines for the Conduct of Asset Sales (the "Sale Guidelines") referenced therein).  Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      **Just Cause.**  The legal and factual bases set forth in the motion establish just cause for the relief granted herein.  Entry of this Sale Order is in the best interests of the Debtors and their respective estates, creditors, and all other parties-in-interest.

C.      **Notice.**  The notice of the motion, the Sale Hearing, and the proposed entry of this Sale Order was adequate and sufficient under the circumstances of these chapter 11 cases, and such notice complied with all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.  A reasonable opportunity to object or be heard regarding the relief granted by this Sale Order has been afforded to those parties entitled to notice pursuant to the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.  Accordingly, no further notice of the motion, the Sale Hearing, or this Sale Order is necessary or required.

D.      Actual written notice of the motion, the Bidding Procedures, the [November 10, 2016] hearing on the motion regarding the Bidding Procedures, the Auction, the Sale Hearing,

the Assumption and Assignment Procedures, the proposed Cure Costs, the Sale Transaction, and all transactions contemplated therein or in connection therewith, and all deadlines related thereto has been given to all interested persons and entities, including, without limitation: (i) all entities that assert any Interest (as defined below) in the Assets; (ii) all parties to the Assigned Contracts (as defined herein) assumed and sold and assigned or rejected pursuant to this Sale Order; (iii) all governmental taxing authorities that have or as a result of the sale of the Assets may have claims, contingent or otherwise, against the Debtors; (iv) all federal, state, and local taxing authorities having jurisdiction over any of the Assets, including the Internal Revenue Service; (v) all federal, state, and local environmental agencies in any jurisdiction where Assets are located, including the Environmental Protection Agency; (vii) the Office of the United States Trustee for Region 2; (viii) the agent under the Debtors' post-petition debtor-in-possession financing and its counsel; (ix) the Committee and its counsel; (x) counsel to the agents or lenders under the Debtors' pre-petition credit facilities; (xi) the U.S. Attorney's Office for the Southern District of New York; (xii) the United States Securities and Exchange Commission; (xiii) all parties that filed requests for notices under Bankruptcy Rule 9010(b) or were entitled to notice under Bankruptcy Rule 2002; (xiv) all known creditors (whether liquidated, contingent or unmatured) and equity interest holders of the Debtors; (xv) all interested governmental, pension, environmental, and other regulatory entities]; (xvi) the state attorneys general for Alabama, Delaware, California, Louisiana, Massachusetts, New York, and Texas; (xvii) the United States Department of Justice; (xviii) all entities that since July 2016 expressed to the Debtors an interest in purchasing all or a substantial portion of the Assets; (xix) counsel to the Stalking Horse Purchaser and all other notice parties reasonably requested by the Stalking Horse Purchaser; and (xx) all other parties required to be provided notice pursuant to the Bidding Procedures Order.   Other parties

3

interested in bidding on the Assets were provided, upon request, sufficient information to make an informed judgment on whether to bid on the Assets. The foregoing constitutes proper, timely, adequate, and sufficient notice under the particular circumstances of these cases, and no further notice need be provided.

E.       The Publication Notice was published in *The Wall Street Journal* and *TradeWinds* on [●]. Such Publication Notice was compliant with the Bidding Procedures Order, and was sufficient and proper notice to any other interested parties, including those whose identities are unknown to the Debtors.

F.       **Extensive Efforts by Debtors.** Since before the commencement of these chapter 11 cases, the Debtors worked with their counsel and financial advisors to implement a viable transaction that would allow them to maximize the value of the Assets. The transaction that is the subject of this Sale Order is the result of the Debtors' extensive efforts seeking to maximize recoveries to the Debtors' estates for the benefit of the Debtors' stakeholders.

G.       **Business Justification.** The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the Court to grant the relief requested in the motion, including, without limitation, to (i) authorize the sale of the Assets free and clear of Interests other than Permitted Liens and Assumed Liabilities; (ii) authorize the assumption and assignment of certain executory contracts and unexpired leases; and (iii) grant related relief as set forth herein. Such compelling and sound business justification, which was set forth in the motion and on the record at the Sale Hearing, are incorporated herein by reference and, among other things, form the basis for the findings of fact and conclusions of law set forth herein.

4

H.    **Objections are Overruled.**  All objections to the relief requested in the motion that have not been withdrawn, waived, or settled as announced to the Court at the Sale Hearing or by stipulation filed with the Court are overruled except as otherwise set forth herein.

I.    **Bidding Procedures Order.**  The Bidding Procedures Order [ECF No. ●] was entered by the Court on [●], which, among other things, (i) approved the Bidding Procedures; (ii) established the Assumption and Assignment Procedures; (iii) approved the form and manner of notice of all procedures, protections, schedules, and agreements described in the motion and attached thereto; and (iv) scheduled a date for the Auction and Sale Hearing.  The Bidding Procedures provided a full, fair, and reasonable opportunity for any entity to make an offer to purchase the Assets.

J.    **Auction; Stalking Horse Agreement.**  The Auction was properly conducted by the Debtors on December in accordance with the Bidding Procedures Order and in a manner designed to result in the highest or otherwise best offer for the Assets.  At the Auction, the Debtors agreed in an exercise of their business judgment, in consultation with their management, board of directors, advisors, and the Bid Consultation Parties or Consultation Parties, as applicable, to enter into and consummate the asset purchase agreement attached hereto as <u>Exhibit A</u> (such asset purchase agreement, the "<u>Stalking Horse Agreement</u>") with J Line Corporation (the "<u>Stalking Horse Purchaser</u>").  The consummation of the transactions contemplated by the Stalking Horse Agreement, the motion, and this Sale Order is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and all of the applicable requirements of such sections and rules, including Sale Guidelines, have been complied with in respect of such transactions.

K.     **Sale Hearing.**  The Sale Hearing occurred on December 20, 2016 in accordance with the Bidding Procedures Order.

L.     **Adequate Marketing; Highest or Otherwise Best Offer.**  As demonstrated by (i) the testimony and other evidence proffered or adduced at the Sale Hearing, including the declaration filed by the Debtors in support of the Sale Transaction [ECF No. ●] and (ii) the representations of counsel made on the record at the [●], 2016 hearing on the Bidding Procedures and at the Sale Hearing, (a) the Debtors have adequately marketed the Assets and conducted the sale process in compliance with the Bidding Procedures Order; (b) a reasonable opportunity has been given to any interested party to make the highest or otherwise best offer for the Assets; (c) the consideration provided by the Stalking Horse Purchaser in the Stalking Horse Agreement constitutes the highest or otherwise best offer for the Assets; (d) the consideration provided by the Stalking Horse Purchaser in the Stalking Horse Agreement provides fair and reasonable consideration for the Assets and constitutes reasonably equivalent value under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia; (e) the Sale Transaction will provide a greater recovery for the Debtors' creditors with respect to the Assets than would be provided by any other practically available alternative; (f) taking into consideration all relevant factors and circumstances, no other entity has offered to purchase the Assets for greater economic value to the Debtors or their estates; and (g) the Debtors' determination that the Stalking Horse Agreement constitutes the highest or otherwise best offer for the Assets constitutes a valid and sound exercise of the Debtors' business judgment.

M.     **No Successor Liability.**  The Stalking Horse Purchaser is an insider of the Debtors; however, the Debtors and the Stalking Horse Purchaser agreed to the Stalking Horse

Agreement and Expense Reimbursement after an arms'-length negotiation. [The transfer of the Assets to and the assumption of the Assumed Liabilities (including any individual elements of the Sale Transaction) by the Stalking Horse Purchaser, except as otherwise set forth in the Stalking Horse Agreement, does not, and will not, subject the Stalking Horse Purchaser to any liability whatsoever, with respect to the operation of the Debtors' businesses prior to the closing of the Sale Transaction or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, in any theory of law or equity including, without limitation, any laws affecting antitrust, successor, transferee or vicarious liability.  Pursuant to the Stalking Horse Agreement, the Stalking Horse Purchaser is not purchasing all of the Debtors' assets in that the Stalking Horse Purchaser is not purchasing any of the Excluded Assets or assuming the Excluded Liabilities, and the Stalking Horse Purchaser is not holding itself out to the public as a continuation of the Debtors.  The Sale Transaction does not amount to a consolidation, merger or *de facto* merger of the Stalking Horse Purchaser and the Debtors and/or the Debtors' estates. There is not substantial continuity between the Stalking Horse Purchaser and the Debtors, and there is no continuity of enterprise between the Debtors and the Stalking Horse Purchaser. The Stalking Horse Purchaser is not a mere continuation of the Debtors or the Debtors' estates, and the Stalking Horse Purchaser does not constitute a successor to the Debtors or the Debtors' estates.  None of the transactions contemplated by the Stalking Horse Agreement, including, without limitation, the Sale Transaction or the assumption and assignment of the Assigned Contracts, is being undertaken for the purpose of escaping liability for any of the Debtors' debts or hindering, delaying, or defrauding creditors under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.]

7

N.    **Acquired Assets Property of the Estate.**    The Assets are property of the Debtors' estates and title thereto is vested in the Debtors' estates.

O.    **Sale in Best Interests.**    The actions represented to be taken by the Debtors and the Stalking Horse Purchaser are appropriate under the circumstances of these chapter 11 cases and are in the best interests of the Debtors, their estates and creditors, their interest holders, and other parties in interest.    Approval of the Stalking Horse Agreement, the Sale Transaction, and all related transactions at this time is in the best interests of the Debtors, their creditors, their estates, and all other parties in interest.

P.    **No *Sub Rosa* Plan.**    The consummation of the Sale Transaction outside of a plan of reorganization pursuant to the Stalking Horse Agreement neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a plan of reorganization or liquidation for the Debtors.    The Stalking Horse Agreement, the Sale Transaction, and the transactions contemplated therein and associated therewith do not constitute a *sub rosa* plan of reorganization.

Q.    **Arm's-Length Sale.**    The Stalking Horse Agreement, the Sale Transaction, and the transactions contemplated therein and associated therewith were negotiated, proposed, and entered into by the Debtors and the Stalking Horse Purchaser without collusion, in good faith, and from arm's-length bargaining positions.    Neither the Debtors, their insiders and affiliates, nor the Stalking Horse Purchaser have engaged in any conduct that would cause or permit the Stalking Horse Agreement, the Sale Transaction, or any part of the transactions thereby to be avoided under Bankruptcy Code section 363(n).

R.    **Good Faith Buyer.**    The Stalking Horse Purchaser is a good faith buyer under Bankruptcy Code section 363(m) and, as such, is entitled to all of the protections afforded

8

thereby. [Specifically: (i) the Stalking Horse Purchaser recognized that the Debtors were free to deal with any other party interested in purchasing the Assets; (ii) the Stalking Horse Purchaser complied in all respects with the provisions in the Bidding Procedures Order; (iii) the Stalking Horse Purchaser agreed to subject their bid to the competitive bid procedures set forth in the Bidding Procedures Order; (iv) all payments to be made by the Stalking Horse Purchaser in connection with the Sale Transaction have been disclosed; (v) the negotiation and execution of the Stalking Horse Agreement was at arm's-length and in good faith, and at all times each of the Stalking Horse Purchaser and the Debtors were represented by competent counsel of their choosing; (vi) the Stalking Horse Purchaser did not in any way induce or cause the chapter 11 filing of the Debtors; and (vii) the Stalking Horse Purchaser has not acted in a collusive manner with any person. The Stalking Horse Purchaser will be acting in good faith within the meaning of 11 U.S.C. § 363(m) in closing the transactions contemplated by the Stalking Horse Agreement.]

S.    **Corporate Authority.**  Each Debtor (i) has full corporate power and authority to execute the Stalking Horse Agreement and all other documents contemplated thereby, and the sale of the Assets pursuant to the Stalking Horse Agreement has been duly and validly authorized by all necessary corporate action of each of the Debtors, (ii) has all of the corporate power and authority necessary to consummate the transactions contemplated by the Stalking Horse Agreement, (iii) has taken all corporate action necessary to authorize and approve the Stalking Horse Agreement and the consummation by the Debtors of the transactions contemplated thereby, and (iv) needs no consents or approvals, other than those expressly provided for in the Stalking Horse Agreement, which may be waived in accordance with the terms therewith.

T.       [**Free and Clear Findings Required by the Stalking Horse Purchaser.**  The Stalking Horse Purchaser would not have entered into the Stalking Horse Agreement and would not consummate the Sale Transaction if the sale of the Assets to the Stalking Horse Purchaser were not, pursuant to Bankruptcy Code section 363(f), free and clear, except for Permitted Liens and Assumed Liabilities,[3] of (i) all liens (statutory or otherwise), claims, mortgages, deeds of trust, pledges, charges, security interests, rights of first refusal, hypothecations, encumbrances, royalties, easements, servitudes, leases or subleases, rights-of-way, encroachments, restrictive covenants, restrictions on transferability or other similar restrictions, rights of offset or recoupment, right of use or possession, subleases, leases, conditional sale arrangements, (ii) all claims as defined in Bankruptcy Code section 101(5), including all rights or causes of action (whether in law or in equity), proceedings, warranties, guarantees, indemnities, rights of recovery, setoff, recoupment, indemnity or contribution, obligations, demands, restrictions, indemnification claims, or liabilities relating to any act or omission of the Debtors or any other person prior to the Closing, consent rights, options, contract rights, covenants, and interests of any kind or nature whatsoever (known or unknown, matured or unmatured, accrued, or contingent and regardless of whether currently exercisable), whether arising prior to or subsequent to the commencement of the above-captioned cases, and whether imposed by agreement, understanding, law, equity, or otherwise, and (iii) all debts, liabilities, obligations, contractual rights and claims and labor, employment and pension claims, in each case, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or un-matured, material or non-material,

---

[3] "Permitted Liens" and "Assumed Liabilities" shall have the meanings ascribed to them in the Asset Purchase Agreement.

disputed or undisputed, whether arising prior to or subsequent to the commencement of these chapter 11 cases, and whether imposed by agreement, understanding, law, equity or otherwise ((i), (ii), and (iii) collectively, the "Interests").   Except for Permitted Liens and Assumed Liabilities, the Sale Transaction shall be free and clear of, and the Stalking Horse Purchaser shall not be responsible for, any Interests, including, without limitation, in respect of the following: (i) any rights or Interests based on any successor or transferee liability, (ii) any Interests that purport to give any party a right or option to effect any forfeiture, modification, right of first offer or first refusal, or termination of the Debtors' or the Stalking Horse Purchaser's interest in the Assets, or any similar rights; (iii) any labor or employment agreements; (iv) mortgages, deeds of trust, and security interests; (v) intercompany loans and receivables between the Debtors and any non-Debtor affiliate; (vi) any pension, multiemployer plan (as such term is defined in Section 3(37) or Section 4001(a)(3) of ERISA), health or welfare, compensation or other employee benefit plans, agreements, practices, and programs, including, without limitation, any pension plans of the Debtors or any multiemployer plan to which the Debtors have at any time contributed to or had any liability or potential liability; (vii) any other employee, worker's compensation, occupational disease, or unemployment or temporary disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (a) the Employee Retirement Income Security Act of 1974, as amended, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employment Act of 1967 and Age Discrimination in Employment Act, as amended, (g) the Americans with Disabilities Act of 1990, (h) the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, including, without limitation, the requirements of Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the

Code and of any similar state law (collectively, "COBRA"), (i) state discrimination laws, (j) state unemployment compensation laws or any other similar state laws, (k) any other state or federal benefits or claims relating to any employment with the Debtors or any of their predecessors, or (l) the WARN Act (29 U.S.C. §§2101 *et seq.*); (viii) any bulk sales or similar law; (ix) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended, and any taxes arising under or out of, in connection with, or in any way relating to the operation of the Assets prior to the Closing, including, without limitation, any *ad valorem* taxes assessed by any applicable taxing authority; (xii) any unexpired and executory contract or unexpired lease to which a Debtor is a party that is not an Assigned Contract that will be assumed and assigned pursuant to this Sale Order and the Stalking Horse Agreement; (xiii) any other Excluded Liabilities as provided in the Stalking Horse Agreement. A sale of the Assets other than one free and clear of all Interests would yield substantially less value for the Debtors' estates, with less certainty, than the Sale Transaction as contemplated. Therefore, the Sale Transaction contemplated by the Stalking Horse Agreement and approved herein free and clear of all Interests, except for Permitted Liens and Assumed Liabilities, is in the best interests of the Debtors, their estates and creditors, and all other parties in interest.]

