WINSTON & STRAWN LLP
David Neier (dneier@winston.com)
Carrie V. Hardman (chardman@winston.com)
200 Park Avenue
New York, New York 10166-4193
Telephone: (212) 294-6700
Facsimile: (212) 294-4700

Hearing Date: November 18, 2016
Hearing Time: 10:00 AM ET
Objection Deadline: November 11, 2016
Objection Time: 4:00 PM ET

*Attorneys for Liberty Global Logistics LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------- x
In re:                                                     :   Chapter 11
                                                           :
INTERNATIONAL SHIPHOLDING                                  :   Case No. 16-12220 (SMB)
CORPORATION, *et al.*,[1]                                  :
                                                           :   Jointly Administered
                                          Debtors.         :
---------------------------------------------------------- x

**OBJECTION OF LIBERTY GLOBAL LOGISTICS LLC TO
DEBTORS' MOTION FOR ENTRY OF AN ORDER
AUTHORIZING THE DEBTORS TO ENTER INTO THE
RESTRUCTURING SUPPORT AGREEMENT WITH SEACOR CAPITAL CORP.**

Liberty Global Logistics LLC ("Liberty") submits this objection (this "Objection") to *Debtors' Motion for Entry of an Order Authorizing the Debtors to Enter into the Restructuring Support Agreement with SEACOR Capital Corp.* [Docket No. 298] (the "RSA Motion"),[2] and in support thereof, Liberty respectfully represents as follows:[3]

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: International Shipholding, Inc. (9662); Enterprise Ship Co. (9059); Sulphur Carriers, Inc. (8965); Central Gulf Lines, Inc. (8979); Coastal Carriers, Inc. (6278); Waterman Steamship Corporation (0640); N.W. Johnsen & Co., Inc. (8006); LMS Shipmanagement, Inc. (0660); U.S. United Ocean Services, LLC (1160); Mary Ann Hudson, LLC (8478); Sheila McDevitt, LLC (8380); Tower LLC (6755); Frascati Shops, Inc. (7875); Gulf South Shipping PTE LTD (8628); LCI Shipholdings, Inc. (8094); Dry Bulk Australia LTD (5383); Dry Bulk Americas LTD (6494); and Marco Shipping Company PTE LTD (4570). The service address for each of the above Debtors is 601 Poydras Street, Pan American Building, Suite 1850, New Orleans, Louisiana 70130.

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the RSA Motion, Estrada Declaration (defined below) and Sale Motion (defined below).

[3] Liberty has acquired the scheduled claim of Offshore Suppliers, LLC against Debtor Central Gulf Lines, Inc., (Schedule # 442439) and therefore is a party-in-interest in these Chapter 11 Cases.

**PRELIMINARY STATEMENT**

1. The RSA Motion seeks the Court's blessing of an insider transaction in favor of Erik L. Johnsen, President and CEO of the Debtors ("Johnsen" or the "CEO"), and the Debtors' DIP Lender, SEACOR Capital Corp. ("SEACOR" or the "DIP Lender"), that removes the core of the Debtors' businesses from competitive bidding, to the detriment of the Debtors' estates and their creditors. Accordingly, the RSA Motion should be denied.

2. Given the attempt by the CEO and DIP Lender to eliminate competitive bidding for the Debtors' core assets, the Court should ensure that any plan proposed by the Debtors provides for a competitive process for plan sponsorship so as to ensure that the value of the Debtors' estates is maximized for the benefit of the Debtors' creditors. Even apart from the benefits being provided to an insider in the transactions proposed in the RSA Motion and Sale Motion, the Court should not countenance a DIP Lender sponsoring a plan that does not provide for competitive bidding.

3. That is particularly true here, where the DIP Lender is proposing to pay only $28 million ($10 million in cash and $18 million to pay off the DIP Loan) in exchange for 100% of the reorganized equity in the Debtors' three core business segments, the Jones Act, PCTC, and Rail-Ferry businesses.[4] However, Liberty has already indicated to the Debtors that it will pay $55 million in cash for just one of the Debtors' business segments, the PCTC business, and will pay additional amounts for the two other core business segments, the Jones Act and Rail-Ferry businesses.

