AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036
Telephone: (212) 872-1000
David H. Botter
Sean E. O'Donnell
Stephanie L. Gal

AKIN GUMP STRAUSS HAUER & FELD LLP
1700 Pacific Avenue, Suite 4100
Dallas, Texas 75201
Telephone: (214) 969-2800Sarah Link Schultz (admitted *pro hac vice*)
Sarah J. Crowe (admitted *pro hac vice*)

*Counsel to Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) ) ) Chapter 11 |
| INTERNATIONAL SHIPHOLDING CORPORATION, *et al.*,[1] | ) ) Case No. 16-12220 (SMB) |
| Debtors. | ) ) Jointly Administered ) |

**DEBTORS' REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO ENTER INTO THE RESTRUCTURING SUPPORT AGREEMENT WITH SEACOR CAPITAL CORP.**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: International Shipholding Corporation (9662); Enterprise Ship Co. (9059); Sulphur Carriers, Inc. (8965); Central Gulf Lines, Inc. (8979); Coastal Carriers, Inc. (6278); Waterman Steamship Corporation (0640); N.W. Johnsen & Co., Inc. (8006); LMS Shipmanagement, Inc. (0660); U.S. United Ocean Services, LLC (1160); Mary Ann Hudson, LLC (8478); Sheila McDevitt, LLC (8380); Tower LLC (6755); Frascati Shops, Inc. (7875); Gulf South Shipping PTE LTD (8628); LCI Shipholdings, Inc. (8094); Dry Bulk Australia LTD (5383); Dry Bulk Americas LTD (6494); and Marco Shipping Company PTE LTD (4570). The service address for each of the above Debtors is 601 Poydras Street, Pan American Building, Suite 1850, New Orleans, Louisiana 70130.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................... 1

ARGUMENT ...................................................................................................... 2

   I.   The RSA Should Be Approved ............................................................ 2

     A.   The Business Judgment Rule Applies to the Debtors' Decision to Enter into the RSA—A Non-Insider Transaction ............................................... 3

     B.   The RSA Reflects the Sound Exercise of the Debtors' Business Judgment ......... 5

     C.   The RSA, Negotiated at Arm's Length and in Good Faith, Passes Muster Even under Entire Fairness Review ............................................................. 8

RESERVATION OF RIGHTS ............................................................................ 10

CONCLUSION ................................................................................................. 11

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Bidermann Indus. U.S.A., Inc.*,
  203 B.R. 547 (Bankr. S.D.N.Y. 1997) ................................................ 4

*In re Cheyenne Software Shareholders Litig.*,
  1996 Del. Ch. LEXIS 142 (Del. Ch. Nov. 7, 1996) ............................ 6

*Citron v. E.I. du Pont de Nemours & Co.*,
  584 A.2d 490 (Del. Ch. 1990) ............................................................ 6

*In re Del. Hudson Ry. Co.*,
  124 B.R. 169 (Bankr. D. Del. 1991) ................................................... 2

*In re Genco Shipping & Trading Ltd.*,
  509 B.R. 455 (Bankr. S.D.N.Y. 2014) ............................................. 5, 8

*In re Grumman Olson Indus., Inc.*,
  329 B.R. 411 (Bankr. S.D.N.Y. 2005) ............................................... 3

*In re Innkeepers SA Tr.*,
  442 B.R. 227 (Bankr. S.D.N.Y. 2010) ............................................ 8, 9

*In re Integrated Res., Inc.*,
  147 B.R. 650 (S.D.N.Y. 1992) .......................................................... 5, 8

*In re Lionel Corp.*,
  722 F.2d 1063 (2d Cir. 1983) ..................................................... 2, 5, 8

*In re MFW Shareholders Litig.*,
  67 A.3d 496 (Del. Ch. 2013) .............................................................. 5

*Minn. Invco of RSA # 7, Inc. v. Midwest Wireless Holdings, LLC*,
  903 A.2d 786 (Del. Ch. 2006) ............................................................ 6

*Pan Am Corp. v. Delta Air Lines, Inc.*,
  175 B.R. 438 (S.D.N.Y. 1994) ........................................................... 3

