AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036
Telephone:  (212) 872-1000
David H. Botter
Sean E. O'Donnell
Stephanie L. Gal

AKIN GUMP STRAUSS HAUER & FELD LLP
1700 Pacific Avenue, Suite 4100
Dallas, Texas 75201
Telephone:  (214) 969-2800
Sarah Link Schultz (admitted *pro hac vice*)
Sarah J. Crow (admitted *pro hac vice*)

*Counsel to Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| INTERNATIONAL SHIPHOLDING CORPORATION, *et al.*,[1] | Case No. 16-12220 (SMB) |
| Debtors. | Jointly Administered |

**DECLARATION OF LAURENCE H. GURLEY
IN SUPPORT OF ENTRY OF ORDER APPROVING THE SALE OF
THE SPECIALTY BUSINESS ASSETS TO STALKING HORSE PURCHASER**

I, Laurence H. Gurley, declare as follows under penalty of perjury:

1.     I am a Managing Director at Blackhill Partners, LLC ("Blackhill"), an investment

banking firm with its principal office located at 2651 North Harwood Street, Suite 120, Dallas,

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: International Shipholding Corporation (9662); Enterprise Ship Co. (9059); Sulphur Carriers, Inc. (8965); Central Gulf Lines, Inc. (8979); Coastal Carriers, Inc. (6278); Waterman Steamship Corporation (0640); N.W. Johnsen & Co., Inc. (8006); LMS Shipmanagement, Inc. (0660); U.S. United Ocean Services, LLC (1160); Mary Ann Hudson, LLC (8478); Sheila McDevitt, LLC (8380); Tower LLC (6755); Frascati Shops, Inc. (7875); Gulf South Shipping PTE LTD (8628); LCI Shipholdings, Inc. (8094); Dry Bulk Australia LTD (5383); Dry Bulk Americas LTD (6494); and Marco Shipping Company PTE LTD (4570).  The service address for each of the above Debtors is 601 Poydras Street, Pan American Building, Suite 1850, New Orleans, Louisiana 70130.

Texas, and the investment banker retained by the Debtors in the above-captioned bankruptcy cases. I have worked at Blackhill from 2011 to the present.

2.      I submit this declaration in support of the *Debtors' Motion for (I) an Order Establishing Bidding Procedures and Granting Related Relief and (II) an Order or Orders Approving the Sale of the Debtors' Assets in the Specialty Business Segment* [ECF No. 300] (the "Sale Motion")[2] and the entry of an order (the "Sale Order") approving the sale of the Specialty Business Assets to the Stalking Horse Purchaser, J Line Corporation, pursuant to the terms of the Asset Purchase Agreement by and among the Stalking Horse Purchaser and certain of the Debtors and their non-Debtor affiliates (the "Asset Purchase Agreement").

3.      I have been one of the principal personnel working on Blackhill's engagement with the Debtors and their non-debtor affiliates and subsidiaries since May 2016. In connection with the proposed Sale Order and Asset Purchase Agreement, I participated directly in discussions, due diligence, and negotiations with the Debtors' management, the independent members of the board of directors (the "Board") of International Shipholding Corporation ("ISH" and, together with its debtor and non-debtor subsidiaries and affiliates, "International Shipholding"), the Debtors' outside counsel, and potential purchasers and bidders for the assets that are subject to the Asset Purchase Agreement.

4.      I am not being compensated specifically for this testimony other than through payments received by Blackhill as a professional retained by the Debtors in these chapter 11 cases. If called upon to testify, I would testify competently to the facts set forth in this declaration.

---

[2] Capitalized terms not defined herein shall have the same meaning as ascribed to such terms in the Sale Motion.

16-12220-smb    Doc 456    Filed 12/18/16    Entered 12/18/16 20:23:32    Main Document
Pg 3 of 37

5.      In forming the opinions set forth herein, I have relied upon and/or considered, among other things, the following: (a) my experience in chapter 11 cases, including with the sales of assets and issues attendant to the marketing of such assets; (b) the Sale Motion; (c) the *Order Establishing Bidding Procedures Relating to the Sale of the Debtors' Assets in the Specialty Business Segment* [D.I. 367] (the "Bidding Procedures Order"), entered on November 18, 2016, and which approved the bidding procedures portion of the Sale Motion; (d) discussions with the Debtors' management concerning the Debtors' business and the marketing of the Debtors' assets; (e) discussions with other professionals and advisors to the Debtors; (f) discussions with potential purchasers of the Debtors' assets and other interested parties; (g) discussion with the independent members of the Board; and (h) my relevant knowledge of the shipping industry.

