Expedited Hearing Requested: To be determined
Objection Deadline: To be determined

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036
Telephone: (212) 872-1000
David H. Botter

1700 Pacific Avenue, Suite 4100
Dallas, TX 75201
Telephone: (214) 969-2800
Sarah Link Schultz (admitted *pro hac vice*)
Sarah J. Crow (admitted *pro hac vice*)

*Counsel to Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) ) ) Chapter 11 |
| INTERNATIONAL SHIPHOLDING CORPORATION, *et al.*,[1] | ) ) Case No. 16-12220 (SMB) ) |
| Debtors. | ) Jointly Administered ) |

**DEBTORS' EXPEDITED MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO CONSUMMATE THE SALE OF THE OSLO WAVE; (II) ESTABLISHING JANUARY 1, 2017, AS THE EFFECTIVE DATE OF THE SALE OF THE OSLO WAVE; (III) STAYING DISTRIBUTION OF THE PROCEEDS OF THE SALE TRANSACTION PENDING FURTHER ORDER OF THE COURT; AND (IV) REJECTING THE BAREBOAT CHARTER *NUNC PRO TUNC* TO JANUARY 1, 2017**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file

this motion for entry of an order, substantially in the form annexed hereto as Exhibit A (the

"Proposed Order"), (i) authorizing the Debtors to consummate the sale of its vessel called the

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: International Shipholding Corporation (9662); Enterprise Ship Co. (9059); Sulphur Carriers, Inc. (8965); Central Gulf Lines, Inc. (8979); Coastal Carriers, Inc. (6278); Waterman Steamship Corporation (0640); N.W. Johnsen & Co., Inc. (8006); LMS Shipmanagement, Inc. (0660); U.S. United Ocean Services, LLC (1160); Mary Ann Hudson, LLC (8478); Sheila McDevitt, LLC (8380); Tower LLC (6755); Frascati Shops, Inc. (7875); Gulf South Shipping PTE LTD (8628); LCI Shipholdings, Inc. (8094); Dry Bulk Australia LTD (5383); Dry Bulk Americas LTD (6494); and Marco Shipping Company PTE LTD (4570). The service address for each of the above Debtors is 601 Poydras Street, Pan American Building, Suite 1850, New Orleans, Louisiana 70130.

"Oslo Wave" free of clear of all liens, claims, and encumbrances; (ii) establishing January 1, 2017, as the effective date of the sale; (iii) staying distribution of the proceeds of the sale transaction pending further order of the Court; and (iv) rejecting that certain bareboat charter dated December 19, 2014, as amended, supplemented or modified from time to time, between the Oslo Bulk Holding Pte Ltd. as bareboat charterer and LCI Shipholdings, Inc. as owner *nunc pro tunc* to January 1, 2017.   In support of the motion, the Debtors submit the *Declaration of Manuel Estrada in Support of the Debtors' Expedited Motion for Entry of an Order (I) Authorizing the Debtors to Consummate the Sale of the Oslo Wave; (II) Establishing January 1, 2017, as the Effective Date of the Sale of the Oslo Wave; (III) Staying Distribution of the Proceeds of the Sale Transaction Pending Further Order of The Court; and (IV) Rejecting the Bareboat Charter* Nunc Pro Tunc *To January 1, 2017* (the "Estrada Declaration") attached hereto as Exhibit C. In further support of the motion, the Debtors respectfully state as follows:

### PRELIMINARY STATEMENT

1.      By this motion, the Debtors seek the authority to sell one of their vessels, the Oslo Wave (IMO: 9190092). The proposed sale requires an effective date of January 1, 2017, and thus the Debtors also seek an order giving the sale and rejection retroactive application to that date. As the Court is aware, the Debtors have made significant progress toward bringing these chapter 11 cases to a successful resolution, including the implementation of a competitive sale process for one segment of their business (the "Specialty Business Sale") and the filing of a chapter 11 plan reorganization (the "Plan") for the remaining business segments.   Under the Debtors' proposed Plan, the Debtors anticipate selling certain assets that are collateral for certain pre-petition debt and delivering the proceeds to the secured lenders or delivering the collateral to such secured lenders.   As the result of ongoing marketing efforts related to this anticipated

disposition of the Debtors' assets, the Debtors have obtained an offer from Oslo Bulk Holding Pte Ltd. ("Buyer") to purchase Oslo Wave for $3.3 million.  The Debtors believe that the immediate sale of the Oslo Wave pursuant to this offer will maximize the value of their estates and is in the best interests of their estates.  The Debtors have conferred with Capital One, National Association ("Capital One"), the secured lender with a pre-petition secured interest in the Oslo Wave, and with SEACOR Capital Corp., the agent under the debtors post-petition facility (the "DIP Agent") and have offered each party the opportunity to credit bid for the vessel.  Both parties have declined and the DIP Agent has advised that it has no objection to the proposed sale.  Capital One has advised that so long as it receives not less than $3.3 million from the sale, it also has no objection to the proposed sale.  The Debtors intend to hold the proceeds of the sale in a segregated account, with the liens attaching to the proceeds pending further order of the Court.  Accordingly, and for all the reasons set forth more fully herein, the Debtors seek the entry of an order authorizing the Debtors to sell the Oslo Wave to Buyer for $3.3 million.

## JURISDICTION

2.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

3.      Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The bases for the relief requested herein are sections 105(a), 363, and 365 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), rule 6004-1 of the Local Rules (the "Local Bankruptcy Rules") for the United States Bankruptcy Court for the Southern District of New York, and the Guidelines for the Conduct of Assets Sales promulgated by the Amended Guidelines for the Conduct of Asset Sales, General Order M-383 (the "Sale Guidelines").

## BACKGROUND

### A.    General Background

5.       On July 31, 2016 (the "Petition Date"), each of the Debtors filed a voluntary

petition for relief under chapter 11 of the Bankruptcy Code.

6.       The Debtors are continuing in the possession of their respective properties and the

management of their respective businesses as debtors in possession pursuant to Bankruptcy Code

sections 1107 and 1108.  These chapter 11 cases have been consolidated for procedural purposes

only.  No trustee or examiner has been appointed in the chapter 11 cases.  On September 1, 2016,

the Office of the United States Trustee for Region 2 (the "U.S. Trustee") appointed the statutory

committee of unsecured creditors (the "Committee") [ECF No. 125].  On September 22, 2016,

the U.S. Trustee amended the Committee's appointment [ECF No. 185].

7.       The events leading up to the Petition Date and the facts and circumstances

supporting the relief requested herein are set forth in the *Declaration of Erik L. Johnsen,*

*President and Chief Executive Officer, Pursuant to Local Bankruptcy Rule 1007-2 and in*

*Support of First Day Filings* [Docket No. 7] (the "First Day Declaration"), and are incorporated

herein by reference.

### B.    Specific Background

*(i)     Debtors Contemplate Selling Certain Vessels to Effectuate Restructuring*

8.       As the Court is aware, the Debtors are pursuing a two-pronged approach in order

to maximize the value of the Debtors' estates: (1) execute the sale process for the majority of the

assets contained in one of their four business segments, the "Specialty Business Segment,"[2] and

(2) obtain confirmation of the Plan with a plan sponsor to reorganize the Debtors' remaining

three business segments.  In connection with the Specialty Business Sale, on November 18,

---

[2] The "Specialty Business Segment" assets to be sold to J Line Corporation include the various "Acquired Assets"
as defined in the Asset Purchase Agreement between the Debtors and J Line Corporation.

2016, the Court entered an order approving the bidding procedures for the sale of the Specialty Business Segment [ECF No. 367]. The Debtors conducted a competitive auction process for the Specialty Business Segment on December 15, 2016, in which the Debtors selected J Line Corporation as the Successful Bidder. The Court approved the Specialty Business Sale to J Line Corporation on the record at the hearing on December 20, 2016.

9.      With respect to the remainder of the Debtors' business segments, the Debtors filed the Plan and Disclosure Statement on November 14, 2016 (which Plan was amended on December 28, 2016). In connection with the Plan, the Debtors have also entered into the RSA with the Plan sponsor of the Plan as approved by the Court on November 21, 2016 [ECF No. 376]. As currently proposed, the Plan involves, among other things, (i) the issuance of new equity in the reorganized Debtors in exchange for a $10 million cash infusion and the conversion of 100% of the Debtors' $18.1 million outstanding debtor-in-possession financing claims,[3] (ii) $25 million in a new senior debt exit facility, a substantial majority of which will be used to satisfy creditor claims under the Plan, (iii) the liquidation by the Debtors of certain vessels not being purchased by the Plan sponsor, and (iv) assumption of certain of the Debtors' pre-petition contracts. The hearing on the Disclosure Statement is currently set for January 5, 2017. Subject to entry of an Order approving the Disclosure Statement and the Court's availability, the Debtors seek to have the proposed confirmation hearing on the Plan on or about February 16, 2017.

10.      Under their proposed Plan, with respect to those vessels that will not be retained by the reorganized Debtors, the Debtors anticipate either (a) returning the vessels to the applicable lenders, or (b) selling the vessels and delivering the proceeds to the applicable lenders. To facilitate this process, the Debtors and their professionals have continued to market the

---

[3] The Plan sponsor funded a portion of the debtor-in-possessing financing and, pursuant to the RSA, has committed to purchasing the remainder of this post-petition financing provided by another lender in connection with the implementation of the Plan.

Debtors' assets to seek the highest and best offer for such assets and have discussed with the applicable lenders if the lender would prefer to have the applicable vessel liquidated by the Debtors or returned.

*(ii)    The Oslo Wave*

11.    The Oslo Wave is among the Debtors' vessels have been marketed for sale as contemplated by the Plan.[4]  The vessel is an ice-strengthened, multi-purpose cargo vessel with a gross tonnage of 12,993 that is registered in the Marshall Islands and owned by owned by LCI Shipholdings, Inc. ("LCI").[5]  The vessel's features include two 57 ton MacGregor Hagglund cranes, combinable to 110 tons; the ability to transverse the St. Lawrence Seaway; strengthening for heavy cargo; ability to carry containers and dangerous goods; and the addition of a sprinkler system enabling the transport of Class 4 cargo.

12.    The Oslo Wave is subject to a bareboat charter dated December 19, 2014, as amended, supplemented or modified from time to time, between the Buyer as bareboat charterer and LCI as owner (the "Bareboat Charter").[6] As amended, the Bareboat Charter continues through December 31, 2019, with options to extend through 2023. The Buyer is obligated to pay $3,000 per day through 2016; $2,500 per day through 2017; $2,225 per day through 2018, and $2,000 per day through 2019 and optional years.

13.    The Oslo Wave is collateral under that certain Loan Agreement, (the "Capital One Facility") dated as of December 28, 2011, as amended, supplemented or modified from time to time, by and among LCI, as borrower, International Shipholding Corporation ("ISH" and, together with its debtor and non-debtor subsidiaries and affiliates, "International Shipholding"),

---

[4] The vessel was previously known as the "Green Wave."

[5] LCI purchased the Oslo Wave from Waterman pursuant to the First Amendment to Loan Agreement, dated as of December 14, 2012.

