AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036
Telephone: (212) 872-1000
David H. Botter

1700 Pacific Avenue, Suite 4100
Dallas, TX 75201
Telephone: (214) 969-2800
Sarah Link Schultz (admitted *pro hac vice*)
David F. Staber (admitted *pro hac vice*)

*Counsel to Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| INTERNATIONAL SHIPHOLDING CORPORATION, *et al.*,[1] | Case No. 16-12220 (SMB) |
| Debtors. | Jointly Administered |

## NOTICE OF FILING OF PLAN SUPPLEMENT DOCUMENTS

   **PLEASE TAKE NOTICE** that, on November 14, 2016, the debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors") filed the *First Amended Joint Chapter 11 Plan of Reorganization for International Shipholding Corporation and its Affiliated Debtors* [Docket No. 536] (as has been, and may further be, amended, modified, or supplemented from time to time, the "Plan").[2]

   **PLEASE TAKE FURTHER NOTICE** that, pursuant to the Plan, attached hereto as **Exhibits A** through **H** (the "Plan Supplement") are the following Plan Supplement documents, as each may be amended, modified, or supplemented from time to time:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: International Shipholding Corporation (9662); Enterprise Ship Co. (9059); Sulphur Carriers, Inc. (8965); Central Gulf Lines, Inc. (8979); Coastal Carriers, Inc. (6278); Waterman Steamship Corporation (0640); N.W. Johnsen & Co., Inc. (8006); LMS Shipmanagement, Inc. (0660); U.S. United Ocean Services, LLC (1160); Mary Ann Hudson, LLC (8478); Sheila McDevitt, LLC (8380); Tower LLC (6755); Frascati Shops, Inc. (7875); Gulf South Shipping PTE LTD (8628); LCI Shipholdings, Inc. (8094); Dry Bulk Australia LTD (5383); Dry Bulk Americas LTD (6494); and Marco Shipping Company PTE LTD (4570). The service address for each of the above Debtors is 601 Poydras Street, Pan American Building, Suite 1850, New Orleans, Louisiana 70130.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

**Exhibit A**:      Form of New Senior Debt Facility

**Exhibit B**:      Schedule of Assumed Contracts and Leases and Proposed Cure
                    Amounts

**Exhibit C**:      Schedule of Rejected Contracts and Leases

**Exhibit D**:      Identification of Officers and Directors

**Exhibit E**:      Form of By-Laws and Charter for Reorganized ISH

**Exhibit F**:      Form of GUC Trust Agreement

**Exhibit G**:      Identification of the GUC Trustee

**Exhibit H**:      Form of Regions Note

**PLEASE TAKE FURTHER NOTICE** that certain of these documents remain subject to continuing negotiations among the Debtors and interested parties with respect hereto. The Debtors reserve all rights to amend, modify, or supplement the Plan Supplement and any of the documents contained therein in accordance with the terms of the Plan. To the extent material amendments or modifications are made to any of these documents, the Debtors will file a blackline version with the Bankruptcy Court prior to the Confirmation Hearing marked to reflect such amendments or modifications.

**PLEASE TAKE FURTHER NOTICE** that the inclusion of a contract or lease on **Exhibit B** or **Exhibit C** shall not be deemed an admission that such contract is an executory contract or unexpired lease, or that it is a binding, valid, and enforceable contract. The Debtors hereby expressly reserve the right to assert that any agreement listed on **Exhibit B** or **Exhibit C** does not constitute an executory contract or unexpired lease within the meaning of Bankruptcy Code section 365.

**PLEASE TAKE FURTHER NOTICE** that the Plan Supplement is integral to, part of, and incorporated by reference into the Plan; however, these documents have not been approved by the Bankruptcy Court at this time.

**PLEASE TAKE FURTHER NOTICE** that the Confirmation Hearing is scheduled to commence at 10:00 a.m. (prevailing Eastern Time) on February 16, 2017, before the Honorable Stuart M. Bernstein, at the Bankruptcy Court, One Bowling Green, Courtroom 723, New York, New York 10004. This hearing may be continued by the Court or by the Debtors without further notice other than by announcement of same in open court and/or by filing and serving a notice of adjournment.

**PLEASE TAKE FURTHER NOTICE** that the copies of the documents included in the Plan Supplement, the Plan, or any other document filed in the Debtors' chapter 11 cases are available at https://cases.primeclerk.com/ish.

2

Dated: New York, New York
February 2, 2017

**AKIN GUMP STRAUSS HAUER & FELD LLP**

By: /s/ *David H. Botter*
David H. Botter
One Bryant Park
New York, NY 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
1700 Pacific Avenue, Suite 4100
Dallas, Texas 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343
Sarah Link Schultz (admitted *pro hac vice*)
David F. Staber (admitted *pro hac vice*)

*Counsel to Debtors and Debtors in Possession*

**EXHIBIT A**

**Form of New Senior Debt Facility**[3]

---

[3] The Debtors reserve all rights to amend, modify, or supplement the form of the New Senior Debt Facility.  The final form of the New Senior Debt Facility shall be acceptable to SEACOR.

# CHASE

CREDIT AGREEMENT

dated as of

_____, 2017

among

INTERNATIONAL SHIPHOLDING CORPORATION,
ITS DOMESTICS SUBSIDIARIES
and
JPMORGAN CHASE BANK, N.A.

PD.20810321.4

# TABLE OF CONTENTS

Page

ARTICLE I. Definitions ...............................................................................................................1
SECTION 1.01. Defined Terms.....................................................................................................1
SECTION 1.02. Classification of Loans and Borrowings. ..........................................................19
SECTION 1.03. Terms Generally.................................................................................................19
SECTION 1.04. Accounting Terms; GAAP .................................................................................20
[SECTION 1.05. Pro Forma Adjustments for Acquisitions and Dispositions] .........................20
[SECTION 1.06. Status of Obligations] ......................................................................................20
ARTICLE II. The Credits ..........................................................................................................20
SECTION 2.01. [Revolving] Commitments ................................................................................21
SECTION 2.02. Loans and Borrowings ......................................................................................21
SECTION 2.03. Borrowing Procedures; Requests for Revolving Borrowings ...........................21
SECTION 2.06. Letters of Credit ................................................................................................22
SECTION 2.05. Funding of Borrowings. ....................................................................................22
SECTION 2.06. Interest Elections. ..............................................................................................22
SECTION 2.07. Termination [and Reduction] of Commitment...................................................23
SECTION 2.08. Repayment and Amortization of Loans; Evidence of Debt. ..............................23
SECTION 2.09. Prepayment of Loans .........................................................................................24
SECTION 2.10. Fees. ...................................................................................................................25
SECTION 2.11. Interest................................................................................................................25
SECTION 2.12. Alternate Rate of Interest. .................................................................................26
SECTION 2.13. Increased Costs. .................................................................................................27
SECTION 2.14. Break Funding Payments. ..................................................................................28
SECTION 2.15. Taxes ..................................................................................................................28
SECTION 2.16. Payments Generally; Allocation of Proceeds.....................................................29
SECTION 2.17. Indemnity for Returned Payments .....................................................................30
ARTICLE III. Representations and Warranties.......................................................................30
SECTION 3.01. Organization; Powers .........................................................................................31
SECTION 3.02. Authorization; Enforceability.............................................................................31
SECTION 3.03. Governmental Approvals; No Conflicts .............................................................31
SECTION 3.04. Financial Condition; No Material Adverse Change ...........................................31
SECTION 3.05. Properties ...........................................................................................................31
SECTION 3.06. Litigation and Environmental Matters. ..............................................................31
SECTION 3.07. Compliance with Laws and Agreements; No Default.........................................32
SECTION 3.08. Investment Company Status. ..............................................................................32
SECTION 3.09. Taxes. .................................................................................................................32
SECTION 3.10. ERISA ................................................................................................................32
SECTION 3.11. Disclosure. .........................................................................................................32
SECTION 3.12. Material Agreements ..........................................................................................33
SECTION 3.13. Solvency. ............................................................................................................33
SECTION 3.14. Insurance. ...........................................................................................................33
SECTION 3.15. Capitalization and Subsidiaries. ........................................................................33
SECTION 3.16. Security Interest in Collateral.............................................................................33
SECTION 3.17. Employment Matters ..........................................................................................34
SECTION 3.18. Federal Reserve Regulations..............................................................................34

PD.20810321.4

SECTION 3.19. Use of Proceeds..................................................................................................34
SECTION 3.20. No Burdensome Restrictions..............................................................................34
SECTION 3.21. Anti-Corruption Laws and Sanctions................................................................34
SECTION 3.22. Affiliate Transactions........................................................................................34
SECTION 3.23. Common Enterprise...........................................................................................35
SECTION 3.24. Other Representations........................................................................................35
ARTICLE IV.  Conditions...........................................................................................................35
SECTION 4.01. Effective Date....................................................................................................35
SECTION 4.02. Each Credit Event..............................................................................................38
ARTICLE V.  Affirmative Covenants..........................................................................................39
SECTION 5.01. Financial Statements; Borrowing Base and Other Information ........................39
SECTION 5.02. Notices of Material Events................................................................................40
SECTION 5.03. Existence; Conduct of Business........................................................................41
SECTION 5.04. Payment of Obligations.....................................................................................41
SECTION 5.05. Maintenance of Properties.................................................................................41
SECTION 5.06. Books and Records; Inspection Rights .............................................................41
SECTION 5.07. Compliance with Laws and Material Contractual Obligations..........................41
SECTION 5.08. Use of Proceeds.................................................................................................42
SECTION 5.09. Accuracy of Information....................................................................................42
SECTION 5.10. Insurance ...........................................................................................................42
SECTION 5.11. Appraisals ..........................................................................................................42
SECTION 5.12. Casualty and Condemnation .............................................................................43
SECTION 5.13. Depository Banks...............................................................................................43
SECTION 5.14. Additional Collateral; Further Assurances........................................................43
SECTION 5.15. Additional Vessel Covenants.............................................................................44
ARTICLE VI.  Negative Covenants .............................................................................................45
SECTION 6.01. Indebtedness.......................................................................................................45
SECTION 6.02. Liens...................................................................................................................47
SECTION 6.03. Fundamental Changes........................................................................................47
SECTION 6.04. Investments, Loans, Advances, Guarantees and Acquisitions ..........................48
SECTION 6.05. Asset Sales .........................................................................................................49
SECTION 6.06. Sale and Leaseback Transactions......................................................................50
SECTION 6.07. Swap Agreements ..............................................................................................50
SECTION 6.08. Restricted Payments; Certain Payments of Indebtedness..................................50
SECTION 6.09. Transactions with Affiliates...............................................................................51
SECTION 6.10. Restrictive Agreements......................................................................................51
SECTION 6.11. Amendment of Material Documents..................................................................51
SECTION 6.12. Financial Covenants...........................................................................................52
ARTICLE VII.  Events of Default................................................................................................52
ARTICLE VIII.  Miscellaneous....................................................................................................55
SECTION 8.01. Notices...............................................................................................................55
SECTION 8.02. Waivers; Amendments.......................................................................................56
SECTION 8.03. Expenses; Indemnity; Damage Waiver..............................................................56
SECTION 8.04. Successors and Assigns......................................................................................58
SECTION 8.05. Survival..............................................................................................................59
SECTION 8.06. Counterparts; Integration; Effectiveness; Electronic Execution.......................59
SECTION 8.07. Severability ........................................................................................................60
SECTION 8.08. Right of Setoff...................................................................................................60
SECTION 8.09. Governing Law; Jurisdiction; Consent to Service of Process............................60
SECTION 8.10. WAIVER OF JURY TRIAL..............................................................................61
SECTION 8.11. Headings.............................................................................................................61

SECTION 8.12.  Confidentiality. ........................................................................................61
SECTION 8.13.  Nonreliance; Violation of Law........................................................................62
SECTION 8.14.  USA PATRIOT Act........................................................................................62
SECTION 8.15.  Disclosure ........................................................................................................62
SECTION 8.16.  Interest Rate Limitation ..................................................................................62
SECTION 8.17.  Marketing Consent ..........................................................................................62
ARTICLE IX.  Loan Guaranty ...................................................................................................62
SECTION 9.01.  Guaranty............................................................................................................62
SECTION 9.02.  Guaranty of Payment........................................................................................63
SECTION 9.03.  No Discharge or Diminishment of Loan Guaranty .........................................63
SECTION 9.04.  Defenses Waived..............................................................................................63
SECTION 9.05.  Rights of Subrogation.......................................................................................64
SECTION 9.06.  Reinstatement; Stay of Acceleration................................................................64
SECTION 9.07.  Information ........................................................................................................64
SECTION 9.08.  Termination .......................................................................................................64
SECTION 9.09.  Taxes.................................................................................................................65
SECTION 9.10.  Maximum Liability ...........................................................................................65
SECTION 9.11.  Contribution.......................................................................................................65
SECTION 9.12.  Liability Cumulative.........................................................................................66
SECTION 9.13.  Keepwell ...........................................................................................................66

SCHEDULES:

Schedule 3.06 – Disclosed Matters
Schedule 3.12 – Material Agreements
Schedule 3.14 – Insurance
Schedule 3.15 – Capitalization and Subsidiaries
Schedule 3.22 – Affiliate Transactions
Schedule 3.24 – Other Representations
Schedule 6.01 – Existing Indebtedness
Schedule 6.02 – Existing Liens
Schedule 6.04 – Existing Investments
Schedule 6.10 – Existing Restrictions

EXHIBITS:

Exhibit A - Compliance Certificate
Exhibit B - Joinder Agreement

CREDIT AGREEMENT dated as of _____, 2017 (as it may be amended or modified from time to time, this "Agreement"), among INTERNATIONAL SHIPHOLDING CORPORATION, a Delaware corporation, as Borrower, the other Loan Parties party hereto, and JPMORGAN CHASE BANK, N.A., as Lender.

The parties hereto agree as follows:

ARTICLE I

Definitions

SECTION 1.01. Defined Terms. As used in this Agreement, the following terms have the meanings specified below:

"Account" has the meaning assigned to such term in the Security Agreement.

"Account Debtor" means any Person obligated on an Account.

"Adjusted EBITDA" means consolidated net income of the Borrower and its Subsidiaries plus, without duplication, to the extent deducted in determining consolidated net income, (a) interest expense, (b) income taxes and franchise tax expense, (c) depreciation expense, (d) amortization expense, (e) other non-cash charges, (f) extraordinary non-cash losses, (g) maintenance capital expenditures (*i.e.* repair, maintenance and drydock expenses), (h) losses on vessel sales and (i) Rentals expense, *minus*, to the extent included in determining consolidated net income, extraordinary gains, amortization of deferred gains on sale-leaseback transactions, gains on vessel sales and other non-cash items which would increase consolidated net income, all calculated on a consolidated basis in accordance with GAAP; provided, that, for the purposes of the financial covenants at Section 6.12, if the sale proceeds of assets or any recovery from casualty events are deposited in a reserve fund, Adjusted EBITDA for a given testing period shall be adjusted to exclude (without duplication) the consolidated net income generated by such assets, as if such sale took place on the first day of such testing period.

"Adjusted LIBO Rate" means, with respect to any Eurodollar Borrowing for any Interest Period or for any CBFR Borrowing, an interest rate per annum (rounded upwards, if necessary, to the next 1/16 of 1%) equal to (a) the LIBO Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate.

"Adjusted One Month LIBOR Rate" means, for any day, an interest rate per annum equal to the sum of (i) 2.50% per annum plus (ii) the Adjusted LIBO Rate for a one-month interest period on such day (or if such day is not a Business Day, the immediately preceding Business Day); provided that, for the avoidance of doubt, the Adjusted LIBO Rate for any day shall be based on the LIBO Screen Rate at approximately 11:00 a.m. London time on such day.

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the specified Person.

"Anti-Corruption Laws" means all laws, rules, and regulations of any jurisdiction applicable to the Borrower or any of its Affiliates from time to time concerning or relating to bribery or corruption.

"Applicable Rate" means, for any day, with respect to any Loan, or with respect to the commitment fees payable hereunder, as the case may be, the applicable rate per annum set forth below under the caption "CBFR Spread", "Eurodollar Spread" or "Commitment Fee Rate", as the case may be:

1

| CBFR Spread | Eurodollar Spread | Commitment Fee Rate |
|---|---|---|
| -0-% | 3.00% | 0.50% |

"Approved Fund" has the meaning assigned to such term in Section 8.04(b).

"Assignments of Insurances" means, collectively, any assignment or assignments of insurance granted by any Loan Party in favor of the Lender covering all of such Loan Party's insurances on the Vessels and personal property relative to the Vessels, now owned or hereafter acquired and now existing or hereafter arising, including any amendment, restatement, modification or supplement thereto, and "Assignment of Insurance" means any of them.

"Availability" means, at any time, an amount equal to the difference between (i) the Revolving Commitment *minus* (ii) the outstanding Revolving Loans.

"Availability Period" means the period from and including the Effective Date to but excluding the earlier of the Revolving Credit Maturity Date and the date of termination of the Revolving Commitment.

"Banking Services" means each and any of the following bank services provided to any Loan Party or any Subsidiary by the Lender or any of its Affiliates: (a) credit cards for commercial customers (including, without limitation, "commercial credit cards" and purchasing cards), (b) stored value cards, (c) merchant processing services, and (d) treasury management services (including, without limitation, controlled disbursement, automated clearinghouse transactions, return items, any direct debit scheme or arrangement, overdrafts and interstate depository network services).

"Banking Services Obligations" means any and all obligations of the Loan Parties or their Subsidiaries, whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor) in connection with Banking Services.

"Bankruptcy Case" means the cases that are being jointly administered under Chapter 11 of the U.S. Bankruptcy Code commenced by the Chapter 11 Debtors on July 31, 2016 or August 1, 2016, in the Bankruptcy Court and captioned *In re International Shipholding Corporation, et al.*, Case No. 16-12220 (SMB).

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York or any other court exercising competent jurisdiction over the Bankruptcy Case or any proceeding therein.

"Bankruptcy Event" means, with respect to any Person, when such Person becomes the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, custodian, assignee for the benefit of creditors or similar Person charged with the reorganization or liquidation of its business appointed for it, or, in the good faith determination of the Lender, has taken any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any such proceeding or appointment, provided that a Bankruptcy Event shall not result solely by virtue of any ownership interest, or the acquisition of any ownership interest, in such Person by a Governmental Authority or instrumentality thereof, unless such ownership interest results in or provides such Person with immunity from the jurisdiction of courts within the U.S. or from the enforcement of judgments or writs of attachment on its assets or permits such Person (or such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person.

"Bankruptcy Plan" means the joint chapter 11 plan proposed by the Chapter 11 Debtors, including, without limitation, all applicable exhibits, supplements, appendices and schedules hereto, either in its present form or as the same may be altered, amended, or modified from time to time in accordance with the U.S. Bankruptcy Code and the rules thereunder.

"Bankruptcy Plan Effective Date" means the Effective Date as defined in the Bankruptcy Plan.

"Board" means the Board of Governors of the Federal Reserve System of the U.S.

"Borrower" means International Shipholding Corporation, a Delaware corporation.

"Borrowing" means (a) Revolving Loans of the same Type, made, converted or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect and (b) Term Loans of the same Type made, converted or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect.

"Borrowing Request" means a request by the Borrower for a Borrowing in accordance with Section 2.03.

"Burdensome Restrictions" means any consensual encumbrance or restriction of the type described in clause (a) or (b) of Section 6.10.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City or New Orleans are authorized or required by law to remain closed; provided that, when used in connection with a Eurodollar Loan, the term "Business Day" shall also exclude any day on which banks are not open for general business in London.

"Capital Expenditures" means, without duplication, any expenditure or commitment to expend money for any purchase or other acquisition of any asset which would be classified as a fixed or capital asset on a consolidated balance sheet of the Borrower and its Subsidiaries prepared in accordance with GAAP.

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"CB Floating Rate" means the Prime Rate; provided that the CB Floating Rate shall never be less than the Adjusted One Month LIBOR Rate on such day (or if such day is not a Business Day, the immediately preceding Business Day). Any change in the CB Floating Rate due to a change in the Prime Rate or the Adjusted One Month LIBOR Rate shall be effective from and including the effective date of such change in the Prime Rate or the Adjusted One Month LIBOR Rate, respectively.

"CBFR", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, bear interest at a rate determined by reference to the CB Floating Rate.

"Change in Control" means (a) the acquisition of ownership, directly or indirectly, beneficially or of record, by any Person or group (within the meaning of the Securities Exchange Act of 1934 and the

rules of the SEC thereunder as in effect on the date hereof) other than _____, of Equity Interests representing more than ___%[1] of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of Holdings; (b) Holdings shall cease to own, free and clear of all Liens or other encumbrances, at least 100% of the outstanding voting Equity Interests of the Borrower on a fully diluted basis; (c) occupation at any time of a majority of the seats (other than vacant seats) on the board of directors of the Borrower by Persons who were neither (i) directors of the Borrower on the date of this Agreement nor (ii) nominated or appointed by the board of directors of the Borrower; or (d) the Borrower shall cease to own, free and clear of all Liens or other encumbrances other than those granted under the Security Agreement, directly or indirectly at least 100% of the outstanding voting Equity Interests of its Subsidiaries on a fully diluted basis.

"Change in Law" means the occurrence after the date of this Agreement of any of the following: (a) the adoption of or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) compliance by the Lender (or, for purposes of Section 2.13(b), by any lending office of the Lender or by the Lender's holding company, if any) with any request, guideline, requirement or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement; provided that, notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements or directives thereunder or issued in connection therewith or in the implementation thereof, and (y) all requests, rules, guidelines, requirements or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the U.S. or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted, issued or implemented.

"Chapter 11 Debtor(s)" means, individually or collectively, as the context requires: (i) International Shipholding Corporation; (ii) Enterprise Ship Co.; (iii) Sulphur Carriers, Inc.; (iv) Central Gulf Lines, Inc.; (v) Coastal Carriers, Inc.; (vi) Waterman Steamship Corporation; (vii) N.W. Johnsen & Co., Inc.; (viii) LMS Shipmanagement, Inc.; (ix) U.S. United Ocean Services, LLC; (x) Mary Ann Hudson, LLC; (xi) Sheila McDevitt, LLC; (xii) Tower LLC; (xiii) Frascati Shops, Inc.; (xiv) Gulf South Shipping PTE LTD; (xv) LCI Shipholdings, Inc.; (xvi) Dry Bulk Australia LTD; (xvii) Dry Bulk Americas LTD; and (xviii) Marco Shipping Company PTE LTD, as they existed prior to the Bankruptcy Plan Effective Date.

"Charges" has the meaning assigned to such term in Section 8.16.

"Class", when used in reference to (a) any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are Revolving Loans or a Term A Loan, and (b) any Commitment, refers to whether such Commitment is a Revolving Commitment or a Term A Commitment.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means any and all property owned, leased or operated by a Person covered by the Collateral Documents and any and all other property of any Loan Party (including all Equity Interests but not including real property interests), now existing or hereafter acquired, that may at any time be, become or intended to be, subject to a security interest or Lien in favor of the Lender, on behalf of the Secured Parties, to secure the Secured Obligations.

---

[1]    Discuss with Borrower.

"Collateral Documents" means, collectively, the Security Agreement, the Ship Mortgages, the Assignments of Insurances and any other agreements, instruments and documents executed in connection with this Agreement that are intended to create, perfect or evidence Liens to secure the Secured Obligations, including, without limitation, all other security agreements, pledge agreements, mortgages, deeds of trust, loan agreements, notes, guarantees, subordination agreements, pledges, powers of attorney, consents, assignments (including without limitation as to earnings and charters of the Vessels), contracts, fee letters, notices, leases, financing statements and all other written matter whether theretofore, now or hereafter executed by any Loan Party and delivered to the Lender.

"Commitment" means the sum of the Revolving Commitment and Term A Commitment.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Confirmation Order" means the order of the Bankruptcy Court confirming the Bankruptcy Plan.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Default" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Disclosed Matters" means the actions, suits, proceedings and environmental matters disclosed in Schedule 3.06.

"Document" has the meaning assigned to such term in the Security Agreement.

"Dollars", "dollars" or "$" refers to lawful money of the U.S.

"ECP" means an "eligible contract participant" as defined in Section 1(a)(18) of the Commodity Exchange Act or any regulations promulgated thereunder and the applicable rules issued by the Commodity Futures Trading Commission and/or the SEC.

"Effective Date" means the date on which the conditions specified in Section 4.01 are satisfied (or waived in accordance with Section 8.02).

"Electronic Signature" means an electronic sound, symbol, or process attached to, or associated with, a contract or other record and adopted by a Person with the intent to sign, authenticate or accept such contract or record.

"Electronic System" means any electronic system, including e-mail, e-fax, web portal access for the Borrower, Intralinks®, ClearPar®, Debt Domain, Syndtrak and any other Internet or extranet-based site, whether such electronic system is owned, operated or hosted by the Lender and any of its respective Related Parties or any other Person, providing for access to data protected by passcodes or other security system.

"Environmental Laws" means all laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by any Governmental Authority, relating in any way to the environment, preservation or reclamation of natural resources, the management, Release or threatened Release of any Hazardous Material or to health and safety matters.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of the Borrower or any Subsidiary directly or indirectly resulting from or based upon (a) any violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) any exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equipment" has the meaning assigned to such term in the Security Agreement.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any of the foregoing.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with the Borrower, is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" means (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder, with respect to a Plan (other than an event for which the 30-day notice period is waived); (b) the failure to satisfy the "minimum funding standard" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived; (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (d) the incurrence by the Borrower or any ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any Plan; (e) the receipt by the Borrower or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan; (f) the incurrence by the Borrower or any ERISA Affiliate of any liability with respect to the withdrawal or partial withdrawal of the Borrower or any ERISA Affiliate from any Plan or Multiemployer Plan; or (g) the receipt by the Borrower or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from the Borrower or any ERISA Affiliate of any notice, concerning the imposition upon the Borrower or any ERISA Affiliate of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA.

"Eurodollar", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, bear interest at a rate determined by reference to the Adjusted LIBO Rate.

"Event of Default" has the meaning assigned to such term in Article VII.

"Excess Cash Flow" means, for the Borrower and its Subsidiaries on a consolidated basis, in accordance with GAAP for any calendar year, an amount equal to (a) the consolidated Adjusted EBITDA for such period *minus* (b) the sum, in each case to the extent not otherwise deducted in determining consolidated Adjusted EBITDA for such period, without duplication, of: (i) the aggregate amount of cash actually paid by the Borrower and its Subsidiaries during such calendar year on account of capital expenditures that are not financed through or reimbursed from the proceeds of any issuance of Indebtedness, any equity issuance, proceeds of any casualty event or other proceeds that would not be included in consolidated Adjusted EBITDA, (ii) consolidated cash interest expense for such period, including commitment fees, (iii) amounts actually paid or distributed in cash in respect of, or for the purpose of, total federal, state, local and foreign income, value added and similar taxes for such period, (iv) the aggregate amount of all scheduled principal payments, voluntary prepayments or repayments of Indebtedness (other than mandatory prepayments of the Term A Loan) made by the Borrower and its Subsidiaries during such calendar year, but only to the extent that such payments or repayments are not financed through any issuance of Indebtedness, any proceeds of casualty event or other proceeds that would not be included in consolidated Adjusted EBITDA and (v) repair, maintenance and dry-docking expenses.

"Excluded Swap Obligation" means, with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the Guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any Guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an ECP at the time the Guarantee of such Guarantor or the grant of such security interest becomes or would become effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such Guarantee or security interest is or becomes illegal.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to the Lender or required to be withheld or deducted from a payment to the Lender: (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of the Lender being organized under the laws of, or having its principal office or its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) U.S. federal withholding Taxes imposed on amounts payable to or for the account of the Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) the Lender acquires such interest in the Loan or Commitment or (ii) the Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.15, amounts with respect to such Taxes were payable either to the Lender's assignor immediately before the Lender acquired the applicable interest in such Loan or Commitment or to the Lender immediately before it changed its lending office and (c) any U.S. federal withholding Taxes imposed under FATCA.

"FATCA" means Sections 1471 through 1474 of the Code as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Code.

"Federal Funds Effective Rate" means, for any day, the rate calculated by the NYFRB based on such day's federal funds transactions by depositary institutions (as determined in such manner as the NYFRB shall set forth on its public website from time to time) and published on the next succeeding Business Day by the NYFRB as the federal funds effective rate.

"Financial Officer" means the chief financial officer, principal accounting officer, treasurer or controller of the Borrower.

"Financial Statements" has the meaning assigned to such term in Section 5.01.

"Fixed Charges" means, for any period, without duplication, cash Interest Expense, *plus* Rentals, *plus* scheduled principal payments on Indebtedness actually made (but not including mandatory prepayments), *plus* expense for taxes paid in cash, *plus* Capital Lease Obligation payments, all calculated for the Borrower and its Subsidiaries on a consolidated basis in accordance with GAAP.

"Fixed Charge Coverage Ratio" means, for any period, the ratio of (a) Adjusted EBITDA *minus* the Unfinanced Capital Expenditures *minus* Restricted Payments to (b) Fixed Charges, all calculated for the Borrower and its Subsidiaries on a consolidated basis in accordance with GAAP.

"Funding Account" has the meaning assigned to such term in Section 4.01(h).

"GAAP" means generally accepted accounting principles in the U.S.

"Governmental Authority" means the government of the U.S., any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation; provided that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business.

"Guaranteed Obligations" has the meaning assigned to such term in Section 9.01.

"Guarantors" means all Loan Guarantors, and the term "Guarantor" means each or any one of them individually.

"Hazardous Materials" means: (a) any substance, material, or waste that is included within the definitions of "hazardous substances," "hazardous materials," "hazardous waste," "toxic substances," "toxic materials," "toxic waste," or words of similar import in any Environmental Law; (b) those substances listed as hazardous substances by the United States Department of Transportation (or any successor agency) (49 C.F.R. 172.101 and amendments thereto) or by the Environmental Protection Agency (or any successor agency) (40 C.F.R. Part 302 and amendments thereto); and (c) any substance, material, or waste that is petroleum, petroleum-related, or a petroleum by-product, asbestos or asbestos-containing material, polychlorinated biphenyls, flammable, explosive, radioactive, freon gas, radon, or a pesticide, herbicide, or any other agricultural chemical.

"Holdings" means SEACOR Holdings, Inc., a Delaware corporation.

"Impacted Interest Period" has the meaning assigned to such term in the definition of "LIBO Rate".

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person upon which interest charges are customarily paid, (d) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (e) all obligations of such Person in respect of the deferred purchase price of property or services (excluding current accounts payable incurred in the ordinary course of business), (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (g) all Guarantees by such Person of Indebtedness of others, (h) all Capital Lease Obligations of such Person, (i) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty, (j) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances, (k) any other Off-Balance Sheet Liability, and (l) the net present value of future amounts owed by such Person on bareboat charters of vessels to such Person for which such Person has not entered into time charters to third parties on terms and conditions satisfactory to the Lender. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in the foregoing clause (a), Other Taxes.

"Indemnitee" has the meaning assigned to such term in Section 8.03(b).

"Information" has the meaning assigned to such term in Section 8.12.

"Interest Election Request" means a request by the Borrower to convert or continue a Borrowing in accordance with Section 2.06.

"Interest Payment Date" means (a) with respect to any CBFR Loan, the first Business Day of each calendar month and the Revolving Credit Maturity Date or the Term A Maturity Date, as applicable, and (b) with respect to any Eurodollar Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part and, in the case of a Eurodollar Borrowing with an Interest Period of more than three months' duration, each day prior to the last day of such Interest Period that occurs at intervals of three months' duration after the first day of such Interest Period and the Revolving Credit Maturity Date or the Term A Maturity Date, as applicable.

"Interest Period" means, with respect to any Eurodollar Borrowing, the period commencing on the date of such Eurodollar Borrowing and ending on the numerically corresponding day in the calendar month that is one, three or six months thereafter, as the Borrower may elect; provided that (i) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day and (ii) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which

there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period. For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter, in the case of a Revolving Borrowing, shall be the effective date of the most recent conversion or continuation of such Borrowing.

"Interpolated Rate" means, at any time, for any Interest Period, the rate per annum (rounded to the same number of decimal places as the LIBO Screen Rate) determined by the Lender (which determination shall be conclusive and binding absent manifest error) to be equal to the rate that results from interpolating on a linear basis between: (a) the LIBO Screen Rate for the longest period (for which the LIBO Screen Rate is available) that is shorter than the Impacted Interest Period and (b) the LIBO Screen Rate for the shortest period (for which the LIBO Screen Rate is available) that exceeds the Impacted Interest Period, in each case, at such time.

"Inventory" has the meaning assigned to such term in the Security Agreement.

"IRS" means the United States Internal Revenue Service.

"Joinder Agreement" means a Joinder Agreement in substantially the form of Exhibit B.

"Lender" means JPMorgan Chase Bank, N.A., its successors and assigns.

"Leverage Ratio" means, on any date, the ratio of (a) Indebtedness less Subordinated Indebtedness of the Borrower and its Subsidiaries on a consolidated basis at such date, in accordance with GAAP to (b) Adjusted EBITDA for the period of four consecutive fiscal quarters ended on or most recently prior to such date; provided, that through the first three fiscal quarters after the Effective Date, including the quarter in which the Effective Date takes place, the calculation of Adjusted EBITDA shall be measured for such applicable fiscal quarter(s) and annualized.

"LIBO Rate" means, with respect to any Eurodollar Borrowing for any applicable Interest Period or for any CBFR Borrowing, the LIBO Screen Rate at approximately 11:00 a.m., London time, two (2) Business Days prior to the commencement of such Interest Period; provided that, if the LIBO Screen Rate shall not be available at such time for a period equal in length to such Interest Period (an "Impacted Interest Period"), then the LIBO Rate shall be the Interpolated Rate at such time.

"LIBO Screen Rate" means, for any day and time, with respect to any Eurodollar Borrowing for any Interest Period or for any CBFR Borrowing, the London interbank offered rate as administered by ICE Benchmark Administration (or any other Person that takes over the administration of such rate for Dollars) for a period equal in length to such Interest Period as displayed on such day and time on pages LIBOR01 or LIBOR02 of the Reuters screen that displays such rate (or, in the event such rate does not appear on a Reuters page or screen, on any successor or substitute page on such screen that displays such rate, or on the appropriate page of such other information service that publishes such rate from time to time as selected by the Lender in its reasonable discretion); provided that if the LIBO Screen Rate shall be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Loan Documents" means, collectively, this Agreement, each promissory note issued pursuant to this Agreement, each Collateral Document, the Loan Guaranty, and each other agreement, instrument, document and certificate identified in Section 4.01 executed and delivered to, or in favor of, the Lender and including each other pledge, power of attorney, consent, assignment, contract, notice, letter of credit agreement, letter of credit application and each other written matter whether heretofore, now or hereafter executed by or on behalf of any Loan Party, or any employee of any Loan Party, and delivered to the Lender in connection with this Agreement or the transactions contemplated hereby. Any reference in this Agreement or any other Loan Document to a Loan Document shall include all appendices, exhibits or schedules thereto, and all amendments, restatements, supplements or other modifications thereto, and shall refer to this Agreement or such Loan Document as the same may be in effect at any and all times such reference becomes operative.

"Loan Guarantor" means each Loan Party other than the Borrower's foreign Subsidiaries.

"Loan Guaranty" means Article IX of this Agreement.

"Loan Parties" means, collectively, the Borrower, the Borrower's domestic Subsidiaries (now or hereafter existing) and any other Person who becomes a party to this Agreement pursuant to a Joinder Agreement and their successors and assigns, and the term "Loan Party" shall mean any one of them or all of them individually, as the context may require.  On the Effective Date, the Borrower's domestic Subsidiaries are Central Gulf Lines, Inc., a Delaware corporation, Waterman Steamship Corporation, a New York corporation, N.W. Johnsen & Co., Inc., a New York corporation, LMS Shipmanagement, Inc., a Louisiana corporation, Coastal Carriers, Inc., a Delaware corporation, U.S. United Ocean Services, LLC, a Florida limited liability company, Mary Ann Hudson, LLC, a Delaware limited liability company, and Sheila McDevitt, LLC, a Delaware limited liability company.  [**Confirm with the Borrower this list here and on signature pages.**]

"Loans" means the loans and advances made by the Lender pursuant to this Agreement.

"Material Adverse Effect" means a material adverse effect on (a) the business, assets, operations, prospects or condition, financial or otherwise, of the Borrower and the other Loan Parties taken as a whole, (b) the ability of any Loan Party to perform any of its obligations under the Loan Documents to which it is a party, (c) the Collateral, or the Lender's Liens (on behalf of itself and the other Secured Parties) on the Collateral or the priority of such Liens, or (d) the rights of or benefits available to the Lender under any of the Loan Documents.

"Material Indebtedness" means Indebtedness (other than the Loans), or obligations in respect of one or more Swap Agreements, of any one or more of the Loan Parties in an aggregate principal amount exceeding $2,500,000.  For purposes of determining Material Indebtedness, the "principal amount" of the obligations of the Loan Parties in respect of any Swap Agreement at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that such Loan Party would be required to pay if such Swap Agreement were terminated at such time.

"Maximum Rate" has the meaning assigned to such term in Section 8.16.

"Moody's" means Moody's Investors Service, Inc.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"NVDC" means the United States National Vessel Documentation Center.

"Net Proceeds" means, with respect to any event, (a) the cash proceeds received in respect of such event including (i) any cash received in respect of any non-cash proceeds (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but excluding any interest payments), but only as and when received, (ii) in the case of a casualty, insurance proceeds and (iii) in the case of a condemnation or similar event, condemnation awards and similar payments, minus (b) the sum of (i) all reasonable fees and out-of-pocket expenses paid to third parties (other than Affiliates) in connection with such event, (ii) in the case of a sale, transfer or other disposition of an asset (including pursuant to a sale and leaseback transaction or a casualty or a condemnation or similar proceeding), the amount of all payments required to be made as a result of such event to repay Indebtedness (other than Loans) secured by such asset or otherwise subject to mandatory prepayment as a result of such event and (iii) the amount of all taxes paid (or reasonably estimated to be payable) and the amount of any reserves established to fund contingent liabilities reasonably estimated to be payable, in each case during the year that such event occurred or the next succeeding year and that are directly attributable to such event (as determined reasonably and in good faith by a Financial Officer).

"NYFRB" means the Federal Reserve Bank of New York.

"NYFRB Rate" means, for any day, the greater of (a) the Federal Funds Effective Rate in effect on such day and (b) the Overnight Bank Funding Rate in effect on such day(or for any day that is not a Banking Day, for the immediately preceding Banking Day); provided that if none of such rates are published for any day that is a Business Day, the term "NYFRB Rate" means the rate for a federal funds transaction quoted at 11:00 a.m. on such day received to the Lender from a Federal funds broker of recognized standing selected by it; provided, further, that if any of the aforesaid rates shall be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"Obligated Party" has the meaning assigned to such term in Section 9.02.

"Obligations" " means all unpaid principal of and accrued and unpaid interest on the Loans, all accrued and unpaid fees and all expenses, reimbursements, indemnities and other obligations and indebtedness (including interest and fees accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), obligations and liabilities of any of the Loan Parties to the Lender or any indemnified party, individually or collectively, existing on the Effective Date or arising thereafter, direct or indirect, joint or several, absolute or contingent, matured or unmatured, liquidated or unliquidated, secured or unsecured, arising by contract, operation of law or otherwise, arising or incurred under this Agreement or any of the other Loan Documents or in respect of any of the Loans made or reimbursement or other obligations incurred or any other instruments at any time evidencing any thereof.

"OFAC" means the Office of Foreign Assets Control of the United States Department of the Treasury.

"Off-Balance Sheet Liability" of a Person means (a) any repurchase obligation or liability of such Person with respect to accounts or notes receivable sold by such Person, (b) any indebtedness, liability or obligation under any so-called "synthetic lease" transaction entered into by such Person, or (c) any indebtedness, liability or obligation arising with respect to any other transaction which is the functional equivalent of or takes the place of borrowing but which does not constitute a liability on the balance sheet of such Person (other than operating leases).

"Other Connection Taxes" means, with respect to the Lender, Taxes imposed as a result of a present or former connection between the Lender and the jurisdiction imposing such Taxes (other than a connection arising from the Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to, or enforced, any Loan Document), or sold or assigned an interest in any Loan or any Loan Document.

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"Overnight Bank Funding Rate" means, for any day, the rate comprised of both overnight federal funds and overnight Eurodollar borrowings by U.S.-managed banking offices of depository institutions (as such composite rate shall be determined by the NYFRB as set forth on its public website from time to time) and published on the next succeeding Business Day by the NYFRB as an overnight bank funding rate (from and after such date as the NYFRB shall commence to publish such composite rate).

"Parent" means, with respect to the Lender, the Person of which the Lender is, directly or indirectly, a subsidiary.

"Participant" has the meaning assigned to such term in Section 8.04(c).

"Participant Register" has the meaning assigned to such term in Section 8.04(c).

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Permitted Encumbrances" means:

(a) Liens imposed by law for Taxes that are not yet due or are being contested in compliance with Section 5.04;

(b) carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by law, arising in the ordinary course of business and securing obligations that are not overdue by more than thirty (30) days or are being contested in compliance with Section 5.04;

(c) pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations;

(d) deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business;

(e) judgment Liens in respect of judgments that do not constitute an Event of Default under clause (k) of Article VII;

(f) easements, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any

monetary obligations and do not materially detract from the value of the affected property or interfere with the ordinary conduct of business of the Borrower or any Subsidiary; and

(g) with respect to the Vessels, Permitted Maritime Liens;

provided that the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness, except with respect to clause (e) above.

"Permitted Investments" means:

(a) direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the U.S. (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the U.S.), in each case maturing within one year from the date of acquisition thereof;

(b) investments in commercial paper maturing within 270 days from the date of acquisition thereof and having, at such date of acquisition, the highest credit rating obtainable from S&P or from Moody's;

(c) investments in certificates of deposit, bankers' acceptances and time deposits maturing within 180 days from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any commercial bank organized under the laws of the U.S. or any state thereof which has a combined capital and surplus and undivided profits of not less than $500,000,000;

(d) fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (c) above; and

(e) money market funds that (i) comply with the criteria set forth in Securities and Exchange Commission Rule 2a-7 under the Investment Company Act of 1940, (ii) are rated AAA by S&P and Aaa by Moody's and (iii) have portfolio assets of at least $5,000,000,000.

"Permitted Maritime Liens" means any seaman's wage liens (including those of masters) for wages, maintenance and cure, salvage and general average liens, stevedore' wages, tort liens (including personal injury and death) and liens for necessaries, all of the foregoing Liens which are either unclaimed or covered by insurance (other than, and after giving effect to, any deductibles that a Loan Party may have on such insurance); provided, that once any such Lien is claimed, such Loan Party shall be permitted to contest any such Lien in good faith by appropriate action promptly initiated and diligently conducted, if (x) such reserve as shall be required by GAAP shall have been made therefor, (y) such Loan Party shall have arranged for a bond or insurance (other than, and after giving effect to, any deductibles that such Loan Party may have on such insurance) related to such Lien in a manner that is satisfactory to the Lender in accordance with law, and (z) such Lien does not involve any risk of seizure or sale of any vessel owned by such Loan Party.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Plan" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of

which the Borrower or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Prepayment Event" means:

(a) any sale, transfer or other disposition (including pursuant to a permitted sale and leaseback transaction) of a Vessel; or

(b) any actual, constructive or agreed total loss to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any Vessel; or

(c) the incurrence by any Loan Party or any Subsidiary of any Indebtedness, other than Indebtedness permitted under Section 6.01.

"Prime Rate" means the rate of interest per annum publicly announced from time to time by the Lender as its prime rate in effect at its principal offices in New York City. Each change in the Prime Rate shall be effective from and including the date such change is publicly announced as being effective.

"Projections" has the meaning assigned to such term in Section 5.01(f).

"Qualified ECP Guarantor" means, in respect of any Swap Obligation, each Loan Party that has total assets exceeding $10,000,000 at the time the relevant Loan Guaranty or grant of the relevant security interest becomes or would become effective with respect to such Swap Obligation or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"Refinance Indebtedness" has the meaning assigned to such term in Section 6.01(f).

"Regions Loan" means the $4,500,000 of Indebtedness owed by the Borrower to Regions Bank on the Effective Date.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, partners, members, trustees, employees, agents, administrators, managers, representatives and advisors of such Person and such Person's Affiliates.

"Release" means any releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, migrating, disposing, or dumping of any substance into the environment.

"Rentals" means, with reference to any period, the aggregate fixed amounts payable by the Borrower and its Subsidiaries under any bareboat charters of vessels to the Borrower or any Subsidiary for which the Borrower or the Subsidiary, as applicable, has not entered into time charters to third parties on terms and conditions satisfactory to the Lender, calculated for the Borrower and its Subsidiaries on a consolidated basis for such period in accordance with GAAP.

"Report" means reports prepared by the Lender or another Person showing the results of appraisals, field examinations or audits pertaining to the Borrower's assets from information furnished by or on behalf of the Borrower, after the Lender has exercised its rights of inspection pursuant to this Agreement.

"Requirement of Law" means, with respect to any Person, (a) the charter, articles or certificate of organization or incorporation and bylaws or operating, management or partnership agreement, or other organizational or governing documents of such Person and (b) any statute, law (including common law), treaty, rule, regulation, code, ordinance, order, decree, writ, judgment, injunction or determination of any arbitrator or court or other Governmental Authority (including Environmental Laws), in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in the Borrower or any Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests or any option, warrant or other right to acquire any such Equity Interests.

"Revolving Commitment" means the commitment of the Lender to make Revolving Loans hereunder, as such commitment may be reduced from time to time pursuant to Section 2.07. The initial amount of the Lender's Revolving Commitment is $5,000,000.

"Revolving Credit Maturity Date" means _____, 2020 (if the same is a Business Day, or if not then the immediately next succeeding Business Day), or any earlier date on which the Revolving Commitment is reduced to zero or otherwise terminated pursuant to the terms hereof.

"Revolving Loan" means a Loan made pursuant to Section 2.01(a).

"S&P" means Standard & Poor's Ratings Services, a Standard & Poor's Financial Services LLC business.

"Sale and Leaseback Transaction" has the meaning assigned to such term in Section 6.06.

"Sanctioned Country" means, at any time, a country, region or territory which is the subject or target of any Sanctions ( at the time of this Agreement, Crimea, Cuba, Iran, North Korea, Sudan and Syria).

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, or by the United Nations Security Council, the European Union, any European Union member state, Her Majesty's Treasury of the United Kingdom or other relevant sanctions authority, (b) any Person operating, organized or resident in a Sanctioned Country or (c) any Person owned or controlled by any such Person or Persons described in the foregoing clauses (a) or (b).

"Sanctions" means all economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) the United Nations Security Council, the European Union, any European Union member state or Her Majesty's Treasury of the United Kingdom or other relevant sanctions authority.

"SEC" means the Securities and Exchange Commission of the U.S.

"Secured Obligations" means all Obligations, together with all (i) Banking Services Obligations and (ii) Swap Agreement Obligations owing to the Lender or its Affiliates; provided, however, that the definition of "Secured Obligations" shall not create any guarantee by any Guarantor of (or grant of

security interest by any Guarantor to support, as applicable) any Excluded Swap Obligations of such Guarantor for purposes of determining any obligations of any Guarantor.

"Secured Parties" means (a) the Lender, (b) each provider of Banking Services, to the extent the Banking Services Obligations in respect thereof constitute Secured Obligations, (c) each counterparty to any Swap Agreement, to the extent the obligations thereunder constitute Secured Obligations, (d) the beneficiaries of each indemnification obligation undertaken by any Loan Party under any Loan Document and (e) the successors and assigns of each of the foregoing.

"Security Agreement" means that certain Pledge and Security Agreement (including any and all supplements thereto), dated as of the date hereof, among the Loan Parties and the Lender, for the benefit of the Secured Parties, and any other pledge or security agreement entered into, after the date of this Agreement by any other Loan Party (as required by this Agreement or any other Loan Document) or any other Person for the benefit of the Lender, on behalf of the Secured Parties, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Ship Mortgage" means any preferred mortgage that conveys or evidences a Lien in favor of the Lender on a Vessel, including any amendment, restatement, modification or supplement thereto.

"Statement" has the meaning assigned to such term in Section 2.16(d).

"Statutory Reserve Rate" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentage (including any marginal, special, emergency or supplemental reserves) established by the Board to which the Lender is subject with respect to the Adjusted LIBO Rate, for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board). Such reserve percentages shall include those imposed pursuant to such Regulation D of the Board. Eurodollar Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to the Lender under such Regulation D of the Board or any comparable regulation. The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Subordinated Indebtedness" of a Person means any Indebtedness of such Person, the payment of which is unsecured and subordinated to payment of the Secured Obligations to the written satisfaction of the Lender in its sole discretion.

"subsidiary" means, with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity [(a)] of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held [, or (b) that is, as of such date, otherwise Controlled], by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Subsidiary" means any direct or indirect subsidiary of the Borrower or of any other Loan Party, as applicable.

"Swap Agreement" means any agreement with respect to any swap, forward, spot, future, credit default or derivative transaction or any option or similar agreement involving, or settled by reference to,

one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrower or the Subsidiaries shall be a Swap Agreement.

"Swap Agreement Obligations" means any and all obligations of the Loan Parties [or their Subsidiaries], whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor), under (a) any Swap Agreement permitted hereunder with the Lender or an Affiliate of the Lender, and (b) any cancellations, buy backs, reversals, terminations or assignments of any Swap Agreement transaction permitted hereunder with the Lender or an Affiliate of the Lender.

"Swap Obligation" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act or any rules or regulations promulgated thereunder.

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), value added taxes, or any other goods and services, use or sales taxes, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term A Commitment" means the commitment of the Lender to make a Term A Loan, expressed as an amount representing the maximum principal amount of the Term A Loan to be made by the Lender. The amount of the Lender's Term A Commitment on the Effective Date is $20,000,000.

"Term A Loan" means the Loan made pursuant to Section 2.01(b).

"Term A Maturity Date" means _____, 2020[2].

"Term Loan(s)" means the Term A Loan.

"Transactions" means the execution, delivery and performance by the Borrower of this Agreement and the other Loan Documents, the borrowing of Loans and other credit extensions and the use of the proceeds thereof hereunder.

"Type", when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Adjusted LIBO Rate or the CB Floating Rate.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of Louisiana or in any other state, the laws of which are required to be applied in connection with the issue of perfection of security interests.

"Unfinanced Capital Expenditures" means, for any period, Capital Expenditures made during such period which are not financed from the proceeds of any Indebtedness.

---

[2] Date specified should be a Business Day.

"Unliquidated Obligations" means, at any time, any Secured Obligations (or portion thereof) that are contingent in nature or unliquidated at such time, including any Secured Obligation that is: (i) an obligation to reimburse a bank for drawings not yet made under a letter of credit issued by it; (ii) any other obligation (including any guarantee) that is contingent in nature at such time; or (iii) an obligation to provide collateral to secure any of the foregoing types of obligations.

"U.S." means the United States of America.

"USA PATRIOT Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001.

"Vessels" means the Mississippi Enterprise (U.S.C.G. Official Number _____) and the _____ (U.S.C.G. Official Number _____).

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

SECTION 1.02. Classification of Loans and Borrowings. For purposes of this Agreement, Loans may be classified and referred to by Class (e.g., a "Revolving Loan") or by Type (e.g., a "Eurodollar Loan") or by Class and Type (e.g., a "Eurodollar Revolving Loan"). Borrowings also may be classified and referred to by Class (e.g., a "Revolving Borrowing") or by Type (e.g., a "Eurodollar Borrowing") or by Class and Type (e.g., a "Eurodollar Revolving Borrowing").

SECTION 1.03. Terms Generally. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "law" shall be construed as referring to all statutes, rules, regulations, codes and other laws (including official rulings and interpretations thereunder having the force of law or with which affected Persons customarily comply) and all judgments, orders and decrees of all Governmental Authorities. The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented or otherwise modified (subject to any restrictions on such amendments, restatements, supplements or modifications set forth herein), (b) any definition of or reference to any statute, rule or regulation shall be construed as referring thereto as from time to time amended, supplemented or otherwise modified (including by succession of comparable successor laws), (c) any reference herein to any Person shall be construed to include such Person's successors and assigns (subject to any restrictions on assignments set forth herein) and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all functions thereof, (d) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (e) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, (f) any reference in any definition to the phrase "at any time" or "for any period" shall refer to the same time or period for all calculations or determinations within such definition, and (g) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

SECTION 1.04. <u>Accounting Terms; GAAP</u>. Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; <u>provided</u> that, if after the date hereof there occurs any change in GAAP or in the application thereof on the operation of any provision hereof and the Borrower notifies the Lender that the Borrower requests an amendment to any provision hereof to eliminate the effect of such change in GAAP or in the application thereof (or if the Lender notifies the Borrower that the Lender requests an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith. Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made (i) without giving effect to any election under Financial Accounting Standards Board Accounting Standards Codification 825-10-25 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of any Loan Party, the Borrower or any Subsidiary at "fair value", as defined therein and (ii) without giving effect to any treatment of Indebtedness in respect of convertible debt instruments under Financial Accounting Standards Board Accounting Standards Codification 470-20 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any such Indebtedness in a reduced or bifurcated manner as described therein, and such Indebtedness shall at all times be valued at the full stated principal amount thereof.

SECTION 1.05. <u>Pro Forma Adjustments for Acquisitions and Dispositions</u>. To the extent the Borrower or any Subsidiary makes any acquisition permitted pursuant to Section 6.04 or disposition of assets outside the ordinary course of business permitted by Section 6.05 during the period of four fiscal quarters of the Borrower most recently ended, the Leverage Ratio shall be calculated after giving pro forma effect thereto (including pro forma adjustments arising out of events which are directly attributable to the acquisition or the disposition of assets, are factually supportable and are expected to have a continuing impact, in each case as determined on a basis consistent with Article 11 of Regulation S-X of the Securities Act of 1933, as amended, as interpreted by the SEC, and as certified by a Financial Officer), as if such acquisition or such disposition (and any related incurrence, repayment or assumption of Indebtedness) had occurred on the first day of such four-quarter period.

SECTION 1.06. Status of Obligations. In the event that the Borrower or any other Loan Party or other Subsidiary shall at any time issue or have outstanding any Subordinated Indebtedness, the Borrower shall take or cause such other Loan Party to take all such actions as shall be necessary to cause the Secured Obligations to constitute senior indebtedness (however denominated) in respect of such Subordinated Indebtedness and to enable the Lender to have and exercise any payment blockage or other remedies available or potentially available to holders of senior indebtedness under the terms of such Subordinated Indebtedness. Without limiting the foregoing, the Secured Obligations are hereby designated as "senior indebtedness" and as "designated senior indebtedness" and words of similar import under and in respect of any indenture or other agreement or instrument under which such Subordinated Indebtedness is outstanding and are further given all such other designations as shall be required under the terms of any such Subordinated Indebtedness in order that the Lender may have and exercise any payment blockage or other remedies available or potentially available to holders of senior indebtedness under the terms of such Subordinated Indebtedness.

ARTICLE II

The Credits

SECTION 2.01. Commitments. (a) Subject to the terms and conditions set forth herein, the Lender agrees to make Revolving Loans in dollars to the Borrower from time to time during the Availability Period in an aggregate principal amount that will not result in the outstanding Revolving Loans exceeding the Revolving Commitment. Within the foregoing limits and subject to the terms and conditions set forth herein, the Borrower may borrow, prepay and reborrow Revolving Loans.

(b) Subject to the terms and conditions set forth herein, the Lender agrees to make a Term A Loan in dollars to the Borrower, on the Effective Date, in a principal amount not to exceed the Lender's Term A Commitment. Amounts prepaid or repaid in respect of Term A Loans may not be reborrowed.

SECTION 2.02. Loans and Borrowings.

(a) Each Loan shall be made as part of a Borrowing consisting of Loans of the same Class and Type.

(b) Subject to Section 2.12, each Revolving Borrowing and the Term A Loan Borrowing shall be comprised entirely of Eurodollar Loans. The Lender at its option may make any Eurodollar Loan by causing any domestic or foreign branch or Affiliate of the Lender to make such Loan (and in the case of an Affiliate, the provisions of Sections 2.12, 2.13, 2.14 and 2.15 shall apply to such Affiliate to the same extent as to the Lender); provided that any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement.

(c) At the commencement of each Interest Period for any Eurodollar Borrowing, such Borrowing shall be in an aggregate amount that is an integral multiple of $100,000 and not less than $100,000. Borrowings of more than one Type and Class may be outstanding at the same time; provided that there shall not at any time be more than a total of 6 Eurodollar Borrowings outstanding.

(d) Notwithstanding any other provision of this Agreement, the Borrower shall not be entitled to request, or to elect to continue, any Borrowing if the Interest Period requested with respect thereto would end after the Revolving Credit Maturity Date or the Term A Maturity Date, as applicable. Reference is made to Section 2.12.

SECTION 2.03. Borrowing Procedures; Requests for Revolving Borrowings. To request a Borrowing, the Borrower shall notify the Lender of such request either in writing (delivered by hand or fax) in a form approved by the Lender and signed by the Borrower or by telephone or through Electronic System, if arrangements for doing so have been approved by the Lender, (a) in the case of a Eurodollar Borrowing, not later than 10:00 a.m., central time, three (3) Business Days before the date of the proposed Borrowing or (b) in the case of a CBFR Borrowing (i.e., if applicable under Section 2.12), not later than noon, central time, on the date of the proposed Borrowing. Each such telephonic Borrowing Request shall be irrevocable and shall be confirmed promptly by hand delivery, fax or a communication through Electronic System to the Lender of a written Borrowing Request in a form approved by the Lender and signed by the Borrower. Each such telephonic and written Borrowing Request shall specify the following information in compliance with Section 2.01:

(i)     the Class of Borrowing, the aggregate amount of the requested Borrowing, and a breakdown of the separate wires comprising such Borrowing;

(ii)    the date of such Borrowing, which shall be a Business Day; and

(iii)    in the case of a Eurodollar Borrowing (i.e., assuming Section 2.12 is not applicable), the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period."

If no Interest Period is specified with respect to any requested Eurodollar Borrowing, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.

SECTION 2.04.  Intentionally Omitted.

SECTION 2.05.  Funding of Borrowings.  The Lender shall make each Loan to be made by it hereunder on the proposed date thereof available to the Borrower by promptly crediting the amounts in immediately available funds, to the Funding Account.

SECTION 2.06.  Interest Elections.

(a)  Subject to Section 2.12, each Borrowing shall be a Eurodollar Borrowing, with an initial Interest Period as specified in such Borrowing Request.  After each Borrowing, the Borrower may elect Interest Periods therefor, all as provided in this Section (but also subject to Section 2.12).  The Borrower may elect different options with respect to different portions of the affected Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing.

(b)  To make an election pursuant to this Section, the Borrower shall notify the Lender of such election by telephone or through Electronic System, if arrangements for doing so have been approved by the Lender, by the time that a Borrowing Request would be required under Section 2.03 if the Borrower were requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election.  Each such telephonic Interest Election Request shall be irrevocable and shall be confirmed promptly by hand delivery, Electronic System or fax to the Lender of a written Interest Election Request in a form approved by the Lender and signed by the Borrower.

(c)  Each telephonic and written Interest Election Request (including requests submitted through Electronic System) shall specify the following information in compliance with Section 2.02:

(i)  the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clause (iii) below shall be specified for each resulting Borrowing);

(ii)  the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day; and

(iii)  the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period".

If any such Interest Election Request does not specify an Interest Period, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.

(d)  Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing and the Lender in its sole and absolute discretion so notifies the Borrower, then, so long as an Event of Default is continuing (i) no outstanding Borrowing may be continued as a Eurodollar Borrowing and (ii) unless repaid, each Eurodollar Borrowing shall be converted to a CBFR Borrowing at the end of the Interest Period applicable thereto.

SECTION 2.07.  Termination and Reduction of Revolving Commitment.

(a)  Unless previously terminated, (i) the Term A Commitment shall terminate at 5:00 p.m., central time, on the Effective Date and (ii) the Revolving Commitment shall terminate on the Revolving Credit Maturity Date.

(b)  The Borrower may at any time terminate the Revolving Commitment upon (i) the payment in full of all outstanding Revolving Loans, together with accrued and unpaid interest thereon, (ii) the payment in full of the accrued and unpaid fees, and (iii) the payment in full of all reimbursable expenses and other Obligations together with accrued and unpaid interest thereon.

(c)  The Borrower may from time to time reduce the Revolving Commitment; provided that (i) each reduction of the Revolving Commitment shall be in an amount that is an integral multiple of $100,000 and not less than $100,000 and (ii) the Borrower shall not terminate or reduce the Revolving Commitment if, after giving effect to any concurrent prepayment of the Revolving Loans in accordance with Section 2.09, the outstanding Revolving Loans would exceed the Revolving Commitment.

(d)  The Borrower shall notify the Lender of any election to terminate or reduce the Revolving Commitment under paragraph (b) or (c) of this Section at least three (3) Business Days prior to the effective date of such termination or reduction, specifying such election and the effective date thereof. Each notice delivered by the Borrower pursuant to this Section shall be irrevocable; provided that a notice of termination of the Revolving Commitment delivered by the Borrower may state that such notice is conditioned upon the effectiveness of other credit facilities, in which case such notice may be revoked by the Borrower (by notice to the Lender on or prior to the specified effective date) if such condition is not satisfied.  Any termination or reduction of the Revolving Commitment shall be permanent.

SECTION 2.08.  Repayment and Amortization of Loans; Evidence of Debt.

(a) The Borrower hereby unconditionally promises to pay the Lender the then unpaid principal amount of each Revolving Loan on the Revolving Credit Maturity Date.

(b) The Borrower hereby unconditionally promises to pay to the Lender on each date set forth below the aggregate principal amount set forth opposite such date:

| Date | Amount |
|---|---|
| _____, 2018[3] | $2,000,000 |
| _____, 2019[4] | $2,000,000 |
| Term A Maturity Date | The entire unpaid principal amount of the Term A Loan |

; provided if any date set forth above is not a Business Day, then payment shall be due and payable on the Business Day immediately preceding such date.  To the extent not previously paid, the unpaid Term A Loan shall be paid in full in cash by the Borrower on the Term A Maturity Date.

---

[3] To be 1st anniversary of closing.
[4] To be 2nd anniversary of closing.

(c)    Each repayment of a Term Loan Borrowing shall be applied ratably to the Loans included in the repaid Term Loan Borrowing. Repayments of Term Loan Borrowings shall be accompanied by accrued interest on the amounts repaid.

(d)    The Lender shall maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of the Borrower to the Lender resulting from each Loan made by the Lender, including the amounts of principal and interest payable and paid to the Lender from time to time hereunder.

(e)    The Lender shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, the Class and Type thereof and the Interest Period applicable thereto, if any, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to the Lender hereunder and (iii) the amount of any sum received by the Lender hereunder.

(f)    The entries made in the accounts maintained pursuant to paragraph (d) or (e) of this Section shall be prima facie evidence of the existence and amounts of the obligations recorded therein; provided that the failure of the Lender to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Loans in accordance with the terms of this Agreement.

(g)    The Lender may request that Loans made by it be evidenced by a promissory note. In such event, the Borrower shall prepare, execute and deliver to the Lender a promissory note payable to the Lender (or, if requested by the Lender, to the Lender and its registered assigns) and in a form approved by the Lender. Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 8.04) be represented by one or more promissory notes in such form.

SECTION 2.09.  Prepayment of Loans.

(a)    The Borrower shall have the right at any time and from time to time to prepay any Borrowing in whole or in part, subject to prior notice in accordance with paragraph (d) of this Section and, if applicable, payment of any break funding expenses under Section 2.14.

(b)    After the end of each calendar year (commencing after the end of 2017), on or before May 15 of each following year, the Borrower shall prepay the Term A Loan with 50% of Excess Cash Flow for such calendar year. A Financial Officer of the Borrower shall have certified to the Lender the manner in which Excess Cash Flow and the resulting prepayment were calculated, which certificate shall be in form and substance satisfactory to the Lender.

(c)    In the event and on each occasion that any Net Proceeds are received by or on behalf of any Loan Party or any Subsidiary in respect of any Prepayment Event, the Borrower shall, immediately after such Net Proceeds are received by any Loan Party or Subsidiary, prepay the Obligations as set forth in Section 2.09(d) below in an aggregate amount equal to 100% of such Net Proceeds, provided, that, in the case of any event described in clause (a) or (b) of the definition of the term "Prepayment Event", if the Borrower shall deliver to the Lender a certificate of a Financial Officer to the effect that the Borrower intends to apply the Net Proceeds from such event (or a portion thereof specified in such certificate), within 360 days after receipt of such Net Proceeds, to replace the sold or total loss Vessel, and certifying that no Default has occurred and is continuing, then no prepayment shall be required pursuant to this paragraph in respect of the Net Proceeds specified in such certificate; provided, that (i) all of the Net Proceeds shall be deposited in a blocked deposit account of the Borrower maintained at the Lender, (ii) the Net Proceeds may be withdrawn only to purchase the replacement Vessel and any shortfall shall be

paid by the Borrower in cash, (iii) at the time of the purchase of the replacement Vessel there shall not exist any Default or event of Default, (iv) the replacement Vessel shall be satisfactory to the Lender and have an orderly liquidation fair market value satisfactory to the Lender, (v) the Lender shall have been provided with such certificates and other information regarding the replacement Vessel as requested by the Lender, (vi) simultaneous with the Borrower's purchase of the replacement Vessel, the Borrower shall grant to the Lender a Ship Mortgage on the replacement Vessel on terms and conditions satisfactory to the Lender, which shall be a first preferred mortgage Lien thereon subject to no other Liens other than as permitted by Section 6.02, and (vii) in any event, to the extent of any such Net Proceeds that have not been so applied by the end of such 360-day period, a prepayment shall be required at such time in an amount equal to such Net Proceeds that have not been so applied.

(d)  All prepayments required to be made pursuant to Sections 2.09(b) and (c) shall be applied to prepay the Term A Loan, and shall be applied to reduce the subsequent scheduled repayments of the Term A Loan to be made pursuant to Section 2.08 in inverse order of maturity.

(e)  The Borrower shall notify the Lender by telephone (confirmed by fax) or through Electronic System, if arrangements for doing so have been approved by the Lender, of any prepayment under this Section: (i) in the case of prepayment of a Eurodollar Borrowing, not later than 10:00 a.m., central time, three (3) Business Days before the date of prepayment, or (ii) in the case of prepayment of a CBFR Borrowing, not later than 10:00 a.m., central time, one (1) Business Day before the date of prepayment. Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of each Borrowing or portion thereof to be prepaid; provided that if a notice of prepayment is given in connection with a conditional notice of termination of the Revolving Commitment as contemplated by Section 2.07, then such notice of prepayment may be revoked if such notice of termination is revoked in accordance with Section 2.07. Each partial prepayment of any Revolving Borrowing or the Term A Loan shall be in an amount that would be permitted in the case of an advance of a Borrowing of the same Type as provided in Section 2.02, except as necessary to apply fully the required amount of a mandatory prepayment. Each prepayment of a Borrowing shall be applied ratably to the Loans included in the prepaid Borrowing. Prepayments shall be accompanied by (i) accrued interest to the extent required by Section 2.11 and (ii) break funding payments pursuant to Section 2.14.

SECTION 2.10.  Fees.

(a) The Borrower agrees to pay to the Lender a commitment fee, which shall accrue at the Applicable Rate on the daily amount of the undrawn portion of the Revolving Commitment of the Lender during the period from and including the Effective Date to but excluding the date on which the Lender's Revolving Commitment terminates. Accrued commitment fees shall be payable in arrears on the last day of March, June, September and December of each year and on the date on which the Revolving Commitment terminates, commencing on the first such date to occur after the date hereof. All commitment fees shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(b) The Borrower agrees to pay to the Lender a closing fee in an aggregate amount equal to $125,000. The entire closing fee shall be deemed fully earned by the Lender and shall be due and payable in full on the Effective Date.

(c)  All fees payable hereunder shall be paid on the dates due, in immediately available funds, to the Lender. Fees paid shall not be refundable under any circumstances.

SECTION 2.11.  Interest.

PD.20810321.4                                25

(a) The Loans comprising each CBFR Borrowing shall bear interest at the CB Floating Rate plus the Applicable Rate.

(b) The Loans comprising each Eurodollar Borrowing shall bear interest at the Adjusted LIBO Rate for the Interest Period in effect for such Borrowing plus the Applicable Rate.

(c) Notwithstanding the foregoing, during the occurrence and continuance of an Event of Default, the Lender may, at its option, by notice to the Borrower, declare that (i) all Loans shall bear interest at 2% plus the rate otherwise applicable to such Loans as provided in the preceding paragraphs of this Section or (ii) in the case of any other amount outstanding hereunder, such amount shall accrue at 2% plus the rate applicable to such fee or other obligation as provided hereunder.

(d) Accrued interest on each Loan (for CBFR Loans, accrued through the last day of the prior calendar month) shall be payable in arrears on each Interest Payment Date for such Loan and, in the case of Revolving Loans, upon termination of the Revolving Commitment; provided that (i) interest accrued pursuant to paragraph (c) of this Section shall be payable on demand, (ii) in the event of any repayment or prepayment of any Loan (other than a prepayment of a CBFR Revolving Loan prior to the end of the Availability Period), accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and (iii) in the event of any conversion of any Eurodollar Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion.

(e) All interest hereunder shall be computed on the basis of a year of 360 days, except that interest computed by reference to the CB Floating Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day). The applicable CB Floating Rate, Adjusted LIBO Rate or LIBO Rate shall be determined by the Lender, and such determination shall be conclusive absent manifest error.

SECTION 2.12.  Alternate Rate of Interest.

(a) If prior to the commencement of any Interest Period for a Eurodollar Borrowing:

(i) the Lender determines (which determination shall be conclusive and binding absent manifest error) that adequate and reasonable means do not exist for ascertaining (including, without limitation, by means of an Interpolated Rate) the Adjusted LIBO Rate or the LIBO Rate, as applicable, for such Interest Period; or

(ii) the Lender determines the Adjusted LIBO Rate or the LIBO Rate, as applicable, for such Interest Period will not adequately and fairly reflect the cost to the Lender of making or maintaining its Loan included in such Borrowing for such Interest Period;

then the Lender shall give notice thereof to the Borrower by telephone, fax or through Electronic System as provided in Section 8.01 as promptly as practicable thereafter and, until the Lender notifies the Borrower that the circumstances giving rise to such notice no longer exist, (i) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Borrowing shall be ineffective and any such Eurodollar Borrowing shall be repaid on the last day of the then current Interest Period applicable thereto, and (ii) if any Borrowing Request requests a Eurodollar Borrowing, such Borrowing shall be made as a CBFR Borrowing.

(b) If an Interest Period of a Borrowing ends with less than 30 days before, as applicable, the Revolving Credit Maturity Date or the Term A Maturity Date, then at the end of such Interest Period the Borrowing shall convert to be a CBFR Borrowing until the applicable maturity date.

(c) If a Revolving Loan is made with less than 30 days before the Revolving Credit Maturity Date, then such Borrowing shall be a CBFR Borrowing until the Revolving Credit Maturity Date.

SECTION 2.13. Increased Costs. (a) If any Change in Law shall:

(i) impose, modify or deem applicable any reserve, special deposit, liquidity or similar requirement (including any compulsory loan requirement, insurance charge or other assessment) against assets of, deposits with or for the account of, or credit extended by, the Lender (except any such reserve requirement reflected in the Adjusted LIBO Rate); or

(ii) impose on the Lender or the London interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or Loans made by the Lender; or

(iii) subject the Lender to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto;

and the result of any of the foregoing shall be to increase the cost to the Lender of making, continuing, converting into or maintaining any Loan (or of maintaining its obligation to make any such Loan) or to reduce the amount of any sum received or receivable by the Lender hereunder (whether of principal, interest or otherwise), then the Borrower will pay to the Lender such additional amount or amounts as will compensate the Lender for such additional costs incurred or reduction suffered.

(b) If the Lender determines that any Change in Law regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on the Lender's capital or on the capital of the Lender's holding company as a consequence of this Agreement, the Commitment of or the Loans made by the Lender to a level below that which the Lender or the Lender's holding company could have achieved but for such Change in Law (taking into consideration the Lender's policies and the policies of the Lender's holding company with respect to capital adequacy and liquidity), then from time to time the Borrower will pay to the Lender such additional amount or amounts as will compensate the Lender or the Lender's holding company for any such reduction suffered.

(c) A certificate of the Lender setting forth the amount or amounts necessary to compensate the Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section shall be delivered to the Borrower and shall be conclusive absent manifest error. The Borrower shall pay the Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(d) Failure or delay on the part of the Lender to demand compensation pursuant to this Section shall not constitute a waiver of the Lender's right to demand such compensation; provided that the Borrower shall not be required to compensate the Lender pursuant to this Section for any increased costs or reductions incurred more than 270 days prior to the date that the Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of the Lender's intention to claim compensation therefor; provided further that, if the Change in Law giving rise to such increased costs or

reductions is retroactive, then the 270-day period referred to above shall be extended to include the period of retroactive effect thereof.

SECTION 2.14.  Break Funding Payments.  In the event of (a) the payment of any principal of any Eurodollar Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default or as a result of any prepayment pursuant to Section 2.09), (b) the conversion of any Eurodollar Loan other than on the last day of the Interest Period applicable thereto, or (c) the failure to borrow, convert, continue or prepay any Eurodollar Loan on the date specified in any notice delivered pursuant hereto (regardless of whether such notice may be revoked under Section 2.07(d) and is revoked in accordance therewith), then, in any such event, the Borrower shall compensate the Lender for the loss, cost and expense attributable to such event.  In the case of a Eurodollar Loan, such loss, cost or expense to the Lender shall be deemed to include an amount determined by the Lender to be the excess, if any, of (i) the amount of interest which would have accrued on the principal amount of such Eurodollar Loan had such event not occurred, at the Adjusted LIBO Rate that would have been applicable to such Eurodollar Loan, for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue, for the period that would have been the Interest Period for such Eurodollar Loan), over (ii) the amount of interest which would accrue on such principal amount for such period at the interest rate which the Lender would bid were it to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the eurodollar market.  A certificate of the Lender setting forth any amount or amounts that the Lender is entitled to receive pursuant to this Section shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay the Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

SECTION 2.15.  Taxes.

(a)  Withholding Taxes; Gross-Up; Payments Free of Taxes.  Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law.  If any applicable law (as determined in the good faith discretion of an applicable withholding agent) requires the deduction or withholding of any Tax from any such payment by a withholding agent, then the applicable withholding agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 2.15), the Lender receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)  Payment of Other Taxes by the Loan Parties.  The Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Lender, timely reimburse it for, Other Taxes.

(c)  Evidence of Payment.  As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section 2.15, such Loan Party shall deliver to the Lender the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment, or other evidence of such payment reasonably satisfactory to the Lender.

(d)  Indemnification by the Borrower.  The Loan Parties shall jointly and severally indemnify the Lender, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this

Section) payable or paid by the Lender or required to be withheld or deducted from a payment to the Lender and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Loan Party by the Lender shall be conclusive absent manifest error.

(e)    Treatment of Certain Refunds.    If the Lender determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.15 (including by the payment of additional amounts pursuant to this Section 2.15), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 2.15 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of the Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).    Such indemnifying party, upon the request of the Lender, shall repay to the Lender the amount paid to the Lender (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event the Lender is required to repay such refund to such Governmental Authority.    Notwithstanding anything to the contrary in this paragraph (e), in no event will the Lender be required to pay any amount to any indemnifying party pursuant to this paragraph (e), the payment of which would place the Lender in a less favorable net after-Tax position than the Lender would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts giving rise to such refund had never been paid.    This paragraph (e) shall not be construed to require the Lender to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(f)    Survival.    Each party's obligations under this Section 2.15 shall survive the resignation or replacement of the Lender or any assignment of rights by, or the replacement of, the Lender, the termination of the Commitment and the repayment, satisfaction or discharge of all obligations under any Loan Document.

(g)    Defined Terms.    For purposes of this Section 2.15, the term "applicable law" includes FATCA.

SECTION 2.16.    Payments Generally; Allocation of Proceeds.

(a)    The Borrower shall make each payment required to be made by it hereunder (whether of principal, interest or fees, or of amounts payable under Sections 2.13, 2.14 or 2.15, or otherwise) prior to 2:00 p.m., central time, on the date when due, in immediately available funds, without set-off or counterclaim.    Any amounts received after such time on any date may, in the discretion of the Lender, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.    All such payments shall be made to the Lender at its offices at 201 St. Charles Avenue, 28th Floor, New Orleans, LA 70170.    Unless otherwise provided for herein, if any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.    All payments hereunder shall be made in dollars.

(b)    Any proceeds of Collateral received by the Lender (i) not constituting either (A) a specific payment of principal, interest, fees or other sum payable under the Loan Documents (which shall be applied as specified by the Borrower), or (B) a mandatory prepayment (which shall be applied in accordance with Section 2.09) or (ii) after an Event of Default has occurred and is continuing and the Lender so elects, such funds shall be applied ratably first, to pay any fees, indemnities, or expense

reimbursements including amounts then due to the Lender from the Borrower, second, to pay interest then due and payable on the Loans ratably, third, to prepay principal on the Loans and to pay any amounts owing with respect to Swap Agreement Obligations, ratably (with amounts allocated to the Term A Loan applied to reduce the subsequent scheduled repayments of the Term A Loan to be made pursuant to Section 2.08 in inverse order of maturity), fourth, to the payment of any amounts owing with respect to Banking Services Obligations, and fifth, to the payment of any other Secured Obligation due to the Lender from the Borrower or any other Loan Party. Notwithstanding anything to the contrary contained in this Agreement, unless so directed by the Borrower, or unless a Default is in existence, the Lender shall not apply any payment which it receives to any Eurodollar Loan of a Class, except (i) on the expiration date of the Interest Period applicable thereto, or (ii) in the event, and only to the extent, that there are no outstanding CBFR Loans of the same Class and, in any such event, the Borrower shall pay the break funding payment required in accordance with Section 2.14. The Lender shall have the continuing and exclusive right to apply and reverse and reapply any and all such proceeds and payments to any portion of the Secured Obligations.

(c)     At the election of the Lender, all payments of principal, interest, fees, premiums, reimbursable expenses (including, without limitation, all reimbursement for fees, costs and expenses pursuant to Section 8.03), and other sums payable under the Loan Documents, may be paid from the proceeds of Borrowings made hereunder following a request by the Borrower pursuant to Section 2.03 or may be deducted from any deposit account of the Borrower maintained with the Lender. The Borrower hereby irrevocably authorizes the Lender to charge any deposit account of the Borrower maintained with the Lender for each payment of principal, interest and fees as it becomes due hereunder or any other amount due under the Loan Documents.

(d)     The Lender may from time to time provide the Borrower with account statements or invoices with respect to any of the Secured Obligations (the "Statements"). The Lender is under no duty or obligation to provide Statements, which, if provided, will be solely for the Borrower's convenience. Statements may contain estimates of the amounts owed during the relevant billing period, whether of principal, interest, fees or other Secured Obligations. If the Borrower pays the full amount indicated on a Statement on or before the due date indicated on such Statement, the Borrower shall not be in default of payment with respect to the billing period indicated on such Statement; provided, that acceptance by the Lender of any payment that is less than the total amount actually due at that time (including but not limited to any past due amounts) shall not constitute a waiver of the Lender's right to receive payment in full at another time.

SECTION 2.17.    Indemnity for Returned Payments. If after receipt of any payment which is applied to the payment of all or any part of the Obligations (including a payment effected through exercise of a right of setoff), the Lender is for any reason compelled to surrender such payment or proceeds to any Person because such payment or application of proceeds is invalidated, declared fraudulent, set aside, determined to be void or voidable as a preference, impermissible setoff, or a diversion of trust funds, or for any other reason (including pursuant to any settlement entered into by the Lender in its discretion), then the Obligations or part thereof intended to be satisfied shall be revived and continued and this Agreement shall continue in full force as if such payment or proceeds had not been received by the Lender. The provisions of this Section 2.17 shall be and remain effective notwithstanding any contrary action which may have been taken by the Lender in reliance upon such payment or application of proceeds. The provisions of this Section 2.17 shall survive the termination of this Agreement.

ARTICLE III

<u>Representations and Warranties</u>

Each Loan Party represents and warrants to the Lender that (and where applicable, agrees):

SECTION 3.01.  <u>Organization; Powers</u>.  Each Loan Party and each Subsidiary is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority to carry on its business as now conducted and , except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required.

SECTION 3.02.  <u>Authorization; Enforceability</u>.  The Transactions are within each Loan Party's organizational powers and have been duly authorized by all necessary organizational actions and, if required, actions by equity holders. Each Loan Document to which each Loan Party is a party has been duly executed and delivered by such Loan Party and constitutes a legal, valid and binding obligation of such Loan Party, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

SECTION 3.03.  <u>Governmental Approvals; No Conflicts</u>.  The Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except such as have been obtained or made and are in full force and effect and except for filings necessary to perfect Liens created pursuant to the Loan Documents, (b) will not violate any Requirement of Law applicable to any Loan Party or any Subsidiary, (c) will not violate or result in a default under any indenture, agreement or other instrument binding upon any Loan Party or any Subsidiary or the assets of any Loan Party or any Subsidiary, or give rise to a right thereunder to require any payment to be made by any Loan Party or any Subsidiary, and (d) will not result in the creation or imposition of any Lien on any asset of any Loan Party or any Subsidiary, except Liens created pursuant to the Loan Documents.

SECTION 3.04.  <u>Financial Condition; No Material Adverse Change</u>.

(a)    After the Effective Date, the financial statements from time to time furnished hereunder to the Lender present fairly, in all material respects, the financial position and results of operations and cash flows of the Borrower and its consolidated Subsidiaries as of the dates thereof and for the corresponding periods in accordance with GAAP, subject in the case of unaudited financial statements to (i) normal year-end audit adjustments all of which, when taken as a whole, would not be materially adverse and (ii) the absence of footnotes.

(b)    After the Effective Date, no event, change or condition has occurred that has had, or could reasonably be expected to have, a Material Adverse Effect, since the Effective Date.

SECTION 3.05.  <u>Properties</u>.

Each of the Loan Parties and each Subsidiary has good and indefeasible title to, or valid leasehold interests in, all of its real and personal property (including without limitation the Vessels), free of all Liens other than those permitted by Section 6.02.

SECTION 3.06.  <u>Litigation and Environmental Matters</u>.

(a)  There are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of any Loan Party, threatened against or affecting any Loan Party or any Subsidiary (i) as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect (other than the Disclosed Matters set forth on Schedule 3.06) or (ii) that involve any Loan Document or the Transactions.

(b)  Except for the Disclosed Matters, (i) no Loan Party or any Subsidiary has received notice of any claim with respect to any Environmental Liability or knows of any basis for any Environmental Liability and (ii) and except with respect to any other matters that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, no Loan Party or any Subsidiary (A) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law (B) has become subject to any Environmental Liability, (C) has received notice of any claim with respect to any Environmental Liability or (D) knows of any basis for any Environmental Liability.

(c)  Since the date of this Agreement, there has been no change in the status of the Disclosed Matters that, individually or in the aggregate, has resulted in, or materially increased the likelihood of, a Material Adverse Effect.

SECTION 3.07.  Compliance with Laws and Agreements; No Default.  Except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, each Loan Party and each Subsidiary is in compliance with (i) all Requirements of Law applicable to it or its property and (ii) all indentures, agreements and other instruments binding upon it or its property. No Default has occurred and is continuing.

SECTION 3.08.  Investment Company Status.  No Loan Party or any Subsidiary is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940.

SECTION 3.09.  Taxes.  Each Loan Party and each Subsidiary has timely filed or caused to be filed all Tax returns and reports required to have been filed and has paid or caused to be paid all Taxes required to have been paid by it, except Taxes that are being contested in good faith by appropriate proceedings and for which such Loan Party or such Subsidiary, as applicable, has set aside on its books adequate reserves. No tax liens have been filed and no claims are being asserted with respect to any such taxes.

SECTION 3.10.  ERISA.  No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability is reasonably expected to occur, could reasonably be expected to result in a Material Adverse Effect. The present value of all accumulated benefit obligations under each Plan (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value of the assets of such Plan, and the present value of all accumulated benefit obligations of all underfunded Plans (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value of the assets of all such underfunded Plans.

SECTION 3.11.  Disclosure.  The Loan Parties have disclosed to the Lender all agreements, instruments and corporate or other restrictions to which any Loan Party or any Subsidiary is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be

expected to result in a Material Adverse Effect. None of the reports, financial statements, certificates or other information furnished by or on behalf of any Loan Party or any Subsidiary to the Lender in connection with the negotiation of this Agreement or any other Loan Document (as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that, with respect to projected financial information, the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time delivered and, if such projected financial information was delivered prior to the Effective Date, as of the Effective Date.

SECTION 3.12. Material Agreements. All material agreements and contracts to which any Loan Party or any Subsidiary is a party or is bound as of the date of this Agreement are listed on Schedule 3.12. No Loan Party or any Subsidiary is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in (i) any material agreement to which it is a party or (ii) any agreement or instrument evidencing or governing Indebtedness.

SECTION 3.13. Solvency. (a) Immediately after the consummation of the Transactions to occur on the Effective Date, (i) the fair value of the assets of each Loan Party, at a fair valuation, will exceed its debts and liabilities, subordinated, contingent or otherwise; (ii) the present fair saleable value of the property of each Loan Party will be greater than the amount that will be required to pay the probable liability of its debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured; (iii) each Loan Party will be able to pay its debts and liabilities, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured; and (iv) no Loan Party will have unreasonably small capital with which to conduct the business in which it is engaged as such business is now conducted and is proposed to be conducted after the Effective Date.

(b)    No Loan Party intends to, nor will permit any Subsidiary to, and no Loan Party believes that it or any Subsidiary will, incur debts beyond its ability to pay such debts as they mature, taking into account the timing of and amounts of cash to be received by it or any such Subsidiary and the timing of the amounts of cash to be payable on or in respect of its Indebtedness or the Indebtedness of any such Subsidiary.

SECTION 3.14. Insurance. Schedule 3.14 sets forth a description of all insurance maintained by or on behalf of the Loan Parties and their Subsidiaries as of the Effective Date. All premiums in respect of such insurance that are due and payable have been paid. The Loan Parties believe that the insurance maintained by or on behalf of the Loan Parties and their Subsidiaries is adequate and is customary for companies engaged in the same or similar businesses operating in the same or similar locations.

SECTION 3.15. Capitalization and Subsidiaries. Schedule 3.15 sets forth (a) a correct and complete list of the name and relationship to the Borrower of each Subsidiary, (b) a true and complete listing of each class of each of the Borrower's authorized Equity Interests, of which all of such issued Equity Interests are validly issued, outstanding, fully paid and non-assessable, owned of record by Holdings, and not registered or listed on any national securities exchange, and (c) the type of entity of the Borrower and each Subsidiary. All of the issued and outstanding Equity Interests owned by any Loan Party have been (to the extent such concepts are relevant with respect to such ownership interests) duly authorized and issued and are fully paid and non-assessable.

SECTION 3.16. Security Interest in Collateral. The provisions of this Agreement and the other Loan Documents create legal and valid Liens on all the Collateral in favor of the Lender, for the

benefit of the Secured Parties, and such Liens constitute perfected and continuing Liens on the Collateral, securing the Secured Obligations, enforceable against the applicable Loan Party and all third parties, and having priority over all other Liens on the Collateral except in the case of (a) Permitted Encumbrances, to the extent any such Permitted Encumbrances would have priority over the Liens in favor of the Lender pursuant to any applicable law or agreement and (b) Liens perfected only by possession (including possession of any certificate of title), to the extent the Lender has not obtained or does not maintain possession of such Collateral.

SECTION 3.17. Employment Matters. As of the Effective Date, there are no strikes, lockouts or slowdowns against any Loan Party or any Subsidiary pending or, to the knowledge of any Loan Party, threatened. The hours worked by and payments made to employees of the Loan Parties and their Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable federal, state, local or foreign law dealing with such matters. All payments due from any Loan Party or any Subsidiary, or for which any claim may be made against any Loan Party or any Subsidiary, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of such Loan Party or such Subsidiary.

SECTION 3.18. Federal Reserve Regulations. No part of the proceeds of any Loan has been used or will be used, whether directly or indirectly, for any purpose that entails a violation of any of the Regulations of the Board, including Regulations T, U and X.

SECTION 3.19. Use of Proceeds. The proceeds of the Loans have been used and will be used, whether directly or indirectly as set forth in Section 5.08.

SECTION 3.20. No Burdensome Restrictions. No Loan Party is subject to any Burdensome Restrictions except Burdensome Restrictions permitted under Section 6.10.

SECTION 3.21. Anti-Corruption Laws and Sanctions. Each Loan Party has implemented and maintains in effect policies and procedures designed to ensure compliance by such Loan Party, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions, and such Loan Party, its Subsidiaries and their respective officers and employees and to the knowledge of such Loan Party its directors and agents, are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects. None of (a) any Loan Party, any Subsidiary or any of their respective directors, officers or employees, or (b) to the knowledge of any such Loan Party or Subsidiary, any agent of such Loan Party or any Subsidiary that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person. No Borrowing, use of proceeds, Transaction or other transaction contemplated by this Agreement or the other Loan Documents will violate Anti-Corruption Laws or applicable Sanctions.

SECTION 3.22. Affiliate Transactions. Except as set forth on Schedule 3.22, as of the date of this Agreement, there are no existing or proposed agreements, arrangements, understandings or transactions between any Loan Party and any of the officers, members, managers, directors, stockholders, parents, holders of other Equity Interests, employees or Affiliates (other than Subsidiaries) of any Loan Party or any members of their respective immediate families, and none of the foregoing Persons are directly or indirectly indebted to or have any direct or indirect ownership, partnership, or voting interest in any Affiliate of any Loan Party or any Person with which any Loan Party has a business relationship or which competes with any Loan Party (except that any such Persons may own Equity Interests in (but not exceeding 2.0% of the outstanding Equity Interests of) any publicly traded company that may compete with a Loan Party.

SECTION 3.23. Common Enterprise.. The successful operation and condition of each of the Loan Parties is dependent on the continued successful performance of the functions of the group of the Loan Parties as a whole and the successful operation of each of the Loan Parties is dependent on the successful performance and operation of each other Loan Party. Each Loan Party expects to derive benefit (and its board of directors or other governing body has determined that it may reasonably be expected to derive benefit), directly and indirectly, from (a) successful operations of each of the other Loan Parties and (b) the credit extended by the Lender to the Borrower hereunder, both in their separate capacities and as members of the group of companies. Each Loan Party has determined that execution, delivery, and performance of this Agreement and any other Loan Documents to be executed by such Loan Party is within its purpose, in furtherance of its direct and/or indirect business interests, will be of direct and indirect benefit to such Loan Party, and is in its best interest.

SECTION 3.24 Other Representations. .

(a)    The provisions of the Bankruptcy Plan constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a holder of a Claim or Interest may have had with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order constitutes the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Chapter 11 Debtors, their Estates, and holders of Claims and Interests and is fair, equitable, and reasonable.

(b)    The Confirmation Order has been entered by the Bankruptcy Court in the Bankruptcy Case, has become final and non-appealable, and remains in full force and effect.

(c)    All of the conditions precedent in Section 10.2 of the Bankruptcy Plan to the Bankruptcy Plan Effective Date have been satisfied and the Bankruptcy Plan Effective Date is the same as the Effective Date.

(d)    Schedule 3.24 sets forth the Directors (or Managers if a limited liability company) of each Loan Party on the Effective Date.

(e)    All holders of Indebtedness of the Chapter 11 Debtors have released their Liens on any assets that belonged to such holders of Indebtedness and terminated any relevant filings.

(f)    The Borrower and its Subsidiaries are not liable or obligated for any Indebtedness or other obligations of the Chapter 11 Debtors other than as set forth on Schedule 3.24.

ARTICLE IV

Conditions

SECTION 4.01. Effective Date. The obligations of the Lender to make Loans hereunder shall not become effective until the date on which each of the following conditions is satisfied (or waived in accordance with Section 8.02):

(a)    Credit Agreement and Loan Documents. The Lender (or its counsel) shall have received (i) from each party hereto either (A) a counterpart of this Agreement signed on behalf of such party or (B) written evidence satisfactory to the Lender (which may include fax or other electronic transmission of a signed signature page of this Agreement) that such party has signed a

counterpart of this Agreement and (ii) duly executed copies of the Loan Documents and such other certificates, documents, instruments and agreements as the Lender shall reasonably request in connection with the transactions contemplated by this Agreement and the other Loan Documents.

(b) <u>Financial Statements and Projections</u>. The Lender shall have received a pro forma balance sheet of the Borrower and its Subsidiaries on a consolidated basis, having an effective date as of the Effective Date after giving effect to the Transactions hereunder on the Effective Date, in form and substance satisfactory to the Lender and (ii) satisfactory Projections through 2021.

(c) <u>Closing Certificates; Certified Certificate of Incorporation; Good Standing Certificates</u>. The Lender shall have received (i) a certificate of each Loan Party, dated the Effective Date and executed by its Secretary or Assistant Secretary or other certifying official, which shall (A) certify the resolutions of its Board of Directors, members or other body authorizing the execution, delivery and performance of the Loan Documents to which it is a party, (B) identify by name and title and bear the signatures of the officers of such Loan Party authorized to sign the Loan Documents to which it is a party and, in the case of the Borrower, its Financial Officers, and (C) contain appropriate attachments, including the charter, articles or certificate of organization or incorporation of each Loan Party certified by the relevant authority of the jurisdiction of organization of such Loan Party and a true and correct copy of its bylaws or operating, management or partnership agreement, or other organizational or governing documents, and (ii) a long form good standing certificate for each Loan Party from its jurisdiction of organization.

(d) <u>No Default Certificate</u>. The Lender shall have received a certificate, signed by a Financial Officer of the Borrower and each other Loan Party, dated as of the Effective Date (i) stating that no Default has occurred and is continuing, (ii) stating that the representations and warranties contained in the Loan Documents are true and correct as of such date, and (iii) certifying as to any other factual matters as may be reasonably requested by the Lender.

(e) <u>Fees</u>. The Lender shall have received all fees required to be paid, and all expenses required to be reimbursed for which invoices have been presented (including the reasonable fees and expenses of legal counsel), on or before the Effective Date. All such amounts will be paid with proceeds of Loans made on the Effective Date and will be reflected in the funding instructions given by the Borrower to the Lender on or before the Effective Date.

(f) <u>Lien Searches</u>. The Lender shall have received the results of a recent lien search (i) in the jurisdiction of organization of each Loan Party and each prior owner of Collateral within the five-year period preceding the Effective Date, (ii) in each jurisdiction where assets of the Loan Parties are located, and (iii) as to the Vessels, from the NVDC. Such searches shall reveal no Liens on any of the assets of the Loan Parties except for liens permitted by Section 6.02 or discharged on or prior to the Effective Date pursuant to a pay-off letter or other documentation satisfactory to the Lender.

(g) <u>Pay-off Letter; Chapter 11 Debtors Emergence from Bankruptcy</u>. The Lender shall have received satisfactory pay-off letters for all existing Indebtedness required to be repaid and which confirms that all Liens upon any of the property of the Loan Parties constituting Collateral will be terminated concurrently with such payment and all letters of credit issued or guaranteed as part of such Indebtedness shall have been cash collateralized. All requirements of the Bankruptcy

Plan for the Bankruptcy Plan Effective Date to occur shall have taken place to the Lender's satisfaction.

(h)  Funding Account.  The Lender shall have received a notice setting forth the deposit account of the Borrower (the "Funding Account") to which the Lender is authorized by the Borrower to transfer the proceeds of any Borrowings requested or authorized pursuant to this Agreement.

(i)  Pledged Equity Interests; Stock Powers; Pledged Notes.  The Lender shall have received (i) the certificates representing the Equity Interests pledged pursuant to the Security Agreement, together with an undated stock power for each such certificate executed in blank by a duly authorized officer of the pledgor thereof and (ii) each promissory note (if any) pledged to the Lender pursuant to the Security Agreement endorsed (without recourse) in blank (or accompanied by an executed transfer form in blank) by the pledgor thereof.

(j)  Filings, Registrations and Recordings.  Each document (including any Uniform Commercial Code financing statement) required by the Collateral Documents or under law or reasonably requested by the Lender to be filed, registered or recorded in order to create in favor of the Lender, for the benefit of the Secured Parties, a perfected Lien on the Collateral described therein, prior and superior in right to any other Person (other than with respect to Liens expressly permitted by Section 6.02), shall be in proper form for filing, registration or recordation.

(k)  Ship Mortgages, Vessel Certificates, etc.  The Lender shall have received, with respect to each Vessel, each of the following, in form and substance reasonably satisfactory to the Lender:

(i)  Ship Mortgage;

(ii)  evidence that a counterpart of the Ship Mortgage has been recorded in the NVDC to create a valid and enforceable first preferred mortgage Lien in favor of the Lender, for the benefit of the Secured Parties;

(iii)  a vessel abstract from NVDC reflecting no Liens thereon other than in favor of the Lender or those being released or satisfied on the Effective Date;

(iv)  the Certificate of Documentation;

(v)  the Certificate of Inspection;

(vi)  if applicable, a Certificate of Financial Responsibility;

(vii)  the Document of Compliance;

(viii) Safety Management Certificate;

(ix)  if applicable, a classification society certification, showing no exceptions;

(x)  a current appraisal of the reflecting an orderly liquidation fair market value together with the other Vessel of at least $13,500,000 in the aggregate, prepared by an appraiser reasonably acceptable to the Lender, and in form and substance satisfactory to the Lender; and

(xi) such other information, documentation, and certifications as may be reasonably required by the Lender.

**[\*\*Add manager subordination?\*\*]**

(l) Insurance. The Lender shall have received evidence of insurance coverage in form, scope, and substance reasonably satisfactory to the Lender and otherwise in compliance with the terms of (i) Section 5.10 of this Agreement, (ii) Section _____ of the Security Agreement and (iii) Section 3.13 of the Ship Mortgages.

(m) Legal Due Diligence. The Lender and its counsel shall have completed all legal due diligence, the results of which shall be satisfactory to Lender in its sole discretion.

(n) USA PATRIOT Act, Etc. The Lender shall have received all documentation and other information required by bank regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including USA PATRIOT Act, and a properly completed and signed IRS Form W-8 or W-9, as applicable, for each Loan Party

(o) Solvency. The Lender shall have received a solvency [certificate signed by a Financial Officer dated the Effective Date in form and substance reasonably satisfactory to the Lender.

(p) Opinion. A written opinion of the Loan Parties' counsel, addressed to the Lender and in form and substance satisfactory to the Lender and its counsel.

**[(q) Control Agreements. The Lender shall have received deposit account control agreements required to be provided pursuant to Section _____ of the Security Agreement.] [\*\*This likely can be deleted. Borrower confirm principal accounts of it and its Subsidiaries will be at Chase. See Section 5.13.\*\*]**

[(r)] Other Documents. The Lender shall have received such other documents as the Lender or its counsel may have reasonably requested.

The Lender shall notify the Borrower of the Effective Date, and such notice shall be conclusive and binding. Notwithstanding the foregoing, the obligations of the Lender to make Loans hereunder shall not become effective unless each of the foregoing conditions is satisfied (or waived pursuant to Section 8.02) at or prior to 2:00 p.m., central time, on _____, 2017 (and, in the event such conditions are not so satisfied or waived, the Commitment shall terminate at such time).

SECTION 4.02. Each Credit Event. The obligation of the Lender to make a Loan on the occasion of any Borrowing is subject to the satisfaction of the following conditions:

(a) The representations and warranties of the Loan Parties set forth in the Loan Documents shall be true and correct with the same effect as though made on and as of the date of such Borrowing (it being understood and agreed that any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct only as of such specified date).

(b) At the time of and immediately after giving effect to such Borrowing, no Default shall have occurred and be continuing.

(c)  After giving effect to any Borrowing, Availability shall not be less than zero.

(d)  No event shall have occurred and no condition shall exist which has or could be reasonably expected to have a Material Adverse Effect.

Each Borrowing shall be deemed to constitute a representation and warranty by the Borrower on the date thereof as to the matters specified in paragraphs (a) and (b) and (d) of this Section.

## ARTICLE V

### Affirmative Covenants

Until the Commitment shall have expired or been terminated and the principal of and interest on each Loan and all fees payable hereunder shall have been paid in full, each Loan Party executing this Agreement covenants and agrees, jointly and severally with all of the other Loan Parties, with the Lender that:

SECTION 5.01.  Financial Statements; Other Information.  The Borrower will furnish to the Lender:

(a)  within 120 days after the end of each fiscal year of the Borrower, its audited consolidated balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of and for such year, setting forth in each case in comparative form the figures for the previous fiscal year, all reported on by independent public accountants of recognized national standing acceptable to the Lender (without a "going concern" or like qualification, commentary or exception, and without any qualification or exception as to the scope of such audit) to the effect that such consolidated financial statements present fairly in all material respects the financial condition and results of operations of the Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied;

(b)  within 45 days after the end of each of the first three fiscal quarters of the Borrower, its consolidated balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of and for such fiscal quarter and the then elapsed portion of such fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by a Financial Officer as presenting fairly in all material respects the financial condition and results of operations of the Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes;

(c)  concurrently with any delivery of financial statements under clause (a) or (b) above (collectively or individually, as the context requires, the "Financial Statements"), a certificate of a Financial Officer in substantially the form of Exhibit A (i) certifying, in the case of the Financial Statements delivered under clause (b) above, as presenting fairly in all material respects the financial condition and results of operations of the Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes, (ii) certifying as to whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (iii) setting forth reasonably detailed calculations demonstrating compliance with Section 6.12 and (iv) stating whether any change in GAAP or in the application thereof has occurred since the date of the audited financial statements referred to

in Section 3.04 and, if any such change has occurred, specifying the effect of such change on the Financial Statements accompanying such certificate;

(d) concurrently with any delivery of Financial Statements under clause (a) above, a certificate of the accounting firm that reported on such Financial Statements stating whether they obtained knowledge during the course of their examination of such Financial Statements of any Default (which certificate may be limited to the extent required by accounting rules or guidelines);

(e) as soon as available, but in any event no later than the end of January of each year, a copy of the plan and forecast (including a projected consolidated and consolidating balance sheet and income statement) of the Borrower for each quarter of that year (the "Projections") in form reasonably satisfactory to the Lender;

(f) promptly following any request therefor, such other information regarding the operations, changes in ownership of Equity Interests, business affairs and financial condition of any Loan Party or any Subsidiary, or compliance with the terms of this Agreement, as the Lender may reasonably request; and

(g) promptly after any request therefor by the Lender, copies of (i) any documents described in Section 101(k)(1) of ERISA that the Borrower or any ERISA Affiliate may request with respect to any Multiemployer Plan and (ii) any notices described in Section 101(l)(1) of ERISA that the Borrower or any ERISA Affiliate may request with respect to any Multiemployer Plan; provided that if the Borrower or any ERISA Affiliate has not requested such documents or notices from the administrator or sponsor of the applicable Multiemployer Plan, the Borrower or the applicable ERISA Affiliate shall promptly make a request for such documents and notices from such administrator or sponsor and shall provide copies of such documents and notices promptly after receipt thereof.

SECTION 5.02.  Notices of Material Events.  The Borrower will furnish to the Lender prompt (but in any event within any time period that may be specified below) written notice of the following:

(a) the occurrence of any Default;

(b) receipt of any notice of any investigation by a Governmental Authority or any litigation or proceeding commenced or threatened against any Loan Party or any Subsidiary that (i) seeks damages in excess of $1,000,000, (ii) seeks injunctive relief, (iii) is asserted or instituted against any Plan, its fiduciaries or its assets, (iv) alleges criminal misconduct by any Loan Party or any Subsidiary, (v) alleges the violation of, or seeks to impose remedies under any Environmental Law or related Requirement of Law, or seeks to impose Environmental Liability, (vi) asserts liability on the part of any Loan Party or any Subsidiary in excess of $1,000,000 in respect of any tax, fee, assessment, or other governmental charge, or (vii) involves any product recall;

(c) the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, could reasonably be expected to result in a Material Adverse Effect;

(d) within two (2) Business Days after the occurrence thereof, any Loan Party entering into a Swap Agreement or an amendment to a Swap Agreement, together with copies of all agreements evidencing such Swap Agreement or amendment; and

(e) any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect.

Each notice delivered under this Section shall be accompanied by a statement of a Financial Officer or other executive officer of the Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

SECTION 5.03.  Existence; Conduct of Business.  Each Loan Party will, and will cause each Subsidiary to, (a) do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, qualifications, licenses, permits, franchises, governmental authorizations, intellectual property rights, licenses and permits material to the conduct of its business, and maintain all requisite authority to conduct its business in each jurisdiction in which its business is conducted; provided that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under Section 6.03 and (b) carry on and conduct its business in substantially the same manner and in substantially the same fields of enterprise as it is presently conducted.

SECTION 5.04.  Payment of Obligations.  Each Loan Party will, and will cause each Subsidiary to, pay or discharge all Material Indebtedness and all other material liabilities and obligations, including Taxes, before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) such Loan Party has set aside on its books adequate reserves with respect thereto in accordance with GAAP and (c) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect; provided, however, that each Loan Party will, and will cause each Subsidiary to, remit withholding taxes and other payroll taxes to appropriate Governmental Authorities as and when claimed to be due, notwithstanding the foregoing exceptions.

SECTION 5.05.  Maintenance of Properties.  Each Loan Party will, and will cause each Subsidiary to, keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted.

SECTION 5.06.  Books and Records; Inspection Rights.  Each Loan Party will, and will cause each Subsidiary to, (a) keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities and (b) permit any representatives designated by the Lender (including employees of the Lender or any consultants, accountants, lawyers, agents and appraisers retained by the Lender), upon reasonable prior notice, to visit and inspect its properties, conduct at the Loan Party's premises field examinations of the Loan Party's assets, liabilities, books and records, including examining and making extracts from its books and records, environmental assessment reports and studies, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times and as often as reasonably requested.  The Loan Parties acknowledge that the Lender, after exercising its rights of inspection, may prepare certain Reports pertaining to the Loan Parties' assets for internal use by the Lender.

SECTION 5.07.  Compliance with Laws and Material Contractual Obligations.  Each Loan Party will, and will cause each Subsidiary to, (i) comply with each Requirement of Law applicable to it or its property (including, without limitation, Environmental Laws) and (ii) perform in all material respects its obligations under material agreements to which it is a party, except, in each case, where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect (except that no such carve-out as to Material Adverse Effect applies as to non-compliance with charters of the Vessels).  Each Loan Party has and will maintain in effect and enforce policies and

procedures designed to ensure compliance by such Loan Party, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions.

SECTION 5.08.  Use of Proceeds.

(a)    The  proceeds  of  the  Term  A  Loan  will  be  used  only  for
_____.[5]  The proceeds of the Revolving Loans will be used only for working capital purposes of the Borrower and its Subsidiaries.  No part of the proceeds of any Loan will be used, whether directly or indirectly, (i) for any purpose that entails a violation of any of the Regulations of the Board, including Regulations T, U and X or (ii) to make any acquisition.

(b)    The Borrower will not request any Borrowing, and the Borrower shall not use, and shall procure that its Subsidiaries and its or their respective directors, officers, employees and agents shall not use, the proceeds of any Borrowing (a) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (b) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, to the extent such activities, businesses or transaction would be prohibited by Sanctions if conducted by a corporation incorporated in the United States or the European Union, or (c) in any manner that would result in the violation of any Sanctions applicable to any party hereto.

SECTION 5.09.   Accuracy of Information.   The Loan Parties will ensure that any information, including financial statements or other documents, furnished to the Lender in connection with this Agreement or any other Loan Document or any amendment or modification hereof or thereof or waiver hereunder or thereunder contains no material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, and the furnishing of such information shall be deemed to be a representation and warranty by the Borrower on the date thereof as to the matters specified in this Section 5.09; provided that, with respect to the Projections, the Loan Parties will cause the Projections to be prepared in good faith based upon assumptions believed to be reasonable at the time.

SECTION 5.10.   Insurance. Each Loan Party will, and will cause each Subsidiary to, maintain with financially sound and reputable carriers having a financial strength rating of at least A- by A.M. Best Company (a) insurance in such amounts (with no greater risk retention) and against such risks (including, without limitation, loss or damage by fire and loss in transit; theft, burglary, pilferage, larceny, embezzlement, and other criminal activities; business interruption; and general liability) and such other hazards, as is customarily maintained by companies of established repute engaged in the same or similar businesses operating in the same or similar locations and (b) all insurance required pursuant to the Collateral Documents.  The Borrower will furnish to the Lender information in reasonable detail as to the insurance so maintained.

SECTION 5.11.   Appraisals.   At any time that the Lender requests, the Borrower will, and will cause each Subsidiary to, provide the Lender with appraisals or updates thereof of the Vessels and their other assets from an appraiser or appraisers selected and engaged by the Lender, and prepared on a basis satisfactory to the Lender, such appraisals and updates to include, without limitation, information required by any applicable Requirement of Law; provided, that if no Event of Default has

---

[5] Discuss with Borrower.

occurred and is continuing, only one such appraisal per Vessel per calendar year shall be at the sole expense of the Borrower.

SECTION 5.12.  Casualty and Condemnation.  The Borrower (a) will furnish to the Lender prompt written notice of any casualty or other insured damage to any material portion of a Vessel or any other Collateral or the commencement of any action or proceeding for the taking of any Vessel or a material portion of other Collateral or interest therein under power of eminent domain or by condemnation or similar proceeding and (b) will ensure that the Net Proceeds of any such event (whether in the form of insurance proceeds, condemnation awards or otherwise) are collected and applied in accordance with the applicable provisions of this Agreement and the Collateral Documents

SECTION 5.13. Depository Banks.  Each Loan Party will maintain the Lender as its principal depository bank, including for the maintenance of operating, administrative, cash management, collection activity, and other deposit accounts for the conduct of its business.

SECTION 5.14.  Additional Collateral; Further Assurances.

(a)  Subject to applicable Requirements of Law, each Loan Party will cause each of its domestic Subsidiaries formed or acquired after the date of this Agreement to become a Loan Party by executing a Joinder Agreement.  Upon execution and delivery thereof, each such Person (i) shall automatically become a Loan Guarantor hereunder and thereupon shall have all of the rights, benefits, duties, and obligations in such capacity under the Loan Documents and (ii) will grant Liens to the Lender, for the benefit of the Secured Parties, in any property of such Loan Party which constitutes Collateral.

(b)  Each Loan Party will cause (i) 100% of the issued and outstanding Equity Interests of each of its domestic Subsidiaries and (ii) 65% (or such greater percentage that, due to a change in applicable law after the date hereof, (1) could not reasonably be expected to cause the undistributed earnings of such foreign Subsidiary as determined for U.S. federal income tax purposes to be treated as a deemed dividend to such foreign Subsidiary's U.S. parent and (2) could not reasonably be expected to cause any material adverse tax consequences) of the issued and outstanding Equity Interests entitled to vote (within the meaning of Treas. Reg. Section 1.956-2(c)(2)) and 100% of the issued and outstanding Equity Interests not entitled to vote (within the meaning of Treas. Reg. Section 1.956-2(c)(2)) in each foreign Subsidiary directly owned by the Borrower or any domestic Subsidiary to be subject at all times to a first priority, perfected Lien in favor of the Lender, for the benefit of the Secured Parties, pursuant to the terms and conditions of the Loan Documents or other security documents as the Lender shall reasonably request.

(c)  Without limiting the foregoing, each Loan Party will, and will cause each Subsidiary to, execute and deliver, or cause to be executed and delivered, to the Lender such documents, agreements and instruments, and will take or cause to be taken such further actions (including the filing and recording of financing statements, fixture filings, mortgages, deeds of trust and other documents and such other actions or deliveries of the type required by Section 4.01, as applicable), which may be required by any Requirement of Law or which the Lender may, from time to time, reasonably request to carry out the terms and conditions of this Agreement and the other Loan Documents and to ensure perfection and priority of the Liens created or intended to be created by the Collateral Documents, all at the expense of the Loan Parties.  Notwithstanding the foregoing, at any time after an Event of Default has occurred and is continuing, each Loan Party will, upon the request of the Lender, cause each foreign Subsidiary to become a Loan Party and a Loan Guarantor and to grant Liens to the Lender on its assets and have the balance of its Equity Interests pledged to the Lender.

(d)  If any material assets (including any real property or improvements thereto or any interest therein) are acquired by any Loan Party after the Effective Date (other than assets constituting Collateral under the Security Agreement that become subject to the Lien under the Security Agreement upon acquisition thereof), the Borrower will (i) notify the Lender and, if requested by the Lender, cause such assets to be subjected to a Lien securing the Secured Obligations and (ii) take, and cause each applicable Loan Party to take, such actions as shall be necessary or reasonably requested by the Lender to grant and perfect such Liens, including actions described in paragraph (c) of this Section, all at the expense of the Loan Parties.

SECTION 5.15.  Additional Vessel Covenants. With respect to each Vessel, the Borrower hereby covenants and agrees:

(a)  to provide to the Lender forthwith copies of all material notices and information received by it in relation to such Vessel, her earnings and insurances, or operations unless such notices or information state they have been provided directly to the Lender;

(b)  to keep such Vessel duly documented under the laws and flag of the United States qualified to engage in the coastwise trade of the United States and to do or suffer to be done nothing whereby such documentation or qualification may be forfeited or canceled;

(c)  to keep and to cause such Vessel to be kept free and clear of all liens, charges, mortgages and encumbrances, other than Permitted Encumbrances, and not to pledge, charge, assign or otherwise encumber (in favor of any Person other than the Lender) the charters, earnings or insurances of such Vessel, or to suffer the creation of any such pledge, charge, assignment or encumbrance as aforesaid to or in favor of any Person other than the Lender;

(d)  to comply with and satisfy all the requisites and formalities established by the laws of the United States

(e)  to maintain the Ship Mortgage thereon as a legal, valid, binding and enforceable first preferred mortgage Lien upon such Vessel and to furnish to the Lender from time to time such proofs as the Lender may reasonably request so that it may be satisfied with respect to the compliance by the Borrower with the provisions of this subsection;

(f)  not to make, or permit to be made, any substantial change in the structure, type or speed of such Vessel unless it shall have received the Lender's prior written approval;

(g)  not to cause or permit such Vessel to be operated in any manner contrary to applicable law, rule or regulation, not to abandon such Vessel in a foreign port, not to engage in any unlawful trade or violate any law or carry any cargo that will expose such Vessel to penalty, expropriation, nationalization, confiscation, forfeiture or capture, and not to do, or suffer or permit to be done, anything which can or may injuriously affect the registration or enrollment of such Vessel or its qualification to be documented under the laws and regulations of the United States of America.

(g)  if a libel or complaint be filed against such Vessel or such Vessel be otherwise attached, levied upon or taken into custody by virtue of any legal proceeding in any court, to promptly (but in any event within two (2) days after the Borrower obtains knowledge of such event) notify the Lender, and within fifteen (15) days after the Borrower obtains knowledge of such event to cause such Vessel to be released and all Liens thereon other than Permitted Encumbrances to be discharged and to promptly notify the Lender thereof in writing; and the Borrower will notify the Lender within two (2) Business Days of any average or salvage incurred by such Vessel;

(h)    at all times and without cost or expense to the Lender, maintain and preserve, or cause to be maintained and preserved, such Vessel and all her equipment, outfitting and appurtenances, tight, staunch, strong, in good condition, working order and repair and in all respects seaworthy and fit for its intended service except ordinary wear and tear; and covenants that it shall at all times comply with all applicable laws, treaties and conventions, and rules and regulations to which the United States is a party and of any jurisdiction where such Vessel operate and shall have on board as and when required thereby valid certificates showing compliance therewith. To the extent applicable, the Borrower shall comply or procure compliance with the ISM code and the ISPS code, and will furnish to the Lender on demand true and complete copies of such Vessel's Document of Compliance, Safety Management Certificate and such other ISM Code documentation as the Lender may reasonably request in writing;

(i)    at all reasonable times and upon prior notice to the Borrower, the Borrower shall afford, or cause to be afforded, the Lender and its authorized representative full and complete access to such Vessel for the purpose of inspecting such Vessel and her papers (provided such access does not unreasonably interfere with the operation of such Vessel) and, at the request of the Lender, the Borrower shall deliver for inspection copies of any and all contracts and documents relating to such Vessel, whether on board or not;

(j)    to furnish the Lender promptly on written demand, all charter parties or other contracts relating to such Vessel and full details as to the parties, times of delivery and the like pertaining thereto;

(k)    not to transfer or change, or permit to be transferred or changed, the flag or port of documentation of such Vessel without the prior written consent of the Lender, and any such written consent to any one transfer or change of flag or port of documentation shall not be construed to be a waiver of this provision with respect to any subsequent proposed transfer or change of flag or port of documentation; and

(l)    without prior notice to and the prior written consent of the Lender, not to operate such Vessel outside of the territorial waters of the United States of America and the Gulf of Mexico.

ARTICLE VI

Negative Covenants

Until the Commitment shall have expired or been terminated and the principal of and interest on each Loan and all fees, expenses and other amounts payable under any Loan Document shall have been paid in full, each Loan Party executing this Agreement covenants and agrees, jointly and severally with all of the other Loan Parties, with the Lender that:

SECTION 6.01. Indebtedness. No Loan Party will, nor will it permit any Subsidiary to, create, incur, assume or suffer to exist any Indebtedness, except:

(a) the Secured Obligations;

(b) Indebtedness existing on the date hereof and set forth in Schedule 6.01 (excluding, however, following the making of the initial Loan hereunder, the Indebtedness to be repaid with the proceeds of such Loans as indicated on Schedule 6.01) and any extensions, renewals, refinancings and replacements of any such Indebtedness in accordance with clause (f) hereof;

(c)    Indebtedness of the Borrower to any Subsidiary and of any Subsidiary to the Borrower or any other Subsidiary, provided that (i) Indebtedness of any Subsidiary that is not a Loan Party to the Borrower or any other Loan Party shall be subject to Section 6.04 and (ii) Indebtedness of any Loan Party to any Subsidiary that is not a Loan Party shall be subordinated to the Secured Obligations on terms reasonably satisfactory to the Lender;

(d)    Guarantees by the Borrower of Indebtedness of any Subsidiary and by any Subsidiary of Indebtedness of the Borrower or any other Subsidiary, provided that (i) the Indebtedness so Guaranteed is permitted by this Section 6.01, (ii) Guarantees by the Borrower or any other Loan Party of Indebtedness of any Subsidiary that is not a Loan Party shall be subject to Section 6.04 and (iii) Guarantees permitted under this clause (d) shall be subordinated to the Secured Obligations on the same terms as the Indebtedness so Guaranteed is subordinated to the Secured Obligations;

(e)    Indebtedness of the Borrower or any Subsidiary incurred to finance the acquisition, construction or improvement of any fixed or capital assets (whether or not constituting purchase money Indebtedness), including Capital Lease Obligations and any Indebtedness assumed in connection with the acquisition of any such assets or secured by a Lien on any such assets prior to the acquisition thereof, and extensions, renewals and replacements of any such Indebtedness in accordance with clause (f) below; provided that (i) such Indebtedness is incurred prior to or within 90 days after such acquisition or the completion of such construction or improvement and (ii) the aggregate principal amount of Indebtedness permitted by this clause (e) together with any Refinance Indebtedness in respect thereof permitted by clause (f) below, shall not exceed $1,000,000 at any time outstanding;

(f)    Indebtedness which represents extensions, renewals, refinancing or replacements (such Indebtedness being so extended, renewed, refinanced or replaced being referred to herein as the "Refinance Indebtedness") of any of the Indebtedness described in clauses (b) (other than the Regions Loan) and (e) hereof (such Indebtedness being referred to herein as the "Original Indebtedness"); provided that (i) such Refinance Indebtedness does not increase the principal amount or interest rate of the Original Indebtedness, (ii) any Liens securing such Refinance Indebtedness are not extended to any additional property of any Loan Party or any Subsidiary, (iii) no Loan Party or any Subsidiary that is not originally obligated with respect to repayment of such Original Indebtedness is required to become obligated with respect to such Refinance Indebtedness, (iv) such Refinance Indebtedness does not result in a shortening of the average weighted maturity of such Original Indebtedness, (v) the terms of such Refinance Indebtedness other than fees and interest are not less favorable to the obligor thereunder than the original terms of such Original Indebtedness and (vi) if such Original Indebtedness was subordinated in right of payment to the Secured Obligations, then the terms and conditions of such Refinance Indebtedness must include subordination terms and conditions that are at least as favorable to the Lender as those that were applicable to such Original Indebtedness;

(g)    Indebtedness owed to any Person providing workers' compensation, health, disability or other employee benefits or property, casualty or liability insurance, pursuant to reimbursement or indemnification obligations to such Person, in each case incurred in the ordinary course of business;

(h)    Indebtedness of any Loan Party in respect of performance bonds, bid bonds, appeal bonds, surety bonds and similar obligations, in each case provided in the ordinary course of business;

(i) Subordinated Indebtedness;

(j) other unsecured Indebtedness in an aggregate principal amount not exceeding $2,500,000 at any time outstanding.

SECTION 6.02.  Liens.  No Loan Party will, nor will it permit any Subsidiary to, create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, or assign or sell any income or revenues (including Accounts) or rights in respect of any thereof, except:

(a) Liens created pursuant to any Loan Document;

(b) Permitted Encumbrances;

(c) any Lien on any property or asset of the Borrower or any Subsidiary existing on the date hereof and set forth in Schedule 6.02; provided that (i) such Lien shall not apply to any other property or asset of the Borrower or any Subsidiary and (ii) such Lien shall secure only those obligations which it secures on the date hereof and extensions, renewals and replacements thereof that do not increase the outstanding principal amount thereof;

(d) Liens on fixed or capital assets acquired, constructed or improved by the Borrower or any Subsidiary; provided that (i) such Liens secure Indebtedness permitted by clause (e) of Section 6.01, (ii) such Liens and the Indebtedness secured thereby are incurred prior to or within 90 days after such acquisition or the completion of such construction or improvement, and (iii) such Liens shall not apply to any other property or assets of the Borrower or any Subsidiary;

(e) any Lien existing on any property or asset (other than Accounts and Inventory) prior to the acquisition thereof by the Borrower or any Subsidiary or existing on any property or asset (other than Accounts and Inventory) of any Person that becomes a Loan Party after the date hereof prior to the time such Person becomes a Loan Party; provided that (i) such Lien is not created in contemplation of or in connection with such acquisition or such Person becoming a Loan Party, as the case may be, (ii) such Lien shall not apply to any other property or assets of the Loan Party and (iii) such Lien shall secure only those obligations which it secures on the date of such acquisition or the date such Person becomes a Loan Party, as the case may be, and extensions, renewals and replacements thereof that do not increase the outstanding principal amount thereof;

(f) Liens of a collecting bank arising in the ordinary course of business under Section 4-208 of the UCC in effect in the relevant jurisdiction covering only the items being collected upon;

(g) Liens arising out of Sale and Leaseback Transactions permitted by Section 6.06; and

(h) Liens granted by a Subsidiary that is not a Loan Party in favor of the Borrower or another Loan Party in respect of Indebtedness owed by such Subsidiary.

SECTION 6.03.  Fundamental Changes.

(a) No Loan Party will, nor will it permit any Subsidiary to, merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or liquidate or dissolve, except that, if at the time thereof and immediately after giving effect thereto no Event of Default shall have occurred and be continuing, (i) any Subsidiary of the Borrower may merge into the Borrower

in a transaction in which the Borrower is the surviving entity, (ii) any Loan Party (other than the Borrower) may merge into any other Loan Party in a transaction in which the surviving entity is a Loan Party and (iii) any Subsidiary that is not a Loan Party may liquidate or dissolve if the Borrower determines in good faith that such liquidation or dissolution is in the best interests of the Borrower and is not materially disadvantageous to the Lender; provided that any such merger involving a Person that is not a wholly owned Subsidiary immediately prior to such merger shall not be permitted unless also permitted by Section 6.04.

(b) No Loan Party will, nor will it permit any Subsidiary to, engage in any business other than businesses of the type conducted by the Borrower and its Subsidiaries on the date hereof and businesses reasonably related thereto.

(c) No Loan Party will, nor will it permit any Subsidiary to change its fiscal year or any fiscal quarter from the basis in effect on the Effective Date.

(d) No Loan Party will change the accounting basis upon which its financial statements are prepared.

(e) No Loan Party will change the tax filing elections it has made under the Code.

SECTION 6.04. Investments, Loans, Advances, Guarantees and Acquisitions. No Loan Party will, nor will it permit any Subsidiary to, form any subsidiary after the Effective Date, or purchase, hold or acquire (including pursuant to any merger with any Person that was not a Loan Party and a wholly owned Subsidiary prior to such merger) any Equity Interests, evidences of indebtedness or other securities (including any option, warrant or other right to acquire any of the foregoing) of, make or permit to exist any loans or advances to, Guarantee any obligations of, or make or permit to exist any investment or any other interest in, any other Person, or purchase or otherwise acquire (in one transaction or a series of transactions) any assets of any other Person constituting a business unit (whether through purchase of assets, merger or otherwise), except:

(a) Permitted Investments, subject to control agreements in favor of the Lender or otherwise subject to a perfected security interest in favor of the Lender;

(b) investments in existence on the date hereof and described in Schedule 6.04;

(c) investments by the Borrower and the other Loan Parties in Equity Interests in their respective Subsidiaries that are Loan Parties, provided that (i) any such Equity Interests held by a Loan Party shall be pledged pursuant to the Security Agreement (subject to the limitations applicable to Equity Interests of a foreign Subsidiary referred to in Section 5.14);

(d) loans or advances made by the Borrower and any other Loan Party to another Loan Party, provided that (i) any such loans and advances shall be evidenced by a promissory note pledged pursuant to the Security Agreement;

(e) Guarantees constituting Indebtedness of Loan Parties permitted by Section 6.01;

(f) notes payable, or stock or other securities issued by Account Debtors to a Loan Party pursuant to negotiated agreements with respect to settlement of such Account Debtor's Accounts in the ordinary course of business, consistent with past practices;

(g) investments in the form of Swap Agreements permitted by Section 6.07;

(h)  investments of any Person existing at the time such Person becomes a Subsidiary of the Borrower or consolidates or merges with the Borrower or any Subsidiary (including in connection with a permitted acquisition), so long as such investments were not made in contemplation of such Person becoming a Subsidiary or of such merger;

(i)  investments received in connection with the disposition of assets permitted by Section 6.05; and

(j)  investments constituting deposits described in clauses (c) and (d) of the definition of the term "Permitted Encumbrances".

SECTION 6.05.  Asset Sales.  No Loan Party will, nor will it permit any Subsidiary to, sell, transfer, lease or otherwise dispose of any asset, including any Equity Interest owned by it, nor will the Borrower permit any Subsidiary to issue any additional Equity Interest in such Subsidiary (other than to the Borrower or another Subsidiary in compliance with Section 6.04), except:

(a)  sales, transfers and dispositions of (i) Inventory in the ordinary course of business and (ii) used, obsolete, worn out or surplus Equipment or property in the ordinary course of business (it being understood that Vessels are not Equipment);

(b)  sales, transfers and dispositions of assets to the Borrower or any Subsidiary, provided that (i) any such sales, transfers or dispositions involving a Subsidiary that is not a Loan Party shall be made in compliance with Section 6.09, and (ii) the Borrower shall not sell, transfer or dispose of the Vessels to a Subsidiary;

(c)  sales, transfers and dispositions of Accounts (excluding sales or dispositions in a factoring arrangement) in connection with the compromise, settlement or collection thereof;

(d)  sales, transfers and dispositions of Permitted Investments and other investments permitted by clauses (h) and (j) of Section 6.04;

(e)  Sale and Leaseback Transactions permitted by Section 6.06; and

(f)  dispositions resulting from any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any property or asset of the Borrower or any Subsidiary;

(g)  charters of vessels to third parties entered into in the ordinary course of business; and

(h)  sales, transfers and other dispositions of assets (other than Equity Interests in a Subsidiary unless all Equity Interests in such Subsidiary are sold) that are not permitted by any other clause of this Section, provided that the aggregate fair market value of all assets sold, transferred or otherwise disposed of in reliance upon this paragraph (h) shall not exceed $250,000 during any fiscal year of the Borrower;

provided that (i) all sales, transfers, leases and other dispositions permitted under this Section 6.05 (other than those permitted by paragraphs (b), (d) and (f) above) shall be made for fair value and for at least 75% cash consideration, and (ii) in any event, any sale or charter of a Vessel if otherwise permitted must be for all cash and not on any credit terms.

SECTION 6.06.  Sale and Leaseback Transactions.  No Loan Party will, nor will it permit any Subsidiary to, enter into any arrangement, directly or indirectly, whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred (a "Sale and Leaseback Transaction"), except for any such sale of any fixed or capital assets by the Borrower or any Subsidiary that is made for cash consideration in an amount not less than the fair value of such fixed or capital asset and is consummated within 90 days after the Borrower or such Subsidiary acquires or completes the construction of such fixed or capital asset.

SECTION 6.07.  Swap Agreements.  No Loan Party will, nor will it permit any Subsidiary to, enter into any Swap Agreement, except (a) Swap Agreements entered into to hedge or mitigate risks to which the Borrower or any Subsidiary has actual exposure (other than those in respect of Equity Interests of the Borrower or any Subsidiary), and (b) Swap Agreements entered into in order to effectively cap, collar or exchange interest rates (from floating to fixed rates, from one floating rate to another floating rate or otherwise) with respect to any interest-bearing liability or investment of the Borrower or any Subsidiary.  The obligations of any Loan Party under or in connection with any such Swap Agreement (other than any Swap Agreement entered into with the Lender or its Affiliate) shall be unsecured and shall comply with the requirements set forth at Section 6.01 hereof.

SECTION 6.08.  Restricted Payments; Certain Payments of Indebtedness.

(a)  No Loan Party will, nor will it permit any Subsidiary to, declare or make, or agree to declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, except (i) the Borrower may declare and pay dividends with respect to its common stock payable solely in additional shares of its common stock, and, with respect to its preferred stock, payable solely in additional shares of such preferred stock or in shares of its common stock, (ii) Subsidiaries may declare and pay dividends ratably with respect to their Equity Interests, and (iii) so long as the financial covenants at Section 6.12 are in compliance and no other Default or Event of Default exists or would result after giving effect thereto, (A) the Borrower may declare and pay dividends or make distributions to its shareholders in an aggregate amount not greater than the amount necessary for such shareholders to pay their actual state and U.S. federal income tax liabilities in respect of income earned by the Borrower after deducting any unused prior losses, (B) beginning in 2018, in each calendar year after the Borrower in accordance with Section 2.09(b) has made the required prepayment based on its Excess Cash Flow of the preceding calendar year, the Borrower may declare and pay dividends or make distributions to its shareholders in an aggregate amount not greater than 50% of such Excess Cash Flow of the preceding calendar year, **[and (C) the Borrower may pay management fees pursuant to that certain [management services agreement] dated as of _____, between the Borrower and _____].**

(b)  No Loan Party will, nor will it permit any Subsidiary to, make or agree to pay or make, directly or indirectly, any payment or other distribution (whether in cash, securities or other property) of or in respect of principal of or interest on any Indebtedness, or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Indebtedness, except:

(i)  payment of Indebtedness created under the Loan Documents;

(ii)  payment of regularly scheduled interest and principal payments as and when due in respect of any Indebtedness permitted under Section 6.01, other than payments in respect of the Subordinated Indebtedness prohibited by the subordination provisions thereof;

(iii)  refinancings of Indebtedness to the extent permitted by Section 6.01; and

(iv)  payment of secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness to the extent such sale or transfer is permitted by the terms of Section 6.05.

SECTION 6.09.  Transactions with Affiliates.  No Loan Party will, nor will it permit any Subsidiary to, sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except (a) transactions that (i) are in the ordinary course of business and (ii) are at prices and on terms and conditions not less favorable to such Loan Party or such Subsidiary than could be obtained on an arm's-length basis from unrelated third parties, (b) transactions between or among the Loan Parties not involving any other Affiliate, (c) any investment permitted by Sections 6.04(c) or 6.04(d), (d) any Indebtedness permitted under Section 6.01(c), (e) any Restricted Payment permitted by Section 6.08, (f) the payment of reasonable fees to directors of the Borrower or any Subsidiary who are not employees of the Borrower or any Subsidiary, and compensation and employee benefit arrangements paid to, and indemnities provided for the benefit of, directors, officers or employees of the Borrower or its Subsidiaries in the ordinary course of business, (g) any issuances of securities or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment agreements, stock options and stock ownership plans approved by the Borrower's board of directors, and (h) so long as no Default has occurred and is continuing, the payment of management, consulting and advisory fees in an amount not to exceed $_____ in any fiscal year of the Borrower.

SECTION 6.10.  Restrictive Agreements.  No Loan Party will, nor will it permit any Subsidiary to, directly or indirectly enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon (a) the ability of such Loan Party or any Subsidiary to create, incur or permit to exist any Lien upon any of its property or assets, or (b) the ability of any Subsidiary to pay dividends or other distributions with respect to any Equity Interests or to make or repay loans or advances to the Borrower or any other Subsidiary or to Guarantee Indebtedness of the Borrower or any other Subsidiary; provided that (i) the foregoing shall not apply to restrictions and conditions imposed by any Requirement of Law or by any Loan Document, (ii) the foregoing shall not apply to restrictions and conditions existing on the date hereof identified on Schedule 6.10 (but shall apply to any extension or renewal of, or any amendment or modification expanding the scope of, any such restriction or condition), (iii) the foregoing shall not apply to customary restrictions and conditions contained in agreements relating to the sale of a Subsidiary pending such sale, provided such restrictions and conditions apply only to the Subsidiary that is to be sold and such sale is permitted hereunder, (iv) clause (a) of the foregoing shall not apply to restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness and (v) clause (a) of the foregoing shall not apply to customary provisions in leases and other contracts restricting the assignment thereof.

SECTION 6.11.  Amendment of Material Documents.  No Loan Party will, nor will it permit any Subsidiary to, amend, modify or waive any of its rights under (a) any agreement relating to any Subordinated Indebtedness, (b) its charter, articles or certificate of organization or incorporation and bylaws or operating, management or partnership agreement, or other organizational or governing documents or (c) material agreements, in each case to the extent any such amendment, modification or waiver would be adverse to the Lender.

SECTION 6.12. Financial Covenants.

(a)     Leverage Ratio.  The Borrower will not permit the Leverage Ratio, on the last day of any fiscal quarter, to be greater than 2.0 to 1.0.

(b)     Fixed Charge Coverage Ratio.  The Borrower will not permit the Fixed Charge Coverage Ratio, for any period of four consecutive fiscal quarters ending on the last day of any fiscal quarter to be less than 1.25 to 1.00; provided, that at the end of each of the first three fiscal quarters after the Effective Date, including the quarter in which the Effective Date takes place, the calculation of the Fixed Charge Coverage Ratio shall be measured only through such applicable fiscal quarter(s).

ARTICLE VII

Events of Default

If any of the following events ("Events of Default") shall occur:

(a) the Borrower shall fail to pay any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b) the Borrower shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in clause (a) of this Article) payable under this Agreement or any other Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of five (5) days;

(c) any representation or warranty made or deemed made by or on behalf of any Loan Party or any Subsidiary in or in connection with this Agreement or any other Loan Document or any amendment or modification hereof or thereof or waiver hereunder or thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with this Agreement or any other Loan Document or any amendment or modification hereof or thereof or waiver hereunder or thereunder, shall prove to have been materially incorrect when made or deemed made;

(d) any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in Section 5.02(a), 5.03 (with respect to a Loan Party's existence) or 5.08 or in Article VI;

(e) any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in this Agreement (other than those specified in clause (a), (b) or (d)), and such failure shall continue unremedied for a period of (i) 5 days after the earlier of any Loan Party's knowledge of such breach or notice thereof from the Lender if such breach relates to terms or provisions of Section 5.01, 5.02 (other than Section 5.02(a)), 5.03 through 5.07, 5.10, 5.11 or 5.13 of this Agreement or Section _____ of the Security Agreement or Section 3.13 of the Ship Mortgages, or (ii) 15 days after the earlier of any Loan Party's knowledge of such breach or notice thereof from the Lender if such breach relates to terms or provisions of any other Section of this Agreement;

(f) any Loan Party or any Subsidiary shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness, when and as the same shall become due and payable;

(g) any event or condition occurs that results in any Material Indebtedness becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity; provided that this clause (g) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Material Indebtedness to the extent such sale or transfer is permitted by the terms of Section 6.05 and so long as the creditor first enforces its Liens on such assets;

(h) an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of a Loan Party or any Subsidiary or its debts, or of a substantial part of its assets, under any federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any Loan Party or any Subsidiary or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for sixty (60) days or an order or decree approving or ordering any of the foregoing shall be entered;

(i) any Loan Party or any Subsidiary shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (h) of this Article, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for such Loan Party or Subsidiary of any Loan Party or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing;

(j) any Loan Party or any Subsidiary shall become unable, admit in writing its inability, or publicly declare its intention not to, or fail generally, to pay its debts as they become due;

(k) one or more judgments for the payment of money in an aggregate amount in excess of $1,000,000 shall be rendered against any Loan Party, any Subsidiary or any combination thereof and the same shall remain undischarged for a period of thirty (30) consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of any Loan Party or any Subsidiary to enforce any such judgment or any Loan Party or any Subsidiary shall fail within thirty (30) days to discharge one or more non-monetary judgments or orders which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, which judgments or orders, in any such case, are not stayed on appeal and being appropriately contested in good faith by proper proceedings diligently pursued;

(l) an ERISA Event shall have occurred that, in the opinion of the Lender, when taken together with all other ERISA Events that have occurred, could reasonably be expected to result in a Material Adverse Effect;

(m) a Change in Control shall occur;

(n) the occurrence of any "default", as defined in any Loan Document (other than this Agreement), or the breach of any of the terms or provisions of any Loan Document (other than this Agreement), which default or breach continues beyond any period of grace therein provided;

(o) the Loan Guaranty shall fail to remain in full force or effect or any action shall be taken to discontinue or to assert the invalidity or unenforceability of the Loan Guaranty, or any individual Guarantor dies or a guardian or conservator is appointed for any individual Guarantor or all or any portion of their property, or any Guarantor shall fail to comply with any of the terms or provisions of the Loan Guaranty, or any Guarantor shall deny that it has any further liability under the Loan Guaranty, or shall give notice to such effect, including, but not limited to notice of termination delivered pursuant to Section 9.08;

(p) except as permitted by the terms of any Collateral Document, (i) any Collateral Document shall for any reason fail to create a valid security interest or other Lien in any Collateral purported to be covered thereby, or (ii) any Lien securing any Secured Obligation shall cease to be a perfected, first priority Lien (subject to applicable permitted Liens under Section 6.02 that would be entitled to priority over the Lien securing the Secured Obligations);

(q) any Collateral Document shall fail to remain in full force or effect or any action shall be taken to discontinue or to assert the invalidity or unenforceability of any Collateral Document;

(r) any material provision of any Loan Document for any reason ceases to be valid, binding and enforceable in accordance with its terms (or any Loan Party shall challenge the enforceability of any Loan Document or shall assert in writing, or engage in any action or inaction that evidences its assertion, that any provision of any of the Loan Documents has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms); or

(s) any Loan Party is criminally indicted or convicted under any law that may reasonably be expected to lead to a forfeiture of any Vessel;

then, and in every such event (other than an event with respect to the Borrower described in clause (h) or (i) of this Article), and at any time thereafter during the continuance of such event, the Lender may, by notice to the Borrower, take either or both of the following actions, at the same or different times: (i) terminate the Commitment, whereupon the Commitment shall terminate immediately, and (ii) declare the Loans then outstanding to be due and payable in whole (or in part, but ratably as among the Classes of Loans and the Loans of each Class at the time outstanding, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), whereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall become due and payable immediately, in each case without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower; and in the case of any event with respect to the Borrower described in clause (h) or (i) of this Article, the Commitment shall automatically terminate and the principal of the Loans then outstanding, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall automatically become due and payable, in each case without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower. Upon the occurrence and during the continuance of an Event of Default, the Lender may increase the rate of interest applicable to the Loans and other Obligations as set forth in this

Agreement and exercise any rights and remedies provided to the Lender under the Loan Documents or at law or equity, including all remedies provided under the UCC and the U.S. Ship Mortgage Act (46 U.S.C. §31301 et seq.).

ARTICLE VIII

Miscellaneous

SECTION 8.01. Notices.

(a) Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by fax, as follows:

(i)   if to any Loan Party, to it in care of the Borrower at:
International Shipholding Corporation

_____

_____

Attention: _____
Fax No: _____

(ii) if to JPMorgan Chase Bank, N.A. at:

JPMorgan Chase Bank, N.A.
Middle Market Servicing
10 South Dearborn, Floor L2
Suite IL1-0480
Chicago, IL, 60603-2300
Attention: _____
Fax No: (312) _____

With a copy to:

JPMorgan Chase Bank, N.A.
201 St. Charles Avenue, 28th Floor
New Orleans, LA 70170
Attention: Mr. Donald K. Hunt
Fax No: (504) 558-9835

All such notices and other communications (i) sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received, (ii) sent by fax shall be deemed to have been given when sent, provided that if not given during normal business hours for the recipient, such notice or communication shall be deemed to have been given at the opening of business on the next Business Day of the recipient, or (iii) delivered through electronic communication to the extent provided in paragraph (b) below shall be effective as provided in such paragraph.

(b)   Notices and other communications to the Lender hereunder may be delivered or furnished by electronic communications (including e-mail and internet or intranet websites) pursuant to procedures approved by the Lender; provided that the foregoing shall not apply to notices pursuant to Article II [or to compliance and no Default certificates delivered pursuant to Sections 5.01(d) and 5.01(e)]

unless otherwise agreed by the Lender. Each of the Lender or the Borrower (on behalf of the Loan Parties) may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications. All such notices and other communications (i) sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if not given during the normal business hours of the recipient, such notice or communication shall be deemed to have been given at the opening of business on the next Business Day for the recipient, and (ii) posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient, at its e-mail address as described in the foregoing clause (i), of notification that such notice or communication is available and identifying the website address therefor; provided that, for both clauses (i) and (ii) above, if such notice, e-mail or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day of the recipient.

(c)    Any party hereto may change its address, facsimile number or e-mail address for notices and other communications hereunder by notice to the other parties hereto.

SECTION 8.02.  Waivers; Amendments.

(a)  No failure or delay by the Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Lender hereunder and under any other Loan Document are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether the Lender may have had notice or knowledge of such Default at the time.

(b)    Neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified except (i) in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Borrower and the Lender or (ii) in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Lender and the Loan Party or Loan Parties that are parties thereto.

SECTION 8.03.  Expenses; Indemnity; Damage Waiver.

(a)  The Loan Parties, jointly and severally, shall pay all (i) reasonable out-of-pocket expenses incurred by the Lender and its Affiliates, including the reasonable fees, charges and disbursements of counsel for the Lender (whether outside counsel or the allocated costs of its internal legal department), in connection with the credit facilities provided for herein, the preparation and administration of the Loan Documents and any amendments, modifications or waivers of the provisions of the Loan Documents (whether or not the transactions contemplated hereby or thereby shall be consummated), and (ii) out-of-pocket expenses incurred by the Lender, including the fees, charges and disbursements of any counsel for the Lender (whether outside counsel or the allocated costs of its internal legal department), in connection with the enforcement, collection or protection of its rights in connection with the Loan Documents, including its rights under this Section, or in connection with the Loans made

hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans.  Expenses being reimbursed by the Loan Parties under this Section include, without limiting the generality of the foregoing, fees, costs and expenses incurred in connection with:

        (A)       appraisals and insurance reviews;

        (B)       field examinations and the preparation of Reports based on the fees charged by a third party retained by the Lender or the internally allocated fees for each Person employed by the Lender with respect to each field examination;

        (C)       background checks regarding senior management and/or key investors, as deemed necessary or appropriate in the sole discretion of the Lender;

        (D)       Taxes, fees and other charges for (i) lien and title searches and title insurance and (ii) recording the Ship Mortgages, filing financing statements and continuations, and other actions to perfect, protect, and continue the Lender's Liens;

        (E)       sums paid or incurred to take any action required of any Loan Party under the Loan Documents that such Loan Party fails to pay or take; and

        (F)       forwarding loan proceeds, collecting checks and other items of payment, and establishing and maintaining the accounts and lock boxes, and costs and expenses of preserving and protecting the Collateral.

All of the foregoing fees, costs and expenses may be charged against a deposit account of the Borrower as described in Section 2.16(c).

        (b) The Loan Parties, jointly and severally, shall indemnify the Lender, and each Related Party of the Lender (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, penalties, incremental taxes, liabilities and related expenses, including the fees, charges and disbursements of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of the Loan Documents or any agreement or instrument contemplated thereby, the performance by the parties hereto of their respective obligations thereunder or the consummation of the Transactions or any other transactions contemplated hereby, (ii) any Loan or the use of the proceeds therefrom, (iii) any actual or alleged presence or Release of Hazardous Materials on or from any property owned or operated by a Loan Party or a Subsidiary, or any Environmental Liability related in any way to a Loan Party or Subsidiary, (iv) the failure of a Loan Party to deliver to the Lender the required receipts or other required documentary evidence with respect to a payment made by such Loan Party for Taxes pursuant to Section 2.15, or (v) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not such claim, litigation, investigation or proceeding is brought by any Loan Party or their respective equity holders, Affiliates, creditors or any other third Person and whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, penalties, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee.  This Section 8.03(b) shall not apply with respect to Taxes other than any Taxes that represent losses or damages arising from any non-Tax claim.

(c) To the extent permitted by applicable law, no Loan Party shall assert, and each Loan Party hereby waives, any claim against any Indemnitee, (i) for any damages arising from the use by others of information or other materials obtained through telecommunications, electronic or other information transmission systems (including the Internet), or (ii) on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document, or any agreement or instrument contemplated hereby or thereby, the Transactions, any Loan or the use of the proceeds thereof; provided that, nothing in this paragraph (c) shall relieve any Loan Party of any obligation it may have to indemnify an Indemnitee against special, indirect, consequential or punitive damages asserted against such Indemnitee by a third party.

(d) All amounts due under this Section shall be payable promptly but in any event not later than ten (10) days after written demand therefor.

SECTION 8.04. Successors and Assigns.

(a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (c) of this Section) and, to the extent expressly contemplated hereby, the Related Parties of the Lender) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)(i) The Lender may assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld) of:

the Borrower, provided that the Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Lender within five (5) Business Days after having received notice thereof, and provided further that no consent of the Borrower shall be required for an assignment to an Affiliate of the Lender, an Approved Fund or, if an Event of Default has occurred and is continuing, any other assignee;

For the purposes of this Section 8.04(b), the term "Approved Fund" has the following meaning:

"Approved Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) the Lender, (b) an Affiliate of the Lender or (c) an entity or an Affiliate of an entity that administers or manages the Lender.

(c) The Lender may, without the consent of the Borrower, sell participations to one or more banks or other entities (a "Participant") in all or a portion of the Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it); provided that (i) the Lender's obligations under this Agreement shall remain unchanged; (ii) the Lender shall remain solely responsible to the other parties hereto for the performance of such obligations; and (iii) the Borrower shall continue to deal solely and directly with the Lender in connection with the Lender's rights and obligations under this Agreement. The Borrower agrees that each Participant shall be entitled to the

benefits of Sections 2.13, 2.14 and 2.15 (subject to the requirements and limitations therein) to the same extent as if it were the Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section; provided that such Participant shall not be entitled to receive any greater payment under Section 2.13 or 2.15, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.

To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 8.08 as though it were the Lender. If the Lender shall sell a participation, it shall, acting solely for this purpose as an agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under this Agreement or any other Loan Document (the "Participant Register"); provided that the Lender shall have no obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any Commitment, Loans or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such Commitment, Loan or other obligation is in registered form under Section 5f.103-1(c) of the U.S. Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and the Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(d)    The Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of the Lender, including without limitation any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release the Lender from any of its obligations hereunder or substitute any such pledgee or assignee for the Lender as a party hereto.

SECTION 8.05.  Survival.  All covenants, agreements, representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid and so long as the Commitment has not expired or terminated.  The provisions of Sections 2.13, 2.14, 2.15 and Section 8.03 shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Commitment or the termination of this Agreement or any other Loan Document or any provision hereof or thereof.

SECTION 8.06.  Counterparts; Integration; Effectiveness; Electronic Execution.

(a)    This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to the Lender constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Lender and when the Lender shall have

received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

(b)     Delivery of an executed counterpart of a signature page of this Agreement by fax, emailed pdf. or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement.   The words "execution," "signed," "signature," "delivery," and words of like import in or relating to any document to be signed in connection with this Agreement and the transactions contemplated hereby or thereby shall be deemed to include Electronic Signatures, deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

SECTION 8.07.  Severability.  Any provision of any Loan Document held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions thereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

SECTION 8.08.  Right of Setoff.  If an Event of Default shall have occurred and be continuing, the Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by the Lender or any Affiliate to or for the credit or the account of any Loan Party against any of and all the Secured Obligations, irrespective of whether or not the Lender shall have made any demand under the Loan Documents and although such obligations may be unmatured.  The rights of the Lender under this Section are in addition to other rights and remedies (including other rights of setoff) which the Lender may have.

SECTION 8.09.  Governing Law; Jurisdiction; Consent to Service of Process.

(a)  The Loan Documents (other than those containing a contrary express choice of law provision) shall be governed by and construed in accordance with the internal laws (and not the law of conflicts) of the State of Louisiana, but giving effect to federal laws applicable to national banks.

(b) Each Loan Party hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of any U.S. federal or Louisiana State court sitting in New Orleans, Louisiana in any action or proceeding arising out of or relating to any Loan Documents, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such state court or, to the extent permitted by law, in such federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement or any other Loan Document shall affect any right that the Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against any Loan Party or its properties in the courts of any jurisdiction.

(c) Each Loan Party hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of

venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in paragraph (b) of this Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d) Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 8.01. Nothing in this Agreement or any other Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

SECTION 8.10. <u>WAIVER OF JURY TRIAL</u>. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE OR OTHER AGENT (INCLUDING ANY ATTORNEY) OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 8.11. <u>Headings</u>. Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

SECTION 8.12. <u>Confidentiality</u>. The Lender agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any Governmental Authority (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by any Requirement of Law or by any subpoena or similar legal process, (d) to any other party to this Agreement, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (x) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (y) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Loan Parties and their obligations, (g) with the consent of the Borrower, (h) to holders of Equity Interests in the Borrower, (i) to any Person providing a Guarantee of all or any portion of the Secured Obligations, or (j) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section or (y) becomes available to the Lender on a non-confidential basis from a source other than the Borrower. For the purposes of this Section, "<u>Information</u>" means all information received from the Borrower relating to the Borrower or its business, other than any such information that is available to the Lender on a non-confidential basis prior to disclosure by the Borrower; <u>provided</u> that, in the case of information received from the Borrower after the date hereof, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

SECTION 8.13.  Nonreliance; Violation of Law.  The Lender hereby represents that it is not relying on or looking to any margin stock (as defined in Regulation U of the Board) for the repayment of the Borrowings provided for herein.  Anything contained in this Agreement to the contrary notwithstanding, the Lender shall not be obligated to extend credit to the Borrower in violation of any Requirement of Law.

SECTION 8.14.  USA PATRIOT Act.  The Lender is subject to the requirements of the USA PATRIOT Act and hereby notifies each Loan Party that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies such Loan Party, which information includes the name and address of such Loan Party and other information that will allow the Lender to identify such Loan Party in accordance with the USA PATRIOT Act.

SECTION 8.15.  Disclosure.  Each Loan Party hereby acknowledges and agrees that the Lender and/or its Affiliates from time to time may hold investments in, make other loans to or have other relationships with, any of the Loan Parties and their respective Affiliates.

SECTION 8.16.  Interest Rate Limitation.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively the "Charges"), shall exceed the maximum lawful rate (the "Maximum Rate") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to the Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by the Lender.

SECTION 8.17.  Marketing Consent.  The Borrower hereby authorizes the Lender, at its sole expense, but without any prior approval by the Borrower, to publish such tombstones and give such other publicity to this Agreement as it may from time to time determine in its sole discretion.  The foregoing authorization shall remain in effect unless the Borrower notifies the Lender in writing that such authorization is revoked.

ARTICLE IX

Loan Guaranty

SECTION 9.01.  Guaranty.  Each Loan Guarantor (other than those that have delivered a separate Guaranty) hereby agrees that it is jointly and severally liable for, and, as a primary obligor and not merely as surety, absolutely and unconditionally and irrevocably guarantees to the Secured Parties, the prompt payment when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter, of the Secured Obligations and all costs and expenses including, without limitation, all court costs and reasonable attorneys' and paralegals' fees (including allocated costs of in-house counsel and paralegals) and expenses paid or incurred by the Lender in endeavoring to collect all or any part of the Secured Obligations from, or in prosecuting any action against, the Borrower, any Loan Guarantor or any other guarantor of all or any part of the Secured Obligations (such costs and expenses, together with the Secured Obligations, collectively the "Guaranteed Obligations"); provided, however, that the definition of "Guaranteed Obligations" shall not create any guarantee by any Loan Guarantor of (or grant of security

interest by any Loan Guarantor to support, as applicable) any Excluded Swap Obligations of such Loan Guarantor for purposes of determining any obligations of any Loan Guarantor). Each Loan Guarantor further agrees that the Guaranteed Obligations may be extended or renewed in whole or in part without notice to or further assent from it, and that it remains bound upon its guarantee notwithstanding any such extension or renewal. All terms of this Loan Guaranty apply to and may be enforced by or on behalf of any domestic or foreign branch or Affiliate of the Lender that extended any portion of the Guaranteed Obligations.

SECTION 9.02.  Guaranty of Payment.  This Loan Guaranty is a guaranty of payment and not of collection. Each Loan Guarantor waives any right to require the Lender to sue the Borrower, any Loan Guarantor, any other guarantor of, or any other Person obligated for all or any part of the Guaranteed Obligations (each, an "Obligated Party"), or otherwise to enforce its payment against any collateral securing all or any part of the Guaranteed Obligations.

SECTION 9.03.  No Discharge or Diminishment of Loan Guaranty.

(a) Except as otherwise provided for herein, the obligations of each Loan Guarantor hereunder are unconditional and absolute and not subject to any reduction, limitation, impairment or termination for any reason (other than the indefeasible payment in full in cash of the Guaranteed Obligations), including:  (i) any claim of waiver, release, extension, renewal, settlement, surrender, alteration, or compromise of any of the Guaranteed Obligations, by operation of law or otherwise; (ii) any change in the corporate existence, structure or ownership of the Borrower or any other Obligated Party liable for any of the Guaranteed Obligations; (iii) any insolvency, bankruptcy, reorganization or other similar proceeding affecting any Obligated Party, or their assets or any resulting release or discharge of any obligation of any Obligated Party; or (iv) the existence of any claim, setoff or other rights which any Loan Guarantor may have at any time against any Obligated Party, the Lender or any other Person, whether in connection herewith or in any unrelated transactions.

(b)    The obligations of each Loan Guarantor hereunder are not subject to any defense or setoff, counterclaim, recoupment, or termination whatsoever by reason of the invalidity, illegality, or unenforceability of any of the Guaranteed Obligations or otherwise, or any provision of applicable law or regulation purporting to prohibit payment by any Obligated Party, of the Guaranteed Obligations or any part thereof.

(c)    Further, the obligations of any Loan Guarantor hereunder are not discharged or impaired or otherwise affected by: (i) the failure of the Lender to assert any claim or demand or to enforce any remedy with respect to all or any part of the Guaranteed Obligations; (ii) any waiver or modification of or supplement to any provision of any agreement relating to the Guaranteed Obligations; (iii) any release, non-perfection, or invalidity of any indirect or direct security for the obligations of the Borrower for all or any part of the Guaranteed Obligations or any obligations of any other Obligated Party liable for any of the Guaranteed Obligations; (iv) any action or failure to act by the Lender with respect to any collateral securing any part of the Guaranteed Obligations; or (v) any default, failure or delay, willful or otherwise, in the payment or performance of any of the Guaranteed Obligations, or any other circumstance, act, omission or delay that might in any manner or to any extent vary the risk of such Loan Guarantor or that would otherwise operate as a discharge of any Loan Guarantor as a matter of law or equity (other than the indefeasible payment in full in cash of the Guaranteed Obligations).

SECTION 9.04.  Defenses Waived.  To the fullest extent permitted by applicable law, each Loan Guarantor hereby waives any defense based on or arising out of any defense of the Borrower or any Loan Guarantor or the unenforceability of all or any part of the Guaranteed Obligations from any cause, or the cessation from any cause of the liability of the Borrower, any Loan Guarantor or any other Obligated

Party, other than the indefeasible payment in full in cash of the Guaranteed Obligations. Without limiting the generality of the foregoing, each Loan Guarantor irrevocably waives acceptance hereof, presentment, demand, protest and, to the fullest extent permitted by law, any notice not provided for herein, as well as any requirement that at any time any action be taken by any Person against any Obligated Party, or any other Person. Each Loan Guarantor confirms that it is not a surety under any state law and shall not raise any such law as a defense to its obligations hereunder. The Lender may, at its election, foreclose on any Collateral held by it by one or more judicial or nonjudicial sales, accept an assignment of any such Collateral in lieu of foreclosure or otherwise act or fail to act with respect to any collateral securing all or a part of the Guaranteed Obligations, compromise or adjust any part of the Guaranteed Obligations, make any other accommodation with any Obligated Party or exercise any other right or remedy available to it against any Obligated Party, without affecting or impairing in any way the liability of such Loan Guarantor under this Loan Guaranty, except to the extent the Guaranteed Obligations have been fully and indefeasibly paid in cash. To the fullest extent permitted by applicable law, each Loan Guarantor waives any defense arising out of any such election even though that election may operate, pursuant to applicable law, to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Loan Guarantor against any Obligated Party or any security.

SECTION 9.05.  Rights of Subrogation.  No Loan Guarantor will assert any right, claim or cause of action, including, without limitation, a claim of subrogation, contribution or indemnification that it has against any Obligated Party, or any collateral, until the Loan Parties and the Loan Guarantors have fully performed all their obligations to the Lender.

SECTION 9.06.  Reinstatement; Stay of Acceleration.  If at any time any payment of any portion of the Guaranteed Obligations (including a payment effected through exercise of a right of setoff) is rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, or reorganization of the Borrower or otherwise (including pursuant to any settlement entered into by a Secured Party in its discretion), each Loan Guarantor's obligations under this Loan Guaranty with respect to that payment shall be reinstated at such time as though the payment had not been made and whether or not the Lender is in possession of this Loan Guaranty. If acceleration of the time for payment of any of the Guaranteed Obligations is stayed upon the insolvency, bankruptcy or reorganization of the Borrower, all such amounts otherwise subject to acceleration under the terms of any agreement relating to the Guaranteed Obligations shall nonetheless be payable by the Loan Guarantors forthwith on demand by the Lender.

SECTION 9.07.  Information.  Each Loan Guarantor assumes all responsibility for being and keeping itself informed of the Borrower's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations and the nature, scope and extent of the risks that each Loan Guarantor assumes and incurs under this Loan Guaranty, and agrees that the Lender shall not have any duty to advise any Loan Guarantor of information known to it regarding those circumstances or risks.

SECTION 9.08.  Termination.  The Lender may continue to make loans or extend credit to the Borrower based on this Loan Guaranty until five (5) days after it receives written notice of termination from any Loan Guarantor. Notwithstanding receipt of any such notice, each Loan Guarantor will continue to be liable to the Lender for any Guaranteed Obligations created, assumed or committed to prior to the fifth day after receipt of the notice, and all subsequent renewals, extensions, modifications and amendments with respect to, or substitutions for, all or any part of such Guaranteed Obligations. Nothing in this Section 9.08 shall be deemed to constitute a waiver of, or eliminate, limit, reduce or otherwise impair any rights or remedies the Lender may have in respect of, any Default or Event of Default that shall exist under [clause (o) of] Article VII hereof as a result of any such notice of termination.

64

SECTION 9.09.  Taxes.  Each payment of the Guaranteed Obligations will be made by each Loan Guarantor without withholding for any Taxes, unless such withholding is required by law.  If any Loan Guarantor determines, in its sole discretion exercised in good faith, that it is so required to withhold Taxes, then such Loan Guarantor may so withhold and shall timely pay the full amount of withheld Taxes to the relevant Governmental Authority in accordance with applicable law.  If such Taxes are Indemnified Taxes, then the amount payable by such Loan Guarantor shall be increased as necessary so that, net of such withholding (including such withholding applicable to additional amounts payable under this Section), the Lender receives the amount it would have received had no such withholding been made.

SECTION 9.10.  Maximum Liability.  Notwithstanding any other provision of this Loan Guaranty, the amount guaranteed by each Loan Guarantor hereunder shall be limited to the extent, if any, required so that its obligations hereunder shall not be subject to avoidance under Section 548 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law.  In determining the limitations, if any, on the amount of any Loan Guarantor's obligations hereunder pursuant to the preceding sentence, it is the intention of the parties hereto that any rights of subrogation, indemnification or contribution which such Loan Guarantor may have under this Loan Guaranty, any other agreement or applicable law shall be taken into account.

SECTION 9.11.  Contribution.

(a)            To the extent that any Loan Guarantor shall make a payment under this Loan Guaranty (a "Guarantor Payment") which, taking into account all other Guarantor Payments then previously or concurrently made by any other Loan Guarantor, exceeds the amount which otherwise would have been paid by or attributable to such Loan Guarantor if each Loan Guarantor had paid the aggregate Guaranteed Obligations satisfied by such Guarantor Payment in the same proportion as such Loan Guarantor's "Allocable Amount" (as defined below) (as determined immediately prior to such Guarantor Payment) bore to the aggregate Allocable Amounts of each of the Loan Guarantors as determined immediately prior to the making of such Guarantor Payment, then, following indefeasible payment in full in cash of the Guarantor Payment and the Guaranteed Obligations (other than Unliquidated Obligations that have not yet arisen), and the Commitment has terminated or expired, and this Agreement, the Swap Agreement Obligations and the Banking Services Obligations have terminated, such Loan Guarantor shall be entitled to receive contribution and indemnification payments from, and be reimbursed by, each other Loan Guarantor for the amount of such excess, pro rata based upon their respective Allocable Amounts in effect immediately prior to such Guarantor Payment.

(b)            As of any date of determination, the "Allocable Amount" of any Loan Guarantor shall be equal to the excess of the fair saleable value of the property of such Loan Guarantor over the total liabilities of such Loan Guarantor (including the maximum amount reasonably expected to become due in respect of contingent liabilities, calculated, without duplication, assuming each other Loan Guarantor that is also liable for such contingent liability pays its ratable share thereof), giving effect to all payments made by other Loan Guarantors as of such date in a manner to maximize the amount of such contributions.

(c)            This Section 9.11 is intended only to define the relative rights of the Loan Guarantors, and nothing set forth in this Section 9.11 is intended to or shall impair the obligations of the Loan Guarantors, jointly and severally, to pay any amounts as and when the same shall become due and payable in accordance with the terms of this Loan Guaranty.

(d)            The parties hereto acknowledge that the rights of contribution and indemnification hereunder shall constitute assets of the Loan Guarantor or Loan Guarantors to which such contribution and indemnification is owing.

(e)        The rights of the indemnifying Loan Guarantors against other Loan Guarantors under this Section 9.11 shall be exercisable upon the full and indefeasible payment of the Guaranteed Obligations in cash (other than Unliquidated Obligations that have not yet arisen) and the termination or expiry of the Commitment and the termination of this Agreement, the Swap Agreement Obligations and the Banking Services Obligations.

SECTION 9.12.    Liability Cumulative.    The liability of each Loan Party as a Loan Guarantor under this Article IX is in addition to and shall be cumulative with all liabilities of each Loan Party to the Lender under this Agreement and the other Loan Documents to which such Loan Party is a party or in respect of any obligations or liabilities of the other Loan Parties, without any limitation as to amount, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary.

SECTION 9.13.    Keepwell.    Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Loan Party to honor all of its obligations under this Guarantee in respect of a Swap Obligation (provided, however, that each Qualified ECP Guarantor shall only be liable under this Section 9.13 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 9.13 or otherwise under this Loan Guaranty voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). Except as otherwise provided herein, the obligations of each Qualified ECP Guarantor under this Section 9.13 shall remain in full force and effect until the termination of all Swap Obligations. Each Qualified ECP Guarantor intends that this Section 9.13 constitute, and this Section 9.13 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Loan Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

[Signature pages follow.]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

INTERNATIONAL SHIPHOLDING CORPORATION

By:_____
    Name:
    Title:

CENTRAL GULF LINES, INC.

By:_____
    Name:
    Title:

WATERMAN STEAMSHIP CORPORATION

By:_____
    Name:
    Title:

N.W. JOHNSEN & CO., INC.

By:_____
    Name:
    Title:

LMS SHIPMANAGEMENT, INC.

By:_____
    Name:
    Title:

COASTAL CARRIERS, INC.

By:_____
    Name:
    Title:

U.S. UNITED OCEAN SERVICES, LLC

By:_____
    Name:
    Title:

[Signatures continued on next page.]

MARY ANN HUDSON, LLC

By:_____
     Name:
     Title:

SHEILA MCDEVITT, LLC

By:_____
     Name:
     Title:

JPMORGAN CHASE BANK, N.A.

By:_____
     Name: Donald K. Hunt
     Title:

### SCHEDULE 3.06

Disclosed Matters

### SCHEDULE 3.12

Material Agreements

### SCHEDULE 3.14

Insurance

### SCHEDULE 3.15

Capitalization and Subsidiaries

### SCHEDULE 3.22

Affiliate Transactions

### SCHEDULE 3.24

Other Representations

### SCHEDULE 6.01

Existing Indebtedness

### SCHEDULE 6.02

Existing Liens

### SCHEDULE 6.04

Existing Investments

### SCHEDULE 6.10

Existing Restrictions

**EXHIBIT A**

COMPLIANCE CERTIFICATE

To:    JPMorgan Chase Bank, N.A.

This Compliance Certificate ("Certificate"), for the period ended _____ __, 20__, is furnished pursuant to that certain Credit Agreement dated as of _____, 2017 (as amended, restated, modified, renewed or extended from time to time, the "Agreement") among International Shipholding Corporation (the "Borrower"), the other Loan Parties, and JPMorgan Chase Bank, N.A., as Lender. Unless otherwise defined herein, capitalized terms used in this Certificate have the meanings ascribed thereto in the Agreement.

THE UNDERSIGNED HEREBY CERTIFIES THAT:

1.    I am the _____ of the Borrower and I am authorized to deliver this Certificate on behalf of the Borrower and its Subsidiaries;

2.    I have reviewed the terms of the Agreement and I have made, or have caused to be made under my supervision, a detailed review of the compliance of the Borrower and its Subsidiaries with the Agreement during the accounting period covered by the attached financial statements (the "Relevant Period");

3.    The attached financial statements of the Borrower and, as applicable, its Subsidiaries and/or Affiliates for the Relevant Period: (a) have been prepared on an accounting basis (the "Accounting Method") consistent with the requirements of the Agreement and, except as may have been otherwise expressly agreed to in the Agreement, in accordance with GAAP consistently applied, and (b) to the extent that the attached are not the Borrower's annual fiscal year end statements, are subject to normal year-end audit adjustments and the absence of footnotes;

4.    The examinations described in paragraph 2 did not disclose and I have no knowledge of, except as set forth below, (a) the existence of any condition or event which constitutes a Default or an Event of Default under the Agreement or any other Loan Document during or at the end of the Relevant Period or as of the date of this Certificate or (b) any change in the Accounting Method or in the application thereof that has occurred since the date of the annual financial statements delivered to the Lender in connection with the closing of the Agreement or subsequently delivered as required in the Agreement;

5.    I hereby certify that, except as set forth below, no Loan Party has changed (i) its name, (ii) its chief executive office, (iii) its principal place of business, (iv) the type of entity it is or (v) its state of incorporation or organization without having given the Lender the notice required by Section ___ of the Security Agreement;

6.    The representations and warranties of the Loan Parties set forth in the Loan Documents are true and correct as of the date hereof, except to the extent that any such representation or warranty specifically refers to an earlier date, in which case it is true and correct only as of such earlier date; and

7.    Schedule I attached hereto sets forth financial data and computations evidencing the Borrower's compliance with certain covenants of the Agreement, all of which data and computations are true, complete and correct.

1

Described below are the exceptions, if any, referred to in paragraph 4 hereof by listing, in detail, the (i) nature of the condition or event, the period during which it has existed and the action which the Borrower has taken, is taking, or proposes to take with respect to each such condition or event or (ii) change in the Accounting Method or the application thereof and the effect of such change on the attached financial statements:

_____
_____
_____

The foregoing certifications, together with the computations set forth in Schedule I and Schedule II hereto and the financial statements delivered with this Certificate in support hereof, are made and delivered this __ day of _____, ____.

_____

By:_____

      Name:_____

      Title:_____

2

Schedule I to Compliance Certificate


Compliance as of _____, ____ with
Provisions of Section 6.12 of the Agreement

1

**EXHIBIT B**

JOINDER AGREEMENT

THIS JOINDER AGREEMENT (this "Agreement"), dated as of [      ], is entered into between _____, a _____ (the "New Subsidiary") and JPMORGAN CHASE BANK, N.A. (the "Lender") under that certain Credit Agreement dated as of _____, 2017 (as the same may be amended, modified, extended or restated from time to time, the "Credit Agreement") among International Shipholding Corporation (the "Borrower"), the other Loan Parties party thereto, and the Lender. All capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in the Credit Agreement.

The New Subsidiary and the Lender, hereby agree as follows:

1.      The New Subsidiary hereby acknowledges, agrees and confirms that, by its execution of this Agreement, the New Subsidiary will be deemed to be a Loan Party under the Credit Agreement and a "Loan Guarantor" for all purposes of the Credit Agreement and shall have all of the obligations of a Loan Party and a Loan Guarantor thereunder as if it had executed the Credit Agreement. The New Subsidiary hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions contained in the Credit Agreement, including without limitation (a) all of the representations and warranties of the Loan Parties set forth in Article III of the Credit Agreement, (b) all of the covenants set forth in Articles V and VI of the Credit Agreement, and (c) all of the guaranty obligations set forth in Article IX of the Credit Agreement.  Without limiting the generality of the foregoing terms of this paragraph 1, the New Subsidiary, subject to the limitations set forth in Section 9.10 and 9.13 of the Credit Agreement, hereby guarantees, jointly and severally with the other Loan Guarantors, to the Lender, as provided in Article IX of the Credit Agreement, the prompt payment and performance of the Guaranteed Obligations in full when due (whether at stated maturity, as a mandatory prepayment, by acceleration or otherwise) strictly in accordance with the terms thereof and agrees that if any of the Guaranteed Obligations are not paid or performed in full when due (whether at stated maturity, as a mandatory prepayment, by acceleration or otherwise), the New Subsidiary will, jointly and severally together with the other Loan Guarantors, promptly pay and perform the same, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Guaranteed Obligations, the same will be promptly paid in full when due (whether at extended maturity, as a mandatory prepayment, by acceleration or otherwise) in accordance with the terms of such extension or renewal.

2.      If required, the New Subsidiary is, simultaneously with the execution of this Agreement, executing and delivering such Collateral Documents (and such other documents and instruments) as requested by the Lender in accordance with the Credit Agreement.

3.      The address of the New Subsidiary for purposes of Section 8.01 of the Credit Agreement is as follows:

_____

_____

_____

4.      The New Subsidiary hereby waives acceptance by the Lender of the guaranty by the New Subsidiary upon the execution of this Agreement by the New Subsidiary.

1

5.    This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all of which together shall constitute one and the same instrument.

6.    THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF LOUISIANA.

IN WITNESS WHEREOF, the New Subsidiary has caused this Agreement to be duly executed by its authorized officer, and the Lender, has caused the same to be accepted by its authorized officer, as of the day and year first above written.

[NEW SUBSIDIARY]

By:_____
Name:_____
Title:_____

Acknowledged and accepted:

JPMORGAN CHASE BANK, N.A.

By:_____
Name:_____
Title:_____

2

# EXHIBIT B[4]

## Schedule of Assumed Contracts and Leases[5] and Proposed Cure Amounts[6]

---

[4] The inclusion of a contract or lease on **Exhibit B** shall not be deemed an admission that such contract is an executory contract or unexpired lease, or that it is a binding, valid, and enforceable contract. The Debtors hereby expressly reserve the right to assert that any agreement listed on **Exhibit B** does not constitute an executory contract or unexpired lease within the meaning of Bankruptcy Code section 365 and to amend **Exhibit B** in accordance with Article 8 of the Plan.

[5] Pursuant to the Plan as proposed, effective as of the Effective Date, all Executory Contracts and Unexpired Leases are assumed, except for an Executory Contract or Unexpired Lease that (i) has previously been assumed or rejected pursuant to a Final Order of the Bankruptcy Court, (ii) is specifically designated as an Executory Contract or Unexpired Lease to be rejected on the Schedule of Rejected Contracts and Leases or is otherwise expressly rejected pursuant to the Plan, (iii) is the subject of a separate (a) assumption motion filed by the Debtors (with the consent of SEACOR) or (b) rejection motion filed by the Debtors (with the consent of SEACOR) under section 365 of the Bankruptcy Code prior to the Confirmation Date, or (iv) is the subject of a pending objection regarding a Cure Dispute. Plan at Art. 8.1.

[6] Pursuant to the Plan as proposed, the proposed Cure Amount for any Executory Contract or Unexpired Lease not listed on the schedule shall be $0.00. Plan at Art. 8.2.1.

# International Shipholding Corporation
## Executory Contracts - Assume
### As of February 02, 2017

| Debtor Name | Contract Counterparty | Description of Contract or Lease and Nature of Debtor's Interest | Cure Amount ($) |
|---|---|---|---|
| Central Gulf Lines, Inc. | MARAD | MSP Operating Agreement 58 | $ 0.00 |
| Central Gulf Lines, Inc. | MARAD | MSP Operating Agreement 59 | $ 0.00 |
| Central Gulf Lines, Inc. | MARAD | MSP Operating Agreement 60 | $ 0.00 |
| Central Gulf Lines, Inc. | MARAD | MSP Operating Agreement 61 | $ 0.00 |
| Central Gulf Lines, Inc. | USTRANSCOM | VISA HTC711-16-D-WV09 | $ 0.00 |
| Central Gulf Lines, Inc. | USTRANSCOM | USC-8 HTC711-16-D-W005 | $ 0.00 |
| Central Gulf Lines, Inc. | Washington Maritime | Broker Commission | $ 0.00 |
| Waterman Steamship Corporation | MARAD | MSP Operating Agreement 104 | $ 0.00 |
| Waterman Steamship Corporation | MARAD | MSP Operating Agreement 105 | $ 0.00 |
| Waterman Steamship Corporation | USTRANSCOM | VISA HTC711-16-D-WV56 | $ 0.00 |
| Gulf South Shipping PTE LTD | CG Railway, Inc. | Charterparty (Bali Sea) | $ 0.00 |
| Gulf South Shipping PTE LTD | CG Railway, Inc. | Charterparty (Banda Sea) | $ 0.00 |
| LMS Shipmanagement, Inc | Wallem Shipmanagement | Bali Sea/Banda Sea Shipman | $ 0.00 |
| International Shipholding Corporation | Meridian Global Consulting | Security guard services on vessels | $ 0.00 |
| LMS Shipmanagement, Inc | MacGregor USA, Inc. | Full inspection of Cargo Access Gear (Ramps) | $ 0.00 |
| LMS Shipmanagement, Inc | MacGregor/ CargoTec | Full inspection of Cargo Access Gear (Ramps) | $ 0.00 |
| LMS Shipmanagement, Inc | Radio Holland | Nav and Communication equipment service | $ 0.00 |
| LMS Shipmanagement, Inc | Radio Holland | Nav and Communication equipment service | $ 0.00 |
| U.S. United Ocean Services, LLC | Iron Mountain | Off-site Storage | $ 1,501.87 |
| U.S. United Ocean Services, LLC | Portserv International | Stevedoring | $ 0.00 |
| International Shipholding Corporation | NOLA | Office lease: landlord | $ 1,702.89 |
| Mobile/Daphney | | | $ 0.00 |
| Central Gulf Lines, Inc. | HBS | Ship Agency | $ 147,757.77 |
| Central Gulf Lines, Inc. | HBS | Brokerage | $ 0.00 |
| Central Gulf Lines, Inc. | Yusen Navtech Co. Ltd | Maintenance Advisor | $ 0.00 |
| International Shipholding Corporation | Morrison & Head, LP | Property Tax Valuation | $ 0.00 |
| International Shipholding Corporation | Premium Parking | Parking Garage lease: lessor | $ 3,150.00 |
| International Shipholding Corporation | RSA | Parking garage | $ 0.00 |
| International Shipholding Corporation | Shred-It | Document Handling vendor: vendor contract | $ 661.64 |
| Frascati Shops, Inc. | Express Services Inc. | Temporary Employment Services | $ 0.00 |
| Frascati Shops, Inc. | Clark Personnel, Inc. | Temporary Employment Services | $ 3,142.80 |
| Frascati Shops, Inc. | AlwaysCare | Dental & Vision Insurance | $ 0.00 |
| Frascati Shops, Inc. | Blue Cross Blue Shield AL | Medical Insurance | $ 0.00 |
| Frascati Shops, Inc. | Infirmary Occupational Health | Pre-Employment Drug Testing | $ 359.00 |
| International Shipholding Corporation | Discovery Benefits | Flexible Spending | $ 0.00 |

# International Shipholding Corporation
## Executory Contracts - Assume
## As of February 02, 2017

| Debtor Name | Contract Counterparty | Description of Contract or Lease and Nature of Debtor's Interest | Cure Amount ($) |
|---|---|---|---|
| International Shipholding Corporation | MetLife | Dental Insurance | $ 0.00 |
| International Shipholding Corporation | Milliman | Pension Actuary | $ 0.00 |
| International Shipholding Corporation | TRowe Price | 401K | $ 0.00 |
| International Shipholding Corporation | United Healthcare | Medical & Vision Insurance | $ 0.00 |
| International Shipholding Corporation | Whitney Bank | Pension Trustee | $ 0.00 |
| International Shipholding Corporation | Zee Medical | First Aid vendor: vendor contract | $ 0.00 |
| International Shipholding Corporation | Reliance Standard Life | Life Insurance | $ 0.00 |
| Claims | | ICC – Insurance & Claims software, migrating to Inform, old asbestos claims | $ 0.00 |
| Company Website | GoDaddy and DNS Services | Website registration for ISH, WSC, CGL, FSI and CG Railway | $ 0.00 |
| Infrastructure Technology | Ecessa | Ecessa Powerlink bandwidth aggregator | $ 0.00 |
| IT Systems Security | TrendMicro | TrendMicro endpoint protection security solution | $ 0.00 |
| Operations | ALK | PC Miler ? | $ 0.00 |
| Vessel Software | | ECDIS Electronic Chart Display and Information System. Chart downloads. | $ 0.00 |
| Vessel Software | | FleetTrack vessel tracking website | $ 0.00 |
| Vessel Software | Polestar | SSAS - Shipboard security system. Polestar Purplefinder shipboard security system | $ 0.00 |
| Claims | INFORM Applications | Insurance & Claims SaaS solution managed by the claims department, Paid for a year , but not completely live | $ 0.00 |
| Claims | TECNORisk, LLC | Tecnoclaims from TecnoRisk LLC, Migrating to Inform, We will need to continue until Insurance& Claims can complete migration work with Inform. | $ 0.00 |
| Communications | Mediacom Southeast LLC | Data Line to Hwy 98 Bldng., Daphne.  105/10 Mbps, $360/ mo | $ 0.00 |
| Communications | Southern Light, LLC | Data Line to Papermill Road Mobile (FSI Railcar Repair Yard), 50/50 Mbps, $650 /mo | $ 1,320.00 |
| Communications | Cox Communications Louisiana, LLC | Data Line to Poydras Street, New Orleans 100/20 Mbps, $330/ mo, | $ 0.00 |
| Communications | Harbor Communications | Fax and data circuit for CGR Trailer at state docks, 6MB down, 1MB up for $110 /month. | $ 2,297.72 |
| Communications | RAZORLINE | Hosted office VOIP phone system used for most locations | $ 0.00 |
| Financials/HRMS | Infor (US), Inc. | ERP System (Lawson) - AP, AR, GL, SL (Strategic Ledger), Assets, HR, Payroll, Benefits | $ 0.00 |
| Financials/HRMS | Lexmark | ImageNow AP & HR Document Imaging/ Workflow for AP coders/approvers | $ 0.00 |

# International Shipholding Corporation
## Executory Contracts - Assume
## As of February 02, 2017

| Debtor Name | Contract Counterparty | Description of Contract or Lease and Nature of Debtor's Interest | Cure Amount ($) |
|---|---|---|---|
| Financials/HRMS | MHC Software Inc. | MHC Document Express - Checks, Tax Forms, Pay stubs, All companies (Forms printing) | $ 0.00 |
| Infrastructure Technology | TSA, Inc. | HP 3PAR NAS storage solution for the data center | $ 0.00 |
| Infrastructure Technology | Park Place Technologies LLC | Park Place provides post warranty maintenance on select equipment at specified locations. Each office has a local Domain Controller, HP 7000 blade servers, Cisco 3750 GB switches, ASA firewalls (5) | $ 0.00 |
| Infrastructure Technology | Sungard Availability Services, LP | Sungard in Dallas is the DR site | $ 3,260.00 |
| IT Systems Security | Zscaler, Inc. | Zscaler internet endpoint protection and logging between users and internet | $ 0.00 |
| Operations | ABS Nautical Systems | ABS NS5 - Nautical Systems (5.5) - Marine payroll and purchasing, office users supporting vessels, QSMS, Prev Maint | $ 0.00 |
| Operations | Bloksberg | Flagship ACE software hosting - Bookings, Manifests & Customs Waterman Supplemental Cargo & CGRailway. Customs & bill of lading. Split between CGR & military cargo. | $ 2,123.29 |
| Operations | Tapestry Solutions, Inc. | ICODES  - Military cargo load software, if we want to carry military cargo, ICODES = Integrated Computerized Deployment System. To satisfy conveyance load-planning demand of the US Army and Marine Corps. | $ 0.00 |
| Operations | GE Transportation (formerly from RMI) | RailConnect 360:  ExpressYard Railcar Asset Management System - Railcar Management and Repair Systems, Inherited when bought FSI, SaaS solution also | $ 0.00 |
| Operations | ShipServ Ltd. | Shipserve - Integrates with NS5 for PO quotes, just buyers use | $ 0.00 |
| Operations | Veson Nautical Corporation | Veson Nautical IMOS 7  UOS vessel management - Voyage Management | $ 0.00 |
| Tax | BSI | BSI payroll tax data for Lawson | $ 0.00 |
| Vessel Communications | Inmarsat | Satellite Communications - Inmarsat XPressLink/ Globe iFusion, Not in IT budget but they support service and code/ approve invoices. | $ 76,923.90 |
| Vessel Software | Inmarsat | Crew email via GlobeWireless, GlobeEmail (WSC, CGL & UOS), used by each person on vessel, vessel users have 4 to 5 workstations on each ship that have Outlook. Globe email is by vessel and position., Included with vessel comms costs | $ 0.00 |

# EXHIBIT C[7]

## Schedule of Rejected Contracts and Leases

---

[7] The inclusion of a contract or lease on **Exhibit C** shall not be deemed an admission that such contract is an executory contract or unexpired lease, or that it is a binding, valid, and enforceable contract. The Debtors hereby expressly reserve the right to assert that any agreement listed **Exhibit C** does not constitute an executory contract or unexpired lease within the meaning of Bankruptcy Code section 365 and to amend **Exhibit C** in accordance with Article 8 of the Plan.

# International Shipholding Corporation
## Executory Contracts - Reject
## As of February 02, 2017

| Debtor Name | Contract Counterparty | Description of Contract or Lease and Nature of Debtor's Interest |
| --- | --- | --- |
| Central Gulf Lines, Inc. | Nippon Yusen Kaisha | Green Lake Time Charter |
| Central Gulf Lines, Inc. | Nippon Yusen Kaisha | Green Bay Time Charter |
| Central Gulf Lines, Inc. | Nippon Yusen Kaisha | Green Cove Time Charter |
| Central Gulf Lines, Inc. | Nippon Yusen Kaisha | Green Ridge Time Charter |
| Central Gulf Lines, Inc. | Nippon Yusen Kaisha | Green Dale Time Charter |
| LCI Shipholdings, Inc | Oslo Bulk Holding | OSLO WAVE Bareboat Charter |
| Waterman Steamship Corporation | Patriot Shipping LLC | OCEAN GIANT Bareboat Charter |
| Waterman Steamship Corporation | Patriot Shipping LLC | OCEAN GLOBE Bareboat Charter |
| Waterman Steamship Corporation | US Ocean LLC | OCEAN GIANT Time Charter |
| rom: | US Ocean LLC | OCEAN GLOBE Time Charter |
| Waterman Steamship Corporation | Crowley Technical Management | OCEAN GLOBE Shipman |
| Waterman Steamship Corporation | Crowley Technical Management | OCEAN GIANT shipman |
| LMS Shipmanagement, Inc | Wallem Shipmanagement | Side Letter Agreement addressing the maximum deposit |
| LMS Shipmanagement, Inc | Wallem Shipmanagement | Green Dale Shipman |
| Waterman Steamship Corporation | Patriot Shipping LLC, US Ocean LLC | Advance of Management Fee Agreement (including First Amendment) |
| Central Gulf Lines, Inc. | Nippon Yusen Kaisha | Memorandum of Understanding |
| Sulphur Carriers, Inc. | BMO Harris Equipment Finance Co. | Operating Lease for Sulphur Enterprise |
| Central Gulf Lines, Inc. | CapitalSource Bank | Operating Lease for Green Lake |
| Central Gulf Lines, Inc. | BB&T Equipment Finance Co. | Operating Lease for Green Cove |
| U.S. United Ocean Services, LLC | Tampa Electric Company | Transportation |
| U.S. United Ocean Services, LLC | The Mosaic Company | Transportation |
| Mary Ann Hudson, LLC | Brayton Point Energy, LLC (Dynegy) | Transportation |
| U.S. United Ocean Services, LLC | Koch Carbon UK Limited | Transportation |
| International Shipholding Corporation | Ecochlor | Ballast Water Management System |
| LMS Shipmanagement, Inc | EPSCO (Cyprus) LTD. | Fire and safety services |
| LMS Shipmanagement, Inc | Fastenal | Tools, Safety, Batteries, etc.. |
| LMS Shipmanagement, Inc | G.C. Maritime | Life Boat and Davit inspection |
| LMS Shipmanagement, Inc | Grainger | Tools, Safety, Batteries, etc.. |
| LMS Shipmanagement, Inc | International Paint | Paint |
| LMS Shipmanagement, Inc | SHANGHAI RESOLVE-SHENGMIN | OSRO - China |
| LMS Shipmanagement, Inc | Staples | Office Supplies & Cabin Items |
| LMS Shipmanagement, Inc | Subsistence - Sysco Foods - Houston | Sysco Foods |
| LMS Shipmanagement, Inc | Subsistence - Sysco Foods - Jacksonville | Sysco Foods |
| LMS Shipmanagement, Inc | Subsistence - Sysco Foods - West Coast Florida | Sysco Foods |
| LMS Shipmanagement, Inc | Subsistence - US Foods | US Foods |

# International Shipholding Corporation
## Executory Contracts - Reject
### As of February 02, 2017

| Debtor Name | Contract Counterparty | Description of Contract or Lease and Nature of Debtor's Interest |
|---|---|---|
| LMS Shipmanagement, Inc | Total Lub Marine | Lubricants |
| LMS Shipmanagement, Inc | Alaska  Prevention and Response Network | OSRO - ALASKA |
| LMS Shipmanagement, Inc | Clean Islands Council | OSRO - Hawaii |
| LMS Shipmanagement, Inc | ECM Maritime Services | Vessel response Plans |
| Sulphur Carriers, Inc. | Lloyd's Register North America | Fuel Oil Testing |
| Sulphur Carriers, Inc. | Lloyd's Register North America | Block Fee Agreement |
| U.S. United Ocean Services, LLC | Marine Towing of Tampa | Assist Tug Tampa |
| U.S. United Ocean Services, LLC | Wilder Corporation | Office lease |
| Central Gulf Lines, Inc. | National Response Corp. | OSRO - California |
| Central Gulf Lines, Inc. | OSROCO, LLC | OSRO Guam |
| International Shipholding Corporation | Brookfield Relocations | Relocation company |
| International Shipholding Corporation | CareerBuilder | Recruitment |
| International Shipholding Corporation | Community Coffee | Coffee vendor: vendor contract |
| International Shipholding Corporation | Ernst & Young - US NL SN | Tax Review and Advice |
| International Shipholding Corporation | JJ Keller & Associates, LLC | Legal Postings |
| International Shipholding Corporation | NeoPost/Mail Finance | Postage machine lease: lessor |
| International Shipholding Corporation | NeoPost/Mail Finance | Postage machine lease: lessor |
| International Shipholding Corporation | Wolters Kluwer | Tax Software |
| U.S. United Ocean Services, LLC | Iron Mountain | Shredding |
| International Shipholding Corporation | Robert Half International, Inc. | Temporary Employment Services |
| U.S. United Ocean Services, LLC | Pitney Bowes | Tampa Postage |
| U.S. United Ocean Services, LLC | Standard Coffee | Staff Coffee |
| U.S. United Ocean Services, LLC | Zee Medical | First Aid |
| U.S. United Ocean Services, LLC | Zephyrhills | Staff Water |
| International Shipholding Corporation | Erik L. Johnsen | Change of Control and Indemnification Agreement |
| International Shipholding Corporation | Fowler Business Group LLC dba RR Mergers & Acquisitions | Letter of Engagement for CG Railway |
| International Shipholding Corporation | Manny Estrada | Change of Control and Indemnification Agreement |
| International Shipholding Corporation | Aflac | Supplement Insurance |
| International Shipholding Corporation | Infirmary Health (iHealthy) | Wellness program |
| International Shipholding Corporation | Leavell Investments | Investment Advisors |
| International Shipholding Corporation | YMCA | Employee Gym Membership |
| International Shipholding Corporation | CHUBB Business Travel Accident | Business Travel Accident Ins. |
| International Shipholding Corporation | CIGNA | Expat Insurance |
| International Shipholding Corporation | Reliastar Life Ins. Co. (Voya Financial) | Life Insurance |

International Shipholding Corporation
Executory Contracts - Reject
As of February 02, 2017

| Debtor Name | Contract Counterparty | Description of Contract or Lease and Nature of Debtor's Interest |
|---|---|---|
| Protection & Indemnity/1 Year | The Standard Club Europe LTD. - 208250 | |
| Protection & Indemnity/1 Year | The Standard Club Europe LTD. - 208347 | |
| Marine Hull Package/War/LOH 1 Year | Navigators Insurance Co. - B0509MARHR1600084 | |
| Bumbershoot Liabilities/1 Year | ProSight Specialty Ins. -ML201600001272 and Navigators Ins. -Co. H016LIA00027402 | |
| Inland Marine - Equipment Floater & Rolling Stock/1 Year | Alterra America Insurance Co. -MAXA61M0050203 | |
| Marine General/1 Year | Navigators Insurance Co. - HI16LIA00027401 | |
| Special Risk Corporate Protection/3 Years | V.O. Schinnerer & Co., Inc. - SCI273610191 | |
| Commercial Property/1 Year | AmRisc, LLC (AmWINS of GA) - multiple subscribers (Lloyds) | |
| Commercial Auto/1 Year | Sentinel Insurance Co., LTD. - 83 UEN VV40443 K3 | |
| Ocean Marine Open Cargo/1 Year | Southern Marine and Aviation (Lloyd's) - 43285 | |
| Workers Compensation & Employers Liability/1 Year | PMA - 201501-04-54-63-7Y | |
| USL&H/1 Year | American Longshore Mutual Assn. (ALMA) - ALMA00995-04 | |
| Fiduciary Liability/2 Years | Continental Casualty Co. - 425422186 | |
| Directors & Officers Liability - Excess DIC/1 Year | Ace USA - DOX 023685553 | |
| Directors & Officers Liability/1 Year | Great American Ins. Co. - DFX1490932 | |
| Management Liability | Continental Casualty Co. - 387047868 | |
| Defense Base Act/1 Year | Ins. Co. of the State of Pennsylvania (AIG) - 13349350 | |
| Property Terrorism/1 Year | Lloyd's America - W1717414101 | |
| Foreign Commercial Lines Package/1 Year | Ins. Co. of the State of Pennsylvania (AIG) - WR10003181 | |
| Fidelity Bond and Crime Policy/3 Years | Zurich American Ins. Co. - 425422186 | |
| Marine War Insurance Breaches/1 Year | XL Catlin - B0509mARHR1500134 | |
| Marine War Insurance/1 Year | XL Catlin - B0509mARHR1600089 | |
| Financials/HRMS | Velocity Technology Solutions, Inc. | Applications hosting service for Infor, MHC & ImageNow |
| Infrastructure Technology | Venyu | Venyu backup and recovery service for the data center |
| Infrastructure Technology | Venyu | Venyu Data Center Co-location rent |
| IT Systems Security | Venyu | Venyu Sentinel intrusion detection Security as a Service powered by Alert Logic |
| Office Productivity | Microsoft | Exchange Online company email for all companies |

International Shipholding Corporation
Executory Contracts - Reject
As of February 02, 2017

| Debtor Name | Contract Counterparty | Description of Contract or Lease and Nature of Debtor's Interest |
|---|---|---|
| Communications | Cogent Communications | Data Line to Whitehall Street, NY (closed) |
| Infrastructure Technology | Microsoft | Windows software support non-Office 365 such as servers. |

For the avoidance of doubt, the Reorganized Debtors are not rejecting the insurance policies or agreements related to the indemnification of the Debtors with respect to alleged Claims related to asbestosis and asbestos-related malignancies.  These insurance policies, agreements and indemnification agreements include, but are not limited to the following documents:

- Stock Purchase Agreement, dated as of May 10, 1965, by and between Waterman Steamship Corporation, a New York corporation and McLean Industries, Inc., a Delaware corporation.

- Stipulated Judgment of Settlement and Dismissal and Final Judgment Approving Settlement, so-ordered on May 21, 1990, in connection with the following adversary proceeding: *Waterman Steamship Corporation v. Fulton P&I Underwriting Agency, Inc.*, Adv. No. 86-5460A (S.D.N.Y. Bankr.).

- Settlement agreement in connection with following litigation: *Sea-Land Service, Inc. v. Waterman Steamship Corporation*, 99 Civ. 3339 (JGK) (S.D.N.Y.).

- Settlement agreement in connection with the following litigation*: SL Service, Inc. et al v. The Protection & Indemnity Underwriting Syndicate et al.*, 00 Civ. 9831 (LAK) (S.D.N.Y.).

- Settlement agreement in connection with the following litigation: *SL Service, Inc. et al v. Marine Office of America Corp.*, 00 Civ. 0038 (LAK) (S.D.N.Y.).

- Settlement agreement in connection with the following litigation:  *American Steamship Owners Mutual Protection & Indemnity Association, Inc. v. Alcoa Steamship Co., Inc., et al.*, 04 Civ. 4309 (LAK)(JCF) (S.D.N.Y.).

**Central Gulf Lines, Inc. – Protection and Indemnity Policies**

| Club | Period of Coverage | | Policy No. |
|------|------|------|------|
| | From | To | |
| West of England | 2/20/1960 | 2/19/1976 | Per the applicable rules |
| | | | |
| American Club | 2/20/1976 | 2/20/1977 | A-3923 |
| American Club | 2/20/1976 | 2/20/1977 | A-3924 |
| American Club | 2/20/1976 | 2/20/1977 | A-3925 |
| American Club | 2/20/1976 | 2/20/1977 | A-3926 |
| American Club | 2/20/1976 | 2/20/1977 | A-3927 |
| American Club | 2/20/1976 | 2/20/1977 | A-3928 |
| American Club | 2/20/1976 | 2/20/1977 | A-3929 |
| American Club | 2/20/1976 | 2/20/1977 | A-3930 |
| American Club | "To Be Declared" | 2/20/1977 | A-3970 |
| American Club | 10/5/1976 | 2/20/1977 | A-3974 |
| American Club | 10/7/1976 | 2/20/1977 | A-3975 |
| American Club | | 2/20/1977 | A-3979 |
| American Club | 2/20/1977 | 2/20/1978 | A-3994 |
| American Club | 2/20/1977 | 2/20/1978 | A-3995 |
| American Club | 2/20/1977 | 2/20/1978 | A-3996 |
| American Club | 2/20/1977 | 2/20/1978 | A-3997 |
| American Club | 2/20/1977 | 2/20/1978 | A-3998 |
| American Club | 2/20/1977 | 2/20/1978 | A-3999 |
| American Club | 2/20/1977 | 2/20/1978 | A-4000 |
| American Club | 2/20/1977 | 2/20/1978 | A-4001 |
| American Club | 2/20/1977 | 2/20/1978 | A-4002 |
| American Club | 2/20/1977 | 2/20/1978 | A-4003 |
| American Club | 2/20/1977 | 2/20/1978 | A-4004 |
| American Club | 2/20/1977 | 2/20/1978 | A-4068 |
| American Club | 2/20/1978 | 2/20/1979 | A-5000 |
| American Club | 2/20/1978 | 2/20/1979 | A-5001 |
| American Club | 2/20/1978 | 2/20/1979 | A-5002 |
| American Club | 2/20/1978 | 2/20/1979 | A-5003 |
| American Club | 2/20/1978 | 2/20/1979 | A-5004 |
| American Club | 2/20/1978 | 2/20/1979 | A-5005 |
| American Club | 2/20/1978 | 2/20/1979 | A-5006 |
| American Club | 2/20/1978 | 2/20/1979 | A-5007 |
| American Club | 2/20/1978 | 2/20/1979 | A-5008 |

| | | | |
|---|---|---|---|
| American Club | 2/20/1978 | 2/20/1979 | A-5023 |
| American Club | 3/30/1978 | 2/20/1979 | A-5049 |
| | | | |
| GARD | 2/20/1979 | 2/19/1995 | Per the applicable rules |

**Waterman Steamship Corporation – Protection and Indemnity Policies**

| Club | Period of Coverage | | Policy No.(s) | Notes |
|------|------|------|------|------|
| | **From** | **To** | | |
| | | | | |
| Fulton | 1940 | 1946 | — | |
| Fulton | 1946 | 1947 | Swogger Agreement | |
| Fulton | 1947 | 1948 | Swogger Agreement | |
| Fulton | 1948 | 1949 | Swogger Agreement | |
| Fulton | 1949 | 1950 | Swogger Agreement | |
| Fulton | 1951 | 1952 | Swogger Agreement | |
| | | | | |
| UK P&I Club | 8/1/52 | 7/31/55 | Per the applicable rules | |
| | | | | |
| Fulton | 1955 | 1956 | Swogger Agreement | |
| Fulton | 1956 | 1957 | Swogger Agreement | |
| Fulton | 8/1/57 | 8/1/58 | P/9410 | |
| Fulton | 8/1/58 | 8/1/59 | P/9686 | |
| Fulton | 8/1/59 | 8/1/60 | P/9936 | |
| Fulton | 8/1/59 | 8/1/60 | P/9938 | |
| Fulton | 8/1/59 | 8/1/60 | P/9941 | |
| Fulton | 8/1/60 | 8/1/61 | P/10181 | |
| Fulton | 8/1/60 | 8/1/61 | P/10183 | |
| | | | | |
| MOAC | 8/1/61 | 8/1/62 | C-61076 | |
| MOAC | 8/1/61 | 8/1/62 | C-61077 | |
| MOAC | 5/30/62 | 8/1/62 | C-61130 | Insured as Waterman Steamship Corporation of Puerto Rico |
| MOAC | 8/1/62 | 8/1/63 | C-62070 | |
| MOAC | 8/1/62 | 8/1/63 | C-62071 | |

| | | | | |
|---|---|---|---|---|
| MOAC | 8/1/62 | 8/1/63 | C-62074 | Insured as Waterman Steamship Corporation of Puerto Rico |
| MOAC | 8/1/62 | 8/1/63 | C-62078 | |
| MOAC | 8/1/63 | 8/1/64 | C-63083 | |
| MOAC | 8/1/63 | 8/1/64 | C-63084 | |
| MOAC | 8/1/63 | 8/1/64 | C-63085 | |
| MOAC | 8/1/63 | 8/1/64 | C-63086 | |
| MOAC | 8/1/63 | 8/1/64 | C-63087 | |
| MOAC | 8/1/63 | 8/1/64 | C-63090 | Insured as Waterman Steamship Corporation of Puerto Rico |
| MOAC | 8/1/64 | 8/1/65 | C-64086 | |
| MOAC | 8/1/64 | 8/1/65 | C-64087 | |
| MOAC | 8/1/64 | 8/1/65 | C-64088 | |
| MOAC | 8/1/64 | 8/1/65 | C-64089 | |
| MOAC | 8/1/64 | 8/1/65 | C-64090 | |
| MOAC | 8/1/64 | 8/1/65 | C-64092 | |
| MOAC | 8/1/64 | 8/1/65 | C-64094 | Insured as Waterman Steamship Corporation of Puerto Rico |
| MOAC | 8/1/65 | 8/1/66 | C-65087 | Insured as Waterman Industries Corporation and Waterman Steamship Corporation |
| MOAC | 8/1/65 | 8/1/66 | C-65089 | |
| MOAC | 8/1/65 | 8/1/66 | C-65090 | |
| MOAC | 8/1/65 | 8/1/66 | C-65114 | |
| MOAC | 8/1/66 | 8/1/67 | C-66092 | |
| MOAC | 8/1/66 | 8/1/67 | C-66093 | |
| MOAC | 8/1/66 | 8/1/67 | C-66103 | |
| MOAC | 8/1/67 | 8/1/68 | C-67086 | |
| MOAC | 8/1/68 | 8/1/69 | C-68102 | |
| MOAC | 8/1/69 | 8/1/70 | C-69128 | |
| | | | | |
| Brittania | 8/1/70 | 2/19/1975 (this date needs to be confirmed) | Per the applicable rules | |
| | | | | |
| American | 2/20/75 | 2/20/76 | A-3868 | |

| | | | | |
|---|---|---|---|---|
| Club | | | | |
| American Club | 2/20/75 | 3/5/75 | A-3886 | |
| American Club | 2/20/76 | 2/20/77 | A-3921 | |
| American Club | 2/20/77 | 2/20/78 | A-4028 | |
| | | | | |
| London Club | 2/20/78 | 2/19/82 | Per the applicable rules | |
| | | | | |
| Standard Club | 2/20/82 | 2/19/95 | Per the applicable rules | |

**EXHIBIT D**

**Identification of Officers and Directors**

Set forth below are the officers and directors for each of the Reorganized Debtors, together with a brief biography for each officer and director.  Each officer shall hold the same position with respect to each Reorganized Debtor.

| Directors | Officers |
|---|---|
| Eric Fabrikant (Chairman) | Eric Fabrikant – Chief Executive Officer[8] |
| Daniel J. Thorogood | Daniel J. Thorogood – President[9] |
| Matthew R. Cenac | Matthew R. Cenac – Vice-President |
| Henry Nuzum[10] | Bruce – Weins – Vice-President & Secretary |
| | Lisa Manekin – Vice-President & Secretary |
| | Henry Nuzum – Chief Executive Officer & President[11] |

**Eric Fabrikant**
**Chief Operating Officer**
**SEACOR Holdings Inc.**

Eric Fabrikant is Co-Chief Operating Officer of SEACOR with oversight of Transportation Services, Witt O'Brien's and CLEANCOR Energy Solutions. Mr. Fabrikant served as Vice President of the Company from May 2009 through February 2015. In addition, Mr. Fabrikant is an officer and/or director of certain SEACOR subsidiaries. Prior to joining SEACOR, he spent five years at Nabors Industries where he held various positions.

**Daniel J. Thorogood**
**President**
**SEACOR Ocean Transport Inc**.

Dan Thorogood commenced his career at SEACOR's international offshore marine services division before moving to SEACOR's corporate office in New York in a business development capacity. In September 2005, shortly after the Seabulk acquisition, he relocated to SEACOR's corporate headquarters to act as assistant to the CEO. In November 2007, Mr. Thorogood was promoted to Senior Vice President of SEACOR Ocean Transport Inc. and in January 2009 he was appointed as President. Currently, he is responsible for SEACOR's deep-sea shipping, harbor towing, bunkering and short-sea shipping investments.

---

[8] Mr. Fabrikant shall not serve as an officer of Reorganized Waterman Steamship Corporation.

[9] Mr. Thorogood shall not serve as an officer of Reorganized Waterman Steamship Corporation.

[10] Mr. Nuzum shall serve as a director of Reorganized Waterman Steamship Corporation only.

[11] Mr. Nuzum shall serve as an officer of Reorganized Waterman Steamship Corporation only.

**Matthew R. Cenac**
**Executive Vice President and Chief Financial Officer**
**SEACOR Holdings Inc.**

Matthew Cenac is Executive Vice President and Chief Financial Officer. He served as Senior Vice President and Chief Financial Officer from August 2014 through February 2015. He served as Vice President and Chief Accounting Officer from August 2005 through August 2014. He was Corporate Controller of the Company from June 2003 through August 2005. In addition, Mr. Cenac is an officer and director of certain SEACOR subsidiaries. Prior to joining the Company, he was Controller of Pipeworks, Inc. from October 2001 through April 2003 and was a Senior Manager with Ernst & Young LLP from August 1987 until September 2001.

**Bruce Weins**
**Senior Vice President and Chief Accounting Officer**
**SEACOR Holdings Inc.**

Bruce Weins is Senior Vice President and Chief Accounting Officer. Mr. Weins served as Corporate Controller from July 2005 through February 2015. Mr. Weins served as Controller of Seabulk International, Inc. ("Seabulk") from January 2005 through July 2005 when it merged with the Company. Prior to joining Seabulk, Mr. Weins was employed by Deloitte & Touche LLP as an Audit Senior Manager from September 1995 through December 2004.

**Lisa Manekin**
**Treasurer**
**SEACOR Holdings Inc.**

Lisa Manekin is Treasurer since November 2008. From May 2007 through November 2008, Ms. Manekin worked for Ryder System, Inc. as a Senior Manager in Corporate Accounting. Ms. Manekin is a CPA and holds a Bachelor's degree in Business from Tulane University and an MBA from Vanderbilt University.

**Henry Nuzum**
**Vice President, Business Development Government Services**
**SEACOR Holdings Inc.**

Mr. Nuzum is Vice President Business Development, Government Services of SEACOR Holdings Inc. since 2009. Prior to his current position, he worked for four years in Dubai, UAE where he managed SEACOR's regional business and corporate development. From 2007-2009, Henry worked as a Special Assistant to Michael Vickers, Assistant Secretary of Defense. Previously, he had a brief stint with the House Armed Services Committee. In 2005, he worked in Iraq for the International Republican Institute, serving first in Baghdad and then as the Director of the Basra Office. Prior to his year in Iraq, Henry served in the Navy. He led a boarding party and combat strikes while aboard USS John S. McCain (DDG 56), completing two Arabian Gulf deployments in 2002-2003, and earning a Navy Achievement Medal and Navy Commendation Medal. In addition to his sea service, he rowed in two Olympic Games (setting the American record in the Men's Double) and two World Championships through the Navy

Sports Program.  He has earned an MA from Johns Hopkins School of Advanced International Studies, and an AB from Harvard University, where he was an NROTC midshipman and captained the Varsity Crew.  The Strategic Studies Institute and Armed Forces Journal have published his writing.

**EXHIBIT E**

**Form of By-Laws and Charter for Reorganized ISH**

# AMENDED AND RESTATED BYLAWS

## OF

## INTERNATIONAL SHIPHOLDING CORPORATION

### (hereinafter the "Corporation")

### ARTICLE I - STOCKHOLDERS

Section 1.        Annual Meeting.

An annual meeting of the stockholders, for the election of directors to succeed those whose terms expire and for the transaction of such other business as may properly come before the meeting, shall be held at such place, on such date, and at such time as the Board of Directors shall each year fix, which date shall be within 13 months of the last annual meeting of stockholders.

Section 2.        Special Meetings.

Special meetings of the stockholders, for any purpose or purposes prescribed in the notice of the meeting, may be called by the Board of Directors or the chief executive officer and shall be held at such place, on such date, and at such time as they or he or she shall fix.

Section 3.        Notice of Meetings.

Notice of the place, if any, date, and time of all meetings of the stockholders, the means of remote communications, if any, by which stockholders and proxyholders may be deemed to be present in person and vote at such meeting, and the record date for determining the stockholders entitled to vote at the meeting, if such date is different from the record date for determining stockholders entitled to notice of the meeting, shall be given, not less than 10 nor more than 60 days before the date on which the meeting is to be held, to each stockholder entitled to vote at such meeting as of the record date for determining the stockholders entitled to notice of the meeting, except as otherwise provided herein or required by law (meaning, here and hereinafter, as required from time to time by the Delaware General Corporation Law or the Certificate of Incorporation of the Corporation).

When a meeting is adjourned to another time or place, notice need not be given of the adjourned meeting if the time and place, if any, thereof, and the means of remote communications, if any, by which stockholders and proxyholders may be deemed to be present in person and vote at such adjourned meeting are announced at the meeting at which the adjournment is taken; provided, however, that if the date of any adjourned meeting is more than 30 days after the date for which the meeting was originally noticed, notice of the place, if any, date, and time of the adjourned meeting and the means of remote communications, if any, by which stockholders and

proxyholders may be deemed to be present in person and vote at such adjourned meeting, shall be given to each stockholder in conformity herewith.  If after the adjournment a new record date for stockholders entitled to vote is fixed for the adjourned meeting, the Board of Directors shall fix a new record date for notice of such adjourned meeting, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors and, except as otherwise required by law, shall not be more than 60 nor less than 10 days before the date of such adjourned meeting, and shall give notice of the adjourned meeting to each stockholder of record entitled to vote at such adjourned meeting as of the record date fixed for notice of such adjourned meeting.  At any adjourned meeting, any business may be transacted which might have been transacted at the original meeting.

Section 4.    Quorum.

At any meeting of the stockholders, the holders of a majority of all of the shares of the stock entitled to vote at the meeting, present in person or by proxy, shall constitute a quorum for all purposes, unless or except to the extent that the presence of a larger number may be required by law.  Where a separate vote by a class or classes or series is required, a majority of the shares of such class or classes or series present in person or represented by proxy shall constitute a quorum entitled to take action with respect to that vote on that matter.

If a quorum shall fail to attend any meeting, the chairman of the meeting or the holders of a majority of the shares of stock entitled to vote who are present, in person or by proxy, may adjourn the meeting to another place, if any, date, or time.

Section 5.    Organization.

Such person as the Board of Directors may have designated or, in the absence of such a person, the President of the Corporation or, in his or her absence, such person as may be chosen by the holders of a majority of the shares entitled to vote who are present, in person or by proxy, shall call to order any meeting of the stockholders and act as chairman of the meeting.  In the absence of the Secretary of the Corporation, the secretary of the meeting shall be such person as the chairman of the meeting appoints.

Section 6.    Conduct of Business.

The chairman of any meeting of stockholders shall determine the order of business and the procedure at the meeting, including such regulation of the manner of voting and the conduct of discussion as seem to him or her in order.  The date and time of the opening and closing of the polls for each matter upon which the stockholders will vote at the meeting shall be announced at the meeting.

Section 7.    Proxies and Voting.

At any meeting of the stockholders, every stockholder entitled to vote may vote in person or by proxy authorized by an instrument in writing or by a transmission permitted by law filed in accordance with the procedure established for the meeting.  Any copy, facsimile telecommunication or other reliable reproduction of the writing or transmission created pursuant to this paragraph may be substituted or used in lieu of the original writing or transmission for any

- 2 -

and all purposes for which the original writing or transmission could be used, provided that such copy, facsimile telecommunication or other reproduction shall be a complete reproduction of the entire original writing or transmission.

The Corporation may, and to the extent required by law, shall, in advance of any meeting of stockholders, appoint one or more inspectors to act at the meeting and make a written report thereof.  The Corporation may designate one or more alternate inspectors to replace any inspector who fails to act.  If no inspector or alternate is able to act at a meeting of stockholders, the person presiding at the meeting may, and to the extent required by law, shall, appoint one or more inspectors to act at the meeting.  Each inspector, before entering upon the discharge of his or her duties, shall take and sign an oath faithfully to execute the duties of inspector with strict impartiality and according to the best of his or her ability.  Every vote taken by ballots shall be counted by an inspector or inspectors appointed by the chairman of the meeting.

All elections shall be determined by a plurality of the votes cast, and except as otherwise required by law, all other matters shall be determined by a majority of the votes cast affirmatively or negatively.

Section 8.    Stock List.

The officer who has charge of the stock ledger of the Corporation shall, at least 10 days before every meeting of stockholders, prepare and make a complete list of stockholders entitled to vote at any meeting of stockholders, provided, however, if the record date for determining the stockholders entitled to vote is less than 10 days before the meeting date, the list shall reflect the stockholders entitled to vote as of the 10th day before the meeting date, arranged in alphabetical order and showing the address of each such stockholder and the number of shares registered in his or her name.  Such list shall be open to the examination of any stockholder for a period of at least 10 days prior to the meeting in the manner provided by law.

A stock list shall also be open to the examination of any stockholder during the whole time of the meeting as provided by law.  This list shall presumptively determine (a) the identity of the stockholders entitled to examine such stock list and to vote at the meeting and (b) the number of shares held by each of them.

Section 9.    Consent of Stockholders in Lieu of Meeting.

Any action required to be taken at any annual or special meeting of stockholders of the Corporation, or any action which may be taken at any annual or special meeting of the stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted and shall be delivered to the Corporation by delivery to its registered office in Delaware, its principal place of business, or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded.  Delivery made to the Corporation's registered office shall be made by hand or by certified or registered mail, return receipt requested.

- 3 -

#4818-9288-7616

Every written consent shall bear the date of signature of each stockholder who signs the consent and no written consent shall be effective to take the corporate action referred to therein unless, within 60 days of the earliest dated consent delivered to the Corporation, a written consent or consents signed by a sufficient number of holders to take action are delivered to the Corporation in the manner prescribed in the first paragraph of this Section.   A telegram, cablegram or other electronic transmission consenting to an action to be taken and transmitted by a stockholder or proxyholder, or by a person or persons authorized to act for a stockholder or proxyholder, shall be deemed to be written, signed and dated for the purposes of this Section to the extent permitted by law.   Any such consent shall be delivered in accordance with Section 228(d)(1) of the Delaware General Corporation Law.

Any copy, facsimile or other reliable reproduction of a consent in writing may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used, provided that such copy, facsimile or other reproduction shall be a complete reproduction of the entire original writing.

<u>ARTICLE II - BOARD OF DIRECTORS</u>

<u>Section 1</u>.      <u>Number and Term of Office</u>.

The number of directors who shall constitute the whole Board of Directors shall be such number as the Board of Directors shall from time to time have designated, except that in the absence of any such designation, such number shall be three (3).   Each director shall be elected for a term of one year and until his or her successor is elected and qualified, except as otherwise provided herein or required by law.

Whenever the authorized number of directors is increased between annual meetings of the stockholders, a majority of the directors then in office shall have the power to elect such new directors for the balance of a term and until their successors are elected and qualified.   Any decrease in the authorized number of directors shall not become effective until the expiration of the term of the directors then in office unless, at the time of such decrease, there shall be vacancies on the board which are being eliminated by the decrease.

<u>Section 2</u>.      <u>Vacancies</u>.

If the office of any director becomes vacant by reason of death, resignation, disqualification, removal or other cause, a majority of the directors remaining in office, although less than a quorum, may elect a successor for the unexpired term and until his or her successor is elected and qualified.

<u>Section 3</u>.      <u>Regular Meetings</u>.

Regular meetings of the Board of Directors shall be held at such place or places, on such date or dates, and at such time or times as shall have been established by the Board of Directors and publicized among all directors.   A notice of each regular meeting shall not be required.

- 4 -

Section 4.        Special Meetings.

Special meetings of the Board of Directors may be called by one-third of the directors then in office (rounded up to the nearest whole number) or by the President and shall be held at such place, on such date, and at such time as they or he or she shall fix.  Notice of the place, date, and time of each such special meeting shall be given to each director by whom it is not waived by mailing written notice not less than five days before the meeting or by telegraphing or telexing or by facsimile or electronic transmission of the same not less than 24 hours before the meeting.  Unless otherwise indicated in the notice thereof, any and all business may be transacted at a special meeting.

Section 5.        Quorum.

At any meeting of the Board of Directors, a majority of the total number of the whole Board of Directors shall constitute a quorum for all purposes.  If a quorum shall fail to attend any meeting, a majority of those present may adjourn the meeting to another place, date, or time, without further notice or waiver thereof.

Section 6.        Participation in Meetings By Conference Telephone.

Members of the Board of Directors, or of any committee thereof, may participate in a meeting of such Board of Directors or committee by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other and such participation shall constitute presence in person at such meeting.

Section 7.        Conduct of Business.

At any meeting of the Board of Directors, business shall be transacted in such order and manner as the Board of Directors may from time to time determine, and all matters shall be determined by the vote of a majority of the directors present, except as otherwise provided herein or required by law.  Action may be taken by the Board of Directors without a meeting if all members thereof consent thereto in writing or by electronic transmission, and the writing or writings or electronic transmission or transmissions are filed with the minutes of proceedings of the Board of Directors.  Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

Section 8.        Compensation of Directors.

Directors, as such, may receive, pursuant to resolution of the Board of Directors, fixed fees and other compensation for their services as directors, including, without limitation, their services as members of committees of the Board of Directors.

## ARTICLE III - COMMITTEES

Section 1.        Committees of the Board of Directors.

The Board of Directors may from time to time designate committees of the Board

- 5 -

of Directors, with such lawfully delegable powers and duties as it thereby confers, to serve at the pleasure of the Board of Directors and shall, for those committees and any others provided for herein, elect a director or directors to serve as the member or members, designating, if it desires, other directors as alternate members who may replace any absent or disqualified member at any meeting of the committee.  In the absence or disqualification of any member of any committee and any alternate member in his or her place, the member or members of the committee present at the meeting and not disqualified from voting, whether or not he or she or they constitute a quorum, may by unanimous vote appoint another member of the Board of Directors to act at the meeting in the place of the absent or disqualified member.

Section 2.        Conduct of Business.

Each committee may determine the procedural rules for meeting and conducting its business and shall act in accordance therewith, except as otherwise provided herein or required by law.  Adequate provision shall be made for notice to members of all meetings; one-third of the members shall constitute a quorum unless the committee shall consist of one or two members, in which event one member shall constitute a quorum; and all matters shall be determined by a majority vote of the members present.  Action may be taken by any committee without a meeting if all members thereof consent thereto in writing or by electronic transmission, and the writing or writings or electronic transmission or transmissions are filed with the minutes of the proceedings of such committee.  Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

## ARTICLE IV - OFFICERS

Section 1.        Generally.

The officers of the Corporation shall consist of a President, one or more Vice Presidents, a Secretary, a Treasurer and such other officers as may from time to time be appointed by the Board of Directors.  Officers shall be elected by the Board of Directors, which shall consider that subject at its first meeting after every annual meeting of stockholders.  Each officer shall hold office until his or her successor is elected and qualified or until his or her earlier resignation or removal.  Any number of offices may be held by the same person.

Section 2.        President.

The President shall be the chief executive officer of the Corporation.  Subject to the provisions of these Bylaws and to the direction of the Board of Directors, he or she shall have the responsibility for the general management and control of the business and affairs of the Corporation and shall perform all duties and have all powers which are commonly incident to the office of chief executive or which are delegated to him or her by the Board of Directors.  He or she shall have power to sign all stock certificates, contracts and other instruments of the Corporation which are authorized and shall have general supervision and direction of all of the other officers, employees and agents of the Corporation.

- 6 -

Section 3.    Vice President.

Each Vice President shall have such powers and duties as may be delegated to him or her by the Board of Directors.  One Vice President shall be designated by the Board of Directors to perform the duties and exercise the powers of the President in the event of the President's absence or disability.

Section 4.    Treasurer.

The Treasurer shall have the responsibility for maintaining the financial records of the Corporation.  He or she shall make such disbursements of the funds of the Corporation as are authorized and shall render from time to time an account of all such transactions and of the financial condition of the Corporation.  The Treasurer shall also perform such other duties as the Board of Directors may from time to time prescribe.

Section 5.    Secretary.

The Secretary shall issue all authorized notices for, and shall keep minutes of, all meetings of the stockholders and the Board of Directors.  He or she shall have charge of the corporate books and shall perform such other duties as the Board of Directors may from time to time prescribe.

Section 6.    Delegation of Authority.

The Board of Directors may from time to time delegate the powers or duties of any officer to any other officers or agents, notwithstanding any provision hereof.

Section 7.    Removal.

Any officer of the Corporation may be removed at any time, with or without cause, by the Board of Directors.

Section 8.    Action with Respect to Securities of Other Corporations.

Unless otherwise directed by the Board of Directors, the President or any officer of the Corporation authorized by the President shall have power to vote and otherwise act on behalf of the Corporation, in person or by proxy, at any meeting of stockholders of or with respect to any action of stockholders of any other corporation in which this Corporation may hold securities and otherwise to exercise any and all rights and powers which this Corporation may possess by reason of its ownership of securities in such other corporation.

ARTICLE V - STOCK

Section 1.    Certificates of Stock.

Each holder of stock represented by certificates shall be entitled to a certificate signed by, or in the name of the Corporation by, the President or a Vice President, and by the Secretary or an Assistant Secretary, or the Treasurer or an Assistant Treasurer, certifying the

- 7 -

number of shares owned by him or her.  Any or all of the signatures on the certificate may be by facsimile.

Section 2.    Transfers of Stock.

Transfers of stock shall be made only upon the transfer books of the Corporation kept at an office of the Corporation or by transfer agents designated to transfer shares of the stock of the Corporation.  Except where a certificate is issued in accordance with Section 4 of Article V of these Bylaws, an outstanding certificate, if one has been issued, for the number of shares involved shall be surrendered for cancellation before a new certificate, if any, is issued therefor.

Section 3.    Record Date.

In order that the Corporation may determine the stockholders entitled to notice of any meeting of stockholders or any adjournment thereof, the Board of Directors may, except as otherwise required by law, fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall not be more than 60 nor less than 10 days before the date of such meeting.  If the Board of Directors so fixes a date, such date shall also be the record date for determining the stockholders entitled to vote at such meeting unless the Board of Directors determines, at the time it fixes such record date, that a later date on or before the date of the meeting shall be the date for making such determination.  If no record date is fixed by the Board of Directors, the record date for determining stockholders entitled to notice of and to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held.  A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board of Directors may fix a new record date for determination of stockholders entitled to vote at the adjourned meeting, and in such case shall also fix as the record date for stockholders entitled to notice of such adjourned meeting the same or an earlier date as that fixed for determination of stockholders entitled to vote in accordance with the foregoing provisions of this Section 3 at the adjourned meeting.

In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than 60 days prior to such action.  If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

In order that the Corporation may determine the stockholders entitled to consent to corporate action without a meeting, (including by telegram, cablegram or other electronic transmission as permitted by law), the Board of Directors may fix a record date, which shall not precede the date upon which the resolution fixing the record date is adopted by the Board of

- 8 -

Directors, and which record date shall be not more than ten days after the date upon which the resolution fixing the record date is adopted. If no record date has been fixed by the Board of Directors and no prior action by the Board of Directors is required by the Delaware General Corporation Law, the record date shall be the first date on which a consent setting forth the action taken or proposed to be taken is delivered to the Corporation in the manner prescribed by Article I, Section 9 hereof. If no record date has been fixed by the Board of Directors and prior action by the Board of Directors is required by the Delaware General Corporation Law with respect to the proposed action by consent of the stockholders without a meeting, the record date for determining stockholders entitled to consent to corporate action  without a meeting shall be at the close of business on the day on which the Board of Directors adopts the resolution taking such prior action.

Section 4.    Lost, Stolen or Destroyed Certificates.

In the event of the loss, theft or destruction of any certificate of stock, another may be issued in its place pursuant to such regulations as the Board of Directors may establish concerning proof of such loss, theft or destruction and concerning the giving of a satisfactory bond or bonds of indemnity.

Section 5.    Regulations.

The issue, transfer, conversion and registration of certificates of stock shall be governed by such other regulations as the Board of Directors may establish.

ARTICLE VI - NOTICES

Section 1.    Notices.

If mailed, notice to stockholders shall be deemed given when deposited in the mail, postage prepaid, directed to the stockholder at such stockholder's address as it appears on the records of the Corporation. Without limiting the manner by which notice otherwise may be given effectively to stockholders, any notice to stockholders may be given by electronic transmission in the manner provided in Section 232 of the Delaware General Corporation Law.

Section 2.    Waivers.

A written waiver of any notice, signed by a stockholder or director, or waiver by electronic transmission by such person, whether given before or after the time of the event for which notice is to be given, shall be deemed equivalent to the notice required to be given to such person. Neither the business nor the purpose of any meeting need be specified in such a waiver.

ARTICLE VII - MISCELLANEOUS

Section 1.    Facsimile Signatures.

In addition to the provisions for use of facsimile signatures elsewhere specifically authorized in these Bylaws, facsimile signatures of any officer or officers of the Corporation may be used whenever and as authorized by the Board of Directors or a committee thereof.

Section 2.        Corporate Seal.

The Board of Directors may provide a suitable seal, containing the name of the Corporation, which seal shall be in the charge of the Secretary.  If and when so directed by the Board of Directors or a committee thereof, duplicates of the seal may be kept and used by the Treasurer or by an Assistant Secretary or Assistant Treasurer.

Section 3.        Reliance upon Books, Reports and Records.

Each director, each member of any committee designated by the Board of Directors, and each officer of the Corporation shall, in the performance of his or her duties, be fully protected in relying in good faith upon the books of account or other records of the Corporation and upon such information, opinions, reports or statements presented to the Corporation by any of its officers or employees, or committees of the Board of Directors so designated, or by any other person as to matters which such director or committee member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Corporation.

Section 4.        Fiscal Year.

The fiscal year of the Corporation shall be as fixed by the Board of Directors.

Section 5.        Time Periods.

In applying any provision of these Bylaws which requires that an act be done or not be done a specified number of days prior to an event or that an act be done during a period of a specified number of days prior to an event, calendar days shall be used, the day of the doing of the act shall be excluded, and the day of the event shall be included.

## ARTICLE VIII - INDEMNIFICATION OF DIRECTORS AND OFFICERS

Section 1.        Right to Indemnification.

Each person who was or is made a party or is threatened to be made a party to or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), by reason of the fact that he or she is or was a director or an officer of the Corporation or is or was serving at the request of the Corporation as a director, officer, or trustee of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to an employee benefit plan (hereinafter an "indemnitee"), whether the basis of such proceeding is alleged action in an official capacity as a director, officer or trustee, or in any other capacity while serving as a director, officer or trustee, shall be indemnified and held harmless by the Corporation to the fullest extent permitted by Delaware law, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than such law permitted the Corporation to provide prior to such amendment), against all expense, liability and loss (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid in settlement) reasonably incurred or suffered by such indemnitee in connection therewith; provided, however, that, except as provided in

- 10 -

Section 3 of this ARTICLE VIII with respect to proceedings to enforce rights to indemnification, the Corporation shall indemnify any such indemnitee in connection with a proceeding (or part thereof) initiated by such indemnitee only if such proceeding (or part thereof) was authorized by the Board of Directors of the Corporation.

Section 2.    Right to Advancement of Expenses.

In addition to the right to indemnification conferred in Section 1 of this ARTICLE VIII, an indemnitee shall also have the right to be paid by the Corporation the expenses (including attorney's fees) incurred in defending any such proceeding in advance of its final disposition (hereinafter an "advancement of expenses"); provided, however, that, if the Delaware General Corporation Law requires, an advancement of expenses incurred by an indemnitee in his or her capacity as a director or officer (and not in any other capacity in which service was or is rendered by such indemnitee, including, without limitation, service to an employee benefit plan) shall be made only upon delivery to the Corporation of an undertaking (hereinafter an "undertaking"), by or on behalf of such indemnitee, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal (hereinafter a "final adjudication") that such indemnitee is not entitled to be indemnified for such expenses under this Section 2 or otherwise.

Section 3.    Right of Indemnitee to Bring Suit.

If a claim under Section 1 or 2 of this ARTICLE VIII is not paid in full by the Corporation within 60 days after a written claim has been received by the Corporation, except in the case of a claim for an advancement of expenses, in which case the applicable period shall be 20 days, the indemnitee may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim.  To the fullest extent permitted by law, if successful in whole or in part in any such suit, or in a suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the indemnitee shall be entitled to be paid also the expense of prosecuting or defending such suit.  In (i) any suit brought by the indemnitee to enforce a right to indemnification hereunder (but not in a suit brought by the indemnitee to enforce a right to an advancement of expenses) it shall be a defense that, and (ii) in any suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the Corporation shall be entitled to recover such expenses upon a final adjudication that, the indemnitee has not met any applicable standard for indemnification set forth in the Delaware General Corporation Law.  Neither the failure of the Corporation (including its directors who are not parties to such action, a committee of such directors, independent legal counsel, or its stockholders) to have made a determination prior to the commencement of such suit that indemnification of the indemnitee is proper in the circumstances because the indemnitee has met the applicable standard of conduct set forth in the Delaware General Corporation Law, nor an actual determination by the Corporation (including its directors who are not parties to such action, a committee of such directors, independent legal counsel, or its stockholders) that the indemnitee has not met such applicable standard of conduct, shall create a presumption that the indemnitee has not met the applicable standard of conduct or, in the case of such a suit brought by the indemnitee, be a defense to such suit.  In any suit brought by the indemnitee to enforce a right to indemnification or to an advancement of expenses hereunder, or brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the

- 11 -

burden of proving that the indemnitee is not entitled to be indemnified, or to such advancement of expenses, under this ARTICLE VIII or otherwise shall be on the Corporation.

<u>Section 4</u>.        <u>Non-Exclusivity of Rights</u>.

The rights to indemnification and to the advancement of expenses conferred in this ARTICLE VIII shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, the Corporation's Certificate of Incorporation, Bylaws, agreement, vote of stockholders or disinterested directors or otherwise.

<u>Section 5</u>.        <u>Insurance</u>.

The Corporation may maintain insurance, at its expense, to protect itself and any director, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under the Delaware General Corporation Law.

<u>Section 6</u>.        <u>Indemnification of Employees and Agents of the Corporation</u>.

The Corporation may, to the extent authorized from time to time by the Board of Directors, grant rights to indemnification and to the advancement of expenses to any employee or agent of the Corporation to the fullest extent of the provisions of this Article with respect to the indemnification and advancement of expenses of directors and officers of the Corporation.

<u>Section 7</u>.        <u>Nature of Rights</u>.

The rights conferred upon indemnitees in this ARTICLE VIII shall be contract rights and such rights shall continue as to an indemnitee who has ceased to be a director, officer or trustee and shall inure to the benefit of the indemnitee's heirs, executors and administrators. Any amendment, alteration or repeal of this ARTICLE VIII that adversely affects any right of an indemnitee or its successors shall be prospective only and shall not limit, eliminate, or impair any such right with respect to any proceeding involving any occurrence or alleged occurrence of any action or omission to act that took place prior to such amendment, alteration or repeal.

<u>ARTICLE IX - AMENDMENTS</u>

These Bylaws may be amended or repealed by the Board of Directors at any meeting or by the stockholders at any meeting.

- 12 -

#4818-9288-7616

# AMENDED AND RESTATED

# CERTIFICATE OF INCORPORATION

# OF

# INTERNATIONAL SHIPHOLDING CORPORATION

**FIRST:** The name of the corporation is International Shipholding Corporation (the "Corporation").

**SECOND:** The address of the Corporation's registered office in the State of Delaware is 1209 Orange Street in the City of Wilmington, County of New Castle, State of Delaware. The name of the Corporation's registered agent at such address is The Corporation Trust Company.

**THIRD:** The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the Delaware General Corporation Law.

**FOURTH:** The total number of shares of stock which the Corporation is authorized to issue is 5,000 shares of common stock, having a par value of $0.001 per share.

**FIFTH:** The business and affairs of the Corporation shall be managed by or under the direction of the board of directors, and the directors need not be elected by ballot unless required by the bylaws of the Corporation.

**SIXTH:** In furtherance and not in limitation of the powers conferred by the laws of the State of Delaware, the board of directors is expressly authorized to make, amend and repeal the bylaws.

**SEVENTH:** A director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the Delaware General Corporation Law, or (iv) for any transaction from which the director derived an improper personal benefit. If the Delaware General Corporation Law is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the Delaware General Corporation Law, as so amended. Any repeal or modification of this provision shall not adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or modification.

**EIGHTH:**  The Corporation reserves the right to amend and repeal any provision contained in this Certificate of Incorporation in the manner from time to time prescribed by the laws of the State of Delaware.  All rights herein conferred are granted subject to this reservation.

# EXHIBIT F

## Form of GUC Trust Agreement[12]

---

[12] On the Effective Date and in compliance with the provisions of the Plan as proposed and the GUC Trust Agreement, the Committee shall appoint a person or firm as GUC Trustee. The salient terms of the GUC Trustee's employment, including the GUC Trustee's duties and compensation, to the extent not set forth in the Plan, and to the extent known on or prior to the Confirmation Hearing, shall be set forth in the GUC Trust Agreement or the Confirmation Order. Plan at Art. 9.5. The Debtors reserve the right to modify the GUC Trust Agreement provided that the final form of GUC Trust Agreement shall be approved by the Committee and reasonably acceptable to the Debtors and SEACOR. Plan at Art. 1.1.65.

## GUC TRUST AGREEMENT AND DECLARATION OF TRUST

This GUC Trust agreement and declaration of trust (the "Agreement"), dated as of February ___, 2017, is made by and among International Shipholding Corporation, Enterprise Ship Co., Sulphur Carriers, Inc., Central Gulf Lines, Inc., Coastal Carriers, Inc., Waterman Steamship Corporation, N.W. Johnsen & Co., Inc., LMS Shipmanagement, Inc., U.S. United Ocean Services, LLC, Mary Ann Hudson, LLC, Sheila McDevitt, LLC, Tower LLC, Frascati Shops, Inc., Gulf South Shipping PTE LTD, LCI Shipholdings, Inc., Dry Bulk Australia LTD, Dry Bulk Americas LTD, and Marco Shipping Company PTE LTD (collectively, "Debtors"), debtors and debtors in possession, on the one hand, and _____ ("GUC Trustee," and together with the Debtors, "Parties"), on the other.

### RECITALS

A    On July 31, 2016, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), and their Chapter 11 Cases are being jointly administered as *In re International Shipholding Corporation, et al.*, Case No. 16-12220 (SMB).

B    On September 1, 2016, the Office of the United States Trustee for Region 2 ("U.S. Trustee") appointed the Official Committee of Unsecured Creditors of the Debtors ("Committee") pursuant to section 1102 of the Bankruptcy Code.  *See* Docket No. 125.  The Committee as originally appointed consisted of:  (i) Masters, Mates, and Pilots Benefit Plans; (ii) Seafarers International Union; and (iii) U.S. Ocean, LLC.  On September 22, 2016, the U.S. Trustee filed a First Amended Appointment of Official Committee of Unsecured Creditors naming the following five members of the Committee: (i) Masters, Mates, and Pilots Benefit Plans; (ii) Seafarers Benefits Plan; (iii) U.S. Ocean, LLC; (iv) Willard E. Bartel and David C.

Peebles, Administrators for the Estate of Robert N. Cain; and (v) Marine Engineers Beneficial

Association.  *See* Docket No. 185.

C       The Debtors filed the *First Amended Joint Chapter 11 Plan of Reorganization for*

*International Shipholding Corporation and Its Affiliated Debtors* (Docket No. 536) on January

13, 2017 ("Plan").

D       On February _, 2017, the Bankruptcy Court entered an order ("Confirmation

Order") (Docket No. ____) confirming the Plan, which became effective on _____

____, 2017 ("Effective Date") (Docket No. ____).

E       The Plan provides for the establishment of the GUC Trust ("Trust") effective on

the Effective Date of the Plan.

F       The Confirmation Order provides for the appointment of the Trustee as GUC

Trustee of the Trust, and the Plan and this Agreement provide for the appointment as necessary

of any successor GUC Trustee of the Trust.

G       The Trust is established for the benefit of the holders of General Unsecured

Claims that are entitled to receive GUC Trust Interests and distributions from the Trust under the

Plan (collectively, "Beneficiaries").

H       The Trust is established for the purpose of collecting, holding, administering,

distributing, and liquidating the Trust Assets (defined below), including to prosecute GUC Trust

Causes of Action, and to file, settle, compromise, withdraw, or litigate to judgment any GUC

Trust Cause of Action as permitted under the Plan and this Agreement, in accordance with

Treasury Regulation section 301.7701-4(d), for the benefit of the holders of Claims in

accordance with the terms and conditions of this Agreement and the Plan and with no objective

2

to continue or engage in the conduct of a trade or business, except to the extent necessary to, and consistent with, the Plan and liquidating purpose of the Trust.

I        Pursuant to the Plan, the Debtors, Trust, Trustee, and Beneficiaries are required to treat, for all federal income tax purposes, the transfer of the Trust Assets to the Trust as a transfer of the Trust Assets by the Debtors to the Beneficiaries in satisfaction of their Allowed Claims, followed by a transfer of the Trust Assets by the Beneficiaries to the Trust in exchange for the beneficial interest herein, and to treat the Beneficiaries as the grantors and owners of the Trust for federal income tax purposes.

J        Pursuant to the Plan, the Trust is intended for federal income tax purposes (i) to be treated as a grantor trust within the meaning of sections 671-677 of the Internal Revenue Code of 1986, as amended, and also (ii) to qualify as a liquidating trust within the meaning of Treasury Income Tax Regulation Section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or another business, except to the extent reasonably necessary to, and consistent with, the purpose of the Trust.

K        In accordance with the Plan, the Trust is further intended to be exempt from the requirements of (i) pursuant to section 1145 of the Bankruptcy Code, the Securities Exchange Act of 1933, as amended, and any applicable state and local laws requiring registration of securities, and (ii) the Investment Company Act of 1940, as amended, pursuant to sections 7(a) and 7(b) of that Act and section 1145 of the Bankruptcy Code.

NOW, THEREFORE, in accordance with the Plan and the Confirmation Order, and in consideration of the premises, and the mutual covenants and agreements of the Parties contained in the Plan and herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and affirmed, the Parties agree and declare as follows:

3

### DECLARATION OF TRUST

The Debtors and the Trustee enter into this Agreement to effectuate the distribution of the Trust Assets to the holders of Allowed Claims pursuant to the Plan and the Confirmation Order;

Pursuant to section 5.11 of the Plan, paragraphs _____ of the Confirmation Order, and section 2.3 of this Agreement, all right, title, and interest in, under, and to the GUC Trust Assets shall be absolutely and irrevocably assigned to the Trust and to its successors in trust and its successors and assigns;

TO HAVE AND TO HOLD unto the Trustee and its successors in trust; and

IT IS HEREBY FURTHER COVENANTED AND DECLARED, that the GUC Trust Assets and all other property held from time to time by the Trust under this Agreement and any proceeds thereof and earnings thereon (collectively, "Trust Assets") are to be held by the Trust and applied on behalf of the Trust by the Trustee on the terms and conditions set forth herein and in the Plan, solely for the benefit of the holders of Claims and for no other party.

## ARTICLE I

### RECITALS, PLAN DEFINITIONS, OTHER DEFINITIONS, AND INTERPRETATION

1.1      Recitals.  The Recitals are incorporated into and made terms of this Agreement.

1.2      Use of Plan Definitions.  All terms which are used in this Agreement and not defined herein shall have the same meaning set forth in the Plan.

1.3      Definitions.  For purposes of this Agreement:

1.3.1    "Claims" means General Unsecured Claims other than General Unsecured Claims in Classes 7(n), 7(o), and 7(r) under the Plan.

1.3.2    "Oversight Committee" means the GUC Trust Oversight Committee.

4

1.3.3   "Trust Assets" means the GUC Trust Assets.

1.4     Interpretation; Headings.  All references herein to specific provisions of the Plan or Confirmation Order are without exclusion or limitation of other applicable provisions of the Plan or Confirmation Order.  Words denoting the singular number shall include the plural number and vice versa, and words denoting one gender shall include the other gender.  The headings in this Agreement are for convenience of reference only and shall not limit or otherwise affect the provisions of this Agreement.

1.5     Conflict Among Plan Documents.  In the event of any inconsistency between the Plan or Confirmation Order, as applicable, on the one hand, and this Agreement, on the other hand, the Plan or Confirmation Order, as applicable, shall control and take precedence.

## ARTICLE II

### ESTABLISHMENT OF TRUST

2.1     Effectiveness of Agreement; Name of Trust.  This Agreement shall become effective on the Effective Date.  The Trust shall be officially known as the "International Shipholding GUC Trust."

2.2     Purpose of Trust.  The Debtors and the Trustee, pursuant to the Plan and in accordance with Bankruptcy Code, hereby create the Trust for the sole purpose of collecting, holding, administering, liquidating and distributing the Trust Assets for the benefit of the holders of Claims in accordance with Treasury Regulation Section 301.7701-4(d) and the terms and conditions of this Agreement and the Plan, and with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Trust.

5

2.3        Transfer of Trust Assets.

2.3.1    Conveyance of Trust Assets.  The Debtors hereby grant, release, assign,

transfer, convey and deliver, on behalf of the holders of Claims, the Trust Assets to the Trust as

of the Effective Date in trust for the benefit of such holders to be administered and applied as

specified in this Agreement and the Plan.  The Trustee shall have no duty to arrange for any of

the transfers contemplated under this Agreement or by the Plan or to ensure their compliance

with the terms of the Plan and the Confirmation Order, and shall be conclusively entitled to rely

on the legality and validity of such transfers.

2.3.2    Title to Trust Assets.  Pursuant to the Plan, all of the Debtors' right, title

and interest in and to the Trust Assets, including all such assets held or controlled by third

parties, are automatically vested in the Trust on the Effective Date, free and clear of all liens,

claims, encumbrances and other interests, except as specifically provided in the Plan, and such

transfer is on behalf of the holders of Claims to establish the Trust.  The Trust shall be authorized

to obtain possession or control of, liquidate, and collect all of the Trust Assets in the possession

or control of third parties and pursue all of the GUC Trust Causes of Action.  On the Effective

Date, the Trust shall stand in the shoes of the Debtors for all purposes with respect to the Trust

Assets and administration of the Claims.  To the extent any law or regulation prohibits the

transfer of ownership of any of the Trust Assets from the Debtors to the Trust and such law is not

superseded by the Bankruptcy Code, the Trust's interest shall be a lien upon and security interest

in such Trust Assets, in trust, nevertheless, for the sole use and purposes set forth in section 2.2

of this Agreement, and this Agreement shall be deemed a security agreement granting such

interest thereon without need to file financing statements or mortgages. By executing this

Agreement, the Trustee on behalf of the Trust hereby accepts all of such property as Trust

6

Assets, to be held in trust for the holders of Claims, subject to the terms of this Agreement and the Plan.

2.4     Capacity of Trust.  Notwithstanding any state or federal law to the contrary or anything herein, the Trust shall itself have the capacity, in its own right and name, to act or refrain from acting, including the capacity to sue and be sued and to enter into contracts.  The Trust may alone be the named movant, respondent, party plaintiff or defendant, or the like in all adversary proceedings, contested matters, and other state or federal proceedings brought by or against it, and may settle and compromise all such matters in its own name.

2.5     No Retention of Excess Cash.  Notwithstanding anything in this Agreement to the contrary, under no circumstances shall the Trust or Trustee retain cash or cash equivalents in excess of a reasonable amount to meet claims, expenses, and contingent liabilities or to maintain the value of the Trust Assets during liquidation other than reserves established pursuant to section 4.1.2 of this Agreement, and, subject to Article VIII of this Agreement, shall distribute all amounts not required to be retained for such purposes to the holders of Allowed Claims as promptly as reasonably practicable in accordance with the Plan and this Agreement.

2.6     Acceptance by Trustee.  The Trustee accepts its appointment as GUC Trustee of the Trust.

## ARTICLE III

### ADMINISTRATION OF TRUST

3.1     Rights, Powers, and Privileges of Trustee Generally.  Except as otherwise provided in this Agreement, the Plan, or the Confirmation Order, as of the date that the Trust Assets are transferred to the Trust, the Trustee on behalf of the Trust may control and exercise authority over the Trust Assets, over the acquisition, management and disposition thereof, and

7

over the management and conduct of the affairs of the Trust. In administering the Trust Assets,

the Trustee shall endeavor not to unduly prolong the Trust's duration, with due regard that undue

haste in the administration of the Trust Assets may fail to maximize value for the benefit of the

holders of Claims and otherwise be imprudent and not in the best interests of such holders.

3.1.1   <u>Power to Contract</u>.  In furtherance of the purpose of the Trust, and except

as otherwise specifically restricted in the Plan, Confirmation Order, or this Agreement, the

Trustee shall have the right and power on behalf of the Trust, and also may cause the Trust, to

enter into any covenants or agreements binding the Trust, and to execute, acknowledge and

deliver any and all instruments that are necessary or deemed by the Trustee to be consistent with

and advisable in furthering the purpose of the Trust.

3.1.2   <u>Ultimate Right to Act Based on Advice of Counsel or Other Professionals</u>.

Nothing in this Agreement shall be deemed to prevent the Trustee from taking or refraining to

take any action on behalf of the Trust that, based upon the advice of counsel or other

professionals, the Trustee determines it is obligated to take or to refrain from taking in the

performance of any duty that the Trustee may owe the holders of Claims or any other Person

under the Plan, Confirmation Order, or this Agreement.

3.2   <u>Powers of Trustee</u>.  Without limiting the generality of the above section 3.1, in

addition to the powers granted in the Plan, the Trustee shall have the power to take the following

actions on behalf of the Trust and any powers reasonably incidental thereto that the Trustee, in

its reasonable discretion, deems necessary or appropriate to fulfill the purpose of the Trust,

unless otherwise specifically limited or restricted by the Plan or this Agreement:

3.2.1   hold legal title to the Trust Assets and to any and all rights of the Debtors

and the holders of Claims in or arising from the Trust Assets;

8

3.2.2    receive, manage, invest, supervise, protect, and where appropriate, cause the Trust to abandon the Trust Assets, including causing the Trust to invest any moneys held as Trust Assets in accordance with the terms of section 3.8 hereof, as long as such management is consistent with the Trust's status as a liquidating trust within the meaning of Treasury Regulation Section 301.7701-4(d) and which actions are merely incidental to its liquidation and dissolution;

3.2.3    open and maintain bank accounts on behalf of or in the name of the Trust;

3.2.4    cause the Trust to enter into any agreement or execute any document or instrument required by or consistent with the Plan, the Confirmation Order or this Agreement, and to perform all obligations thereunder;

3.2.5    subject to Article VIII of this Agreement, collect and liquidate all Trust Assets, including the sale of any Trust Assets;

3.2.6    protect and enforce the rights to the Trust Assets (including any GUC Trust Causes of Action) vested in the Trust and Trustee by this Agreement by any method deemed appropriate, including, without limitation, by judicial proceedings or otherwise;

3.2.7    investigate any Trust Assets, including GUC Trust Causes of Action, and any objections to Claims, and cause the Trust to seek the examination of any Person pursuant to Federal Rule of Bankruptcy Procedure 2004;

3.2.8    cause the Trust to employ and pay professionals, claims agents, disbursing agents, and other agents and third parties pursuant to this Agreement;

3.2.9    cause the Trust to pay all of its lawful expenses, debts, charges, taxes and other liabilities, and make all other payments relating to the Trust Assets;

9

3.2.10  subject to Article VIII of this Agreement, cause the Trust to pursue, commence, prosecute, compromise, settle, dismiss, release, waive, withdraw, abandon, or resolve all GUC Trust Causes of Action;

3.2.11  subject to Article VIII of this Agreement, calculate and make all distributions on behalf of the Trust to the holders of Allowed Claims provided for in, or contemplated by, the Plan and this Agreement;

3.2.12  establish, adjust, and maintain reserves for Disputed Claims required to be administered by the Trust;

3.2.13  cause the Trust to withhold from the amount distributable to any Person the maximum amount needed to pay any tax or other charge that the Trustee has determined, based upon the advice of its agents and/or professionals, may be required to be withheld from such distribution under the income tax or other laws of the United States or of any state or political subdivision thereof;

3.2.14  in reliance initially solely upon the Debtors' Schedules and the official claims register maintained in the Debtors' bankruptcy cases, review, and where appropriate, cause the Trust to allow or object to Claims and Interests; and, subject to Article VIII of this Agreement, supervise and administer the Trust's commencement, prosecution, settlement, compromise, withdrawal, or resolution of all objections to Disputed Claims required to be administered by the Trust;

3.2.15  in reliance upon the Debtors' Schedules and the official claims register maintained in the Chapter 11 Cases, maintain a register evidencing the beneficial interest herein

10

held by each Beneficiary and, in accordance with section 3.9 of this Agreement, such register may be the official claims register maintained in the Chapter 11 Cases;

3.2.16  cause the Trust to file and prosecute tax refund claims, make tax elections by and on behalf of the Trust, and prepare, or have prepared, and file, if necessary, with the appropriate taxing authority any and all tax returns, information returns, and other required tax documents with respect to the Trust, and pay taxes, if any, payable for and on behalf of the Trust; provided, however, that notwithstanding any other provision of this Agreement, the Trustee shall have no personal responsibility for the signing or accuracy of the Debtors' income tax returns that are due to be filed after the Effective Date or for any tax liability related thereto;

3.2.17  subject to section 9.9 of the Plan, cause the Trust to abandon or donate to a charitable organization any Trust Assets that the Trustee determines to be too impractical to distribute to Beneficiaries or of inconsequential value to the Trust and Beneficiaries;

3.2.18  cause the Trust to send annually to Beneficiaries, in accordance with the tax laws, a separate statement stating a Beneficiary's interest in the Trust and its share of the Trust's income, gain, loss, deduction or credit, and to instruct all such Beneficiaries to report such items on their federal tax returns;

3.2.19  cause the Trust to seek any appropriate tax determination relating to the Trust, including, without limitation, a determination of tax liability or refund under section 505 of the Bankruptcy Code;

3.2.20  cause the Trust to establish such reserves for taxes, assessments and other expenses of administration of the Trust as may be necessary and appropriate for the proper operation of matters incident to the Trust;

3.2.21  cause the Trust to purchase and carry all insurance policies that the Trustee deems reasonably necessary or advisable and to pay all associated insurance premiums and costs;

3.2.22  subject to Article VIII of this Agreement, if the Trustee has a conflict or if any of the Trust Assets are situated in any state or other jurisdiction in which the Trustee is not qualified to act as trustee, nominate and appoint a Person duly qualified to act as trustee in such state or jurisdiction in accordance with the terms of this Agreement;

3.2.23  undertake all administrative functions of the Trust, including overseeing the winding down and termination of the Trust;

3.2.24  exercise, implement, enforce, and discharge all of the terms, conditions, powers, duties, and other provisions of the Plan, the Confirmation Order, and this Agreement; and

3.2.25  take all other actions consistent with the provisions of the Plan that the Trustee deems reasonably necessary or desirable to administer the Trust.

3.3     Exclusive Authority to Pursue GUC Trust Causes of Action.  The Trust shall have the exclusive right, power, and interest to pursue, commence, prosecute, compromise, settle, dismiss, release, waive, withdraw, abandon, or resolve the GUC Trust Causes of Action. The Trust shall be the sole representative of the Estates under section 1123(b)(3) of the Bankruptcy Code with respect to the GUC Trust Causes of Action.

3.4     Abandonment.  If, in the Trustee's reasonable judgment, any non-cash Trust Assets cannot be sold in a commercially reasonable manner or the Trustee believes in good faith that such property has inconsequential value to the Trust or its Beneficiaries, the Trustee shall

12

have the right to cause the Trust to abandon or otherwise dispose of such property, including by

donation of such property to a charitable organization, subject to section 9.9 of the Plan.

      3.5        <u>Responsibility for Administration of Claims</u>.  As of the Effective Date, the

Trust shall become responsible for administering and paying distributions to the holders of

Allowed Claims entitled to receive distributions from the Trust pursuant to the Plan.  The

Debtors or the Reorganized Debtors, as applicable, shall have the authority to file, settle,

compromise, withdraw or litigate to judgment any objections to claims as permitted under the

Plan; provided, however, that, subject to section 6.2 of the Plan, the Trustee and the Debtors or

the Reorganized Debtors, as applicable, shall have the joint authority to file, settle, compromise,

withdraw or litigate to judgment any objection to General Unsecured Claims in accordance with

the terms of this Agreement; provided further, however, that the Debtors or the Reorganized

Debtors, as applicable, shall provide notice prior to seeking the reclassification of any claim to a

General Unsecured Claim and the GUC Trust shall have standing to object to such

reclassification. The Trust shall have the right to object to the allowance of any claim on any

ground and shall be entitled to assert all defenses of the Debtors and their Estates.  The Trust

shall also be entitled to assert all of the Estates' rights under applicable law, including, without

limitation, section 558 of the Bankruptcy Code.  The Trust may also seek estimation of any

General Unsecured Claims under and subject to section 502(c) of the Bankruptcy Code.

      3.6        <u>Agents and Professionals</u>.  The Trustee may, but shall not be required to,

consult with and retain attorneys, financial advisors, accountants, appraisers, and other

professionals the Trustee believes have qualifications necessary to assist in the administration of

the Trust, including professionals previously retained by the Debtors or the Committee.  For the

avoidance of doubt, and without limitation of applicable law, nothing in this Agreement shall

13

limit the Trustee from engaging counsel or other professionals, including the Trustee itself or the

Trustee's firm or their affiliates, to do work for the Trust. The Trustee may pay the reasonable

salaries, fees and expenses of such Persons out of the Trust Assets in the ordinary course of

business.

        3.7        <u>Safekeeping and Investment of Trust Assets</u>. All moneys and other assets

received by the Trustee shall, until distributed or paid over as provided herein and in the Plan, be

held in trust for the benefit of the holders of Claims, but need not be segregated in separate

accounts from other Trust Assets, unless and to the extent required by law or the Plan. The

Trustee shall not be under any obligation to invest Trust Assets. Neither the Trust nor the

Trustee shall have any liability for interest or producing income on any moneys received by them

and held for distribution or payment to holders of Claims, except as such interest shall actually

be received by the Trust or Trustee, which shall be distributed as provided in the Plan. Except as

otherwise provided by the Plan, the powers of the Trustee to invest any moneys held by the

Trust, other than those powers reasonably necessary to maintain the value of the assets and to

further the Trust's liquidating purpose, shall be limited to powers to invest in demand and time

deposits, such as short-term certificates of deposit, in banks or other savings institutions, or other

temporary liquid investments, such as treasury bills; <u>provided</u>, <u>however</u>, that the scope of

permissible investments shall be limited to include only those investments that a "liquidating

trust," within the meaning of Treasury Income Tax Regulation Section § 3.01.7701-4(d), may be

permitted to hold pursuant to the Treasury Regulations, or any modification of the Internal

Revenue Service ("<u>IRS</u>") guidelines, whether set forth in IRS rulings, IRS pronouncements, or

otherwise. For the avoidance of doubt, the provisions of section 11-2.3 of the Estates, Power,

and Trusts Law of New York shall not apply to this Agreement. Notwithstanding the foregoing,

14

the Trustee shall not be prohibited from engaging in any trade or business on its own account,

provided that such activity does not interfere or conflict with the Trustee's administration of the

Trust.

3.8      Maintenance and Disposition of Trust Records.  The Trustee shall maintain

accurate records of the administration of Trust Assets, including receipts and disbursements and

other activity of the Trust.  The Trust may engage a claims agent to continue to maintain and

update the claims register maintained in the Chapter 11 Cases throughout the administration of

the Trust, and such claims register may serve as the Trustee's register of beneficial interests held

by Beneficiaries.  The books and records maintained by the Trustee may be disposed of by the

Trustee at the later of (i) such time as the Trustee determines that the continued possession or

maintenance of such books and records is no longer necessary for the benefit of the Trust or its

Beneficiaries or (ii) upon the termination and completion of the winding down of the Trust.

3.9      Reporting Requirements.  The Trustee shall provide any Oversight Committee

member the information and reports they may reasonably request concerning Trust

administration.

3.10     Conflicts of Interest.  Conflicts of interest of the Trustee will be addressed by

the Oversight Committee as set forth below in Article VIII.  If no Oversight Committee is

established or serving, the Trustee will appoint a disinterested Person to handle any matter where

the Trustee has identified a conflict of interest or the Bankruptcy Court, on motion of a party in

interest, determines one exists.  In the event the Trustee is unwilling or unable to appoint a

disinterested Person to handle any such matter, the Bankruptcy Court, on notice and hearing,

may do so.

DOCS_NY:34854.4 42331/002

3.11    <u>No Bond Required; Procurement of Insurance</u>. Notwithstanding any state or other applicable law to the contrary, the Trustee (including any successor Trustee) shall be exempt from giving any bond or other security in any jurisdiction and shall serve hereunder without bond.  The Trustee is hereby authorized, but not required to obtain all reasonable insurance coverage for itself, its agents, representatives, employees or independent contractors, including, without limitation, coverage with respect to the liabilities, duties and obligations of the Trustee and its agents, representatives, employees or independent contractors under this Agreement.  The cost of any such insurance coverage shall be an expense of the Trust and paid out of Trust Assets.

# ARTICLE IV

## DISTRIBUTIONS

4.1    <u>Distribution and Reserve of Trust Assets</u>.  Following the transfer of Trust Assets to the Trust, the Trustee shall make continuing efforts on behalf of the Trust to collect, liquidate, and distribute all Trust Assets, subject to the reserves required under the Plan or this Agreement.

4.1.1    <u>Distributions</u>.  Subject to Article VIII of this Agreement, the Trustee shall cause the Trust to distribute the Trust's net Cash income and net Cash proceeds from the liquidation of the Trust Assets to holders of Allowed Claims, except the Trust may retain an amount of net income and other Trust Assets reasonably necessary to maintain the value of the Trust Assets or to meet expenses, claims and contingent liabilities of the Trust and Trustee, and retention of such amount may preclude distributions to holders of Allowed Claims.

4.1.2    <u>Reserves; Pooling of Reserved Funds</u>.  Before any distribution can be made, the Trustee shall, in its reasonable discretion, establish, supplement, and maintain reserves

16

in an amount sufficient to meet any and all expenses and liabilities of the Trust, including

attorneys' fees and expenses, the fees and expenses of other professionals, and fees owed the

United States Trustee.  The Trustee need not maintain the Trust's reserves in segregated bank

accounts and may pool funds in the reserves with each other and other funds of the Trust;

provided, however, that the Trust shall treat all such reserved funds as being held in a segregated

manner in its books and records.

       4.1.3   Distributions Net of Reserves and Costs.  Distributions shall be made net

of reserves in accordance with the Plan and also net of the actual and reasonable costs of making

the distributions.

       4.1.4   Right to Rely on Professionals.  Without limitation of the generality of

section 6.6 of this Agreement, in determining the amount of any distribution or reserves, the

Trustee may rely and shall be fully protected in relying on the advice and opinion of the Trust's

financial advisors, accountants, or other professionals.

     4.2    Method and Timing of Distributions.  Distributions to holders of Allowed

Claims will be made from the Trust in accordance with the terms of the Plan and this Agreement.

The Trust may engage a Disbursing Agent and other Persons to help make distributions.

     4.3    Withholding from Distributions.  Subject to section 9.8 of the Plan, the Trustee,

in its discretion, may cause the Trust to withhold from amounts distributable from the Trust to

any Beneficiary any and all amounts as may be sufficient to pay the maximum amount of any tax

or other charge that has been or might be assessed or imposed by any law, regulation, rule,

ruling, directive, or other governmental requirement on such Beneficiary or the Trust with

respect to the amount to be distributed to such Beneficiary.  The Trustee shall determine such

17

maximum amount to be withheld by the Trust in its sole, reasonable discretion and shall cause

the Trust to distribute to the Beneficiary any excess amount withheld.

4.4      Tax Identification Numbers.  The Trustee may require any Beneficiary to

furnish its taxpayer identification number as assigned by the IRS and may condition any

distribution to any Beneficiary upon receipt of such identification number.  If a Beneficiary does

not timely provide the Trustee with its taxpayer identification number in the manner and by the

deadline established by the Trustee, then the distribution to such Beneficiary shall be

administered in accordance with section 4.5 of this Agreement.

4.5      Unclaimed and Undeliverable Distributions.  If any distribution to a

Beneficiary is returned to the Trustee as undeliverable or is otherwise unclaimed, no further

distributions to such Beneficiary shall be made unless and until the Beneficiary claims the

distributions by timely notifying the Trustee in writing of any information necessary to make the

distribution to the Beneficiary in accordance with this Agreement, the Plan, and applicable law,

including such Beneficiary's then-current address or taxpayer identification number.  If the

Beneficiary timely provides the Trustee such missing information, all missed distributions shall

be made to the Beneficiary as soon as is practicable, without interest.  Undeliverable or

unclaimed distributions shall be administered in accordance with section 7.4.6 of the Plan.

4.5.1   No Responsibility to Attempt to Locate Beneficiaries.  The Trustee may,

in its sole discretion, attempt to determine a Beneficiary's current address or otherwise locate a

Beneficiary, but nothing in this Agreement or the Plan shall require the Trustee to do so.

4.5.2   Disallowance of Claims; Cancellation of Corresponding Beneficial

Interests.  All Claims in respect of undeliverable or unclaimed distributions that pursuant to

section 7.4.6 of the Plan have become unclaimed property under section 347(b) of the

18

Bankruptcy Code, shall be deemed Disallowed and expunged, and the corresponding beneficial

interests in the Trust of the Beneficiary holding such Disallowed Claims shall be deemed

canceled.  The Holder of any such Disallowed Claim shall no longer have any right, claim, or

interest in or to any distributions in respect of such Disallowed Claims.  The Holder of any such

Disallowed Claim is forever barred, estopped, and enjoined from receiving any distributions

under this Agreement and from asserting such Disallowed Claim against the Trust or Trustee.

      4.5.3    <u>Inapplicability of Unclaimed Property or Escheat Laws</u>.  Unclaimed

property held by the Trust shall not be subject to the unclaimed property or escheat laws of the

United States, any state, or any local governmental unit.

      4.6    <u>Voided Checks; Request for Reissuance</u>.  Distribution checks issued to

Beneficiaries shall be null and void if not negotiated within one hundred twenty (120) days after

the date of issuance thereof.  Requests for reissuance of any check shall be made in writing

directly to the Trustee by the Beneficiary that was originally issued such check.  All such

requests shall be made promptly and in time for the check to be reissued and cashed before the

date established by section 7.4.7 of the Plan.  Distributions in respect of voided checks shall be

treated as unclaimed distributions under the Plan and administered under section 4.5 of this

Agreement and section 7.4.6 of the Plan.  The Beneficiary shall bear all the risk that, and shall

indemnify and hold the Trust and Trustee harmless against any loss that may arise if, the Trustee

does not reissue a check promptly after receiving a request for its reissuance and the date

established by section 7.4.7 of the Plan passes without the check being reissued or cashed.

      4.7    <u>Conflicting Claims</u>.  If any conflicting claims or demands are made or asserted

with respect to the beneficial interest of a Beneficiary under this Agreement, or if there is any

disagreement between the assignees, transferees, heirs, representatives or legatees succeeding to

19

all or a part of such an interest resulting in adverse claims or demands being made in connection with such interest, then, in any of such events, the Trustee shall be entitled, in its sole discretion, to refuse to comply with any such conflicting claims or demands.

4.7.1    The Trustee may elect to cause the Trust to make no payment or distribution with respect to the beneficial interest subject to the conflicting claims or demand, or any part thereof, and to refer such conflicting claims or demands to the Bankruptcy Court, which shall have exclusive jurisdiction over resolution of such conflicting claims or demands.  Neither the Trust nor the Trustee shall be or become liable to any of such parties for their refusal to comply with any such conflicting claims or demands, nor shall the Trust or Trustee be liable for interest on any funds which may be so withheld.

4.7.2    The Trustee shall be entitled to refuse to act until either (i) the rights of the adverse claimants have been adjudicated by a Final Order of the Bankruptcy Court or (ii) all differences have been resolved by a valid written agreement among all such parties to the satisfaction of the Trustee, which agreement shall include a complete release of the Trust and Trustee.  Until the Trustee receives written notice that one of the conditions of the preceding sentence is met, the Trustee may deem and treat as the absolute owner under this Agreement of the beneficial interest in the Trust the Beneficiary identified as the owner of that interest in the books and records maintained by the Trustee.  The Trustee may deem and treat such Beneficiary as the absolute owner for purposes of receiving distributions and any payments on account thereof for federal and state income tax purposes, and for all other purposes whatsoever.

4.7.3    In acting or refraining from acting under and in accordance with this section 4.7 of the Agreement, the Trustee shall be fully protected and incur no liability to any purported claimant or any other Person to the extent set forth in Article VI of this Agreement.

20

4.8     Priority of Expenses of Trust.  The Trust must pay or reserve for all of its

expenses before making distributions.

# ARTICLE V

## BENEFICIARIES

5.1     Interest Beneficial Only.  The ownership of a beneficial interest in the Trust

shall not entitle any Beneficiary to any title in or to the Trust Assets or to any right to call for a

partition or division of such assets or to require an accounting.

5.2     Ownership of Beneficial Interests Hereunder.  Each Beneficiary shall own a

beneficial interest herein which shall, subject to Section 4.1 herein and the Plan, be entitled to a

distribution in the amounts, and at the times, set forth in the Plan.

5.3     Evidence of Beneficial Interest.  Ownership of a beneficial interest in the Trust

Assets shall not be evidenced by any certificate, security, or receipt or in any other form or

manner whatsoever, except as maintained on the books and records of the Trust by the Trustee.

5.4     No Right to Accounting.  Except as set forth in section 9.4 of this Agreement,

neither the Beneficiaries nor their successors, assigns, creditors, or any other Person shall have

any right to an accounting by the Trustee, and the Trustee shall not be obligated to provide any

accounting to any Person.  Nothing in this Agreement is intended to require the Trustee at any

time or for any purpose to file any accounting or seek approval of any court with respect to the

administration of the Trust or as a condition for making any advance, payment, or distribution

out of proceeds of Trust Assets.

5.5     No Standing.  Except as expressly provided in this Agreement, a Beneficiary

shall not have standing to direct or to seek to direct the Trust or Trustee to do or not to do any act

21

or to institute any action or proceeding at law or in equity against any Person upon or with respect to the Trust Assets.

5.6      Requirement of Undertaking.  The Trustee may request the Bankruptcy Court to require, in any suit for the enforcement of any right or remedy under this Agreement, or in any suit against the Trustee for any action taken or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit, including reasonable attorneys' fees, against any party litigant in such suit; provided, however, that the provisions of this Section 5.6 shall not apply to any suit by the Trustee.

5.7      Limitation on Transferability.  It is understood and agreed that the beneficial interests herein shall be non-transferable and non-assignable during the term of this Agreement except by operation of law.  An assignment by operation of law shall not be effective until appropriate notification and proof thereof is submitted to the Trustee, and the Trustee may continue to cause the Trust to pay all amounts to or for the benefit of the assigning Beneficiaries until receipt of proper notification and proof of assignment by operation of law.  The Trustee may rely upon such proof without the requirement of any further investigation.

5.8      Exemption from Registration.  The rights of the Beneficiaries arising under this Agreement may be deemed "securities" under applicable law.  However, such rights have not been defined as "securities" under the Plan because (i) the parties hereto intend that such rights shall not be securities and (ii) if the rights arising under this Agreement in favor of the Beneficiaries are deemed to be "securities," the exemption from registration under section 1145 of the Bankruptcy Code is intended to be applicable to such securities.  No party to this Agreement shall make a contrary or different contention.

22

5.9     Delivery of Distributions.  Subject to the terms of this Agreement, the Trustee shall cause the Trust to make distributions to holders of Allowed Claims in the manner provided in the Plan.

## ARTICLE VI

### THIRD PARTY RIGHTS AND LIMITATION OF LIABILITY

6.1     Parties Dealing With the Trustee.  In the absence of actual knowledge to the contrary, any Person dealing with the Trust or the Trustee shall be entitled to rely on the authority of the Trustee or any of the Trustee's agents to act in connection with the Trust Assets. There is no obligation of any Person dealing with the Trustee to inquire into the validity or expediency or propriety of any transaction by the Trustee or any agent of the Trustee.

6.2     Limitation of Trustee's and Oversight Committee's Liability.  In exercising the rights granted herein, the Trustee shall exercise the Trustee's best judgment, to the end that the affairs of the Trust shall be properly managed and the interests of all of the holders of Claims safeguarded.  But, notwithstanding anything herein or in the Plan to the contrary, neither the Trustee, any member of the Oversight Committee, nor their respective firms, companies, affiliates, partners, officers, directors, members, employees, professionals, advisors, attorneys, financial advisors, investment bankers, disbursing agents, or agents, and any of such Person's successors and assigns shall incur any responsibility or liability by reason of any error of law or fact or of any matter or thing done or suffered or omitted to be done under or in connection with this Agreement, whether sounding in tort, contract, or otherwise, except for fraud, gross negligence, or willful misconduct that is found by a final judgment (not subject to further appeal or review) of a court of competent jurisdiction to be the direct and primary cause of loss, liability, damage, or expense suffered.  In no event shall the Trustee or Oversight Committee be

23

liable for indirect, punitive, special, incidental or consequential damage or loss (including but not

limited to lost profits) whatsoever, even if the Trustee or Oversight Committee has been

informed of the likelihood of such loss or damages and regardless of the form of action.

6.3    No Liability for Acts of Other Persons.  None of the Persons identified in the

immediately preceding section 6.2 of this Agreement shall be liable for the act or omission of

any other Person identified in that section.

6.4    No Liability for Acts of Predecessors.  No successor Trustee shall be in any

way responsible for the acts or omissions of any Trustee in office prior to the date on which such

successor becomes the Trustee, unless a successor Trustee expressly assumes such responsibility.

6.5    No Liability for Good Faith Error of Judgment.  The Trustee shall not be liable

for any error of judgment made in good faith, unless it shall be finally determined by a final

judgment of a court of competent jurisdiction (not subject to further appeal or review) that the

Trustee was grossly negligent or engaged in willful misconduct in ascertaining the pertinent

facts.

6.6    Reliance by Trustee and Oversight Committee on Documents and Advice of

Counsel or Other Persons.  Except as otherwise provided herein, the Trustee and Oversight

Committee may rely and shall be protected in acting upon any resolution, certificate, statement,

instrument, opinion, report, notice, request, consent, order or other paper or document believed

by them to be genuine and to have been signed or presented by the proper party or parties.  The

Trustee and Oversight Committee also may engage and consult with their respective legal

counsel and other agents and advisors, and shall not be liable for any action taken, omitted, or

suffered by them in reliance upon the advice of such counsel, agents, or advisors.

24

6.7     No Liability For Acts Approved by Bankruptcy Court or Oversight Committee.
The Trustee and Oversight Committee shall have the right at any time to seek instructions from
the Bankruptcy Court concerning the administration or disposition of the Trust Assets and the
Claims required to be administered by the Trust.  Neither the Oversight Committee nor the
Trustee shall be liable for any act or omission that has been approved by the Bankruptcy Court,
and all such actions or omissions shall conclusively be deemed not to constitute fraud, gross
negligence, or willful misconduct.  The Trustee shall not be liable for any act or omission
approved by the Oversight Committee under Article VIII of this Agreement or otherwise, and all
such actions or omissions shall conclusively be deemed not to constitute fraud, gross negligence,
or willful misconduct.

6.8     No Personal Obligation for Trust Liabilities.  Persons dealing with the Trustee
shall have recourse only to the Trust Assets to satisfy any liability incurred by the Trustee to any
such Person in carrying out the terms of this Agreement, and the Trustee shall have no personal,
individual obligation to satisfy any such liability.

6.9     Indemnification.  The Trustee and the members of the Oversight Committee,
and their respective firms, companies, affiliates, partners, officers, directors, members,
employees, professionals, advisors, attorneys, financial advisors, investment bankers, disbursing
agents, or agents and any of such parties' successors and assigns (collectively, the "Indemnified
Parties" and each, an "Indemnified Party") shall, to the fullest extent permitted by applicable
law, be defended, held harmless, and indemnified by the Trust from time to time and receive
reimbursement from and against any and all loss, liability, expense (including counsel fees), or
damage of any kind, type or nature, whether sounding in tort, contract, or otherwise, that the
Indemnified Parties may incur or sustain in connection with the exercise or performance of any

25

of the Trust's, Trustee's, or Oversight Committee's powers and duties under this Agreement or in rendering services by the Indemnified Party to the Trust, Trustee, or Oversight Committee (the "Indemnified Conduct"), including, without limitation, the costs of counsel or others in investigating, preparing, defending, or settling any action or claim (whether or not litigation has been initiated against the Indemnified Party) or in enforcing this Agreement (including its indemnification provisions), except if such loss, liability, expense, or damage is finally determined by a final judgment (not subject to further appeal or review) of a court of competent jurisdiction to result directly and primarily from the fraud, gross negligence, or willful misconduct of the Indemnified Party asserting this provision.

6.9.1    Expense of Trust; Limitation on Source of Payment of Indemnification. All indemnification liabilities of the Trust under this section 6.9 shall be an expense of the Trust. The amounts necessary for such indemnification and reimbursement shall be paid by the Trust out of the available Trust Assets after reserving for all actual and anticipated expenses and liabilities of the Trust.  The Trustee shall not be personally liable for the payment of any Trust expense or claim or other liability of the Trust, and no Person shall look to the Trustee or other Indemnified Parties personally for the payment of any such expense or liability.

6.9.2    Procedure for Current Payment of Indemnified Expenses; Undertaking to Repay.  The Trust shall reasonably promptly pay an Indemnified Party all amounts subject to indemnification under this section 6.9 on submission of invoices for such amounts by the Indemnified Party. The Oversight Committee shall approve the indemnification of any Indemnified Party and thereafter shall approve any monthly bills of such Indemnified Party for indemnification of more than $50,000.  All invoices for indemnification shall be subject to the approval of the Trustee.  By accepting any indemnification payment, the Indemnified Party

26

undertakes to repay such amount promptly if it is determined that the Indemnified Party is not entitled to be indemnified under this Agreement.  The Bankruptcy Court shall hear and finally determine any dispute arising out of this section 6.9.

6.10    No Implied Obligations.  The Trustee shall not be liable except for the performance of such duties and obligations as are specifically set forth herein, and no implied covenants or obligations shall be read into this Agreement against the Trustee.

6.11    Confirmation of Survival of Provisions.  Without limitation in any way of any provision of this Agreement, the provisions of this Article VI shall survive the death, dissolution, liquidation, resignation, replacement, or removal, as may be applicable, of the Trustee, or the termination of the Trust or this Agreement, and shall inure to the benefit of the Trustee's and the Indemnified Parties' heirs and assigns.

## ARTICLE VII

### TAX MATTERS

7.1    Tax Treatment of Trust.    Pursuant to and in accordance with the Plan, for all federal income tax purposes, the Debtors, the Beneficiaries, the Trustee and the Trust shall treat the Trust as a "liquidating trust" within the meaning of Treasury Regulation Section 301.7701-4(d) and IRS Revenue Procedure 94-45, 1994-2 C.B. 124.  The transfer of the Trust Assets to the Trust shall be treated as a transfer of the Trust Assets by the Debtors to the Beneficiaries in satisfaction of their Allowed Claims and, to the extent the Trust Assets are allocable to a reserve for Disputed Claims, to such reserve, followed by a transfer of the Trust Assets (other than Trust Assets allocable to a reserve for Disputed Claims) by the Beneficiaries to the Trust in exchange for their pro rata beneficial interests in the Trust.  Accordingly, for U.S. federal income tax purposes, the Trust shall be treated as a grantor trust, and the Beneficiaries shall be treated as

27

grantors and owners of their respective share of the Trust Assets (other than the Trust Assets allocable to a reserve for Disputed Claims). The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local tax purposes.

7.2    <u>Annual Reporting and Filing Requirements</u>. Pursuant to and in accordance with the terms of the Plan and this Agreement, the Trustee shall file tax returns for the Trust as a grantor trust pursuant to Treasury Income Tax Regulation Section 1.671-4(a). The Trustee also will annually send to each Beneficiary a separate statement setting forth such holder's share of items of income, gain, loss, deduction or credit (including the receipts and expenditures of the Trust) as relevant for U.S. federal income tax purposes and will instruct all such Beneficiaries to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such Beneficiary's underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns. The Trustee shall also file (or cause to be filed) any other statement, return or disclosure relating to the Trust that is required by any governmental unit.

7.3    <u>Tax Treatment of Reserves for Disputed Claims</u>. The Trustee may, in the Trustee's sole discretion, determine the best way to report for tax purposes with respect to any reserve for Disputed Claims, including (i) filing a tax election to treat any and all reserves for Disputed Claims as a Disputed Ownership Fund ("<u>DOF</u>") within the meaning of Treasury Income Tax Regulation Section 1.468B-9 for federal income tax purposes rather than to tax such reserve as a part of the Trust or (ii) electing to report as a separate trust or sub-trust or other entity. If an election is made to report any reserve for disputed claims as a DOF, the Trust shall comply with all federal and state tax reporting and tax compliance requirements of the DOF,

28

including but not limited to the filing of a separate federal tax return for the DOF and the

payment of federal and/or state income tax due.

7.4     Payment of Taxes. The Trustee shall be responsible for payment, out of

the Trust Assets, of any taxes imposed on the Trust or the Trust Assets, including any

reserve for Disputed Claims.  In the event, and to the extent, any cash retained on account of

Disputed Claims in a Disputed Claims reserve is insufficient to pay the portion of any such taxes

attributable to the taxable income arising from the assets allocable to, or retained on account of,

Disputed Claims, such taxes shall be (i) reimbursed from any subsequent cash amounts retained

on account of Disputed Claims or (ii) to the extent such Disputed Claims have subsequently been

resolved, deducted from any amounts otherwise distributable by the Trustee as a result of the

resolution of such Disputed Claims

7.5     Valuation of Trust Assets.  The value of the cash portion of the Trust Assets

shall be $3,000,000.00. As soon as reasonably practicable after the establishment of the Trust,

the Trustee shall determine the value of the non-cash assets transferred to the Trust, and the

Trustee shall apprise, in writing, the Reorganized Debtors of such valuation and, upon five (5)

days written request of the Reorganized Debtors, provide the Reorganized Debtors with

reasonable documentation (the "Valuation Documentation") supporting such valuation. The

Reorganized Debtors shall have the earlier of (i) twenty-five (25) days following receipt of the

Trustee's notice of valuation or (ii) twenty (20) days following receipt of the Valuation

Documentation, to provide the Trustee with any written objections to such valuation (the

"Valuation Objection Period"). If the Reorganized Debtors do not object to such valuation before

the expiration of the Valuation Objection Period, the Trustee's valuation shall be binding on the

Trustee, the Beneficiaries, and the Reorganized Debtors. If the Reorganized Debtors timely

29

object to such valuation, the Trustee and the Reorganized Debtors shall work in good faith to resolve any dispute. If the Trustee and the Reorganized Debtors are not able to resolve such dispute, the Reorganized Debtors may file a motion with the Bankruptcy Court seeking the entry of an Order resolving such dispute; provided, however, any such motion shall be filed not later than fifteen (15) days after the expiration of the Valuation Objection Period, and if no such motion is filed within that period, the Trustee's valuation shall be binding on theTrustee, the Beneficiaries and the Reorganized Debtors. In connection with any such judicial proceeding, it shall be the Reorganized Debtors' burden to demonstrate that the Trustee's valuation is unreasonable.  The valuation agreed to by the parties or determined by the Bankruptcy Court in accordance with this section 7.4 shall be used consistently by all parties  including the Debtors or the Reorganized Debtors, as applicable, the Trustee, and the Beneficiaries) for all federal income tax purposes. To the extent the Trustee makes any material modifications to the valuation to take into account future transfers of assets to the Trust, the foregoing procedures shall apply to such revised valuation. The Valuation Documentation shall be deemed confidential information and neither the Reorganized Debtors nor SEACOR nor any of their employees, representative and professionals shall provide any of the information in the Valuation Documentation to any potential target of an Avoidance Action or the employees, representatives and professionals of such potential target of an Avoidance Action, without the prior written consent of the Trust. The time periods set forth in this paragraph may be extended only upon written agreement of the Reorganized Debtors and the Trustee.

> 7.5.1    In connection with the preparation of the valuation contemplated by the Plan and this Agreement, the Trust shall be entitled to retain such professionals and advisors as the Trustee shall determine to be appropriate or necessary, and the Trustee shall take such other

actions in connection therewith as it determines to be appropriate or necessary. The Trust shall bear all of the reasonable costs and expenses incurred in connection with determining such value, including the fees and expenses of any professionals retained in connection therewith.

## ARTICLE VIII

### OVERSIGHT COMMITTEE

8.1     Appointment, Composition, and Governance of Oversight Committee.  The GUC Trust Oversight Committee (the "Oversight Committee") shall consist of [three] members, who are: _____, _____, and _____.

8.2     Rights and Duties of Oversight Committee; Corresponding Limitations on Trustee's Actions.  The rights and duties of the Oversight Committee shall be those set forth in this Agreement.  The Trustee shall limit its actions on behalf of the Trust in accordance with the limits established by those provisions.

8.3     Approval and Authorization on Negative Notice.  The Trustee may obtain any approval or authorization required under the Plan or this Agreement from the Oversight Committee on three business days' negative notice.  The Trustee may make requests on behalf of the Trust for approval or authorization by the Oversight Committee in writing, which may be made in the form of an e-mail.  In the event any Oversight Committee member objects to the Trustee's request, the Trustee shall consult with the members of the Oversight Committee about how to proceed.  The Bankruptcy Court shall hear and finally determine any dispute arising out of this section or this Article.

8.4     Compensation of Professionals.  The Oversight Committee shall approve any professional's monthly bill that is for more than [$     ].  Either the Trustee or the professional

31

submitting the bill may seek such approval.  The Trustee may obtain approval as set forth in the

preceding section 8.3 of this Agreement.

      8.5      Appointment of Supplemental Trustee.  The Oversight Committee shall

approve the Trustee's appointment of any Supplemental Trustee (defined below) under section

9.9 of this Agreement and the removal and replacement of any Supplemental Trustee under that

provision.

      8.6      Reimbursement of Oversight Committee Expenses.  The Trustee shall pay from

the Trust Assets all reasonable costs and expenses, including attorneys' fees and expenses, of

members of the Oversight Committee.  The Bankruptcy Court shall hear and finally determine

any dispute arising out of this section.

      8.7      Oversight Committee Member's Conflicts of Interest.  The Oversight

Committee members shall disclose any actual or potential conflicts of interest that such member

has with respect to any matter arising during administration of the Trust to the other Oversight

Committee members and the Trustee and such member shall be recused from voting on any

matter on which such member has an actual or potential conflict of interest.

      8.8      Trustee's Conflicts of Interest.  The Trustee shall disclose to the Oversight

Committee any conflicts of interest that the Trustee has with respect to any matter arising during

administration of the Trust.  In the event that the Trustee cannot take any action, including

without limitation the prosecution of any Causes of Action or the Objection to any Claim, by

reason of an actual or potential conflict of interest, the Oversight Committee acting by majority

shall be authorized to take any such action(s) in the Trustee's place and stead, including without

limitation the retention of professionals (which may include professionals retained by the

32

Trustee) for the purpose of taking such actions.  The Bankruptcy Court shall hear and finally determine any dispute arising out of this section.

8.9      Resignation of Oversight Committee Member.  A member of the Oversight Committee may resign at any time on notice (including e-mailed notice) to the other Oversight Committee members and the Trustee.  The resignation shall be effective on the later of (i) the date specified in the notice delivered to the other Oversight Committee members and the Trustee or (ii) the date that is thirty days (30) after the date such notice is delivered.

8.10      Appointment of Replacement Oversight Committee Members.  In the event of the resignation, death, incapacity, or removal of a member of the Oversight Committee, the Trustee shall nominate and the remaining members of Oversight Committee shall approve, by a vote of at least one member of the Oversight Committee, an additional member of the Oversight Committee.

8.11      Absence of Oversight Committee.  In the event that the members of the Committee do not appoint an Oversight Committee, an Oversight Committee is not yet formed, no one is willing to serve on the Oversight Committee, or there shall have been no Oversight Committee members for a period of thirty (30) consecutive days, then the Trustee may, during such vacancy and thereafter, ignore any reference in this Agreement to an Oversight Committee, and all references to the Oversight Committee's rights and responsibilities in this Agreement will be null and void.

33

# ARTICLE IX

## SELECTION, REMOVAL, REPLACEMENT, AND COMPENSATION OF TRUSTEE

9.1     Initial Trustee.  In accordance with the Plan, the Trustee has been selected by the Creditors' Committee and is appointed effective as of the Effective Date.  The initial trustee shall be the Trustee.

9.2     Term of Service.  The Trustee shall serve until (a) the completion of the administration of the Trust Assets and the Trust, including the winding up of the Trust, in accordance with this Agreement and the Plan; (b) termination of the Trust in accordance with the terms of this Agreement and the Plan; or (c) the Trustee's resignation, death, incapacity or removal.  In the event the Trustee's appointment terminates by reason of death, dissolution, liquidation, resignation or removal, the Trustee shall be immediately compensated for all reasonable fees and expenses accrued through the effective date of termination, whether or not previously invoiced.  The provisions of Article VI of this Agreement shall survive the resignation or removal of any Trustee.

9.3     Removal of Trustee.  Any Person serving as Trustee may be removed at any time for cause.  Any party in interest, on notice and hearing before the Bankruptcy Court, may seek removal of the Trustee for cause.  The Bankruptcy Court shall hear and finally determine any dispute arising out of this section.

9.4     Resignation of Trustee.  The Trustee may resign at any time on written notice to the Oversight Committee, U.S. Trustee, and Bankruptcy Court.  The resignation shall be effective on the later of (i) the date specified in the notice of resignation and (ii) the date that is thirty days (30) after the date such notice is filed with the Bankruptcy Court and served on the Oversight Committee members and the U.S. Trustee.  In the event of a resignation, the resigning

34

Trustee shall render to the Oversight Committee and the United States Trustee a full and complete accounting of monies and assets received, disbursed, and held during the term of office of that Trustee.

9.5    Appointment of Successor Trustee.  Upon the resignation, death, incapacity, or removal of a Trustee, a successor Trustee shall be appointed by the Oversight Committee.  In the event no party in interest seeks the appointment of a successor Trustee, the Bankruptcy Court may do so on its own motion.  Any successor Trustee so appointed shall consent to and accept its appointment as successor Trustee, which may be done by e-mail or through acquiescence in not objecting to a motion for approval of its appointment as successor Trustee.  Any successor Trustee may be appointed to serve only on an interim basis.

9.6    Powers and Duties of Successor Trustee.  A successor Trustee shall have all the rights, privileges, powers, and duties of its predecessor under this Agreement, the Plan, and Confirmation Order.

9.7    Trust Continuance.  The resignation, death, incapacitation, dissolution, liquidation, or removal of the Trustee shall not terminate the Trust or revoke any existing agency created pursuant to this Agreement or invalidate any action theretofore taken by the Trustee.

9.8    Compensation of Trustee and Costs of Administration.  The Trustee shall receive fair and reasonable compensation for its services, which shall be a charge against and paid out of the Trust Assets.  All costs, expenses, and obligations incurred by the Trustee (or professionals who may be employed by the Trustee in administering the Trust, in carrying out their other responsibilities under this Agreement, or in any manner connected, incidental, or related thereto) shall be paid by the Trust from the Trust Assets prior to any distribution to the

35

Beneficiaries.  The terms of the compensation of the Trustee and the timing and manner of

payment are set forth on **Exhibit A** hereto.

9.9      Appointment of Supplemental Trustee.  Subject to Article VIII of this

Agreement, if the Trustee has a conflict or any of the Trust Assets are situated in any state or

other jurisdiction in which the Trustee is not qualified to act as trustee, the Trustee shall

nominate and appoint a Person duly qualified to act as trustee (the "Supplemental Trustee") in

such state or jurisdiction and require from each such Supplemental Trustee such security as may

be designated by the Trustee in its discretion.  The Trustee may confer upon such Supplemental

Trustee all of the rights, powers, privileges and duties of the Trustee hereunder, subject to the

conditions and limitations of this Agreement, except as modified or limited by the laws of the

applicable state or other jurisdiction (in which case, the laws of the state or other jurisdiction in

which such Supplemental Trustee is acting shall prevail to the extent necessary).  The Trustee

shall require such Supplemental Trustee to be answerable to the Trustee for all monies, assets

and other property that may be received in connection with the administration of all the Trust

Assets by the Supplemental Trustee.  Subject to Article VIII of this Agreement, the Trustee may

remove such Supplemental Trustee, with or without cause, and appoint a successor Supplemental

Trustee at any time by executing a written instrument declaring such Supplemental Trustee

removed from office and specifying the effective date and time of removal.

## ARTICLE X

### DURATION OF TRUST

10.1      Duration.  Once the Trust becomes effective upon the Effective Date of the

Plan, the Trust and this Agreement shall remain and continue in full force and effect until the

Trust is terminated.

10.2    <u>Dissolution/Termination of Trust.</u>  The Trust shall be dissolved at such time as (i) all of the Trust Assets have been distributed pursuant to the Plan and the Trust Agreement, (ii) the Trustee determines that the administration of any remaining Trust Assets is not likely to yield sufficient additional proceeds to justify further pursuit, or (iii) all distributions required to be made by the Trustee under the Plan and this Agreement have been made; provided, however, that in no event shall the Trust be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court determines that a fixed period extension (not to exceed two (2) years, including any prior extensions) is necessary to facilitate or complete the recovery and liquidation of the Trust Assets.  If at any time the Trustee determines, in reliance upon such professionals as the Trustee may retain, that the expense of continued administration of the Trust is likely to exceed the value of the remaining Trust Assets, the Trustee may apply to the Bankruptcy Court for authority to (i) reserve any amount necessary to dissolve the Trust, (ii) donate any balance to a charitable organization (A) described in section 501(c)(3) of the Tax Code, (B) exempt from U.S. federal income tax under section 501(a) of the Tax Code, (C) not a "private foundation" as defined in section 509(a) of the Tax Code, and (D) that is unrelated to the Debtors, the Trust, and any insider of the Trustee, and (iii) dissolve the Trust.

10.3    <u>No Termination by Beneficiaries.</u>  The Trust may not be terminated at any time by the Beneficiaries.

10.4    <u>Continuance of Trust for Winding Up; Discharge and Release of Trustee.</u>  After the termination of the Trust and solely for the purpose of liquidating and winding up the affairs of the Trust, the Trustee shall continue to act as such until its responsibilities have been fully performed.  Except as otherwise specifically provided herein, upon the distribution of the Trust Assets including all excess reserves, the Oversight Committee members, the Trustee, and the

37

Trust's professionals and agents shall be deemed discharged under this Agreement and have no

further duties or obligations hereunder.  Upon a motion by the Trustee, the Bankruptcy Court

may enter an order relieving the Oversight Committee members and the Trustee, its employees,

and the Trust's professionals and agents of any further duties, discharging and releasing the

Trustee from all liability related to the Trust, and releasing the Trustee's bond, if any.

## ARTICLE XI

### MISCELLANEOUS

11.1    Cumulative Rights and Remedies.  The rights and remedies provided in this

Agreement are cumulative and not exclusive of any rights and remedies under law or in equity.

11.2    Notices.  All notices to be given to Beneficiaries may be given by ordinary

mail, or may be delivered Personally, to the Holders at the addresses appearing on the books kept

by the Trustee.  Any notice or other communication which may be or is required to be given,

served, or sent to the Trustee shall be in writing and shall be sent by registered or certified

United States mail, return receipt requested, postage prepaid, or transmitted by hand delivery or

facsimile (if receipt is confirmed) addressed as follows:

    If to the Trust or the Trustee:

    with a copy to its counsel:

or to such other address as may from time to time be provided in written notice by the Trustee.

38

11.3     Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to rules governing the conflict of laws.

11.4     Successors and Assigns.  This Agreement shall inure to the benefit of and shall be binding upon the Parties and their respective successors and assigns.

11.5     Particular Words.  Reference in this Agreement to any Section or Article is, unless otherwise specified, to that such Section or Article under this Agreement.  The words "hereof," "herein," and similar terms shall refer to this Agreement and not to any particular Section or Article of this Agreement.

11.6     Execution.  All funds in the Trust shall be deemed in custodia legis until such times as the funds have actually been paid to or for the benefit of a Beneficiary, and no Beneficiary or any other Person can execute upon, garnish or attach the Trust Assets or the Trustee in any manner or compel payment from the Trust except by Final Order of the Bankruptcy Court.  Payments will be solely governed by the Plan and this Agreement.

11.7     Amendment.  This Agreement may be amended by written agreement of the Trustee and the Oversight Committee or by order of the Bankruptcy Court; provided, however, that such amendment may not be inconsistent with the Plan or the Confirmation Order.

11.8     No Waiver.  No failure or delay of any party to exercise any right or remedy pursuant to this Agreement shall affect such right or remedy or constitute a waiver thereof.

11.9     No Relationship Created.  Nothing contained herein shall be construed to constitute any relationship created by this Agreement as an association, partnership or joint venture of any kind.

39

11.10     Severability.  If any term, provision covenant or restriction contained in this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void, unenforceable or against its regulatory policy, the remainder of the terms, provisions, covenants and restrictions contained in this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

11.11     Further Assurances.  Without limitation of the generality of section 2.4 of this Agreement, the Parties agree to execute and deliver all such documents and notices and to take all such further actions as may reasonably be required from time to time to carry out the intent and purposes and provide for the full implementation of this Agreement and the pertinent provisions of the Plan, and to consummate the transactions contemplated hereby.

11.12     Counterparts.  This Agreement may be executed simultaneously in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

11.13     Jurisdiction.  The Bankruptcy Court shall have jurisdiction over the Trust, Trustee, and Trust Assets, including, without limitation, the determination of all disputes arising out of or related to administration of the Trust.  The Bankruptcy Court shall have exclusive jurisdiction and venue to hear and finally determine all matters among the Parties arising out of or related to this Agreement or the administration of the Trust.

DOCS_NY:34854.4 42331/002

IN WITNESS WHEREOF, the Parties have or are deemed to have executed this

Agreement as of the day and year written above.

INTERNATIONAL SHIPHOLDING
CORPORATION


By:_____
Name:_____
Title:_____


ENTERPRISE SHIP CO.


By:_____
Name:_____
Title:_____


SULPHUR CARRIERS, INC.


By:_____
Name:_____
Title:_____


CENTRAL GULF LINES, INC.


By:_____
Name:_____
Title:_____


COASTAL CARRIERS, INC.


By:_____
Name:_____
Title:_____

WATERMAN STEAMSHIP
CORPORATION


By:_____
Name:_____
Title:_____


N.W. JOHNSEN & CO., INC.


By:_____
Name:_____
Title:_____


LMS SHIPMANAGEMENT, INC.


By:_____
Name:_____
Title:_____


U.S. UNITED OCEAN SERVICES, LLC


By:_____
Name:_____
Title:_____


MARY ANN HUDSON, LLC


By:_____
Name:_____
Title:_____

42

SHEILA MCDEVITT, LLC


By:_____
Name:_____
Title:_____


TOWER LLC


By:_____
Name:_____
Title:_____


FRASCATI SHOPS, INC.


By:_____
Name:_____
Title:_____


GULF SOUTH SHIPPING PTE LTD


By:_____
Name:_____
Title:_____


LCI SHIPHOLDINGS, INC.


By:_____
Name:_____
Title:_____

43

DRY BULK AUSTRALIA LTD


By:_____
Name:_____
Title:_____


DRY BULK AMERICAS LTD


By:_____
Name:_____
Title:_____

MARCO SHIPPING COMPANY PTE LTD


By:_____
Name:_____
Title:_____


[TRUSTEE]


By:_____
Name:_____
Title:_____

44

# Exhibit A

**Terms of Compensation of Trustee**

1.)    <u>Compensation</u>.  In consideration for the services of the Trustee under this Agreement, the Trustee shall receive the following compensation from the Trust Assets: (i) start-up costs not to exceed [$      ]; (ii) a monthly fee of [      ]; and (iii) reimbursement of reasonable and necessary expenses, including payment of all fees and expenses of the Trustee's attorneys incurred in drafting, reviewing, revising, negotiating, and executing this Agreement, the Plan, Confirmation Order, and any related documents.

2.)    <u>Payment of Monthly Fee and Start-Up Costs; Full Fee for Initial Month</u>.  The Trustee's monthly fee, together with payment of any start-up costs and expenses under the above paragraph, shall be payable out of the Trust Assets beginning on the Effective Date and continuing thereafter until the Trustee is discharged.  The first monthly fee shall be incurred immediately on the Confirmation Date, but not payable until the appointment of the Trustee on the Effective Date.  The Trustee shall be entitled to payment of its entire monthly fee, without prorating, for and beginning with the month in which the Trustee is appointed.

3.)    <u>Means and Timing of Payment</u>.  The Trustee's monthly fee shall be automatically paid in advance by wire transfer or equivalent electronic means in the Trustee's discretion on the Effective Date and thereafter on the first day of each month though and including the month in which the Trustee is discharged.

DOCS_NY:34854.4 42331/002

**EXHIBIT G**

**Identification of the GUC Trustee**

**(to Come)**

**EXHIBIT H**

**Form of Regions Note**[13]

---

[13] The Debtors reserve all rights to amend, modify, or supplement the form of the Regions Note.  The final form of the Regions Note shall be acceptable to SEACOR.

**LIMITED RECOURSE SECURED PROMISSORY NOTE**

[_____ __], 2017

FOR VALUE RECEIVED, [INTERNATIONAL SHIPHOLDING CORPORATION], [U.S. UNITED OCEAN SERVICES, LLC], [MARY ANN HUDSON, LLC], and [C.G. RAILWAY, INC.], (collectively, the "Maker"), pursuant to the order of the Bankruptcy Court dated [February 16, 2017] confirming the Plan,  hereby promise to pay to the order of Regions Bank (the "Payee"), as administrative and collateral agent on behalf of the holders of the Regions Facility Claims, the principal sum of [_____]¹ DOLLARS ($[_____]) together with interest, in each case in the manner described herein.  Certain terms used herein are defined in Annex A.

      1.     <u>Payments of Principal</u>.  Subject to the acceleration provisions of Section 7, all unpaid principal, fees (if applicable pursuant to this Note) and accrued and unpaid interest shall be due and payable in full on the earlier of (i) [_____ __, ____]² and (ii) two business days after the occurrence of both (x) the consummation of the sale of the Vessels pursuant to Vessel Dispositions and (y) the receipt of final collection on account of the BP Claim (the "<u>Maturity Date</u>").

      2.     <u>Interest</u>.  The unpaid principal amount of this Note shall accrue interest on the basis of a 360 day year at 7.00% per annum.  Accrued interest shall be payable (a) upon the payment or prepayment of any principal outstanding under this Note (but only on the principal amount so paid or prepaid), (b) on the last business day of each calendar month, commencing on [_____ __, ____] and (c) on the Maturity Date.

      3.     <u>Prepayments</u>.

          (a)     <u>Optional Prepayment</u>.  The Maker may at any time and from time to time prepay any principal amount of this Note in whole or in part without premium or penalty.

          (b)     <u>Mandatory Prepayment</u>.  Within two business days of the occurrence of (x) each Vessel Disposition and (y) receipt of collection on account of the BP Claim by the Maker, the Maker shall prepay this Note in accordance with Section 4 using the Net Proceeds received by the Maker.

      4.     <u>Payment Terms</u>.  All payments of principal of, and interest upon, this Note shall be made by the Maker to the Payee in cash in immediately available funds in lawful money of the United States of America, by wire transfer to the bank account designated by the Payee in writing from time to time. All payments under this Note shall be made to the Payee without withholding, defense, set-off, counterclaim or deduction.  Payments and prepayments made to the Payee by the Maker hereunder shall be applied to

---

¹ NTD: $4,500,000, minus the amount of proceeds, if any, from the disposition or collection, as applicable, of (i) the *Louisiana Enterprise* (and *Coastal 101*), (ii) at the election of SEACOR, the *Texas Enterprise* or the *Florida Enterprise* (and the *Coastal 202*) and (iii) the BP Claim, in each case received and paid to the holders of the Regions Facility Claims on or before the Effective Date.

² NTD: Insert one year anniversary of the Effective Date.

accrued interest and then to principal. If the due date of any payment under this Note would otherwise fall on a day that is not a business day, such due date shall be extended to the next succeeding business day, and interest shall be payable on any principal so extended for the period of such extension.

5.       Security Grant.  As collateral security for the prompt payment in full when due (whether at stated maturity, by acceleration or otherwise) of all Obligations, the Maker hereby pledges and grants to the Payee a security interest in all of the Maker's right, title and interest in the following property, assets and revenues, whether now owned by the Maker or hereafter acquired and whether now existing or hereafter coming into existence (all of the property, assets and revenues described in this Section 5 being collectively referred to herein as the "Collateral"):

(a)       the vessel *Louisiana Enterprise* (and Coastal 101);

(b)       the vessel [*Texas Enterprise / Florida Enterprise*][3] (and Coastal 102);

(c)       the BP Claim; and

(d)       all proceeds of and to any of the Collateral.[4]

6.       Events of Default.  An "Event of Default" shall exist hereunder if any one or more of the following events shall occur:

(a)       the Maker shall fail (i) to pay any principal or any portion thereof when due, or (ii) to pay any interest or any portion thereof or any other amount hereunder within three business days the same becomes due; or

(b)       the Maker shall fail to perform or observe any other covenant or agreement contained herein or in any of the Vessel Mortgages for ten business days after notice thereof; or

(c)       any representation or warranty of the Maker made herein proves to have been materially incorrect when made; or

(d)       the Maker institutes or consents to any proceeding under any bankruptcy laws relating to it or to all or any part of its property, or is unable or admits in writing its inability to pay its debts as they mature, or makes an assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer for it or for all or any part of its property; or any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer is appointed without the application or consent of the Maker; or any proceeding under a Debtor Relief Law relating to the Maker or to all or any part of its property is instituted without its consent; or any judgment, writ, warrant of attachment or execution or similar process is issued or levied against all or any

---

[3] NTD: Insert vessel at election of SEACOR.

[4] NTD:  With respect to vessels *Louisiana*, *Texas* or *Florida*, parties to (i) file new vessel mortgage(s) referencing the [$4.5 mm] note as the secured obligations and (ii) terminate the old vessel mortgages. Parties to also execute releases of the *Green Ridge* and the *Mississippi Enterprise* from the existing vessel mortgages and, with regard to the BP Claim, execute a UCC-3 in favor of C.G. Railway, releasing all collateral pledged by Railway other than the BP Claim (from the existing lien).

material part of its property and is not released, vacated or fully bonded within ten calendar days after its issue or levy; or

(e)    a judgment against the Maker is entered that could result in a Lien on any of the Collateral; and, absent procurement of a stay of execution, any such judgment remains unbonded or unsatisfied for ten calendar days after the date of entry of judgment, or in any event later than 60 days prior to the date of any proposed sale thereunder; or

(f)    the Maker shall contest the validity or enforceability of any part of this Note.

7.    <u>Remedies</u>.  Upon the occurrence of any Event of Default specified in Section 6(d) above, the principal amount of this Note together with any interest thereon, all Obligations shall become immediately and automatically due and payable, without presentment, demand, notice, protest or other requirements of any kind (all of which are hereby expressly waived by the Maker).  Upon the occurrence and during the continuance of any other Event of Default, the Payee may, by written notice to the Maker, declare the principal amount of this Note together with any interest thereon to be due and payable, and the principal amount of this Note together with any such interest shall thereupon immediately become due and payable without presentment, further notice, protest or other requirements of any kind (all of which are hereby expressly waived by the Maker).  Following any such demand, the Maker shall immediately pay to such holder all amounts due and payable with respect to this Note.  If an Event of Default shall have occurred and is continuing, the Payee shall have all of the rights and remedies with respect to the Collateral of a secured party under the UCC (whether or not the UCC is in effect in the jurisdiction where the rights and remedies are asserted) and such additional rights and remedies to which a secured party is entitled under the laws in effect in any jurisdiction where any rights and remedies hereunder may be asserted, including the right, to the fullest extent permitted by law, to exercise all voting, consensual and other powers of ownership pertaining to the Collateral as if the Payee were the sole and absolute owner thereof (and the Maker agrees to take all such action as may be appropriate to give effect to such right).

8.    <u>Maker's Representations and Warranties</u>.  The Maker represents and warrants to the Payee as follows:

(a)    <u>General Representations</u>.  It has the legal capacity to execute, deliver and perform this Note.  The execution, delivery and performance by the Maker does not violate any law, or result in a breach of or default under, or would, with the giving of notice or the lapse of time or both, constitute a breach of or default under, or cause or permit the acceleration of any obligation owed under, any indenture, loan or credit agreement or any other contractual obligation to which the Maker is a party or by which the Maker or any of its property or assets are bound or affected.  This Note has been executed and delivered by the Maker and constitutes the legal, valid and binding obligation of the Maker enforceable against the Maker in accordance with its terms.  There are no actions, suits or proceedings by or before any arbitrator or governmental authority pending against or, to the knowledge of the Maker, threatened against or affecting the Collateral or that involve this Note or the transactions contemplated hereby.

(b)    <u>Collateral Representations</u>. It owns the Collateral purported to be owned by it or otherwise has rights or the power to transfer rights in the Collateral in which it purports to grant a security interest hereunder and no Lien exists upon the Collateral other than the security interest created or provided for herein.

9.    <u>Covenants</u>.  The Maker covenants and agrees as follows:

(a)    Restrictions on Liens.  The Maker shall not directly or indirectly create, incur, assume or suffer to exist any Liens against any Collateral, except Liens hereunder and Permitted Liens.

(b)    Vessel Dispositions.  The Maker shall apply the Net Proceeds of any Vessel Disposition to the mandatory prepayment of the Note pursuant to Sections 3.2 and 4.  The Maker shall not consummate any Vessel Disposition unless the Payee has consented to such Vessel Disposition (which consent shall not to be unreasonably withheld); provided that the Payee's consent shall not be required for any Vessel Disposition on or prior to [_____ __, ____][5] if the Net Proceeds thereof are sufficient to prepay the Note in full.

(c)    Collection on the Account of the BP Claim.  The Maker shall use its commercially reasonable efforts to expeditiously pursue collection (including by, at its option, negotiating a favorable settlement) of the BP Claim.  The Maker shall apply the Net Proceeds of such collection to the mandatory prepayment of the Note pursuant to Section 3.2 and 4.  The Maker shall not settle or dispose of the BP Claim without the consent (not to be unreasonably withheld) of the Payee; provided that such consent shall not be required for any settlement or disposition on or prior to [_____ __, ____][6] if the Net Proceeds thereof are sufficient to prepay the Note in full.

(d)    Perfection and Recordation.

(i)    The Maker authorizes the Payee to file Uniform Commercial Code financing statements describing the Collateral.

(ii)    On or prior to the Effective Date, the Maker shall deliver to the Payee Vessel Mortgages encumbering each Vessel duly executed by the Maker who is the registered owners of such Vessel and notarized, legalized, and/or apostilled as required by such Vessel's jurisdiction of registry, and evidence that each such Vessel Mortgage has been or will be recorded in all places to the extent necessary or desirable, in the reasonable judgment of the Payee, so as to enable the Payee in its own capacity to hold a perfected and enforceable first priority (subject to Permitted Liens) preferred mortgage lien and security interest on such Vessel.

(e)    Further Assurances.  The Maker shall do such further acts and things, and to execute and deliver such additional conveyances, assignments, financing statements, agreements and instruments, as the Payee may at any time reasonably request in connection with the administration or enforcement of this Note and the other documents delivered in connection therewith or related to the collateral or any part thereof or in order better to assure and confirm unto the Payee its rights, powers and remedies in respect thereof.

10.    Governing Law; Submission to Jurisdiction; Waiver of Jury Trial, Etc.  This Note shall be governed by, and construed in accordance with, the law of the State of New York.  The Maker and Payee hereby submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York and of any New York state court sitting in New York City, borough of Manhattan

---

[5] NTD: Insert date one month prior to the date in clause (i) of the definition of Maturity Date.

[6] NTD: Insert date one month prior to the date in clause (i) of the definition of Maturity Date.

for the purposes of all legal proceedings arising out of or relating to this Note or the transactions contemplated hereby.  This Note may be executed in any number of counterparts, each of which, when so executed, shall be deemed to be an original and all of which, taken together, shall constitute one and the same Note.  Delivery of an executed counterpart of a signature page to this Note by electronic transmission shall be as effective as delivery of an original executed counterpart of this Note.  Section 10 shall survive the termination of this Note.  **EACH PARTY HERETO IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS NOTE OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THE ACTIONS OF THE PARTIES HERETO IN THE NEGOTIATION, PERFORMANCE OR ENFORCEMENT HEREOF.**

11.    Expenses; Notices.  Each party hereto shall be responsible for its own costs and expenses in connection with this Note; provided that the Maker shall pay on demand all reasonable attorney fees and expenses of the Payee in connection with the enforcement or attempted enforcement of this Note upon an Event of Default.  This Note may not be changed, modified or terminated orally, but only by an agreement in writing signed by the Maker and the Payee.  All notices and other communications in respect of this Note shall be given or made in writing at the following respective addresses:

If to the Makers,

_____

_____

_____

If to the Payee,

Regions Bank, as Agent
NC-CX-02382-B
6805 Morrison Blvd. Suite 100
Charlotte, NC  28211
Attention:  Mr. Douglas E. Smith
704-362-3596
douglase.smith@regions.com

or to such other address or addresses as may be designated by such party in a notice to the other party.  Except as otherwise provided in this Note, all such communications shall be deemed to have been duly given when transmitted by electronic transmission or personally delivered or, in the case of a mailed notice, upon receipt, in each case given or addressed as aforesaid.

12.    Right of Setoff.  If an Event of Default shall have occurred and be continuing, the Payee and each of its affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by the Payee or any such affiliate to or for the credit or the account of the Maker against any and all of the obligations of the Maker now or hereafter existing hereunder to the Payee or, irrespective of whether or not the Payee shall have made any demand hereunder and although such obligations of the Maker may be contingent or unmatured or are owed to a branch or office of the Payee different from the branch or office holding such deposit or obligated on such indebtedness.  The rights of

the Payee and its affiliates hereunder are in addition to other rights and remedies (including other rights of setoff) that the Payee or its affiliates may have.

13.    <u>Assignments</u>.  The Maker may not assign any of its rights or obligations under this Note without the consent of the Payee.  The Payee may not assign its rights and obligations under this Note without the prior written consent of the Maker (not to be unreasonable withheld); provided, however, that no such consent to such an assignment by the Payee shall be required after the occurrence and during the continuance of an Event of Default.  From and after the effective date specified in each assignment and assumption, the assignee thereunder shall be a party to this Note and, to the extent of the interest assigned by such assignment and assumption, have the rights and obligations of the Payee under this Note, and the Payee shall, to the extent of the interest assigned by such assignment and assumption, be released from its obligations under this Note (and, in the case of an assignment and assumption covering all of the Payee's rights and obligations under this Note, the Payee shall cease to be a party hereto) but shall continue to be entitled to the benefits of Section 11 with respect to facts and circumstances occurring prior to the effective date of such assignment.

14.    <u>Limited Recourse</u>.

(a)    (i) The payment obligations of the Maker set forth in this Note shall constitute limited recourse obligations of the Maker payable solely from the Collateral and (ii) upon the Maker's liquidation of the Vessels, its receipt of collections on account of the BP Claim, and payment of all Net Proceeds thereof to the Payee with application thereof to the Note, any remaining obligations of the Maker and any claim against the Maker in respect of this Note shall be extinguished and shall not thereafter revive.

(b)    It is understood that nothing in this Section 14 shall (i) prevent recourse to the Collateral for the sums due or to become due under any security, instrument or agreement which is part of the collateral, (ii) prevent recourse to the Maker to the extent of any Collateral, or Net Proceeds of the Collateral, distributed or transferred by the Maker in violation of the provisions of this Note, or (iii) constitute a waiver, release or discharge of any indebtedness or obligation evidenced by the Note or payable under this Note until all Collateral has been liquidated, whereupon any outstanding indebtedness or obligation shall be extinguished and shall not thereafter revive.

15.    <u>Joint and Several Liability</u>.  If the Maker consists of more than one Person, each shall be jointly and severally liable to perform the obligations of the Maker under this Note.

16.    <u>Terms Generally</u>.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any person shall be construed to include such person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Note in its entirety and not to any particular provision hereof, (d) all references herein to Sections shall be construed to refer to Sections of this Note and (e) any reference to any law or regulation herein shall, unless otherwise specified, refer to such law or regulation as amended, supplemented or otherwise modified from time to time.

IN WITNESS WHEREOF, the Maker has caused this Note to be executed and delivered by their duly authorized officers, as of the date and year and at a place first above written.

[_____].


By: _____
Name:
Title:



[_____].


By: _____
Name:
Title:



[_____].


By: _____
Name:
Title:

ANNEX A

Definitions.  The following capitalized terms, when used in this Note, shall have the following meanings:

"BP Claim" means the claim of C.G. Railway, Inc. (Claim No. 154805) asserted in the Deepwater Horizon Economic and Property Damages Settlement Program.

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York.

"Debtor Relief Law" means the Bankruptcy Reform Act of 1978, codified as 11 U.S.C. §§101 et seq, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Effective Date" has the meaning set forth in the Plan.

"Lien" means any lien, mortgage, pledge, assignment, security interest, charge or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease or license in the nature thereof) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing.

"Net Proceeds", when used with respect to any Person, means cash proceeds received by such Person from any (x) Vessel Disposition net of the reasonable costs and expenses (including without limitation attorney fees and expenses) of such sale, lease, transfer or other disposition or (y) collection on the account of the BP Claim net of the reasonable costs and expenses (including without limitation attorney fees and expenses) of such collection.

"Obligations" means, collectively, (a) all obligations of the Maker under this Note to pay principal, reasonable attorney fees and expenses (only upon an Event of Default) and interest, and (b) in the case of each of the foregoing, including all interest thereon and expenses related thereto, including any interest or expenses accruing or arising after the commencement of any case under any Debtor Relief Law (whether or not such interest or expenses are enforceable, allowed or allowable as a claim in whole or in part in such case).

"Permitted Liens" (a) Liens for the wages of the crew, and for wages of stevedores when employed by the Maker or the master of a Vessel, (b) Liens for general average or for salvage (including contract salvage), (c) Liens fully covered (less permitted deductibles) by valid policies of insurance held by or otherwise in favor of the Maker, (d) maritime liens which attach to a Vessel by operation of law, but only to the extent that such Liens are incurred and paid in the ordinary course of business without delay or default, and (e) such other Liens as may be incurred with the prior written consent of the Payee; provided, however, that no Lien described above in clauses (a) through (e) of this definition shall be a Permitted Lien if such Lien is no longer inchoate or otherwise entails a material risk of seizure, sale or forfeiture of a Vessel.

"Person" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and governmental authorities.

"Plan" means the First Amended Joint Chapter 11 Plan of Reorganization of International Shipholding Corporation and its affiliated debtors.

"Regions Facility Claims" has the meaning set forth in the Plan.

"UCC" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect from time to time in any applicable jurisdiction.

"Vessel Disposition" means the disposition whether by sale, lease, transfer or otherwise of the Vessels.

"Vessel Mortgage" means any preferred ship mortgage or other similar instrument encumbering a Vessels constituting Collateral described therein, and all proceeds thereof, each to be executed in favor of the Payee by the Maker who is the registered owner of the Vessel covered thereby in a form recordable as required by such Vessel's jurisdiction of registry, and acceptable to the Payee, as such instruments may be amended, modified, renewed or supplemented from time to time.

"Vessels" means the vessels described in Sections 5(a) and (b).