**Hearing Date:  January 29, 2019 at 10:00 a.m. (prevailing Eastern Time)**
**Response Deadline:  January 22, 2018 at 4:00 p.m. (prevailing Eastern Time)**

Robert J. Feinstein
Richard E. Mikels
Bradford J. Sandler
Steven W. Golden
PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 34th Floor
New York, NY  10017
Telephone:  (212) 561-7700
Facsimile:  (212) 561-7777
rfeinstein@pszjlaw.com
rmikels@pszjlaw.com
bsandler@pszjlaw.com
sgolden@pszjlaw.com

*Counsel for the GUC Trustee of*
*the GUC Trust*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | **Chapter 11** |
| | : | |
| **INTERNATIONAL SHIPHOLDING** | : | **Case No. 16-12220 (SMB)** |
| **CORPORATION., *et al.*,**[1] | : | |
| | : | **Jointly Administered** |
| | : | |
| **Reorganized Debtors.** | : | |

---------------------------------------------------------------x

**MOTION OF THE GUC TRUSTEE TO ENFORCE THE PLAN AND CONFIRMATION ORDER WITH RESPECT TO THE REORGANIZED DEBTORS' RESPONSIBILITY TO DEFEND ASBESTOS CLAIMS, RELIEVING STAY AND INJUNCTION, AND APPROVING THE GUC TRUSTEE'S RIGHT NOT TO DEFEND ASBESTOS CLAIMS**

---

[1] The Reorganized Debtors in these cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, are: International Shipholding Corporation (9662); Central Gulf Lines, Inc. (8979); Coastal Carriers, Inc. (6278); Waterman Steamship Corporation (0640); N.W. Johnsen & Co., Inc. (8006); Tower LLC (6755); Frascati Shops, Inc. (7875); Gulf South Shipping PTE LTD (8628); and LCI Shipholdings, Inc. (8094).  The service address for each of the above Reorganized Debtors is 2200 Eller Drive, P.O. Box 13038, Fort Lauderdale, FL 33316.

Robert N. Michaelson (the "GUC Trustee" "or "Trustee"), in his capacity as trustee of the International Shipholding GUC Trust (the "GUC Trust" or "Trust") hereby submits this motion (the "Motion") for entry of an order enforcing the terms of the Debtors' *First Amended Modified Joint Chapter 11 Plan of Reorganization for International Shipholding Corporation and its Affiliated Debtors* [Docket No. 671-1] (the "Plan") and *Findings of Fact, Conclusions of Law, and Order Confirming the First Amended Modified Joint Chapter 11 Plan of Reorganization for International Shipholding Corporation and its Affiliated Debtors* [Docket No. 671] (the "Confirmation Order"), and respectfully represents as follows:[2]

### **Preliminary Statement**

1.      Pursuant to a settlement between the Debtors and the Official Committee of Unsecured Creditors, as more fully discussed in the *Disclosure Statement for the First Amended Modified Joint Chapter 11 Plan of Reorganization for International Shipholding Corporation and its Affiliated Debtors* [Dkt. No. 537] (the "Disclosure Statement"), the GUC Trust was created and funded with $3 million (the "GUC Fund"),[3] which amount was intended to both fund the activities of the GUC Trust and to make a distribution to general unsecured claimholders.  As described in the Disclosure Statement, the aggregate estimated amount of non-asbestos related general unsecured claims to be paid out of the GUC Trust was $101,855,136.67, which the Debtors suggested would probably lead to a recovery of 3%.

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan.

[3] The GUC Trust also received potential preference actions, subject to certain conditions being satisfied.

2.      There are more than 800 Asbestos Claims (defined below) pending in courts across the country, which together could have an aggregate claim value of over $800,000,000.[4] The cost to defend against those Asbestos Claims could run in the tens of millions of dollars.[5]

3.      The Plan imposed upon the Reorganized Debtors the duty to defend against the Asbestos Claims.  However, the Reorganized Debtors have taken the position that they are not responsible for defending against the Asbestos Claims, but the GUC Trust somehow is.  There is simply no legal or factual way the Reorganized Debtors' interpretation of the Plan makes sense.  First, the Plan clearly imposes the obligation to defend against the Asbestos Claims on the Reorganized Debtors.  Second, the Disclosure Statement's estimate of claims to be paid out of the GUC Trust, which served as the basis for creditors voting on the Plan, does not take into account the Asbestos Claims.  Third, the Asbestos Claims would likely be liquidated in state or federal courts across the country, and with only $3 million in the GUC Trust, there is no practical way the GUC Trust could have been expected to fund the defense against the Asbestos Claims, which would likely cost tens of millions of dollars.  Fourth, the Reorganized Debtors kept all of the records necessary to defend against the Asbestos Claims, including the applicable insurance policies.  Fifth, and perhaps most tellingly, the Reorganized Debtors pursuant to the Plan, assumed the applicable policies of insurance that cover the Asbestos Claims.

4.      For several months, the GUC Trustee has been working with the Reorganized Debtors in an attempt to resolve the disputes underlying this Motion and to liquidate the Asbestos Claims in a manner that would avoid significant litigation.  While those efforts have

---

[4] Assume for purposes of this motion that, on average, the amount of each Asbestos Claim is liquidated in the amount of $100,000.

[5] Assuming an unrealistically low average defense cost of $25,000 per Asbestos Claim, inclusive of legal and expert fees, and extrapolate by the 831 Asbestos Claims, the cost of defense could easily reach over $20,000,000.

3

not yet been successful, the GUC Trustee remains hopeful that all parties, including the Reorganized Debtors, the Plaintiffs holding asbestos related claims (the "<u>Plaintiffs</u>" or the "<u>Claimants</u>"), and the Clubs (as defined below) can reach a consensual resolution of the issues surrounding the defense and payment of the Asbestos Claims.

