```
UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X
In re:

INTERNATIONAL SHIPHOLDING
CORPORATION, et al.
                          Debtors.
---------------------------------------------------------------------X
BOARD OF TRUSTEES OF THE MEBA PENSION
TRUST – DEFINED BENEFIT PLAN; BOARD OF
TRUSTEES OF THE MASTERS, MATES & PILOTS
PENSION PLAN; and BOARD OF TRUSTEES OF THE
MASTERS, MATES & PILOTS ADJUSTABLE
PENSION PLAN,


                          Plaintiffs,

             v.

CG RAILWAY, LLC, d/b/a CG RAILWAY, INC; BULK
SHIPHOLDING, INC.; EAST GULF SHIPHOLDING,
INC.; JOHN DOE CORPORATIONS "1" THROUGH
"100" and OTHER JOHN DOE ENTITIES "1" THROUGH
"100,"

                          Defendants.
---------------------------------------------------------------------X
```

Chapter 11
Case No. 16-12220 (SMB)

Jointly Administered


Adversary Proceeding
No. _____

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiffs the MEBA Pension Trust – Defined Benefit Pension Plan (the "MEBA Pension Plan"), the Masters, Mates & Pilots Pension Plan (the "MM&P Pension Plan") and the Masters, Mates & Pilots Adjustable Pension Plan (the "MM&P APP" and collectively, the "Pension Plans"), by their respective Boards of Trustees, state as follows for their Complaint against Defendants CG Railway, LLC ("CG Railway"), Bulk Shipholding, Inc. ("Bulk Shipholding"), East Gulf Shipholding, Inc. ("East Gulf"), John Doe Corporations "1" through "100" and Other John Doe Entities "1" through "100" (collectively, the "Unknown Defendants" and, together with CG Railway, Bulk Shipholding and East Gulf, the "Control Group Defendants"):

**Nature of the Action**

1.      This is an adversary proceeding governed by the provisions of Part VII of the Federal Rules of Bankruptcy Procedure and the Local Rules of this Court.  The Pension Plans entered settlements with Debtors International Shipholding Corporation, Waterman Steamship Corporation, Sulphur Carriers Inc. and Central Gulf Lines, Inc. to settle priority and administrative expense claims filed against the Debtors (the "Bankruptcy Claims Settlements") in *In re: International Shipholding Corporation, et al.*, Case No. 16-12220 (the "Bankruptcy Proceeding").  The Bankruptcy Claims Settlements provided that, in consideration of a lump-sum payment from Debtors, the Pension Plans agreed: (i) to convert their filed priority and administrative claims to general unsecured claims; and (ii) that they would not assert any additional priority or administrative expense claims relating to unpaid contributions or withdrawal liability in the Bankruptcy Proceeding.

2.      The Debtors had a complete withdrawal from each of the Pension Plans.  The Pension Plans assessed withdrawal liability against the Control Group Defendants in the total amount of $58,856,388.  In response, non-debtor Defendants CG Railway, Bulk Shipholding and East Gulf incorrectly asserted that the withdrawal liability assessed by the Pension Plans was released under the Bankruptcy Claims Settlements.  Accordingly, the Pension Plans now seek a declaratory judgment that their withdrawal liability claims against non-debtor affiliates, including the Control Group Defendants, were not released under the Bankruptcy Claims Settlements.

**Jurisdiction and Venue**

3.      The Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334, as well as Section AA of the *Findings of Fact, Conclusions of Law and Order Confirming First*

*Amended Modified Joint Chapter 11 Plan of Reorganization*[1] and Section 12 of the *First Amended Modified Joint Chapter 11 Plan of Reorganization*.[2] In addition, there exists diversity of citizenship jurisdiction pursuant to 28 U.S.C. § 1332(a) because of the parties' diversity of citizenship and because the amount in controversy, exclusive of costs, exceeds $75,000.

4. This action is a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

5. Venue lies in this Court under 28 U.S.C. § 1409.

6. Personal jurisdiction exists over Defendant pursuant to Bankruptcy Rule 7004(f).

## Parties

7. The MEBA Plan is a joint labor-management benefit plan established pursuant to LMRA § 302(c), 29 U.S.C. § 186(c), and a multiemployer benefit plans within the meaning of ERISA §§ 3(3) and 3(37), 29 U.S.C. §§ 1002(3) and 1002(37).