U.     **Binding and Valid Transfer.**  The transfer of the Assets to the Stalking Horse Purchaser will be a legal, valid, and effective transfer of the Assets and, except for the Permitted Liens and Assumed Liabilities, will vest the Stalking Horse Purchaser with all right, title, and interest of the Debtors to the Assets free and clear of all Interests and any liabilities of the Debtors.

V.     **Satisfaction of Section 363(f) Standards.**  The Debtors may sell the Assets free and clear of all Interests of any kind or nature whatsoever, because, in each case, one or more of

the standards set forth in Bankruptcy Code section 363(f)(1)-(5) has been satisfied. Those holders of Interests, and non-debtor parties to the Assigned Contracts who did not object, or who withdrew their objections, to the motion are deemed to have consented pursuant to Bankruptcy Code section 363(f)(2). In all cases, each such person with Interests in the Assets is enjoined from taking any action against the Stalking Horse Purchaser, the Stalking Horse Purchaser's affiliates, or any agent of the foregoing to recover any such Interest.

W.    **Necessity of Order.** The Stalking Horse Purchaser would not have entered into the Stalking Horse Agreement and would not consummate the transactions without all of the relief provided for in this Sale Order (including, but not limited to, that the transfer of the Assets to the Stalking Horse Purchaser be free and clear of all Interests). The consummation of the transactions pursuant to this Sale Order and the Stalking Horse Agreement is necessary for the Debtors to maximize the value of their estates for the benefit of all creditors and other parties in interest.

X.    **Time of the Essence.** The sale of the Assets must be approved and consummated promptly in order to preserve the value of the Assets. Therefore, time is of the essence in consummating the Sale Transaction, and the Debtors and the Stalking Horse Purchaser intend to close the sale of the Assets as soon as reasonably practicable.

Y.    **Assigned Contracts.** The Debtors have demonstrated that it is an exercise of their sound business judgment to sell, assume, and assign the unexpired leases and executory contracts designated on Exhibit D of the Stalking Horse Agreement (collectively, the "Assigned Contracts" and, individually, an "Assigned Contract") to the Stalking Horse Purchaser in connection with the consummation of the Sale Transaction, and the assumption and assignment of the Assigned Contracts is in the best interests of the Debtors, their estates and creditors, and

13

other parties in interest.  The Assigned Contracts being assigned to the Stalking Horse Purchaser

are an integral part of the Assets being purchased by the Stalking Horse Purchaser, and,

accordingly, such assumption and assignment of the Assigned Contracts and the liabilities

associated therewith are reasonable and enhance the value of the Debtors' bankruptcy estates.

       Z.    **Cure and Adequate Assurance.**  The Debtors have cured or the Debtors have

demonstrated their ability to cure any default with respect to any act or omission that occurred

prior to the Closing under any of the Assigned Contracts, within the meaning of Bankruptcy

Code section 365(b)(1)(A).  The proposed Cure Costs or any other cure amount reached by

agreement after any objection by a counterparty to an Assigned Contract (an "<u>Assigned Contract

Objection</u>") are deemed the amounts necessary to "cure" all "defaults," each within the meaning

of Bankruptcy Code section 365(b), under such Assigned Contracts.  The Stalking Horse

Purchaser's promise to perform the obligations under the Assigned Contracts arising after the

Closing shall constitute adequate assurance of its future performance of and under the Assigned

Contracts, within the meaning of Bankruptcy Code sections 365(b)(1) and 365(f)(2).  All

counterparties to the Assigned Contracts who did not file an Assigned Contract Objection or an

objection to the assumption and assignment of the Assigned Contracts prior to the Sale Hearing,

are deemed to consent to the assumption by the Debtors of their respective Assigned Contract

and the assignment thereof to the Stalking Horse Purchaser.  The filed objections of all

counterparties to the Assigned Contracts that were heard at the Sale Hearing (to the extent not

withdrawn or adjourned), were considered by the Court, and are overruled on the merits with

prejudice.  The Court finds that, with respect to all such Assigned Contracts, the payment of the

proposed Cure Costs in accordance with the terms of the Stalking Horse Agreement is

appropriate and is deemed to fully satisfy the Debtors' obligations under Bankruptcy Code

section 365(b).  Accordingly, all of the requirements of Bankruptcy Code section 365(b) have been satisfied for the assumption and the assignment by the Debtors to the Stalking Horse Purchaser of each of the Assigned Contracts.  To the extent any Assigned Contract is not an executory contract within the meaning of Bankruptcy Code section 365, it shall be transferred to the Stalking Horse Purchaser in accordance with the terms of this Sale Order that are applicable to the Assets.

AA.    **Unenforceability of Anti-Assignment Provisions.**  Anti-assignment provisions in any Assigned Contract shall not restrict, limit, or prohibit the assumption, assignment, and sale of the Assigned Contracts and should be deemed and found to be unenforceable anti-assignment provisions within the meaning of Bankruptcy Code section 365(f).

BB.    **Final Order.**  This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), the Court expressly finds that there is no just reason for delay in the implementation of this Sale Order and expressly directs entry of judgment as set forth herein.

CC.    **Best Interest.**  Entry of this Sale Order is in the best interests of the Debtors, the Debtors' estates, their creditors, and other parties in interest.

DD.    **Findings and Conclusions.**  The findings of fact and conclusions of law herein constitute the Court's findings of fact and conclusions of law for the purposes of Bankruptcy Rule 7052, made applicable pursuant to Bankruptcy Rule 9014.  To the extent any findings of facts are conclusions of law, they are adopted as such.  To the extent any conclusions of law are findings of fact, they are adopted as such.

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT**:

**<u>General Provisions</u>**

15

1.      The motion is granted and the relief requested therein with respect to the Sale

Transaction is granted and approved in its entirety, as set forth herein.

2.      Any objections to the entry of this Sale Order or to the relief granted herein or the

relief requested in the motion, including any objections to the proposed Cure Costs or the

assumption and assignment of any Assigned Contracts, that have not been adjourned, withdrawn,

waived, or settled, or not otherwise addressed or resolved pursuant to the terms hereof, if any,

hereby are denied and overruled on the merits with prejudice.

**Approval of the Sale of the Assets**

3.      The Stalking Horse Agreement, and all the terms and conditions thereof, is

approved.

4.      Pursuant to Bankruptcy Code section 363(b), the sale of the Assets to the Stalking

Horse Purchaser free and clear of all obligations, Interests and encumbrances (except Permitted

Liens and Assumed Liabilities), and the transactions contemplated thereby is approved in all

respects.

**Sale and Transfer of the Assets**

5.      Pursuant to Bankruptcy Code sections 105, 363, and 365, the Debtors are

authorized to perform their obligations under, and comply with the terms of, the Stalking Horse

Agreement and consummate the Sale Transaction and the related transactions pursuant to, and in

accordance with, the terms and conditions of the Stalking Horse Agreement and this Sale Order.

The Debtors are authorized to execute and deliver, and empowered to perform under,

consummate, and implement, the Stalking Horse Agreement, together with all additional

instruments and documents that the Debtors or the Stalking Horse Purchaser deem necessary or

appropriate to implement the Stalking Horse Agreement and effectuate the transactions

16

contemplated therein, and to take all further actions as may reasonably be required by the Stalking Horse Purchaser for the purpose of assigning, transferring, granting, conveying, and conferring to the Stalking Horse Purchaser or reducing to Stalking Horse Purchaser's possession the Assets or as may be necessary or appropriate to the performance of the obligations as contemplated by the Stalking Horse Agreement.

6.      Following the Closing, the Debtors or the Stalking Horse Purchaser are authorized and directed to execute and file a certified copy of this Sale Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all obligations, liabilities, encumbrances and Interests in the Assets of any kind or nature whatsoever.  Upon the Closing, this Sale Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Debtors' interests in the Assets and a bill of sale transferring good and marketable title in the Assets to the Stalking Horse Purchaser free and clear of all Interests, except for the Permitted Liens and Assumed Liabilities. Each and every federal, state, and local governmental agency, quasi-agency, or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions.

7.      Except for the Permitted Liens and Assumed Liabilities, pursuant to Bankruptcy Code sections 105(a) and 363(f), the Assets shall be transferred to the Stalking Horse Purchaser as required under the Stalking Horse Agreement, and such transfer shall be free and clear of all Interests of any person, including, without limitation, all such Interests specifically enumerated in this Sale Order, whether arising by agreement, by statute, or otherwise and whether occurring or arising before, on, or after the Petition Date, whether known or unknown, occurring, or arising prior to such transfer, with all such Interests to attach to the proceeds of the Sale Transaction

17

ultimately attributable to the property against or in which the holder of an Interest claims or may

claim an Interest, in the order of their priority, with the same validity, force, and effect which

they now have, subject to any claims and defenses the Debtors may possess with respect thereto.

8.    The transfer of the Assets to the Stalking Horse Purchaser pursuant to the Stalking

Horse Agreement constitutes a legal, valid, and effective transfer of the Assets and shall vest the

Stalking Horse Purchaser with all right, title, and interest of the Debtors in and to the Assets free

and clear of all Interests of any kind or nature whatsoever, except for the Permitted Liens and

Assumed Liabilities.

9.    All persons and entities are prohibited and enjoined from taking any action to

adversely affect or interfere with the ability of the Debtors to transfer the Assets to the Stalking

Horse Purchaser in accordance with the Stalking Horse Agreement and this Sale Order; *provided*

that the foregoing restriction shall not prevent any party from appealing this Sale Order in

accordance with applicable law or opposing any appeal of this Sale Order, or from enforcing its

rights under Bankruptcy Code section 365 or relieve the Stalking Horse Purchaser of any

Assumed Liability.

10.    Except as expressly permitted by the Stalking Horse Agreement or this Sale

Order, all persons and entities, including, but not limited to, all debt security holders, equity

security holders, governmental, tax, and regulatory authorities, lenders, trade creditors, dealers,

employees, litigation claimants, contract counterparties, and other creditors, holding liens, claims

encumbrances, and other interests of any kind or nature whatsoever, including, without

limitation, rights or claims based on any taxes or successor or transferee liability, against or in a

Debtor or the Assets (whether legal or equitable, secured or unsecured, matured or unmatured,

contingent or non-contingent, senior or subordinated), arising under or out of, in connection

with, or in any way relating to, the Debtors, the Assets or the operation of the Assets before the

Closing, or the transactions contemplated by the Stalking Horse Agreement, including, without

limitation, the Sale Transaction and the assumption and assignment of the Assigned Contracts,

are forever barred, estopped, and permanently enjoined from asserting against the Stalking Horse

Purchaser, its respective successors and assigns, its respective property and the Assets, such

persons' or entities' liens, claims, encumbrances, or other Interests, including, without limitation,

rights or claims based on any taxes or successor or transferee liability, *provided* that nothing

herein shall impair or otherwise affect any right under Bankruptcy Code section 365 of a lease or

contract counterparty to an Assigned Contract under its respective Assigned Contract(s), or

relieve the Stalking Horse Purchaser of any Assumed Liability.

11.    Upon the Closing, each of the Debtors' creditors and any other holder of an

Interest is authorized and directed, without cost to the Debtors, to execute such documents and

take all other actions as may be necessary to release its Interest in the Assets, if any, as such

Interest may have been recorded or may otherwise exist.  If any person or entity that has filed

financing statements, mortgages, mechanic's liens, *lis pendens*, or other documents or

agreements evidencing an Interest in the Debtors or the Assets shall not have delivered to the

Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties,

termination statements, instruments of satisfaction, releases of all Interests, which the person or

entity has with respect to the Debtors or the Assets or otherwise, then (i) the Debtors are

authorized to execute and file such statements, instruments, releases, and other documents on

behalf of the person or entity with respect to the Debtors or the Assets, and (ii) the Stalking

Horse Purchaser is authorized to file, register, or otherwise record a certified copy of this Sale

Order, which shall constitute conclusive evidence of the release of all Interests of any kind or

19

nature whatsoever in the Debtors or the Assets.  Each and every federal, state, and local governmental agency or department is hereby authorized and directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Stalking Horse Agreement, including, without limitation, recordation of this Sale Order.  This Sale Order shall be binding upon and shall govern the acts of all persons including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of such assets or other property interests.

12.    All entities that are currently, or on the Closing may be, in possession of some or all of the Assets are hereby directed to surrender possession of the Assets to the Stalking Horse Purchaser on the Closing, unless the Stalking Horse Purchaser otherwise agrees.

13.    The Sale Order is self-executing, and neither the Debtors nor the Stalking Horse Purchaser shall be required to execute or file releases, termination statements, assignments, consents, or other instruments to effectuate, consummate, and implement the provisions of this Sale Order.

14.    To the extent provided by Bankruptcy Code section 525, no governmental unit may deny, revoke, suspend, or refuse to renew any permit, license, or similar grant relating to the operation of the Assets sold, transferred, or conveyed to the Stalking Horse Purchaser on account

of the filing or pendency of these chapter 11 cases or the consummation of the transactions

contemplated by the Stalking Horse Agreement and this Sale Order.

## Implementation of the Sale

15.    On Closing, the Debtors shall [insert funds flow description, escrow, other

repayment directions, and/or other sale implementation provisions].

16.    The Sellers shall not terminate the Stalking Horse Agreement for the purpose of

entering into an Alternate Transaction without first consulting with the Bid Consultation Parties

(as defined in the Bidding Procedures Order).

17.    All parties in interest in these chapter 11 cases expressly reserve their rights with

respect to any allocation of the Purchase Price or value among the purchased Assets.

## No Successor Liability

18.    [Except to the extent the Stalking Horse Purchaser assumes the Assumed

Liabilities, or takes the Assets subject to the Permitted Liens, or as otherwise set forth in the

Stalking Horse Agreement, the Stalking Horse Purchaser shall not have any successor,

transferee, derivative, or vicarious liabilities of any kind or character for any Interests, including

under any theory of successor or transferee liability, *de facto* merger, or continuity, whether

known or unknown as of the Closing, now existing or hereafter arising, whether fixed or

contingent, asserted or unasserted, liquidated or unliquidated, including without limitation, with

respect to any of the following: (i) any foreign, federal, state, or local revenue, pension, ERISA,

tax, labor, employment, the WARN Act, antitrust, environmental, or other law, rule, or

regulation (including, without limitation, filing requirements under any such laws, rules or

regulations); (ii) under any products liability law, rule, regulation, or doctrine with respect to the

Debtors' liability under such law, rule, regulation, or doctrine, or under any product warranty

21

liability law or doctrine; (iii) any employment or labor agreements, consulting agreements, severance arrangements, change-in-control agreements, or other similar agreement to which the Debtors are a party; (iv) any welfare, compensation, or other employee benefit plans, agreements, practices, and programs, including, without limitation, any pension plan of the Debtors; (v) the cessation of the Debtors' operations, dismissal of employees, or termination of employment or labor agreements or pension, welfare, compensation, or other employee benefit plans, agreements, practices, and programs, obligations that might otherwise arise from or pursuant to the (a) Employee Retirement Income Security Act of 1974, as amended, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employment Act of 1967, (g) the Americans with Disabilities Act of 1990, or (h) COBRA; (vi) environmental liabilities, debts, claims, or obligations arising from conditions first existing on or prior to the Closing (including, without limitation, the presence of hazardous, toxic, polluting, or contamination substances or wastes), which may be asserted on any basis, including, without limitation, under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 *et seq.*; (vii) any liabilities, debts, or obligations of or required to be paid by the Debtors for any taxes of any kind for any period; (viii) any liabilities, debts, commitments, or obligations for any taxes relating to the operation of the Assets prior to the Closing; (ix) any bulk sale law; and (x) any litigation.  The Stalking Horse Purchaser shall have no liability or obligation under the WARN Act simply by virtue of its purchase of assets from the Debtors. Nothing herein relieve the Stalking Horse Purchaser of any obligations imposed pursuant to a governmental unit's police or regulatory powers on the owner or operator of property.]