**BACKGROUND**

4. According to the Debtors, since early July 2016, the Debtors and their investment

---

[4] The CEO and DIP Lender also propose to obtain an additional $25 million in exit financing, but that hardly counts as consideration being paid for the Debtors' reorganized equity.

2

banker have been marketing the Debtors' assets. *See Declaration of Manuel G. Estrada, Chief Financial Officer* dated October 28, 2016 [Docket No. 299] (the "Estrada Declaration") ¶4. The Debtors received ten indications of interest. *Estrada Declaration* ¶4.

5. Among those who provided the Debtors with an indication of interest and a proposed asset purchase agreement was a Liberty designee. Liberty's designee proposed to pay $55 million to Debtors for their PCTC business and indicated to the Debtors' investment bankers that it would make an all assets bid if that is what it took to compete for the Debtors' assets. A copy of the proposal made to the Debtors is attached hereto as Exhibit A. After initially being told it was the stalking horse for the Debtors' PCTC business and working with the Debtors' professionals on a draft asset purchase agreement, Liberty was suddenly told to cease further work as the Debtors had decided to propose a plan sponsored by the DIP Lender. Liberty was not given an opportunity to compete to be the plan sponsor.[5]

6. The Debtors filed the RSA Motion on October 28, 2016. Along with the RSA Motion, the Debtors filed the *Motion for (I) an Order Establishing Bidding Procedures and Granting Related Relief and (II) an Order or Orders Approving the Sale of the Debtors' Assets in the Specialty Business* [Docket No. 300] (the "Sale Motion").

7. Among other things the Sale Motion provides that "[t]he Stalking Horse Purchaser is an insider of the Debtors . . .", namely Johnsen, the CEO of the Debtors, and members of his family. *Sale Motion* ¶51; 11 U.S.C. §101 (31).

8. Although not discussed in the RSA Motion or the RSA, the term sheet attached to the RSA Motion (the "RSA Term Sheet") states that "[t]he current chief executive officer [i.e.,

---

[5] Liberty does not believe these statements are in dispute; however, Liberty is prepared to provide additional documents, e-mails and testimony in support of these statements.

Johnsen] is expected to continue with the business in a capacity to be mutually agreed by SEACOR and the current chief executive officer [i.e., Johnsen]." *RSA Term Sheet* at 6.

9.      In addition, although not discussed in the RSA Motion or the RSA, the RSA Term Sheet provides that SEACOR's equity in the reorganized Debtors will "be subject to dilution by a management incentive plan . . . ." *RSA Term Sheet* at 2.

10.     Also not discussed in the RSA Motion, RSA or Sale Motion, the sale of the Specialty Business is a condition precedent for the RSA,[6] and all proceeds from the CEO's $18 million purchase of the Debtors' Specialty Business will be used to pay off the Debtors' prepetition lenders ***and not the $18 million priming DIP Loan***. *RSA Term Sheet* at 2. If the proceeds from the sale of the Specialty Business were used to pay off the DIP Lender, the Debtors would be free from the controls and milestones that the DIP Lender has imposed on the Debtors. Instead, the RSA requires that the proceeds of the sale of the Specialty Business be used to pay off the Debtors' prepetition lenders, thereby ensuring the DIP Lender remains in control of the Debtors and their reorganization process.

11.     The RSA also prohibits the Debtors from engaging in a competitive process for plan sponsorship. Among other things, the RSA provides that:

- The Debtors shall "take no action that is materially inconsistent with this [RSA] Agreement, [and] the [RSA] Term Sheet…." *RSA* §5(g).

- The Debtors shall "not directly or indirectly join in or support any alternative plan or transaction other than the [DIP Lender] Plan." *RSA* §5(h).

- The Debtors shall "object to any motion to approve or confirm, as applicable, any other plan of reorganization, sale transaction, or any motions related thereto, to the extent that the terms of any such motions, documents, or other agreements are

---

[6] The RSA Term Sheet states that a condition to confirmation of the plan is that "[t]here shall be executed definitive documents with respect to the sale of the Specialty Business Segment/The sale of the Specialty Business Segment shall be consummated." RSA Term Sheet at 7.

inconsistent with this Agreement or the Term Sheet and such inconsistencies were not approved in writing by SEACOR." *RSA* §5(i).