*In re Residential Capital, LLC*,
  No. 12-12020, 2013 WL 3286198 (Bankr. S.D.N.Y. June 27, 2013) ........... 2, 10

*Sinclair Oil Corp. v. Levien*,
  280 A.2d 717 (Del. 1971) ................................................................... 5

*Smith v. Van Gorkom*,
   488 A.2d 858 (Del. 1985) .................................................................. 5

*Trans World Airlines, Inc. v. Texaco, Inc. (In re Texaco, Inc.)*,
   81 B.R. 813 (Bankr. S.D.N.Y. 1988) .............................................. 2

STATUTES

11 U.S.C. § 105 ..................................................................................... 2

11 U.S.C. § 363(b) ................................................................................ 2

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this reply memorandum of law in support of their *Motion for Entry of an Order Authorizing the Debtors to Enter into the Restructuring Support Agreement with SEACOR Capital Corp.* (the "RSA Motion," ECF Doc. # 298) in the above-captioned chapter 11 cases (the "Chapter 11 Cases").[2]

## PRELIMINARY STATEMENT

1.      As detailed in the RSA Motion and in the accompanying Declaration of Laurence H. Gurley, the RSA is the product of arms' length negotiations and the Debtors' sound business judgment. Its terms are the result of a five-month marketing process and extensive negotiations between the Debtors and SEACOR. And it provides the Debtors with the best and most viable path to exit chapter 11, maximize creditor recoveries and benefit the Debtors' employees.

2.      Liberty Global Logistics LLC ("Liberty") claims to have very recently bought a small scheduled claim against the Debtors in order to stomp its feet in protest of the RSA Motion.[3] *Objection of Liberty Global Logistics LLC to Debtors' Motion for Entry of an Order Authorizing the Debtors to Enter Into the Restructuring Support Agreement with SEACOR Capital Corp.* (the "Liberty Objection"), ECF No. 323, at 1 n.1. It is the *only* party objecting to the RSA Motion—which is firmly supported by the Debtors' and the Official Committee of Unsecured Creditors.

---

[2] The Debtors are filing simultaneously herewith a declaration of Laurence H. Gurley (the "Gurley Declaration") in support of the RSA Motion. Terms that are not specifically defined herein shall be given the meaning ascribed to such terms in the RSA Motion or the Gurley Declaration.

[3] The Debtors reserve their rights to contest the standing of Liberty and conduct appropriate discovery with respect thereto.

3.      Liberty argues that the Debtors' should discard the RSA and jeopardize what appears to be the best and only reliable path to reorganizing so that Liberty can cherry-pick the Debtors' most marketable asset—its PCTC Segment—while the Debtors and their stakeholders hope, wish, and pray for a better outcome in a naked auction for the remainder of their operations.  This proposition is hugely irresponsible on its face and becomes even more troubling when one accounts for the fact that the Debtors have been unable to obtain any better offers despite their pursuit of value maximizing transactions through a robust marketing process over the past five months.

4.      The Liberty Objection, not the RSA, should be discarded.

## ARGUMENT

## I.      The RSA Should Be Approved

5.      The RSA before the Court is a not a novel concept.  Courts in this district and others often approve restructuring and support agreements.  *See In re Residential Capital, LLC*, No. 12-12020, 2013 WL 3286198, at * 20 (Bankr. S.D.N.Y. June 27, 2013) ("Plan support agreements . . . have generally been approved by courts in this and other districts."); *Trans World Airlines, Inc. v. Texaco, Inc. (In re Texaco, Inc.)*, 81 B.R. 813, 818 (Bankr. S.D.N.Y. 1988) (holding "court approval of [agreement to use best efforts to obtain confirmation of Chapter 11 plan] was not required").  In evaluating a restructuring support agreement, courts look to sections 363(b) and 105 of the Bankruptcy Code, requiring, as they do for all proposed uses of property outside the ordinary course of business, that a debtor demonstrate a sound business justification for the transaction.  *See, e.g.*, *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983) (holding business judgment rule requires finding that good business reason exists to grant debtor's

2

application under section 363(b)); *In re Del. Hudson Ry. Co.*, 124 B.R. 169, 179 (Bankr. D. Del. 1991).