## A.      Marketing Efforts

6.      Since early July 2016, the Debtors have been marketing their operations and assets through Blackhill to a broad array of potential strategic and financial third party buyers in an effort to solicit interest for the sponsorship of a reorganization plan for the Debtors or the purchase of some or all of the Debtors' assets, including the Specialty Business Segment.[3]

7.      Since the filing of their chapter 11 cases, the Debtors have been actively engaged with their pre-petition lenders, the lenders under their post-petition debtor-in-possession credit facility, their unions, and the Committee. The Debtors have held weekly calls with these creditor constituencies, in addition to multiple in-person meetings and regular informal discussions as needed. As a result of this collaboration, and in consultation with their advisors, the Debtors

---

[3] For purposes of the Sale Motion, the Debtors defined the "Specialty Business Segment" as being comprised of various contracts and agreements between Company affiliates and third parties, as well as certain notes receivable financing certain vessels owned by third parties, in each case relating to the Company's provision of logistical and seaborne transportation services in Southeast Asia and third party brokerage services related to these Southeast Asian operations.

determined that a sale of the Assets would preserve and maximize the value of their estates and, accordingly, is in the best interests of their estates and creditors.

8.      Through the pre-petition and post-petition marketing process, Blackhill (i) contacted approximately sixty-eight (68) prospective buyers, (ii) received signed non-disclosure agreements from twenty-eight (28) interested parties and provided such parties with access to a virtual data room and the Debtors' professionals, and (iii) received ten (10) indications of interest for either purchasing substantially all of the Debtors' assets or for one of the Debtors' individual business segments.  The Debtors received two specific proposals for the purchase of the Assets, one from the Stalking Horse Purchaser and another from Hemisphere Logistics LLC ("HLL").

9.      After providing diligence and negotiating terms with each interested counterparty, the Debtors determined that the Stalking Horse Purchaser's proposal represented the highest and best proposal.  In connection with this determination, the Debtors agreed to provide the Stalking Horse Purchaser with an expense reimbursement but no break-up fee.  The Debtors then went back to HLL to solicit a topping bid, but such competing bidder declined to increase its bid. Thus, the Debtors executed the purchase and sale agreement for the Specialty Business Segment (the "Stalking Horse Agreement") in order to maximize value for the estates.

10.     The Stalking Horse Purchaser is substantially owned by Erik L. Johnsen, the CEO of the Debtors and an insider of the Debtors.  Consequently, the Debtors and their professionals were extraordinarily careful to ensure that the negotiation of the Stalking Horse Agreement was conducted at arm's-length.  During the negotiations, the Debtors' interests were represented by Blackhill and Manuel Estrada, the Debtors' chief financial officer.  Mr. Johnsen and his family members were not privy to the Debtors' consideration of the competing bids and Mr. Johnsen

and his cousin, Niels M. Johnsen, who are two of the eight members of the Board, recused themselves from voting on all matters related to the Sale Motion and the Plan.

11.    As a result of the arm's-length negotiations, the Stalking Horse Agreement represented a substantially higher purchase price for the assets than any other proposal received prior to the subsequent auction.  The Debtors also believed that the Stalking Horse Agreement represented lower execution risk than any other proposal.  Further, the process for soliciting overbids through an auction process as described below ensured that other parties had the opportunity to submit higher or better bids in order to maximize the recovery from the Specialty Business Segment assets.

**B.    The Auction for the Specialty Business Assets**

12.    Following the entry of the Bidding Procedures Order, on December 8, 2016, the Debtors received a bid from HLL for the Specialty Business Assets.  The Debtors, represented by Mr. Estrada and the independent members of the ISH Board, on behalf of, respectively, International Shipholding management and the ISH Board, consulted with their advisors (including myself and other members of my team as well as other professionals retained by the Debtors) and the Bid Consultation Parties, and engaged the bidders in substantial arm's-length negotiations regarding certain aspects of their bids.  The above-referenced representatives of the Debtors subsequently deemed the bid submitted by HLL to be the highest or otherwise best Qualified Bid at that time and declared it the Auction Baseline Bid.  On December 14, 2016, the Debtors' advisors provided the Stalking Horse Bidder with a copy of the Auction Baseline Bid.

13.    In accordance with the Bidding Procedures Order, since they received two Qualified Bids, the Debtors commenced the Auction on December 15, 2016, at the New York offices of the Debtors' legal counsel which the Debtors' management and Mr. James J.