[6] Under a bareboat charter or a "demise," the charterer has full possession and control of the vessel and is treated in many ways as the owner, generally called owner pro hac vice. *Reed v. S. S. Yaka*, 373 U.S. 410, 412 (1963).

as guarantor, and Capital One, National Association ("Capital One"), as lender.[7] The vessel
secures Capital One's claim of $5,919,075 against LCI in these chapter 11 cases.

14.    Further, under the *Final Order (1) Authorizing Debtors to (A) Obtain Postpetition
Financing, (B) Use Cash Collateral, and (C) Grant Certain Protections to Prepetition Lenders
and (2) Granting Certain Related Relief* [ECF No. 180] (the "Final DIP Order"), DVB Bank SE
and the DIP Agent (the "DIP Lenders") hold a first priority, senior lien of up to $1,250,000
against the Oslo Wave and a junior security interests in the Debtors' encumbered property,
including the Oslo Wave.

15.    The Debtors' most recent appraisal of the Oslo Wave, done on August 31, 2016,
in connection with these chapter 11 cases, estimated a market value from $4,400,000 and
$4,600,000. *See Declaration of William B. Mollard in Support of Entry of Interim and Final
Orders: (I) Authorizing Debtors to (A) Obtain Priming and Super-Priority Postpetition
Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1)
and 364(e) and (B) Use Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate
Protection Pursuant to  11 U.S.C. §§ 361, 362, 363 and 364, (III) Scheduling a Final Hearing
Pursuant to Bankruptcy Rules 4001(b) and (c) and (IV) Granting Related Relief* at ¶ 32, Ex. M
[ECF No. 147].

   (iii) *Pre-Petition Marketing Efforts*

16.    As described in the First Day Declaration, since 2014, International Shipholding
has encountered certain challenges related to complying with debt covenants and overall
liquidity restraints.  In an attempt to strengthen International Shipholding's financial position, on
October 21, 2015, the Board of Directors of ISH approved a plan (the "Strategic Plan") to

---

[7] The Capital One Facility was originally made between Waterman Steamship Corporation ("Waterman"), ISH, and
Capital One.  LCI purchased the Oslo Wave from Waterman pursuant to the First Amendment to Loan Agreement,
dated as of December 14, 2012.

restructure International Shipholding by focusing on its three (3) core segments—the Jones Act,[8]
PCTC,[9] and Rail-Ferry[10] segments—with the objective to reduce debt to more manageable levels
and to increase liquidity. Since that date, International Shipholding has modified the Strategic
Plan in response to new developments, including efforts to sell assets and ongoing discussions
with its lenders, lessors, directors, and others.

17. In tandem with these efforts, the Debtors also marketed the Oslo Wave for sale
prior to the Petition Date. However, pre-petition the Debtors did not receive what the Debtors
determined to be an adequate offer for the Oslo Wave.

### (iv) The Buyer's Offer to Purchase the Oslo Wave

18. Beginning in September 2016, the Debtors entered into confidential negotiations
with the Buyer in connection with the potential sale of the Oslo Wave.[11] As a result of these
negotiations, on September 30, 2016, the Buyer made an offer to purchase the Oslo Wave for
$3,300,000, subject to certain credits for a post-October 2016 closing and the contemporaneous
termination of the Bareboat Charter. After ongoing, arm's-length negotiations, which included

---

[8] The Merchant Marine Act of 1920 (better known as the Jones Act) requires that all goods transported by water between U.S. ports must, subject to certain limited exceptions, be carried aboard U.S. flag vessels that are constructed in the U.S., owned predominantly by U.S. citizens, and crewed by U.S. citizens. Under its Jones Act segment, International Shipholding currently deploys two (2) bulk carriers, one (1) integrated tug-barge unit, one (1) articulated tug-barge unit, and one (1) vessel that transports molten sulphur. Vessels deployed under the Jones Act segment serve primarily in the Gulf of Mexico and operate as the primary marine transporter of coal, sulphur, and phosphate rock. Petroleum coke and fertilizer are the other principal cargoes carried by the Jones Act vessels.

[9] The PCTC business segment currently includes five (5) vessels, four (4) of which are U.S. flag vessels and one (1) of which is an international flag vessel. The PCTC vessels transport all types of vehicles from fully assembled passenger cars to construction machinery and equipment in large number on multiple internal decks.

[10] The Rail-Ferry segment currently uses two (2) double-deck roll-on/roll-off rail ferries, which carry rail cars between the U.S. Gulf Coast and Mexico in regularly scheduled waterborne service. The service provides departures every four (4) days from Mexico and the U.S. Gulf Coast, respectively, for a three (3) day transit between ports. Since 2007, International Shipholding has conducted these operations out of its terminal in Mobile, Alabama and a terminal in Coatzacoalcos, Mexico. Trade for this segment is primarily driven by commodities such as forest products, sugar, metals, minerals, plastics and chemicals. In August 2012, ISH acquired two (2) related businesses that own and operate a certified rail-car repair facility near the port of Mobile, Alabama.

[11] As described in the First Day Declaration, ISH previously owned a 23.68% interest in the Buyer. The interest was sold in the first quarter of 2016 as part of the Strategic Plan to strengthen International Shipholding's financial condition.

elimination of the aforementioned credits, and research into the market for the Oslo Wave, the Debtors determined that the offer reflected in Memorandum of Agreement attached hereto as Exhibit B (the "APA") to be appropriate under the circumstances.

19.     Although the Debtors did not conduct a Court-authorized sale process to market the Oslo Wave while finalizing the Specialty Business Sale and their proposed Plan, they contacted brokers regarding the Buyer's offer and, through their financial advisors, Blackhill Partners, LLC, conducted an analysis of recent comparable sales. The Debtors also discussed the proposal with Capital One, the DIP Agent, and the Committee. As the result of this inquiry, the Debtors have determined that the Buyer's offer is higher than any offer that the Debtors could reasonable expect to obtain after additional marketing or establishing auction procedures.

20.     Due the difficulties facing the global shipping industry, the secondary vessel market is weak—and has only declined since the filing of the Debtors' cases—especially for multi-purpose cargo vessels like the Oslo Wave. Although the Debtors believe that the Oslo Wave has features that make it more valuable than the typical multi-purpose vessel, based on the sales of comparable vessels and the Debtors' knowledge of other similar vessels being offered in the market today, the Debtors anticipate that that the market value that they could obtain for the Oslo Wave is between $2.1 to $2.5 million.

21.     Because of upcoming regulatory changes regarding vessel emissions and ballast water treatment taking effect in 2020, the Debtors believe that a timely sale is necessary to maximize the value of the Oslo Wave. The Oslo Wave will need costly improvements to comply with these regulatory changes. With each passing month, the useful life of the Oslo Wave without such improvements declines. The Debtors therefore anticipate that the value of the Oslo Wave to potential purchasers will not increase.

22.     The Buyer is in a position to make a higher offer on the Oslo Wave than other potential purchasers. As the bareboat charterer, the Buyer has existing business operations on the Oslo Wave and has full possession and control of the vessel.  Unlike other potential purchasers, the Buyer will not face incur the expenses of transitioning the operations of the vessel.  The Buyer's obligations to make payments under the Bareboat Charter also factor into the Buyer's ability to profitably make a higher offer than other potential purchasers.

23.     Given the pre-petition marketing of the Oslo Wave, the state of the secondary vessel market, the need for improvements to the Oslo Wave, the fact that the proposed sale will not require the payment of a broker fee, and the considerations unique to the Buyer's offer, the Debtors do not believe that they have a realistic chance of obtaining a better offer than the offer reflected in the APA.

24.     However, the Buyer has expressly provided that its offer is contingent on the Debtors promptly closing on the APA, with an effective date of January 1, 2017 (to that end, the APA contains an outside Court approval date of January 31, 2017).   But for the proposed rejection of the Bareboat Charter, the Buyer would be obligated to pay approximately $2,500 per day as of January 1, 2017, in fees under the Bareboat Charter, increasing the total cost of the vessel to the Buyer as time goes on.  If the Debtors wait until after confirmation of their Plan to attempt to sell the Oslo Wave, the value of the vessel to potential purchasers, including the Buyer, may decline.  The Debtors therefore believe it is in the best interests of their estates and creditors to enter into an asset purchase agreement with the Buyer as soon as practicable.

## PROPOSED ASSET PURCHASE AGREEMENT

**A.      Summary of Proposed APA**

25.      A summary of the principal terms of the proposed APA, a complete copy of which is attached hereto as Exhibit B, is as follows:[12]

| | Description of Provision |
| --- | --- |
| **Asset** | Oslo Wave |
| **Purchaser** | Oslo Bulk Holding Pte Ltd. |
| **Debtor Seller:** | LCI Shipholdings, Inc. |
| **Purchase Price** | $3.3 million |
| **Extraordinary Provisions of APA / Sale Order** | 1. The Debtors do not intend on holding an auction. 2. The Debtors seek shortened notice on this motion. 3. Order seeks relief from Bankruptcy Rule 6004(h). |
| **Releases** | Sale "as is, where is" |
| **Other** | 1. The APA is based on NSF 2012, one of the commonly used forms for the sale and purchase of commercial vessels. 2. The Bareboat Charter will be terminated upon delivery of vessel. 3. The APA provides for termination of the APA upon a good-faith determination of the Debtors' board of directors, after seeking the advice of outside counsel, that proceeding with the APA would be inconsistent with the continued exercise of the Debtors' fiduciary duties under applicable law. |

26.      The Debtors have discussed the sale of the Oslo Wave pursuant to the APA with the Capital One, DIP Agent, and the Committee. Capital One does not object to the proposed sale so long as it receives not less than $3.3 Million, the DIP Agent has consented to the proposed sale and the Committee is considering its position.

---

[12] The following summary is qualified in its entirety by reference to the provisions of the APA.  In the event of any inconsistencies between the provisions of the APA and the terms herein, the terms of the APA shall govern.

**B.      Extraordinary Provisions in the APA**

27.      The proposed Sale Order and the APA contain the following items that may be considered Extraordinary Provisions under the Sale Guidelines:

- <u>Private Sale/No Competitive Bidding</u>:  The sale of the Oslo Wave pursuant to the APA does not contemplate an auction or other further competitive bidding process.  As described in more detail herein, the Debtors believe that an expedited sale of the Oslo Wave to the Buyer provides the best opportunity to maximize value, particularly given the marketing process completed through these chapter 11 cases.  The Buyer has conditioned its offer at the current level on the condition that the Debtors will not hold an auction for the Oslo Wave.  The Debtors believe that any delay resulting from an auction or further bidding process risks losing the committed Buyer, would require the Debtors to engage a vessel broker, thus increasing transaction fees, and would be unlikely to achieve a higher or better offer for the Oslo Wave from any other potential purchaser.

- <u>Deadlines that Effectively Limit Notice</u>: The Debtors seek to have a hearing on this motion on shortened notice.  As set forth herein, the Debtors believe that good cause exists to shorten notice so that the Buyer continues with the transaction.  If the Buyer does not continue with the transaction contemplated by the APA, the Debtors believe that they will be forced to accept a lower offer.

- <u>Relief from Bankruptcy Rule 6004(h) and 6006(d)</u>: The Debtors seek relief from the fourteen day stay imposed by Bankruptcy Rule 6004(h) and 6006(d) to enable closing as quickly as possible if the sale is approved.  As Oslo Bulk Holding is already a bareboat charterer of the vessel, and has full possession and control of the vessel, the stay does not protect the rights of any party in interest here.