## Jurisdiction

5.      The United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>") has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334, the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012, paragraph 48 of the Confirmation Order, and section 12.1.7 of the Plan.  The GUC Trustee confirms his consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), to the entry of a final order by the Bankruptcy Court in connection with this Motion to the extent that it is later determined that the Bankruptcy Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

6.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

### A.  *Plan Confirmation and Establishment of the GUC Trust*

7.      On March 2, 2017, the Court entered the Confirmation Order.  Pursuant to the terms of the Plan, the GUC Trust was formed and funded with $3 million to cover the cost of administration of the GUC Trust and provide for a recovery to the general unsecured creditors. *See Plan*, at §§ 1.1.68, 9.3.1.

8.      In the Disclosure Statement, the Debtors stated that the aggregate amount of general unsecured claims in Classes 7(a)-(m) and 7(p)-(q), which claims were those that would

DOCS_NY:38326.5 42331/003

receive interests in the GUC Trust, was $101,855,136.67. *Disclosure Statement*, at p. 13. Given that the GUC Trust was funded with $3 million, the Debtors estimated the general unsecured creditors' recovery to be approximately 3%. *Id.*

9.     On July 3, 2017, the Effective Date of the Plan occurred. *See Notice of (I) Entry of Order Confirming the First Amended Modified Joint Chapter 11 Plan of Reorganization for International Shipholding Corporation and its Affiliated Debtors; (II) Occurrence of Effective Date; and (III) Deadline for Filing Fee Claims and Administrative Expense Claims* [Docket No. 796] (the "Effective Date Notice").

10.     Pursuant to the Plan, the GUC Trustee was appointed on the Effective Date "to implement the Plan . . . and distribute the GUC Trust Assets." [*See Plan*] at section 9.6. Notably, the Reorganized Debtors included in the Plan and Confirmation Order that, notwithstanding the establishment of the GUC Trust, the Reorganized Debtors would retain the right "to file, settle, compromise, withdraw or litigate to judgment any objection to General Unsecured Claims." *Id.*, at section 6.2. The GUC Trustee was also accorded the right to do so. *Plan*, at section 9.2.1. Importantly, the policies of insurance applicable to the coverage of the Asbestos Claims were not transferred to the GUC Trust, but rather were assumed and assigned to the Reorganized Debtors. *See Plan*, at § 6.5.3. and § 8.1.

**B.  The Asbestos Claims**

11.     Of the approximately 1,161 filed claims, which in the aggregate assert over $872,341,724 in unsecured liabilities against the Debtors, approximately 831 asbestos-related claims have been filed in these cases, totaling approximately $639.1 million plus unliquidated amounts, asserting claims, predominantly against Debtors Central Gulf Lines, Inc. ("CGL"),

and/or Waterman Steamship Corporation ("WSC"),[6] related to alleged exposure to asbestos onboard the Debtors' vessels (the "Asbestos Claims").[7]  Thus, the Asbestos Claims represent over 70% in number and over 73% in amount of the filed general unsecured claims.

### C.  The Policies

12.    Upon information and belief, CGL (since 1960) and WSC (since 1946) have been a party to various insurance policies (the "Policies") which may cover liability the Debtors may have on account of personal injury claims, including the Asbestos Claims.  The structure of the Policies, however, is complex and the identity of the applicable insurance provider varies depending on the year of injury and vessel.  Accordingly, an Asbestos Claim may be covered by multiple Policies to the extent the Claimant worked aboard several of the Debtors' ships over a period of time.  It is even more complex if an Asbestos Claimant worked on vessels owned by non-Debtor shipping companies during the same periods.

13.    Upon information and belief, some or all of the Policies may not be traditional insurance policies, but rather may be maritime indemnity policies issued by indemnity clubs ("Clubs" or "Insurance Companies"), which are themselves a collective of many shipowners. The ship-owners indemnify each other through the Clubs, which, in many cases, is how insurance for injuries and sickness is provided to the seamen who work on the shipowners vessels.  Pursuant to those Policies, Club members, who are shipowners like the Reorganized Debtors, arguably must "pay first," and then seek reimbursement for such expenses and damages by the Club subject to certain deductibles and conditions. Absent a bankruptcy, it might be that

---

[6] A small number of Asbestos Claims also appear to have been filed against Sulphur Carriers, Inc. ("SCI").  The Trustee has not been provided with any information concerning SCI's insurance and indemnity policy structure.

[7] For the purposes of this Motion, Asbestos Claims include non-asbestos related personal injury claims, which are treated substantially the same way as Asbestos Claims.

DOCS_NY:38326.5 42331/003

the insured ship-owner would have to defend all claims and pay all expense costs and damages before seeking reimbursement from the Club. The Club would be required to reimburse the shipowner for the expenses plus the damages paid, less a deductible (the "Deductible") amount provided for in such policies. Since the Clubs are consortiums of ship-owning companies, the shipowners in each Club insure and indemnify each other against insurance claims. The Clubs have the right to take over the defense of any claims directly.