8. The MM&P Plan is a joint labor-management benefit plan established pursuant to LMRA § 302(c), 29 U.S.C. § 186(c), and a multiemployer benefit plan within the meaning of ERISA §§ 3(3) and 3(37), 29 U.S.C. §§ 1002(3) and 1002(37).

9. The APP is a joint labor-management benefit plan established pursuant to LMRA § 302(c), 29 U.S.C. § 186(c), and a multiemployer benefit plans within the meaning of ERISA §§ 3(3) and 3(37), 29 U.S.C. §§ 1002(3) and 1002(37).

10. Upon information and belief, Defendant CG Railway is a corporation organized under the laws of Delaware. CG Railway's principal place of business is located at 601 Poydras Street, Suite 1625, New Orleans, Louisiana 70130. CG Railway is a non-debtor subsidiary of Debtor International Shipholding Corporation ("ISH").

---

[1] See Bankruptcy Proceeding, Doc. No. 671, p. 11 of 36.
[2] See Bankruptcy Proceeding, Doc. No. 645, pp. 63-64 of 139.

11. Upon information and belief, Defendant Bulk Shipholding was a corporation organized under the laws of the Marshall Islands and dissolved in April 2017. Bulk Shipholding was a non-debtor subsidiary of ISH.

12. Upon information and belief, Defendant East Gulf was a corporation organized under the laws of the Marshall Islands and dissolved in April 2017. East Gulf was a non-debtor subsidiary of ISH.

13. Upon information and belief, Defendants CG Railway, Bulk Shipholding and East Gulf are trades or businesses under common control with Debtors Waterman Steamship Corporation, Sulphur Carriers Inc. and Central Gulf Lines, Inc. at the time of Debtors' withdrawal from the Pension Plans pursuant to ERISA Section 4001(b)(1), 29 U.S.C. § 1301(b)(1).

14. John Doe Corporations "1" through "100" are those yet unknown corporations that were under common control with Debtors Waterman Steamship Corporation, Sulphur Carriers Inc. or Central Gulf Lines, Inc. at the time of Debtors' withdrawal from the Pension Plans.

15. Other John Doe Entities "1" through "100" are those yet unknown entities that were under common control with Debtors Waterman Steamship Corporation, Sulphur Carriers Inc. or Central Gulf Lines, Inc. at the time of Debtors' withdrawal from the Pension Plans.

16. The Pension Plans may assess withdrawal liability against other entities if they learn of any other non-debtor trades or businesses under common control with Debtors.

**Background Facts**

17. The Debtors employed unionized deck and engineering officers (the "Licensed Officers") who were responsible for operating, navigating and maintaining Debtors' vessels.

4

There are two different unions that represented the Licensed Officers. The International Organization of Masters Mates & Pilots ("MM&P") represented the Licensed Deck officers that were employed on certain of the Debtors vessels. These officers included the licensed captains and mates who navigated vessels and who ensured cargo operations were performed safely and efficiently. The Marine Engineers' Beneficial Association ("MEBA") represented the licensed engineering officers who operated, maintained and repaired the ships' propulsion plant and all other auxiliary machinery and equipment on the vessels.

18. Debtors Waterman Steamship Corporation, Sulphur Carriers Inc., and Central Gulf Lines, Inc. (collectively referred to as the "Signatory Debtors") were parties to collective bargaining agreements ("CBAs") with the MM&P and MEBA covering the Licensed Officers.

19. Under the CBAs with the MM&P and MEBA, the Debtors were required to make monthly contributions on behalf of the Licensed Officers to various MM&P and MEBA employee benefit plans (collectively, the "Licensed Officer Plans"),[3] including each of the Plaintiff Pension Plans.

20. In January 2016, the Debtors began falling behind on their payments of contributions to the Licensed Officer Plans, including the contributions owed to the Pension Plans.