19.    The Stalking Horse Purchaser has given substantial consideration under the Stalking Horse Agreement, which consideration shall constitute valid and valuable consideration for the releases of any potential claims of successor liability of the Stalking Horse Purchaser and which shall be deemed to have been given in favor of the Stalking Horse Purchaser by all holders of encumbrances and liabilities (except for Permitted Liens and Assumed Liabilities) in or against the Debtors, or the Assets. Without limiting the Stalking Horse Purchaser's obligation to pay and satisfy the Assumed Liabilities, upon consummation of the Sale Transaction, the Stalking Horse Purchaser shall not be deemed to (a) be the successor to the Debtors, (b) have, *de facto* or otherwise, merged with or into the Debtors, or (c) be a mere continuation, alter ego, or substantial continuation of the Debtors.

**Good Faith**

20.    The transactions contemplated by the Stalking Horse Agreement are undertaken by the Stalking Horse Purchaser without collusion and in good faith, as that term is used in Bankruptcy Code section 363(m), and, accordingly, the reversal or modification on appeal of the authorization provided in this Sale Order to consummate the transactions shall not affect the validity of the transactions (including the assumption and assignment of any of the Assigned Contracts).  The Stalking Horse Purchaser is a buyer in good faith of the Assets and is entitled to all the protections afforded by Bankruptcy Code section 363(m).

21.    As a good faith buyer of the Assets, the Stalking Horse Purchaser has not entered into an agreement with any other potential bidders at the Auction, and has not colluded with any of the other bidders, potential bidders or any other parties interested in the Assets, and, therefore, neither the Debtors nor any successor in interest to the Debtors' estates shall be entitled to bring

an action against the Stalking Horse Purchaser, and the Sale Transaction may not be avoided pursuant to Bankruptcy Code section 363(n).

22.    The consideration provided by the Stalking Horse Purchaser for the Assets under the Stalking Horse Agreement shall be deemed to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.    The Sale Transaction may not be avoided under Bankruptcy Code section 363(n).    The Stalking Horse Agreement was not entered into, and the Sale Transaction is not being consummated, for the purpose of hindering, delaying, or defrauding creditors of the Debtors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law.    Neither the Debtors nor the Stalking Horse Purchaser have entered into the Stalking Horse Agreement or any agreement contemplated thereby or are consummating the Sale Transaction with any fraudulent or otherwise improper purpose, including, without limitation, to evade any pension liabilities.    No other person or entity or group of persons or entities has offered to purchase the Assets for an amount that would provide greater value to the Debtors and their estates than the value provided by the Stalking Horse Purchaser.    The Court's approval of the motion and the Stalking Horse Agreement are in the best interests of the Debtors, the bankruptcy estates of the Debtors, their creditors, and all other parties in interest.

**Assumption and Assignment of Assigned Contracts**

23.    Pursuant to Bankruptcy Code sections 105(a), 363, and 365 and subject to and conditioned upon the Closing of the Sale Transaction, the Debtors' sale and assumption and assignment to the Stalking Horse Purchaser of the Assigned Contracts is approved, and the requirements of Bankruptcy Code section 365(b)(1) with respect thereto are deemed satisfied.

24.    The Debtors are authorized and directed in accordance with Bankruptcy Code sections 105(a) and 365 to (i) assume and assign to the Stalking Horse Purchaser, effective as of the Closing, as provided by, and in accordance with, the Bidding Procedures Order and the Stalking Horse Agreement, the Assigned Contracts free and clear of all Interests of any kind or nature whatsoever, other than the Permitted Liens and Assumed Liabilities, and (ii) execute and deliver to the Stalking Horse Purchaser such documents or other instruments as the Stalking Horse Purchaser reasonably deems necessary to assign and transfer the Assigned Contracts to the Stalking Horse Purchaser.

25.    The Assigned Contracts shall be transferred and assigned to, pursuant to the Bidding Procedures Order and the Stalking Horse Agreement, and thereafter remain in full force and effect for the benefit of the Stalking Horse Purchaser, notwithstanding any provision in any such Assigned Contract (including, but not limited to, those of the type described in Bankruptcy Code sections 365(b)(2), (e)(1), and (f)) that prohibits, restricts, or conditions such assignment or transfer.   The Debtors shall be relieved from any further liability with respect to the Assigned Contracts after such assumption and assignment to the Stalking Horse Purchaser.   The Debtors may assign each Assigned Contract in accordance with Bankruptcy Code sections 363 and 365, and any provisions in any Assigned Contracts that prohibit or condition the assignment of such Assigned Contracts or terminate, recapture, impose any penalty, condition, renewal, or

extension, or modify any term or condition upon the assignment of such Assigned Contracts, constitute unenforceable anti-assignment provisions which are void and of no force and effect. All other requirements and conditions under Bankruptcy Code sections 363 and 365 for the assumption by the Debtors and assignment to the Stalking Horse Purchaser of each Assigned Contract have been satisfied.

26.    All defaults and all other obligations or liabilities under any Assigned Contract occurring, arising, or accruing prior to the date of the assignment or transfer to the Stalking Horse Purchaser shall be deemed cured or satisfied upon payment by the Stalking Horse Purchaser (or the Seller as specified in the Stalking Horse Agreement) of the proposed Cure Costs, as set forth in the Cure Notice, or any other cure amount reached by agreement after an Assigned Contract Objection, and, without limiting the foregoing, no effect shall be given to any default of the type set forth in Bankruptcy Code section 365(b)(2), or the type of default concerning an unexpired lease of real property described in Bankruptcy Code section 365(b)(1), whether or not such Assigned Contract is an executory contract within the meaning of Bankruptcy Code section 365. The Cure Costs listed on the Cure Notice, or any other cure amount reached by agreement after an Assigned Contract Objection, reflect the sole amounts necessary under Bankruptcy Code section 365(b) to cure all monetary defaults under the Assigned Contracts, and no other amounts are or shall be due to the non-debtor parties in connection with the assumption by the Debtors and assignment to the Stalking Horse Purchaser of the Assigned Contracts.

27.    Except as provided in the Stalking Horse Agreement or this Sale Order, after the Closing, the Debtors and their estates shall have no further liabilities or obligations with respect to any Assigned Contract, and all holders of such claims arising from and after Closing under

26

any Assigned Contract are forever barred and estopped from asserting any claims under any Assigned Contract against the Debtors, their successors or assigns, and/or their estates.

28.    The failure of the Debtors or the Stalking Horse Purchaser to enforce at any time one or more terms or conditions of any Assigned Contract shall not be a waiver of such terms or conditions, or of the Debtors' and the Stalking Horse Purchaser's rights to enforce every term and condition of the Assigned Contracts.

29.    Except for the Assumed Liabilities and Cure Costs that will be paid as provided in the Stalking Horse Agreement, neither the Stalking Horse Purchaser, nor any of its successors or assigns, or any of their respective affiliates shall have any liability for any Interest that arose or occurred prior to the Closing, or otherwise is assertable against the Debtors or is related to the Assets prior to the Closing.  The Stalking Horse Purchaser is not and shall not be deemed a "successor" to the Debtors or their estates, have, *de facto* or otherwise, merged with or into the Debtors, or be a mere continuation or substantial continuation of the Debtors or the enterprise of the Debtors under any theory of law or equity as a result of any action taken in connection with the Stalking Horse Agreement or any of the transactions or documents ancillary thereto or contemplated thereby or in connection with the acquisition of the Assets.

**Backup Bidder**

30.    [●] is hereby approved as the Backup Bidder and pursuant to Bankruptcy Code sections 105, 363 and 365, and the asset purchase agreement submitted by [●] (the "Backup Bid") and the sale of the Assets to and consummation of the sale to [●] are hereby approved as the Backup Bid.  The Backup Bid, pursuant to the terms submitted therewith, is hereby approved and authorized as a Backup Bid and shall remain open as a Backup Bid pursuant to the terms of the Bidding Procedures Order and the bid terms submitted at the Auction.  In the event that the

27

Successful Bidder cannot or refuses to consummate the Sale Transaction, the Backup Bidder will be deemed the new Successful Bidder and the Debtors shall be authorized, but not directed, to close, and take all actions necessary to close, with the Backup Bidder on the Backup Bid without further order of the Bankruptcy Court, and in such case the findings and other provisions of this Sale Order shall apply to the Backup Bidder and the Backup Bid to the same extent they do with respect to the Stalking Horse Purchaser and the Stalking Horse Agreement.

**Additional Provisions**

31.    If any person or entity that has filed statements or other documents or agreements evidencing claims, liens, encumbrances, or Interests in any of the Assets (other than any Permitted Liens or Assumed Liabilities) does not deliver to the Debtors or the Stalking Horse Purchaser prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all Interests and other Interests that the person or entity has or may assert with respect to any of the Assets, the Debtors and/or the Stalking Horse Purchaser are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of such persons or entity with respect to any of the Assets.

32.    This Sale Order and the Stalking Horse Agreement shall be binding in all respects upon all known and unknown creditors of, and holders of equity security interests in, any Debtor, including any holders of Interests, all counterparties to the Assigned Contracts, all counterparties to contracts that are not assumed or assigned, all successors and assigns of the Stalking Horse Purchaser, each Debtor and their affiliates and subsidiaries, the Assets, and any trustees appointed in the Debtors' chapter 11 cases or upon a conversion to cases under chapter 7 of the

28

Bankruptcy Code, and this Sale Order shall not be subject to amendment or modification and the

Stalking Horse Agreement shall not be subject to rejection. Nothing contained in any chapter 11

plan confirmed in any Debtor's bankruptcy case, any order confirming any such chapter 11 plan,

or any other order in these chapter 11 cases shall alter, conflict with, or derogate from, the

provisions of the Stalking Horse Agreement or this Sale Order.

33.    To the extent applicable, the automatic stay pursuant to Bankruptcy Code section

362 is hereby lifted with respect to the Debtors to the extent necessary, without further order of

the Court (a) to allow the Stalking Horse Purchaser to give the Debtors any notice provided for

in the Stalking Horse Agreement, and (b) to allow the Stalking Horse Purchaser to take any and

all actions permitted by the Stalking Horse Agreement.

34.    No bulk sales law or similar law shall apply in any way to the transactions

contemplated by the Sale Transaction, the Stalking Horse Agreement, the motion, and this Sale

Order.

35.    This Court retains jurisdiction, pursuant to its statutory powers under 28 U.S.C.

§ 157(b)(2), to, among other things, interpret, implement, and enforce the terms and provisions

of this Sale Order, all amendments hereto, and any waivers and consents hereunder, including,

but not limited to, retaining jurisdiction to (i) compel delivery of the Assets to the Stalking Horse

Purchaser; (ii) interpret, implement, and enforce the provisions of this Sale Order; (iii) protect

the Stalking Horse Purchaser, any of the Stalking Horse Purchaser's affiliates, or any agent of

the foregoing, against any Interests against the Debtors or the Assets of any kind or nature

whatsoever, except for the Permitted Liens and Assumed Liabilities, and (iv) enter any order

under Bankruptcy Code sections 363 and 365.

29

36.    No brokers were involved in consummation of the Sale Transaction, and no brokers' commissions are due to any person in connection with the Sale Transaction; *provided*, *however*, that this provision does not impact any transaction or other fees due to investment bankers or financial advisors employed by the Debtors or certain of their creditors for which the Debtors may be obligated to pay in accordance with an engagement letter with such professional(s).

37.    To the extent there is any inconsistency between the terms of this Sale Order and the terms of the Stalking Horse Agreement (including all ancillary documents executed in connection therewith), the terms of this Sale Order shall govern.

38.    The failure to specifically include any particular provision of the Stalking Horse Agreement in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Stalking Horse Agreement be authorized and approved in its entirety.

39.    The Stalking Horse Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court, *provided* that the Debtors shall provide the Bid Consultation Parties with three (3) business days' notice thereof and *provided further* that any such modification, amendment, or supplement does not, based on the Debtors' judgment, have a material adverse effect on the Debtors' estates.

40.    Notwithstanding the provisions of Bankruptcy Rules 6004(h) and 6006(d), this Sale Order shall not be stayed for fourteen (14) days after its entry and shall be effective immediately upon entry, and the Debtors and the Stalking Horse Purchaser are authorized to close the transactions immediately upon entry of this Sale Order.  Time is of the essence in

closing the transactions referenced herein, and the Debtors and the Stalking Horse Purchaser intend to close the transactions as soon as practicable. This Sale Order is a final, appealable order and the period in which an appeal must be filed shall commence upon the entry of this Sale Order. Any party objecting to this Sale Order must exercise due diligence in filing an appeal and pursuing a stay, or risk its appeal being foreclosed as moot.

41.    The provisions of the Stalking Horse Agreement and this Sale Order may be specifically enforced in accordance with the Stalking Horse Agreement notwithstanding the appointment of any chapter 7 or chapter 11 trustee after the Closing.

42.    Headings utilized in this Sale Order are for convenience of reference only, and do not constitute a part of this Sale Order for any other purpose.

43.    All time periods set forth in this Sale Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

44.    The provisions of this Sale Order are nonseverable and mutually dependent.


New York, New York
Dated: _____, 2016

                                        _____
                                        UNITED STATES BANKRUPTCY JUDGE

**Exhibit D to Sale Motion, Exhibit 1 to the Bidding Procedures, and Exhibit 1 to Sale Order**

**Stalking Horse Agreement**

*EXECUTION VERSION*

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made and entered into effective as of this 28th day of October 2016 (the "Effective Date"), by and among INTERNATIONAL SHIPHOLDING CORPORATION, a Delaware corporation ("ISH"), LCI SHIPHOLDINGS, INC., GULF SOUTH SHIPPING PTE LTD., MARCO SHIPPING Company (PTE) LTD., N.W. JOHNSEN & CO., Inc. (collectively, the "Debtor Sellers") and MPV NETHERLANDS C.V., MPV NETHERLANDS COÖPERATIEF U.A., and MPV NETHERLANDS V.B. (collectively, the "Non-Debtor Sellers" and collectively with Debtor Sellers, "Sellers"), and J LINE CORPORATION, a Marshall Islands corporation, or its assigns ("Buyer").[1]  Buyer and Sellers may be referred to herein individually as a "Party" and collectively as the "Parties".  For purposes of this Agreement, the term "Affiliates" shall mean with respect to either Party hereto, any other company or legal entity which is controlled by, controls such Party, or is under common control of such Party, and the terms "control," "controls," "controlled" and words or phrases of similar import mean the power to direct the management and policies of an entity, whether through the ownership of voting securities, by contract, or otherwise.

WHEREAS, Sellers desire to sell to Buyer, and Buyer desires to purchase from Sellers, pursuant to the terms and conditions of this Agreement, certain Acquired Assets (as defined below);

WHEREAS, on July 31, 2016 (the "Petition Date"), Debtor Sellers and certain of their Affiliates (collectively, the "Debtors") each filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code styled *In re: International Shipholding Corporation, et. al.,* Chapter 11 Case No 16-12220 (the "Bankruptcy Cases"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

WHEREAS, the Parties intend to effectuate the transactions contemplated by this Agreement through a sale of the Acquired Assets free and clear of all liens and encumbrances, other than Permitted Liens (as defined below), pursuant to Sections 105, 362, 363 and 365 of Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"); and

WHEREAS, Sellers' ability to consummate the transactions contemplated by this Agreement is subject to, among other things, the entry of an order by the Bankruptcy Court (the "Sale Order").

NOW, THEREFORE, for and in consideration of the premises and the mutual agreements contained herein, Buyer and Sellers hereby agree as follows:

---

[1] Buyer anticipates using multiple affiliated entities to take title to assets.  Identity of such affiliates will be determined prior to the Closing Date.

1

## ARTICLE I

### SALE AND PURCHASE

Section 1.1    Acquired Assets.  Subject to the entry of the Sale Order by the Bankruptcy Court and Section 1.2, and in accordance with the terms and conditions of this Agreement, Sellers agree to sell and assign to Buyer, and Buyer agrees to purchase and acquire from Seller, all of Seller's right, title and interest in and to the following (collectively, the "Acquired Assets"), as more specifically described in Exhibits A and B attached hereto:

(a)    all of Sellers' rights under each of the contracts, agreements or arrangements, written or oral (each, a "Contract") set forth on Exhibit A hereto (collectively, the "Assigned Contracts");[2]

(b)    all of Sellers' rights, title and interest in and to the assets set forth on Exhibit B;[3]

(c)    to the extent transferable using commercially reasonable efforts, all rights of Sellers under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent relating to products sold, or services provided, to Sellers in respect of the Acquired Assets other than any warranties, representations and guarantees pertaining to any Excluded Assets; and

(d)    all goodwill of, and other intangible rights of Sellers in, the Acquired Assets.