12. Taken together, the RSA Motion and Sale Motion thus contemplate the following sequence of events:

- The Debtors' Specialty Business is sold to CEO for $18 million;

- The $18 million in proceeds from sale of Specialty Business are used to pay Debtors' prepetition secured lenders rather than pay off the $18 million priming DIP Loan that has a maturity date of January 31, 2017;

- 100% of the equity in the reorganized Debtors is provided to DIP Lender in exchange for paying off the $18 million DIP Loan plus $10 million, for a total of $28 million;

- The DIP Lender and CEO agree on new management role for CEO in the business segments being acquired by the DIP Lender;

- The CEO receives equity as part of a management incentive plan for the reorganized Debtors; and

- The CEO and DIP Lender will have the ability to re-merge all of the Debtors' operations post-confirmation, since the CEO would have a management role in the reorganized Debtors' Jones Act, PCTC, and Rail-Ferry businesses and would also own outright the Debtors' Specialty Business.

## ARGUMENT

### The RSA Should not be Approved as an Exercise of the Debtors' Business Judgment

13. The Debtors have proposed that the RSA Motion and related Sale Motion be approved as a "sound exercise of the Debtors' business judgment." *RSA Motion* ¶34; Sale Motion ¶¶55-56.

14. Transactions that prevent competitive bidding in favor of insiders and DIP lenders should not be approved as an exercise of a debtor's business judgment. Insider transactions such as the RSA Motion and Sale Motion should be subject to the entire fairness standard of review and not the business judgment rule. *See Pepper v. Litton*, 308 U.S. 295, 306 (1939) (A dominant or

5

controlling shareholder is a fiduciary, whose "dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the . . . stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein.");[7] *WHBA Real Estate Ltd. P'ship v. Lafayette Hotel P'ship (In re Lafayette Hotel P'ship)*, 227 B.R. 445, 454 (S.D.N.Y. 1998) (insider transactions must be subject to rigorous scrutiny), *aff'd*, 198 F.3d 234 (2d Cir. 1999); *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holdings Unsecured Claims (In re Papercraft Corp.)*, 211 B.R. 813, 823 (W.D. Pa. 1997) ("[I]nsider transactions are subjected to rigorous scrutiny and when challenged, the burden is on the insider not only to prove the good faith of a transaction but also to show the inherent fairness from the viewpoint of the corporation and those with interests therein."), *aff'd,* 160 F.3d 982 (3d Cir. 1998); *In re Bidermann Indus. U.S.A., Inc.*, 203 B.R. 547, 554 (Bankr. S.D.N.Y. 1997) (applying heightened scrutiny to a proposed sale which would benefit insiders); *In re Integrated Res.*, 147 B.R. 650, 656–58 (S.D.N.Y. 1992) ("the appropriate test is the 'entire fairness' of a transaction, rather than the business judgment rule" when the decision involves interested fiduciaries); *C & J Clark Am., Inc. v. Carol Ruth, Inc. (In re Wingspread Corp.)*, 92 B.R. 87, 93 (Bankr. S.D.N.Y. 1988) ("Sales to fiduciaries are necessarily subjected to heightened scrutiny because they are rife with the possibility of abuse."); *In re Blixseth*, Case No. 09-60452-7, 2010 WL 716198, *9 (Bankr. D. Mont. Feb. 23, 2010) (with respect to a "sale to an entity with very close ties to the Debtor and the property at issue . . . aimed at cutting off other competing bids, the business judgment rule simply does not apply.").

---

[7] The Court in *Pepper* believed it to be the duty of the bankruptcy court to "sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate." 308 U.S. at 308.