6.      Here, the RSA is the best and most value maximizing proposed transaction for the Debtors and their estates.  Liberty's Objection falls far short of refuting this justification and should therefore be overruled.

A.      ***The Business Judgment Rule Applies to the Debtors' Decision to Enter into the RSA—A Non-Insider Transaction***

7.      Liberty erroneously casts the RSA as a purported insider transaction by conflating the RSA with the separate and distinct transaction for the sale of the Specialty Business Segment for which an entity formed by, among others, the Debtors' Chief Executive Officer, Erik Johnsen, serves as the proposed stalking horse bidder.  Liberty Objection ¶ 1.  According to Liberty, the RSA should be evaluated under the stricter entire fairness standard rather than the business judgment rule due to the transaction's "insider" nature.  Liberty Objection ¶ 14.  This argument obscures the fact that the RSA Motion seeks to approve the RSA, which is a transaction between the Debtors and SEACOR—and no one else.    And although the RSA requires a sale of the Specialty Business Segment, it does not require a specific buyer, and SEACOR has no approval rights over the sale.

8.      SEACOR, though a lender under the Debtors' DIP Credit Agreement, is ***not*** an insider.  Indeed, Liberty does not dub SEACOR as an insider in its Objection, nor does Liberty even attempt to address any of the factors courts apply to determine whether a creditor may be considered an insider.  *See Pan Am Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 500 (S.D.N.Y. 1994) (finding DIP lender was not an "insider" of debtor for purposes of equitable subordination under factors courts generally use to determine whether a creditor is an "insider" under the

Bankruptcy Code); *see also In re Grumman Olson Indus., Inc.*, 329 B.R. 411, 428 (Bankr. S.D.N.Y. 2005) (holding "neither superior bargaining power nor the contractual right of oversight over the debtor or its operations transforms an outsider into an insider" under section 101(31) of the Bankruptcy Code).

9.       Liberty's attempt to brand the RSA as an "insider" transaction by making repeated (and irrelevant) allegations about Mr. Johnsen is unavailing.  Liberty points to the RSA's term sheet which notes that Mr. Johnsen "is expected to continue with the business in a capacity to be mutually agreed" and that SEACOR's equity in the reorganized Debtors will "be subject to dilution by a management incentive plan," but in so doing, Liberty is truly grasping at straws.  The fact that Mr. Johnsen *may* continue working with ISH in *some capacity* post-bankruptcy or that Mr. Johnsen *may* participate in an undefined management incentive plan at some point in the future in no way rises to the legal level of control by SEACOR necessary to render the RSA an "insider" agreement subject to the entire fairness standard.  And, not surprisingly, Liberty cites no case law to support such an extreme proposition.

10.       In fact, none of the cases Liberty cites support the proposition that the entire fairness standard should apply to transactions between a debtor and its DIP lender and only one of Liberty's cases, *In re Bidermann Indus. U.S.A., Inc.*, 203 B.R. 547, 549 (Bankr. S.D.N.Y. 1997), considers the approval of a restructuring support agreement.  At issue in *In re Bidermann* was an agreement to market the debtors' business between the debtors, a financial company and the Debtors' turnaround consultants, and the debtors had entered into this agreement without relying upon legal or financial advisors.  *Id.*  The case is inapposite.  Here, the Debtors retained both legal and financial advisors several months prior to entering into the RSA and, as set forth in the accompanying Gurley Declaration, worked extensively with these advisors when marketing the

4

Debtors assets, evaluating the numerous options, and negotiating the terms of the RSA. Gurley Declaration ¶¶ 5, 7, 10.