5

McNamara, an independent member of the Board, the Consultation Parties, the Stalking Horse Bidder, and HLL attended.[4]  At the Auction, both of the Qualified Bidders elected to submit further bids and engaged in a highly competitive, ten-round bidding process by increments of $500,000 or more, that resulted in material improvements in both purchase price and contract terms.   The Auction lasted for approximately four (4) hours with multiple recesses to facilitate discussions between the Debtors and individual Qualified Bidders, to allow individual Qualified Bidders to consider how they would proceed and to allow the Debtors to consult with the Consultation Parties.

14.     The Auction culminated in the Debtors declaring, in consultation with their professionals and the Bid Consultation Parties, an all-cash bid submitted by the Stalking Horse Purchaser for the Specialty Business Assets of $24.5 million, with certain modifications to the Stalking Horse Agreement as discussed on the record and memorialized in the Asset Purchase Agreement, as the highest, best, and winning bid at the Auction (the "Successful Bid").  The Successful Bid submitted by the Stalking Horse Purchaser provides *an additional $6.5 million* for the Debtors' estates as compared to the Stalking Horse Purchaser's original bid.  In addition to determining the Successful Bid, the Debtors designated HLL as the Backup Bidder.  The Backup Bidder proposes to purchase the Specialty Business Assets for a total purchase price of $24 million on otherwise materially the same terms as the Successful Bid.

15.     I believe that the Asset Purchase Agreement, as executed among the Debtors and the Stalking Horse Purchaser, represents the highest and otherwise best offer received for the Specialty Business Assets.  The Asset Purchase Agreement reflects the highest cash bid the Debtors received for the Specialty Business Assets during the Auction, which is also a substantial

---

[4] Attached hereto as Exhibit A is the transcript from the Auction.

(approximately 36%) improvement over the Auction Baseline Bid, and materially improved contract terms over the Stalking Horse Agreement. Moreover, based upon Blackhill's review of the information provided by the Stalking Horse Purchaser to the Debtors and in reliance upon the representations made in connection therewith, I believe that the Stalking Horse Purchaser will be able to close the sale transaction and perform all associated obligations in a timely fashion.

16.    I further believe that the Debtors, with the assistance of their advisors, conducted the Auction in a manner that was thorough, fair, and complied with the Bidding Procedures in all material respects. All Qualified Bidders were afforded a full, fair, and reasonable opportunity to submit higher or better offers for some or all of the Specialty Business Assets and to object or otherwise be heard with respect to the process. At all times during the Auction, the Debtors' negotiations and discussions were conducted in good faith, at arm's-length, and by parties who were at all times represented by their own counsel and advisors.

**C.    Executory Contracts and Unexpired Leases**

17.    The Asset Purchase Agreement also provides that the Stalking Horse Purchaser will assume certain executory contracts and unexpired leases in connection with the sale of the Specialty Business Assets. Based upon Blackhill's review of the financial information provided by the Stalking Horse Purchaser to the Debtors and Blackhill and in reliance upon the representations provided by the Stalking Horse Purchaser as to the accuracy of such information, I believe that the Stalking Horse Purchaser will be able to perform its future obligations under such executory contracts and unexpired leases.

**D.    Conclusion**

18.    For all of the foregoing reasons, I believe that the Debtors, with the help of their advisors, have conducted a robust sale and marketing process for the Specialty Business Assets

7

that has maximized value for their creditors and estates.  In light of the Debtors' comprehensive sale and marketing process and the results of the Auction, I do not believe that further marketing of the Specialty Business Assets would have resulted in higher or otherwise better offers for the Specialty Business Assets, and I believe that the sale contemplated by the Asset Purchase Agreement should be approved by this Court.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:  December 18, 2016
         Dallas, Texas

                                        Respectfully submitted,

                                         /s/ *Laurence H. Gurley*
                                        Laurence H. Gurley
                                        Managing Director
                                        Blackhill Partners, LLC

# **EXHIBIT A**

**Auction Transcript**

Page 1

1

2          UNITED STATES BANKRUPTCY COURT

            SOUTHERN DISTRICT OF NEW YORK

3

   IN RE:                           )

4                                   )

   INTERNATIONAL SHIPHOLDING        )Chapter 11

5  CORPORATION, et al.,             )

                                    )16-12220(SMB)

6               Debtors,            )

                                    )

7  -------------------------------)

8

9

10           AUCTION PROCEEDINGS

11            New York, New York

12        Thursday, December 15, 2016

13

14

15

16

17

18

19

20

21

22

23

24  Reported by:

   Philip Rizzuti

25  JOB NO. 117030

1

2

3                 December 15, 2016

4                 12:15 p.m.