**<u>RELIEF REQUESTED</u>**

28.      By this motion, the Debtors request entry of the Proposed Order (i) authorizing the Debtors to consummate the sale of the Oslo Wave pursuant to the APA free of clear of all liens, claims, and encumbrances; (ii) establishing January 1, 2017, as the effective date of the APA *nunc pro tunc*; (iii) staying distribution of the proceeds of the sale transaction pending further order of the Court; and (iv) rejecting the Bareboat Charter *nunc pro tunc* to Janauary 1, 2017.

12

## SUPPORTING AUTHORITY

29.    The Debtors submit that application of Bankruptcy Code section 363(b) standard to sales outside of the ordinary course of a debtor's business is met here.  This Court's power under Bankruptcy Code section 363 is supplemented by Bankruptcy Code section 105(a), which provides in relevant part:  "The Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  As set forth below, the Debtors submit they have satisfied the requirements of Bankruptcy Code sections 105 and 363 as those sections have been construed by courts in the Second Circuit.

**A.    Approval of the Sale Transaction is Warranted Pursuant to Bankruptcy Code Section 363(b) because a Sound Business Reason Exists for the Sale Transaction.**

30.    Bankruptcy Code section 363(b)(1) provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  The use, sale, or lease of property of the estate, other than in the ordinary course of business, is authorized when there is an "articulated business justification" for the action to be taken. *See Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991) (citation omitted).  When a valid business justification exists, the law vests a debtor's decision to use property out of the ordinary course of business with a strong presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company." *See Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (citation omitted).

31.    Furthermore, Bankruptcy Code section 363(b) applies to private sales consummated in the absence of competitive bidding.  *See, e.g., In re Wieboldt Stores, Inc.*, 92 B.R. 309, 312 (N.D. Ill. 1988) ("Section 363(b) is not limited to sales involving competitive

bidding. Bankruptcy Rule 6004, which sets forth procedures for Section 363(b) transfers, expressly provides for private sales.").  In this District, the Sale Guidelines require that, if a debtor moves to sell assets in the absence of an auction, or if the debtor has not otherwise sought higher or better offers, the movant must state and explain why such sale is likely to maximize the sale price. *See* Sale Guidelines at ¶ I.D.3.

32.    The Debtors have articulated a clear business justification for entering into the sale transaction for the Oslo Wave.  The Debtors believe that the sale of the Oslo Wave is necessary for their restructuring efforts and that, since the Debtors' highest priority in these chapter 11 cases is to maximize the value of their estates for the benefit of their creditors and other stakeholders, pursuing a sale of the Oslo Wave is a sound business decision.  To that end, the Debtors have secured, after good-faith, arm's-length negotiations, an offer from the Buyer for the Oslo Wave.  To date, as set forth in greater detail above, the Debtors and their professionals have engaged in sale and marketing efforts with respect to the Oslo Wave for more than nearly a year since the first quarter of 2015.  In addition, the Debtors engaged in negotiations with the Buyer in the formulation of the APA.  Thus, the Debtors entered into the APA after a deliberate effort to market the Oslo Wave and are confident that the sale price is fair and reasonable.

33.    The Debtors and the Buyer both have the relevant industry experience to competently and proficiently engage in a fair and arm's-length negotiation of the APA.  In addition, based on relevant industry knowledge, it is the Debtors' belief that there is no higher value or better use for the Oslo Wave than the sale to the Buyer pursuant to the APA. Accordingly, it is a valid exercise of the Debtors' business judgment to seek the relief requested in the Proposed Order.

34.     Moreover, Bankruptcy Rule 6004(f)(1) explicitly permits a debtor to enter into transactions outside of the ordinary course of business through private sales.  As discussed above, the sale to the Buyer provides the Debtors with the best—and perhaps only—opportunity to maximize the sale price of the Oslo Wave and prevent the value loss associated with losing the Buyer and being forced to sell the Oslo Wave for a lower value or diminution of value as the result of the evolving regulatory environment.  Furthermore, the Debtors believe that an auction is not warranted on account of the cost and time to conduct an auction process for the Oslo Wave as compared to the value of the Oslo Wave and the current state of the secondary vessel market.

35.     Courts in this District have previously approved private sales in accordance with the Sale Guidelines where the benefit of the private sale outweighs the delay and expense of conducting a public auction.  *See In re Hawker Beechcraft, Inc.*, Case No. 12-11873 (SMB) (Bankr. S.D.N.Y. Nov. 29, 2012) [Docket No. 857] (authorizing private sale under Rule 6004(f)(1) where public auction would require estate to incur substantial additional costs, but would result in no additional value to the estate); *In re Dewey & Leboeuf LLP*, 2012 Bankr. LEXIS 5116 at *17-18 (Bankr. S.D.N.Y. Nov. 1, 2012) (finding good business reason to sell assets pursuant to private sale where public sale would be more costly); *In re Chemtura Corp.*, Case No. 09-11233 (REG), 2010 Bankr. LEXIS 5349 (Bankr. S.D.N.Y. July 23, 2010) (approving private sale of debtor's business pursuant to asset purchase agreement where prior purchase right would stifle third-party interest in the business and purchaser was uniquely positioned to operate the business); *In re Sonix Med. Res. Inc.*, Case No. 09-77781 (DTE), 2010 Bankr. LEXIS 5471 (Bankr. E.D.N.Y. March 19, 2010) (authorizing private sale of debtors' assets and approving asset purchase agreement where there was substantial risk that value of assets would deteriorate if sale was not consummated and purchase agreement was best

opportunity to realize value of assets on going-concern basis and avoid decline and devaluation of debtors' business); *see also In re Wieboldt Stores, Inc.*, 92 B.R. 309, 312 (N.D. Ill. 1988) ("Section 363(b) is not limited to sales involving competitive bidding. Bankruptcy Rule 6004, which sets forth procedures for Section 363(b) transfers, expressly provides for private sales."); *Palermo v. Pritam Realty, Inc. (In re Pritam Reality, Inc.)*, 233 B.R. 619 (D.P.R. 1999) (upholding bankruptcy court order approving private sale by debtor).

36.    Completing the sale of the Oslo Wave to the Buyer pursuant to the APA is an exercise of the Debtors' sound business judgment, is permitted by the Bankruptcy Code and Bankruptcy Rules, and is in the best interests of the Debtors' estates and creditors.

**B.    The APA Should be Approved *Nunc Pro Tunc* to January 1, 2017**

37.    As noted above, the Buyer has expressly provided that its offer is contingent on the Debtors promptly closing on the APA.  The Buyer is obligated under the Bareboat Charter to continue to make payments of $3,000 per day through the end of 2016 and $2,500 through the end of 2017.  By continuing to incur these fees, the cost of the Oslo Wave to the Buyer continuously increases as time moves on.

38.    To establish the sale price under the APA and to avoid a sale price that fluctuates based on the date of closing, the Debtors request that the Court order that the APA be approved *nunc pro tunc* to January 1, 2017 such that, upon closing, the Buyer would no longer be obligated for any bareboat charter fees accruing after January 1, 2017.  Instead, upon the payment of the sale price of $3,300,000, the Buyer would be retroactively deemed the owner of the Oslo Wave for purposes of payment obligations under the Bareboat Charter and the APA.

39.    Bankruptcy Code section 105(a) provides in relevant part that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  Retroactive authorization of the APA here is necessary to

16

implement the provisions of Bankruptcy Code section 363.  The Buyer's position as bareboat charterer has put the Buyer in a position to offer the highest and best offer for the Oslo Wave, but also presents difficulty in consummating the sale contemplated by that offer.  By granting the APA retroactive authority, the Court will allow the Buyer and Debtors to determine an unambiguous sale price and thereby accomplish the provisions of Bankruptcy Code section 363, while leaving in place the procedural safeguards of the Bankruptcy Code and Bankruptcy Rules.

40.     As the Buyer already has full possession and control over the Oslo Wave, the effect of such retroactive authority is merely to assist in the efficient administration of these chapter 11 cases, and does not affect the substantive rights of any of the parties.

## C.     The Proposed Sale Transaction Satisfies the Requirements of Bankruptcy Code Section 363(f) for a Sale Free and Clear

41.     Bankruptcy Code section 363(f) permits a debtor to sell property free and clear of another party's interest in the property if:  (a) applicable non-bankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is in bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest.  *See* 11 U.S.C. § 363(f).  Because Bankruptcy Code section 363(f) is stated in the disjunctive, satisfaction of any one of its five requirements will suffice to warrant approval of the proposed sale. *See Scherer v. Fed. Nat'l Mortg. Ass'n (In re Terrace Chalet Apartments, Ltd.)*, 159 B.R. 821, 825 (N.D. Ill. 1993) (sale extinguishes liens under section 363(f) as long as one of the five specified exceptions applies).  The sale of the Oslo Wave to the Buyer free and clear of liens or other interests pursuant to the APA is appropriate under Bankruptcy Code section 363(f).

42.    The Debtors may sell the Oslo Wave free and clear of the interests of the DIP Lenders pursuant to Bankruptcy Code section 363(f)(2), which provides that property of the estate may be sold free and clear of an entity's interest in the property if such entity consents. The Debtors propose to sell the Oslo Wave in a commercially reasonable manner and expect that the value of the proceeds from such sale will fairly reflect the value of the property sold and the DIP Agent has consented to the sale contemplated by the APA and the Proposed Order.

43.    The Debtors may sell the Oslo Wave free and clear of the interests of Capital One pursuant to Bankruptcy Code section 363(f)(5), which provides that property of the estate may be sold free and clear of an entity's interest in the property if such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.  Judicial or non-judicial foreclosure and enforcement actions can satisfy Bankruptcy Code section 363(f)(5) where the junior lienholder may be required to accept less than full payment on the debt secured by the collateral. *In re Boston Generating, LLC*, 440 B.R. 302, 333 (Bankr. S.D.N.Y. 2010). In addition to any applicable state law remedies, with respect to ship mortgages and maritime liens such as the one Capital One holds against the Oslo Wave, 46 U.S.C. § 31326(a) provides that "when a vessel is sold by order of a district court in a civil action in rem brought to enforce a preferred mortgage lien or a maritime lien, any claim in the vessel existing on the date of sale is terminated . . . and the vessel is sold free of all those claims." Capital One's interest is therefore one that may therefore be satisfied by monetary satisfaction.

44.    The Debtors are not aware of any entities other than Capital One and the DIP Lenders that hold a lien or other interest in the Oslo Wave.  Nonetheless, to the extent that any other lienholder does not object to the proposed sales transaction, that entity should be deemed to have consented to the relief sought herein, thereby satisfying Bankruptcy Code section 363(f)(2).

Any entity holding liens, claims, or encumbrances on the Oslo Wave will receive notice of this motion and the hearing on the motion. Accordingly, all parties in interest will be given sufficient opportunity to object to the relief requested herein. Failure to object should be deemed consent. *See Futuresource LLC v. Reuters Ltd.*, 312 F.3d 281, 285-86 (7th Cir. 2002) ("It is true that the Bankruptcy Code limits the conditions under which an interest can be extinguished by a bankruptcy sale, but one of those conditions is the consent of the interest holder, and lack of objection (provided of course there is notice) counts as consent. It could not be otherwise; transaction costs would be prohibitive if everyone who might have an interest in the bankrupt's assets had to execute a formal consent before they could be sold." (internal citations omitted). Debtors have discussed the sale of the Oslo Wave pursuant to the APA with the Capital One, DIP Agent, and the Committee.