14.    The following chart shows CGL's and WSC's historical insurance coverage:

| Central Gulf Lines, Inc. | |
| --- | --- |
| **Period of Coverage** | **Underwriter** |
| 1960 – 1976 | The West of England Ship Owners Insurance Services, Ltd. |
| 1976 – 1979 | Shipowners Claims Bureau, Ltd. |
| 1979 – 1995 | Gard (North America) Inc. |
| *Waterman Steamship Corporation* | |
| 1946 – 1952 | Protection and Indemnity Underwriting Syndicate |
| 1952 – 1955 | Thomas Miller P&I Ltd. |
| 1955 – 1961 | Protection and Indemnity Underwriting Syndicate |
| 1960 – 1970 | Marine Office of America Corporation |
| 1970 – 1975 | The Britannia Steam Ship Insurance Association Ltd. |
| 1975 – 1978 | American Steamship Owners Mutual Protection & Indemnity Association, Inc. |
| 1978 – 1982 | The London P&I Club |
| 1982 – 1995 | The Standard Club Ltd.[8] |

15.    Upon information and belief, each of the Policies contain a "pay to be paid" provision, making it an obligation for the defense costs to be expended and any damages satisfied before being reimbursed, in form and substance similar to the following:

> It is a condition precedent of a Member's right to recover from the funds of the Association in respect of any liabilities, costs or expenses that he shall first have discharged and paid the same out of funds belonging to him unconditionally and not by way of loan or otherwise.

---

[8] The Standard Club does not believe that the insurance it provides covers any of the asserted Asbestos Claims.

7

*The American Club By-Laws, Rules & List of Correspondents, 2005-06* (the "American Club Rules"), at Rule 1.4.28, available at http://www.american-club.com/files/files/0506.pdf.

16.    The "pay first" provision discussed above can work an injustice if the insured is in bankruptcy and insolvent.  If the Clubs do not assume the defense and pay the expenses and damages, and the insured does not have the resources to do so, some of the Clubs might assert the position that they do not have to pay under the policy because the insured has not paid first. Such a refusal to pay legitimate claims could leave injured seamen without insurance coverage. Some of the Policies and rules of the Club for particular years may provide an exception to the pay first rules for injured seaman.[9]  Some jurisdictions provide some relief for seamen as well. For example in England the Third Parties (Rights Against Insurers) Act 1930 provides a complicated method by which some seaman may obtain insurance proceeds on account of their injuries notwithstanding the Club having issued an indemnity policy. This statute was updated by the Third Parties (Rights Against Insurers) Act 2010 which appears applicable to claims where the debtor commenced insolvency proceedings on or after August 1, 2016, just one day after the Debtors filed these proceedings. In Louisiana, there is a right of injured parties to sue an insurance company directly.  L.S.A.-R.S. 22:1269 (2009).[10]  In New York there is a statute

---

[9] For example, the 2010 the Standard Club Rules provide:

> 6.16.1 Notwithstanding rule 6.15, where a member has failed to discharge a legal liability to pay damages or compensation for crew injury, illness or death, the club shall discharge or pay such claim on the member's behalf directly to such crewmember or dependent thereof.
> 6.16.2 There shall be no recovery unless the crewmember or dependent has no enforceable right of recovery against any other party and would otherwise be uncompensated.
> 6.16.3 Subject to rule 6.16.4, the amount payable by the club shall under no circumstances exceed the amount which the member would have been able to recover from the club under the rules and his terms of entry.

*See also, e.g.,* The American Club 2018 Rules, at Rule 29; West of England Club 2018 Rules, at Rule 10 of Part II; Gard (North America) Inc. 2018 Rules, at Rule 87(3).

[10] The Trustee believes that Louisiana is the only state involved with Asbestos Claims that allows direct actions against the Clubs.

allowing injured parties the right to recover from an insolvent debtor's insurance, N.Y. Ins. Law § 3420(a)(1), but maritime insurance is specifically excluded from these provisions. *See, e.g., Dicola v. American S.S. Owners Mut. Protection & Indem. Assoc.* (*In re Prudential Lines*), 158 F.3d 65 (2d Cir. 1998); *Ahmed v. Am. Steamship Mut. Protection & Indem. Assn.*, 640 F.2d 993, 995-96 (9th Cir. 1981) (citing N.Y. Ins. Law §§ 167(4), 112(2)(c), and 46(21)). Being a seaman is an inherently dangerous occupation, and presumably seamen anticipate that their injuries and diseases will be covered by shipowners' insurance. Is it really possible for an injured seaman to lose insurance coverage, from a consortium of ship-owners that banded together to provide insurance covering sickness, injury, and death of seaman, only for the seaman to lose any rights of recovery simply because its particular employer is insolvent?[11]

17. In order to convey the context of the requests being made by this Motion, it is worthwhile to discuss some background with respect to the attempts by the Trustee to reach a global settlement. The Trustee believes that there are numerous issues and risks to all parties in litigating the issues surrounding the Asbestos Claims. A list of some of the risks for all of the parties is as follows:

    a.   If no party defends the Asbestos Claims and the Insurance Companies do not assume the defense, there will likely be default judgments entered in favor of the claimants. Since default judgments are often in much higher amounts than actual litigation damages would have been, the Clubs would potentially be liable for very high judgments. While the Clubs may assert their rights to deny coverage to injured seaman who worked for an insolvent shipowner, the courts may determine that the insolvency of the shipowner does not relieve the Clubs and their members of their responsibilities to the seamen whose injuries they purport to insure. After all, the Clubs are just groups of shipowners that indemnify each other from risks they all face. Should the very employers of seaman be absolved of responsibility to provide payments to sick and injured seaman simply because the shipowner that employed them is unable to pay the

---

[11] While this particular issue may not have to be decided in conjunction with this motion, it is central to the resolution of many of the asbestos related issues in these Chapter 11 cases.