21. The MM&P and MEBA unions worked with the Debtors throughout March 2016 to arrange a payment schedule in an effort to avoid them having to file for bankruptcy and instead be able to pay the contributions due.

---

[3] The Licensed Officer Plans include the MM&P Benefit Plans (consisting of Plaintiffs MM&P Pension Plan and MM&P Adjustable Pension Plan, as well as non-parties MM&P Health and Benefit Plan, MM&P Vacation Plan, MM&P Individual Retirement Account Plan, MM&P Maritime Advancement, Training, Education, and Safety Program, MM&P Joint Employment Committee, and Maritime Institute for Research and Industrial Development) and the MEBA Benefit Plans (consisting of Plaintiff MEBA Pension Trust – Defined Benefit Plan, as well as non-parties MEBA Medical and Benefit Plan, MEBA Pension Trust – 401(k) Plan, MEBA Pension Trust – Money Purchase Benefit Plan, MEBA Training Plan, MEBA Joint Employment Committee, MEBA Vacation Plan and American Maritime Congress).

5

22.  The Debtors were unable to make the requisite payments required in the payment schedules that were negotiated with MM&P and MEBA. On August 1, 2016 (the "Petition Date"), the Debtors filed voluntary petitions for relief in the Bankruptcy Proceeding under Chapter 11 of the Bankruptcy Code.

### The Licensed Officer Plans' Bankruptcy Claims

23.  Although the Debtors were not paying contributions due to the Licensed Officer Plans, they were keeping up to date on the payments to the benefit plans covering its executives and non-union employees. Therefore, at the time of the Petition Date, very little was owed to those non-union plans, while millions of dollars was owed to the Licensed Officer Plans.

24.  On December 15, 2016, the Licensed Officer Plans, including the Pension Plans, filed proofs of claim against each of the 3 Signatory Debtors in the Bankruptcy Proceeding for their failure to pay monthly contributions and reimbursable expenses for the period January 2016 through July 2016.[4] These proofs of claim included priority claims for delinquent contributions owed to the Licensed Officer Plans for services rendered less than 180 days prior to the Petition Date pursuant to 11 U.S.C. § 507(a)(5) (hereinafter, the "Priority Claims"). The Priority Claims were filed in the following amounts:

| Signatory Debtor | MM&P Benefit Funds Priority Claims | MEBA Benefit Funds Priority Claims |
|---|---:|---:|
| Central Gulf Lines, Inc. | $1,034,555.22 | $746,545.07 |
| Waterman Steamship Corp. | $407,890.24 | $686,978.22 |
| Sulphur Carriers, Inc. | $556,311.89 | $670,812.23 |
| **TOTAL PRIORITY CLAIMS** | **$1,998,757.35** | **$2,104,335.52** |

25.  Thus, the total Priority Claims filed by the Licensed Officer Plans for delinquent contributions totaled $4,103,092.87.

---

[4] See Bankruptcy Proceeding Claim Nos. 1322, 1325, 1332, 1333, 1338, and 1345.

26. On December 15, 2016, the Plaintiff Pension Plans also each filed separate proof of claims against all Debtors[5] for contingent withdrawal liability in the event that Debtors' reorganization and/or sale of assets could trigger a withdrawal from the Pension Plans pursuant to ERISA Section 4203, 29 U.S.C. § 1383 (hereinafter, the "<u>Withdrawal Liability Proofs of Claim</u>").

27. Since the Withdrawal Liability Proofs of Claim were filed as a prophylactic measure based on a contingency—the Debtors' withdrawal from the Pension Plans—that had not yet occurred, the amounts of the Withdrawal Liability Proofs of Claim were estimated by the Plans' actuaries based on the data available at the time the claims were filed. The Withdrawal Liability Proofs of Claim each stated that the Pension Plans reserved their rights to amend those claims once a withdrawal event occurred.

28. The MEBA Pension Plan filed its contingent withdrawal liability claim in the estimated amount of **$21,324,244**, the MM&P Pension Plan filed its contingent withdrawal liability claim in the estimated amount of **$34,688,054**, and the MM&P APP filed its contingent withdrawal liability claim in the estimated amount of **$70,204**.