Section 1.2    Excluded Assets.  Notwithstanding the foregoing, the term "Acquired Assets" shall not include any assets of Sellers, other than the Acquired Assets, including the following (collectively, the "Excluded Assets"):

(a)    any equipment, tools, supplies or spare parts owned by a third party;

(b)    any asset of Sellers that would otherwise constitute an Acquired Asset but for the fact that it is consumed, conveyed, leased or otherwise disposed of, in the ordinary course of Sellers' business prior to the Closing Date (as defined below) not in violation of this Agreement;

(c)    the certificates of incorporation or, as applicable, formation, qualifications to conduct business as a foreign corporation or, as applicable, limited liability company, taxpayer and other identification numbers, seals, stock transfer books, blank stock certificates, corporate books and records of internal corporate or limited liability company proceedings, tax and accounting records, work papers and other records relating to the organization or maintenance of

---

[2] Assigned Contracts listed on **Exhibit A** hereto that are related to the Seller's Specialty business may be added or deleted at any time prior to the Closing Date (as defined herein).

[3] Additional assets listed on **Exhibit B** hereto that are related to the Seller's Specialty business may be added or deleted at any time prior to the Closing Date (as defined herein).

corporate or limited liability company existence of Sellers and any other records that Sellers are required by law to retain; provided, however, that copies of the foregoing items shall be provided by Sellers to Buyer following the Closing Date upon Buyer's request at Buyer's sole expense;

(d)    the rights of Sellers under this Agreement and all consideration payable or deliverable to Sellers under this Agreement;

(e)    the capital stock or other equity interests of any Seller;

(f)    any Contract not used solely in the operation or ownership of the Acquired Assets (collectively, the "Excluded Contracts");

(g)    any Contract that terminates or expires prior to the Closing Date in accordance with its terms or in the ordinary course of business of Sellers;

(h)    all rights (including rights under insurance policies), claims or causes of action with respect to or arising in connection with Excluded Assets;

(i)    all rights (including rights under insurance policies), claims or causes of action arising from or related to facts or circumstances occurring or existing on or prior to the Closing Date;

(j)    all rights, recoveries, refunds and rights of set-off against third parties arising from or related to facts or circumstances occurring or existing on or prior to the Closing Date;

(k)    all deposits (including, with respect to the Excluded Assets, customer deposits and security deposits (whether maintained in escrow or otherwise) for rent, electricity, telephone or otherwise) and prepaid charges and expenses of Sellers that relate exclusively to the Excluded Assets;

(l)    any other tangible or intangible assets not used exclusively in connection with the ownership or operation of the Acquired Assets; and

(m)    the assets set forth on Schedule 1.2(m).

Section 1.3    Assumed Liabilities.  Upon the terms and subject to the conditions of this Agreement, Buyer agrees, effective at the Effective Time, to assume, pay, perform and discharge the following Liabilities (as defined below) (such Liabilities, the "Assumed Liabilities"):

(a)    any and all amounts due and owing in order to cure any defaults under the Assigned Contracts that are required to be cured under the Bankruptcy Code (such amounts, the "Cure Amounts") due and owing under the Assigned Contracts;

(b)    all of Sellers' Liabilities under the Assigned Contracts;

(c)    all Liabilities relating to amounts required to be paid by Buyer hereunder;

3

(d)      all Transfer Taxes (as defined below) and all Liabilities relating to Taxes (as defined below) imposed on the Acquired Assets that are attributable to any Tax period or year, or portion thereof, that begins on or after the Closing Date (each, a "Post-Closing Tax Period"); and

(e)      all Liabilities relating to or arising from Buyer's ownership, possession or use of the Acquired Assets from and after the Closing Date.

As used herein, the term "Liability" or "Liabilities" means all liabilities and obligations of any kind and nature, whether known or unknown, express or implied, primarily or secondarily, direct or indirect, absolute, accrued, contingent or otherwise and whether due or to become due.

Section 1.4      Excluded Liabilities.  Except as specifically set forth in Section 1.3, Buyer shall not assume or be liable for any of the Liabilities of Sellers (except to the extent they constitute Assumed Liabilities) set forth below (collectively, the "Excluded Liabilities"):

(a)      all Liabilities of Sellers that relate to any of the Excluded Assets (including under any Excluded Contracts);

(b)      all Liabilities of Sellers for Taxes, other than Transfer Taxes, for any Tax period or year, or portion thereof, that ends before the Closing Date (each, a "Pre-Closing Tax Period");

(c)      all Liabilities for any legal, accounting, investment banking, brokerage or similar fees or expenses incurred by any Seller or any predecessor of any Seller in connection with, resulting from or attributable to the Bankruptcy Cases or the transactions contemplated by this Agreement or otherwise;

(d)      all indebtedness of any Seller;

(e)      all Liabilities of Sellers related to the right to or issuance of any capital stock or other equity interest of any Seller, including any stock options or warrants;

(f)      all Liabilities of Sellers resulting from, caused by or arising out of, or which relate to, directly or indirectly, the conduct of any person or ownership, lease or license of any properties or assets or any properties or assets previously used by Sellers at any time, or other actions, omissions or events occurring prior to the Closing (as defined below) and which (A) constitute, may constitute or are alleged to constitute a tort, breach of contract or violation of any rule, regulation, treaty or other similar authority or (B) relate to any and all claims, disputes, demands, actions, Liabilities, damages, suits in equity or at law, administrative, regulatory or quasi-judicial proceedings, accounts, costs, expenses, setoffs, contributions, attorneys' fees or causes of action of whatever kind or character ("Proceeding") against Sellers, whether past, present, future, known or unknown, liquidated or unliquidated, accrued or unaccrued, pending or threatened;

4

     (g)     any Liability arising out of any proceeding commenced against Sellers after the Closing and arising out of, or relating to, any occurrence or event happening prior to, on or after the Closing (except that Purchaser shall be liable for all Cure Amounts);

     (h)     all accounts payable of Sellers arising prior to the Closing Date (except that Buyer shall be liable for all Cure Amounts);

     (i)     any Liability under any Excluded Contract; and

     (j)     any Liability of Sellers under this Agreement or any related agreement executed in connection herewith.

## ARTICLE II

### CONSIDERATION

Section 2.1    Sale Price.  Subject to the terms and conditions hereof, the purchase price for the Acquired Assets is EIGHTEEN MILLION DOLLARS ($18,000,000.00) (the "Purchase Price"), which shall be paid as provided in Section 2.2 and Section 2.3.

Section 2.2    Deposit.  Upon execution of this Agreement and simultaneously therewith, the execution and delivery of the Addendum to the Escrow Agreement (as defined below), on the Effective Date, Buyer shall pay into the escrow account at The Bank of New York Mellon, a New York banking corporation (the "Escrow Agent" and such account, the "Escrow Account"), a deposit equal to 10% of the Purchase Price (such amount, together with all interest earned thereon, the "Deposit") amounting to ONE MILLION EIGHT HUNDRED THOUSAND DOLLARS ($1,800,000.00).  The Deposit shall be held pursuant to the terms of the escrow agreement (the "Escrow Agreement") and the addendum thereto to be entered into by Buyer, Sellers and the Escrow Agent (the "Addendum to the Escrow Agreement"), each substantially in the form attached hereto as Exhibit D.  The Parties shall equally share the costs related with the Escrow Account.

Section 2.3    Closing.

     (a)     The closing of the purchase and sale of the Acquired Assets (the "Closing") shall occur following entry of the Sale Order by the Bankruptcy Court approving the sale as provided in this Agreement and satisfaction or waiver (in respect of any conditions that are subject to waiver) of the other conditions to Closing set forth in Section 9.1, Section 9.2 and Section 9.3 (the "Closing Date").  The Closing shall take place at the offices of Akin Gump Strauss Hauer & Feld LLP, located at One Bryant Park, New York, New York or at another location to be agreed upon by the Parties.  If the Closing has not occurred by March 31, 2017 (the "Outside Closing Date"), as a result of delays or a material breach by Buyer under this Agreement, Sellers shall have the right to terminate this Agreement pursuant to Section 12.1 and (a) may market the Acquired Assets and enter into a purchase agreement with a third party and (b) retain the Deposit.  In such case, Buyer relinquishes all its rights to the Deposit.  As used herein, the term "Business Day" means a day on which National Association banks are required to be open for business in the United States.

5

(b)      At the Closing, Buyer shall pay directly to Sellers an amount equal to the Purchase Price (i) less the Deposit and (ii) adjusted upward or downward, as appropriate, in an amount to be agreed between the Buyer and Sellers prior to Closing, to take into account any expenses prepaid by Sellers related to the Acquired Assets and any accrued expenses related to the Acquired Assets such as amounts accrued to cover regulatory dry docking expenses (the "Closing Payment") and Buyer and ISH shall direct the Escrow Agent to release the full amount of the Deposit to Sellers.  If Sellers are ready, willing and able to proceed with the Closing and Buyer does not pay the Closing Payment, as required herein, Sellers shall have no obligation to close the sale of the Acquired Assets to Buyer as contemplated hereunder and Sellers may terminate this Agreement as provided in Section 12.1(d), market the Acquired Assets and enter into a purchase agreement with a third party and retain the Deposit.  In such case, Buyer relinquishes all rights to the Deposit.

(c)      Delivery of the Acquired Assets shall be at their respective locations or at other locations at the time of Closing to be agreed upon by the Parties.

(d)      If the Parties are not able to close by the Closing Date for any reason other than Buyer's material breach of this Agreement, upon the termination of this Agreement in accordance with its terms, Buyer and ISH shall direct the Escrow Agent to return the Deposit to Buyer and, in addition, shall pay the reasonable, documented out-of-pocket costs and expenses actually incurred by Buyer (including reasonable, documented out-of-pocket attorney's fees) in connection with the negotiation, preparation and performance of this Agreement and the transaction contemplated hereby in an amount not to exceed $500,000 (the "Expense Reimbursement").

Section 2.4      Wire Instructions.  All payments to Sellers hereunder are to be made in US Dollars in immediately available funds wired in accordance with instructions provided by Sellers.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

Section 3.1      THE SALE OF THE ACQUIRED ASSETS IS MADE "AS IS, WHERE IS AND WITH ALL FAULTS" AND EXCEPT FOR THE EXPRESS WARRANTIES SET FORTH IN SECTION 3.4(F), SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES WHATSOEVER (EXPRESS, IMPLIED, STATUTORY OR OTHERWISE) CONCERNING CLASSIFICATION, VALUE, DESIGN, OPERATION, MERCHANTABILITY, QUALITY, CONDITION OR SEAWORTHINESS OF THE ACQUIRED ASSETS OR THE FITNESS OF THE ACQUIRED ASSETS FOR ANY INTENDED PURPOSE OR USE.

Section 3.2      BUYER MAKES A FULL WAIVER OF WARRANTY AS TO THE SEAWORTHINESS, REDHIBITION AND CONDITION OF THE ACQUIRED ASSETS (ENVIRONMENTAL AND OTHERWISE), AND ACKNOWLEDGES AND AGREES THAT THIS SALE IS BEING MADE ON AN "AS IS, WHERE IS AND WITH ALL FAULTS" BASIS EXCEPT FOR THE EXPRESS WARRANTIES SET FORTH IN SECTION 3.4(F).

6

BUYER ACKNOWLEDGES AND AGREES THAT BUYER IS RELYING SOLELY ON ITS OWN INSPECTION OF THE ACQUIRED ASSETS AND NOT ON ANY WARRANTIES AND REPRESENTATIONS (VERBAL OR WRITTEN) FROM OR ON BEHALF OF SELLERS AT ANY TIME AS TO THE CONDITION OF THE ACQUIRED ASSETS IN ANY RESPECT, AND THE PURCHASE PRICE TAKES INTO CONSIDERATION THE CONDITION OF THE ACQUIRED ASSETS. BUYER WAIVES ALL WARRANTIES OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED, WITH RESPECT TO THE CONDITION OR SEAWORTHNESS OF THE ACQUIRED ASSETS, INCLUDING, WITHOUT LIMITATION, ANY REPRESENTATIONS OR WARRANTIES AS TO THE PHYSICAL OR ENVIRONMENTAL CONDITION THEREOF, OR AS TO THE ABSENCE OF REDHIBITORY OR LATENT DEFECTS OR ANY VICES (WHETHER APPARENT, EASILY DISCOVERABLE OR HIDDEN, KNOWN OR UNKNOWN), OR AS TO FITNESS FOR ORDINARY USE OR A PARTICULAR PURPOSE OR ITS SUITABILITY OR CAPACITY, AND BUYER HEREBY RELEASES SELLERS FROM ANY LIABILITY THEREFOR, AND PARTICULARLY FOR ANY CLAIM OR CAUSE OF ACTION FOR REDHIBITION OR FOR REDUCTION OF PURCHASE PRICE. BUYER ACKNOWLEDGES THAT THE FOREGOING WAIVERS HAVE BEEN CALLED TO BUYER'S ATTENTION AND READ AND EXPLAINED TO BUYER AND THAT SAID WAIVERS ARE A MATERIAL AND INTEGRAL CONSIDERATION FOR THIS SALE. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, BUYER HEREBY SPECIFICALLY ACKNOWLEDGES AND AGREES THAT UPON AND AFTER EXECUTION OF THE SALE CONTEMPLATED BY THIS AGREEMENT, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, BUYER SHALL HAVE NO RECOURSE WHATSOEVER AGAINST SELLERS FOR ANY DEFECTS IN THE ACQUIRED ASSETS, WHETHER SUCH DEFECTS ARE LATENT, VISIBLE OR HIDDEN.

Section 3.3    Buyer hereby represents, warrants and covenants to Sellers the following as of the date hereof and as of the Closing Date:

(a)    Buyer is duly incorporated and validly existing under the laws of the Republic of the Marshall Islands and has full legal right, power and authority to enter into this Agreement and to perform its obligations hereunder.

(b)    All necessary corporate action with respect to Buyer has been taken to duly authorize the transactions contemplated by, and to execute and deliver the documents provided under, this Agreement;

(c)    This Agreement and the documents contemplated hereby have been duly executed and delivered by Buyer, and assuming the due authorization, execution and delivery by Sellers thereto, are valid and binding agreements of Buyer, enforceable against Buyer in accordance with their terms, except as such enforcement is subject to the effect of any applicable bankruptcy, insolvency, reorganization or similar laws relating to or affecting creditors' rights (collectively, the "Enforceability Exceptions");

(d)    The execution and delivery of this Agreement, and completion of all transactions herein contemplated, does not:

7

(i)     except as set forth on <u>Schedule 3.3(d)</u> (the "<u>Required Consents</u>"), conflict with, violate, result in a breach or right of termination or acceleration, constitute a default or require any consent or authorization under any other terms, conditions or provisions of any mortgage, indenture, agreement, loan, guarantee, note, bond, permit, license, lease, grant, patent or other undertaking or authorization, written or oral, to or by which Buyer is a party or is bound;

(ii)     conflict with, result in a breach of or require any consent under any of the terms, conditions or provisions of Buyer's certificate of incorporation, bylaws or equivalent governing documents; or

(iii)     result in a violation by Buyer of any law, judgment, order (including executive order), award, writ, injunction or decree applicable to, or binding upon, Buyer;

(e)     Buyer has sufficient funds readily available, or written commitments from financing sources to make the necessary funds readily available, to pay the Purchase Price and consummate the transactions contemplated by this Agreement; and

Section 3.4     Sellers hereby represent, warrant and covenant to Buyer the following as of the date hereof and as of the Closing Date:

(a)     Sellers are duly incorporated and validly existing under the laws of the respective jurisdictions indicated in the Preamble, and have full legal right, power and authority to enter into this Agreement, and to perform their obligations hereunder, subject to entry of the Sale Order by the Bankruptcy Court;

(b)     All necessary corporate or limited liability company action, as applicable, has been taken to duly authorize the transactions contemplated by, and to execute and deliver the documents provided under, this Agreement;

(c)     This Agreement and the documents contemplated hereby have been duly executed and delivered by Sellers, and assuming the due authorization, execution and delivery by Buyer thereto, and subject to the Bankruptcy Court entering the Sale Order, are valid and binding agreements of Sellers, enforceable against Sellers in accordance with their terms, except as such enforcement is subject to the Enforceability Exceptions;

(d)     The execution and delivery of this Agreement, and completion of all transactions herein contemplated, does not:

(i)     conflict with, result in a breach of or require any consent under any of the terms, conditions or provisions of Sellers' certificates of incorporation, bylaws or equivalent governing documents; or

(ii)     result in a violation by Sellers of any law, judgment, order (including executive order), award, writ, injunction or decree applicable to, or binding upon, Sellers; and

8

(e)    Sellers (i) are the legal and beneficial owners of, and have good and marketable title to, the owned Acquired Assets and (ii) hold a valid leasehold interest in the leased Acquired Assets, and, as of the Closing Date, the Acquired Assets will be free and clear of all liens and any other encumbrances, claims, security interests, mortgages or pledges (collectively, "Liens"), except for Permitted Liens (as defined below), that may affect legal transfer of title to Buyer at the Closing.