15. In the case of *In re Innkeepers USA Trust*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010), Judge Chapman held that the "heightened scrutiny" standard may apply to the debtors' decision to assume a restructuring support agreement that benefitted insiders, though the court ultimately found that the debtors did not meet their burden even under the less stringent business judgment test. *Id.* at 231. "In applying heightened scrutiny, courts are concerned with the integrity and entire fairness of the transaction at issue, typically examining whether the process and price of a proposed transaction not only appear fair but are fair and whether fiduciary duties were properly taken into consideration." *Id.*

16. In *Bidermann*, Judge Brozman denied the debtors' request to enter into a letter agreement by which the debtors would be acquired by a buyer comprised of an outside investor and a firm affiliated with the debtors' CEO. At the time of the proposed buyout, the debtors' CEO was a principal of one of the proposed buyers, and pursuant to a consulting agreement, the debtors' CEO would be appointed as CEO of the new owner. *In re Bidermann*, 203 B.R. at 549. The Court found that the debtors' CEO had a conflict of interest and that "the proposed transaction [did] not reveal the effective exercise of business judgment, but rather the 'illicit manipulation of a board's deliberate process by self-interested fiduciaries.'" *Id*. at 551. The Court noted that under the business judgment standard, a debtor has a fiduciary obligation to make "an intensive effort to drum up the best price obtainable for the creditors" and avoid a process that "aims to cut off other possible sales." *Id. at 552*. The Court therefore issued an order to show cause why an examiner with expanded powers should not be appointed as the Court's "confidence in management and the debtors' counsel [had] been shaken by the manner in which they sought to pursue [the] transaction." *Id*. at 554.

**Plan Sponsorship Should be Subject to a Competitive Bidding Process**

17.  Permitting the DIP Lender to serve as a plan sponsor without allowing for competitive bidding process is detrimental to the interests of creditors and the Debtors' estates. *In re Smart World Techs., LLC*, 423 F.3d 166, 175 (2d Cir. 2005) ("the debtor bears the burden of maximizing the value of the estate."); *In re Yellowstone Mountain Club, LLC*, Case No. 08-61570-11, 2009 WL 982233, at 5* (Bankr. D. Mont. Feb. 18, 2009) (finding that the debtor's proposed bidding procedures did not encourage third-party bids, but rather, were drafted to ensure that the DIP lender would be the successful purchaser).

18.  Without a competitive process, the Debtors' plan may violate the absolute priority rule by paying the DIP Lender more than it is entitled.  In addition, if there is no competitive process for the Debtors' core businesses, there is a risk that creditors would receive less than they would receive in a Chapter 7, as is required by the best interests test.  These rights should not be undermined by allowing the DIP Lender to acquire assets without a competitive process. *See In re Bd. of Dirs. of Telecom Arg. S.A.*, No. 05-17811 (BRL), 2006 WL 686867, at *7 (Bankr. S.D.N.Y. Feb. 24, 2006) (best interests test is "one of the most fundamental protections provided creditors under U.S. law"); *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877, 881 (Bankr. S.D.N.Y. 1990) (best interests test and absolute priority rule are fundamental creditor plan protections).

19.  Allowing for a competitive process to be the plan sponsor will ensure that the value of the Debtors' estates is maximized for the benefit of creditors. *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434 (1999) (plan that benefits insiders should provide for competitive process).  The failure of the board to insist on such a procedure demonstrates that the Court should not approve the RSA Motion. *In re Castleton Plaza, LP*, 707

F.3d 821 (7th Cir. 2013) (remanding to the bankruptcy court with directions to open the proposed plan of reorganization to competitive bidding); *Official Comm. off Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 659 (Bankr. S.D.N.Y. 1992) (competitive process will "encourage bidding and maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

## RESERVATION OF RIGHTS

20. The Debtors intend to file their proposed plan and disclosure statement on November 14, 2016, which is subsequent to the deadline set for this Objection. Liberty therefore reserves its rights to supplement and amend this Objection.

## CONCLUSION

WHEREFORE, Liberty respectfully requests that the Court (i) deny the RSA Motion and (ii) grant such other and further relief as may be just and proper, including, without limitation, instructing the Debtors to provide for a competitive process for plan sponsorship.

| | |
|---|---|
| Dated: November 11, 2016 | WINSTON & STRAWN LLP |
| | *David Neier* |
| | David Neier (dneier@winston.com) |
| | Carrie V. Hardman (chardman@winston.com) |
| | 200 Park Avenue |
| | New York, New York 10166-4193 |
| | Telephone: (212) 294-6700 |
| | Facsimile: (212) 294-4700 |
| | |
| | *Attorneys for the Liberty Global Logistics LLC* |