### B.    The RSA Reflects the Sound Exercise of the Debtors' Business Judgment

11.    The Debtors' decision to enter into the RSA should not be "second-guess[ed]" by this Court or any purported objector because the decision "can be attributed to [the] rational business purpose" of obtaining the best available and most value maximizing transaction for the Debtors' estates that allows an efficient and timely exit from chapter 11 prior to running out of cash needed to continue business operations. *See In re MFW Shareholders Litig.*, 67 A.3d 496, 526 (Del. Ch. 2013) (citing *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971)); *In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 463 (Bankr. S.D.N.Y. 2014) (finding "Debtors' decision to assume the RSA clearly meets the 'business judgment' standard" where RSA avoided a long, drawn out Chapter 11 process, resulted in enhanced liquidity, preserved the debtors' going-concern value, and provided a fiduciary out giving the debtors the ability to receive, review, and negotiate unsolicited proposals for any better alternative transaction).    Such a valid business justification unambiguously triggers the business judgment rule's "presumption that in making [this] business decision [the Debtors] acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company."    *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)). Liberty's Objection, rote with mere conclusory allegations that the RSA is not in the best interests of the Debtors' estates, fails to rebut this presumption.[4]    *Integrated Res.*, 147 B.R. at 656

---

[4] Despite Liberty's claim that the facts regarding the circumstances of their indication of interest, proposed asset purchase agreement, and negotiations with the Debtors are undisputed, the Debtors disagree. Liberty Objection ¶ 5 n.5.    Liberty's conceded failure to provide evidence supporting these allegations, in addition to all other allegations Liberty has made in its Objection, further demonstrates Liberty's failure to meet its evidentiary burden in support of its Objection. *Integrated Res.*, 147 B.R. at 656; *see also* Lionel, 722 F.2d at 1071.

("Parties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity."); *see also Lionel*, 722 F.2d at 1071 (holding an objector must "produce some evidence respecting its objections" to satisfy its burden in rebutting the business judgment rule's presumption).

12.     Despite Liberty's attempts to distract the Court, the record is clear.   The independent members of the Board of Directors of Debtor International Shipholding Corporation (the "ISH Board"), in the exercise of its business judgment, approved the RSA considering several different proposals obtained through a robust marketing process and following advice from the Debtors' financial and legal advisors. [5] Gurley Declaration ¶ 5; *see also Citron v. E.I. du Pont de Nemours & Co.*, 584 A.2d 490, 510-12 (Del. Ch. Ct. 1990) (upholding independent directors' decision approving a merger under business judgment rule where board relied on advice of legal counsel and its financial advisors); *see also Minn. Invco of RSA # 7, Inc. v. Midwest Wireless Holdings, LLC*, 903 A.2d 786, 797 (Del. Ch. Ct. 2006) (upholding board of directors' decision where evidence at trial showed board acted "upon the advice of counsel and Bear Stearns"); *In re Cheyenne Software Shareholders Litig.*, 1996 Del. Ch. LEXIS 142, at *9 (Del. Ch. Nov. 7, 1996) (upholding board's decision to sell the company to a particular bidder under business judgment rule where board "approached seven other potential bidders and retained two investment banks and legal counsel for advice").

13.     Ultimately, the ISH Board correctly concluded, based upon numerous facts and the advice of its advisors, that the RSA was the best option available and the most value

---

[5] To avoid the appearance of impropriety, Erik Johnsen and his cousin, Niels M. Johnsen, both members of the ISH Board, recused themselves from the vote to approve the RSA.  Gurley Declaration ¶ 13 n.4.

maximizing transaction for the Debtors, their estates, and their stakeholders. *First*, the RSA yields materially more value to the Debtors' estates based on the actual value provided by the Improved SEACOR Proposal contained in the RSA as compared to the estimated valuations of hypothetical transactions of individual business segment sales. Gurley Declaration ¶ 14.

14.     *Second*, to the extent there were any remaining proposals for the individual business segments (other than Liberty's proposal), there is a materially higher degree of execution risk with respect to any such sale proposals than under the SEACOR Proposal set forth in the RSA. *Id.* ¶ 15. Under the RSA, each of the Debtors' four business segments is addressed. *Id.* ¶ 15. A continuation of the individual business segment sales process, as advocated by Liberty, would require the Debtors to conduct a blind auction of the Debtors' Rail Ferry and Jones Act Segments, in a depressed market, with absolutely no guaranty that a sale for either segment would be consummated for anything more than scrap value. *Id.* ¶ 15. Although Liberty states that it would pay "additional amounts" for these business segments, Liberty has yet to make an offer—verbal or otherwise—for either segment or offer any other insight as to what these "additional amounts" *might* be. Liberty Objection ¶ 3. Blackhill has run a marketing process for five months and still, there are no other buyers for these segments.