5

6         AUCTION PROCEEDINGS, held at the

7   offices of Akin Gump Strauss Hauer &

8   Feld LLP, One Bryant Park, New York,

9   New York, pursuant to order, before

10  Philip Rizzuti, a Notary Public of the

11  State of New York

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1

2  A P P E A R A N C E S:

3

4         AKIN GUMP STRAUSS HAUER & FELD

5         Attorneys for Debtors

6             1333 New Hampshire Avenue, N.W.

7             Washington D.C. 20036

8         BY:   J. ROBERTSON CLARKE, ESQ.

9             STEPHEN KUHN, ESQ.

10            DAVID BOTTER, ESQ.

11            SARAH SCHULTZ, ESQ.

12            PATRICK RICE, ESQ.

13

14        MILBANK, TWEED, HADLEY & McCOY

15        Attorneys for Hemisphere Logistics

16            28 Liberty Street

17            New York, New York 10005

18        BY:   ABHILASH M. RAVAL, ESQ.

19            DENNIS O'DONNELL, ESQ.

20

21        BUTLER SNOW

22        Attorneys for J Line Corporation

23            5430 Lyndon B. Johnson Freeway

24            Dallas, Texas 75240

25        BY:   MARTIN SOSLAND, ESQ.

Page 4

1

2    A P P E A R A N C E S:

3

4         PACHULSKI STANG ZIEHL & JONES

5         Attorneys for Committee

6              780 Third Avenue

7              New York, New York 10017

8         BY:   BRADFORD SANDLER, ESQ.

9              ROBERT FEINSTEIN, ESQ.

10

11

12    ALSO PRESENT:

13        STEVE FURMAN, Regions Bank

14        JON LUBIN, Hemisphere Logistics

15        JANET YEUNG, Hemisphere Logistics

16        KEITH WHITTAKER, Hemisphere Logistics

17        DEAN FEZZA, Hemisphere Logistics

18        CARL RASMUSSEN, Hemisphere Logistics

19        ABHI RAVAL, Hemisphere Logistics

20        DENNIS O'DONNELL, Hemisphere Logistics

21        ROLAND HLAWATY, Hemisphere Logistics

22        KENNETH BECKER, Committee

23        SUNIL KURIEN, Committee

24        MARTIN SOSLAND, J Line

25        ERIK JOHNSEN, J Line

Page 5

1

2    A P P E A R A N C E S:

3         DENNIE REPEROWITZ, Capital One

4         LANCE GURLEY, Blackhill

5         MATT DENNY, Blackhill

6         HARDIN BETHEA, Blackhill

7         JUSTIN O'MALLEY, Blackhill

8         MANNY ESTRADA, Debtor

9         JIM McNAMARA, Board of Directors

10         ROBERT GAYDA, DVB Bank

11         JOHN ASHMEAD, DVB Bank

12         JOANNE LUCKEY, Seacor

13         NELLY ALMEIDA, Seacor

14         EVAN FLECK, Seacor

15

16

17

18

19

20

21

22

23

24

25

1        Auction Proceedings

2        MS. SCHULTZ:  Good morning

3    everyone, or good afternoon, we

4    appreciate everybody's patience as we are

5    getting ready to start today.

6        My name is Sarah Schultz, I

7    together with my partners Stephen Kuhn,

8    David Botter and Patrick Rice, along with

9    our team represent International

10   Shipholding in their Chapter 11

11   bankruptcy.  We are joined today at the

12   front table by Mr. Manny Estrada who is

13   the company's CFO, as well as Jim

14   McNamara who is the ISH independent board

15   member, and Mr. Lance Gurley of Blackhill

16   who is the lead investment banker on

17   behalf of the company.

18        As I think everybody knows we are

19   here in connection with the Chapter 11

20   case 16-12220 pending before Judge Stuart

21   Bernstein in the United States Bankruptcy

22   Court for the Southern District of New

23   York.  More specifically we are here for

24   the auction of certain assets of what we

25   have been referring to as the specialty

1          Auction Proceedings

2   business.   These are the assets that are

3   described in detail in the order

4   establishing bidding procedures relating

5   to the sale of the debtor's assets in the

6   specialty business segment that was

7   entered on November 18, 2016 at docket

8   number 367, which I will refer to as the

9   bidding procedures order.

10         We will be conducting today's

11  auction in accordance with the bidding

12  procedures order.   Copies of the order

13  are available in this auction room along

14  with copies of the stalking horse bid and

15  various other pleadings filed on the

16  docket that are related to the auction

17  process, they are available at the back

18  table.