45.    Any party with an interest in the Oslo Wave pursuant to this motion will have the opportunity to assert a corresponding security interest in the sale proceeds received by the Debtors therefrom (with all of the Debtors' claims, defenses and objections with respect to the amount, validity, or priority of each such interest and the underlying liabilities expressly preserved). *See MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 94 (2d Cir. 1988) ("It has long been recognized that when a debtor's assets are disposed of free and clear of third-party interests, the third party is adequately protected if his interest is assertable against the proceeds of the disposition.").

46.    Therefore, any lienholders are adequately protected and could be compelled to accept a monetary satisfaction of their interest. As such, the requirements of Bankruptcy Code section 363(f)(5) would be satisfied for a sale of the Oslo Wave free and clear of all liens, claims, and encumbrances.

**D.     The Buyer Should be Entitled to the Protections of Bankruptcy Code Section 363(m).**

47.     Bankruptcy Code section 363(m) provides in relevant part that the reversal or modification on appeal of an authorization under section 363(b) of a sale or lease of property does not affect the validity of a sale or lease under such authorization to a purchaser who bought or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal. *See* 11 U.S.C. § 363(m).  "Although the Bankruptcy Code does not define the meaning of 'good-faith purchaser,' . . . most courts have adopted a traditional equitable definition: 'one who purchases the assets for value, in good faith and without notice of adverse claims.'"  *In re Gucci*, 126 F.3d at 390 (citation omitted).  The Third Circuit has held that: "'[t]he requirement that a purchaser act in good faith . . . speaks to the integrity of [purchaser's] conduct in the course of the sale proceedings.'"  *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) (citation omitted).  Typically, the misconduct that would destroy a purchaser's good faith status involves "'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.'"  *Hoese Corp. v. Vetter Corp. (In re Vetter Corp.)*, 724 F.2d 52, 56 (7th Cir. 1983) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978) (interpreting Bankruptcy Rule 805, the precursor to section 363(m))).  In addition, section 363(m) protection applies in the context of private sales.  *See In re Wieboldt Stores, Inc.*, 92 B.R. at 312.  The Debtors submit that the sale contemplated in the APA is an arm's-length transaction entitled to the protections of Bankruptcy Code section 363(m), negotiated by sophisticated and unrelated parties.

E.    **The Purchase Price Constitutes Reasonably Equivalent Value for the Assets Transferred.**

48.    A debtor receives reasonably equivalent consideration when "the debtor's net worth has been preserved" following a transfer of its assets. *Harrison v. N.J. Cmty. Bank (In re Jesup & Lamont, Inc.)*, 507 B.R. 452, 472 (Bankr. S.D.N.Y. 2014); *see also Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 646-47 (3d Cir. 1991) ("The touchstone is whether the transaction conferred realizable commercial value on the debtor reasonably equivalent to the realizable commercial value of the assets transferred.").  A finding of reasonably equivalent value does not require an exact equivalent exchange of consideration, but the benefits that a debtor receives from the transfer should approximate its costs. *Harrison*, 507 B.R. at 472 ("[I]f [the value received] approximates the value of what the debtor transferred, there will be reasonably equivalent value[.]").  Further, transactions between a debtor and a third-party on an arm's-length basis are presumptively for reasonably equivalent value. *See Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.)*, 247 B.R. 51, 109 (Bankr. S.D.N.Y. 1999) ("[W]hen there is an arm's-length transaction by parties that have equal knowledge, a court should not substitute its own view of a fair market price.") (citing *Cooper v. Ashley Comm., Inc., (In re Morris Communications NC, Inc.)*, 914 F.2d 458, 465, 474-75 (4th Cir. 1990)).

49.    Here, the sale of the Oslo Wave constitutes an arm's-length transaction between the Debtors and an unaffiliated third party.  As set forth herein, the Debtors believe that the sale proceeds represent reasonably equivalent value for the Oslo Wave.  The Debtors have kept Capital One, the DIP Agent and the Committee apprised of the negotiations and analysis regarding the sale of the Oslo Wave.

**F.      The Court Should Approve the Rejection of the Bareboat Charter *Nunc Pro Tunc* to January 1, 2017**

50.      Bankruptcy Code section 365(a) provides that a debtor may, subject to court approval, "reject an executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). "This provision allows a [debtor] to relieve the bankruptcy estate of burdensome agreements which have not been completely performed." *See Stewart Title Guar. Co. v. Old Republic Nat'l Title Ins. Co.*, 83 F.3d 735, 741 (5th Cir. 1996) (citing *In re Murexco Petroleum, Inc.*, 15 F.3d 60, 62 (5th Cir. 1994)).

51.      A debtor's rejection of an executory contract or unexpired lease is governed by the business judgment standard. *See In re Old Carco LLC*, 406 B.R. 180, 193 (Bankr. S.D.N.Y. 2009) ("[T]he scope of the Court's inquiry is limited. Under the business judgment standard, the Court must determine whether rejection will benefit the Debtors' estates. As part of this determination, the Court must determine whether the Debtors made their decisions rationally."); *In re Enron Corp.*, 2006 WL 898033, at *4 (Bankr. S.D.N.Y. Mar. 24, 2006) ("In determining whether to approve a [debtor's] decision to reject such lease or contract, a court applies the 'business judgment' test which is met if the rejection is beneficial to the estate."); *In re Ames Dep't Stores, Inc.*, 306 B.R. 43, 51 (Bankr. S.D.N.Y. 2004) ("When the exercise of business judgment makes such advisable, the estate can, by rejection, be relieved of the duty of continuing post-petition performance on a contract, and the landlord's claim for any damages arising from the rejection is a pre-petition claim for breach of contract."). Accordingly, rejection of the Rejected Lease is appropriate if, in the Debtors' business judgment, rejection would benefit their stakeholders and their estates. *See COR Route 5 Company, LLC v. Penn Traffic Company*, (In re Penn Traffic Co.), 524 F.3d 373, 383 (2d Cir. 2008) ("This standard rather obviously presupposes that the estate will assume a contract only where doing so will be to its economic

advantage and will reject contracts whose performance would benefit the counterparty at the expense of the estate."); *In re Stable Mews Assocs., Inc.*, 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984) ("The business judgment test provides considerably more flexibility to a [debtor]. It requires only that the [debtor] demonstrate that rejection of the [agreement] will benefit the estate.").

52.    The Debtors' decision to reject to the Bareboat Charter reflects the Debtors exercise of sound business judgment. The rejection of the Bareboat Charter is an essential element of the Debtors' proposed sale of the Oslo Wave. Because the Buyer is the bareboat charterer, the rejection of the Contract merely recognizes that the Buyer will have possession, control, and ultimate ownership of the Oslo Wave upon the closing of the APA. If the sale of the Oslo Wave was being made to a third party, the Bareboat Charter agreement would be assigned to such hypothetical purchaser; however, rejecting the contract provides a simpler structure to the transaction contemplated by the APA.

53.    *Nunc pro tunc* rejection is appropriate here to effectuate the Debtors' and Buyer's intention that the APA be given an effective date of January 1, 2017. As affirmed by this Court and courts in other jurisdictions, a court may permit retroactive rejection when the balancing of the equities favor such treatment. *See, e.g.*, *BP Energy Co. v. Bethlehem Steel Corp.*, 2002 WL 31548723, at *3 (S.D.N.Y. Nov. 15, 2002) (finding that it is within a bankruptcy court's authority to approve retroactive rejection when the balance of equities favors such treatment); *Constant Ltd. P'ship v. Jamesway Corp. (In re Jamesway Corp.)*, 179 B.R. 33, 36 (S.D.N.Y. 1995) (affirming bankruptcy court's retroactive approval of lease rejection); *Thinking Machs v. Mellon Fin. Servs. Corp.* (*In re Thinking Machs Corp.*), 67 F.3d 1021, 1028 (1st Cir. 1995) ("[B]ankruptcy courts may enter retroactive orders of approval, and should do so when the

balance of equities preponderates in favor of such remediation."). The balance of equities favors

retroactive rejection here because it reflects the intention of all affected parties—including the

Buyer, the Debtors, Capital One, and the DIP Agent— that the transaction contemplated by the

APA be given an effective date of January 1, 2017. Further, the Buyer has agreed to the

rejection of the Bareboat Charter, *nunc pro tunc* to January 1, 2017, if such relief is granted

contemporaneous with an order approving the sale contemplated by the APA and to waive any

claim as a result of the rejection.

## <u>DISTRIBUTION OF THE PROCEEDS FROM THE SALE</u>

54.    The Debtors believe that subject to the priming liens capped at $1.25 million

created by the Final DIP Order, Capital One has a valid and enforceable first-priority security

interest in the Oslo Wave for the reasons more fully detailed in the Estrada Declaration and the

documents annexed thereto. As the Certificate of Ownership and Encumbrance issued by the

Marshall Islands indicates, Capital One holds a preferred ship mortgage against the Oslo Wave.

55.    Capital One's consent to the sale transaction contemplated in the APA is

contingent on its receipt of the proceeds of such sale. While the DIP Agent continues to

maintain its limited priming lien, neither the Debtors nor the DIP Agent anticipate at this time

that the DIP Agent will be required to exercise such priming lien. Rather, pursuant to the Plan,

the parties anticipate that claims arising under the Final DIP Order will be converted to equity in

the reorganized Debtors. To preserve status quo until Plan confirmation, the Debtors request

language in their Proposed Order (i) acknowledging that the Debtors' stipulation that Capital

One has a valid first priority security interest in the entirety of the proceeds of the sale

transaction contemplated by the APA is subject to the DIP Agent's priming lien, (ii) ordering

that the proceeds of the sale be held in a segregated account, with liens, claims and

encumbrances attaching in the order in which they exist pursuant to the Final DIP Order, and (iii)

providing that such proceeds not be released or otherwise disposed of absent further order of the Court (which may be an order confirming a plan of reorganization). The DIP Agent has consented to this language.

56.    Pursuant to the Final DIP Order, the Debtors have already stipulated that it had granted to Capital One "valid, perfected, binding, non-avoidable, and enforceable first priority security interests in, and liens on, the Marshal Islands flagged vessel Oslo Wave along with customary assignments of earning and insurance and other collateral related to such vessel . . . ." The Debtors therefore believe that the language regarding Capital One's interest in the proceeds does not alter any party's substantive rights. Importantly, the Debtors are not seeking the Court to order that the Debtors' stipulation is accurate, and the Proposed Order expressly states that all security interests and liens against the proceeds of the sale will have the same "validity, priority, force and effect that they now have as against the Oslo Wave."

57.    The Debtors anticipate requesting authority to release the proceeds of this sale to Capital One through the Debtors' proposed Plan. Any party claiming a superior interest in the Oslo Wave will have the opportunity to object to confirmation and assert a corresponding security interest in the sale proceeds received by the Debtors therefrom (with all of the Debtors' claims, defenses and objections with respect to the amount, validity, or priority of each such interest and the underlying liabilities expressly preserved).

**WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h) AND 6006(d)**

58.    The Debtors also request that the Court waive the stay imposed by Bankruptcy Rules 6004(h) and 6006(d). Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). Similarly,

Bankruptcy Rule 6006(d) provides that "[a]n order authorizing the trustee to assign an executory contract or unexpired lease under §365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." The value of the transaction decreases for the Buyer as time passes as the result of the amounts paid under the Bareboat Charter. Therefore, time is of the essence in consummating the sale, and the Debtors and the Buyer intend to close on the sale transaction as soon as reasonably practicable. Accordingly, the Debtors respectfully request that the Court waive the fourteen-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d), as the exigent nature of the relief sought herein justifies immediate relief.

## NOTICE

59.    No trustee or examiner has been appointed in the Debtors' chapter 11 cases. The Debtors have caused notice of this application to be provided by electronic mail, facsimile, regular or overnight mail, and/or hand delivery to: (i) the U.S. Trustee; (ii) the agent under the Debtors' post-petition debtor-in-possession financing and its counsel; (iii) the Committee and its counsel; (iv) counsel to the agents and lenders under the Debtors' pre-petition credit facilities; (v) the U.S. Attorney's Office for the Southern District of New York; (vi) the Internal Revenue Service; (vii) the United States Securities and Exchange Commission; (ix) all parties that have filed a request to receive service of pursuant to Bankruptcy Rule 2002; and (x) all other parties on the master service list prepared and maintained pursuant to the *Order Establishing Certain Notice, Case Management, and Administrative Procedures* [ECF No. 178]. In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary; and (xii) any party claiming an interest in the Oslo Wave.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court (a) enter an order, substantially in the form of the Proposed Order, granting the relief requested herein, and (b) grant such other and further relief as may be just and proper.

Dated:  New York, New York
        December 30, 2016

**AKIN GUMP STRAUSS HAUER & FELD LLP**

By:  */s/ David H. Botter*
David H. Botter
One Bryant Park
New York, NY 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

Sarah Link Schultz (admitted *pro hac vice*)
Sarah J. Crow (admitted  *pro hac vice*)
1700 Pacific Avenue, Suite 4100
Dallas, Texas 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343

*Counsel to Debtors and Debtors in Possession*

**<u>EXHIBIT A</u>**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) ) ) | Chapter 11 |
| INTERNATIONAL SHIPHOLDING CORPORATION, *et al.*,[1] | ) ) ) | Case No. 16-12220 (SMB) |
| Debtors. | ) ) ) | Jointly Administered |

**ORDER (I) AUTHORIZING THE DEBTORS TO CONSUMMATE THE SALE OF THE OSLO WAVE; (II) ESTABLISHING JANUARY 1, 2017, AS THE EFFECTIVE DATE OF THE SALE OF THE OSLO WAVE; (III) STAYING DISTRIBUTION OF THE PROCEEDS OF THE SALE TRANSACTION PENDING FURTHER ORDER OF THE COURT; AND (IV) REJECTING THE BAREBOAT CHARTER *NUNC PRO TUNC* TO JANUARY 1, 2017**

Upon the motion of the above-captioned debtors and debtors in possession (collectively, the "Debtors")[2] for entry of the Proposed Order authorizing the Debtors to consummate the sales of the Oslo Wave pursuant to the APA free of clear of all liens, claims, and encumbrances; and the Court having jurisdiction to consider the motion and the relief requested therein in accordance with 28 U.S.C. § 1334 and the *Amended Standing Order of Reference* from the United States Southern District of New York, dated as of January 31, 2012; and consideration of the motion and the relief requested therein being a core proceeding in accordance with 28 U.S.C. §§ 157(b)(2); and venue being proper in this jurisdiction pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the motion being adequate and appropriate under the

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: International Shipholding Corporation (9662); Enterprise Ship Co. (9059); Sulphur Carriers, Inc. (8965); Central Gulf Lines, Inc. (8979); Coastal Carriers, Inc. (6278); Waterman Steamship Corporation (0640); N.W. Johnsen & Co., Inc. (8006); LMS Shipmanagement, Inc. (0660); U.S. United Ocean Services, LLC (1160); Mary Ann Hudson, LLC (8478); Sheila McDevitt, LLC (8380); Tower LLC (6755); Frascati Shops, Inc. (7875); Gulf South Shipping PTE LTD (8628); LCI Shipholdings, Inc. (8094); Dry Bulk Australia LTD (5383); Dry Bulk Americas LTD (6494); and Marco Shipping Company PTE LTD (4570). The service address for each of the above Debtors is 601 Poydras Street, Pan American Building, Suite 1850, New Orleans, Louisiana 70130.

[2] Capitalized terms used but not otherwise defined herein have the meanings set forth in the motion or in the Estrada Declaration, as applicable.

particular circumstances; and a hearing having been held to consider the relief requested in the motion; and upon the Estrada Declaration, the record of the hearing and all proceedings had before the Court; and the Court having found and determined that the relief sought in the motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest, and that the legal and factual bases set forth in the motion establish just cause for the relief granted herein; and any objections to the requested relief having been withdrawn or overruled on the merits; and after due deliberation and sufficient cause appearing therefor, it is hereby **FOUND AND DETERMINED THAT**:

A.        The transaction contemplated by the APA constitutes the highest and best offer for the Oslo Wave, and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative.  The Debtors' determination that the APA constitutes the highest and best offer constitutes a valid and sound exercise of the Debtors' business judgment.

B.        The APA represents a fair and reasonable offer to purchase the Oslo Wave under the circumstances of these chapter 11 cases.  No other person or entity or group of entities has offered to purchase the Oslo Wave for greater value to the Debtors' estates than the Buyer.

C.        Approval of the motion and the APA and the consummation of the transactions contemplated thereby are in the best interests of the Debtors, their creditors, their estates, and other parties in interest.

D.        The terms of the APA and the sale transaction contemplated therein are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, are the best available to the Debtors under the circumstances.

E.      The Debtors' decision to reject the Bareboat Charter was an exercise of the Debtors' business judgment.

F.      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.  To the extent that any findings of fact constitute conclusions of law, they are adopted as such.  To the extent any conclusions of law constitute findings of fact, they are adopted as such.

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.      The motion is granted to the extent set forth herein.

2.      Upon the transfer of the Oslo Wave to the Buyer in accordance with the APA, attached to the motion as <u>Exhibit B</u>, the Bareboat Charter shall be rejected.  Such rejection shall be effective *nunc pro tunc* to January 1, 2017, and Buyer waives any claim arising from the rejection of the Bareboat Charter.

3.      Subject to paragraph 8 of this Order, notwithstanding the relief granted herein and any actions taken hereunder, nothing contained in this Order shall constitute, nor is it intended to constitute, an admission as to the validity or priority of any claim against the Debtors, the creation of an administrative priority claim on account of the pre-petition obligations sought to be paid, or the assumption or adoption of any contract or agreement under Bankruptcy Code section 365.

4.      The APA, and all of the terms and conditions thereof, is hereby approved, *nunc pro tunc* to January 1, 2017.

5.      Pursuant to Bankruptcy Code section 363(b), the Debtors are authorized, and empowered to take any and all actions necessary or appropriate to (a) consummate the sale transaction of the Oslo Wave with the Buyer upon the terms and subject to the conditions set

3

forth in the APA, (b) close the Oslo Wave sale transaction upon the terms and subject to the conditions as set forth in the APA and this Order, and (c) execute and deliver, perform under, consummate, implement and close fully the APA, together with all additional instruments and documents that may be reasonably necessary or appropriate to implement the APA, provided that such additional documents do not materially change the terms of the APA or that may be reasonably necessary or appropriate to the performance of the obligations as contemplated by the APA, in each case, without further application to, or order of, the Court.

6.      Pursuant to Bankruptcy Code sections 105(a), 363(b), and 363(f), the Debtors are authorized and directed to transfer the Oslo Wave to the Buyers pursuant to the APA.  The Oslo Wave shall be transferred to the Buyer upon the terms and subject to the conditions as set forth in the APA and such transfer shall constitute a legal, valid, binding, and effective transfer of the APA, and the Oslo Wave shall be free and clear of all liens, claims, and encumbrances.  Upon the closing, the Buyer shall take title to and possession of the Oslo Wave free and clear of all liens, claims, and encumbrances pursuant to Bankruptcy Code section 363(f).

7.      Subject to paragraph 8 of this Order, all liens, claims, and encumbrances on the Oslo Wave shall attach solely to the proceeds of the Oslo Wave sale transaction with the same validity, priority, force and effect that they now have as against the Oslo Wave.  The proceeds of the Oslo Wave transaction shall be held in a segregated account pending further order of the Court.

8.      The Debtors admit, acknowledge, stipulate and agree that upon closing of the APA, Capital One will have a valid, perfected, binding, non-avoidable, and enforceable first priority security interest in, and liens on, the proceeds from the sale transaction contemplated under the APA, subject only to the priming lien of the DIP Lenders, capped at $1,250,000.

4

9.      Subject to paragraph 8 of this Order, all parties reserve all rights with respect to the distribution of the proceeds of the sale transaction pending further order of the Court.

10.      Except as expressly permitted or otherwise specifically provided in the APA or this Order, all persons or entities holding liens, claims, and encumbrances on all or any portion of the Oslo Wave arising under or out of, in connection with, or in any way relating to the Debtors, the Oslo Wave, the operation of the Debtors' business prior to the closing of the Oslo Wave sale transaction, or the transfer of the Oslo Wave to the Buyer, hereby are forever barred, estopped, and permanently enjoined from asserting against the Buyer, its successors or assigns, or their property, such persons' or entities' liens, claims, and encumbrances in and to the Oslo Wave.

11.      The provisions of this Order authorizing the sale of the Oslo Wave by the Debtors free and clear of liens, claims, and encumbrances shall be self-executing, and none of the Debtors, the Buyer, or any other party shall be required to execute or file releases, termination statements, assignments, cancellations, consents or other instruments to effectuate, consummate, and/or implement the provisions hereof with respect to the sale; *provided*, *however*, that this paragraph shall not excuse such parties from performing any and all of their respective obligations under the APA or as otherwise set forth in this Order or requested by Buyer.

12.      Without limiting the foregoing, upon consummation of the transactions set forth in the APA, the Buyer shall be authorized to file termination statements or lien terminations in any required jurisdiction to remove any record, notice filing, or financing statement recorded to attach, perfect, or otherwise notice any lien or encumbrance with respect to the Oslo Wave (but not the proceeds thereof) that is extinguished or otherwise released pursuant to this Order under section 363 and the related provisions of the Bankruptcy Code.  A certified copy of this Order

may be filed with the appropriate clerk and/or recorded to act to cancel any of the liens, claims, and encumbrances on the Oslo Wave of record.

13.     This Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials and all other persons or entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by APA; provided that nothing herein shall relieve any entity of the obligation to pay filing fees required to be paid under non-bankruptcy law.