DOCS_NY:38326.5 42331/003

claims before seeking indemnity? If the Clubs are ultimately required to pay, the magnitude of the default judgments will likely exceed the damages that would be established by litigation which is defended. This is a large risk for the Clubs.

b.  The Reorganized Debtors have asserted that they do not have to defend under the Policies or pay damages to the claimants. This is a risk to the Trustee and the unsecured creditors, but also to the Reorganized Debtors.

c.  Given the magnitude of the Asbestos Claims asserted, even if only a fraction of the total were ultimately the subject of judgments, that amount would likely be an exponentially greater amount than the funds held in the Trust. The Trustee should not be required to pay pre-petition claims that are supposed to be covered by insurance. Further, the Trustee should not be required to pay amounts constituting Deductibles under the policies which would otherwise be unsecured claims. Also, the Trust might have to remain in existence for a long period of time during which Asbestos Claims are resolved in state or federal courts or even by arbitration or court proceeding in foreign jurisdictions. These are risks for the Trustee and the general unsecured creditors.

d.  Personal injury claims may not be liquidated to judgment in the bankruptcy court and therefore the defense costs may well include extensive litigation in other courts. 28 U.S.C. § 157(b)(5). This is a risk for the Trustee, the Reorganized Debtors, and the Clubs.

e.  The Reorganized Debtors may have to defend and pay the Asbestos Claims, subject to being reimbursed under the indemnity provisions of the Policies. This is a risk for the Reorganized Debtors.

f.  The risk for the injured seamen is that even if they are successful in the litigation of their claims, if no party pays the defense costs and damages, the Clubs might take the position that they are not required to pay the Claimants under the terms of the Policies. The Claimants could conceivably be left without insurance coverage. This would also involve significant time delay to resolve the issues regarding the obligation of the Clubs to pay, to the further detriment of the Claimants.

g.  The Trustee has limited resources in the Trust which are in no way sufficient to pay the ongoing costs of defending and paying this magnitude of Asbestos Claims. That approach could cause the administrative insolvency of the Trust which could quickly run out of cash availability. This is a risk for general unsecured creditors.

h.  If the Clubs assert their purported rights to require the Reorganized Debtors to pay first and seek indemnity under the policies, they might demand that not only that the costs of defense have to be paid first, but also that the full extent

DOCS_NY:38326.5 42331/003

of damages would have to be paid before the policies could be realized upon. This is a risk for the Reorganized Debtors or the Trustee.[12]

18.    Because of the existence of these significant issues and risks, among others, the situation seemed more easily resolved in a consensual manner rather than through litigation.  The Trustee decided to try to seek a global settlement that would provide a framework to settle all personal injury claims, including Asbestos Claims.  Accordingly, the Trustee and Reorganized Debtors worked together to try to reach a universal settlement that would avoid the cost, delay, and risks to all parties from litigating all of these issues and many others which would be involved in the assertion and defense of the Asbestos Claims and the determination of the responsibilities of the Clubs.

19.    At first, this effort realized success.  The Trustee and the Reorganized Debtors were able to reach an informal accord with a Club that insured personal injury claims that were not Asbestos Claims.  The Trustee and the Reorganized Debtors also contacted Plaintiffs' counsel and representatives of the remaining Insurance Companies to see if they would agree to a similar approach.  Unfortunately, no global accord has been reached, and although the Trustee and the Reorganized Debtors are still waiting for a response from most of the Clubs, enough time has passed that the Trustee has concluded that a different approach is needed.[13]  While progress has been made, the Trustee does not feel it appropriate to wait any longer to see if a practical approach will be possible without bringing the matters raised in this Motion to the Court.

---

[12] In paragraph 3.1(d) of the Disclosure statement the Reorganized Debtor estimates that deductibles on the Policies were the subject to a reserve in the amounts of $456,000, $292,000 and $352,000 for the years of 2016, 2015, and 2014, respectively.

[13] The possible continuation of the stay and the plan injunction as well as the appeals pending on dismissals of many insurance claims for lack of jurisdiction appear to be making settlement discussions more complicated.

11

## Relief Requested

20.    The GUC Trustee respectfully requests: (A) the Court enter an order enforcing the Plan, compelling the Reorganized Debtors, and not the GUC Trustee, to defend the Asbestos Claims; (B) that when the Court determines that the Reorganized Debtors must defend the Asbestos Claims, the Court enter an order lifting the automatic stay and the injunctions issued pursuant to the Plan to allow for the prosecution of the Asbestos Claims; and (C) that unless the Court enters an order determining the Reorganized Debtors are the party that is to defend against the Asbestos Claims, the Court should enter an order approving, but not directing, the right of the Trustee to make a business determination, under the facts of this case, to not defend the Asbestos Claims.  The Trustee also reserves the right to seek an order requiring the Reorganized Debtors to reimburse the GUC Trust for all costs and expenses incurred by the Trustee in working on the resolution of the Asbestos Claims, since the Plan provides for the Reorganized Debtors to provide the defense thereof.

## Basis for Relief

### A. *This Court Can Issue an Order Interpreting the Plan and Confirmation Order and Requiring Compliance Therewith*

21.    Paragraph 48 of the Confirmation Order provides that the Court

> may properly, and from and after the Effective Date shall, to the fullest extent as is legally permissible, retain exclusive jurisdiction over the Chapter 11 Cases, and all matters arising under, arising out of, or related to, the Chapter 11 Cases and the Plan [ ] as provided for in Article 12 of the Plan . . .

*Confirmation Order*, ¶ 48.  In turn, the Plan provides that

> the Bankruptcy Court shall retain the maximum legally permissible jurisdiction over all matters arising out of, and related to the Chapter 11 Cases, or the Plan pursuant to, and for purposes of, Bankruptcy Code sections 105(a) and 1142, including, without limitation, jurisdiction to . . . resolve any cases, Claims, controversies, suits, disputes, or causes of action that may arise in connection with the occurrence of the Effective Date, confirmation, interpretation, implementation

12

**or enforcement of the Plan** or the extent of any Person's obligations incurred in connection with or released under the Plan . . .