29. The Withdrawal Liability Proofs of Claim also each stated that the Pension Plans reserved their rights to seek administrative priority for all or part of their withdrawal liability claims against all Debtors pursuant to 11 U.S.C. §§ 503, 507.

30. On December 16, 2016, two of the Licensed Officer Plans also filed motions in the Bankruptcy Proceeding seeking administrative priority for unpaid retiree benefits pursuant to 11 U.S.C. § 1114(e). Specifically, the MEBA Medical and Benefit Plan filed an administrative

---

[5] See Bankruptcy Proceeding Claim Nos. 1326, 1331 and 1336.

7

claim in the amount of **$673,129.55**[6] and the MM&P Health and Benefit Plan filed an administrative claim in the amount of **$879,627.38** (collectively, the "<u>Administrative Claims</u>").[7]

31. From December 2016 through February 20, 2017, the Debtors and the Licensed Officer Plans engaged in discussions to resolve the Priority Claims and Administrative Claims filed by the Licensed Officer Plans. During this period, the Debtors repeatedly represented to the Licensed Officer Plans that there were insufficient assets to pay the Licensed Officer Plans' Priority Claims and Administrative Claims in full.

32. For example, on December 29, 2016, the Debtors filed the *First Amended Joint Chapter 11 Plan of Reorganization for International Shipholding Corporation and its Affiliated Debtors*[8] and the *Disclosure Statement for First Amended Joint Chapter 11 Plan of Reorganization for International Shipholding Corporation and Its Affiliated Debtors*[9] (the "Disclosure Statement"). The Disclosure Statement set forth the Debtors' estimates of projected claim amounts and estimated recoveries by each class of claimants. With regard to "Other Priority Claims," which Debtors estimated to total $7,620,435.10, the Debtors estimated that those claims would only yield a 48% recovery.

33. On January 4, 2017, the Licensed Officer Plans filed a *Reservation of Rights to Object to the Plan*[10] which explicitly raised the concern that a 48% recovery would not comply with the Plan of Reorganization's requirement to pay 100% of the Allowed Other Priority Claims.

---

[6] See Bankruptcy Proceeding Doc. No. 447.
[7] See Bankruptcy Proceeding Doc. No. 448.
[8] See Bankruptcy Proceeding Doc. No. 485.
[9] See Bankruptcy Proceeding Doc. No. 486, pp. 19 of 215.
[10] See Bankruptcy Proceeding Doc. No.

8

34.     The day after the Licensed Officer Plans raised this issue in their *Reservation of Rights to Object to the Plan,* the Debtors filed another version of the Disclosure Statement[11] which reduced the estimated amount of "Other Priority Claims" to $5,297,545.20 but provided those claims would yield a 100% recovery. Debtors provided no explanation for the $2.3 million reduction in estimated "Other Priority Claims" to achieve a 100% recovery to priority claimants.

35.     The Licensed Officer Plans raised this discrepancy with the Bankruptcy Court in their reply brief in support of their administrative claims motion.[12]

36.     On January 23, 2017, the Licensed Officer Plans provided a summary of the Priority Claims and Administrative Claims filed by the different benefit plans and indicated that some of the plans intended to file additional administrative claims in the amount of $73,896.26 for unpaid post-petition contributions. The Licensed Officer Plans also informed the Debtors that they had potential administrative claims for the post-petition portion of any withdrawal liability owed to the Pension Plans.

37.     Even after filing the second version of the Disclosure Statement, Debtors' counsel continued to state that Debtors had insufficient assets to pay 100% of the priority claims and administrative claims filed by the Licensed Officer Plans. Debtors' counsel explained that if the Licensed Officer Plans did not accept a reduced amount in satisfaction of their priority and administrative claims, the Debtors would be forced into liquidation, in which case, the Licensed Officer Plans would receive no recovery for their claims.

38.     The Licensed Officer Plans were therefore faced with a choice: insist that the Priority Claims and Administrative Claims, as well as the not-yet-filed additional administrative

---

[11] See Bankruptcy Proceeding Doc. No. 507, pp. 16 of 112.
[12] See Bankruptcy Proceeding Doc. No. 598, pp. 2 of 9, n.2.

expense claims, are paid at 100% but risk no recovery if Debtors' liquidate, or agree to a reduced recovery in partial satisfaction of the Priority Claims and Administrative Claims.