As used herein, "Permitted Liens" means (a) mechanics', carriers', workers', repairers' and similar statutory liens arising or incurred in the ordinary course of business; (b) liens for Taxes, assessments, or governmental charges or levies not yet due and payable; (c) Liens securing indebtedness and (d) the Liens set forth on Schedule 3.4(e).

## ARTICLE IV

### PRE-CLOSING COVENANTS

Section 4.1    Conduct of Business.

(a)    Except as may be required by the Bankruptcy Court and the Chapter 11 Cases, from the date hereof until the Closing Date, Sellers shall use commercially reasonable efforts to maintain the Acquired Assets at their current respective locations (or in the case of the Vessels, shall use commercially reasonable efforts to continue to operate the Vessels in the ordinary course).

(b)    Except as may be required by the Bankruptcy Court and the Chapter 11 Cases or otherwise in the ordinary course, from the date hereof until the Closing Date, Sellers shall not sell, lease, or otherwise dispose of, or incur any Liens, other than Permitted Liens, on, any of the Acquired Assets or agree or commit to do any of the foregoing.

Section 4.2    Government Approvals.    Buyers and Sellers shall cooperate and use commercially reasonable efforts to obtain the consents, approvals or authorizations of the applicable Governmental Authorities (as defined below) set forth on Schedule 4.2 (the "Required Governmental Approvals").    From and after the date hereof through the Closing Date, each Party shall take such actions necessary to preserve, and refrain from taking any actions that would reasonably be expected to jeopardize, the ability of the Required Governmental Approvals to be obtained.

Section 4.3    Access to Records and Properties; Confidentiality.    Intentionally omitted.

Section 4.4    Public Announcements.    The Parties agree to consult with each other before issuing any press release or making any public statement with respect to this Agreement or the transaction contemplated hereby, provided, however, that the Sellers may file any applications, motions or other pleadings in the Bankruptcy Cases they deem necessary or appropriate, and except for any press releases and public statements the making of which may be required by applicable law or any listing agreement with any national securities exchange (including any applications, motions or other pleadings deemed necessary or appropriate by the Sellers to be filed in the Bankruptcy Cases), will not issue any press release or make any such public statement prior to such consultation.

9

Section 4.5    Notice of Certain Events.  Sellers shall promptly notify Buyer of:

(a)    any notice or other communication from any person alleging that the consent of such person is or may be required in connection with the transactions contemplated by this Agreement;

(b)    any notice or other communication from any Governmental Authority in connection with the transactions contemplated by this Agreement; and

(c)    any actions, suits, claims, investigations or proceedings commenced relating to the Acquired Assets.

Section 4.6    Sufficient Funds.  Buyer shall ensure that on the Closing Date, Buyer will have access to sufficient funds to pay (i) all Cure Amounts with respect to the Assigned Contracts, (ii) the Closing Payment and (iii) all other cash payment obligations of Buyer contained in this Agreement.

Section 4.7    Consents.  Sellers will use commercially reasonable efforts to receive the Required Consents.

Section 4.8    Insurance.  Sellers will use commercially reasonable efforts to keep their current insurance coverage for the Acquired Assets until the Closing.  Without limiting Sellers' obligations under Section 6.1, Buyer understands and agrees that from and after the Closing, no insurance coverage under any insurance policy issued to Sellers or any of their Affiliates shall be made available to or cover Buyer.

Section 4.9    Alternate Transactions.  Nothing in this Agreement shall restrict Sellers' right to pursue one or more Alternate Transactions (as defined below), including marketing Sellers' assets (including the Acquired Assets) or providing due diligence materials, solely to the extent permitted by an order, in substantially the form attached hereto as Exhibit E, with such changes as may be reasonably acceptable to the Parties, issued by the Bankruptcy Court (the "Bidding Procedures Order") that, among other things, establishes procedures for an auction process to solicit competing bids.

## ARTICLE V

## POST-CLOSING COVENANTS

Section 5.1    Sellers' Marks.  As promptly as practicable following the Closing, but in any event no later than 30 days thereafter, Buyer shall remove, or cause to be removed any markings bearing any trademarks, trade names or logos of Sellers or any of their Affiliates or any predecessor entities of Sellers (including any variations or derivations thereof) that are not Acquired Assets, including those set forth on Schedule 5.1.

Section 5.2    Access to Records and Properties after Closing.  Following the Closing, Buyer and Sellers agree to permit their respective representatives to have access, at reasonable times and in a manner so as not to unreasonably interfere with their normal business operations, to the books and records acquired pursuant to this Agreement (or, in the case of Buyer, books

10

and records relating to the Excluded Assets) so as to enable Buyer and Sellers to prepare Tax, financial or court filings or reports, to respond to court orders, subpoenas or inquiries, investigations, audits or other proceedings of Governmental Authorities, to reconcile and resolve claims, to facilitate the wind-down of Sellers' estates, if applicable, and the Bankruptcy Cases, and to prosecute and defend legal actions or for other similar purposes (other than any such actions that are between or among the Parties). If either Party desires to dispose of any such records, such Party shall, prior to such disposition, provide the other Party with a reasonable opportunity to remove such of the records to be disposed of at the removing Party's expense. The Parties hereto shall cooperate with one another in the collection of historical invoices, preparation of Tax filings and similar accounting functions following Closing. Buyer and its subsidiaries shall, and shall cause any of their assignees of the rights and obligations hereunder to, (A) permit Sellers and any successors or assigns (including a plan administrator or trustee of a liquidating trust), their counsel, financial and tax advisors, consultants and other representatives reasonable access during normal business hours and after reasonable prior written request therefor to the financial and other books and records relating to Acquired Assets (whether in documentary or data form); (B) provide information reasonably requested in connection with the preparation of any Tax returns, amended Tax returns or claims for refund by Sellers' estate; (C) provide information reasonably requested related to the prosecution, reconciliation, investigation or resolution of any pending or potential claims or causes of action, including avoidance actions by Sellers' estate; and (D) provide information reasonably requested related to the resolution or reconciliation of claims filed against Sellers' bankruptcy estates.

## ARTICLE VI

## CERTAIN ADDITIONAL COVENANTS

Section 6.1    Transfer of Acquired Assets.  Buyer shall obtain title to and assume the risk of loss for the Acquired Assets immediately upon the Closing. Other than as expressly set forth elsewhere in this Agreement, any costs associated with the Acquired Assets incurred before the Closing shall be for the account of Sellers, and any costs associated with the Acquired Assets incurred after the Closing shall be for the account of Buyer, including the cost, if any, to store the Acquired Assets where the Acquired Assets are currently located or to transport the Acquired Assets to the delivery point as mutually agreed by the Parties.

Section 6.2    Assigned Contracts.

(a)    Notwithstanding anything herein to the contrary, this Agreement shall not constitute an agreement to assign any Assigned Contract if, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, an attempted assignment thereof, without the consent of any other person party thereto, would constitute a breach thereof (unless the restrictions on assignment would be rendered ineffective pursuant to Sections 9-406 through 9-409, inclusive, of the Uniform Commercial Code, as amended). If, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, such consent or approval is required but not obtained, neither Sellers nor Buyer shall be in breach of this Agreement nor shall the Purchase Price be adjusted or the Closing delayed; provided that Sellers shall cooperate with Buyer without further consideration, in any reasonable arrangement designed to provide Buyer with all of the benefits of or under any such Assigned Contract, including but not limited to

11

enforcement for the benefit of Buyer of any and all rights of Sellers against any person party to the Assigned Contract arising out of the breach or cancellation thereof by such person; provided, however, that after Closing, Buyer shall be responsible for all payment and other obligations under, and for all costs of enforcing rights under, such Assigned Contract to the same extent as if such Assigned Contract had been assigned. Any assignment to Buyer of any Assigned Contract that shall, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, require the consent or approval of any person for such assignment as aforesaid shall be made subject to such consent or approval being obtained.

(b)     Buyer shall, on or prior to the Closing, cure any and all defaults under the Assigned Contracts that are required to be cured under the Bankruptcy Code. Sellers shall provide Purchaser with a schedule of proposed Cure Amounts at least three (3) Business Days prior to giving notice thereof to parties required to receive notice under the Bankruptcy Code and Bankruptcy Rules.

(c)     With respect to each Assigned Contract, Buyer shall provide adequate assurance of the future performance of such Assigned Contract by Buyer. Buyer shall take such actions as may be reasonably requested by Sellers to assist Sellers in obtaining the Bankruptcy Court's entry of the Sale Order and any other order of the Bankruptcy Court reasonably necessary to consummate the transactions contemplated by this Agreement.

Section 6.3     DNB Singapore Account. At or prior to Closing, ISH and P.T. Amas will cause the signatories on the DNB Singapore Account to be changed as instructed by Buyer.

Section 6.4     Personally Identifiable Information. Buyer shall honor and observe, in connection with the transactions contemplated by this Agreement, any and all policies of Sellers in effect on the Petition Date prohibiting the transfer of personally identifiable information about individuals and otherwise comply with the requirements of Section 363(b)(l)(A) of the Bankruptcy Code.

Section 6.5     Further Assurances.

(a)     At the request and the sole expense of the requesting party, Buyer or Sellers, as applicable, shall execute and deliver, or cause to be executed and delivered, such documents as Buyer or Sellers, as applicable, or their respective counsel may reasonably request to effectuate the purposes of this Agreement and transactions contemplated hereby.

(b)     Each party shall use commercially reasonable efforts to take, or cause to be taken, all other actions and to do, or cause to be done, all other things reasonably necessary, proper or advisable to consummate and make effective as promptly as practicable the transactions contemplated hereby.

**ARTICLE VII**

**EMPLOYEE MATTERS**

Section 7.1     Employees. Buyer shall be neither obligated to nor prohibited from offering employment to any employee of Sellers from and after Closing.

12

## ARTICLE VIII

### BANKRUPTCY COURT MATTERS

Section 8.1    Motions.  Sellers shall promptly file with the Bankruptcy Court a motion or motions (the "Motion") seeking the Bankruptcy Court's approval of the Bidding Procedures Order and the Sale Order, in form determined by Sellers and reasonably acceptable to Buyer. Sellers shall affix or submit to the Bankruptcy Court a true, correct and complete copy of this Agreement as an exhibit to the Motion filed with the Bankruptcy Court.  Sellers and Buyer acknowledge that this Agreement and the sale of the Acquired Assets are subject to higher or otherwise better bids at the auction to be conducted by the Sellers in accordance with the Bidding Procedures Order and Bankruptcy Court approval.  Sellers and Buyer acknowledge that to obtain Bankruptcy Court approval of this Agreement and the transactions contemplated hereby, (i) Sellers must demonstrate that they have taken reasonable steps to obtain the highest or otherwise best offer available for the Acquired Assets, and that such demonstration shall include giving notice of the transactions contemplated by this Agreement to creditors and other interested parties as required by the local rules of the Bankruptcy Court and Bidding Procedures Order, (ii) subject to receipt by Sellers of one or more higher or otherwise better bids, Sellers shall have conducted the auction in accordance with the Bidding Procedures Order, and (iii) with respect to the Assigned Contracts, Buyer must provide adequate assurance of future performance under such agreements.

Section 8.2    Procedure.  Subject to their obligations as debtors-in-possession, Sellers shall promptly make any filings, take all actions and use all commercially reasonable efforts to obtain any and all relief from the Bankruptcy Court that is necessary or appropriate to consummate the transactions contemplated by this Agreement.    Sellers agree to use commercially reasonable efforts to prosecute the entry of the Bidding Procedures Order and the Sale Order.  In the event the entry of the Bidding Procedures Order or the Sale Order shall be appealed (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Bidding Procedures Order, Sale Order or other such order), Sellers and Buyer shall cooperate and use their respective reasonable efforts to defend and obtain an expedited resolution of any such appeal, petition or motion.

## ARTICLE IX

### CONDITIONS PRECEDENT

Section 9.1    Mutual Conditions Precedent.  The obligations of Buyer and Sellers to consummate the transactions to be performed in connection with the Closing are, in all material respects, subject to satisfaction or waiver by Buyer and Sellers of the following conditions precedent (provided that the condition in Section 9.1(a) shall not be subject to waiver):

(a)    the Sale Order shall have been entered by the Bankruptcy Court and shall not be subject to a stay pending appeal;

(b)      no preliminary or permanent injunction or other order of any court or any foreign, federal, state, local or other governmental, administrative or regulatory authority, body, agency, court, tribunal or similar entity having competent jurisdiction (a "Governmental Authority") (other than the Bankruptcy Court) issues an order or law that prevents the consummation of the transactions contemplated hereby shall be in effect;

(c)      the Required Governmental Approvals shall have been obtained;

(d)      all waiting periods under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 applicable to this Agreement shall have expired or been terminated; and

(e)      Subject to Section 6.2(a), the Assigned Contracts designated hereunder as Assigned Contracts shall be so assumed, sold and assigned to Buyer by order of the Bankruptcy Court reasonably satisfactory to the Parties.

Section 9.2      Buyer's Conditions Precedent.  The obligations of Buyer to consummate the transactions to be performed by it in connection with the Closing are, in all material respects, subject to satisfaction by Sellers or waiver by Buyer of the following conditions precedent:

(a)      The representations and warranties of Sellers set forth in Section 3.4 shall be true and correct in all respects at the Closing except where the failure of such representations and warranties to be true and correct in all respects does not have a material adverse effect with respect to the Acquired Assets;

(b)      Sellers shall have performed or complied in all material respects with all covenants and agreements they are required to perform or comply with hereunder at or prior to the Closing;

(c)      Sellers shall have obtained any other authorization, license or approval under applicable law for Sellers to consummate the transactions contemplated by this Agreement;

(d)      Sellers shall have obtained the Required Consents.

Section 9.3      Sellers' Conditions Precedent.  The obligations of Sellers to consummate the transactions to be performed by it in connection with the Closing are, in all material respects, subject to satisfaction by Buyer or waiver by Sellers of the following conditions precedent:

(a)      The representations and warranties of Buyer set forth in Section 3.3 shall be true and correct in all material respects at the Closing except where the failure of such representations and warranties to be true and correct in all respects does not a material adverse effect on the ability of Buyer to satisfy its obligations hereunder and consummate the transactions contemplated hereby;

(b)      Buyer shall have performed or complied in all material respects with all covenants and agreements it is required to perform or comply with hereunder at or prior to the Closing; and

14

(c)    Buyer shall have obtained any other authorization, license or approval under applicable law for Buyer to consummate the transactions contemplated by this Agreement.

## ARTICLE X

## CLOSING DELIVERABLES

Section 10.1    <u>Documents to be Delivered by Sellers and Buyer</u>.  On the Closing Date, representatives of Sellers and Buyer shall meet as contemplated above for the purpose of completing the sale and purchase of the Acquired Assets.

(a)    <u>Sellers' Deliverables</u>. Simultaneously with the delivery of the Closing Payment and delivery of the items described in <u>Section 10.1(b)</u> below, Sellers shall deliver to Buyer:

(i)    joint escrow instructions to the Escrow Agent releasing the Deposit to Sellers; and

(ii)    the instruction contemplated by <u>Section 6.3</u>.

(b)    <u>Buyer's Deliverables</u>.  At the Closing Date, Buyer shall deliver to Sellers:

(i)    joint escrow instructions to the Escrow Agent releasing the Deposit to Sellers;

(ii)    the Closing Payment; and

(iii)    A certified copy of the resolution of the board of directors of Buyer authorizing the execution of this Agreement and the purchase of the Acquired Assets.