15.     In fact, even Liberty's proposal to buy the PCTC Segment—arguably the Debtors' most attractive asset—remains subject to a number of unresolved material terms, making consummation of even this segment far from certain. Gurley Declaration ¶ 16. For example, Liberty's offer remains conditioned upon the Debtors and Liberty entering into a fairly complex transition services arrangement—which would effectively transfer the economics of the transaction to Liberty prior to the deal's consummation and result in an unquantifiable, but

7

material, deduct to the purchase price. *Id.* Although the Debtors have repeatedly told Liberty this was a non-starter, Liberty has continued to insist upon such an arrangement. *Id.*

16.    ***Third***, the RSA provides a clear path for the Debtors' efficient exit from these Chapter 11 Cases before the Debtors run out of cash. Liberty states that "[i]f the proceeds from the sale of the Specialty Business were used to pay off the DIP Lender, the Debtors would be free from the controls and milestones that the DIP Lender has imposed on the Debtors." Liberty Objection ¶ 10. Unfortunately, without financing, the Debtors are scheduled to run out of cash by the end of January 2017. Gurley Declaration ¶ 17. Given the need to finance their operations and these cases, it would be hugely imprudent to "bet it all on black," as Liberty advocates, so that Liberty could buy the PCTC Segment and we can all hold our breath and hope that executable and higher offers surface for the remaining segments of the Debtors' operations before the Debtors run out of money. *Id.* ¶ 17.

17.    ***Finally***, in addition to insuring a reliable path to exit chapter 11, the SEACOR Proposal memorialized in the RSA provides the Debtors with a "fiduciary out." *Id.* ¶ 18. Approving the RSA allows the Debtors to lock in its value maximizing deal with SEACOR, but, given this fiduciary out, does nothing to prevent the Debtors from receiving higher offers or better proposals from any other interested parties. *Id.* ¶ 18. To the extent better offers are submitted for the Debtors' business, the RSA permits the ISH Board to exercise their fiduciary duties to pursue the most value maximizing transaction for the Debtors' estates. *Id.* ¶ 18; *see also Genco*, 509 B.R. at 463.

18.    Liberty does not—because it cannot—point to a single piece of evidence contradicting this clear record thereby failing to satisfy its burden of proof necessary to deny the RSA Motion. *Integrated Res.*, 147 B.R. at 656; *see also Lionel*, 722 F.2d at 1071. This Court,

8

accordingly, should approve the Debtors' decision to enter into the RSA with SEACOR as a sound exercise of the Debtors' business judgment.

### C.    The RSA, Negotiated at Arm's Length and in Good Faith, Passes Muster Even under Entire Fairness Review

19.    Even if Liberty were correct—which it is not—that entire fairness review applies, the RSA should still be approved.  According to Liberty and the case law it relies upon, entire fairness review requires that "the process and price of a proposed transaction not only appear fair but are fair" and that "fiduciary duties [be] properly taken into consideration."  *In re Innkeepers SA Tr.*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010).  Liberty harps on this language, asserting that the RSA is unfair because it prevents competitive bidding in favor of an insider and a DIP lender.  Liberty fails, however, to demonstrate that the RSA does indeed stifle a competitive process.

20.    Since early July 2016, the Debtors have engaged in a robust and competitive marketing process in which Blackhill contacted sixty-eight prospective buyers and received ten indications of interest for either purchasing substantially all of the Debtors' assets or for one of the Debtors' four individual business segments.  Gurley Declaration ¶¶ 3-4.   After engaging in due diligence, some of those ten indications of interests transformed into more formal proposals to transact with the Debtors.  *Id.* ¶ 5.  Upon receipt of such proposals, the Debtors entered into extensive negotiations with each of the parties.  *Id.* ¶ 10.  Ultimately in mid-October, the Debtors chose to pursue the Improved SEACOR Proposal, after (a) rejecting the Initial SEACOR Proposal received from SEACOR a month prior, and (b) pursuing a completely different strategy of individual business segment sales which ultimately proved to have an increased execution risk and to be less valuable for the Debtors estates.  *Id.* ¶¶ 11, 13.  And in so choosing, the Debtors specifically requested more time under the DIP Credit Agreement in order to further negotiate the