19         If there are court documents that

20  you require during this process that we

21  do not have in this room please let one

22  of the debtor advisors know and we will

23  endeavor to get you a copy.

24         This proceeding is being recorded

25  as you can see by a court reporter.   In

1          Auction Proceedings

2    connection with that we would note that

3    he will be recording all official

4    components of this auction.  In order to

5    ensure a clean record, which I think we

6    all want, we would ask that you identify

7    yourselves for the record each time you

8    speak.  Please allow the previous speaker

9    to finish before speaking, and either

10   come to the podium or use the hand held

11   microphone when you speak to ensure that

12   he can hear everything that you say.

13          We would ask that each bidder

14   identify a single spokesperson for their

15   bid.  With that we will launch into the

16   details.

17          The debtors have received two bids

18   for the specialty assets.  The first was

19   received from the stalking horse bidder J

20   Line Corporation.  That bid was attached

21   to the bid procedures order.  The second

22   was received from Hemisphere Logistics

23   LLC.  So there is no confusion we are

24   referring to the asset purchase agreement

25   that was attached to Jonathan Lubin's

1          Auction Proceedings

2     E-mail of 4:26 p.m. Central time on

3     12/8/2016.

4          Over the weekend the debtors

5     received notice from J Line Corporation

6     of certain clarifications with respect to

7     the bid for J Line Corporation that were

8     shared with the consultation parties as

9     defined in the bid procedures and which

10    were shared by the debtors with

11    Hemisphere Logistics.

12          Subsequent to providing the J Line

13    clarifications the debtors have discussed

14    such clarifications with Hemisphere

15    Logistics and we understand at the

16    conclusion of my presentation that a

17    representative of Hemisphere will be

18    putting certain revisions with respect to

19    the Hemisphere bid on the record.

20          Based on all of the information

21    submitted to the debtors and the

22    advisors, including the revisions that I

23    just referenced, the independent members

24    of the debtor's board of directors have

25    upon the advice of debtor's counsel Akin

Page 10

1          Auction Proceedings

2    Gump, and the debtor's investment banker

3    Blackhill, determined that the bid

4    submitted by Hemisphere is a qualified

5    bid as such term is defined in the

6    bidding procedures.

7          In accordance with the bidding

8    procedures yesterday afternoon the

9    debtors provided a copy of the Hemisphere

10   bid to J Line Corporation together with a

11   red line against the J Line bid.

12         The debtors also consulted with

13   consultation parties.  Based on this

14   consultation the debtors have determined

15   the Hemisphere APA will serve as the

16   auction baseline bid as such term is

17   defined in the bidding procedures.

18         Accordingly in addition to

19   identifying any increase in consideration

20   with respect to each bid any party

21   submitting a bid at the auction will need

22   to identify any changes or modifications

23   they wish to make to the Hemisphere APA.

24   Any changes not announced on the record

25   in connection with the bid will not be

1          Auction Proceedings

2     deemed part of the bid, and every bid

3     shall be irrevocable.

4          In accordance with the bid

5     procedures all increases shall be in

6     $500,000 increments unless the debtors in

7     accordance with the bid procedures

8     provide otherwise.

9          Additionally we will be asking

10    each bidder to confirm that they have not

11    engaged in collusion in connection with

12    the submission of their bid.

13         If a party wishes to confer

14    outside of the main auction room they may

15    ask the debtor to take a break.  The

16    debtors will do their best to honor such

17    requests, but reserve the right to limit

18    the length of such breaks.

19         At this time we would ask that a

20    representative on behalf of each of the

21    qualified bidders acknowledge that they

22    have reviewed the bidding procedures, the

23    bidding procedures order, and that they

24    are prepared to comply with such

25    documents during the course of this

1       Auction Proceedings

2   auction.  We would also at that time ask

3   for an acknowledgement that the parties

4   have not engaged in collusion.

5       We know the parties have been here

6   for a while this morning, we appreciate

7   your patience as we move through this

8   process.

9       MR. SOSLAND:  Martin Sosland of

10  Butler Snow speaking for J Line

11  Corporation.  We have read and reviewed

12  the bidding procedures and we have not

13  engaged in collusion.

14      MR. RAVAL:  Abhilash Raval,

15  Milbank Tweed Hadley & McCoy on behalf of

16  Hemisphere Logistics.  We have read and

17  reviewed the bidding procedures and

18  bidding procedures order and acknowledge

19  them, and also have not undertaken any

20  collusive actions.

21      MS. SCHULTZ:  So I think now the

22  floor is to Hemisphere to provide further

23  revisions to their bid.