14.     If any person or entity which has filed statements or other documents or agreements evidencing liens, claims, and encumbrances on, interests in, all or a portion of the Oslo Wave shall not have delivered to the Debtors prior to the closing of the APA, in proper form for filing and executed by appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary or desirable to the Buyer for the purpose of documenting the release of all liens, claims, and encumbrances on the Oslo Wave, which the person or entity has or may assert with respect to all or any portion of the Oslo Wave, the Debtors are hereby authorized and directed, and the Buyer is hereby authorized, to execute and file such statements, instruments, releases, and other documents on behalf of such person or entity with respect to the Oslo Wave.

15.    The Buyer is purchasing the Oslo Wave in good faith and is a good faith buyer within the meaning of Bankruptcy Code section 363(m), and is therefore entitled to the full protection of that provision, and otherwise has proceeded in good faith in all respects in connection with this proceeding in that, *inter alia*:  (i) all agreements or arrangements entered into by the Buyer in connection with the sale transaction have been disclosed; (ii) the Buyer has not violated Bankruptcy Code section 363(n) by any action or inaction; and (iii) the negotiation and execution of the APA was at arms' length and in good faith.

16.    In the absence of a stay pending appeal, the Buyer will be acting in good faith pursuant to Bankruptcy Code section 363(m) in closing the transaction contemplated by the APA, at any time on or after entry of this Order in accordance with the APA.

17.    Notice of the motion as provided herein was good and sufficient and such notice satisfies the requirements of Bankruptcy Rule 6004(a) and the Local Rules.

18.    Notwithstanding the possible applicability of Bankruptcy Rules 6004(h) and 6006(d), this order shall be immediately effective and enforceable upon its entry.

19.    The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this order.

20.    The Court retains jurisdiction with respect to all matters arising from or related to the interpretation or implementation of this order.

New York, New York
Dated: _____, 2017

_____
United States Bankruptcy Judge

## <u>EXHIBIT B</u>

**Memorandum of Agreement for the Sale of the Oslo Wave**

Date: December 28, 2016

## MEMORANDUM OF AGREEMENT

It is this day mutually agreed by and between LCI Shipholdings, Inc. (hereinafter called "the Sellers") and Oslo Wave PTE LTD (hereinafter called "the Buyers"). That the Sellers shall sell and the Buyers shall buy the M/V OSLO WAVE on the following terms and conditions:

| | |
|---|---|
| (I) SELLERS: | LCI Shipholdings, Inc. |
| (II) BUYERS: | Oslo Wave Pte Ltd |
| (III) VESSEL'S NAME: | OSLO WAVE (IMO No. 9190092) |
| (IV) FLAG: | Marshall Islands |
| (V) CLASS: | ABS |
| (VI) BUILT: | 2000 |
| (VII) GRT: | 12993 |
| (VIII) NRT: | 5894 |

## 1) PRICE

USD 3,300,000 (three million three hundred thousand)

## 2) PAYMENT

Purchase payment shall be made free of bank charges to LCI Shipholdings, Inc. nominated bank, on delivery of the vessel, but not later than three (3) banking days after the vessel is ready for delivery and written, facsimile, or e-mail notice thereof has been given to the Buyers by the Sellers.

## 3) DOCUMENTATION

Not later than seven (7) days prior to the Vessel's intended date of readiness for delivery as notified by the Sellers pursuant to Clause 4(b) of this Agreement, the Sellers shall furnish the Buyers with a copy of the Vessel's current Certificate of Documentation and shall to the extent possible exchange copies, drafts or samples of the other documents listed in this Clause 3 to ensure that the transfer of ownership of the Vessel

1

from the Sellers to the Buyer in the Buyer's name may be registered under Marshall Island flag at the time of delivery of the Vessel.

At or prior to the time of delivery of the Vessel, the Sellers will furnish the Buyers with the following documents, provided that the Sellers shall provide, at any time, any other documentation necessary to register the transfer of ownership from Sellers to Buyers, if found after the delivery of the Vessel:

a)      One (1) original of the Bill of Sale attached as Exhibit A, duly attested by a Notary Public and specifying that the Vessel is free from all debts, encumbrances and maritime liens.

b)      One (1) original of a certificate of the Secretary or Assistant Secretary of the Sellers, duly notarized and certifying as to the resolutions adopted by the Board of Directors of the Sellers approving the sale of the Vessel to the Buyers and the terms of this Agreement and granting a power of attorney to authorized representatives of the Sellers,

c)      One (1) original of "Power of Attorney" of the Sellers duly executed and duly notarized in favor of authorized representatives of the Sellers authorizing such persons to execute the Bill of Sale, to sign and deliver any documents in connection with the sale of the Vessel to the Buyers, and to effect the Vessel's delivery,

d)      One (1) original of "Class Maintenance Certificate" issued by the Classification Society of the date not more than five (5) Banking Days prior to the date of delivery of the Vessel, evidencing that the Vessel has its present class fully maintained,

e)      One (1) original of "Commercial Invoice" stating the Purchase Price of the Vessel,

f)      Two (2) sets of "Protocol of Delivery and Acceptance" confirming the date and time of delivery of the Vessel from the Sellers to the Buyers to be signed by both the Sellers and the Buyers at closing,

g)      Such other documents may be reasonably required by Buyers and by Buyers' flag for registration purpose only, and

h)      The documents mentioned in subclauses a), b), c), d), e), f), g), h), i) and j) above will be executed in English.

## 4) DELIVERY PLACE AND TIME

The Vessel will be delivered, as is, where isat a mutually agreed time, at sea or in port.

## 5) DELIVERY CONDITION

The Buyers shall accept the vessel in "as is, where is" condition.

## 6) UNDERWATER INSPECTION

No underwater inspection to be carried out prior to delivery.

## 7) NOTICE OF READINESS

When the Vessel becomes ready for delivery in accordance with the terms and condition of this Agreement the Sellers shall tender to the Buyers a notice of readiness for delivery. The Buyers shall take over the Vessel within three (3) Banking Days (any day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in New York) from the day of the receipt of such notice.

## 8) FORCE MAJEURE

Should the Vessel become an actual or constructive total loss before delivery or not be able to be delivered through outbreak of war, political reasons, restraint of Governments, Princes or People, or any other cause which either party hereto cannot prevent, this Agreement shall be deemed to be null and void.

## 9) ALLOCATION OF RISK

The Vessel with belongings to her (as set out in Clause 10) shall be at the Sellers' risk and expense until she is delivered to the Buyers, and after the delivery of the Vessel in accordance with this Agreement the Sellers shall have no liability for any fault or deficiency of her description and/or conditions.

## 10) BELONGINGS AND BUNKERS

The Sellers shall deliver to the Buyers the Vessel with belongings to her at the time of delivery including spare parts, stores and equipment, on board, on order or ashore, used or unused; The Buyers shall take over and shall be deemed pay the Sellers for unused lubricating oil at last purchased net prices.

As Bunkers are the property of the Buyers, there will be no settlement of amounts of fuel/diesel oils remaining onboard the Vessel at time of delivery.

## 11) EXCLUSIONS FROM THE SALE

The Sellers have the right to take ashore crockery, plate, cutlery, linen and other articles bearing the Sellers' flag or name, provided they substitute for the same, if

3

required by the Buyers, an adequate number of similar unmarked items. Books, cassettes, videos and forms etc., exclusively for use on the Sellers' vessels, shall be taken ashore before delivery.

## 12) LASHING MATERIALS
The Vessel will be delivered with existing lashing materials onboard.

## 13) CHANGE OF NAME/FUNNEL MARKINGS
The Buyers have their option to use the current name of the Vessel and the funnel markings after delivery of the Vessel.

## 14) ENCUMBRANCES
The Sellers shall deliver to the Buyers the Vessel free from all debts, mortgages, encumbrances and maritime liens.

## 15) DEFAULT AND COMPENSATION
Should the Buyers fail to fulfill this Agreement, the Sellers have the right to cancel the Agreement.

If the Sellers should default in the delivery of the Vessel with belongings to her (as set out in Clauses 10) and 11) in the manner and within the time herein specified, the Sellers shall, when such default is due to their negligent or intentional acts or omissions, make due compensation for loss caused by their non-fulfillment of this Agreement.

## 17) MANUALS, PLANS, DRAWINGS ETC.
The Sellers shall, at the time of delivery, hand to the Buyers all classification certificates as well as all manuals produced by the Sellers and the Vessel, plans, drawings, etc., which are not required to return to registry/ABS or relative authorities. After delivery of the Vessel, at the Buyers request other technical documentation which may be in the Sellers' possession shall promptly be forwarded to the Buyers at the Buyers' cost. The Sellers may keep logbooks but the Buyers to have the right to take copies of same at the Buyers' cost.

## 18) TAX, FEES AND EXPENSES
Any taxes, fees and expenses connected with the purchase and registration under the Buyers' flag shall be for the Buyers' account.

## 19) FAMILIARIZATION
The Sellers agree that the Buyers have the right to have their appointed persons embark the Vessel for familiarization purpose before delivery of the Vessel to the Buyers in which case Buyers will take responsibility for costs incurred to the persons during their stay onboard and for any accidents of injury and/or loss of life of the persons which occur during their stay onboard the Vessel. The Buyers shall pay USD

4

10.00 per day per person as meal charge. Other charges including communication, if any, shall be paid by the Buyers and settled onboard at the time of delivery. The Sellers also agree that the Buyers have the right to keep Sellers' officers ex the Vessel after delivery of the Vessel to the Buyers to the extent not more than thirty (30) days, subject to the Vessel's capacity availability and the Buyers paying the agreed amount of cost to the Sellers and taking responsibility for such the Sellers' officers accidents of injury and/or loss of life.

Notwithstanding the conditions above, when LOI is signed for the persons' embarkation or keeping officer(s) onboard, the LOI shall override this clause.

**20)  TERMINATION OF BARE BOAT CHARTER**
The Sellers and the Buyers are parties to that certain bare boat charter dated December 19, 2014, as amended, supplemented or modified from time to time (hereinafter called "the Bare Boat Charter").   Upon the transfer of the Vessel to the Buyers in accordance with this Agreement, the Bare Boat Charter shall be terminated, effective as of January 1, 2017, and the Buyers shall waive any and all claims against the Sellers for such termination.

**21)  APPROVAL OF THE BANKRUPTCY COURT**
On July 31, 2016, the Sellers filed voluntary petitions pursuant to title 11 of chapter 11 of the United States Code.   The Sellers' cases are pending before the United States Bankruptcy Court for the Southern District of New York (hereinafter called "the Bankruptcy Court"), Case No. 16-12220 (SMB).   The sale of the Vessel is expressly contingent upon the entry of an order from the Bankruptcy Court approving the sale of the Vessel to the Buyers free and clear of all liens, claims and encumbrances, which order shall be in form and substance reasonably satisfactory to the Sellers and the Buyers.   If such an order is not obtained on or prior to January 31, 2017, either party may terminate this Agreement upon written notice (which notice may be via email) to the other party.

**22)  TERMINATION OF THIS AGREEMENT**
The Sellers may terminate this Agreement, in their discretion, by written notice to the Buyers (which notice may be email), upon a determination by the Sellers' board of directors, in good faith, after seeking the advice of outside counsel, that proceeding with the Agreement would be inconsistent with the continued exercise of the Sellers' fiduciary duties under applicable law.

Sellers:
LCI Shipholdings, Inc.