*Plan*, at § 12.1.7 (emphasis added). Accordingly, this Court has exclusive jurisdiction to enforce and interpret all parties' obligations under the Plan and Confirmation Order.

22.    Additionally, section 1142 of the Bankruptcy Code requires a debtor (or any entity organized for the purpose of carrying out a plan) to carry out the provisions of a plan and also permits a court to order performance of a plan:

> The court may direct the debtor and any other necessary party to execute and deliver or to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by a confirmed plan, and to perform any other act, including the satisfaction of any lien, that is necessary for the consummation of the plan.

11 U.S.C. § 1142(b).

23.    This Bankruptcy Code section "implicitly contemplates a creditor, shareholder, or other party affected by the plan moving for an order which triggers the court's authority to direct a recalcitrant debtor or other party to perform acts necessary to consummate the plan." *Harlow v. Palouse Producers, Inc.* (*In re Harlow Properties, Inc.*), 56 B.R. 794, 798 (9th Cir. B.A.P. 1985).

24.    Indeed, a bankruptcy court has "broad power" under section 1142(b) of the Bankruptcy Code to enforce the terms of a confirmed plan and to ensure that the plan is being implemented consistent with the terms of the plan and confirmation order. *See Gordon Sel-Way, Inc. v. United States* (*In re Gordon Sel-Way, Inc.*), 270 F.3d 280, 289 (6th Cir. 2001) ("several courts have held that 11 U.S.C. § 1142 provides bankruptcy courts with broad power to enforce the terms of a confirmed plan"); *see also Hillis Motors, Inc. v. Hawaii Auto. Dealers' Ass'n*, 997 F.2d 581, 581 n. 11 (9th Cir. 1993) ("Regardless of any plan provision, a bankruptcy court has statutory jurisdiction under 11 U.S.C. § 1142(b) to ensure that any act necessary for the

13

consummation of the plan is carried out and it has continuing responsibilities to satisfy itself that

the plan is being properly implemented."); 8 COLLIER ON BANKRUPTCY ¶ 1142.03[1] (16th ed.

2015) ("The scope of section 1142(b) is considerably broader than merely ministerial acts, such

as termination or creation of liens.  Acting pursuant to 1142(b), the court may issue any order

necessary for the implementation of the plan.").[14]

### B.    *The Plan Requires the Reorganized Debtors to Defend Against the Asbestos Claims*

25.    Section 6.5.3 of the Plan provides as follows:

> Notwithstanding anything to the contrary in the Disclosure Statement, the Plan,
> the Plan Documents, the Plan Supplement, the Confirmation Order, any other
> document related to any of the foregoing or any other order of the Bankruptcy
> Court, the insurance policies and agreements related to the indemnification of the
> Debtors with respect to alleged Claims related to asbestosis and asbestos-related
> malignancies (the **"Asbestos Policies"**) shall not be deemed to be rejected.  To the
> extent that any such Claims have not been satisfied or discharged in the Chapter
> 11 Cases, the Reorganized Debtors will comply with any valid, contractual
> obligations they may have under the Asbestos Policies, as applicable.

26.    Moreover, pursuant to section 8.1 of the Plan and section 18 of the Confirmation

Order, any contract that is not rejected is assumed by the Reorganized Debtors.  Accordingly,

read together, sections 6.5.3 and 8.1 of the Plan and section 18 of the Order establish that the

Reorganized Debtors assumed the Policies pursuant to section 365 of the Bankruptcy Code.

Thus, the Reorganized Debtors must comply with all obligations under the Policies, a fact that is

further reinforced by the recitation in section 6.5.3 of the Plan that "the Reorganized Debtors will

---

[14] Similarly, a bankruptcy court has authority under section 105(a) of the Bankruptcy Code to "issue any order,
process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11
U.S.C. § 105(a); *see also* FED. R. BANKR. P. 3020(d) ("Notwithstanding the entry of the order of confirmation, the
court may issue any other order necessary to administer the estate."); *In re Continental Airlines, Inc.*, 236 B.R. 318,
325-26 (Bankr. D. Del. 1999), *aff'd*, 279 F.3d 226 (3d Cir. 2002) ("It is axiomatic that a court possesses inherent
authority to enforce its own orders."); *Pioneer Liquidating Corp. v. United States Trustee* (*In re Consolidated
Pioneer Mortgage Entities*), 248 B.R. 368, 384 (9th Cir. B.A.P. 2000) ('the Code gives the bankruptcy court
authority to 'direct the debtor and any other necessary party' to perform any act necessary to consummate the plan
and 'to issue any order, process, or judgment that is necessary or appropriate to carry out the provisions' of the
Code.") (quoting 11 U.S.C. §§ 105(a) and 1142(b)).

14

comply with any valid, contractual obligations they may have under the Asbestos Policies." *See, e.g., NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 531-32 (1984); *In re Kopel*, 232 B.R. 57, 63-64 (Bankr. E.D.N.Y. 1999) (stating that a debtor "cannot simply retain the favorable and excise the burdensome provisions of an agreement"). Such obligations include the obligations to defend and to pay the cost of defense and the damages. It is clear that the Reorganized Debtors have assumed the obligation to defend against the Asbestos Claims, and the burden should not, and cannot, be shifted onto the GUC Trust.

27. The GUC Trust has limited resources which are in no way sufficient to pay the costs of defending the likely magnitude of Asbestos Claims. If the Clubs assert the full extent of their purported rights under the indemnities of the Policies, they might demand that both the costs of defense and the full extent of awarded damages be paid first before the Policies could be realized upon. From the inception of the GUC Trust, it would simply have been impossible for the GUC Trustee to defend against the over 800 Asbestos Claims; the amount it would cost to defend the Asbestos Claims greatly exceeds the mere $3 million with which the GUC Trust was seeded. Further, payment of the damages as well as the expenses might be required. Any reimbursement by the Clubs will be net of Deductibles and the Debtors' estimates in the Disclosure Statement that the deductibles could well exceed $1 million. If the Trustee is required to defend and pay first, that over one-third of the funds posted for the Trust under the Plan could be lost to Deductibles.