39.     After reviewing additional documents and information provided by Debtors concerning Debtors' ability to pay the Priority Claims and Administrative Claims, the Licensed Officer Plans agreed to a reduction of their claims.

## The Bankruptcy Claims Settlements

40.     On January 17, 2017, the MEBA Benefit Plans (including Plaintiff MEBA Pension Plan) entered a settlement letter with the Debtors which provided that, in consideration for a lump-sum payment in the amount of $1,319,253.50 from Debtors, the MEBA Benefit Plans agreed: (i) to convert their filed priority and administrative claims to general unsecured claims; and (ii) that they would not assert any additional priority or administrative expense claims relating to unpaid contributions or withdrawal liability.

41.     On January 20, 2017, the MM&P Benefit Plans (including Plaintiffs MM&P Pension Plan and MM&P APP) entered a settlement letter with the Debtors which provided that, in consideration for a lump-sum payment in the amount of $1,224,258.30 from Debtors, the MM&P Benefit Plans agreed: (i) to convert their filed priority and administrative claims to general unsecured claims; and (ii) that they would not assert any additional priority or administrative expense claims relating to unpaid contributions or withdrawal liability.

42.     These settlement agreements (collectively, the "Bankruptcy Claims Settlements") contain the same release language:

> [The Licensed Officer Plans] agree not to assert **any priority or administrative claims**, on their behalf or on behalf of any plan participants or any other person or entity, against ISH, Reorganized ISH, or Seacor Capital Corp., or any of the foregoing's respective past, present, or future subsidiaries or affiliates, relating to unpaid contributions to the [Licensed Officer Plans] owed through the date of this letter, or any withdrawal liability incurred by ISH or any other past or present

10

subsidiary or affiliate thereof… Additionally, nothing herein shall be construed to prohibit the [Pension Plans] from pursuing a general unsecured claim against the Debtors in the Bankruptcy Proceeding for any contingent, estimated, or actual withdrawal liability incurred by ISH...

(emphasis added.)

43. The Bankruptcy Claims Settlements released the Debtors, the Reorganized Debtors, Seacor Capital Corp., and their respective subsidiaries and affiliates, from priority and administrative claims that could be brought in the Bankruptcy Proceeding, in exchange for lump-sum payments of reduced amounts of the Priority Claims and Administrative Claims filed by the Licensed Officer Plans.

44. The Bankruptcy Claims Settlements therefore only addressed claims that could be brought in a bankruptcy proceeding.

45. With respect to the Pension Plans' withdrawal liability claims, the Bankruptcy Claims Settlements released the Debtors, the Reorganized Debtors, Seacor Capital Corp., and their respective subsidiaries and affiliates, from priority and administrative claims for withdrawal liability that the Pension Plans could bring in the Bankruptcy Proceeding.

46. As further support that the Bankruptcy Claims Settlements only addressed bankruptcy claims, the agreement separately carved out the Pension Plans' rights to bring general unsecured claims for withdrawal liability in the Bankruptcy Proceeding.

47. Thus, the Bankruptcy Claims Settlements only addressed three types of withdrawal liability claims – priority, administrative and general unsecured – that can only be brought in a bankruptcy proceeding.

48. The Bankruptcy Court Settlements did not release the Pension Plans' non-bankruptcy claims (*i.e.*, claims that are not administrative or priority claims) against non-debtors such as the Control Group Defendants.

11

49. The Debtors and the Licensed Officer Plans never discussed the Pension Plans' non-bankruptcy claims prior to entering the Bankruptcy Court Settlements.

50. The Debtors never indicated that they intended the scope of the release in the Bankruptcy Court Settlements to extend beyond the Licensed Officer Plans' priority and administrative claims.

51. Counsel for the Debtors never mentioned that they represented Defendants CG Railway, Bulk Shipholding, or East Gulf prior to entering the Bankruptcy Court Settlements.