## ARTICLE XI

## INDEMNIFICATION

Section 11.1    The (a) representations and warranties of Sellers and (b) covenants and agreements of Sellers that by their terms are to be performed prior to Closing, contained in this Agreement, the MOAs or any other certificate or other writing delivered in connection herewith, shall not survive the Closing.  The covenants and agreements contained herein that by their terms are to be performed after Closing shall survive indefinitely.

Section 11.2    From and after the Closing, Buyer will defend, indemnify, and hold Sellers, their Affiliates and each of their respective officers, directors, managers, partners, employees, equityholders, agents and other representatives (the "<u>Sellers Indemnified Parties</u>") harmless from and pay any and all Damages (as defined below), directly or indirectly, resulting from, relating to, arising out of, or attributable to any of the following: (i) breach of any representation or warranty by Buyer under <u>Section 3.3</u> of this Agreement, (ii) breach by Buyer of any covenant or obligation of Buyer in this Agreement, and (iii) any Assumed Liability.

15

Section 11.3    For the avoidance of doubt, and except as required elsewhere in this Agreement, Buyer will protect, defend, forever discharge, release, waive, indemnify and hold Sellers Indemnified Parties harmless from and against Damages and causes of actions for personal injuries, death, or property Damages of any kind and nature sustained by or purported to be sustained or brought by any person, entity or vessel, whomsoever made and howsoever arising directly or indirectly in connection with or related to this Agreement or the Acquired Assets, after the Closing Date.

Section 11.4    ALL OF THE INDEMNITIES AND ALLOCATIONS OF RISK CONTAINED IN THIS <u>ARTICLE XI</u> OR ELSEWHERE IN THIS AGREEMENT SHALL APPLY (TO THE EXTENT PERMITTED BY LAW), NOTWITHSTANDING THE SOLE, JOINT OR CONCURRENT NEGLIGENCE, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY PERSON OR PARTY, STRICT LIABILITY, UNSEAWORTHNESS, LIABILITY IMPOSED BY STATUTE, OR ANY OTHER BREACH OF OBLIGATION OF ANY PERSON OR ANY OTHER EVENT OR CONDITION.

Section 11.5    For purposes of this Agreement, "<u>Damages</u>" means all damages, losses, Liabilities, payments, amounts paid in settlement, obligations, fines, penalties, costs, and expenses (including reasonable fees and expenses of legal counsel) of any kind or nature whatsoever.

## ARTICLE XII

## <u>TERMINATION</u>

Section 12.1    Subject to <u>Section 12.2</u>, this Agreement may be terminated (except for the provisions referenced in <u>Section 12.2</u>) at any time prior to the Closing upon the occurrence of any one or more of the following:

(a)    by the mutual written agreement of the Parties;

(b)    by either Party, if (i) any law or order becomes final and effective that prohibits and makes illegal the consummation of the transactions contemplated by this Agreement, upon notification to the non-terminating Party by the terminating Party, (ii) any Governmental Authority (other than the Bankruptcy Court) issues an order, decree or ruling prohibiting the transactions contemplated by this Agreement and the MOAs, or (iii) if the Closing has not occurred by the Outside Closing Date;

(c)    by Buyer, (i) if Sellers shall have breached or failed to perform in any material respect any of their representations, warranties, covenants or other agreements contained in this Agreement the result of which causes a failure of the conditions set forth in <u>Section 9.1</u> and <u>Section 9.2</u> to be satisfied, or (ii) if all of the conditions set forth in <u>Section 9.1</u> and <u>Section 9.2</u> have been satisfied or waived, as applicable, and Sellers nevertheless refuse or fail to Close the transactions contemplated in this Agreement; <u>provided</u>, Sellers shall first be entitled to ten (10) days' prior notice and the opportunity to cure, and provided furthermore that Buyer shall not be in breach in any material respect of this Agreement at such time;

16

(d)    by Sellers, (i) if Buyer shall have breached or failed to perform in any material respect any of its representations, warranties, covenants or other agreements contained in this Agreement the result of which causes a failure of the conditions set forth in Section 9.1 and Section 9.3 to be satisfied, or (ii) if all of the conditions set forth in Section 9.1 and Section 9.3 have been satisfied or waived, as applicable, and Buyer nevertheless refuses or fails to Close the transactions contemplated in this Agreement; provided, Buyer shall first be entitled to ten (10) days' prior notice and the opportunity to cure, and provided furthermore that Buyer shall not be in breach in any material respect of this Agreement at such time;

(e)    by Sellers if Sellers execute a definitive agreement with a third party for the acquisition of all or substantially all of the Acquired Assets (an "Alternate Transaction"); or

(f)    by Sellers, if Sellers determine for any reason to terminate the sale of the Acquired Assets.

The Party exercising its rights to terminate pursuant to Section 12.1 shall give notice of such termination to the other Parties.

Section 12.2    Effect of Termination.

(a)    If a Party is entitled to terminate this Agreement in accordance with Section 12.1 then the Party so entitled to terminate this Agreement shall be entitled to the remedy for such Party set forth in Section 2.3, as such Party's sole and exclusive remedy hereunder.

(b)    If the Agreement is terminated by a Party pursuant to Section 12.1, then except for the provisions of Section 2.3, ARTICLE XI, this Section 12.2, ARTICLE XIV, ARTICLE XV, ARTICLE XVI and ARTICLE XVII, which provisions shall survive any such termination, the Parties shall have no further Liability or obligation hereunder.

## ARTICLE XIII

### TAXES; BULK SALES LAWS

Section 13.1    Cooperation.    Buyer and Sellers agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Acquired Assets (including access to books and records and Tax returns and related working papers dated before Closing) as is reasonably necessary for the filing of all Tax returns, the making of any election relating to Taxes, the preparation for any audit by any taxing authority, the prosecution or defense of any claims, suit or proceeding relating to any Tax, and the claiming by Buyer of any federal, state or local business tax credits or incentives that Buyer may qualify for in any of the jurisdictions in which any of the Acquired Assets are located; provided, however, that neither Buyer nor any Seller shall be required to disclose the contents of its income Tax returns to any Person other than the Parties.  Any expenses incurred in furnishing such information or assistance pursuant to this Section 13.3 shall be borne by the Party requesting it.  For purposes of this Agreement, "Tax" or "Taxes" means any federal, state, local, or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property,

17

personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty, or addition thereto, whether disputed or not.

Section 13.2    <u>Waiver of Bulk Sales Laws</u>.    To the greatest extent permitted by applicable law, Buyer and Sellers hereby waive compliance by Buyer and Sellers with the terms of any bulk sales or similar laws in any applicable jurisdiction in respect of the transactions contemplated by this Agreement. Buyer shall indemnify Sellers from and hold Sellers harmless from and against any Damages (including reasonable attorneys' fees) resulting from or arising out of (i) the Parties' failure to comply with any such bulk sales laws in respect of the transactions contemplated by this Agreement or (ii) any action brought or levy made as a result thereof. The Sale Order shall exempt Sellers and Buyer from compliance with any such laws.

## ARTICLE XIV

### BROKERAGE

Section 14.1    Sellers shall have no Liability whatsoever for the payment of any commission or brokerage fee to any broker or agent for which Buyer could become liable. Buyer agrees to indemnify and hold harmless Sellers from and against all loss, cost, damage, or expense arising out of claims for any other fees or commissions of brokers or agents employed or alleged to have been employed by Buyer in connection with the sale and purchase provided for herein.

Section 14.2    Buyer shall have no Liability whatsoever for the payment of any commission or brokerage fee to any broker or agent for which Sellers could become liable. Sellers agree to jointly and severally indemnify and hold harmless Buyer from and against all loss, cost, damage, or expense arising out of claims for any other fees or commissions of brokers or agents employed or alleged to have been employed by Sellers in connection with the sale and purchase provided for herein.

## ARTICLE XV

### COST OF THE TRANSACTION

Whether or not the transactions contemplated hereby shall be consummated, except as otherwise expressly provided herein, the Parties agree that each Party will pay the fees, expenses and disbursements of such Party and its agents, representatives, and counsel incurred in connection with the subject matter of this Agreement. Without limiting the generality of the foregoing, Buyer shall bear the costs incurred by it in carrying out any of its inspections, and for any expenses and fees arising from the registration of the Vessels under Buyer's flag.

18

**ARTICLE XVI**

**NOTICES**

Any notice, demand or communication required, permitted or desired to be given hereunder must be given in writing and shall be deemed effectively given upon receipt and shall be personally delivered, telecopied, e-mailed or delivered by express international courier, addressed as follows:

Sellers:

> International Shipholding Corporation
> 601 Poydras Street, Suite 1850
> New Orleans, Louisiana 70130
> Attn: Manny Estrada
> Fax: +1-251-706-6919

with a copy (which shall not constitute notice) to:

> Akin Gump Strauss Hauer & Feld LLP
> One Bryant Park
> Bank of America Tower
> New York, New York 10036-6745
> Attn: David Botter, Stephen B. Kuhn and Patrick Rice
> Fax: +1-212-872-1002
> Email: dbotter@akingump.com, skuhn@akingump.com and
> price@akingump.com

> and

> Akin Gump Strauss Hauer & Feld LLP
> 1700 Pacific Avenue
> Suite 4100
> Dallas, Texas 75201
> Fax: +1-214-969-4343
> Attn: Sarah Link Schultz
> E-mail: sschultz@akingump.com

Buyer:

> J Line Corporation
> c/o Mr. Martin Sosland
> Butler Snow LLP
> 5430 LBJ Freeway, Suite 1200
> Dallas, Texas 75240
> Fax: +1-469-680-5501
> Email: martin.sosland@butlersnow.com

with a copy (which shall not constitute notice) to:

> Butler Snow LLP
> 5430 LBJ Freeway, Suite 1200
> Dallas, Texas 75240
> Attn: Martin A. Sosland
> Fax: +1-469-680-5501
> Email: martin.sosland@butlersnow.com

or to such other address, and to the attention of such other person or officer, as any Party may designate by notice.

## ARTICLE XVII

### GENERAL

Section 17.1 <u>Entire Agreement</u>. This Agreement supersedes all previous agreements, and, together with the Sale Order and the Bidding Procedures Order, constitutes the entire agreement of whatsoever kind or nature existing between or among the Parties respecting the subject matter of this Agreement. As between or among the Parties, no oral statements, prior correspondence (including any email correspondence), schedules, lists, brochures, drawings or written material of any kind not specifically incorporated herein shall be of any force and effect, and shall not be relied upon by the other Party. All prior representations or agreements, whether written or verbal, not expressly incorporated herein, are superseded.

Section 17.2 <u>Waiver of Consequential Damages</u>. In no event shall either Party be liable to the other Party for, and each Party expressly waives against the other Party, any claim for consequential, punitive, incidental, special or indirect loss or damages, including but not limited to loss of revenue, loss of profit or use in any way arising out, incident to or in connection with this Agreement.

Section 17.3 <u>Exclusive Remedy</u>. Except as specifically set forth in this Agreement or the MOAs, effective as of the Closing, Buyer hereby waives any rights and claims Buyer may have against Sellers or their Affiliates, whether in law or equity, relating to (i) any breach of representation, warranty, covenant or agreement contained herein occurring on or prior to the Closing, (ii) the Acquired Assets or (iii) the Assumed Liabilities. Buyer and Sellers acknowledge and agree that if this Agreement is terminated for any reason, the provisions of <u>Section 2.3</u> and <u>Section 12.2</u> shall be the sole and exclusive remedies of Buyer for any beach of the representations, warranties, covenants or agreements contained herein.

Section 17.4 <u>Choice of Law</u>. The Parties agree that this Agreement shall be governed by and construed in accordance with the United States Bankruptcy Code, United States Maritime Law (and New York law to the extent not covered by the United States Bankruptcy Code or United States Maritime Law). The Bankruptcy Court shall have jurisdiction over the sale or any dispute with respect thereto.

Section 17.5 <u>Jurisdiction; Venue</u>.

20

(a)     Prior to the closing of the Chapter 11 Cases, except as otherwise expressly provided in this Agreement, the Parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought exclusively in the Bankruptcy Court, and each of the parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the Bankruptcy Court or that any such suit, action or proceeding which is brought in the Bankruptcy Court has been brought in an inconvenient forum.  Process in any such suit, action or proceeding may be served on any Party anywhere in the world, whether within or without the jurisdiction of the Bankruptcy Court.  Without limiting the foregoing, each Party agrees that service of process on such party as provided in ARTICLE XVI shall be deemed effective service of process on such party.

(b)     Upon the closing of the Chapter 11 Cases, except as otherwise expressly provided in this Agreement, the Parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought in the United States District Court for the Southern District of New York or any New York State court sitting in New York City, so long as one of such courts shall have subject matter jurisdiction over such suit, action or proceeding, and that any cause of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of New York, and each of the Parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum.  Process in any such suit, action or proceeding may be served on any Party anywhere in the world, whether within or without the jurisdiction of any such court.  Without limiting the foregoing, each party agrees that service of process on such party as provided in ARTICLE XVI shall be deemed effective service of process on such Party.

Section 17.6   Waiver of Jury Trial.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 17.7   Headings.  The headings contained in this Agreement are included for purposes of convenience only, and do not affect the meaning or interpretation of this Agreement.

Section 17.8   Construction.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement must be construed as if drafted jointly by the Parties and no presumption or burden of proof must arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.  The word "including" shall mean including without

21

limitation.  Any reference to the singular in this Agreement shall also include the plural and vice versa.

Section 17.9  Amendments; Waivers.    No amendment, modification, replacement, termination or cancellation of any provision of this Agreement will be valid, unless the same shall be in writing and signed by Buyer and Sellers.  No waiver by any Party of any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, may be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising because of any prior or subsequent such occurrence.

Section 17.10    Assignment.  Neither this Agreement, nor any of its rights, interests, or obligations hereunder, may be assigned by any Party without the prior written consent of the other Party, except that Buyer may assign its rights and obligations hereunder to an Affiliate upon providing notice to Sellers; provided, however, that no such assignment by Buyer shall relieve Buyer of its obligations under this Agreement.

Section 17.11    Binding Effect; Third Party Beneficiaries.    This Agreement shall become effective when each Party hereto shall have received a counterpart hereof signed by the other party hereto.  All of the terms and provisions of this Agreement are binding upon, and inure to the benefit of and are enforceable by, the Parties and their respective successors and permitted assigns.  Except for Seller Indemnified Parties, no provision of this Agreement is intended to confer upon any person other than the Parties hereto any rights or remedies hereunder.

Section 17.12    Severability.    The invalidity, illegality or unenforceability of any provision or any part of any provision of this Agreement shall not affect the continuation in force of such other part or the remainder of this Agreement.

Section 17.13    Counterparts.  This Agreement may be executed in any number of counterparts by the Parties hereto on separate counterparts, each of which when executed and delivered shall constitute an original, but all of which shall together constitute one and the same instrument.  Any document or signature delivered by facsimile or electronic transmission (including .pdf) shall be deemed an original executed document for all purposes.

<p align="center">[<em>Remainder of Page Intentionally Left Blank</em>]</p>

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed in multiple originals by their duly authorized officers, all as of the day and year first above written.