9

terms of their agreement with SEACOR on an arm's length basis to arrive at more favorable terms for the Debtors' estates as a whole. *Id.* ¶ 12. The give and take between the Debtors and SEACOR in the latter half of October resulted in the comprehensive agreement before the Court, which reflects concessions from all signatories. *Id.* ¶¶ 11, 13-14.

21.    Ignoring the competition that has already taken place, Liberty focuses on the process going forward, arguing that no parties other than Mr. Johnsen and SEACOR have a chance at involvement in the Debtors' chapter 11 plan. This argument is flatly contradicted by the terms of the RSA. The RSA clearly sets forth the Debtors' right, in all circumstances, to exercise their fiduciary duties and walk away from the RSA. RSA ¶ 13. If a party comes to the Debtors with an unsolicited proposal that is better and more value maximizing for the Debtors' estates, the Debtors' remain free to pursue that proposal. And this fiduciary out is not subject to any impermissible carve outs or exceptions. *See Innkeepers*, 442 B.R. at 235 (criticizing proposed fiduciary out provision because it contained an inappropriate exception to the out). Therefore, to argue that the RSA effectively precludes any competitive bidding is purely disingenuous on the part of Liberty and is contrary to the express terms of the RSA before the Court.

## **RESERVATION OF RIGHTS**

22.    The remaining filings responding to the RSA Motion raise limited objections and/or reserve rights to object to the RSA or the Debtors' plan and disclosure statement in the future. *Reservation of Rights of IOMM&P and MEBA with respect to Debtors' Motion for Entry of an Order Authorizing the Debtors to Enter Into the Restructuring Support Agreement with SEACOR Capital Corp.*, ECF No. 321; *Reservation of Rights of Regions Bank, as Agent, in Response to the Debtors' Motion for Entry of an Order Authorizing the Debtors to Enter Into the Restructuring Support Agreement with SEACOR Capital Corp.*, ECF No. 324; *Capital One,*

*National Association's Limited Objection and Reservation of Rights in Response to Debtors' Motion for Entry of an Order Authorizing the Debtors to Enter Into the Restructuring Support Agreement with SEACOR Capital Corp.*, ECF No. 326.

23.    To the extent parties reserve their rights to further object to the RSA Motion, the Debtors reserve their rights to respond to such objections at this Court's hearing to consider the approval of the RSA Motion.  Additionally, to the extent any party, and more specifically Liberty, objects to SEACOR as the Debtors' plan sponsor or any of the terms of the Debtors' proposed disclosure statement and plan of reorganization, such objections are premature and "for another day." *Residential Capital*, 2013 WL 3286198, at *2 ("The standards applicable to approval of [a restructuring support agreement] are *not* the standards applicable to approval of a disclosure statement or confirmation of a plan.").  The Debtors reserve their right to respond to those objections at the procedurally appropriate time.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court (a) enter an order authorizing the Debtors to enter into the Restructuring Support Agreement with SEACOR Capital Corp., and (b) grant such other and further relief as may be just and proper.

Dated:  November 16, 2016          **AKIN GUMP STRAUSS HAUER & FELD LLP**
       New York, New York          By: */s/ Sean E. O'Donnell*_____

                             David H. Botter
                             Sean E. O'Donnell
                             Stephanie L. Gal
                             One Bryant Park
                             New York, NY 10036
                             Telephone:  (212) 872-1000
                             Facsimile:  (212) 872-1002

                             Sarah Link Schultz (admitted *pro hac vice*)

11

Sarah J. Crow (admitted *pro hac vice*)
1700 Pacific Avenue, Suite 4100
Dallas, Texas 75201
Telephone:  (214) 969-2800
Facsimile:  (214) 969-4343

*Counsel to Debtors and Debtors in Possession*