24      MR. RAVAL:  With respect to the

25  Hemisphere Logistics bid, Sarah I think

1          Auction Proceedings

2    you referenced the December 8th asset

3    purchase agreement, there have been

4    subsequent revisions.  So the draft

5    purchase agreement that we have executed

6    and delivered to you is one dated

7    December 13, 2016.  I believe that is the

8    one that is also sitting out there on the

9    chairs.

10         Our bid for $18,850,000 broken up

11   in the following amounts:  $18,850,000

12   cash consideration.  We are then giving

13   indemnity as set forth in the same form

14   and substance as set forth in the current

15   purchase agreement in the amount of not

16   more than $892,000 for the following

17   items.  The indemnity would cover the

18   punitive equity participation fee of

19   approximately a million 5.  It would

20   cover the annual return on that million 5

21   which I understand would be approximately

22   $120,000.  It would also cover the annual

23   fee which we understand to be $600,000,

24   and the bonus which we understand to be

25   $200,000.

Page 14

1        Auction Proceedings

2        That indemnity that we are

3    providing would be in the same form and

4    substance as the current indemnity set

5    forth in our first agreement, and it

6    would cover just those four items that we

7    have addressed in the indemnity that

8    would be provided by Hemisphere

9    Logistics.

10       With respect to section 1.1(j) of

11    our asset purchase agreement we would

12    delete the reference to acquiring

13    proceeds of insurance, and we would also

14    add $42,000 cash to sum up to -- one

15    moment.

16       MS. SCHULTZ:  Off the record for a

17    moment.

18       (Recess taken.)

19       MR. RAVAL:  Two clarifications.

20       One, our bid sits at 18,850,000

21    plus the indemnity, so there is not an

22    additional $42,000, sorry that was my

23    math that was incorrect.

24       Secondly with respect to 1.1(j)

25    also a clarification, we are simply

1          Auction Proceedings

2    carving out the $300,000 of insurance

3    proceeds that is coming to the company.

4    Any other insurance proceeds would still

5    come to Hemisphere Logistics.

6          We understand on these terms that

7    we are a qualified bidder.

8          MR. BOTTER:  One question before

9    you leave.  With respect to the indemnity

10   can you just clarify that is in addition

11   to the existing indemnity in the

12   agreement?

13         MR. RAVAL:  Correct.  It would be

14   in addition to the existing indemnity in

15   the agreement, it would have the same

16   substance, forms, terms and conditions.

17         MR. BOTTER:  For these specific

18   items?

19         MR. RAVAL:  For these specific

20   items, correct.

21         MS. SCHULTZ:  One clarification

22   question as it relates to your changes in

23   1.1(j).  The intent is to carve out the

24   claim, correct, and not limiting the

25   payment?

1      Auction Proceedings

2      MR. RAVAL:  Correct, so we are

3   carving out that claim, insurance claim

4   that is for $300,000.  But we would be

5   maintaining our right to acquire all

6   other insurance claims that may exist.

7      MR. GURLEY:  For the record, Lance

8   Gurley of Blackhill Partners, investment

9   banker to the debtor.  I appreciate

10  everybody being here today.

11      With those clarifications we will

12  open the auction.  The auction baseline

13  bid is that of Hemisphere Logistics as

14  clarified on the record by Mr. Raval.

15  The minimum overbid increment as set in

16  the bidding procedures is $500,000.

17      So we will turn the floor to J

18  Line.

19      MR. SOSLAND:  You mind if I do it

20  from here, I will use a mike.

21      J Line will respond to the changes

22  to the agreement as follows.  We have a

23  couple of additional modifications to the

24  agreement which I will go through and

25  then we will bid.

1        Auction Proceedings

2        We will bid off of the -- so we

3    are making it apples to apples off of the

4    form that Hemisphere Logistics is using

5    with these modifications.

6        We will delete section 4.3.  We

7    will delete the last section of 7.1, and

8    if I miss any other specific references

9    to the MHR's, NDA's, obviously all of

10   those, and we will keep our corporate

11   representations as opposed to the

12   competing bidder's bid.

13       MR. KUHN:  Just for clarification,

14   Stephen Kuhn for the record.  In regard

15   to section 7.1 I think you said the last

16   section, did you mean the last sentence?

17       MR. SOSLAND:  I did mean the last

18   sentence, thank you.  The last sentence

19   of paragraph 7.1 we would delete.