Name:  ERIK L JOHANSEN
Title:  PRESIDENT

Buyers:
Oslo Bulk Holdings Pte Ltd / OSLO WAVE PTE LTD.

Name:  DAG ROHKEN
Title:  DIRECTOR

5

## EXHIBIT C

**Declaration of Manuel G. Estrada**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: | ) ) ) Chapter 11 |
| INTERNATIONAL SHIPHOLDING CORPORATION, *et al.*,[1] | ) ) Case No. 16-12220 (SMB) ) |
| Debtors. | ) Jointly Administered ) |

**DECLARATION OF MANUEL ESTRADA IN SUPPORT OF THE DEBTORS' EXPEDITED MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO CONSUMMATE THE SALE OF THE OSLO WAVE; (II) ESTABLISHING JANUARY 1, 2017, AS THE EFFECTIVE DATE OF THE SALE OF THE OSLO WAVE; (III) STAYING DISTRIBUTION OF THE PROCEEDS OF THE SALE TRANSACTION PENDING FURTHER ORDER OF THE COURT; AND (IV) REJECTING THE BAREBOAT CHARTER *NUNC PRO TUNC* TO JANUARY 1, 2017**

I, Manual G. Estrada, declare as follows under penalty of perjury:[2]

      1.      I am Vice President and Chief Financial Officer of International Shipholding Corporation, a corporation organized under the laws of Delaware and one of the above-captioned debtors and debtors in possession (collectively, the "Debtors"). I am a 1977 graduate of Loyola University in New Orleans, Louisiana and received a certified professional accountant designation in 1986. I joined the Debtors in 1978 and have been employed in my present capacity since 2005. Accordingly, I am familiar with the Debtors' day-to-day operations, business, and financial affairs.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: International Shipholding Corporation (9662); Enterprise Ship Co. (9059); Sulphur Carriers, Inc. (8965); Central Gulf Lines, Inc. (8979); Coastal Carriers, Inc. (6278); Waterman Steamship Corporation (0640); N.W. Johnsen & Co., Inc. (8006); LMS Shipmanagement, Inc. (0660); U.S. United Ocean Services, LLC (1160); Mary Ann Hudson, LLC (8478); Sheila McDevitt, LLC (8380); Tower LLC (6755); Frascati Shops, Inc. (7875); Gulf South Shipping PTE LTD (8628); LCI Shipholdings, Inc. (8094); Dry Bulk Australia LTD (5383); Dry Bulk Americas LTD (6494); and Marco Shipping Company PTE LTD (4570). The service address for each of the above Debtors is 601 Poydras Street, Pan American Building, Suite 1850, New Orleans, Louisiana 70130.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the motion.

2.      I submit this Declaration in support of the *Debtors' Expedited Motion for Entry of an Order (I) Authorizing the Debtors to Consummate the Sale of the Oslo Wave; (II) Establishing January 1, 2017, as the Effective Date of the Sale of the Oslo Wave; (III) Staying Distribution of the Proceeds of the Sale Transaction Pending Further Order of The Court; and (IV) Rejecting the Bareboat Charter Nunc Pro Tunc To January 1, 2017* filed contemporaneously herewith. Except as otherwise indicated, all facts set forth herein are based on my personal knowledge, my discussions with other members of the Debtors' senior management, my review of relevant documents, or my opinion based upon experience, knowledge, and information concerning the Debtors' operations and financial affairs.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtors.

## A.      Debtors' Contemplated Asset Sales

3.      Since 2014, International Shipholding has encountered certain challenges related to complying with its debt covenants and overall liquidity restraints. In an attempt to strengthen its financial position, International Shipholding has taken certain steps to reduce debt to more manageable levels and to increase liquidity, including efforts to sell assets.  As relevant to this motion, the Debtors determined to market for sale the Debtors ice-strengthened multi-purpose cargo vessel called the "Oslo Wave," and formerly known as the "Green Wave."

4.      The Debtors proposed Plan also seeks the sale of the various vessel assets. The Debtors are pursuing a two-pronged approach in order to maximize the value of their estates: (1) execute the sale process for the majority of the assets contained in one of their four business segments, the "Specialty Business Segment,"[3] and (2) obtain confirmation of the Plan with a plan

---

[3] The "Specialty Business Segment" assets to be sold to J Line Corporation include the various "Acquired Assets" as defined in the Asset Purchase Agreement between the Debtors and J Line Corporation.

sponsor to reorganize the Debtors' remaining three business segments.  In connection with the Specialty Business Sale, on November 18, 2016, the Court entered an order approving the bidding procedures for the sale of the Specialty Business Segment [ECF No. 367].  The Debtors conducted a competitive auction process for the Specialty Business Segment on December 15, 2016 in which the Debtors selected J Line Corporation as the Successful Bidder.  The Court approved the Specialty Business Sale to J Line Corporation on the record at the hearing on December 20, 2016 and approved the Specialty Business Sale from the Bench on December 20, 2016.

5.    With respect to the remainder of the Debtors' business segments, the Debtors filed the Plan and Disclosure Statement on November 14, 2016 (which Plan was amended December 28, 2016).  In connection with the Plan, the Debtors have also entered into the RSA with the Plan sponsor of the Plan as approved by the Court on November 21, 2016 [ECF No. 376].  As currently proposed, the Plan involves, among other things, (i) the issuance of new equity in the reorganized Debtors in exchange for a $10 million cash infusion and the conversion of 100% of the Debtors' $18.1 million outstanding debtor-in-possession financing claims,[4] (ii) $25 million in a new senior debt exit facility, a substantial majority of which will be used to satisfy creditor claims under the Plan, (iii) the liquidation by the Debtors of certain vessels not being purchased by the Plan sponsor, and (iv) assumption of certain of the Debtors' pre-petition contracts.  The hearing on the Disclosure Statement is currently set for January 5, 2017.  Subject to entry of an Order approving the Disclosure Statement and the Court's availability, the Debtors seek to have the proposed confirmation hearing on the Plan on or about February 16, 2017.

---

[4] The Plan sponsor funded a portion of the debtor-in-possessing financing and, pursuant to the RSA, has committed to purchasing the remainder of this post-petition financing provided by another lender in connection with the implementation of the Plan.

6.    Under their proposed Plan, with respect to those vessels that will not be retained by the reorganized Debtors, the Debtors anticipate either (a) returning the vessels to the applicable lenders, or (b) selling the vessels and delivering the proceeds to the applicable lenders. To facilitate this, the Debtors and their professionals have continued to market the Debtors' assets to seek the highest and best offer for such assets and have discussed with the applicable lenders if the lender would prefer to have the applicable vessel liquidated by the Debtors or returned

**B.    The Oslo Wave**

7.    The Oslo Wave, IMO ship identification number 9190092, is among the Debtors' vessels that have been marketed for sale according to the Plan.  The vessel is an ice-strengthened, multi-purpose cargo vessel with a gross tonnage of 12,993 that is registered in the Marshall Islands and owned by owned by LCI Shipholdings, Inc. ("LCI").[5]  The vessel's features include two 57 ton MacGregor Hagglund cranes, combinable to 110 tons; the ability to transverse the St. Lawrence Seaway; strengthening for heavy cargo; ability to carry containers and dangerous goods; and the addition of a sprinkler system enabling the transport of Class 4 cargo.

8.     The Oslo Wave is currently subject to a bareboat charter dated December 19, 2014, as amended, supplemented or modified from time to time, between the Buyer as bareboat charterer and LCI as owner (the "Bareboat Charter").  As amended, the Bareboat Charter continues through December 31, 2019, with options to extend through 2023. The Buyer is obligated to pay $3,000 per day through 2016; $2,500 per day through 2017; $2,225 per day through 2018, and $2,000 per day through 2019 and optional years.

---

[5] LCI purchased the Oslo Wave from Waterman pursuant to the First Amendment to Loan Agreement, dated as of December 14, 2012.

9.      The Oslo Wave is collateral under that certain Loan Agreement, (the "Capital One Facility") dated as of December 28, 2011, as amended, supplemented or modified from time to time, by and among LCI, as borrower, International Shipholding Corporation ("ISH" and, together with its debtor and non-debtor subsidiaries and affiliates, "International Shipholding"), as guarantor, and Capital One, National Association ("Capital One"), as lender.[6] The vessel secures Capital One's claim of $5,919,075 against LCI in these chapter 11 cases. Attached hereto as Exhibit 1 is a Certificate of Ownership and Encumbrance issued by the Marshall Islands indicating Capital One's security interest.

10.      Further, under the *Final Order (1) Authorizing Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Certain Protections to Prepetition Lenders and (2) Granting Certain Related Relief* [ECF No. 180] (the "Final DIP Order"), DVB Bank SE and the DIP Agent (the "DIP Lenders") hold a first priority, senior lien of up to $1,250,000 against the Oslo Wave and a junior security interests in the Debtors' encumbered property, including the Oslo Wave.

11.      The Debtors' most recent appraisal of the Oslo Wave, done on August 31, 2016 in connection with these chapter 11 cases, estimated a market value from $4,400,000 and $4,600,000. *See Declaration of William B. Mollard in Support of Entry of Interim and Final Orders: (I) Authorizing Debtors to (A) Obtain Priming and Super-Priority Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) Use Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection Pursuant to  11 U.S.C. §§ 361, 362, 363 and 364, (III) Scheduling a Final Hearing*

---

[6] The Capital One Facility was originally made between Waterman Steamship Corporation ("Waterman"), ISH, and Capital One.  LCI purchased the Oslo Wave from Waterman pursuant to the First Amendment to Loan Agreement, dated as of December 14, 2012.

*Pursuant to Bankruptcy Rules 4001(b) and (c) and (IV) Granting Related Relief* at ¶ 32, Ex. M

[ECF No. 147]

### C.    Marketing and Sale Efforts

12.    As described in the First Day Declaration, since 2014, International Shipholding has encountered certain challenges related to complying with debt covenants and overall liquidity restraints.  In an attempt to strengthen International Shipholding's financial position, on October 21, 2015, the Board of Directors of ISH approved a plan (the "Strategic Plan") to restructure International Shipholding by focusing on its three (3) core segments—the Jones Act,[7] PCTC,[8] and Rail-Ferry[9] segments—with the objective to reduce debt to more manageable levels and to increase liquidity.  Since that date, International Shipholding has modified the Strategic Plan in response to new developments, including efforts to sell assets and ongoing discussions with its lenders, lessors, directors, and others.

13.    In tandem with these efforts, the Debtors also marketed the Oslo Wave for sale prior to the Petition Date.  However, pre-petition the Debtors did not receive what the Debtors determined to be an adequate offer, for the Oslo Wave.

---

[7] The Merchant Marine Act of 1920 (better known as the Jones Act) requires that all goods transported by water between U.S. ports must, subject to certain limited exceptions, be carried aboard U.S. flag vessels that are constructed in the U.S., owned predominantly by U.S. citizens, and crewed by U.S. citizens.  Under its Jones Act segment, International Shipholding currently deploys two (2) bulk carriers, one (1) integrated tug-barge unit, one (1) articulated tug-barge unit, and one (1) vessel that transports molten sulphur.  Vessels deployed under the Jones Act segment serve primarily in the Gulf of Mexico and operate as the primary marine transporter of coal, sulphur, and phosphate rock.  Petroleum coke and fertilizer are the other principal cargoes carried by the Jones Act vessels.