28. It is clear that the Reorganized Debtors did not contemplate that the GUC Trust would defend the Asbestos Claims. In addition to the fact that the Asbestos Claims are dealt with specifically in section 6.5.3 of the Plan, the Disclosure Statement would have been misleading if the Reorganized Debtors expected the GUC Trustee to be responsible for

15

defending over 800 Asbestos Claims. Section 7.6(g) of the Disclosure Statement states that the

GUC Trust's funds shall be used to pay all costs and expenses of the GUC Trust, including,

without limitation, the costs and expenses of the GUC Trustee in objecting to General Unsecured

Claims and pursuing the GUC Causes of Action. That section does not specifically disclose that

the Debtors contemplated that the GUC Trustee would be paying the huge amounts of expenses

and damages that would be incurred should the GUC Trustee be required to defend litigation

concerning the Asbestos Claims. That would have been a material lack of disclosure to voting

creditors relying on the Disclosure Statement if the Debtors intended for the Plan to be read to

require that the GUC Trustee is required to provide a defense costs and damages on the Asbestos

Claims and absorb deductibles.

29.     For example, section 3.1(d) of the Disclosure Statement provides the following

discussion of the asbestos litigation:

> Debtors Waterman Steamship Corporation ("**Waterman**") and Central Gulf
> Lines, Inc. ("**Central Gulf**") are named as defendants in lawsuits claiming
> damages related to asbestosis and asbestos-related malignancies. As of the
> Petition Date, Waterman was named as a defendant in ninety-eight (98) lawsuits
> and Central Gulf was named as defendant in thirty-seven (37) lawsuits in various
> state and federal courts arising from asbestosis claims. At least 812 proofs of
> claim have been filed in these Chapter 11 Cases against Waterman, Central Gulf,
> and Sulphur Carriers Inc. on behalf of alleged asbestosis claimants. Although
> insurance and the indemnification rights of Waterman against a third party
> mitigate the Debtors' exposure, the Debtors have established reserves based on
> an analysis performed in conjunction with outside counsel of the overall
> exposure arising from such claims. The Debtors' historical reserves for
> projected aggregate out-of-pocket liability with respect to insurance deductibles
> owing on account of these lawsuits as of December 31, 2016, December 31, 2015
> and December 31, 2014, were approximately $450,000, $292,000, and $352,000,
> respectively. The Debtors believe that these reserves represent the best available
> estimate for future aggregate out-of-pocket liability with respect to insurance
> deductibles on such claims.

*Disclosure Statement*, at § 3.1(d) (footnotes omitted).

16

30.    Nowhere in the Plan or Disclosure Statement did the Debtors describe these amounts as responsibilities of the GUC Trust.  Indeed, while recognizing that the Asbestos Claims were filed, the Debtors clearly did not take them into account when calculating distributions to beneficiaries of the GUC Trust; the Debtors only listed approximately $101 million of general unsecured claims in the Disclosure Statement, whereas the Asbestos Claims themselves totaled more than $640 million.  Further, an estimate of the costs of defending the Asbestos Claims is not provided in the Disclosure Statement at all, indicating either that the Debtors did not believe that this was an obligation of the GUC Trust or that the Debtors did not make relevant disclosures in the Disclosure Statement.  The Trustee assumes that the former must be the correct answer.  If the latter is correct, then the Disclosure Statement was hopelessly misleading. Even if the expenses were ultimately reimbursed by the Clubs it would still be difficult for the GUC Trust to have sufficient liquidity to pay expenses and damages before any reimbursement is made.  Also, the Plan is clear that the Reorganized Debtors have been assigned the rights and duties under the Policies.  If the Debtors had any inclination that the Trustee would be making claims against the Policy they would have provided for the Trustee to have such rights explicitly in the Plan.  They provided such a right, but they provided it to the Reorganized Debtors, not the Trustee.

31.    Section 6.5.1 of the Plan also states: "provided, further, that the Debtors or Reorganized Debtors, as applicable, shall have no obligation to pay any amounts in respect of prepetition deductibles."  Obviously, that provision would have been unnecessary if the Reorganized Debtors were not meant to be responsible for defending against Asbestos Claims. Section 6.5.1 of the Plan also provides that if an insurer agrees to settle a claim it must consult with the Reorganized Debtors.  It does not require consultation with the Trustee. Obviously, that

17

portion of the Plan would have been unnecessary if it were not intended that the Reorganized

Debtors would be handing the defense of Asbestos Claims.  Further, section 6.5.1 of the Plan

provides that if a Club pays a claim, the "Reorganized Debtor may direct the Voting and Claims

Agent to expunge such Claim from the claims Register…."  Again, there is no reference to the

Trustee.  This provision would have been unnecessary if it were not intended that the

Reorganized Debtors were responsible for the administration and defense of Asbestos Claims.

32.    The express terms of the Plan provide that the defense of the Asbestos Claims is

the responsibility of the Reorganized Debtors, and any other conclusion would make the

Disclosure Statement grossly misleading.  The Plan is clear.  The Disclosure Statement is clear.

The obligation to defend against the Asbestos Claims rests with the Reorganized Debtors.  The

Reorganized Debtors are refusing to comply with their obligations under the Plan, and this Court

should enter an Order enforcing the Plan, requiring the Reorganized Debtors to live up to their

obligations.