52. On February 10, 2017, counsel for the Debtors provided first drafts of the Bankruptcy Court Settlements to counsel for the Licensed Officer Plans and described the draft settlement letters as "the settlement letters with respect to each of the plans administrative and priority claims."

### The Pension Plans' Withdrawal Liability Assessments

53. Each of the Pension Plans' Boards of Trustees determined that Debtors' triggered a complete withdrawal from each of the Pension Plans within the meaning of ERISA Section 4203, 29 U.S.C. § 1383.

54. The Pension Plans assessed withdrawal liability against three non-debtor affiliates of Debtors – Defendants CG Railway, Bulk Shipholding, Inc., and East Gulf Shipholding, Inc. – because those entities were trades or businesses under common control with Debtors at the time of Debtors' withdrawal. The aggregate withdrawal liability totaled $58,856,388 (the "Withdrawal Liability"). By letters dated March 2, 2018 and March 8, 2018, the Pension Plans sent notices and demand for payment of the Withdrawal Liability (the "Notice and Demand") to Defendants CG Railway, Bulk Shipholding, Inc., and East Gulf Shipholding, Inc.

55. On or about April 19, 2018, counsel for the Debtors indicated that they also represented Defendants CG Railway, Bulk Shipholding, Inc., and East Gulf Shipholding, Inc. and that they would accept service of the Notice and Demand on their clients' behalf.

56. By letter dated May 25, 2018, Defendants CG Railway, Bulk Shipholding, Inc., and East Gulf Shipholding, Inc. responded to the Notice and Demand and denied liability based on the incorrect assertion that "all issues relating to any withdrawal liability of [Debtors], or its controlled group members, were fully and finally resolved in a settlement agreement negotiated and agreed to by the Plans and approved by the bankruptcy court in the order confirming the plan during [Debtors'] bankruptcy."

57. Defendants also asserted that Bulk Shipholding, Inc., and East Gulf Shipholding, Inc. were foreign shell companies without assets.

## Count I
## Claim for Declaratory Judgment

58. Plaintiffs incorporate Paragraphs 1-57 as if fully restated herein.

59. Defendants CG Railway, Bulk Shipholding, Inc., and East Gulf Shipholding, Inc. incorrectly assert that the Withdrawal Liability assessed by the Pension Plans was released against non-debtors under the Bankruptcy Claims Settlements.

60. An actual and justifiable controversy exists between the Pension Plans and Defendants regarding whether Defendants were released from the Pension Plans' Withdrawal Liability claims by the Bankruptcy Claims Settlement.

61. The Pension Plans are entitled to a declaratory judgment declaring that the Withdrawal Liability claims against non-debtors, including Defendants, were not released under the Bankruptcy Claims Settlements.

**WHEREFORE,** the Pension Plans respectfully request that the Court enter a declaration and final judgment in its favor:

   a. Declaring that the Withdrawal Liability claims against non-debtor Defendant CG Railway were not released under the Bankruptcy Claims Settlements; and

   b. Declaring that the Withdrawal Liability claims against non-debtor Defendant Bulk Shipholding were not released under the Bankruptcy Claims Settlements; and

   c. Declaring that the Withdrawal Liability claims against non-debtor Defendant East Gulf were not released under the Bankruptcy Claims Settlements; and

   d. Declaring that the Withdrawal Liability claims against the Unknown Defendants were not released under the Bankruptcy Claims Settlements; and

   e. Declaring that the Withdrawal Liability claims against any other non-debtor affiliates were not released under the Bankruptcy Claims Settlements; and

   b. Awarding Plaintiffs such other relief as this Court deems just and proper.

| | |
|---|---|
| Dated:  January 28, 2019 | */s/ Christopher M. Leins*  <br>Barry S. Slevin <br>Jeffrey S. Swyers (*pro hac vice*) <br>Christopher M. Leins (*pro hac vice*) <br>Slevin & Hart, P.C. <br>1625 Massachusetts Ave., N.W., Suite 450 <br>Washington, DC  20036 <br>(202) 797-8700 <br>Fax:  (202) 234-8231 <br>bslevin@slevinhart.com <br>jswyers@slevinhart.com <br>cleins@slevinhart.com <br>*Attorneys for Plaintiffs* |

20700265v1