**SELLERS**:

**INTERNATIONAL SHIPHOLDING CORPORATION**

By: _____
Name: M. Estrada
Title: CFO

**LCI SHIPHOLDINGS, INC.**

By: _____
Name: M. Estrada
Title:

**GULF SOUTH SHIPPING PTE LTD.**

By: _____
Name: M. Estrada
Title:

**MARCO SHIPPING Company (PTE) LTD.**

By: _____
Name: M. Estrada
Title:

**LCI SHIPHOLDINGS, INC.**

By: _____
Name: M. Estrada
Title:

**N.W. JOHNSEN & CO., Inc.**

By: _____
Name:
Title:

[Signature Page to Asset Purchase Agreement]

**SELLERS (CONT.)**

**MPV NETHERLANDS C.V.**

By: _____

Name: _M. Estrada_

Title:


**MPV NETHERLANDS COÖPERATIEF U.A.**

By: _____

Name: _M. Estrada_

Title:


**MPV NETHERLANDS V.B.**

By: _____

Name: _M. Estrada_

Title:

[Signature Page to Asset Purchase Agreement]

**BUYER:**

**J LINE CORPORATION**

By: _____

Name:  Erik L. Johnsen

Title:  President

## __EXHIBIT A__

[see attached]

## **EXHIBIT B**

[see attached]

**SCHEDULE 1.2(m) – Excluded Assets**

**SCHEDULE 3.3(d) – Required Consents**

**<u>SCHEDULE 3.4(e) – Permitted Liens</u>**

**<u>SCHEDULE 4.2 – Required Governmental Approvals</u>**

**SCHEDULE 5.5 – Sellers' Marks**

## **Exhibit E to Sale Motion**

### **Cure Notice**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 11 |
| INTERNATIONAL SHIPHOLDING CORPORATION, *et al.*,[1] | Case No. 16-12220 (SMB) |
| Debtors. | Jointly Administered |

### NOTICE OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES THAT MAY BE ASSUMED AND ASSIGNED IN CONNECTION WITH THE SALE OF THE DEBTORS' ASSETS IN THE SPECIALTY BUSINESS SEGMENT AND THE PROPOSED CURE COST WITH RESPECT THERETO

**YOU ARE RECEIVING THIS NOTICE OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES THAT MAY BE ASSUMED AND ASSIGNED IN CONNECTION WITH THE SALE OF THE DEBTORS' ASSETS AND THE PROPOSED CURE AMOUNT WITH RESPECT THERETO (THE "CURE NOTICE") BECAUSE YOU MAY BE A COUNTERPARTY TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE WITH INTERNATIONAL SHIPHOLDING CORPORATION OR ONE OR MORE OF ITS AFFILIATED DEBTORS (COLLECTIVELY, THE "DEBTORS"). PLEASE READ THIS NOTICE CAREFULLY AS YOUR RIGHTS MAY BE AFFECTED BY THE TRANSACTIONS DESCRIBED HEREIN.**

**PLEASE TAKE NOTICE** that on October 28, 2016, the Debtors filed a motion (the "Motion")[2] with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") seeking, among other things, entry of an order (the "Bidding Procedures Order"):  (i) approving proposed bidding procedures (the "Bidding Procedures") by which the Debtors will solicit and select the highest or otherwise best offer for the sale of certain assets contained in the Debtors' Specialty Business Segment (the "Assets") through a sale of the Assets (the "Sale Transaction"); (ii) establishing procedures for the assumption and assignment of executory contracts and unexpired leases, including notice of proposed cure amounts (the "Assumption and Assignment Procedures"); (iii) approving the form and manner of notice with respect to certain procedures, protections, schedules, and agreements described herein and

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: International Shipholding, Inc. (9662); Enterprise Ship Co. (9059); Sulphur Carriers, Inc. (8965); Central Gulf Lines, Inc. (8979); Coastal Carriers, Inc. (6278); Waterman Steamship Corporation (0640); N.W. Johnsen & Co., Inc. (8006); LMS Shipmanagement, Inc. (0660); U.S. United Ocean Services, LLC (1160); Mary Ann Hudson, LLC (8478); Sheila McDevitt, LLC (8380); Tower LLC (6755); Frascati Shops, Inc. (7875); Gulf South Shipping PTE LTD (8628); LCI Shipholdings, Inc. (8094); Dry Bulk Australia LTD (5383); Dry Bulk Americas LTD (6494); and Marco Shipping Company PTE LTD (4570).  The service address for each of the above Debtors is 601 Poydras Street, Pan American Building, Suite 1850, New Orleans, Louisiana 70130.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

attached hereto; (iv) scheduling (a) an auction (the "<u>Auction</u>") if the Debtors receive two or more timely and acceptable Qualified Bids (as defined below) and (b) a final hearing (the "<u>Sale Hearing</u>") to approve a Sale of the Assets; and (v) granting related relief.

**PLEASE TAKE FURTHER NOTICE** that on [●], 2016, the Bankruptcy Court entered the Bidding Procedures Order [ECF No. ●].

**PLEASE TAKE FURTHER NOTICE** that the Bidding Procedures Order, among other things, established procedures for the assumption and assignment of certain executory contracts and unexpired leases that the Debtors believe they might seek to assume and assign in connection with a Sale Transaction (collectively, the "<u>Assigned Contracts</u>") to a purchaser and the determination of related Cure Costs (as defined below).  The Debtors are parties to numerous Designated Contracts and, in accordance with the Bidding Procedures Order, hereby file this notice identifying (i) the Designated Contracts, which may be assumed and assigned to te Stalking Horse Purchaser or such other Successful Bidder in connection with the Sale Transaction and (ii) the proposed amounts, if any, the Debtors believe are owed to the counterparty to the Designated Contract to cure any defaults or arrears existing under the Designated Contract (the "<u>Cure Costs</u>"), both as set forth on <u>Exhibit 1</u> attached hereto.  Other than the Cure Costs listed on Exhibit 1, the Debtors are not aware of any amounts due and owing under the Designated Contracts listed therein.

**PLEASE TAKE FURTHER NOTICE** that the hearing to approve the sale of the Assets (the "<u>Sale Hearing</u>") will be held before the Honorable Stuart M. Bernstein, United States Bankruptcy Judge, at the United States Bankruptcy Court of the Southern District of New York, Alexander Hamilton Customs House, One Bowling Green, New York, New York 10004, Courtroom 723 on **December 20, 2015 at 10:00 a.m. (prevailing Eastern Time)**.

**PLEASE TAKE FURTHER NOTICE** that the listing of a Designated Contract on Exhibit 1 does not constitute an admission that the Designated Contract is an executory contract or unexpired lease as contemplated by Bankruptcy Code section 365(a) or that the Debtors have any liability thereunder, and the Debtors expressly reserve all of their rights, claims, causes of action, and defenses with respect to the Designated Contracts listed on <u>Exhibit 1</u>.

**PLEASE TAKE FURTHER NOTICE** that a counterparty to a Designated Contract listed on this Cure Notice may file an objection (a "<u>Designated Contract Objection</u>") only if such objection is to the proposed assumption and assignment of the applicable Designated Contract or the proposed Cure Costs, if any.  All Designated Contract Objections must (1) state, with specificity, the legal and factual basis for the objection as well as what Cure Costs are required, if any, (2) include appropriate documentation in support thereof, and (3) be filed and served on the Objection Recipients no later than **4:00 p.m. (prevailing Eastern Time) fourteen (14) days following the Assumption and Assignment Service Date** (the "<u>Assignment and Assumption Objection Deadline</u>").

**PLEASE TAKE FURTHER NOTICE** that the Objection Recipients are: (i) Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Attn: David Botter, Esq., Email: dbotter@akingump.com, and Sarah Link Schultz, Esq., 1700 Pacific Avenue, Suite 4100, Dallas, Texas 75201, Email: sschultz@akingump.com, counsel for the

Debtors; (ii) Pachulski Stang Ziehl & Jones LLP, 780 Third Avenue, 34th Floor, New York, NY 10017, Attn: Robert J. Feinstein, Esq., Email: rfeinstein@pszjlaw.com, and Bradford J. Sandler, Esq., Email: bsandler@pszjlaw.com, proposed counsel to the statutory committee of unsecured creditors; (iii) the Office of the United States Trustee for the Southern District of New York, U.S. Federal Office Building, 201 Varick St., Room 1006, New York, New York 10014, Attn: Serene Nakano, Esq., Email: serene.nakano@usdoj.gov; (v) counsel to the agents and lenders under the Debtors' pre-petition credit facilities; (vi) counsel to the agent under the Debtors' post-petition debtor-in-possession financing; (vii) the Internal Revenue Service; (viii) the United States Attorney for the Southern District of New York; (vii) the Securities and Exchange Commission; (ix) all parties that have filed a request to receive service of court filings pursuant to Bankruptcy Rule 2002; (x) all other parties on the master service list prepared and maintained pursuant to the *Order Establishing Certain Notice, Case Management, and Administrative Procedures* [ECF No. 178]; and (xiii) if known on the Sale Objection Deadline, any Successful Bidder.

**PLEASE TAKE FURTHER NOTICE THAT IF A COUNTERPARTY TO A DESIGNATED CONTRACT FILES A DESIGNATED CONTRACT OBJECTION IN A MANNER THAT IS CONSISTENT WITH THE REQUIREMENTS SET FORTH ABOVE, AND THE PARTIES ARE UNABLE TO CONSENSUALLY RESOLVE THE DISPUTE PRIOR TO THE SALE HEARING, THE AMOUNT TO BE PAID OR RESERVED WITH RESPECT TO SUCH OBJECTION WILL BE DETERMINED AT THE SALE HEARING, SUCH LATER HEARING DATE THAT THE DEBTORS DETERMINE IN THEIR DISCRETION, OR SUCH OTHER DATE DETERMINED BY THE BANKRUPTCY COURT. ALL OTHER OBJECTIONS TO THE PROPOSED ASSUMPTION AND ASSIGNMENT OF THE DEBTORS' RIGHT, TITLE, AND INTEREST IN, TO, AND UNDER THE DESIGNATED CONTRACTS WILL BE HEARD AT THE SALE HEARING.**

**PLEASE TAKE FURTHER NOTICE** that if the counterparty to a Designated Contract does not timely file and serve a Designated Contract Objection that is consistent with the requirements set forth above by the Assignment and Assumption Objection Deadline, such counterparty will be deemed to have consented to the assumption and assignment of the Designated Contract to a Successful Bidder, notwithstanding any anti-alienation provision or other restriction on assumption or assignment in the Designated Contract, and shall be forever barred from asserting any objection with regard to such assumption and assignment and/or Cure Costs set forth in Exhibit 1, except with respect to the adequate assurance of future performance by the Successful Bidder. Any objections to the Stalking Horse Bidder or Successful Bidder's proposed form of adequate assurance of future performance must be raised at the Sale Hearing or Supplemental Designated Contract Hearing, as applicable, and will be resolved at the hearing at which it is raised or, in the Debtors' discretion, adjourned to a later hearing.

**PLEASE TAKE FURTHER NOTICE** that although the Debtors have made a good faith effort to identify all Designated Contracts that might be assumed and assigned in connection with a Sale Transaction, the Debtors may discover certain contracts inadvertently omitted from the Designated Contracts list or Successful Bidder may identify other executory contracts or unexpired leases that they desire to assume and assign in connection with the Sale. Accordingly, the Debtors have reserved the right, at any time after the Assumption and

5

Assignment Service Date and before the closing of a Sale Transaction, to supplement the list of Designated Contracts on this Cure Notice with previously omitted Designated Contracts in accordance with the definitive agreement for a Sale Transaction.

**PLEASE TAKE FURTHER NOTICE** that in the event the Debtors supplement the list of Assigned Contracts, the Debtors shall promptly serve a supplemental notice ( a "Supplemental Cure Notice") by electronic transmission, hand delivery, or overnight mail on the counterparty (and its attorney, if known) to each impacted Assigned Contract at the last known address available to the Debtors.

**PLEASE TAKE FURTHER NOTICE** that this Cure Notice is subject to the terms and conditions of the Motion and the Bidding Procedures Order, with such Bidding Procedures Order controlling in the event of any conflict, and the Debtors encourage parties-in-interest to review such documents in their entirety. Parties with questions regarding the Assumption and Assignment Procedures contained herein should contact the Debtors' counsel at the contact information provided below.

**PLEASE TAKE FURTHER NOTICE** that the inclusion of a Designated Contract on this Cure Notice (or Supplemental Cure Notice) will not obligate the Debtors to assume any Designated Contract listed thereon or the Successful Bidder to take assignment of such Designated Contract. Only those Designated Contracts that are included on a schedule of assumed and assigned executory contracts and unexpired leases attached to the final Purchase Agreement with the Successful Bidder (each, an "Acquired Contract") will be assumed and assigned to the Successful Bidder.

Dated:  New York, New York            **AKIN GUMP STRAUSS HAUER & FELD LLP**
       [●], 2016

                         By: _/s/ DRAFT_____
                         David H. Botter
                         One Bryant Park
                         New York, NY 10036
                         Telephone: (212) 872-1000
                         Facsimile: (212) 872-1002

                         Sarah Link Schultz (admitted *pro hac vice*)
                         Sarah J. Crow (admitted *pro hac vice*)
                         1700 Pacific Avenue, Suite 4100
                         Dallas, TX 75201
                         Telephone: (214) 969-2800
                         Facsimile: (214) 969-4343

                         *Counsel to Debtors and Debtors in Possession*

**Exhibit F to Sale Motion**

**Sale Notice**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re:<br><br>INTERNATIONAL SHIPHOLDING<br>CORPORATION, *et al.*,[1]<br><br>　　　　　　　　　　　Debtors. | Chapter 11<br><br>Case No. 16-12220 (SMB)<br><br>Jointly Administered |

### NOTICE BID DEADLINE, AUCTION, AND SALE HEARING

**PLEASE TAKE NOTICE** that on July 31, 2016, the debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

**PLEASE TAKE FURTHER NOTICE** that, on October 28, 2016, the Debtors filed a motion (the "Motion")[2] with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") seeking, among other things, entry of an order (the "Bidding Procedures Order"): (i) approving proposed bidding procedures (the "Bidding Procedures") by which the Debtors will solicit and select the highest or otherwise best offer for the sale of certain assets contained in the Debtors' Specialty Business Segment (the "Assets") through one or more sales of the Assets (the "Sale Transaction"); (ii) establishing procedures for the assumption and assignment of executory contracts and unexpired leases, including notice of proposed cure amounts (the "Assumption and Assignment Procedures"); (iii) approving the form and manner of notice with respect to certain procedures, protections, schedules, and agreements described herein and attached hereto; (iv) scheduling (a) an auction (the "Auction") if the Debtors receive two or more timely and acceptable Qualified Bids (as defined below) and (b) a final hearing (the "Sale Hearing") to approve one or more Sales of the Assets; and (v) granting related relief.

**PLEASE TAKE FURTHER NOTICE** that, on [●], the Bankruptcy Court entered the Bidding Procedures Order [ECF No. ●].

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: International Shipholding, Inc. (9662); Enterprise Ship Co. (9059); Sulphur Carriers, Inc. (8965); Central Gulf Lines, Inc. (8979); Coastal Carriers, Inc. (6278); Waterman Steamship Corporation (0640); N.W. Johnsen & Co., Inc. (8006); LMS Shipmanagement, Inc. (0660); U.S. United Ocean Services, LLC (1160); Mary Ann Hudson, LLC (8478); Sheila McDevitt, LLC (8380); Tower LLC (6755); Frascati Shops, Inc. (7875); Gulf South Shipping PTE LTD (8628); LCI Shipholdings, Inc. (8094); Dry Bulk Australia LTD (5383); Dry Bulk Americas LTD (6494); and Marco Shipping Company PTE LTD (4570). The service address for each of the above Debtors is 601 Poydras Street, Pan American Building, Suite 1850, New Orleans, Louisiana 70130.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

1

**PLEASE TAKE FURTHER NOTICE** that pursuant to the Bidding Procedures Order, if the Debtors receive two or more timely and acceptable Qualified Bids for the Assets, the Debtors will conduct the Auction on **December 15, 2016 at 10:00 a.m. (prevailing Eastern Time)** at the offices of counsel for the Debtors, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, or such other place and time as the Debtors shall notify all Qualified Bidders and the Consultation Parties.  Any party that wishes to take part in this process and submit a bid for the Assets must submit its bid in accordance with the Bidding Procedures by **December 8, 2016 at 5:00 p.m. (prevailing Eastern Time)** (the "Bid Deadline"). Only the Debtors, the Consultation Parties, the Stalking Horse Bidder, any other Qualified Bidder, and/or other party as the Debtors may determine to include in their discretion, in each case, along with their representatives and advisors, shall be entitled to attend the Auction (such attendance to be in person), and only Qualified Bidders will be entitled to make Overbids at the Auction.  **All interested or potentially affected parties should carefully read the Bidding Procedures and the Bidding Procedures Order.**

**PLEASE TAKE FURTHER NOTICE** that the Debtors have the right to adjourn or cancel the Auction at or prior to the Auction.

**PLEASE TAKE FURTHER NOTICE that the Sale Hearing to consider approval of the sale of the Assets to the Successful Bidder at the Auction, free and clear of all liens, claims, interests, and encumbrances in accordance with Bankruptcy Code section 363(f), will be held before the Honorable Stuart M. Bernstein, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton Customs House, One Bowling Green, New York, New York 10004, Courtroom 723 on December 20, 2015 at 10:00 a.m. (prevailing Eastern Time).**

**PLEASE TAKE FURTHER NOTICE** that objections to the Sale, if any, must be filed and served so as to be actually received by the Objection Recipients no later than **December [●], 2016 at [●].m. (prevailing Eastern Time)**.