20       We will delete the first sentence

21   of section 9.2(i).  To the extent that

22   the second sentence of 9.2(i) needs to be

23   modified to reflect the current state of

24   any of the mortgages, we will do so.  It

25   being the intent that we will acquire the

1          Auction Proceedings

2    mortgages as they -- in the state that

3    they exist today.

4          With regard to the items that were

5    announced by the bidder that were going

6    to be added to the indemnity, we will add

7    each of those items to the assumed

8    liabilities under our bid.

9          With those modifications we will

10   bid $20 million.

11        MR. BOTTER:  One clarification,

12   you said you are assuming the liabilities

13   that were placed into the indemnity by

14   Hemisphere Logistics, and that is in

15   accordance with the clarification E-mail

16   that you sent this prior weekend?

17        MR. SOSLAND:  Yes, that would be

18   consistent with the letter that we sent

19   over the last weekend.

20        MR. GURLEY:  Thank you for your

21   bid J Line.  We will now take a brief

22   recess, consult with the consultation

23   parties and come back to the auction.

24        Five minutes.

25        (Recess taken.)

1       Auction Proceedings

2       MR. BOTTER:  Mr. Feinstein said

3 that the unsecured creditor committee as

4 a consultation party believes that 20

5 million is higher than 18 on the terms

6 that Mr. Sosland put on the record.

7       Any of the consultation parties

8 disagree with that view?

9       They are saying no.

10      MR. GURLEY:  To Hemisphere the

11 current bid is $20 million in accordance

12 with the terms laid out by J Line on the

13 record.  The minimum bid increment is

14 $500,000.

15      MR. RAVAL:  We would like to take

16 a break to discuss it.

17      MR. GURLEY:  How much time do you

18 need?

19      MR. RAVAL:  Hopefully not more

20 than five to seven minutes.

21      MR. GURLEY:  Now we are off the

22 record.

23      (Recess taken.)

24      MR. GURLEY:  We are on the record

25 again.

Page 20

1          Auction Proceedings

2          The last bid was $20 million from

3     J Line with the changes read out on the

4     record.  Hemisphere do you have a

5     response?

6          MR. RAVAL:  Thank you Lance.

7          On behalf of Hemisphere Logistics

8     we increase our prior bid by $2 million

9     cash.

10         MR. BOTTER:  Off the record for a

11    second.

12         (Recess taken.)

13         MR. RAVAL:  We are increasing our

14    cash component from $18,850,000 to

15    $20,500,000, all of the terms and

16    conditions unchanged.

17         MR. GURLEY:  The consultation

18    parties?

19         MR. FEINSTEIN:  We are fine.

20         MR. GURLEY:  The bid was

21    $20,500,000 from Hemisphere with the

22    terms and conditions on the record.

23         J Line it is your yours.

24         MR. SOSLAND:  We will bid

25    21,500,000.

Page 21

1           Auction Proceedings

2           MR. GURLEY:  Terms and conditions

3    the same as last time?

4           MR. SOSLAND:  Yes.

5           MR. GURLEY:  Hemisphere the bid

6    from J Line was $21,500,000, terms and

7    conditions the same as read on the

8    record.  The bid is yours.

9           MR. RAVAL:  Another break please.

10          MR. GURLEY:  Ten minutes

11   sufficient.

12          MR. RAVAL:  Yes, hopefully less.

13          MR. GURLEY:  Off the record.

14          (Recess taken.)

15          MR. GURLEY:  We are back on the

16   record.

17          The last bid $21,500,000 from J

18   Line.  Hemisphere Logistics it is your

19   bid.

20          MR. RAVAL:  On behalf of

21   Hemisphere we bid $22 million cash.  All

22   of the terms and conditions unchanged.

23          MR. GURLEY:  The bid from

24   Hemisphere is $22 million.

25          J Line it is your bid.

1       Auction Proceedings

2       MR. SOSLAND:  J Line bids $22.5

3  million, all the terms and conditions the

4  same.

5       MR. GURLEY:  Thank you.  The bid

6  on the record from J Line is $22,500,000.

7       Hemisphere the bid is yours, and

8  there is no need to repeat same terms so

9  long as the terms are the same and there

10 are no changes.

11      MR. RAVAL:  We would like to take

12 a break.

13      MR. GURLEY:  Very good.  Will five

14 minutes suffice this time.

15      MR. RAVAL:  Yes.

16      MR. GURLEY:  Thank you, off the

17 record.

18      (Recess taken.)

19      MR. GURLEY:  We are back on the

20 record.

21      The last bid was $22,500,000 from

22 J Line.

23      Hemisphere the bid is yours.

24      MR. RAVAL:  Hemisphere will

25 increase it's bid to $23 million, all

1         Auction Proceedings

2    terms and conditions are unchanged.