[8]  The PCTC business segment currently includes five (5) vessels, four (4) of which are U.S. flag vessels and one (1) of which is an international flag vessel.  The PCTC vessels transport all types of vehicles from fully assembled passenger cars to construction machinery and equipment in large number on multiple internal decks.

[9]  The Rail-Ferry segment currently uses two (2) double-deck roll-on/roll-off rail ferries, which carry rail cars between the U.S. Gulf Coast and Mexico in regularly scheduled waterborne service.  The service provides departures every four (4) days from Mexico and the U.S. Gulf Coast, respectively, for a three (3) day transit between ports.  Since 2007, International Shipholding has conducted these operations out of its terminal in Mobile, Alabama and a terminal in Coatzacoalcos, Mexico.  Trade for this segment is primarily driven by commodities such as forest products, sugar, metals, minerals, plastics and chemicals.  In August 2012, ISH acquired two (2) related businesses that own and operate a certified rail-car repair facility near the port of Mobile, Alabama.

**D.    Buyer's Offer to Purchase the Oslo Wave**

14.    Beginning in September 2016, the Debtors entered into confidential negotiations with the Buyer in connection with the potential sale of the Oslo Wave.   As a result of these negotiations, on September 30, 2016, the Buyer made an offer to purchase the Oslo Wave for $3,300,000, subject to certain credits for a post-October 2016 closing and the contemporaneous termination of the Bareboat Charter.   After ongoing, arm's-length negotiations, which included elimination of the aforementioned of the aforementioned credits, and research into the market for the Oslo Wave, the Debtors determined that the offer reflected in Memorandum of Agreement attached to the motion as Exhibit B (the "APA") to be appropriate under the circumstances.

15.    The Buyer has expressly provided that its offer is contingent on the Debtors promptly closing on the APA, with an effective date of January 1, 2017 (to that end the APA contains an outside approval date of January 31, 2017).   But for the proposed rejection of the Bareboat Charter, the Buyer would be obligated to pay approximately $2,500 per day as of January 1, 2017, in fees under the Bareboat Charter, increasing the total cost of the vessel to the Buyer as time goes on.

16.    The Debtors believe that the Buyer will not hold its offer open for pending confirmation of the Debtors' Plan. As the value of the vessel to potential purchasers, including the Buyer, will likely decline, the Debtors believe that any offer they receive after confirmation will be lower than the Buyer's current offer.

17.    The Buyer has conditioned its offer at the current level on the condition that the Debtors will not hold an auction on the Oslo Wave.  The Debtors believe that the Buyer would seek to make a lower opening bid if the Debtors implemented an auction procedure.

E.    **Debtors' Decision to Accept the Buyers Offer**

18.    Although the Debtors did not conduct a Court-authorized sale process to market the Oslo Wave while finalizing the Specialty Business Sale and their proposed Plan, they contacted brokers regarding the Buyer's offer and, through their financial advisors, Blackhill Partners, LLC, conducted an analysis of recent comparable sales.  The Debtors also discussed the proposal with Capital One, the DIP Agent, and the Committee.  As the result of this inquiry, the Debtors have determined that the Buyer's offer is higher than any offer that the Debtors could reasonable expect to obtain after additional marketing or establishing auction procedures.

19.    Due the difficulties facing the global shipping industry, the secondary vessel market is weak—and has only declined since the filing of the Debtors' cases—especially for multi-purpose cargo vessels like the Oslo Wave.  Although the Debtors believe that the Oslo Wave has features that make it more valuable than the typical multi-purpose vessel, based on the sales of comparable vessels and the Debtors' knowledge of other similar vessels being offered in the market today, the Debtors anticipate that that the market value that they could obtain for the Oslo Wave is between $2.1 to $2.5 million.

20.    Because of upcoming regulatory changes regarding vessel emissions and ballast water treatment taking effect in 2020, the Debtors believe that a timely sale is necessary to maximize the value of the Oslo Wave.  The Oslo Wave will need costly improvements to comply with these regulatory changes.  With each passing month, the useful life of the Oslo Wave without such improvements declines.  The Debtors therefore anticipate that the value of the Oslo Wave to potential purchasers will not increase

21.    The Debtors believe that the higher offer from the Buyer is the result of the Buyer's particular position with respect to the Oslo Wave. As the bareboat charterer, the Buyer has existing business operations on the Oslo Wave and has full possession and control of the

vessel. Unlike other potential purchasers, the Buyer will not face incur the expenses of transitioning the operations of the vessel. The Buyer's obligations to make payments under the Bareboat Charter also factor into the Buyer's ability to profitably make a higher offer than other potential purchasers.

22.      Given the pre-petition marketing of the Oslo Wave, the state of the secondary vessel market, the need for improvements to the Oslo Wave, the fact that the proposed sale will not require the payment of a broker fee, and the considerations unique to the Buyer's offer, the Debtors do not believe that they have a realistic chance of obtaining a better offer than the offer reflected in the APA.

**F.      The Proposed APA**

23.      The Debtors are still in arm's-length negotiations with the Buyer regarding the final terms of the agreement for the sale of the Oslo Wave. However, the Debtors have negotiated agreements with the Buyer for the sale of vessels previously and will use a standard form for the sale of commercial vessels.

24.      The Debtors and the Buyer both have the relevant industry experience to competently and proficiently engage in a fair and arm's-length negotiation of the APA. In addition, based on relevant industry knowledge, it is the Debtors' belief that there is no higher value or better use for the Oslo Wave than the sale to the Buyer pursuant to the forthcoming APA.

25.      I believe that the sale of the Oslo Wave to the Buyer provides the Debtors with the best—and perhaps only—opportunity to maximize the sale price of the Oslo Wave and prevent the value loss associated with losing the APA with the Buyer and being forced to sell the Oslo Wave for a significantly lower price. Furthermore, I believe that an auction is not

warranted on account of the cost and time to conduct an auction process for the Oslo wave as compared to the value of the Oslo Wave.

26.     I believe that the marketing and sale process for the Oslo Wave has been performed in a commercially reasonable manner, and I expect that the value of the proceeds from such sale will fairly reflect the value of the property sold.  I submit that the sale of the Oslo Wave is an arm's-length transaction between the Debtors and an unaffiliated third party that was negotiated by sophisticated and unrelated parties.  I believe that the proceeds from the sale of the Oslo Wave represent reasonably equivalent value for the Oslo Wave.

**G.     Motion to Reject the Bareboat Charter Agreement**

27.     The Debtors' decision to reject to the Bareboat Charter reflects the Debtors' determination that any commercially reasonable sale of the Oslo Wave requires either the assignment or rejection of the Bareboat Charter.  The rejection of the Bareboat Charter is an essential element of the Debtors' proposed sale of the Oslo Wave.  Otherwise, the Buyer would still be obligated to make payments to the Debtors despite purchasing the Oslo Wave.  Because the Buyer is the bareboat charterer, the rejection of the Contract merely recognizes that the Buyer will have, possession, control, and ultimate ownership of the Oslo Wave upon the closing of the APA.  If the sale of the Oslo Wave was being made to a third party, the Bareboat Charter agreement would be assigned to such hypothetical purchaser; however, rejecting the contract provides a simpler structure to the transaction contemplated by the APA.

28.     I believe that the rejection of the Bareboat Charter, as part of the sale of the Oslo Wave to the Buyer, is in the best interests of the Debtors estates and their creditors.

**H.      Need for Sale and Rejection of Bareboat Charter to be Effective *Nunc Pro Tunc* to January 1, 2017**

29.      As noted above, the Buyer has expressly provided that its offer is contingent on the Debtors promptly closing on the APA.  The Buyer is obligated under the Bareboat Charter to continue to make payments of $3,000 per day through the end of 2016 and $2,500 through the end of 2017.  By continuing to incur these fees, the cost of the Oslo Wave to the Buyer continuously increases as time moves on.

30.      To establish the sale price under the APA and to avoid a sale price that fluctuates based on the date of closing, the Buyers and the Debtors are seeking that the APA and the rejection of the Bareboat Charter be approved *nunc pro tunc* to January 1, 2017 such that, upon closing, the Buyer would no longer be obligated for any bareboat charter fees accruing after January 1, 2017.  Instead, upon the payment of the sale price of $3,300,000 and the transfer of the Oslo Wave, the Buyer would be retroactively deemed the owner of the Oslo Wave for purposes of payment obligations under the Bareboat Charter and the APA.

31.      The Debtors and the Buyers seek to have the effective date of the sale and rejection set to January 1, 2017 only so that the price that the Buyer will be paying for the Oslo Wave can be unambiguously determined irrespective of the time that elapses between the filing of the motion, the entry of an order, and the closing of the transaction and to simplify the structure of the sale transaction.  The Debtors believe that this determination has aided in the evaluation of the Buyer's offer by Capital One and the DIP Lenders.  The Debtors do not believe that the substantive rights of any party will be affected by this retroactive application.

32.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

is true and correct to the best of my knowledge and belief.


Dated:  December 30, 2016

By:   /s/ *Manuel G. Estrada*
Manuel G. Estrada
Vice President and Chief Financial Officer
International Shipholding Corporation

## <u>EXHIBIT 1</u>

**Certificate of Ownership and Encumbrance**

# Republic of the Marshall Islands

### Office of the Maritime Administrator

## CERTIFICATE OF OWNERSHIP AND ENCUMBRANCE
### of a vessel registered under Marshall Islands Flag

IT IS HEREBY CERTIFIED that as of April 20, 2016 at 11:18 A.M., E.D.S.T.,   according to the records of the Office of the Maritime Administrator of the Republic of the Marshall Islands, the vessel described hereunder:

**IMO NO.:** 9190092   **OFFICIAL NO.:** 4991   **CALL LETTERS:** V7AG6   **TYPE:** GENERAL CARGO

**VESSEL NAME:** OSLO WAVE

**DATE OF REGISTRATION:** December 14, 2012   **GROSS TONS:** 12993   **NET TONS:** 5894

**BUILT AT:** CHINA   **IN:** 2000

**PRESENT CERTIFICATE OF REGISTRY NUMBER:** 385-13   **ISSUED:** November 8, 2013

**AT:** Singapore

is owned by:

| NAME | RESIDENCE | CITIZENSHIP | PROPORTION |
|------|-----------|-------------|------------|
| LCI SHIPHOLDINGS, INC. | Majuro, Marshall Islands | Marshall Islands | 100% |

AND THAT there are on record in this Office the following mortgages, liens or other encumbrances, and no others:

Preferred Ship Mortgage dated December 14, 2012, granted by LCI Shipholdings, Inc. to Capital One, National Association in the total amount of U.S. $13,622,321.46 and interest, expenses, fees and performance of mortgage covenants; recorded on December 14, 2012 at 01:26 P.M., E.S.T. at New York, New York in Book PM 23 at Page 1099.

Issued by the Authority of the Government of the Republic of the Marshall Islands under my hand and seal at Reston, Virginia/USA on this 20th day of April, 2016 at 11:19 A.M., E.D.S.T.

Guy E. C. Maitland
Senior Deputy Commissioner of Maritime Affairs

Shawnté Bell
Special Agent of Maritime Affairs

MI-223 (Rev. 9/24/13)