**C. If The Reorganized Debtors are Required to Defend the Asbestos Claims, the Automatic Stay and the Plan Injunction Should be Lifted to Allow the Claimants to Move Forward to Liquidate Their Asbestos Claims.**

33.    The provisions of Section 6.5.1 of the Plan provides that:

Holders of Allowed Claims that are covered by the Debtors' general liability insurance policies shall be entitled, in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed Claims, to proceed with the liquidation of such Allowed Claims, including any litigation pending as of the Petition Date and seek payment of such Claims from applicable Policies, to the extent permitted by applicable non-bankruptcy law (including the applicable Policies.

34.    This provision likely does not grant relief from stay for three reasons.  First,

Asbestos Claims are dealt with specifically by section 6.5.3 of the Plan, which does not deal with

stay or injunction issues at all.  Second, section 6.5.1 of the Plan only allows holders of

"Allowed Claims" covered by insurance to proceed.  There can be no Allowed Claim until the

18

underlying claim has been liquidated.  Third, the section of the Plan appears to only allow actions directly against Clubs and under the law of the involved states, and only Louisiana provides for direct actions against Clubs.

35.    The provisions of Section 6.5.2 Of the Plan provide:

…(iv) the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in Section 11.4 of the Plan, if and to the extent applicable, shall be deemed lifted without further order of the Bankruptcy Court, solely to permit: (A) claimants with valid claims covered by any of the Policies to proceed with their claims against such Policies.

36.    This provision is not effective in lifting the stay or injunction except in Louisiana where direct actions are allowed against insurance companies.  To the best of the Trustee's knowledge, no Asbestos Claims litigation is currently proceeding forward, except possibly in Louisiana.  Once it is decided that the Reorganized Debtors will defend the litigation there is no reason to have a stay or injunction in effect and the Claimants should be allowed to move forward.  Accordingly, to the extent the Court enters an order determining that the Reorganized Debtors bear the responsibility to defend against the Asbestos Claims, the Court should also clarify in such order that the automatic stay and plan injunctions are lifted thereto.

### D. The Court Should Approve, But Not Direct,  the Right of the Trustee to Make A Business Determination, Under the Facts of This Case, To Not Defend the Asbestos Claims

37.    The Plan provides that the Reorganized Debtors would be defending personal injury claims, including the Asbestos Claims.  The Disclosure Statement would be woefully misleading if it were to turn out that it is the Trustee who is required to defend; the payment of the costs and the damages could run well into nine figures.  Even if there could be an insurance reimbursement, it would be difficult for the Trustee to pay over $100,000,000 or more from the mere $3 million provided to fund the trust.  Further, the Trustee would be at risk of being required to absorb the Deductibles which, by the Debtors' estimates, could exceed one-third of

19

the GUC Fund.  Since the amount to be paid to general unsecured creditors under the Plan is so small, it does not seem to be prudent for the Trustee to undertake the defense of the Asbestos Claims should the Court find that it is the Trustee's responsibility to do so.

38.    In the event that the Court does not grant the relief requested herein, the Trustee seeks an order from this Court approving, but not directing, the business decision of the Trustee to not defend the Asbestos Claims.  In the event the Reorganized Debtors are not found to be responsible for the Asbestos Claims, it might not be prudent for the Trustee to do so.  This may lead to default judgments in large amounts in favor of the Claimants, but hopefully the Clubs will defend and satisfy the claims.  If the Reorganized Debtors are not required to defend, and the Clubs do not provide the defense, it might still be better for the Trustee to not defend.  Any claims ultimately allowed will be required to pursue insurance before receiving a dividend the estate.  *See* Plan, at §6.5.1.  To the extent the effort to recover from the insurance fails, the Claimants would be unsecured creditors of the estate.  Given the Debtors' projections of the dividend to general unsecured creditors it seems prudent for the trustee to consider not engaging further in the defense of these claims.

39.    The Clubs have the right to provide the defense to the Asbestos Claims.  Presumably they would do so, and if not they will be a great risk of ultimately having to pay enormous default judgments.  The right of the Trustee to exercise his discretion not to provide a defense to the Asbestos Claims should be recognized and approved by the Court.

**E. The Liquidating Trustee Reserves the Right to Seek a Determination that the Reorganized Debtors Should Replenish the Trust for All Costs and Expenses Incurred in Working on the Resolution of the Asbestos Claim Issues**

40.    The Plan provides for the Reorganized Debtors to defend personal injury claims, including Asbestos Claims.  The Disclosure Statement can only be read to assure the general unsecured creditors of this fact.  The Trustee has incurred significant costs and expenses working

20

on the issues related to the Asbestos Claims, much of which would have been unnecessary if the Reorganized Debtors simply assumed those responsibilities that Plan and the Disclosure Statement required.  The Reorganized Debtors were to post $3 million into the Trust, which it did.  However, in not accepting its responsibilities under the Plan, it has caused the Trustee and his professionals to engage in significant efforts to resolve issues regarding the Asbestos Claims.

41.    The Trustee has expended considerable effort trying to find a global solution to the problems raised in this Motion.  Trustee's counsel, along with the Reorganized Debtors' counsel, has tried to reach an accord with the Clubs.  The Trustee's counsel, along with the Reorganized Debtors' counsel, have approached the Plaintiffs' counsel to see if a global resolution could be reached.  While that was accomplished with the cooperation of the Reorganized Debtors' counsel, the Trustee's role in the process would have been substantially reduced had the Reorganized Debtors simply accepted their own responsibilities based on the language in the Plan.  Any funds expended by the Trustee because of the failure of the Reorganized Debtors to perform their obligations under the Plan should be paid by the Reorganized Debtors to the Trust so that the Trust and its beneficiaries will receive what the Plan provided for them. The Reorganized Debtors should not be allowed to propose to fund a trust for creditors with a set sum contributed and then reduce the benefit to the general unsecured creditors by refusing to fulfill their clear obligations under the Plan. The Trustee reserves the right to seek an order to require the Reorganized Debtors to make the Trust whole consistent with the Court's power to enforce the Plan.