**PLEASE TAKE FURTHER NOTICE** that the Objection Recipients are:  (i) Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Attn: David Botter, Esq., Email: dbotter@akingump.com, and Sarah Link Schultz, Esq., 1700 Pacific Avenue, Suite 4100, Dallas, Texas 75201, Email: sschultz@akingump.com, counsel for the Debtors; (ii) Pachulski Stang Ziehl & Jones LLP, 780 Third Avenue, 34th Floor, New York, NY 10017, Attn: Robert J. Feinstein, Esq., Email: rfeinstein@pszjlaw.com, and Bradford J. Sandler, Esq., Email: bsandler@pszjlaw.com, proposed counsel to the statutory committee of unsecured creditors; (iii) the Office of the United States Trustee for the Southern District of New York, U.S. Federal Office Building, 201 Varick St., Room 1006, New York, New York 10014, Attn: Serene Nakano, Esq., Email: serene.nakano@usdoj.gov; (v) counsel to the agents and lenders under the Debtors' pre-petition credit facilities; (vi) counsel to the agent under the Debtors' post-petition debtor-in-possession financing; (vii) the Internal Revenue Service; (viii) the United States Attorney for the Southern District of New York; (vii) the Securities and Exchange Commission; (ix) all parties that have filed a request to receive service of court filings pursuant to Bankruptcy Rule 2002; (x) all other parties on the master service list prepared and maintained pursuant to the *Order Establishing Certain Notice, Case Management, and Administrative*

*Procedures* [ECF No. 178]; and (xiii) if known on the Sale Objection Deadline, any Successful Bidder.

**PLEASE TAKE FURTHER NOTICE THAT UNLESS AN OBJECTION IS TIMELY SERVED AND FILED IN ACCORDANCE WITH THIS NOTICE, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND THE BANKRUPTCY COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER HEARING AND NOTICE.**

**PLEASE TAKE FURTHER NOTICE** that this Notice of Bid Deadline, Auction, and Sale Hearing is subject to the terms and conditions of the Motion and the Bidding Procedures Order, with such Bidding Procedures Order controlling in the event of any conflict, and the Debtors encourage parties in interest to review such documents in their entirety. Parties interested in receiving more information regarding the sale of the Assets and/or copies of any related document, including the Motion or the Bidding Procedures Order, may make a written request to counsel for the Debtors, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Attn: David Botter, Esq., Email: dbotter@akingump.com, and Sarah Link Schultz, Esq., 1700 Pacific Avenue, Suite 4100, Dallas, Texas 75201, Email: sschultz@akingump.com. In addition, copies of the Motion, the Bidding Procedures Order and this Notice may be examined by interested parties (i) free of charge at the website established for these chapter 11 cases by the Debtors' Court approved claims agent, Prime Clerk, at https://cases.primeclerk.com/ish/ or (ii) on the Court's electronic docket for the Debtors' chapter 11 cases, which is posted on the Internet at https://ecf.nysb.uscourts.gov/ (a PACER login and password are required and can be obtained through the PACER Service Center at www.pacer.psc.uscourts.gov).

Dated:  New York, New York
       [●], 2016

**AKIN GUMP STRAUSS HAUER & FELD LLP**

By: _/s/ DRAFT_____
David H. Botter
One Bryant Park
New York, NY 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

Sarah Link Schultz (admitted *pro hac vice*)
Sarah J. Crow (admitted *pro hac vice*)
1700 Pacific Avenue, Suite 4100
Dallas, TX 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343

*Counsel to Debtors and Debtors in Possession*

## **Exhibit G to Sale Motion**

**Publication Notice**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 11 |
| INTERNATIONAL SHIPHOLDING CORPORATION, *et al.*,[1] | Case No. 16-12220 (SMB) |
| Debtors. | Jointly Administered |

## NOTICE OF BID DEADLINE, AUCTION AND SALE HEARING

PLEASE TAKE NOTICE that on July 31, 2016, the debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

PLEASE TAKE FURTHER NOTICE that, on October 28, 2016, the Debtors filed a motion (the "Motion")[2] with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") seeking, among other things, entry of an order (the "Bidding Procedures Order"): (i) approving proposed bidding procedures (the "Bidding Procedures") by which the Debtors will solicit and select the highest or otherwise best offer for the sale of certain assets contained in the Debtors' Specialty Business Segment (the "Assets") through a sale of the Assets (the "Sale Transaction"); (ii) establishing procedures for the assumption and assignment of executory contracts and unexpired leases, including notice of proposed cure amounts (the "Assumption and Assignment Procedures"); (iii) approving the form and manner of notice with respect to certain procedures, protections, schedules, and agreements described herein and attached hereto; (iv) scheduling (a) an auction (the "Auction") if the Debtors receive two or more timely and acceptable Qualified Bids (as defined below) and (b) a final hearing (the "Sale Hearing") to approve a Sale of the Assets; and (v) granting related relief. On [●], 2016, the Bankruptcy Court entered the Bidding Procedures Order [ECF No. ●].

1) AUCTION

Pursuant to the Bidding Procedures Order, if the Debtors receive two or more timely and acceptable Qualified Bids for the same Assets, the Debtors will conduct the Auction on

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: International Shipholding, Inc. (9662); Enterprise Ship Co. (9059); Sulphur Carriers, Inc. (8965); Central Gulf Lines, Inc. (8979); Coastal Carriers, Inc. (6278); Waterman Steamship Corporation (0640); N.W. Johnsen & Co., Inc. (8006); LMS Shipmanagement, Inc. (0660); U.S. United Ocean Services, LLC (1160); Mary Ann Hudson, LLC (8478); Sheila McDevitt, LLC (8380); Tower LLC (6755); Frascati Shops, Inc. (7875); Gulf South Shipping PTE LTD (8628); LCI Shipholdings, Inc. (8094); Dry Bulk Australia LTD (5383); Dry Bulk Americas LTD (6494); and Marco Shipping Company PTE LTD (4570). The service address for each of the above Debtors is 601 Poydras Street, Pan American Building, Suite 1850, New Orleans, Louisiana 70130.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

December 15, 2016 at 10:00 a.m. (prevailing Eastern Time) at the offices of counsel for the Debtors, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, or such other place and time as the Debtors shall notify all Qualified Bidders and the Consultation Parties. Any party that wishes to take part in this process and submit a bid for the Assets must submit its Bid by **December 8, 2016 at 10:00 a.m. (prevailing Eastern Time)** (the "Bid Deadline") and in accordance with the Bidding Procedures. Only the Debtors, the Consultation Parties, the Stalking Horse Bidder, any other Qualified Bidder and/or other party as the Debtors may determine to include in their discretion, in each case, along with their representatives and advisors, shall be entitled to attend the Auction (such attendance to be in person) and only Qualified Bidders will be entitled to make any Overbids at the Auction. The Debtors have the right to adjourn or cancel the Auction at or prior to the Auction. **All interested or potentially affected parties should carefully read the Bidding Procedures and the Bidding Procedures Order.**

2) SALE HEARING

**The Sale Hearing to consider approval of the sale of the Assets to the Successful Bidder at the Auction, free and clear of all liens, claims, interests, and encumbrances in accordance with Bankruptcy Code section 363(f), will be held before the Honorable Stuart M. Bernstein, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton Customs House, One Bowling Green, New York, New York 10004, Courtroom 723 on December 20, 2015 at 10:00 a.m. (prevailing Eastern Time).** Objections to the Sale, if any, must be filed and served so as to be actually received by the Objection Recipients no later than **December [●], 2015 at [●].m. (prevailing Eastern Time)**. The Objection Recipients are: (i) Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Attn: David Botter, Esq., Email: dbotter@akingump.com, and Sarah Link Schultz, Esq., 1700 Pacific Avenue, Suite 4100, Dallas, Texas 75201, Email: sschultz@akingump.com, counsel for the Debtors; (ii) Pachulski Stang Ziehl & Jones LLP, 780 Third Avenue, 34th Floor, New York, NY 10017, Attn: Robert J. Feinstein, Esq., Email: rfeinstein@pszjlaw.com, and Bradford J. Sandler, Esq., Email: bsandler@pszjlaw.com, proposed counsel to the statutory committee of unsecured creditors; (iii) the Office of the United States Trustee for the Southern District of New York, U.S. Federal Office Building, 201 Varick St., Room 1006, New York, New York 10014, Attn: Serene Nakano, Esq., Email: serene.nakano@usdoj.gov; (v) counsel to the agents and lenders under the Debtors' pre-petition credit facilities; (vi) counsel to the agent under the Debtors' post-petition debtor-in-possession financing; (vii) the Internal Revenue Service; (viii) the United States Attorney for the Southern District of New York; (vii) the Securities and Exchange Commission; (ix) all parties that have filed a request to receive service of court filings pursuant to Bankruptcy Rule 2002; (x) all other parties on the master service list prepared and maintained pursuant to the *Order Establishing Certain Notice, Case Management, and Administrative Procedures* [ECF No. 178]; and (xi) if known on the Sale Objection Deadline, any Successful Bidder.

**PLEASE TAKE FURTHER NOTICE THAT UNLESS AN OBJECTION IS TIMELY SERVED AND FILED IN ACCORDANCE WITH THIS NOTICE, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND THE BANKRUPTCY COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER HEARING AND NOTICE.**

3) <u>COPIES OF THE MOTION AND BIDDING PROCEDURES ORDER</u>

This Notice of Bid Deadline, Auction and Sale Hearing is subject to the terms and conditions of the Motion and the Bidding Procedures Order, with such Bidding Procedures Order controlling in the event of any conflict, and the Debtors encourage parties in interest to review such documents in their entirety. Parties interested in receiving more information regarding the sale of the Assets and/or copies of any related document, including the Motion or the Bidding Procedures Order, may make a written request to: counsel for the Debtors, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Attn: David Botter, Esq., Email: dbotter@akingump.com, and Sarah Link Schultz, Esq., 1700 Pacific Avenue, Suite 4100, Dallas, Texas 75201, Email: sschultz@akingump.com. In addition, copies of the Motion, the Bidding Procedures Order and this Notice may be examined by interested parties (i) free of charge at the website established for these chapter 11 cases by the Debtors' Court approved claims agent, Prime Clerk LLC, at https://cases.primeclerk.com/ish/ or (ii) on the Court's electronic docket for the Debtors' chapter 11 cases, which is posted on the Internet at https://ecf.nysb.uscourts.gov/ (a PACER login and password are required and can be obtained through the PACER Service Center at www.pacer.psc.uscourts.gov).

**<u>Exhibit H to Sale Motion</u>**

**Post-Auction Notice**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) ) ) | Chapter 11 |
| INTERNATIONAL SHIPHOLDING CORPORATION, *et al.*,[1] | ) ) ) ) | Case No. 16-12220 (SMB) |
| Debtors. | ) ) ) | Jointly Administered |

**NOTICE OF SUCCESSFUL AND BACKUP BIDDERS WITH**
**RESPECT TO THE AUCTION OF THE DEBTORS' ASSETS**

**PLEASE TAKE NOTICE** that, on [●], 2016, the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") entered an order [ECF No. ●] (the "Bidding Procedures Order"): (i) approving proposed bidding procedures (the "Bidding Procedures") by which the Debtors will solicit and select the highest or otherwise best offer for the sale of certain assets contained in the Debtors Specialty Business Segment (the "Assets") through a sale of the Assets (the "Sale Transaction"); (ii) establishing procedures for the assumption and assignment of executory contracts and unexpired leases, including notice of proposed cure amounts (the "Assumption and Assignment Procedures"); (iii) approving the form and manner of notice with respect to certain procedures, protections, schedules, and agreements described herein and attached hereto; (iv) scheduling (a) an auction (the "Auction") if the Debtors receive two or more timely and acceptable Qualified Bids (as defined below) and (b) a final hearing (the "Sale Hearing") to approve one or more Sales of the Assets; and (v) granting related relief.

**PLEASE TAKE FURTHER NOTICE** that, on December [●], 2016 at [●].m. (prevailing Eastern Time), pursuant to the Bidding Procedures Order, the Debtors conducted the Auction with respect to certain of the Assets.

**PLEASE TAKE FURTHER NOTICE** that, at the conclusion of the Auction, the Debtors, in consultation with their professionals and the Bid Consultation Parties, selected the following Successful Bidder and Back-Up Bidder with respect to the Assets:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: International Shipholding, Inc. (9662); Enterprise Ship Co. (9059); Sulphur Carriers, Inc. (8965); Central Gulf Lines, Inc. (8979); Coastal Carriers, Inc. (6278); Waterman Steamship Corporation (0640); N.W. Johnsen & Co., Inc. (8006); LMS Shipmanagement, Inc. (0660); U.S. United Ocean Services, LLC (1160); Mary Ann Hudson, LLC (8478); Sheila McDevitt, LLC (8380); Tower LLC (6755); Frascati Shops, Inc. (7875); Gulf South Shipping PTE LTD (8628); LCI Shipholdings, Inc. (8094); Dry Bulk Australia LTD (5383); Dry Bulk Americas LTD (6494); and Marco Shipping Company PTE LTD (4570). The service address for each of the above Debtors is 601 Poydras Street, Pan American Building, Suite 1850, New Orleans, Louisiana 70130.

2

| Asset(s) | Successful Bidder | Back-Up Bidder |
|----------|-------------------|----------------|
|          |                   |                |

**PLEASE TAKE FURTHER NOTICE that the Sale Hearing to consider approval of the sale of the Assets to the Successful Bidder at the Auction, <u>free and clear of all liens, claims, interests, and encumbrances</u> in accordance with Bankruptcy Code section 363(f), will be held before the Honorable Stuart M. Bernstein, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton Customs House, One Bowling Green, New York, New York 10004, Courtroom 723 on December 20, 2015 at 10:00 a.m. (prevailing Eastern Time).** The Sale Hearing may be adjourned or rescheduled without notice.

**PLEASE TAKE FURTHER NOTICE** that, at the Sale Hearing, the Debtors will seek Bankruptcy Court approval of the Successful Bid and the Back-Up Bid (if any). Unless the Bankruptcy Court orders otherwise, the Sale Hearing shall be an evidentiary hearing on matters relating to the Sale Transaction and there will be no further bidding at the Sale Hearing. In the event that the Successful Bidder cannot or refuses to consummate the Sale because of the breach or failure on the part of the Successful Bidder, the Back-Up Bidder will be deemed the new Successful Bidder and the Debtors shall be authorized, but not required, to close with the Back-Up Bidder on the Back-Up Bid without further order of the Bankruptcy Court.

**PLEASE TAKE FURTHER NOTICE** that this Notice of Successful and Backup Bidders is subject to the terms and conditions of the Motion and the Bidding Procedures Order, with such Bidding Procedures Order controlling in the event of any conflict, and the Debtors encourage parties in interest to review such documents in their entirety. Parties interested in receiving more information regarding the sale of the Assets and/or copies of any related document, including the Motion or the Bidding Procedures Order, may make a written request to: counsel for the Debtors, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Attn: David Botter, Esq., Email: dbotter@akingump.com, and Sarah Link Schultz, Esq., 1700 Pacific Avenue, Suite 4100, Dallas, Texas 75201, Email: sschultz@akingump.com. In addition, copies of the Motion, the Bidding Procedures Order and this Notice may be examined by interested parties (i) free of charge at the website established for these chapter 11 cases by the Debtors' Court approved claims agent, Prime Clerk LLC, at https://cases.primeclerk.com/ish/ or (ii) on the Court's electronic docket for the Debtors' chapter 11 cases, which is posted on the Internet at https://ecf.nysb.uscourts.gov/ (a PACER login and password are required and can be obtained through the PACER Service Center at www.pacer.psc.uscourts.gov).

Dated:  New York, New York
       December [●], 2016

**AKIN GUMP STRAUSS HAUER & FELD LLP**

By: /s/ *DRAFT*
David H. Botter
One Bryant Park
New York, NY 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

Sarah Link Schultz (admitted *pro hac vice*)
Sarah J. Crow (admitted *pro hac vice*)
1700 Pacific Avenue, Suite 4100
Dallas, TX 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343

*Counsel to Debtors and Debtors in Possession*