3         MR. GURLEY:  Assuming everyone is

4    signed off on the above, the current bid

5    $23 million.

6         J Line the bid yours.

7         MR. SOSLAND:  J Line bids $23.5

8    million.

9         MR. GURLEY:  The bid is $23.5

10   million from J Line.

11        Hemisphere the bid is yours.

12        MR. RAVAL:  We will take another

13   break.

14        MR. GURLEY:  Be prompt please.

15        (Recess taken.)

16        MS. SCHULTZ:  We are back on the

17   record.  Just a clarification before we

18   proceed with further bids.

19        The defined term outside backup

20   date in the bidding procedures that are

21   attached to the bid procedures order is

22   blank.  In consultation with the

23   consultation parties that date, assuming

24   that the outside closing date under the

25   asset purchase agreement is ultimately

Page 24

1          Auction Proceedings

2    executed is March 31st, shall be set at

3    April 28, 2017.

4          MR. GURLEY:  With that

5    clarification we are ready to resume the

6    auction.

7          The last bid was $23,500,000 from

8    J Line.

9          Hemisphere it's your bid.

10          MR. RAVAL:  On behalf of

11    Hemisphere our bid is $24 million.

12          MR. GURLEY:  The bid from

13    Hemisphere is $24 million.

14          J Line your bid.

15          MR. SOSLAND:  We need to caucus.

16          MR. GURLEY:  Off the record.

17          (Recess taken.)

18          MR. GURLEY:  The last bid was 24

19    million for Hemisphere.

20          J Line your bid.

21          MR. SOSLAND:  J Line will bid

22    24,500,000.

23          MR. GURLEY:  The bid is $24.5

24    million from J Line.

25          Hemisphere Logistics it is your

Page 25

Auction Proceedings

1    bid.

2    MR. RAVAL:  We would like to take

3    a break.

4    MR. GURLEY:  Okay, brief recess.

5    (Recess taken.)

6    MR. GURLEY:  Back on the record.

7    Last bid was $24.5 million from J

8    Line.

9    Hemisphere it is your bid.

10    MR. RAVAL:  We decline to bid

11    further.

12    MR. GURLEY:  For the record it is

13    now 3:51, eastern time, we will adjourn

14    the auction and go off the record.

15    Thank you all.

16    MR. GURLEY:  Back on the record.

17    The results of the auction is a

18    $24,500,000 bid from J Line who is the

19    successful bidder according to the bid

20    procedures.  The backup bid is for $24

21    million from Hemisphere Logistics.

22    The auction is adjourned.

23    MR. SANDLER:  For the record this

24    is Bradford Sandler, Pachulski Stang

1         Auction Proceedings

2    Ziehl & Jones on behalf of the committee,

3    we would like Hemisphere Logistics to

4    acknowledge that they will serve as the

5    backup bidder.

6         MR. O'DONNELL:  I am Dennis

7    O'Donnell from Milbank Tweed on behalf of

8    Hemisphere Logistics.  We confirm on

9    behalf of Hemisphere Logistics that we

10   will serve as the backup bidder in

11   accordance with the terms of the APA as

12   modified today, including the new outside

13   backup date of April 28, 2017.

14        MR. GURLEY:  Thank you.  Now the

15   auction is adjourned.

16        (Time noted:  4:10 p.m.)

17

18

19

20

21

22

23

24

25

Page 27

1

2                C E R T I F I C A T E

3   STATE OF NEW YORK      )

4                              : ss.

5   COUNTY OF NEW YORK     )

6

7            I, Philip Rizzuti, a Notary

8    Public within and for the State of New

9    York, do hereby certify:

10           That the within auction

11   proceedings are a true and accurate record.

12           I further certify that I am not

13   related to any of the parties to this

14   action by blood or marriage, and that I am

15   in no way interested in the outcome of this

16   matter.

17           IN WITNESS WHEREOF, I have

18   hereunto set my hand this 15th day of

19   December, 2016.

20           _____

21              PHILIP RIZZUTI

22

23

24

25

1

2    ----------------- I N D E X -----------------

3    WITNESS              EXAMINATION BY          PAGE

4    none

5

6    ------------- INFORMATION REQUESTS -----------

7    DIRECTIONS:         None

8    RULINGS:            None

9    TO BE FURNISHED:    None

10   REQUESTS:           None

11   MOTIONS:            None

12

13   ----------------- EXHIBITS ------------------

14   None marked

15

16

17

18

19

20

21

22

23

24

25