## **Notice**

42.    The GUC Trustee has caused notice of this motion to be provided by electronic mail, facsimile, regular or overnight mail, and/or hand delivery to: (i) the U.S. Trustee; (ii) the

DOCS_NY:38326.5 42331/003

Reorganized Debtors; (iii) all parties that have filed a request to receive service of pursuant to

Bankruptcy Rule 2002; and (iv) all other parties on the master service list prepared and

maintained pursuant to the *Order Establishing Certain Notice, Case Management, and

Administrative Procedures* [ECF No. 178].  The GUC Trustee submits that, in light of the nature

of the relief requested, no other or further notice need be given.

**No Prior Request**

43.    No prior request for the relief sought in this Motion has been made to this or any

other court.

**Conclusion**

WHEREFORE the GUC Trustee respectfully requests the entry of the Order,

substantially in the form annexed hereto as **Exhibit A**, enforcing the Plan and compelling the

Reorganized Debtors, and not the GUC Trustee, to defend the Asbestos Claims, authorizing but

not directing the Trustee to exercise its discretion to not provide a defense, and for such other

and further relief as the Court deems appropriate under the circumstances.

Dated:  November 28, 2018
        New York, New York          PACHULSKI STANG ZIEHL & JONES LLP

                                    */s/ Richard E. Mikels*
                                    Robert J. Feinstein
                                    Richard E. Mikels
                                    Bradford J. Sandler
                                    Steven W. Golden
                                    780 Third Avenue, 34th Floor
                                    New York, NY 10017
                                    Telephone: (212) 561-7700
                                    Facsimile:  (212) 561-7777
                                    Email:    rfeinstein@pszjlaw.com
                                              rmikels@pszjlaw.com
                                              bsandler@pszjlaw.com
                                              sgolden@pszjlaw.com

DOCS_NY:38326.5 42331/003

# **EXHIBIT A**

## **Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
                                                  :
In re                                             :          **Chapter 11**
                                                  :
**INTERNATIONAL SHIPHOLDING**                     :          **Case No. 16-12220 (SMB)**
**CORPORATION., et al.[1]**                       :
                                                  :          **Jointly Administered**
                                                  :
                     **Reorganized Debtors.**     :
-----------------------------------------------------------------x

### ORDER GRANTING MOTION OF THE GUC TRUSTEE TO ENFORCE THE PLAN AND CONFIRMATION ORDER WITH RESPECT TO THE REORGANIZED DEBTORS' RESPONSIBILITY TO DEFEND ASBESTOS CLAIMS, RELIEVING STAY AND INJUNCTION, AND APPROVING THE GUC TRUSTEE'S RIGHT NOT TO DEFEND ASBESTOS CLAIMS

Upon the *Motion of the GUC Trustee to Enforce the Plan and Confirmation Order With Respect to the Reorganized Debtors' Responsibility to Defend Asbestos Claims, Relieving Stay and Injunction, Approving the GUC Trustee's Right Not to Defend Asbestos Claims* (the "Motion"),[2] pursuant to Bankruptcy Code sections 105 and 1142; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Plan; and consideration of the Motion and the relief requested therein being a core proceeding in accordance with 28 U.S.C. § 157(b)(2); and venue being proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion being adequate and appropriate under the particular circumstances; and the Court having found

---

[1] The Reorganized Debtors in these cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, are: International Shipholding Corporation (9662); Central Gulf Lines, Inc. (8979); Coastal Carriers, Inc. (6278); Waterman Steamship Corporation (0640); N.W. Johnsen & Co., Inc. (8006); Tower LLC (6755); Frascati Shops, Inc. (7875); Gulf South Shipping PTE LTD (8628); and LCI Shipholdings, Inc. (8094). The service address for each of the above Reorganized Debtors is 2200 Eller Drive, P.O. Box 13038, Fort Lauderdale, FL 33316.

[2] All capitalized terms not otherwise defined herein are to be given the meanings ascribed to them in the Motion.

and determined the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is hereby **ORDERED**:

1.      Pursuant to the terms of the Plan, the Reorganized Debtors (and not the GUC Trust or GUC Trustee) shall defend against the Asbestos Claims.  To the extent the Reorganized Debtors pay any amounts on account of Asbestos Claims, the Reorganized Debtors may seek reimbursement of such amounts from the Clubs, to the extent the Policies permit, but shall not be entitled to reimbursement or indemnification from the GUC Trust.

2.      For the avoidance of doubt, pursuant to the terms of the Plan, neither the GUC Trustee nor the GUC Trust have the obligations described in paragraph 1 above, including but not limited to the obligation to defend against the Asbestos Claims.  To the extent that an Asbestos Claim is liquidated in a court of competent jurisdiction and, when liquidated, the amount of the Asbestos Claim exceeds the amount covered by one or more Policies, the amount of such liquidated Asbestos Claim not covered by one or more Policies shall be an Allowed General Unsecured Claim, entitled to its *pro rata* distribution from the GUC Trust as and when distribution with other general unsecured claims in accordance with the terms of the Plan.

3.      The automatic stay and any post-confirmation injunctions contained in the Plan are hereby lifted to permit the Asbestos Claimants to liquidate the Asbestos Claims.

4.      The Court retains jurisdiction with respect to all matters arising from or related to the interpretation or implementation of this order.

New York, New York
Dated: _____, 2018

_____
Honorable Stuart M. Bernstein
United States Bankruptcy Judge

2